Jordan Fletcher
FLETCHER LAW PLLC
246 Fifth Avenue, 3rd Floor
New York, NY 10001
Tel: (212) 320-8945
Fax: (347) 983-0046
jordan@fletcherlaw.co

*Attorneys for Defendant and Counterclaim Plaintiff*
*Juan Henriquez*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| CITY OF NEW YORK, by and through the FDNY, and the FDNY FOUNDATION, INC., | : : : | Case No. 22 Civ. 3190 |
| Plaintiffs, | : | |
| v. | : : | |
| JUAN HENRIQUEZ, | : : | |
| Defendant. | : : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| JUAN HENRIQUEZ | : : | **AMENDED ANSWER TO COUNT I OF** |
| Counterclaim Plaintiff, | : : | **SECOND AMENDED COMPLAINT AND** |
| v. | : : | **COUNTERCLAIMS** |
| CITY OF NEW YORK, by and through the FDNY, and the FDNY FOUNDATION, INC., | : : | |
| | : | **JURY TRIAL DEMANDED** |
| Counterclaim Defendants. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

<u>**ANSWER**</u>

Defendant and Counterclaim Plaintiff Juan Henriquez ("Henriquez" or "Counterclaim Plaintiff"), by and through his attorneys Fletcher Law PLLC, hereby responds to the Second Amended Complaint ("SAC") of the City of New York ("City"), by and through the Fire Department of New York ("FDNY") and FDNY Foundation, Inc. ("Foundation", and together with City and FDNY, "Counterclaim Defendants"), as follows:

## NATURE OF ACTION[1]

1.     Refer to the SAC for a true and correct statement of the allegations and claims contained therein. Further, admit that Henriquez has, at certain times, been employed by the City as a full-time FDNY paramedic, and otherwise deny the allegations contained in paragraph 1 of the SAC.

2.     Refer to the SAC for a true and correct statement of the allegations and claims contained therein, and otherwise deny the allegations contained in paragraph 2 of the SAC.

## PARTIES

3.     Admit the allegations contained in paragraph 3 of the SAC.

4.     Admit the allegations contained in paragraph 4 of the SAC.

5.     Admit the allegations contained in paragraph 5 of the SAC.

6.     Admit that Henriquez is a citizen of New York State, and otherwise deny the allegations contained in paragraph 6 of the SAC.

## JURISDICTION AND VENUE

7.     Paragraph 7 of the SAC consists of legal conclusions to which no response is required. To the extent, and only to the extent, a response is required, admit.

8.     Paragraph 8 of the SAC consists of legal conclusions to which no response is required. To the extent, and only to the extent, a response is required, deny that Henriquez resides in the Eastern District of New York and admit the remaining allegations in paragraph 8.

---

[1] Henriquez submits this Answer in response to allegations contained the SAC as they relate to Count I (Declaratory Judgement of Non-Infringement of Trademark Infringement), only. Henriquez filed a pre-motion letter on December 2, 2022 in anticipation of moving to dismiss Count II of the SAC pursuant to Fed. R. Civ. P. 12(b)(6), and expressly does not answer and instead reserves all rights to move with respect thereto.

<u>**FACTS**</u>

9.      Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 9 of the SAC.

10.     Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 10 of the SAC, except admit that the referenced trademark registration numbers appear in a USPTO database search.

11.     Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 11 of the SAC.

12.     Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 12 of the SAC.

**The FDNY Foundation**

13.     Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 13 of the SAC.

14.     Henriquez lacks knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 14 of the SAC.

**Annual FDNY Medical Special Operations Conference**

15.     Admit the allegations contained in paragraph 15 of the SAC, except deny: (i) that the defined term "FDNY MSOC" accurately describes the referenced events; (ii) that the referenced events occurred solely in partnership with the FDNY Foundation; and (iii) that the referenced events have occurred every year "since 2013."

16.     Admit the allegations contained in paragraph 16 of the SAC, except deny (i) the accuracy of the definition of the term "FDNY MSOC"; and (ii) that the marks defined by the term "MSOC Marks" consist solely of common law trademarks.

17.     Admit the allegations contained in paragraph 17 of the SAC, except deny (i) the accuracy of the definition of the term "FDNY MSOC"; (ii) that the marks defined by the term "MSOC Marks" consist solely of common law trademarks; and further lack knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 17 of the SAC that (i) the referenced website "prominently use[s]" the FDNY Trademarks; and (ii) that each instance of the referenced event has been promoted in the via the referenced advertising channels.

**Defendant Henriquez's Prior Role with Regard to the Annual FDNY MSOC Conferences**

18.     Admit that Henriquez is employed as a full-time FDNY paramedic, and otherwise deny the allegations contained in paragraph 18 of the SAC.

19.     Deny the allegations contained in paragraph 19 of the SAC.

20.     Admit that Henriquez and Dr. Isaacs "had become acquainted through the FDNY" and otherwise deny the allegations contained in paragraph 20 of the SAC.

21.     Deny the SAC's characterization of the referenced document to the extent it conflicts with the actual document, and refer to the referenced document for a true and correct recitation of the statements made therein.

22.     Deny the allegations contained in paragraph 22 of the SAC.

23.     Deny the SAC's characterization of the referenced document to the extent it conflicts with the actual referenced document, refer to the referenced document for a true and correct recitation of the terms contained therein, and otherwise deny the allegations contained in paragraph 23 of the SAC.

24.     Admit that the referenced exhibit appears to contain a copy of the referenced document.

25.     Deny the SAC's characterization of the referenced document to the extent it conflicts with the actual referenced document and refer to the referenced document for a true and correct recitation of the terms contained therein.

26.     Admit the allegations contained in paragraph 26 of the SAC, except deny the accuracy of the definition of the term "FDNY MSOC," and deny the suggestion, if any, that the referenced logos were created pursuant to the Donation Agreement.

27.     Admit the allegations contained in paragraph 27 of the SAC, except deny the accuracy of the definition of the term "FDNY MSOC."

28.     Admit that Henriquez participated in a podcast interview in or about early 2018, and otherwise refer to any true and correct recording of that interview for a recitation of the statements made therein.

29.     Admit that Henriquez participated in a podcast interview in or about early 2018, and otherwise refer to any true and correct recording of that interview for a recitation of the statements made therein.

30.     Lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 30 of the SAC.

31.     Deny the allegations contained in paragraph 31 of the SAC.

32.     Admit the allegations contained in paragraph 32 of the SAC.

33.     Deny the SAC's characterizations of the referenced documents to the extent they conflict with the actual referenced documents, and refer to the referenced documents for a true and correct recitation of the statements contained therein.

34.     Deny the SAC's characterization of the referenced documents to the extent they conflict with the actual referenced documents, refer to the referenced documents for a true and

correct recitation of the statements contained therein, and otherwise deny the allegations contained in paragraph 34 of the SAC.

35.     Deny the SAC's characterization of the referenced documents to the extent it conflicts with the actual referenced documents, refer to the referenced documents for a true and correct recitation of the statements contained therein, and otherwise deny the allegations contained in paragraph 35 of the SAC.

36.     Deny the SAC's characterization of Henriquez's "claims," and refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

37.     Deny the allegations contained in paragraph 37 of the SAC.

38.     Deny the allegations contained in paragraph 38 of the SAC.

39.     Admit that Henriquez produced MSOC-branded events in 2011 and 2012, and otherwise deny the remaining allegations in paragraph 39, except refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

40.     Deny the allegations contained in paragraph 40 of the SAC, and deny in particular that "federal and state" governmental "partners" ever "hosted" MSOC events.

41.     Deny the allegations contained in paragraph 41 of the SAC, and deny in particular that "federal and state" governmental "partners" ever "hosted" MSOC events.

42.     Deny the allegations contained in paragraph 42 of the SAC, and deny in particular that "federal and state" governmental "partners" ever "hosted" MSOC events

43.     Deny the allegations contained in paragraph 43 of the SAC, and deny in particular that "federal and state" governmental "partners" ever "hosted" MSOC events.

44.     Deny the allegations contained in paragraph 44 of the SAC, and deny in particular that "federal and state" governmental "partners" ever "hosted" MSOC events.

45. Admit the allegations contained in paragraph 45 of the SAC.

46. Admit the allegations contained in paragraph 46 of the SAC, except deny the accuracy of the definition of the terms "Medical Special Operations Community" and "MSOC Marks."

47. Admit the allegations contained in paragraph 47 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks."

48. Admit the allegations contained in paragraph 48 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks."

49. Admit the allegations contained in paragraph 49 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks."

50. Admit the allegations contained in paragraph 50 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks."

51. Admit the allegations contained in paragraph 51 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks."

52. Admit that other FDNY paramedics participated in or attended the events referenced in SAC paragraph 52, but deny (i) that Henriquez's role or rights were similar to those other individuals, and (ii) deny the accuracy of the defined term "FDNY MSOC".

53. Deny the allegations contained in paragraph 53 of the SAC.

54. Deny the allegations contained in paragraph 54 of the SAC.

55. Deny the allegations contained in paragraph 55 of the SAC.

56. Deny the allegations contained in paragraph 56 of the SAC.

57. Deny the allegations contained in paragraph 57 of the SAC.

58. Deny the allegations contained in paragraph 58 of the SAC.

59.     Deny the allegations contained in paragraph 59 of the SAC.

60.     Deny the allegations contained in paragraph 60 of the SAC.

61.     Deny the allegations contained in paragraph 61 of the SAC.

62.     Deny the characterization of the referenced document contained in SAC paragraph 62 to the extent it conflicts with the actual referenced document, and refer to the referenced document for a true and correct recitation of the statements contained therein.

63.     Admit that the referenced document appears to be the document described in paragraph 63.

64.     Admit the allegations contained in paragraph 64 of the SAC, except deny that Henriquez is the only individual responsible for these tasks.

65.     Admit the allegations contained in paragraph 65 of the SAC, except deny that this is the only use for the referenced website.

66.     Admit the allegations contained in paragraph 66 of the SAC.

67.     Admit the allegations contained in paragraph 67 of the SAC.

68.     Deny the allegations contained in paragraph 68 of the SAC, and deny in particular that the referenced events are "hosted" by the MSOC Entity.

69.     Admit the allegations contained in paragraph 69 of the SAC, except deny the accuracy of the definition of the term "MSOC Marks", and deny that this is the only use for the referenced website.

70.     Deny the allegations contained in paragraph 70 of the SAC.

71.     Admit the allegations contained  in paragraph 71 o the SAC.

72.     Admit the allegations contained in paragraph 72 of the SAC.

**Defendant's Federal Trademark Registration**

73. Admit the allegations contained in paragraph 73 of the SAC.

74. Admit that an Office Action was issued by the USPTO in connection with the subject trademark application, deny the SAC's characterization of that document to the extent it conflicts with the actual referenced document, and refer to that document for a true and correct recitation of the statements contained therein.

75. Admit that an Office Action was issued by the USPTO in connection with the subject trademark application, deny the SAC's characterization of that document to the extent it conflicts with the actual document, and refer to the referenced document for a true and correct recitation of the statements contained therein.

76. Deny that Henriquez filed an "amended application" or that Exhibit 5 of the SAC contains an "amended application"; deny the SAC's characterization of the contents of referenced document to the extent it conflicts with the actual document; and further refer to the referenced document for a true and correct recitation of the statements contained therein.

77. Deny the SAC's reference to an "amended application," deny the SAC's characterization of the contents of the referenced document to the extent it conflicts with the actual document, and refer to the referenced document for a true and correct recitation of the statements contained therein.

78. Admit that the USPTO issued a registration for the word mark MEDICAL SPECIAL OPERATIONS CONFERENCE, deny the SAC's reference to an "amended application," and otherwise lack knowledge and information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 78 of the SAC.

79. Deny the SAC's characterization of the referenced document to the extent it conflicts with the actual referenced document, and refer to the referenced document for a true and

correct recitation of the statements contained therein.

80.     Deny the SAC's characterization of the referenced document to the extent it conflicts with the actual referenced document, and refer to the referenced document for a true and correct recitation of the statements contained therein.

81.     Deny the allegations contained in paragraph 81 of the SAC.

82.     Deny the SAC's reference to an "amended application," admit that Henriquez did not specifically identify his licensing agreement with Plaintiffs in the referenced document, and otherwise refer to the referenced document for a true and correct recitation of the statements contained therein.

83.     Deny the allegations contained in paragraph 83 of the SAC.

84.     Deny the SAC's characterization of Henriquez's "claims," deny the accuracy of the definitions of the terms "FDNY MSOC" and "MSOC Marks," and otherwise refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

85.     Deny the SAC's characterization of Henriquez's "claims," deny the accuracy of the definitions of the terms "FDNY MSOC" and "MSOC Marks," and otherwise refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

86.     Admit that Henriquez does not claim ownership in the marks specifically depicted in paragraph 9 of the SAC.

87.     Deny the allegations contained in paragraph 87 of the SAC.

88.     Deny the allegations contained in paragraph 88 of the SAC.

89.     The phrase "material terms" in paragraph 89 consists of legal conclusion to which no response is required; and otherwise deny the allegations contained in paragraph 89 of the SAC.

90.     The phrase "material terms" in paragraph 90 consists of legal conclusion to which

no response is required; and otherwise deny the allegations contained in paragraph 90 of the SAC.

91.     The phrase "material terms" in paragraph 91 consists of a legal conclusion to which no response is required; and otherwise deny the allegations contained in paragraph 91 of the SAC.

<u>COUNT I</u>
**(Declaratory Judgement of Non-Infringement of Trademark Infringement)**

92.     Henriquez repeats the responses contained in the preceding paragraphs.

93.     Deny the SAC's characterization of Henriquez's "claims," deny the accuracy of the definition of the terms "FDNY MSOC" and "MSOC Marks," and otherwise refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

94.     Deny the allegations contained in paragraph 94 of the SAC.

95.     Deny the allegations contained in paragraph 95 of the SAC.

96.     Deny the allegations contained in paragraph 96 of the SAC.

97.     Deny the allegations contained in paragraph 97 of the SAC.

98.     Deny the use and definition of the terms "MSOC Marks" and "FDNY MSOC," and otherwise refer to the Counterclaims for a true and correct statement of Henriquez's allegations in this lawsuit.

99.     Paragraph 99 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 99 of the SAC.

100.     Paragraph 100 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 100 of the SAC.

101.     Paragraph 101 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 101 of the SAC.

102.     Paragraph 102 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 102 of the SAC.

103.     Paragraph 103 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 103 of the SAC.

104.     Paragraph 104 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 104 of the SAC.

105.     Paragraph 105 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 105 of the SAC.

106.     Paragraph 106 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 106 of the SAC.

107.     Deny the allegations contained in paragraph 107 of the SAC.

108.     Deny the allegations contained in paragraph 108 of the SAC.

109.     Paragraph 109 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 109 of the SAC.

110.     Paragraph 110 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 110 of the SAC.

111.     Admit that an actual and justiciable controversy exists between the parties, and otherwise deny the allegations contained in paragraph 111 of the SAC.

112.     Paragraph 112 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 112 of the SAC.

113.     Deny the allegations contained in paragraph 113 of the SAC.

114.     Paragraph 114 consists of legal conclusions to which no response is required; and otherwise deny the allegations contained in paragraph 114 of the SAC.

115.     Paragraph 115 consists of legal conclusions to which no response is required; and

otherwise deny the allegations contained in paragraph 115.[2]

## **AFFIRMATIVE DEFENSES**

1.      Plaintiffs' requested relief is barred because the SAC fails to state a claim upon which relief can be granted, including but not limited to the requests for declaratory relief started in paragraphs 114 and 115 of the SAC.

2.      Plaintiff's requested relief is barred because no justiciable controversy exists that could give rise to a declaration concerning the relief requested in paragraph 115 of the SAC.

3.      Plaintiffs' requested relief is barred by the doctrine of latches because Plaintiffs delayed too long to bring this lawsuit following their agreement to receive a license, and the subsequent termination of their license.

4.      Plaintiffs' requested relief is barred because Plaintiffs are former licensees whose license was terminated.

5.      Plaintiffs' requested relief is barred by the doctrine of estoppel, including licensee estoppel.

6.      Plaintiffs' requested relief is barred because Plaintiffs have unclean hands based on the various bad faith infringing and retaliatory actions taken again Henriquez, as described in paragraphs 57-73 of Henriquez's Counterclaims, which are incorporated by reference herein.

7.      Plaintiffs' requested relief is barred because Defendant has priority as a senior user of the contested trademarks.

8.      Plaintiffs' requested relief is barred because Plaintiffs are willful and bad faith infringers of Defendants' rights in the contested trademarks, based on the various bad faith

---

[2] No response to paragraphs 116 to 126 is made in light of Henriquez's impending motion to dismiss Count II of the SAC.

infiring and retaliatory actions taken again Henriquez, as described in paragraphs 57-73 of Henriquez's Counterclaims, which are incorporated by reference herein.

9. Plaintiffs' requested relief is barred because Defendant owed no duty of loyalty to Plaintiffs with respect to the matters alleged in the SAC and concerning the relief sought in paragraph 115 of the SAC.

10. Plaintiffs' requested relief is barred because they seek relief, in particular the relief requested in paragraph 115 of the SAC, that is not available under trademark law or otherwise pursuant to the causes of action alleged in the SAC.

## COUNTERCLAIMS

Defendant and Counterclaim Plaintiff Juan Henriquez ("Henriquez" or "Counterclaim Plaintiff"), by and through his attorneys Fletcher Law PLLC, for his Counterclaims against plaintiffs and counterclaim defendants the City of New York ("City"), by and through the Fire Department of New York ("FDNY") and FDNY Foundation, Inc. ("Foundation", and together with City and FDNY, "Counterclaim Defendants"), hereby alleges as follows:

## PARTIES

1. Henriquez is a citizen of the State of New York who resides in Orange County, New York.

2. Counterclaim Defendant City is a municipal corporation organized pursuant to the laws of the State of New York, with its principal offices located in New York, New York.

3. Counterclaim Defendant FDNY is an agency of the City, with its principal offices located in Brooklyn, New York.

4. Counterclaim Defendant Foundation is a New York not-for-profit corporation with its principal offices located in Brooklyn, New York.

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction over all Counterclaim Defendants because they are a municipal corporation, a municipal agency, and a non-profit corporation organized under the laws of the State of New York and located in New York; and further, because the Counterclaim Defendants have consented to jurisdiction by initiating this lawsuit.

6.      The Court has federal question jurisdiction over Henriquez's federal counterclaims pursuant to 28 U.S.C. § 1331 and 1338.

7.      The Court has supplemental jurisdiction over Henriquez's state and local law counterclaims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because Counterclaim Defendants are located in this District, and because a substantial part of the events giving rise to these Counterclaims occurred here.

## FACTUAL ALLEGATIONS

### A.      Background to Mr. Henriquez and the Medical Special Operations Conference

9.      Henriquez is a veteran rescue paramedic who has been employed by the FDNY since 2001. He is among the most highly decorated emergency services workers currently on the force and has received the FDNY's top medal multiple times.

10.     In approximately 2010, Henriquez and several others ("MSOC Community") conceived of the idea to bring military-level special operations medical skills and training to the wider first responder community via a series of conferences.

11.     Henriquez created the name "Medical Special Operations Conference" ("MSOC") in late 2010, and he first used it in commerce as a trademark ("MSOC Mark") in connection with an event held in Ohio in early 2011, which he organized in partnership with several private industry

providers.

12.     Henriquez incorporated the MSOC Mark into a graphic logo ("MSOC Logo"), which he used along with the MSOC Mark in connection with the first MSOC-branded conference in Ohio, and then a second MSOC-branded event Georgia in 2012, which was organized in partnership with a different industry provider. Images of these MSOC Logos are below:

 

## B.     <u>Background to the MSOC Conferences Hosted by the FDNY</u>

13.     Shortly after Henriquez and the MSOC Community conceived of idea for MSOC events, in approximately 2011, Henriquez and others asked an FDNY Medical Director named Dr. Douglas Isaacs to join them at a military-oriented conference in Florida, so that Dr. Isaacs could see for himself the type of skills training that the MSOC Community hoped to bring to a wider, non-military, first responder audience. At that conference, Henriquez and others in the MSOC Community told Dr. Isaacs about the new, MSOC-branded conference event they were developing.

14.     In mid-2012, Dr. Isaacs approached Henriquez about bringing MSOC-branded events to New York City, to be hosted by the FDNY in FDNY facilities.

15.     Dr. Issacs knew at the time that Henriquez and others in the MSOC Community had previously produced multiple MSOC-branded events in other locations in the United States, which were hosted by other organizations.

16.     Dr. Isaacs also knew that Henriquez and the MSOC Community intended to

continue running MSOC-branded events in other locations, and that the collaboration with the FDNY was intended to be a New York City iteration of the MSOC Community's larger effort to bring high level urban search and rescue stills to a wider domestic and international audience.

17.     Henriquez informed Dr. Isaacs that the explicit purpose of MSOC-branded events was to benefit front-line first responders. Henriquez informed Isaacs that the intention was to return all conference profits back to the first responder community in the form of training, equipment, free or reduced-cost conference tickets, professional certifications, and other needed resources.

18.     Dr. Isaacs told Henriquez that he agreed that these would be the goals of any MSOC-branded events hosted by the FDNY in New York.

19.     From 2013 to 2019, at Dr. Isaacs' request, Henriquez was a principal organizer of a series of annual, FDNY-hosted MSOC conferences. These were run administratively on the FDNY side through Counterclaim Defendant Foundation, an independent non-profit entity closely tied to the FDNY. Dr. Isaacs was the principal agent of the FDNY and Foundation who interfaced with Henriquez and the MSOC Community to produce the events.

20.     The nature of the relationship between the FDNY, on the one hand, and Henriquez's MSOC-branded events, on the other – *i.e.*, that the FDNY and Foundation would act as the New York host organizations for the independent MSOC event – was made clear in conversations between Henriquez and Dr. Isaacs.  It was also made clear to various high-ranking FDNY officials in early planning meetings for the FDNY-hosted MSOC events. Further, the nature of the relationship was made clear to the public via promotional materials for the conference, which called the FDNY-hosted event, "MSOC 2013 at FDNY."

21.     From 2013 to 2019, Henriquez devoted hundreds – if not thousands – of unpaid hours to organizing the FDNY-hosted MSOC events. This organizing work was entirely outside

the scope of Henriquez job duties as an FDNY paramedic. Henriquez was not formally assigned by his superiors to work on FDNY-hosted MSOC events, nor did he receive overtime pay or performance evaluations for his MSOC organizing work.

22.     With Dr. Isaacs' knowledge – and often pursuant to his specific requests – Henriquez designed and created branded conference marketing materials, organized ticket sales, maintained participant lists, sourced instructors, designed and updated course syllabi, produced internal organizing documents, originated and facilitated vendor and sponsor relationships, and arranged for federal grant funding.

23.     Henriquez also spent thousands of dollars of his own personal funds for website, advertising, materials, and equipment expenses for the FDNY-hosted MSOC conferences, which were never reimbursed by the FDNY or Foundation.

24.     With the FDNY and Foundation's knowledge and consent, Henriquez personally designed and coded the website for the first FDNY-hosted MSOC in 2013 ("FDNY-MSOC Website"). The FDNY-MSOC Website for the 2013 event was located at a web domain address (*i.e.*, [www.fdnymsoc.com](www.fdnymsoc.com)) purchased and owned by Henriquez and hosted on Henriquez's personal server.

25.     The 2013 FDNY-MSOC Website contained all pertinent publicity information concerning the 2013 FDNY-hosted event. The 2013 FDNY-MSOC Website was also the sole portal for ticket sales for the 2013 event. Although the Foundation's website featured a link to the MSOC Website and some basic information about the event, all 2013 conference business was conducted via the MSOC Website owned by Henriquez.

26.     In late 2013, following the first FDNY-hosted MSOC event and in anticipation of another event in 2014, Henriquez grew concerned about displaying trademarks owned by the

FDNY or Foundation (*e.g.*, the acronym "FDNY" and related logos) on a website and server owned by Henriquez. To resolve this issue, the parties entered into a "Donation Agreement," whereby Henriquez agreed to "create, host and maintain a website" for the 2014 FDNY-hosted conference, while the Foundation granted Henriquez permission to display FDNY and Foundation intellectual property on the website.

27.     Pursuant to the Donation Agreement, Henriquez created a website for the 2014 event and hosted it on his personal server. Henriquez also transferred ownership of the web domain address [www.fdnymsoc.com](www.fdnymsoc.com) to the FDNY and/or Foundation. Subsequently, for the 2015 FDNY-hosted event, the FDNY-MSOC Website was transferred to a server owned by the Foundation.

28.     Henriquez created the internal and external brand identity for the FDNY-hosted MSOC events by designing the FDNY-MSOC Website, the marketing and publicity materials, and the conference organizing documents.

29.     In various organizing materials created by Henriquez and approved by the FDNY and Foundation, the FDNY-hosted MSOC event was called "MSOC [year] at FDNY," indicating the parties' understanding that the FDNY was playing the role of New York City host organization for Henriquez's independent MSOC-branded events.

30.     In late 2014, Henriquez also created an FDNY-specific version of the MSOC Logo for use in connection with the 2015 FDNY-hosted MSOC event ("FDNY-MSOC Logo"). The FDNY-MSOC Logo was identical to the regular MSOC Logo Henriquez had created in 2012, except that it included the words "Fire Department City of New York" at the bottom, *i.e.*, thus indicating that the logo related to the FDNY-hosted iteration of the wider community of MSOC-branded events run by Henriquez and the MSOC Community.

31.     In later years, Henriquez created a new version of the FDNY-MSOC Logo, which

contained the words "Rescue School" at the bottom but was otherwise identical to the original MSOC Logo.

32.     Images of these FDNY-MSOC Logos are below:

 

33.     Dr. Isaacs knew that the FDNY-MSOC Logo was simply a New York-specific version of the MSOC Logo that Henriquez used for other MSOC-branded events across the United States.

34.     Henriquez policed the FDNY's use of the MSOC Mark in a variety of ways. These included the large amount of oversight and quality control of FDNY-hosted MSOC events that Henriquez exercised via his principal organizing role in those events.

35.     Further, in early 2013, Henriquez corrected Dr. Isaacs' proposed use of certain publicity materials featuring the MSOC Mark that were created by a third-party organization without Henriquez's approval.

36.     Further, in late 2014 and early 2015, Dr. Isaacs informed Henriquez that the Foundation was unable to run the 2015 FDNY-hosted MSOC conference and suggested that one of the event's media sponsors should take over administration for the 2015 event. Henriquez and other members of the MSOC Community rejected Dr. Isaacs' proposal because they believed that this media sponsor did not align with the overall values of MSOC-branded events. Ultimately, the Foundation did handle administration for the 2015 MSOC and it was hosted by the FDNY.

**C.**     **Continuation of MSOC-Branded Events Outside New York City**

37.     Concurrently with the MSOC-branded events hosted by the FDNY, Henriquez and the MSOC Community continued to produce MSOC-branded events with other organizations outside of New York.

38.     These outside events have included, but have not necessarily been limited to, events in Georgia (2015); Palm Beach County, Florida (2015); Maryland (2017); Florida (2018); Kansas (2019); online (2021); and South Carolina (2022).

39.     Dr. Isaacs and other individuals at the FDNY and Foundation knew that Henriquez continued to produce these MSOC-branded events outside of New York City.

40.     In March 2015, Dr. Isaacs traveled to Florida to serve as an instructor at an MSOC-branded event hosted by Palm Beach County Fire Rescue.

41.     The MSOC Logo that was used for the Florida event attended by Dr. Isaacs was identical to the FDNY-MSOC Logo that Henriquez had furnished to Dr. Isaacs in late 2014, except that the words "Fire Department City of New York" were replaced with the words "Palm Beach County Fire Rescue." An image of that logo ("Palm Beach MSOC Logo") is below:



42.     The Palm Beach MSOC Logo was displayed on publicity materials for the Florida conference that Dr. Isaacs attended as an instructor.

43.     Dr. Isaacs knew that Henriquez used a near-identical version of the MSOC Logo

for the Florida event as the one Henriquez had provided to the FDNY for the FDNY-hosted MSOC events. Thus, Dr. Isaacs knew that the FDNY-hosted MSOC event was being publicly positioned as an FDNY-hosted iteration of a wider community of MSOC-branded events produced by Henriquez around the country.

44.    In August 2018, Dr. Isaacs travelled to Ocala, Florida to serve as an instructor at another MSOC-branded event that was independent of the FDNY.

**D.    Henriquez Discovers and Reports FDNY Financial Improprieties**

45.    In approximately late 2017, Henriquez reviewed FDNY and/or Foundation records pertaining to the FDNY-hosted MSOC conference and discovered certain financial improprieties relating to the FDNY and/or Foundation's handing of conference funds. Some of these improprieties appeared to involve misuse by the FDNY and/or Foundation of federal grant monies.

46.    Additionally, Henriquez discovered that profits from the FDNY-hosted MSOC events were not being used for the benefit of front line first responders, as had been previously discussed and agreed upon between Henriquez and Dr. Isaacs.

47.    In late 2017 and 2018, Henriquez reported his concerns about these financial improprieties to Dr. Isaacs. In response, Dr. Isaacs threatened Henriquez to "let things be," stating, "You don't know what they do to people like you." Upon information and belief, Dr. Isaacs was referring, in part, to an FDNY custom or practice of retaliating against whistleblowers. Upon information and belief, Dr. Isaacs did not take any further action to investigate or remedy the issues raised by Henriquez.

48.    In November 2019, Henriquez reported his concerns about these financial improprieties in a meeting with two attorneys for the City, FDNY counsel Moira Archer and Assistant Corporation Counsel Gerald Singleton. At the end of this meeting, Mr. Singleton said to

Henriquez, approximately, "I don't know how much you value your job, but you should think hard about whether or not you want to pursue this." Upon information and belief, Mr. Singleton was threatening Henriquez's employment and was referring to the FDNY's custom and practice of retaliating against whistleblowers. Upon information and belief, neither Ms. Archer nor Mr. Singleton took any further action to investigate or remedy the issues raised by Henriquez.

49.     Around this time, Henriquez also reported his concerns about financial improprieties to other City officials, including an investigator for the City's Department of Investigations ("DOI"). Upon information and belief, none of these individuals took any further action to investigate or remedy the issues raised by Henriquez.

50.     Henriquez has never received a status update from the City about any of the financial issues he raised, nor did the City ever present him with any information indicating that it has conducted an investigation or issued a report concerning the City's findings.

**E.**     **Henriquez Asks the FDNY and Foundation to Stop Using His Intellectual Property**

51.     At the same time as Henriquez was raising his concerns about financial improprieties to FDNY officials, Henriquez heard rumors that the FDNY was in the process of investigating Henriquez for alleged financial improprieties concerning the FDNY-hosted MSOC.

52.     Given the FDNY and Foundation's failure to remedy the financial issues raised by Henriquez, as well as the rumors of the FDNY's possible investigation of retaliation against Henriquez, Henriquez told Dr. Isaacs and another FDNY official that Henriquez and the MSOC Community were planning on moving the FDNY-hosted MSOC event to California. Dr. Isaacs responded in a manner that indicated that he understood that the MSOC Mark did not belong the FDNY and that Henriquez and the MSOC Community were entitled to revoke the FDNY's permission to use the MSOC Mark.

53. Further, in late 2018, Dr. Isaacs informed a member of the MSOC Community named Joseph Hernandez that the FDNY-hosted MSOC event might not go forward in 2019. Mr. Hernandez responded that the MSOC Community would be happy to move the 2019 MSOC event to Florida and produce it independently of the FDNY and Foundation. Dr. Isaacs did not object to that suggestion, nor did he indicate that he believed the FDNY owned the MSOC Mark. Instead, Dr. Isaacs agreed that the FDNY and Foundation's participation was not required to successfully run the 2019 MSOC event.

54. In late 2018, January 2019, and November 2019, Henriquez told Dr. Isaacs, other FDNY and Foundation officials, and attorney Ms. Archer that the FDNY and Foundation should stop using any MSOC-related intellectual property created and owned by Henriquez that had previously been "licensed" to the FDNY and Foundation by Henriquez. These included the MSOC Mark, the FDNY-MSOC Logos, and various other conference and organizing materials related to the FDNY-hosted MSOC events.

55. Despite Henriquez's instruction to the FDNY and Foundation to cease using his intellectual property, including the MSOC Mark, the City did not stop using the MSOC Mark. Instead, Dr. Isaacs told Henriquez that the parties would work out an amicable resolution, and in the meantime he needed Henriquez to keep working to produce the 2019 FDNY-hosted MSOC event.

56. In reliance on Dr. Isaacs' representations, Henriquez did in fact continue to produce the 2019 FDNY-hosted MSOC event.

F.    **FDNY Retaliates Illegally Against Henriquez, Despite New Whistleblowing**

57. Notwithstanding Henriquez's engagement in protected whistleblowing activities, the City initiated a years-long campaign of retaliation against Henriquez that continues to this day.

58.     First, in or about August 2018, FDNY and Foundation officials caused the DOI to launch an investigation into Henriquez for financial misdealing related to the FDNY-MSOC events. This ultimately resulted in a finding by DOI in October 2019 that the original allegations were unsubstantiated.

59.     Then, in January 2019, the FDNY via Ms. Archer sent a letter to Henriquez claiming that *it* was the owner of the MSOC Mark and FDNY-MSOC Logos and ordered Henriquez to cease using his own intellectual property.

60.     In September 2019, the FDNY again sent a letter to Henriquez accusing him of infringing the copyrights and trademark to intellectual property that Henriquez created, owned, and had licensed to the FDNY and Foundation.

61.     Next, the FDNY initiated a bad faith disciplinary proceeding against Henriquez with the FDNY's Bureau of Investigations and Trials ("BIT"), falsely charging Henriquez with, *inter alia*, (a) engaging in business transactions in conflict with his official duties, and (b) misappropriating FDNY property, in connection with the FDNY-hosted MSOC events. In March 2021, following a full evidentiary hearing, the BIT Hearing Officer determined that all four disciplinary charges brought by the FDNY against Henriquez were "unsubstantiated." Further, the BIT Hearing Officer stated that the FDNY's allegations "should not have been escalated as a disciplinary matter."

62.     Further, during the period 2020 through 2022, the FDNY withheld from Henriquez certain award citations, high performance ratings, and overtime opportunities, and it denied him requested shift transfers.

63.     In May 2021, employment counsel for Henriquez raised Henriquez's prior concerns about FDNY financial improprieties in a letter sent to the FDNY's Equal Employment Opportunity

Commissioner.

64.     In a response letter sent on July 16, 2021, Assistant Corporation Counsel Gerald Singleton completely ignored Henriquez's counsel's May 2021 financial whistleblowing allegations. Upon information and belief, the City did not take any further action to investigate or remedy the corruption issues raised by Henriquez following this letter.

65.     In May 2022, the FDNY and Foundation again used the MSOC Mark in connection with a conference organized solely by the FDNY and Foundation, and without Henriquez's permission.

66.     On May 10, 2022, trademark counsel for Henriquez sent a cease-and-desist letter to the FDNY and Foundation concerning the infringing use of the MSOC Mark at the FDNY's May 2022 event.

67.     On May 25, 2022, Assistant Corporation Counsel Gerald Singleton responded by letter to Henriquez's May 10, 2022 cease-and-desist letter. Less than a week later, on May 31, 2022, the City filed the instant lawsuit.

68.     During June 2022, Henriquez initiated and pursued good faith settlement discussions with counsel for the City, which included producing numerous emails and documents demonstrating Henriquez's ownership of the MSOC Mark.

69.     In the course of the June 2022 settlement discussions, counsel for Henriquez reiterated Henriquez's whistleblowing allegations concerning FDNY-hosted MSOC financial improprieties that Henriquez first started reporting to his superiors in or about late 2016.

70.     Mr. Singleton responded to the June 2022 whistleblowing with additional acts of retaliation on July 1 and July 8, 2022. These included:

        a.      Threatening to bring defamation claims against Henriquez if Henriquez

were to make the details of his whistleblowing claims publicly known, as well as for even asserting those details in the context of settlement negotiations;

       b.       Stating in writing that he did not believe Henriquez's whistleblowing allegations and would not be reporting them to his superiors;

       c.       Stating that he intended to report Henriquez to the City's Conflict of Interest Board for asserting ownership over the MSOC Mark and raising a potential implied license defense to the City's lawsuit.

71.      On July 8, 2022, the City filed a First Amended Complaint ("FAC") in this lawsuit, adding a frivolous and bad faith claim for breach of fiduciary duty, and seeking as a damages remedy the return of all monies paid to Henriquez for his employment as an FDNY rescue paramedic dating back at least to November 2018. This fiduciary duty claim rested on the baseless allegation that Henriquez, who works pursuant to a union contract, performed hundreds if not thousands of hours of unpaid work organizing the FDNY-hosted MSOC events *within the scope of his employment* as an FDNY rescue paramedic. The City made this claim even though Mr. Singleton knew that the BIT tribunal had determined the opposite in 2021, *i.e.*, that Henriquez's work on FDNY-hosted MSOC events was outside the scope of his FDNY employment. The City also alleged in its signed FAC that Henriquez had been "tasked" to work on FDNY-hosted MSOC events, notwithstanding Mr. Singleton's knowledge that Henriquez's voluminous FDNY employment file, which includes time records and performance evaluations, does not contain any record of such "tasking" nor does it indicate that Henriquez's official job duties included anything other than those typically performed by an FDNY rescue paramedic.

72.      In October 2022, while the parties were preparing for a settlement conference in this action, Henriquez discovered that the FDNY and Foundation are intending to produce another

conference in May 2023 using the MSOC Mark. The FDNY and Foundation have published promotional materials for that conference on the Foundation's website which feature the MSOC Mark.

73.     During October and November 2022, Henriquez received inquiries from two conference vendors who were confused about the relationship, if any, between Henriquez and the FDNY and Foundation's proposed event in May 2023. Henriquez has also received communications during November 2022 from multiple industry colleagues who, based on the FDNY and Foundation's use of the MSOC and Acronym Marks, appeared to believe that Henriquez and the MSOC Community are producing the FDNY's May 2023 event.

**F.      Henriquez's Trademark Registration and Common Law Mark**

74.     Henriquez is the owner of a valid federal trademark registration no. 6128514 for the mark MEDICAL SPECIAL OPERATIONS CONFERENCE (*i.e.*, the MSOC Mark), in International Class 036. The registration, which was issued on August 18, 2020, reflects a first use date of January 2011. Based on all the facts alleged herein, as well as consumers' recognition of the MSOC Mark as associated with Henriquez's services, the MSOC Mark has acquired secondary meaning.

75.     In addition to the MSOC Mark, beginning in 2011 and continuing to the present, Henriquez has also used the acronym "MSOC" in commerce as a common law trademark ("Acronym Mark") in connection with MSOC-branded events. Based on all the facts alleged herein, as well as consumers' recognition of the Acronym Mark as associated with Henriquez's services, the Acronym Mark is arbitrary and fanciful, and it has also acquired secondary meaning.

76.     The FDNY and Foundation's licensed use and subsequent infringement of the MSOC Mark has also been accompanied by licensed use, and subsequent infringement, of

Henriquez's Acronym Mark.

# FIRST CLAIM FOR RELIEF
## (Federal Trademark Infringement)

77.     Counterclaim Plaintiff Juan Henriquez repeats and incorporates by references the allegations in the preceding paragraphs.

78.     Counterclaim Plaintiff is the owner of the MSOC Mark and a valid federal trademark registration for the MSOC Mark, in connection with charitable fundraising and special events services.

79.     Counterclaim Plaintiff first used the MSOC Mark in commerce in connection with a conference in or about January 2011.

80.      Counterclaim Plaintiff has use the MSOC Mark in commerce on a continuous and exclusive basis, since 2011 and continuing to the present.

81.     From 2013 until 2018, Counterclaim Plaintiff permitted Counterclaim Defendants to use the MSOC Mark in commerce subject to a limited and non-exclusive license, and with Counterclaim Plaintiff's supervision, participation, and exercise of quality control.

82.     In late 2018 early 2019, Counterclaim Plaintiff first terminated Counterclaim Defendants' license to use the MSOC Mark, but renewed permission for the FDNY-hosted spring 2019 MSOC event.

83.     In late 2019, Counterclaim Plaintiff again terminated Counterclaim Defendants' license to use the MSOC Mark.

84.     Counterclaim Defendants have continued to use the MSOC Mark without Counterclaim Plaintiff's permission in connection with charitable fundraising and special events services, and they have demonstrated their intention to use the MSOC Mark again in the future in the same manner.

85.     Counterclaim Defendants use of the MSOC Mark is confusingly similar to Counterclaim Plaintiff's federally registered mark, in violation of 15 U.S.C. § 1114. Counterclaim Defendants' activities are causing, and unless enjoined by the Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and additionally, injury to Counterclaim Plaintiff's goodwill and reputation, for which Counterclaim Plaintiff has no adequate remedy at law.

86.     Counterclaim Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Counterclaim Plaintiff's MSOC Mark, to Counterclaim Plaintiff's great and irreparable harm.

87.     Counterclaim Defendants have cause and are likely to continue to cause substantial injury to the public and to Counterclaim Plaintiff, and Counterclaim Plaintiff is entitled to injunctive relief and to recover Counterclaim Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## SECOND CLAIM FOR RELIEF
### (Common Law Trademark Infringement)

88.     Counterclaim Plaintiff repeats and incorporates by references the allegations in the preceding paragraphs.

89.     Counterclaim Defendants have deliberately and willfully attempted to trade on Counterclaim Plaintiff's long-standing and hard-earned goodwill in its Acronym Mark and the reputation Counterclaim Plaintiff has established in connection with his products and services, as well as to confuse consumers as to the origin and sponsorship of Counterclaim Defendants' products and services and to pass their products and services off as those of Counterclaim Plaintiff.

90.     Counterclaim Defendants' unauthorized and tortious conduct has also deprived and

will continue to deprive Counterclaim Plaintiff of the ability to control the consumer perception of the products and services offered under the Acronym Mark, placing the valuable reputation and goodwill of Counterclaim Plaintiff in the hands of Counterclaim Defendants.

91. Counterclaim Defendants' conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or association of Counterclaim Defendants with Counterclaim Plaintiff, and as to the origin, sponsorship or approval of Counterclaim Defendants and their products and services, in violation of New York common law.

92. As a result of Counterclaim Defendants' aforesaid conduct, Counterclaim Plaintiff has suffered substantial damages, as well as the continuing loss of the goodwill and reputation established by Counterclaim Plaintiff in its Acronym Mark. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Counterclaim Plaintiff has no adequate remedy at law. Counterclaim Plaintiff will continue to suffer irreparable harm unless this Court enjoins Counterclaim Defendants' conduct.

## THIRD CLAIM FOR RELIEF
### (Federal Unfair Competition)

93. Counterclaim Plaintiff repeats and incorporates by references the allegations in the preceding paragraphs.

94. Counterclaim Defendants' use of a confusingly similar imitation of Counterclaim Plaintiff's MSOC Mark and Acronym Mark has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Counterclaim Defendants' conference are produced by; affiliated, connected, or associated with; or have the sponsorship, endorsement, or approval of Counterclaim Plaintiff.

95. Counterclaim Defendants have made false representations, false descriptions, and false designations of, on, or in connection with their services in violation of 15 U.S.C. § 1125(a).

Counterclaim Defendants' activities have cause and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Counterclaim Plaintiff's goodwill and reputation, for which Counterclaim Plaintiff has no adequate remedy at law.

96.     Counterclaim Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Counterclaim Plaintiff's MSOC Mark and Acronym Mark to the great and irreparable injury of Counterclaim Plaintiff.

97.     Counterclaim Defendants' conduct has caused, and is likely to continue causing, substantial injury to the public and to Counterclaim Plaintiff. Counterclaim Plaintiff is entitled to injunctive relieve and to recover Counterclaim Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1125(a), 116, and 1117.

**FOURTH CLAIM FOR RELIEF**
**(First Amendment Whistleblower Retaliation)**

98.     Counterclaim Plaintiff repeats and incorporates by references the allegations in the preceding paragraphs.

99.     At all relevant times, Counterclaim Plaintiff has been an FDNY employee.

100.     On repeated occasions between late 2017 and June 2022, Counterclaim Plaintiff engaged in protected speech in the form of whistleblowing activity concerning financial improprieties and/or corruption and misuse of federal monies arising from the FDNY and Foundation's administration of the FDNY-hosted MSOC events.

101.     Counterclaim Plaintiff communicated this protected speech to various individuals at the City, including Dr. Isaacs, a DOI investigator, FDNY attorney Ms. Archer, and Assistant Corporation Counsel Mr. Singleton.

102.     Counterclaim Plaintiffs' protected speech occurred in his capacity as a citizen of the United States, outside the scope of his employment as an FDNY rescue paramedic, and about matters of public concern.

103.     Shortly after Counterclaim Plaintiff initiated his whistleblowing activity, the FDNY began retaliating against Counterclaim Plaintiff and his employment with the FDNY. This retaliation has included: (a) falsely asserting exclusive ownership over the MSOC Mark, Acronym Mark, and FDNY-MSOC Logos; (b) launching an investigation into Henriquez over baseless allegations of financial misdealing; (c) initiating a bad faith disciplinary proceeding against Henriquez before the BIT, which the BIT hearing officer determined was wholly "unsubstantiated" and "should not have been escalated as a disciplinary matter"; (d) withholding from Henriquez various awards, overtime opportunities, and shift transfers to which he was otherwise eligible or entitled; (e) filing the instant declaratory judgment lawsuit; (f) filing the First Amended Complaint, which added a meritless and bad faith claim for breach of fiduciary duty against Henriquez, and sought to claw back almost four years of Henriquez's earned salary; (g) threatening to file a defamation lawsuit against Henriquez for engaging in protected whistleblowing speech; and (h) threatening to report Henriquez to the City's Conflict of Interest Board.

104.     By taking these actions, Counterclaim Defendants treated Henriquez differently than a member of the general public would be treated in similar circumstances.

105.     Counterclaim Defendants lacked any adequate justification for treating Henriquez differently than they would treat a member of the general public under the circumstances.

106.     Counterclaim Plaintiff's various acts of protected whistleblowing speech was a motivating factor in the retaliatory actions perpetrated by the City.

107.     The actions taken by the City in the BIT proceeding against Henriquez and in this

lawsuit are actions of this City itself.

108.     Further, based on the repeated and pervasive acts of retaliation by the City, as well as statements made by various City officials to Henriquez, the City's retaliation has occurred pursuant to a municipal custom or policy of retaliating against whistleblowers. These included a threat by Dr. Isaacs to Henriquez that Henriquez should "let things be," because, "You don't know what they do to people like you"; and by Mr. Singleton to Henriquez, approximately, "I don't know how much you value your job, but you should think hard about whether or not you want to pursue this."

109.     Further, Mr. Singleton, as the Assistant Corporation Counsel representing the City, including the FDNY and Foundation, in this lawsuit, acted as a final policymaker with respect to the various retaliatory actions in which he engaged on the Counterclaim Defendants' behalf as their lead counsel.

110.     Further, the BIT Deputy Director who prosecuted the bad faith disciplinary proceeding against Henriquez acted as a final policymaker with respect to that particular retaliatory action.

111.     As a direct and proximate result of the adverse employment actions taken against him, Henriquez has suffered a chilling effect on the exercise of his First Amendment right to free speech, damage to his professional reputation, economic loss, and emotional distress. Counterclaim Plaintiff is entitled to compensation for these losses.

### FIFTH CLAIM FOR RELIEF
**(N.Y.C. Admin. Code Whistleblower Retaliation)**

112.     Counterclaim Plaintiff repeats and incorporates by reference the allegations in the preceding paragraphs.

113.     On repeated occasions, Counterclaim Plaintiff made a report of information to City

officers and employees concerning conduct that Counterclaim Plaintiff reasonable believed to involve corruption, criminal activity, conflict of interest, gross mismanagement, or abuse of authority by another city officer or employee. This included reporting such conduct to the Corporation Counsel and the DOI.

114.    Following Counterclaim Plaintiff's protected activity, the City, the FDNY, and various officers and employees of the city took various adverse personnel actions against Counterclaim Plaintiff.

115.    Counterclaim Plaintiff has taken various steps to report Counterclaim Defendants' retaliation, including by reporting that retaliation to Assistant Corporation Counsel Gerald Singleton.

116.    Following Counterclaim Plaintiff's protected activity, Counterclaim Defendants failed to take the steps required by N.Y.C. Admin. Code § 12-113 to investigate, report on, issue any finding concerning, and/or remedy the issues reported by Counterclaim Plaintiff or the acts of retaliation that followed. In fact, Counterclaim Defendants engaged in additional retaliatory action against Henriquez.

117.    As a direct and proximate result of the adverse employment actions taken against him, Henriquez has suffered damage to his professional reputation, economic loss, and emotional distress. Counterclaim Plaintiff is entitled to relief from this Court and compensation for these losses, as well as reimbursement of his litigation costs and reasonable attorney's fees, pursuant to N.Y.C. Admin. Code § 12-113(e)(1)(v).

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Counterclaim Defendants as follows:

1.     Finding that Counterclaim Defendants City, FDNY and Foundation, and all of their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Counterclaim Defendants, or in concert with Counterclaim Defendants, be enjoined and ordered to cease-and-desist from:

  a.     Using Counterclaim Plaintiff's registered MSOC Mark and common law Acronym Mark (as defined in the accompanying Memorandum of Law) in connection with charitable fundraising, special events, training courses, or any other goods or services confusingly similar thereto; and

  b.     Using any trademark, name, logo, design, or source designation in connection with Counterclaim Defendants' services that is confusingly similar to Henriquez's MSOC Mark or Acronym Mark, or likely to cause public confusion that such services are produced, provided, sponsored, authorized by, or connected to Henriquez.

2.     Counterclaim Defendants be ordered to account to Henriquez for any and all profits derived by Counterclaim Defendants from their infringing use of the MSOC and Acronym Marks;

3.     Henriquez be awarded all damages cause by the acts forming the basis of these Counterclaims;

4.     Based on Counterclaim Defendants' knowing, intentional, willful, and bad faith infringing use of the MSOC and Acronym Marks, the damages awarded be trebled and the award of Counterclaim Defendants' profits be enhanced as provided for by 15 U.S.C. § 1117(a);

5.     Counterclaim Defendants be required to pay to Henriquez the costs and reasonable attorneys' fees incurred by Henriquez in this action pursuant to 15 U.S.C. § 1117(a);

6.      Based on Counterclaim Defendants' willful and deliberate infringement and/or dilution of the MSOC and Acronym Marks, and to deter such conduct in the future, Henriquez be awarded punitive damages;

7.      Henriquez be awarded compensatory and punitive damages, costs, and reasonable attorney's fees for Counterclaim Defendants' unlawful retaliation against Henriquez for exercising his protected whistleblowing speech rights under the First Amendment;

8.      Henriquez be awarded compensatory damages, costs, and reasonable attorney's fees incurred as a result of Counterclaim Defendants' unlawful retaliation against Henriquez for engaging whistleblowing conduct protected by N.Y.C. Admin Code N.Y.C. Admin. Code 12-113;

9.      Counterclaim Defendants be ordered to investigate and report upon Henriquez's whistleblowing allegations, and take all remedial actions thereby warranted, pursuant to the requirements of N.Y.C. Admin Code N.Y.C. Admin. Code 12-113

10.     Henriquez be awarded prejudgment and post-judgment interest on all monetary awards; and

11.     Henriquez be granted such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.


Dated:  December 14, 2022

                              **FLETCHER LAW, PLLC**

                              By: _____
                              Jordan Fletcher
                              246 Fifth Avenue, 3rd Floor

New York, NY 10001
Tel: (212) 320-8945
Fax: (347) 983-0046
jordan@fletcherlaw.co

*Counsel for Defendant and*
*Counterclaim Plaintiff Juan Henriquez*