UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
THE CITY OF NEW YORK, by and through
the FDNY, and the FDNY FOUNDATION,
INC.,                                           **MEMORANDUM & ORDER**

                 *Plaintiffs*,        22-CV-3190 (KAM)(PK)

    -against-

JUAN HENRIQUEZ

               *Defendant*.

-------------------------------------X

**MATSUMOTO, United States District Judge:**

       At issue in this case are the Defendant's trademarks
of the words MEDICAL SPECIAL OPERATIONS CONFERENCE (the "MSOC
Mark"), and the acronym "MSOC" ("Acronym Mark") (collectively,
the "Marks"), used to describe a series of conferences organized
by Mr. Henriquez and founding members of MSOC for emergency
rescue medical professionals.  Defendant and founding members of
MSOC hosted conferences starting in 2010, in collaboration with
different municipalities and city agencies throughout the
country, including, for some years, with the Fire Department of
New York ("FDNY").  Pending before the Court is Defendant and
Counterclaim Plaintiff Juan Henriquez's ("Mr. Henriquez" or
"Counter-Plaintiff") motion for a preliminary injunction
pursuant to Federal Rule of Civil Procedure 65.  Mr. Henriquez
moves the Court to enjoin the City of New York, by and through
the FDNY, and the FDNY Foundation, Inc. (the "FDNY Parties" or

1

"Counter-Defendants"), and their agents, from: "(1) using Mr. Henriquez's trademarked MSOC Mark and Acronym Mark in connection with charitable fundraising, special events, training courses, and other goods or services confusingly similar thereto; and (2) using any trademark, name, logo, design, or source designation in connection with the [FDNY Parties'] services that are confusingly similar to Mr. Henriquez's MSOC Mark or Acronym Mark or likely to cause public confusion that such services are produced, provided, sponsored, authorized by, or connected to Mr. Henriquez."

The Court held an evidentiary hearing on January 17 and 18, 2023.  (ECF No. 28, Evidentiary Hearing Transcript ("Tr.").)  Having reviewed the submissions and evidence and assessed the credibility of the witnesses, pursuant to Federal Rule of Civil Procedure 65, the Court sets forth herein its findings of fact and conclusions of law and **GRANTS** Defendant's motion for a preliminary injunction against Counter-Defendants.

<u>**BACKGROUND**</u>

I.  **FINDINGS OF FACT**

The Court makes the following findings of fact based on the parties' submissions, evidence, and testimony presented at the preliminary injunction hearing.[1]

---

[1](See ECF Nos. 47, Motion for Preliminary Injunction ("Mot."); 48, Memorandum in Support for Preliminary Injunction ("PI Mem."); 49-49-7, Juan Henriquez Declaration in Support of Preliminary Injunction ("Henriquez Decl.") and

Defendant and Counter-Plaintiff Juan Henriquez is a rescue paramedic who has worked for FDNY since 2001 and has received numerous awards and citations for his service, including the FDNY's top medal multiple times.  (ECF No. 49, Henriquez Decl. ¶ 3.)  In 2009 or 2010, Mr. Henriquez and other medical first responders trained in the field of urban search and rescue, including Mr. Joseph Hernandez and Mr. Vincent Johnson, attended a conference that provided training on military special operations skills.  (*Id.* ¶ 4; *see also* ECF No. 50, Hernandez Decl. ¶¶ 6-7.)  The conference was organized by the Special Operations Medical Association ("SOMA").  After the SOMA training, Mr. Henriquez, Mr. Hernandez, and other medical first responders decided to bring military-level special operations medical skills and training to the wider medical first responder community through a series of conferences. (*Id.*)

In or around 2010, on his own time and separate from his FDNY duties, Mr. Henriquez began to organize and implement the Medical Special Operations Conference idea with Mr.

---

exhibits attached thereto; 50-50-3, Joseph Hernandez Declaration in Support of Preliminary Injunction ("Hernandez Decl.") and exhibits attached thereto; 51-51-1, Jordan Fletcher Declaration in Support of Preliminary Injunction ("Fletcher Decl.") and exhibits attached thereto; 52-1-52-35, Opposition to Motion for Preliminary Injunction ("FDNY Opp.") and exhibits attached thereto; 53, Reply in Support for Preliminary Injunction ("PI Reply"); 54-54-6, Juan Henriquez Reply Declaration in Support of Preliminary Injunction ("Henriquez Supp. Decl.") and exhibits attached thereto; Jordan Fletcher Reply Declaration in Support of Preliminary Injunction ("Fletcher Supp. Decl.") and exhibits attached thereto.

Hernandez and other medical responders passionate about the field of medical special operations training for civilian medical first responders.  (ECF No. 49, Henriquez Decl. ¶ 4.) Mr. Henriquez created the name "Medical Special Operations Conference" and acronym "MSOC" to brand these conferences. (*Id.*)  On October 7, 2010, Mr. Hernandez wrote an email to Mr. Henriquez that stated in relevant part, "I think we are really moving along and everyone seems really excited to participate. I like your idea for the medical operations conference name better.  Let me know when you have time to talk.  I spoke to a few of the guys from SOMA follow up."  (ECF No. 49-2, Henriquez Decl., Ex. B at pp. 1-3.)

Around this time, in approximately 2010 or 2011, Mr. Henriquez and Mr. Hernandez also invited Dr. Doug Issacs, then the FDNY Assistant Medical Director, to attend a military-oriented conference organized by SOMA in Tampa, Florida.  (*Id*; Tr. at p. 256.)("We invited [Dr. Isaacs] to try to attend [the SOMA conferences].  We kept trying to persuade him and see if he would be interested in the idea that we had, and I believe that he attended in 2010 or 2011, not real sure.")  Around 2010 or 2011, Mr. Henriquez and Mr. Hernandez shared with Dr. Isaacs their idea of bringing military-oriented medical special operations training to the medical profession, but there is no

4

evidence that Dr. Isaacs communicated Mr. Henriquez's and Mr. Hernandez's ideas to the FDNY at that time.  (*Id.*)

Mr. Henriquez continued to organize materials and publicity for the Medical Special Operations Conference idea. He designed a graphic logo with the words Medical Special Operations Conference.  (ECF No. 49, Henriquez Decl., Ex. A at p. 5.)  Mr. Henriquez testified at the hearing, that in 2011, he finalized the MSOC logo, with each image used in the logo carefully designed to symbolize meanings for those working in the medical special operations community.  (Tr. at pp. 65-66)(He explained, "Each one of those things that are in [the MSOC logo], as far as like the eagle, the shovel, the Maltese cross, the Star of Life, the hazardous materials trefoil, and the hurricane sign, along with the world, they each have a meaning. And none of it relates to the FDNY.")  On March 28, 2012, Mr. Hernandez emailed Mr. Henriquez, "I love the MSOC logo.  Great job! . . . . I also sent it out to . . . the team from Ohio." (ECF No. 49-2, Henriquez Decl., Ex. B.)  Versions of Mr. Henriquez's MSOC logo were used for other MSOC-branded events that Mr. Henriquez, Mr. Hernandez, and others organized and presented, outside of New York City.  (ECF Nos. 50, Hernandez Decl. ¶ 10; 49-7, Henriquez Decl., Ex. G.)

From January 30 and February 1, 2011, Mr. Henriquez and his collaborators produced a conference, with support from

private commercial entities including FERNO, FERNO Military Systems, and Mr. Hernandez's company, Disaster Medical Solutions ("DMS"), in Wilmington, Ohio and used the Medical Special Operations Conference name and MSOC acronym.  (ECF No. 49-1, Henriquez Decl.,Ex. A at pp. 1-3.)  In connection with this event, Mr. Henriquez began developing materials and speakers— such as agendas, programs, publicity flyers, Event Action Plans ("EAP")—for the Medical Special Operations Conference.  (ECF No. 49, Henriquez Decl., Ex. A  at pp. 2-4.)  At the top of the 2011 Ohio MSOC event agenda, the name Medical Special Operations Conference is placed prominently, and at the bottom of page two are the words, "Prepare[d] by: Juan Henriquez."  (*Id.*)  The flyer for the 2011 Ohio MSOC event described the target audience as: "Medical professionals working in Urban Search and Rescue, Disaster Medicine, Civilian pre-hospital care, equipment development and Military Special Operations."  (*Id.*)  The conference flyer also stated: "To register pleas [sic] email: msoc@yahoo.com."  (*Id.*)  This email address was created and registered by Mr. Henriquez.  (*Id.*)

In 2012, Mr. Henriquez, Mr. Hernandez, and other medical professionals planned another Medical Special Operations Conference in Perry, Georgia, parts of which were to be located at the soon-to-be opened Guardian Centers, an emergency training center.  (ECF No. 49, Henriquez Decl. ¶ 7.)  Like the MSOC Ohio

event, the flyer for the August 2012 Georgia MSOC event stated, "Open to all first responders . . . Medical professionals working in Urban Search and Rescue, Disaster Medicine, Civilian pre-hospital care, equipment development and Military Special Operations are all invited to attend the Medical Special Operations Conference (MSOC) in Perry Georgia."[2]  (ECF No. 49-1, Henriquez Decl., Ex. A at pp. 6-9.)  The 2012 Perry, Georgia MSOC agenda listed Mr. Henriquez and Mr. Hernandez as points of contact.  (*Id.*)

Mr. Henriquez also developed an Event Action Plan for the 2012 MSOC Georgia event, which included the logo designed by Mr. Henriquez, with the location, Perry, Georgia, incorporated into the logo.  (*Id.*)  Mr. Henriquez explained that he incorporates into his MSOC logo, and continues to incorporate, the names of the various locales and entities hosting MSOC events for that specific event and refers to the location addition as a "rocker."  (Tr. at p. 67) ("Yeah, the rocker . . . was added, . . . depending on where we were going to be and who was sponsoring it or who was the supporter for that.")

---

[2] The FDNY Parties assert in their brief that no event took place in 2012 at the Guardian Centers, but Mr. Henriquez explained at the hearing, that, for reasons related to national security, the Guardian Centers had allowed a limited number of medical professionals to informally visit and test out the center's simulation grounds in 2012, before opening it to the public, later that year.  (Tr. at pp. 161-62.)

Throughout this time, Dr. Isaacs stayed in touch with
Mr. Henriquez and Mr. Hernandez, together attending events
focused on military-oriented and urban medical operations.  (ECF
No. 49, Henriquez Decl. ¶¶ 9-10.)  Mr. Henriquez and Dr. Isaacs
had a relationship outside of the FDNY and considered one
another a friend.  (Tr. at pp. 159-60, 267.)  Mr. Henriquez and
Dr. Isaacs discussed the various events that Mr. Henriquez and
Mr. Hernandez were hosting in Ohio and Georgia.  (*Id.*)
Beginning from 2010 to 2011, Mr. Isaacs was aware of the first
MSOC events and expressed interested in bringing the MSOC event
to New York.  (*Id.*)

In 2012, Dr. Isaacs approached Mr. Henriquez about
bringing MSOC events to New York to partner with FDNY.  (ECF No.
49, Henriquez Decl. ¶ 11.)  On June 29, 2012, Mr. Henriquez
emailed Dr. Isaacs, "I attached a draft to show how we would do
[an MSOC event] in NY.  It follows the same structure as the
previous MSOC events.  The formula is the same just tweaked it
to what we have available here.  It all depends on how much
support we get from the rest of the FDNY.  Joe [Hernandez] and
Vinny [Johnson] are all in."  (ECF No. 49-3, Henriquez Decl.,
Ex. C.)  Dr. Isaacs responded that day, "Thanks Juan!"  (*Id.*)
On July 9, 2012, Mr. Henriquez emailed Dr. Isaacs, "The
following are a small example of what exists out there in
regards to special operations [urban search and rescue] medical

8

conferences/ discussions outside of the usual med-spec classes, working group meetings and redundant literature . . . . I have several other ideas, but I'll [j]ust keep going on forever." (ECF No. 52-14, FDNY Opp., Ex. 1.)  Mr. Henriquez attached different websites and resources, and Dr. Isaacs responded, "Thanks Juan!  I will review the various sites."  (*Id.*)

Mr. Henriquez and Mr. Hernandez believed that Dr. Isaacs understood that the FDNY would act as a "host" for the Medical Special Operations Conference.  Mr. Hernandez stated that there was never any discussion in 2012 or 2013 about the MSOC events at FDNY becoming a long-term arrangement.  (ECF No. 50, Hernandez Decl. ¶ 14.)  In fact, Mr. Henriquez testified that after the first FDNY hosted conference, "every year [Dr. Isaacs] had to try and present [the MSOC event] to FDNY [leadership] to see if they would carry the conference."  (Tr. at p. 274.)

Mr. Henriquez helped organize annual MSOC events with FDNY from 2013 to 2019, providing unpaid hours of work outside of his duties as an FDNY paramedic, by creating "MSOC at FDNY" conference materials, sourcing and communicating with vendors and sponsors, and contributing thousands of dollars of his own personal funds for expenses related to marketing (some of which, Mr. Henriquez testified, were never reimbursed by FDNY).  (ECF Nos. 49 Henriquez Decl. ¶¶ 18-20, 48-49; Tr. at pp. 169-70.)

Mr. Henriquez volunteered his own time, resources to MSOC events, and efforts because he intended that any proceeds, awards, grants, or donations should be used to assist the personnel who responded to medical emergencies.  (Tr. at p. 52, 87) (Mr. Henriquez described participation in the MSOC events as "we all contribute whatever resources we have to make [the conference] happen" and that the "money that [agencies are] charging for the conference attendance is supposed to go back into the . . . first responder community.")  Mr. Henriquez testified that the discussions with FDNY in hosting MSOC included an understanding that the profits from the conference would "go back to the FDNY EMS Special Operation Command and also the [Special Operations Command]."  (*Id*. at 88.)

Dr. Isaacs relied heavily on Mr. Henriquez to coordinate the MSOC events hosted by FDNY.  On November 24, 2012, Dr. Isaacs emailed Mr. Henriquez, "Juan, I hope you are finally getting some much needed R&R this weekend . . . . Also, if you could forward me the draft of the assigned lecturers we had discussed at the station the other week.  Let me know where the speakers recommended by Mike and Joe would fit in."  (ECF No. 49-4, Ex. D at p. 2.)

Dr. Issacs also often acknowledged to FDNY leadership Mr. Henriquez's role in coordinating and organizing the MSOC at FDNY events.  On March 19, 2013, Dr. Isaacs emailed FDNY leaders

the "MSOC 2013 at FDNY" brochure and included Mr. Henriquez,
writing: "Between myself and Juan we have spoken to you about
the overall concept for the conference (brochure is attached)
including the skill station component . . . . In the meantime if
you have any questions, please do not hesitate to contact either
Juan or myself."  (ECF No. 49-4, Henriquez Decl., Ex. D at p.
3.)  The attached brochure stated, "Medical Special Operations
Conference" at the very top left and on the right-hand side, it
stated, "MSOC 2013 at FDNY."  (ECF No. 49-4, Henriquez. Decl.,
Ex. D at p. 4.)  Mr. Henriquez testified that the titles of
"MSOC [year] at [location]" clarified that the MSOC Mark was
used with his consent in multiple years and in multiple venues.
(Tr. at pp. 226-27.)  He further explained that the language of
"MSOC at [location]", like all of the other rockers added to the
logo, was framed "to identify [] where that MSOC conference is
being held, so there's really no difference [between "MSOC at
FDNY" or "MSOC FDNY"] because everyone knows what an MSOC is.
It's just a matter of where that particular [MSOC event] is
being held at."  (*Id.*)

On December 20, 2013, Dr. Isaacs sent an email to
several FDNY officials, including the FDNY Foundation Executive
Director, Jean O'Shea.  Dr. Isaacs again acknowledged Mr.
Henriquez's role in MSOC by writing, "Attached is the draft MSOC
Flyer for your review.  Juan once again has done an amazing

job." (ECF No. 49-4, Henriquez Decl., Ex. D at p. 5.)  In a
January 14, 2014 email, Mr. Henriquez wrote to FDNY leadership,
"I made those changes last night.  The lectures will be posted
using a script that will prevent downloading." (*Id.* at 6.)  On
March 13, 2014, Dr. Isaacs wrote to FDNY officials, "We feel
this is truly an important conference for our special operations
community and we hope to 'grow it' . . . . Please let me know if
you need any further information.  I included Juan Henriquez,
one of our senior Rescue Medics and USAR Medical Specialist, who
has been instrumental in the development of this conference and
making it the success that [it has] has become." (*Id.* at 9.)

Indeed, between 2013 to 2019, Mr. Henriquez was highly
involved in the FDNY-hosted MSOC events, coordinating everything
from identifying speakers and organizing courses and programs at
the conferences, to marketing the FDNY-hosted event to the
community of attendees.  In July 2014, Dr. Isaacs emailed Mr.
Henriquez requesting that he send his and Mr. Hernandez's 2012
contact list from their MSOC event in Georgia.  (ECF No. 54,
Henriquez Supp. Decl., Ex. L.)  Mr. Henriquez did so in order to
assist the FDNY with marketing. (*Id.* ¶ 2.)  On October 9, 2014,
Mr. Henriquez sent Dr. Isaacs an email about the MSOC at FDNY
2014 event, saying, "I have been working on it and everything
should be done two weeks from now . . . . So that we can start
meetings with MSOC staff, foundation, Randall's [Island] and

[Special Operations Command] . . . . I just have to speak to two potential presenters that will bring some international and military presentations.  I'll show you the schedule with topics." (*Id.* at 30.)  Mr. Henriquez was responsible for promoting the 2015 MSOC at FDNY event, for example emailing Dr. Isaacs on March 15, 2015, stating, "I've been sending out promo email, updating the portal (info.fdnymsoc.com), sending out the objectives and creating the social media promotion/highlight excerpts . . . . Let me know if you need more specific instructions.  Just a general outline of what should be covered." (*Id.* at 49-50.)  In 2017, Dr. Isaacs emailed Mr. Henriquez and Mr. Hernandez, stating, "Need to start finalizing details for MSOC.  Joe [Hernandez], attached is a rough draft of topics and ideas Juan [Henriquez] and I had started . . . . Juan we need to also figure out the costs for all the preconference courses." (*Id.* at 55.)

Exhibits before the Court also demonstrate both Mr. Henriquez led coordination of the MSOC at FDNY events between 2013 and 2019, and further establish that the FDNY served as a host for the MSOC events, as other municipalities had done.  Dr. Isaacs provided Event Action Plans for the 2013 to 2019 MSOC at FDNY events to FDNY and FDNY Foundation leadership that clearly stated "Prepared by Juan Henriquez" throughout various sections. (*Id.* at 11-14, 46, 51, 54; ECF No. 49-7, Ex. G at pp. 2, 5.)

The Event Action Plan and draft agenda for an MSOC event hosted by FDNY in 2014 prominently displayed Medical Special Operations Conference at the very top of the planning documents, and underneath, "MSOC 2014 at FDNY."  (ECF No. 49-7, Henriquez Decl., Ex. G. at pp. 11-14.)  The 2015 Event Action Plan included the logo Mr. Henriquez created and was also labeled "Medical Special Operation Conference" at the top of the page, with the subtitle, "MSOC 2015 at FDNY" underneath.  (*Id*. at 32-33.)  Again, the title "MSOC [year] at [location]" was used by Mr. Henriquez to distinguish MSOC from the hosting entity, such as the FDNY or FDNY Foundation.  (Tr. at pp. 226-27.)

Mr. Henriquez also created and maintained the website, www.fdnyfoundation.org, for the FDNY Parties and MSOC collaborated events, with the knowledge and authority of the FDNY and FDNY Foundation.  On January 14, 2014, Dr. Isaacs emailed other FDNY officials about the MSOC event at FDNY saying, "I included Juan Henriquez who developed the web site." (ECF No. 49-4, Henriquez Decl., Ex. D at p. 7.)

Mr. Henriquez credibly testified at the hearing about first creating a website for the Medical Special Operations Conference in other locations, before ever partnering with FDNY. (Tr. at pp. 61-63.)  In 2013, FDNY used Mr. Henriquez's server and website for its first event with MSOC.  (*Id*.)  In 2014, after the FDNY decided that it did not want the MSOC event to be

on Mr. Henriquez's server, which he also used for his other MSOC
events, Mr. Henriquez entered into a donation agreement drafted
by and at the request of the FDNY Foundation, stating that the
impetus for the donation agreement was that the FDNY Foundation
was "hosting a Medical Special Operations Conference" from May
15-18, 2014, to train medical personnel, operating in the
special operations environment (emphasis added). (ECF No. 49-5,
Henriquez Decl., Ex. E at pp. 2-3; Tr. at pp. 61-63.) At the
request of the FDNY parties, Mr. Henriquez had purchased the
domain name, www.fdnyfoundation.org, to create the website for
the FDNY's hosting of the MSOC event, but was never reimbursed
by the FDNY Foundation for his purchase. (Tr. at pp. 169-70.)
The donation agreement noted Mr. Henriquez's agreement to donate
his services to develop, host, and maintain a website
specifically for the 2014 MSOC event hosted by the FDNY
Foundation. The donation agreement for the 2014 MSOC event
hosted by the FDNY Foundation, provided, *inter alia*, with
respect to the FDNY's "name, trademarked logo, or other FDNY
trademarks in connection with the website," "[t]he Foundation
represents that any copyrighted material that it requests that
Author place on its website will be owned by the Foundation, *or*
the Foundation will have *permission* to use such material." (ECF
No. 49-5, Henriquez Decl., Ex. E at p. 2.) The 2014 donation
agreement also stated: "Author expressly acknowledges that all

15

services provided to the Foundation *in connection with the creation of the website* are specifically created for use in connection with MSOC and hereby irrecoverably transfers and assigns all right title and interest, including copyrights, renewals and extensions thereto, to the Foundation or its assignees."  (*Id.*)

Mr. Henriquez, who was not represented by counsel in connection with the donation agreement, understood that the donation agreement was entered into because FDNY wanted to have control over the website Mr. Henriquez created for the 2014 conference, which utilized the *FDNY* logo and *FDNY* trademark on materials related to the 2014 MSOC event hosted by the FDNY. During the donation agreement discussions, the FDNY Parties and Mr. Henriquez did not discuss the terms Medical Special Operations Conference or MSOC Marks.  (Tr. at pp. 172-73.) According to Mr. Henriquez, the purpose of the donation agreement was primarily to "keep things separated" between the MSOC at FDNY event branding and his other MSOC event branding, because Mr. Henriquez would also be posting the FDNY logo on his personal MSOC website and documents he created for the FDNY hosted MSOC event.[3]  (*Id.*)  Mr. Henriquez created a version of

---

[3] Though Mr. Henriquez does not elaborate on what the FDNY intended regarding "keep[ing] things separate" in his testimony, presumably, the FDNY Parties requested the donation agreement to control its own FDNY trademark because it was concerned about the FDNY trademark being used in any of Mr. Henriquez's outside MSOC work, demonstrating an acknowledgement that Mr. Henriquez

the MSOC logo for FDNY by adding FDNY's name to the bottom of

the MSOC logo—in the same fashion as Mr. Henriquez had

incorporated the Perry, Georgia, location into the MSOC logo for

the 2012 Georgia event.  (Tr. at p. 64.)  As usual, Mr.

Henriquez stated the rocker was added to the logo "to describe

where that MSOC is being held at or what agency or what entity's

deploying."  (*Id.*)

　　　While Mr. Henriquez assisted the FDNY with hosting

MSOC events, from 2015 to 2019, Mr. Henriquez continued to

organize MSOC events in other years and states, including in:

Georgia (2015); Palm Beach County, Florida (2015); Maryland

(2017); Florida (2018); Kansas (2019); online due to the COVID-

19 pandemic (2021); and South Carolina (2022).  (ECF Nos. 49,

Henriquez Decl. ¶ 27; 49-7, Ex. G.)  Whenever Mr. Henriquez

developed and coordinated an MSOC event with a different state

or city, he would continue to incorporate the name of the host

into the bottom of the general MSOC logo that he created.  (Tr.

at p. 67.)  One MSOC brochure provided to the Court advertised

"Sponsorship Opportunities" with details below stating: "WHEN

---

conducted MSOC activity "separate" from the FDNY Foundation.  (Tr. at 172.)
Tayo Kinnane, then Deputy Counsel in the FDNY Bureau of Legal Affairs,
declared that, "In December 2013, I prepared a Donation Agreement between the
FDNY Foundation (the "Foundation") and Juan Henriquez ("Henriquez")
pertaining to services that Henriquez was providing to the Foundation in
connection with a website, www.fdnymsoc.com, for a "Medical Special
Operations Conference" or "MSOC" that the Foundation was hosting at the Fire
Academy on Randall's Island," in 2014.  (ECF No. 52-11, Kinnane Decl. ¶ 4.)

YOU BECOME A MEDICAL SPECIAL OPERATIONS COMMUNITY[4] (MSOC) SPONSOR
THROUGH VENDOR SUPPORT, YOU ARE PARTNERING WITH THE LEADING
ORGANIZATION REPRESENTING URBAN SEARCH AND RESCUE MEDICAL
OPERATIONS ACROSS THE COUNTRY." (ECF No. 49-7, Henriquez Decl.,
Ex. G at p. 6.)  The flyer refers to and establishes that MSOC
events took place in multiple cities and with multiple agencies,
before, during, and after the first MSOC event hosted by the
FDNY Parties.

Throughout this period, Dr. Isaacs was aware that Mr.
Henriquez continued to host other MSOC events while Mr.
Henriquez concurrently helped plan the MSOC at FDNY events.  To
the extent Dr. Isaacs testified "he did not recall" being aware
of Mr. Henriquez's involvement in MSOC events outside of New
York City (Tr. at pp. 454, 457-60, 462-64, 467-77), the Court
finds him not credible.  In February of 2015, Dr. Isaacs
traveled to Palm Beach County, Florida to teach at an MSOC-
branded event organized by Mr. Henriquez and hosted by Palm
Beach County Fire Rescue.  (ECF No. 49, Henriquez Decl. ¶ 28.)
Dr. Isaacs flew to Palm Beach that year, and he was listed as an

---

[4] Mr. Henriquez's trademarked term is Medical Special Operations Conference,
but in this flyer, Mr. Henriquez and other coordinators refer to the Medical
Special Operations Community, in reference to the same conferences being
planned all over the country.  (Tr. at p. 25)(Mr. Henriquez explained that
the Medical Special Operations *Community* was a "group of us from the national
system" who "would get together every time that we were somewhere either
delivering training or at an event to share those ideas [about medical
special operations], and that's kind of how the MSOC evolved, the Medical
Special Operations *conferences* evolved, or were created.")

instructor and FDNY Assistant Medical Director.  (ECF No. 49-8, Henriquez Decl., Ex. H at pp. 2-3.)  The PowerPoint/hand-out for the 2015 MSOC event-hosted by Palm Beach County had the same MSOC logo that Mr. Henriquez had designed in 2010, and used many times, situated on the page beside the Palm Beach County Fire Rescue logo.  (*Id*.)  In 2018, Mr. Hernandez texted Dr. Isaacs about attending another MSOC conference: "Hi Doug are you still in for the class in Ocala on Aug 27-30."  (ECF No. 50-1, Hernandez Decl., Ex. A at p. 1.)  Later that year, Mr. Hernandez's organization, Disaster Medical Solutions, an entity that often helped Mr. Henriquez organize MSOC events, "paid to fly Dr. Isaacs to Ocala, Florida to be an instructor at another MSOC-branded event sponsored by DMS."  Dr. Isaacs attended multiple MSOC events outside of New York City that were independent of the FDNY.  (ECF Nos. 49, Henriquez Decl. ¶ 30; 50, Hernandez Decl. ¶ 22.)

In approximately 2017, Mr. Henriquez was able to review FDNY and FDNY Foundations records that he believed demonstrated the FDNY Parties' mishandling and misuse of MSOC funds and grants, diverting funds that were meant to benefit emergency medical responders as originally agreed by the FDNY Foundation.  (ECF No. 49, Henriquez Decl. ¶¶ 31-32.)  He reported the alleged financial impropriety to the New York City Department of Investigations, as well as to FDNY attorney Moira

19

Archer and New York City Assistant Corporation Counsel Gerald Singleton, who has appeared in this litigation. (*Id.*)  Both Ms. Archer and Mr. Singleton deny that Mr. Henriquez reported any financial improprieties. (ECF Nos. 52-2, Singleton Decl. ¶¶ 12-13, 15; 52-3, Archer Decl. ¶ 12.)  Mr. Henriquez testified at the evidentiary hearing that he did not want FDNY's misuse of funds and any impropriety around the MSOC at FDNY events to affect the national reputation of MSOC, as events were still occurring in different locations outside of New York City.  (Tr. at pp. 232-33.)  Mr. Henriquez explained, "Obviously, my goal, even until this day, is not to disrupt anything. I haven't even told everyone exactly what the FDNY is trying to do because I don't want that to get out there and cause any issues for the larger community, for the people that actually benefit from this."  (Tr. at p. 103.)

On November 8, 2018, Mr. Henriquez texted Dr. Isaacs to "please ask the Foundation to take down my designs, images, themes, and layouts from their website and any other published media or advertising." (ECF No. 49-9, Henriquez Decl., Ex. I at p. 1.)  On November 9, 2018, Dr. Isaacs texted Mr. Hernandez that, "The conference has become a nightmare and may have to be canceled." (ECF No. 49, Henriquez Decl., Ex. B.)  In late December 2018 to January 2019, Mr. Henriquez and Mr. Hernandez had discussions with Dr. Issacs that if the FDNY and MSOC

relationship would no longer work, the coordinators could move the MSOC event to California or another state instead.  (Tr. at pp. 206-07; ECF No. 50, Hernandez Decl. ¶ 24.)  On December 14, 2018, Mr. Hernandez texted Dr. Isaacs, "If [medical professional teams] don't get to go up there [to New York] because it doesn't work out . . . . We will bring them down to [Florida] and offer housing and meals as package.  My web site mentions nothing about the [FDNY] foundation . . . [a]nd doesn't want to."  (ECF No. 50, Hernandez Decl., Ex. C.)  Dr. Isaacs responded to Mr. Hernandez's text with, "Understood."  (*Id.*)  Mr. Hernandez further stated, "[The FDNY] Foundation can never offer this on its own," and Dr. Isaacs responded, "They have no plans to do so but they are concern[ed] about their nonprofit status."  (*Id.*)  Mr. Hernandez then said, "We don't need [the FDNY] for anything," and Dr. Isaacs responded, "Agree."  (*Id.*)

In January 2019, Mr. Henriquez emailed Dr. Isaacs, copying other FDNY and FDNY Foundation leaders, again "requesting to please unpublish any references to the MSOC artwork/patches, MSOC and MSOC branding."  (ECF Nos. 49, Henriquez Decl. ¶ 35; 49-9, Ex. I at p. 3.)  Despite the erosion of trust, however, in 2019, Mr. Henriquez produced one last MSOC event with FDNY, credibly testifying that he believed and hoped that any conflicts would be resolved.  (Tr. at p. 131.)  Mr. Henriquez testified at the hearing that Dr. Isaacs and other

FDNY officials repeatedly relayed to him that "there was a misunderstanding" and encouraged Mr. Henriquez to finish coordinating the 2019 FDNY-hosted MSOC event.  (*Id.*)  Mr. Henriquez testified that he did not perceive there to be a dispute with the FDNY Parties about the MSOC name because of Dr. Isaacs's and other FDNY officials' assurances that any "misunderstanding[s]" would be resolved, and "people who are in a dispute don't work together."  (Tr. at pp. 134-35.)

In late 2019, Henriquez officially filed an application to register the words "Medical Special Operations Conference" with the United States Patent and Trademark Office ("USPTO") under Section 2(f) of the Lanham Act, based on the provision that he had been using the applied-for mark on a substantially exclusive and continuous basis during the five-year period preceding his application, and the USPTO granted his registration in August 2020.  (ECF No. 49, Henriquez Decl. ¶ 38; 52-1, FDNY Opp. at pp. 4-5.)  When Mr. Henriquez first filed for the trademark, the USPTO rejected his application due to the use of the word "conference."  (Tr. at p. 123.)  Mr. Henriquez provided more evidentiary documents, including his MSOC event organization documents and publicity materials, to demonstrate his substantially exclusive and continued use of the Medical Special Operations Conference name since he created them.  (Tr. at p. 129.)  In 2020, the USPTO approved the Trademark

registration of "Medical Special Operations Conference,"
documenting the first use of the words in 2011. (ECF No. 49,
Henriquez Decl. ¶ 38; 49-10, Ex. J.)

From 2019 through 2021, the FDNY Parties began to ask
Mr. Henriquez to cease and desist from using his Medical Special
Operations Conference name and acronym for the MSOC events he
was planning in other states. (ECF No. 49, Henriquez Decl. ¶
39.) The FDNY Parties stated that Mr. Henriquez made an
"unauthorized use of intellectual property belonging to the [the
FDNY Parties]" by hosting an event "clearly modeled after the
original Medical Special Operations Conference ("MSOC"), which
has been produced and held annually by [the FDNY Parties] in New
York City in 2013." (ECF No. 52-22, FDNY Opp., Ex. 9.)

On November 13, 2019, Mr. Henriquez sent an email to
FDNY attorney, Moira Archer, Assistant Corporation Counsel, Mr.
Singleton, and Deputy General Counsel, Carol Moran, showing his
use of his MSOC Marks "prior to [him] bringing the event to the
FDNY," and requesting that the FDNY and Foundation "remove any
references" to the MSOC Mark and the Acronym Mark in association
with the FDNY. (ECF Nos. 49, Henriquez Decl. ¶ 37; 49-9, Ex. I.
at p. 4.) Mr. Henriquez had heard that the FDNY Parties would
not be hosting a 2020 conference and would be re-branding away
from MSOC if they did host a conference. (Tr. at pp. 131-32.)
In 2020, FDNY did not host a conference with MSOC due to the

23

COVID-19 pandemic, but Mr. Henriquez hosted an MSOC event in 2020, without the involvement of the FDNY, outdoors and virtually for medical first responders.  (*Id.*)  In 2021, FDNY again did not host a conference, but Mr. Henriquez virtually hosted another MSOC event that year.  (Tr. at p. 241; ECF No. 49-9, Ex. G.)

As the FDNY Parties began to request that Mr. Henriquez stop using his MSOC Marks, they also initiated a proceeding with the FDNY Bureau of Investigations and Trials ("BIT") against Mr. Henriquez.  (ECF No. 49, Henriquez Decl. ¶ 39.)  Mr. Henriquez testified that his job was threatened and he believes the BIT investigation was brought in retaliation for his assertion of his rights to the Medical Special Operations Conference and MSOC Marks.  (Tr. at pp. 104-07.) ("Mr. Singleton, he told me that, you know, I better . . . he did say if I value my job, you better, you know, think about this or who you work for.")  The BIT ultimately determined that all of the FDNY's allegations against Mr. Henriquez were "unsubstantiated" and "should not have been escalated as a disciplinary matter."  (*Id.*; ECF No. 49-11, Henriquez Decl., Ex. K; Tr. at p. 97.)  In April 2022, Mr. Henriquez discovered that the FDNY planned on holding another MSOC-branded conference in the following month, May 2022 without Mr. Henriquez's permission or participation.  (ECF No. 49, Henriquez Decl. ¶ 40.)

On May 10, 2022, Mr. Henriquez, through counsel, sent a cease-and-desist letter to FDNY and the Foundation regarding their use of his MSOC Marks.[5]  (ECF No. 52-24, FDNY Opp., Ex. 11.)  On May 31, 2022, in return, the FDNY Parties filed the instant action against Mr. Henriquez, seeking, *inter alia,* a declaratory judgment of non-infringement and cancellation of the federal trademark registration issued to Mr. Henriquez, based on allegedly materially false statements in his application to the USPTO for the registration.  (*Id.* at 12; FDNY Opp. at p. 4.)

In June 2022, the FDNY Parties and Mr. Henriquez entered into settlement discussions and continued to do so, at the Court's recommendation in September 2022.  (ECF No. 55-1, Fletcher Supp. Decl., Ex. B; Minute Entry dated Sept. 7, 2022.) In October 2022, however, Henriquez learned that the FDNY Parties were planning to host a May 2023 conference, yet again using, without the permission of Mr. Henriquez, his MSOC Mark and the Acronym Mark.  (ECF Nos. 49, Henriquez Decl. ¶ 41.)  Mr. Henriquez then filed a pre-motion conference letter for an anticipated preliminary injunction motion on November 1, 2022, leading to the instant preliminary injunction motion before the Court.  (ECF No. 17, Henriquez Pre-motion Conf. Letter.)

---

[5] The Court does not have sufficient information about the nature of the May 2022 MSOC at FDNY event from the parties to incorporate it into its analysis. But the Court notes that Mr. Henriquez sent a cease-and-desist letter within weeks of realizing there would be a May 2022 event, and that there were no 2021 or 2020 MSOC at FDNY events.

## II.   PROCEDURAL BACKGROUND

On May 31, 2022, the FDNY Parties filed this lawsuit against Mr. Henriquez.  The FDNY Parties' claims included a request for declaratory judgment of non-infringement; declaratory judgment declaring Mr. Henriquez's copyright of his MSOC Design logo invalid; a cancellation of the federally registered MSOC Mark; and unfair competition.  (ECF No. 1, Complaint.)  On July 8, 2022, the FDNY Parties filed an Amended Complaint, amending their claims to a declaratory judgment of non-infringement; cancellation of the federally registered MSOC Mark; a declaratory judgment that the FDNY had a right to use Mr. Henriquez's MSOC Design Logo; a breach of fiduciary duty; and unfair competition.  (ECF No. 8, First Amended Complaint ("FAC").)  On September 7, 2022, the Court held a pre-motion conference for Defendant's anticipated motion to dismiss.

The parties then followed this Court's recommendation to enter into settlement discussions with Magistrate Judge Kuo rather than commencing motion practice at the time.  (Minute Entry on Sept. 7, 2022.)  On November 10, 2022, the Plaintiffs filed a Second Amended Complaint against Mr. Henriquez, asserting the following claims: a declaratory judgment of non-infringement and cancellation of Mr. Henriquez's federally registered MSOC Mark.  (ECF No. 26, Second Amended Complaint ("SAC").)

Following Mr. Henriquez's November 1, 2022 pre-motion conference request, on November 10, 2022, the Court held a pre-motion conference to discuss Mr. Henriquez's anticipated motion for a preliminary injunction. The Court set a briefing schedule for the preliminary injunction motion to be fully submitted by January 11, 2023. (Minute Entry on Nov. 10, 2022.) The Court also ordered Mr. Henriquez, the Defendant, to properly file an answer with any counterclaims, or a pre-motion conference request for any anticipated motions to dismiss by December 12, 2022. (*Id.*) On December 12, 2022, Defendant Henriquez filed an answer to the Second Amended Complaint with counterclaims against the FDNY Parties alleging federal trademark infringement; common law trademark infringement; federal unfair competition; and whistleblower retaliation. (ECF No. 32, Counterclaims and Answer.) On December 2, 2022, the Defendant also filed a letter motion for a pre-motion conference for an anticipated motion to dismiss the Second Amended Complaint. (ECF No. 27, Henriquez Pre-motion Conf. Letter.) On December 12, 2022, the Court held a third pre-motion conference with the parties to set a date for an evidentiary hearing for Mr. Henriquez's preliminary injunction motion and held the scheduling of his motion to dismiss the Second Amended Complaint in abeyance. (Minute Entry for Dec. 12, 2022.)

The evidentiary hearing was scheduled for January 17 and January 18, 2023.  By January 12, 2023, the parties had fully briefed Mr. Henriquez's preliminary injunction motion. (ECF Nos. 47-55.)  On January 17-18, 2023, the evidentiary hearing on the pending preliminary injunction was held.  Since the hearing, the FDNY Parties have also filed a pre-motion conference for their anticipated motion to dismiss Mr. Henriquez's counterclaims.  (ECF No. 59, FDNY Parties' Pre-motion Conf. Letter.)

## DISCUSSION

## I.   PRELIMINARY INJUNCTION STANDARDS

A party seeking preliminary injunctive relief must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (citation omitted).

The Lanham Act prohibits the use in commerce, without the consent of the registrant, of any "registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods" in a way that is likely to cause confusion.  15 U.S.C. § 1114(1)(a).  "The [Lanham] Act similarly

28

prohibits the infringement of unregistered, common-law trademarks." *Time, Inc. v. Petersen Pub. Co. LLC*, 173 F.3d 113, 117 (2d Cir. 1999) (citing 15 U.S.C. § 1125(a)(1)).  Mr. Henriquez asserts both common law and registered marks for the Medical Special Operations Conference Mark and MSOC Acronym Mark.

To establish a Lanham Act infringement claim, plaintiff must establish (1) that "the plaintiff's mark is entitled to protection," and (2) that "defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005), *cert. denied*, 546 U.S. 1033 (2005).

To establish a common law trademark infringement claim, the claimant must first establish that it is the senior user of the mark. *See Woodstock Ventures LC v. Woodstock Roots*, LLC, 387 F. Supp. 3d 306, 315 (S.D.N.Y. 2019) ("the user who first appropriates the mark obtains an enforceable right to exclude others from using it"), *aff'd*, 837 F. App'x 837 (2d Cir. 2021).  Then, the elements of common law trademark infringement under New York law mirror those for the Lanham Act, and as a result these claims may be analyzed together. *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 54 (S.D.N.Y.

29

2015).  "The heart of a successful claim based upon [both] . . .
the Lanham Act . . . and common law trademark infringement is
the showing of likelihood of confusion as to the source or
sponsorship of defendant's products."  *Standard & Poor's Corp.
v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982).

To evaluate whether there is a likelihood of
confusion, courts in the Second Circuit apply the eight-factor
Polaroid balancing test.  *See Polaroid Corp. v. Polaroid Elecs.
Corp.*, 287 F.2d 492 (2d Cir. 1961).  "The eight factors are: (1)
strength of the trademark; (2) similarity of the marks; (3)
proximity of the products and their competitiveness with one
another; (4) evidence that the senior user may 'bridge the gap'
by developing a product for sale in the market of the alleged
infringer's product; (5) evidence of actual consumer confusion;
(6) evidence that the imitative mark was adopted in bad faith;
(7) respective quality of the products; and (8) sophistication
of consumers in the relevant market."  *Starbucks Corp. v.
Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)
(*citing Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384
(2d Cir. 2005)).

"The application of the *Polaroid* test is 'not
mechanical, but rather, focuses on the ultimate question of
whether, looking at the products in their totality, consumers
are likely to be confused.'"  *Id*.  "In trademark cases, a

showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." *Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) (internal quotation marks and citations omitted); *see also Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021); 15 U.S.C. § 1116(a).  "Thus, if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm." *Two Hands IP LLC*, 563 F. Supp. 3d at 300; *see also Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 967 (2d Cir. 1995).

       The presumption of irreparable harm does not apply if "the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."  *Tough Traveler, Ltd.*, 60 F.3d at 968.  "Though such delay may not warrant the denial of ultimate relief, it may, 'standing alone . . . preclude the granting of preliminary injunctive relief,' because the 'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury[.]'"  *Id.* (citations omitted).  "[D]elay may not, [however], negate the presumption

of irreparable harm if the delay was caused by the plaintiff's ignorance of the defendant's competing product or the plaintiff's making good-faith efforts to investigate the alleged infringement[.]" *Id.* (citations omitted); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

The Court finds that Mr. Henriquez establishes all four elements for a grant of preliminary injunctive relief. The Court will first analyze the validity of Mr. Henriquez's common law trademarks of the Medical Special Operations Conference name and MSOC acronym, and registered mark of the Medical Special Operations Conference name. Next, the Court will conduct the likelihood of confusion analysis by applying the *Polaroid* factors. Then, the Court will address the FDNY Parties' argument in rebuttal of Mr. Henriquez's presumption of harm, based on assertions of extraordinary delay on behalf of Mr. Henriquez. Finally, the Court will conduct the balance of the hardships and whether the public's interest weighs in favor of granting an injunction.

## A. Likelihood of Success on the Merits: Validity of the Common Law and USPTO Marks

The Court finds that Mr. Henriquez has established a likelihood of success on the merits, because he has valid Marks and he can establish a likelihood of confusion applying the *Polaroid* factors.

First, the evidence before the Court unequivocally establishes that it is Mr. Henriquez who has created, used, and held a valid common law trademark for the Medical Special Operations Conference name and MSOC acronym since 2010[6], and further as a validly registered USPTO trademark of the Medical Special Operations Conference name since 2020.  Based on the record and applicable law, the Court respectfully rejects the primary contention of the FDNY Parties that *they* first appropriated the Medical Special Operations Conference name and MSOC acronym.

### 1. *Common Law Trademark*

The undisputed, credible evidence establishes that Mr. Henriquez, in consultation with Mr. Hernandez, created the term Medical Special Operations Conference, MSOC Acronym, and logo in 2010, as they discussed plans for a conference to be held in 2011 in Ohio.  (ECF No. 49-2, Henriquez Decl., Ex. B at pp. 1-3.)  The Marks were used by Mr. Henriquez at the 2011 Ohio conference, the 2012 Florida conference, with Mr. Henriquez's permission at an MSOC events hosted by the FDNY from 2013 to 2019, and at other MSOC events nationally and concurrently with

---

[6] The Court notes that Mr. Henriquez first created the MSOC name in 2010, and thus, has held the common law trademark to MSOC since 2010.  He first used the MSOC name at a conference in Ohio in 2011, and the USPTO registration marks the first use as 2011.

the FDNY events taking place. (ECF No. 49, Henriquez Dec. ¶¶ 4-7; 14-17; 27.)

The FDNY Parties' opposition to Mr. Henriquez's preliminary injunction motion asserting that they "have been using the MSOC Marks for the FDNY MSOC since 2013," ignores the fact of Mr. Henriquez's prior use and that he permitted the FDNY's 2013 use. (ECF No. 52, FDNY Opp. at p. 1.) Moreover, the FDNY Parties do not claim common law trademark infringement against Mr. Henriquez and "have no objection to his continuing use of the MSOC Marks because there is no likelihood of consumer confusion as to the origin, sponsorship or endorsement of the parties' separate conferences." (*Id.*) Nonetheless, the FDNY Parties appear to have asserted that they own the common law trademark of Medical Special Operations Conference and MSOC acronym, rather than Mr. Henriquez, by sending him a cease-and-desist letter on September 27, 2019, and seeking cancellation of his Marks. (ECF Nos. 26, SAC; 52-32, Singleton Decl., Ex. 21.)

To establish a common law trademark, the first person to use a mark "obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974); *Stern Elecs., Inc. v. Kaufman*, 523 F. Supp. 635, 640 (E.D.N.Y. 1981), *aff'd*,

669 F.2d 852 (2d Cir. 1982).  "To prove *bona fide* usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory."  *Id.* at 1271-72 (citing 3 Callmann, Unfair Competition, Trademarks & Monopolies § 76.2(d) (1969)). "Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question."  *United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 100 (1918).

First, the Court finds, based on the undisputed facts, that Mr. Henriquez, and not Dr. Isaacs or anyone else associated with the FDNY leadership, was the creator and prior user of the Medical Special Operations Conference words and MSOC acronym. Even if Dr. Isaacs and Mr. Henriquez created the MSOC name together, which they did not, the Court cannot fathom how the FDNY Parties alone could be considered the first appropriators of the MSOC Mark and Acronym, and not, at the very least, users of the name with permission of Mr. Henriquez as they collaborated on the 2013-2019 MSOC events hosted by the FDNY. The undisputed evidence from the exhibits, testimony, and submissions provided to this Court and to the USPTO, establishes that prior to the first 2013 MSOC event hosted by the FDNY with Mr. Henriquez's significant input, Mr. Henriquez created, coordinated, and organized MSOC events in other cities that

utilized the words Medical Special Operations Conference and
MSOC acronym.[7]

In 2010, Mr. Henriquez created the Medical Special
Operations Conference name, MSOC acronym and MSOC logo to use as
a brand in connection with his idea to bring military-level
special operations medical skills and training to the first
responder community via a series of conferences. (ECF No. 49,
Henriquez. Decl. ¶ 4.) Also in 2010, three years before the
first MSOC event hosted by the FDNY, Mr. Hernandez acknowledged
to Mr. Henriquez in an email, "I think we are really moving
along and everyone seems really excited to participate. I like
your idea for the medical operations conference name better.
Let me know when you have time to talk. I spoke to a few of the
guys from SOMA [an organization not related to FDNY] [to] follow
up." (ECF No. 49-2, Henriquez Decl., Ex. B at pp. 1-3.)

Mr. Henriquez, Mr. Hernandez, and others presented the
first MSOC event in early 2011, in Ohio, first using the Medical
Special Operations Conference name and MSOC acronym as a
trademark. Mr. Henriquez also created an MSOC graphic logo that
appeared on the 2011 Ohio MSOC event materials. (ECF No. 49,
Henriquez Decl. ¶¶ 4, 5.) The following year, Mr. Henriquez
added the words "Perry, Georgia" to the MSOC logo and conference

---

[7] The Court repeats some of the primary facts and key events in support of
this conclusion, but notes that there is more evidence in support detailed
comprehensively in the Facts section.

materials used at an MSOC event in 2012 in Perry, Georgia. (*Id.* ¶¶ 6-8.)  Mr. Henriquez and Mr. Hernandez invited Dr. Isaacs to a military-oriented conference in Florida and told him about their MSOC events using the MSOC Marks in 2011. (*Id.* ¶ 9.) During 2011 to 2012, Mr. Henriquez continued discussing the MSOC events and whether the FDNY would be interested in hosting an MSOC event. (*Id.* ¶ 10.)

On June 29, 2012, Mr. Henriquez emailed Dr. Isaacs, "I attached a draft to show how we would do [an MSOC event] in NY. It follows the same structure as the previous MSOC events.  The formula is the same just tweaked it to what we have available here.  It all depends on how much support we get from the rest of the FDNY.  Joe [Hernandez] and Vinny [Johnson] are all in." (ECF No. 49-3, Henriquez Decl., Ex. C.)  Dr. Isaacs responded that day, "Thanks Juan!" (*Id.*)  The Court finds, based on the undisputed evidence, that Mr. Henriquez was the first creator, appropriator, and user of the Medical Special Operations Conference name and acronym.  Consequently, Mr. Henriquez has common law rights to the MSOC name and acronym marks and logo.

Moreover, the FDNY Parties have provided no evidence that Dr. Isaacs or any of the FDNY Parties created or used Mr. Henriquez's trademarked Medical Special Operations Conference name and MSOC acronym as a term or event associated with the FDNY, prior to Mr. Henriquez's creation and uses of the name in

2011 in Ohio, and 2012 in Georgia.  The FDNY Parties assert that
Dr. Issacs created the term but offered no credible evidence or
exhibits showing the FDNY Parties' use of the Marks in
communications coordinating any MSOC events prior to the first
MSOC event in 2013 hosted by the FDNY with the participation and
permission of Mr. Henriquez.  Though affidavits from Dr. Isaacs
and various FDNY officials were submitted, the Court does not
find Dr. Isaacs's hearing testimony to be reliable or credible,
given his claimed inability to recall emails regarding MSOC
events that he sent or received and emails in which he
repeatedly praised Mr. Henriquez's significant efforts in
coordinating and organizing the FDNY-hosted MSOC events.
Moreover, Dr. Isaac's declaration does not state that he created
or used the MSOC Marks *prior* to Mr. Henriquez's documented first
use of the Medical Special Operations Conference name in 2010,
and the FDNY Parties do not offer any other evidence on this
point.  *United Drug Co.*, 248 U.S. at 100 ("Undoubtedly, the
general rule is that, as between conflicting claimants to the
right to use the same mark, priority of appropriation determines
the question.")

Indeed, none of the FDNY parties' declarations state
that the FDNY Parties created and/or first used the MSOC Marks.
Instead, although declarations and testimony of Dr. Isaacs and
Dr. Pamela Lai state that Dr. Isaacs created the idea and name

for the MSOC event, hosted by the FDNY in 2013, they do not claim that the FDNY was the creator or first user of the MSOC events that did not involve the FDNY. (ECF Nos. 52-4, Isaacs Decl. ¶ 9 ("I came up with the idea for FDNY MSOC, not Henriquez. Since 2012, I have planned and organized the FDNY MSOC, albeit with Henriquez's assistance."); 52-5, Lai Decl. ¶ 5 ("To the best of my knowledge, Douglas Isaacs, M.D. came up with the idea for the FDNY MSOC, as well as the name.") When asked at the hearing whether he came up with the words "Medical Special Operations Conference," Dr. Isaacs testified, "Well, it was always called FDNY Medical Special Conference[8]" and stated that he had no knowledge of the phrase "Medical Special Operations Conference" used prior to its use with FDNY. (Tr. at p. 452.) Dr. Isaacs's testimony at the hearing directly contradicts his written declaration, in which he stated, "I chose the words Medical Special Operations Conference or MSOC as the name for the FDNY MSOC because it was descriptive of the nature of the proposed FDNY conference and the terms were already well known in the relevant community for such a conference." (ECF No. 52-4, Isaacs Decl. ¶ 24.) Moreover, given Dr. Lai's lack of personal knowledge (her declaration and testimony lacked specific details of Dr. Isaacs creating MSOC)

---

[8] Dr. Isaacs did not say Operations in this part of his testimony. (Tr at 452.)

and close, personal and professional relationship with Dr.
Isaacs, her testimony was of scant probative value.  (Tr. at
367.)  The declarations and testimony of Dr. Isaacs and Dr. Lai
overlook Mr. Henriquez's established common law rights to the
term "Medical Special Operations Conference" name and "MSOC"
acronym three years prior to 2013.  (ECF No. 52-4, Isaacs Decl.
¶¶ 9, 21; Lai Decl. ¶ 5; Tr. at 451-53.)

        If anything, Dr. Issacs's declarations and testimony
consistently pointed to his work on the FDNY's hosting of the
Medical Special Operations Conferences between 2013 and 2019 as
a collaborative effort with Mr. Henriquez and Mr. Hernandez.
(Tr. at pp. 522-23)(When asked why Mr. Henriquez and Mr.
Hernandez would have corresponded with Dr. Isaacs about programs
using the "MSOC" Marks around the country that were, clearly
unaffiliated with the FDNY, Dr. Isaacs merely responded, "It's
friends discussing ideas.").  Moreover, Dr. Isaac's declaration
and hearing testimony attempting to minimize Mr. Henriquez's
critical contributions to organizing and coordinating the MSOC
events hosted by the FDNY were belied by his contemporaneous
emails to the leadership of the FDNY Parties acknowledging and
praising Mr. Henriquez's efforts.  (*See* ECF Nos. 49-4, Henriquez
Decl., Ex. D at p. 5 (In a December 20, 2013 email, Dr. Isaacs
wrote to FDNY officials, "Attached is the draft MSOC Flyer for
your review.  Juan once again has done an amazing job."); p. 7

(On January 14, 2014, Dr. Isaacs emailed FDNY officials about the MSOC event at FDNY saying, "I included Juan Henriquez who developed the web site."); p. 9 (In a March 13, 2014 email to FDNY officials, Dr. Isaacs described Mr. Henriquez as "instrumental in the development of this conference and making it the success that [it has] has become."); *see also* 52-4, Isaacs Decl. ¶ 10 ("Henriquez volunteered to work with me on the FDNY MSOC conferences, beginning with the first [MSOC at FDNY] conference in 2013[.]").)

The Court also briefly addresses the FDNY Parties' argument (raised after the briefing of Mr. Henriquez's preliminary injunction motion was completed) that Mr. Henriquez does not have standing to assert a common law trademark because he has "no commercial interest in the use of the MSOC Marks as trademarks".  (ECF No. 59, FDNY Pre-Motion Conf. Letter at p. 2.)   A mark is used in commerce when it is "placed in any manner on the goods . . . and the goods are sold or transported in commerce." 15 U.S.C. § 1127.  To determine whether a plaintiff has satisfied the "use in commerce" requirement, courts ask "whether the trademark has been displayed to consumers in connection with a commercial transaction." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013).  Mr. Henriquez has shown that, based on over a decade of MSOC events that he organized, registrants of the MSOC events all over the

country recognize the Medical Special Operations Conference name and purchase their attendance at the MSOC events based on the trademarked name recognition, in order to benefit from the services (trainings, courses, certifications, and accreditations). (ECF No. 49, Henriquez Decl. ¶ 3; Tr. at pp. 136-39.) Thus, Mr. Henriquez has satisfied that the Marks have been used in commerce.

Even assuming, arguendo, that the FDNY Parties are correct that the MSOC Marks have not been used in commerce, then the FDNY Parties would also lack standing to assert a common law trademark based on the FDNY-hosted MSOC events between 2013 to 2019, because according to Mr. Henriquez, the FDNY hosted MSOC events were intended to be non-commercial, "public-spirited" and "internationally inclusive", in alignment with the "spirit and intent behind the [ ] MSOC-branded events." (ECF No. 49, Henriquez Decl. ¶¶ 31-32, 47; Tr. at p. 88 ("In the FDNY's case . . . the discussion was that it was going to go back to the FDNY EMS Special Operation Command and also the SOC command.") The FDNY Parties did not raise their challenge to Mr. Henriquez's common law trademark until after Mr. Henriquez testified at the hearing that the proceeds from MSOC events were intended to benefit the first responder medical community, and were not primarily for profit. (Tr. at pp. 87-88)(As Mr. Henriquez explained, "When you're charging for attendance, it's

to cover for any resources, right, that you would need. Anything left over is supposed to go back to the first responder community.")

The Second Circuit has held that for a common law trademark to be created or exist, "[t]here must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade." *Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00-cv-7909(DLC), 2001 WL 830667, at *5 (S.D.N.Y. July 23, 2001), *aff'd*, 45 Fed. Appx. 42 (2d Cir. 2002). The Court finds that after creating the "Medical Special Operations Conference" Mark and "MSOC" Acronym Mark and logo in 2010, Mr. Henriquez and his fellow MSOC friends have repeatedly and continuously held MSOC events since 2011, multiple times a year, in multiple states, in "an active and public attempt to establish a trade" around the training and certification of medical special operations. (ECF Nos. 49, Henriquez Decl. ¶ 27; 49-9, Ex. G.)

Indeed, the FDNY parties themselves acknowledge the Second Circuit's concern in *Colligan v. Activities Club of N.Y., Ltd.*, that "Congress' purpose in enacting § 43(a) [of the Lanham Act] was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration of consumer rights of action in particular." 442 F.2d 686 (2d Cir.

1971).  Although Lanham Act standing is denied to consumers, the focus of the Act is on the "unfair competition."  The Court finds that Mr. Henriquez has suffered and would continue to suffer from "unfair competition" if the FDNY Parties use his protected common law trademarks and registered MSOC Mark in the same year that Mr. Henriquez hosts an MSOC event in New York, and in other states.

Moreover, Mr. Henriquez has demonstrated that there is a commercial interest in the MSOC events involving the vendors, sponsors, and attendees, even if he personally does not receive profits as an individual.  Instead, he intends that any proceeds fund the MSOC events, participants who need funding, or the agencies, with which MSOC partners, in order to help them implement the MSOC training.  *Cf*. *Nordco A.S. v. Ledes*, 95-CV7753(RJW), 1997 WL 570546, at *3 (S.D.N.Y. Sept. 15, 1997) (holding that plaintiff "failed to produce evidence demonstrating that it has a commercial interest in the . . . trademark . . . . Nor has [plaintiff] pointed to any actual economic harm caused by [defendant's] use of the trademark in connection with its magazine.")  Accordingly, even if the MSOC Marks were not by definition used in commerce, the Court finds that Mr. Henriquez made "an active and public attempt to establish [ ]a trade" of MSOC events across the country, *Momentum Luggage & Leisure Bags* at *5, and that any lost

proceeds from Mr. Henriquez's MSOC events would cause economic
harm to future MSOC events, participants, and partner agencies.

Accordingly, Mr. Henriquez has standing to protect his
common law trademarks of the Medical Special Operations
Conference name and MSOC acronym and holds common law trademarks
in both Marks as the first creator, user, and appropriator in
commerce.

### 2.   *Registered Trademark*

The USPTO approved the registration of Mr. Henriquez's
"Medical Special Operations Conference" Mark on August 18, 2020.
The FDNY Parties challenge the validity of Mr. Henriquez's
registered Mark, asserting that Mr. Henriquez fraudulently
registered the Mark with the USPTO because he did not actually
use the Mark on a substantially exclusive and continuous basis.
(ECF No. 52-1, FDNY Opp. at p. 7.)  The FDNY Parties also
contend that the trademark should not have been registered,
because the term Medical Special Operations Conference is not
distinctive, but is instead "merely descriptive" and has not
achieved "secondary meaning in the descriptive words."  (*Id*. at
11-14.)  Based on the record before the Court, the contentions
of the Plaintiffs and Counter-Defendants are rejected.

Mr. Henriquez has established he owns a valid
protectable mark.  Here, Mr. Henriquez successfully registered
the words Medical Special Operations Conference with the USPTO,

establishing "prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *see also* § 15 U.S.C. 1115(b). Based on the registration certificate issued to Mr. Henriquez by the USPTO, "[t]here is a 'presumption of validity' that attaches to the issuance of a trademark registration. This rebuttable presumption merely shifts the burden of persuasion to the party seeking cancellation, or the alleged infringer." *Quality Serv. Grp. v. LJMJR Corp.*, 831 F. Supp. 2d 705, 712 (S.D.N.Y. 2011) (citing *Cold War Museum, Inc. v. Cold War Air Museum*, 586 F.3d 1352, 1357 (Fed. Cir. 2009)); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.* 696 F. 3d 206, 217 n.10 (2d Cir. 2012) ("In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence, see id., that the mark is ineligible for protection."); § 15 U.S.C. 1115(a)(a party seeking to invalidate a registration must prove the existence of a "legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered").

  Because Mr. Henriquez's trademark is registered, it is also presumed to be distinctive. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)

(citations omitted).  The Court will further address the FDNY Parties' contention about distinctiveness in the *Polaroid* factor section regarding the strength of the Marks. (ECF No. 52-1, FDNY Opp. at pp. 11-13.)

The Court finds that Mr. Henriquez's USPTO registration of the words "Medical Special Operations Conference" is valid.  Mr. Henriquez credibly explained at the evidentiary hearing that the USPTO's initial issue with the MSOC Marks was with the word "conference" being merely descriptive, and then required Mr. Henriquez to submit proof of secondary meaning by having him attest to the requisite (minimum) five years of substantially exclusive and continuous use of the term, "Medical Special Operations Conference".  (Tr. at p. 123.)  This fact is also substantiated by the USPTO's disclaimer on Mr. Henriquez's approved MSOC trademark registration, "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'CONFERENCE' APART FROM THE MARK AS SHOWN."  (ECF No. 49-10, Henriquez Decl., Ex. J.)  The FDNY Parties offer no evidence to undermine the validity of the registered Mark.

Mr. Henriquez provided evidence that the USPTO requested to prove substantially exclusive and continuous use of the MSOC Mark and Acronym, for much longer than five years.  The USPTO registration form expressly states: "FIRST USE: 20110130. FIRST USE IN COMMERCE: 20110130," documenting Mr. Henriquez's

substantial and continuous use of the Medical Special Operations Conference words since 2011.[9]  (ECF No. 49, Henriquez Decl., Ex. J.)

> For the foregoing reasons, the Court finds that Mr. Henriquez holds both the common law trademarks to the "Medical Special Operations Conference" name and MSOC acronym since 2010 and a validly registered USPTO Mark to the "Medical Special Operations Conference" name since 2020.

### B.   Likelihood of Success on the Merits: Likelihood of Confusion Applying *Polaroid*

> In addition to establishing that the FDNY parties used Mr. Henriquez's valid marks without his consent, Mr. Henriquez further establishes likelihood of success on the merits, by successfully demonstrating there would be a likelihood of confusion between his and the FDNY Parties' uses of his MSOC Marks.  The Court finds that Mr. Henriquez has shown that the FDNY Parties' use of that mark "is likely to cause confusion . . . as to the affiliation, connection, or association of the [FDNY Parties] with [Mr. Henriquez], or as to the origin, sponsorship, or approval of the [FDNY Parties'] goods, services, or commercial activities by [Mr. Henriquez]."  *1-800 Contacts* at 407; *see also* 15 U.S.C. § 1125(a)(1)(A).  Once the movant establishes a valid mark entitled to protection, "its possessor,

---

[9] The USPTO registration does not state a date, just the year 2011.

in order to succeed on its infringement claim, must prove that 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'" *Time, Inc. v. Petersen Pub. Co. LLC* at 117  (quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993).

To determine the likelihood of confusion, the Court will apply the *Polaroid* eight-factor test.  *See Polaroid Corp.*, 287 F.2d at 492.  Here, it is important to note, again, that the MSOC Marks used by the FDNY Parties are exactly the same as Mr. Henriquez's protected Marks, except that the FDNY Parties added its own trademarked "FDNY" acronym and FDNY logo to Mr. Henriquez's trademarked Medical Special Operations Conference name and acronym.  Based on its review of the evidence in light of the *Polaroid* factors, the Court finds that Mr. Henriquez has shown that a likelihood of confusion exists if both the FDNY Parties and Mr. Henriquez continue to host events using the MSOC Marks in New York and throughout the country.

### 1.    *Strength of the Marks*

The Court finds that the strength of Mr. Henriquez's Medical Special Operations Conference Marks is at least strongly suggestive, and not generic or merely descriptive.  "[T]he strength of a mark depends ultimately on its distinctiveness, or

its origin-indicating quality, in the eyes of the purchasing public." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 71 (S.D.N.Y. 2021) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004)). The four categories of inherent distinctiveness, in ascending order of strength, are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Id.* (citing *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004)).

"A generic term is a common name, like automobile or aspirin, that describes a kind of product." *Gruner*, 991 F.2d at 1075. "Generic marks are never entitled to trademark protection." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997). A descriptive mark is "one that tells something about a product, its qualities, ingredients or characteristics." *Gruner* at 1076. Descriptive terms are protectable only with evidence of secondary meaning. *Id.* A suggestive mark suggests the product, though it may take imagination to grasp its nature. *Id.* An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product, and a fanciful mark is a made-up name. *See id.* at 1075–76.

Suggestive, arbitrary, and fanciful marks are inherently distinctive and eligible for protection without proof of secondary meaning. *See id.*; *see also Gameologist Grp., LLC*

*v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013).  As noted by the Second Circuit, "[r]egistration by the [US]PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Cap. Mgmt., Inc.* at 345 (2d Cir. 1999). Given that the mark is registered with the USPTO and is thus presumed to be inherently distinctive and not merely descriptive or generic, it is the FDNY Parties who bear the burden of overcoming that presumption. *Reese Pub. Co. v. Hampton Int'l Commc's, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980).

The FDNY Parties argue without documentary support, that the strength of the Marks is weak because the words "Medical Special Operations Conference" is a "ubiquitous term" in the medical professionals industry, which suggests the USPTO Mark is generic.  To determine if a mark is generic, the Court asks, "whether the consuming public understands and commonly uses the term to denote a particular source or origin of a product, even if that source is unknown (in which case the mark is descriptive), as opposed to the nature or class of the product (in which case the mark is generic)." *See Jewish Sephardic Yellow Pages, Ltd*. v. DAG Media, Inc., 478 F. Supp. 2d 340, 360 (E.D.N.Y. 2007) (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113 (1938)); see also 15 U.S.C. § 1064(3).

Based on the evidence in the record, the Court concludes the MSOC Mark and Acronym Mark are not generic or merely descriptive, but are suggestive or arbitrary and are inherently distinctive.

FDNY relies on a July 2022 Second Circuit case, reversing a district court's grant of a preliminary injunction to a plaintiff alleging infringement of its registered marks, finding on *de novo* review that the "district court failed to recognize the inherent weakness of Plaintiff's mark." *See RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022). In *RiseandShine Corp.,* the Second Circuit found that the "RISE" mark used for a canned coffee drink was inherently weak, because there was a logical association between the word "Rise" and coffee's capacity to "jumpstart [one's] energy for the day", and the word "Rise" was "tightly linked with the perceived virtues of coffee." *Id.* at 122.

The *RiseandShine Corp*. analysis of the "Rise" term is distinguishable from the case here, because the Court finds that the words Medical Special Operations Conference are more "suggestive" or "arbitrary" under Second Circuit case law, and not "merely descriptive." *See Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162-63 (2d Cir. 2016) ("The meaning of a suggestive mark typically evokes an array of goods, which means that consumers must make an additional mental effort

to identify the associated product in particular.")  "Both
descriptive and suggestive marks convey information about, and
thus are associated with, the product to which they are
attached.  The difference between them lies in the immediacy of
association—how quickly and easily consumers grasp the nature of
the product from the information conveyed."  *Id.*  Thus, "[i]f
the mental leap between the word and the product's attributes is
not almost instantaneous, this strongly indicates
suggestiveness, not direct descriptiveness."  *Id.* (quoting 2 J.
Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §
11:67 (4th ed.)).

  Applying the above guidance, the Court finds that the
words, "Medical Special Operations Conference," singly or in
combination have defined meanings, but do not clearly identify
or describe the product.  The words literally suggest a special
medical operation or surgery, rather than the distinct meaning
that Mr. Henriquez has provided since he first used the combined
words to describe his conference events.  Contrary to the FDNY
Parties' assertion, the mark is not merely descriptive; the MSOC
Mark and Acronym Mark "[do] not directly describe[ ] the goods
with which [the Marks are] associated," nor "forthwith convey[ ]
an immediate idea of the ingredients, qualities or
characteristics of the goods [or services at issue]."  *Kohler
Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 719 (E.D.N.Y.

2018).  There is "certainly a connotation" to the term "Medical Special Operations Conference" that evokes the image of a conference focused on a specialized surgery or operation in the field of medicine, *Giggle*, 856 F. Supp. 2d at 630, but the mark requires "some degree of imagination, perhaps assisted by consideration of the product itself," for consumers to "invest" the mark with its "intended mental association."  *Sunenblick v. Harrell*, 895 F. Supp. 616, 625 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

The Court notes that the Medical Special Operations Conference was created by Mr. Henriquez and hosted every year since 2011 in multiple states to share information and provide training for civilian emergency medical practitioners in a specific field that includes "all first responders . . . medical professionals working in Urban Search and Rescue, Disaster Medicine, Civilian pre-hospital care, equipment development and Military Special Operations."  Thus, the Medical Special Operations Conference Mark and MSOC Acronym Mark demonstrate a level of specificity and meaning that exceeds mere description or even suggestion.  (ECF No. 49-1, Henriquez Decl., Ex. A; Tr. at p. 527 (Dr. Isaacs said about the conferences, "we do it for the love of the field.").)  The words "Medical Special Operations Conference" do not directly describe or suggest what the conferences are and what services are provided, especially

54

to the average person, even including the average medical professional.

In gauging a mark's strength, the Court must also consider both the inherent distinctiveness of the mark and the mark's distinctiveness in the marketplace. *See Time*, 173 F.3d at 118. Suggestive marks, such as the one here, are inherently distinctive. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005). Suggestive marks, however, are not necessarily distinct in the marketplace. *See Gameologist*, 838 F. Supp. 2d at 158 ("Although a suggestive mark is entitled to protection without a showing of secondary meaning, suggestiveness is not necessarily dispositive of the issue of the strength of the mark without a showing of secondary meaning."). The burden is on Mr. Henriquez to prove market distinctiveness with reference to this circuit's well-established secondary meaning factors: (1) advertising and promotional expenses; (2) consumer studies linking the mark to the source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987). No single factor is determinative and every element need not be proved. *Id.* at 1222. (*citing and quoting Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).

In this case, the market distinctiveness and secondary meaning factors weigh in favor of Mr. Henriquez.  Mr. Henriquez has provided evidence as to the time and costs of his promotional and marketing efforts since 2010, to both create, organize, and launch the MSOC events, and maintain them, not only for the FDNY Parties, but also with many other host agencies, vendors, and participants throughout the years since 2011.  (ECF No. 49, Henriquez Decl. ¶¶ 18-21, 49-50.)  *See Gameologist*, 838 F. Supp. 2d at 158.  Mr. Henriquez said that the MSOC events were regularly advertised and reported in trade publications, and Mr. Henriquez recalls the events being covered by local news sources outside of the New York City.  (ECF No. 49, Henriquez Decl. ¶ 50.)  Mr. Henriquez also testified to the success of the MSOC events, based on a substantial increase in attendance every year since 2011, with roughly 500 attendees participating in the 2022 MSOC event he coordinated.  (Tr. at p. 81.)  Between 2013 and 2019, with Mr. Henriquez's permission, the FDNY Parties have used the MSOC Marks but have not proffered any evidence that they created or started using the MSOC Marks before Mr. Henriquez did.  The FDNY Parties' plan to continue using the MSOC Marks, despite lacking authority from Mr. Henriquez, who explicitly requested that they cease and desist, provides support to the *Centaur* factor regarding attempts by the FDNY Parties to plagiarize Mr. Henriquez's mark.  Finally, Mr.

Henriquez has provided abundant evidence of the length and exclusivity of his use of MSOC Marks, having held his first MSOC event in 2011, and the continuation of MSOC events, in New York and elsewhere in the United States, including MSOC events during the pandemic years of 2020-2021, even when FDNY did not host an MSOC event.  (ECF Nos. 49-1, Henriquez Decl. Ex. A; 49-9, Ex. G; Tr. at pp. 81, 133.)

Thus, even assuming the Medical Special Operations Conference marks are "merely descriptive", which the Court does not find the trademarked words to be, the Marks appear to have achieved market distinctiveness and secondary meaning among the community of attendees, trainers, and sponsors of the MSOC branded events.  (ECF Nos. 49, Henriquez Decl. ¶¶ 49-50 (describing the medical first responder community promoting MSOC events through "word of mouth" and coverage of MSOC-named events in emergency responder trade publications); 54, Henriquez Supp. Decl. ¶¶ 9-10 (referring to the members of "medical special operations community" associating the MSOC name and acronym with events they hosted together); 49-7, Henriquez Decl., Ex. G at p. 6 (flyer requesting sponsors for MSOC events.))

Accordingly, with respect to the strength of the marks, the Court finds that the strength of Mr. Henriquez's Medical Special Operations Conference Marks are strongly

suggestive or arbitrary marks with inherent distinctiveness and market distinctiveness.

### 2. *Similarity of the Marks*

The Court finds that the similarity of the marks factor weighs heavily in favor of Mr. Henriquez. When analyzing the similarity of the disputed marks, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Sports Auth.*, 89 F.3d at 962; *see also Car-Freshner Corp.* at 330-31 ("[W]e have found no decision where differences in packaging dispelled the similarity of a mark that used two identical words, neither of which is descriptive of the products on which they appear, and the defendant put them, in sequence, in a mark placed on competitive products."); *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 294 (S.D.N.Y. 2012)("[W]hen the dominant words in two marks are the same, courts have found that their similarity can cause consumer confusion.") The Second Circuit has also noted that "[i]t is extremely unusual for the mark of a junior user to include two identical words of a senior user's mark in sequence." *Car-Freshner Corp. at* 330.

The Court finds that the similarity of the marks factor weighs heavily in favor of Mr. Henriquez because the FDNY's use of the Medical Special Operations Conference name and MSOC acronym in publicizing its conference is identical to the use and sequence of the Mr. Henriquez's registered Medical Operations Special Conference trademark, except for the addition of the FDNY logo.  The FDNY Parties are also the junior user and directly adopted the Medical Special Operations Conference name and MSOC acronym in their entirety from Mr. Henriquez, after he unequivocally withdrew his consent in November 2019.

### 3. *Proximity of the products and their competitiveness with one another*

The Court finds that the proximity and competitiveness of the products factor heavily weigh in favor of Mr. Henriquez. In considering "to what extent the two products compete with each other," the Court takes into account both the "market proximity and geographic proximity." *Brennan's, Inc. v. Brennan's Rest.*, LLC, 360 F.3d 125, 134 (2d Cir. 2004).  "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products.  Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion."  *Id.*

In this case, not only do the parties have close market proximity, but they are in identical geographic markets with an identical client base, with a nearly identical product. The record before the Court establishes that the market targeting civilian professionals for training in emergency urban search and rescue medical skills did not appear to be significant, or even exist, before Mr. Henriquez and his colleagues first decided to host military-level special operations medical skills and operations training and conferences in different states.  (ECF Nos. 49, Henriquez. Decl. ¶¶ 4-10; 54, Henriquez Supp. Decl. ¶ 9 (Mr. Henriquez described his first MSOC event In 2011 as follows: "[W]e kind of just got together somehow with whatever resources our agencies or our departments or individuals could provide . . . . That first year . . . it was a collective effort from people, now from around the world, just getting [MSOC events] off the ground.")

In 2012, the FDNY, through Dr. Isaacs, approached Mr. Henriquez to host an MSOC event in 2013 with Mr. Henriquez and Mr. Hernandez.  Mr. Henriquez recently learned that the FDNY Parties intend to host the same event (with different programming) in New York in May 2023, targeting the same audience, using the same instructors, vendors, sponsors, in the same place using the MSOC name and acronym Marks, without the consent of Mr. Henriquez.  Though it is true that "both parties'

products exist[ing] within the same industry is not enough" to satisfy competitive proximity, *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 586 (S.D.N.Y. 2018), here, the parties' products and use of the MSOC Marks are identical and there is already evidence of resources being stretched or diverted between the two parties.

Mr. Henriquez asserts there is a limited pool of federal grant monies available to support training conferences in the specialized field of urban search and rescue medical training events, such as the MSOC events, and that federal funding cuts were announced for 2023.  (ECF No. 49, Henriquez Decl. ¶¶ 44-45.)  He also describes how the funding to which the FDNY Parties may have access, previously were provided to benefit the MSOC events organized by Mr. Henriquez for the FDNY in the past.  (*Id*; *see also* ECF No. 54, Henriquez. Supp. Decl. ¶ 12 ("[Mr. Henriquez] and others outside of the FDNY worked to lobby FEMA and state funding agencies to permit their grant funds to be used by regional task force teams specifically for MSOC-branded events."))  Through the efforts of Mr. Henriquez, the funding allowed MSOC event attendees to pay for their attendance and related costs for travel and hotels using federal and state funds and receive their federal certifications.

Not only are the two conferences competing for the same resources, Mr. Henriquez and the FDNY Parties would also be

competing for attendees.  Mr. Henriquez asserts that the FDNY
Parties' intended use of the MSOC and Acronym Marks in May 2023
will create confusion among attendees at the May 2023 FDNY
event, because they may use federal and state grant funds
intended to assist members of state and national search and
rescue teams to obtain required certifications by attending the
MSOC events, but "the FDNY conference . . . will not give them
the required certifications."  (ECF No. 54, Henriquez Supp.
Decl. ¶ 12.)  The FDNY Parties provided no evidence to the
contrary.  There is no evidence that consumers or potential
conference attendees would understand that MSOC and FDNY are
competitors with two separate conferences, because they would
likely be confused by the FDNY's unauthorized use of Mr.
Henriquez's MSOC Marks in New York as planned in May 2023.  In
any case, the Court concludes that there is market proximity
between the MSOC events hosted by Mr. Henriquez and events by
the FDNY parties using Mr. Henriquez's Marks.

　　　　　Mr. Henriquez's MSOC events and the FDNY-hosted
conference are also geographically close.  Both Mr. Henriquez
and the FDNY Parties both hope to host MSOC conferences in New
York.  (ECF No. 49, Henriquez Decl. at ¶ 42.)  Moreover, though
Mr. Henriquez's other MSOC events take place in other geographic
markets—the MSOC brand is national, with medical responders from
all over the country, including the FDNY, traveling to various

conferences outside of New York.  Therefore, even if the FDNY event takes place only in New York, it likely will affect Mr. Henriquez's MSOC event in New York and other geographic markets, placing the two parties in competition.

Given the market proximity and geographic proximity, these factors heavily weigh in favor of Mr. Henriquez.

### 4.   Evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product

The "bridging the gap" factor also weighs heavily in Mr. Henriquez's favor.  Though the "proximity-of-the-products" inquiry concerns whether and to what extent the two products compete with each other," *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996), consideration of "'[b]ridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc.*, 412 F.3d at 387.  Here, both the New York market and the product are the same.  "When . . . the parties' goods are the same, [the 'bridging the gap'] *Polaroid* factor is irrelevant because there is no gap to bridge." *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 195 (S.D.N.Y. 2020).

The Court notes that here, the senior user, Mr. Henriquez, was the first to enter the national market with his MSOC Marks.  Because both Mr. Henriquez and the FDNY Parties

once collaborated to present the MSOC event at the FDNY, they now plan to operate separate events using the Medical Special Operations Conferences Marks in the same New York market. Consequently, the "bridging the gap" factor weighs heavily in Mr. Henriquez's favor.

### 5.   *Evidence of actual consumer confusion*

The Court finds that there is undisputed evidence of actual consumer confusion.  "It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enters. Ltd.*, 335 F.3d at 151.  As such, "evidence of actual confusion [is] 'particularly relevant' to the inquiry." *Id.* (citation omitted).  Based on undisputed evidence in the record, the Court also notes that actual confusion "need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove, and the Act requires only a likelihood of confusion as to source." *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 456 (S.D.N.Y. 2014) (citing *Lois Sportswear* at 875).  The Court finds that there is both actual confusion and the likelihood of confusion as to the source of the Medical Special Operations Conferences if Mr. Henriquez and the FDNY Parties both use the MSOC Marks for their conference names in 2023.

Because the MSOC events at FDNY were developed, organized, and coordinated primarily by Mr. Henriquez between

2013 and 2019, but the FDNY, without permission from Mr.
Henriquez, intends to present a separate MSOC branded event in
May 2023, the Court presumes a high likelihood of confusion for
those who were previously involved with the MSOC events hosted
by the FDNY as participants, speakers, or vendors, as well as
for those newly introduced to the MSOC brand.  It is not
disputed that Mr. Henriquez received inquiries in October and
November 2022 from vendors who were confused about the
relationship between the FDNY-hosted conference and the MSOC
events presented by Mr. Henriquez.  (ECF No. 49, Henriquez Decl.
¶ 43.)  Mr. Henriquez also declared that industry colleagues,
who might have served as instructors, suppliers, or
collaborators, also believed that Mr. Henriquez and the MSOC
community were involved with the FDNY Parties' plans for a 2023
MSOC event, as they had been in all prior years.  (*Id.*)

Mr. Henriquez also credibly testified to vendors, the
public, past participants, volunteers, and instructors
expressing confusion about the FDNY's plan for a 2023 MSOC
event.  (Tr. at pp. 136-39.)  He described participants
registering for the FDNY's MSOC-branded events being confused
about whether certain courses and certifications that were
provided in the past were still going to be available from the
FDNY-hosted 2023 event.  (*Id.*)  Mr. Henriquez also testified
that there are at least seven instances of groups of medical

professionals signing up for the FDNY-hosted event, expecting to take the pre-conference courses Mr. Henriquez and others provided in past MSOC events, and inquiring about refunds when they realized that the courses would not be available at the FDNY's event planned for 2023.  (*Id*.)

Mr. Henriquez explained in his declaration that he and other MSOC coordinators have been participating in a process that will allow them to present upgraded training and federal certifications in accordance with new federal requirements. (ECF No. 49, Henriquez Decl. ¶ 46.)  Though the FDNY Parties state that it is "speculative and unsubstantiated" that the FDNY-hosted event would not be up to date (ECF No. 52, FDNY Opp. at p. 40), there is no evidence disputing Mr. Henriquez's evidence showing that vendors, attendees, sponsors, and industry colleagues are already confused by the FDNY's unauthorized use of Mr. Henriquez's MSOC Marks.  The FDNY Parties seemingly seek to benefit from the confusion that participants may have, as to whether the FDNY-hosted event in 2023 will be the same conference as the past MSOC conference hosted by the FDNY, in which Mr. Henriquez played a significant role between 2013 and 2019.  (ECF No. 54, Henriquez Supp. Decl. ¶ 12; 54-6, Ex. Q (demonstrating that in the past, Dr. Isaacs had already relied on Mr. Henriquez's efforts to secure federal grants for MSOC at FDNY events to reassure the FDNY Foundation there would be

66

enough funding for future MSOC at FDNY events).)   Mr. Henriquez
testified that, in fact, many instructors that he invited to
participate in his previous MSOC events are still going to
support or work at the FDNY-hosted event, because Mr. Henriquez
and other MSOC coordinators do not want to foster animosity and
still want to provide relevant and important resources to the
urban medical first responder community.   (Tr. at 136-39.)

         The Lanham Act is meant to protect "against mistaken
purchasing decisions and not against confusion generally."
Restatement (Third) of Unfair Competition § 20 reporter's note
at 179.   In particular, the Act seeks to avoid "consumer
confusion that enables a seller to pass off his goods as the
goods of another." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576,
582 (2d Cir. 1991).   Based on the record, the Court finds that
due to the FDNY Parties' continued unauthorized use of Mr.
Henriquez's MSOC Marks, "[the] confusion represented by the
[attendees, vendors, and speakers] could inflict commercial
injury in the form of either a diversion of sales, damage to
goodwill, or loss of control over reputation" for Mr. Henriquez.
*Id*.   Because there is considerable undisputed evidence of actual
consumer confusion, this factor weighs heavily in Mr.
Henriquez's favor.

### 6.   *Evidence that the Marks were adopted in bad faith*

The Court finds that the FDNY Parties adopted the Marks in bad faith, and this factor weighs heavily in favor of Mr. Henriquez.  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star*, 412 F.3d at 388.  To demonstrate bad faith, Mr. Henriquez must show that the FDNY Parties had "an intent to promote confusion or exploit good will or reputation."  *Id*.  Bad faith may be inferred where a junior user has actual or constructive knowledge of the senior user's mark.  *Id*.

From the facts discussed at length, the Court finds, *inter alia*, that the FDNY Parties continued to use the MSOC Marks, after Mr. Henriquez withdrew his permission for the FDNY Parties to use his Marks, and despite the FDNY's knowledge that Mr. Henriquez also coordinated MSOC events using his MSOC Marks since 2011 outside of New York, before the first MSOC at FDNY 2013 event.  (ECF No. 49-9, Ex. I) (In an email to three FDNY counsel Moira Archer, Gerald Singleton, and Carol Moran, Mr. Henriquez reiterated his request that his MSOC Marks not be used by the FDNY and wrote, "Attached are copies of some of the documents we discussed, showing the use of 'MSOC' prior to us bringing the event to the FDNY.")  The FDNY Parties also had

knowledge that Mr. Henriquez had established to the satisfaction
of the USPTO his substantial and continued use of the MSOC Marks
in order to obtain USPTO approval of his MSOC trademark
registration.  (ECF No. 51, Fletcher Decl. ¶ 2.)  Nonetheless,
the FDNY Parties commenced planning the 2023 conference, using
the MSOC Marks, without authority from Mr. Henriquez, and this
factor also weighs in favor of Mr. Henriquez.

### 7.   *Respective quality of the products*

The Court finds that the factor regarding the quality
of the conferences weighs in favor of Mr. Henriquez.  The
analysis of the quality of the MSOC event "is primarily
concerned with whether the senior user's reputation could be
jeopardized by virtue of the fact that the junior user's product
is of inferior quality."  *Arrow Fastener*, 59 F.3d at 398.  As
discussed above, Mr. Henriquez has provided undisputed, credible
evidence that the FDNY-hosted events will lack certain courses
and accreditation resources that attendees at past MSOC events
need and expect.  (ECF Nos. 49, Henriquez Decl. ¶ 46; 54,
Henriquez Supp. Decl. ¶ 12; Tr. at pp. 136-39.)  Furthermore,
the record clearly demonstrates that the MSOC events hosted by
the FDNY were largely developed, organized, and coordinated by
Mr. Henriquez between 2013 and 2019, and Mr. Henriquez is no
longer involved with the FDNY-hosted events.  (Tr. at pp. 613-
14)(Dr. Isaacs admitted that Mr. Henriquez suggested major

topics, training, and speakers, and provided his contact lists, materials, and resources.)  Though it appears that the FDNY has benefitted from Mr. Henriquez's creation of previous Event Action Plans and prepared materials, the Court finds it more likely than not that there will be a difference in quality due to Mr. Henriquez's proven role in planning and coordinating the past FDNY hosted MSOC events.  As discussed above, Mr. Henriquez has presented evidence that past attendees who have registered for the upcoming FDNY event in 2023, have already expressed disappointment and requested refunds upon discovering that certain programs and accreditations previously offered at MSOC events, including those hosted by the FDNY, are not offered at the 2023 FDNY event.  (Tr. at pp. 136-39.)  Furthermore, many of these potential attendees may only receive state or federal grant monies to attend one conference on medical special operations training, highlighting the importance that registrants are correctly selecting the conference that would actually provide them with the necessary accreditations.  (ECF No. 54, Henriquez Supp. Decl. ¶ 12.)  Accordingly, the Court finds that the factor regarding quality of the conferences, and protecting Mr. Henriquez's reputation and good will, weighs in favor of Mr. Henriquez.

8.  *Sophistication of consumers in the relevant Market*

Finally, the factor regarding the sophistication of consumers in relevant market weighs in favor of Mr. Henriquez. In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979).  In general, greater sophistication of consumers reduces the likelihood of confusion. *Centaur*, 830 F.2d at 1228.  For purposes of this factor, consumers of relatively inexpensive goods and consumers who make impulsive purchases are generally considered unsophisticated. *See Sports Auth.*, 89 F.3d at 965.

In this case, however, there are not two separate marks for the sophisticated or unsophisticated consumer to distinguish between.  The two parties both use Mr. Henriquez's registered Medical Special Operations Conference name and common law MSOC Marks.  Accordingly, though the medical professionals who attend or participate in the conference are likely to be "sophisticated" for the purposes of being able to distinguish average everyday consumer goods, there is no evidence that the sophistication of these consumers would prevent confusion

between the planned 2023 FDNY-hosted event and the MSOC events produced and organized by Mr. Henriquez, both with the FDNY in the past, and with other medical first responders nationwide. Furthermore, the Court finds that though the MSOC events are attended by "sophisticated" medical professionals, new attendees, sponsors, vendors, and instructors have been added to the MSOC events every year since Mr. Henriquez's first event in 2011.  (ECF No. 54, Henriquez Supp. Decl. ¶ 18).  A 2019 MSOC in Kansas event coordinated by Mr. Henriquez was attended by approximately 300-350 paid attendees, while the 2022 MSOC in South Carolina event was attended by more than 500 paid participants.  (*Id.*)  Thus, there is a strong likelihood of confusing the increasing the number of new participants and partners interested in MSOC events hosted by Mr. Henriquez, and also confusing past attendees incapable of distinguishing between the previous MSOC at FDNY events and the 2023 FDNY-hosted conference, regardless of the sophistication level of these consumers.  This last *Polaroid* factor regarding sophistication of consumers in relevant market weighs in favor of Mr. Henriquez.

### C. **Irreparable Harm**

#### 1. *Delay*

Now that the Court has found that Mr. Henriquez established the likelihood of success on the merits, it will

consider whether, and does find that, Mr. Henriquez has shown that he will suffer irreparable harm in the absence of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  The Court notes again that "if (1) [Mr. Henriquez] establishes that [he] has a likelihood of success on the merits (that is, [he] establishes both the validity of [his] mark and a likelihood of confusion), and (2) the [FDNY Parties] fail to rebut the presumption, the [moving party] satisfies [his] burden of showing irreparable harm." *Two Hands IP LLC*, 563 F. Supp. 3d at 300; *see also Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 967 (2d Cir. 1995).

The FDNY Parties primarily argue that any presumption of harm to Mr. Henriquez is negated because Mr. Henriquez acted with extraordinary delay and that both parties have been "using the MSOC Marks as descriptive marks to hold separate conferences, without any evidence of likely or actual consumer confusion."  (ECF Nos. 52-1, FDNY Opp. at pp. 11-12; 69, Mr. Singleton's Feb. 22, 2023 Letter.)  The Court respectfully disagrees with the FDNY's inaccurate view of the evidence.  The FDNY Parties has not proffered evidence that it held separate conferences using Mr. Henriquez's protected MSOC Marks.  Indeed, the record shows that after Mr. Henriquez notified the FDNY Parties to cease using his Marks after he assisted with the 2019 MSOC events hosted by the FDNY, the FDNY did not host a

conference in 2020 or 2021, purportedly due to the Covid-19 pandemic.  (Tr. at pp. 131-32, 241; ECF No. 49-9, Henriquez Decl., Ex. G.)

Mr. Henriquez did not have knowledge of the FDNY Parties' intentions to use, without his consent, his identical MSOC name and acronym Marks for the planned 2023 event, and diligently pursued his legal rights to notify the Dr. Isaacs and the FDNY Parties to enforce his Marks when he became aware of the 2023 event.  (ECF Nos. 49, Henriquez Decl. ¶ 41; 51, Fletcher Decl. ¶ 2; Tr. at 136-39.)  Furthermore, as early as 2018, Mr. Henriquez repeatedly communicated to Dr. Isaacs and FDNY legal counsel and officials his request that FDNY cease using his MSOC Marks.  (ECF No. 49, Henriquez Decl. 35; 49-9, Ex. I at p. 2.)

On November 8, 2018, Mr. Henriquez sent a text to Dr. Isaacs requesting that the FDNY Parties stop using his Marks. (ECF No. 49-9, Henriquez Decl., Ex. I at p. 2.)  On January 14, 2019, Mr. Henriquez sent an email to Dr. Isaacs and the FDNY Foundation leadership "requesting to please unpublish any references to the MSOC artwork/patches, MSOC, and MSOCC branding."  (*Id.* at p. 3.)  In this email, Mr. Henriquez made it clear that his licensed MSOC materials could not be used or shared publicly until concerns between the FDNY Parties and him were clarified.  (*Id.*)  Despite the break down in trust, in

2019, Mr. Henriquez produced one last MSOC event with and at the request of the FDNY, credibly testifying (Tr. at p. 131) that he believed and hoped that any conflicts would be resolved.  Mr. Henriquez further testified at the hearing that Dr. Isaacs and other FDNY officials repeatedly relayed to him that "there was a misunderstanding" and pushed Mr. Henriquez to finish coordinating the 2019 conference.  (*Id.*)  The Court also finds that Mr. Henriquez believed in good faith that there would be an amicable resolution between the parties.  Though the FDNY Parties used Mr. Henriquez's MSOC Marks in 2019, the use was in *partnership* with, and with the consent of, Mr. Henriquez, as Dr. Isaacs and others asked Mr. Henriquez to help produce the 2019 MSOC at FDNY event.  (ECF No. 49, Henriquez Decl. ¶ 36.)

After the 2019 MSOC event hosted by FDNY, however, Mr. Henriquez reiterated his request to the FDNY Parties to cease using his MSOC Marks.  In a November 2019 email to FDNY attorney Moira Archer, New York City Assistant Corporation Counsel Gerald Singleton, and FDNY Deputy General Counsel Carol Moran, Mr. Henriquez requested again that the FDNY "remove any references to MSOC/Medical Special Operations in association with the FDNY" and included attachments of Mr. Henriquez's previous use of the MSOC Marks elsewhere in the country, before the MSOC at FDNY event in 2013.  (ECF Nos. 49, Henriquez Decl. ¶ 37; 49-9, Ex. I.

75

at p. 3.)  Mr. Henriquez expressed his continuing hope to resolve the dispute in a positive manner.  (*Id.*)

FDNY did not host conferences in 2020 and 2021, so Mr. Henriquez had no reason to believe that his MSOC name and acronym Marks would be used again by the FDNY.  (Tr. at pp. 131-32, 241.)  In fact, Dr. Issacs's text messages in November and December 2019 to Mr. Henriquez's friend and fellow MSOC organizer, Mr. Hernandez, stated that the MSOC event had "become a nightmare and may have to be cancelled," and that the FDNY Foundation had no intention of offering the MSOC conferences on its own, without the support provided by Mr. Henriquez and Mr. Hernandez, who stated they "did not need the [FDNY Foundation] for anything."  (ECF Nos. 50-2, Hernandez Decl., Ex. B; 50-3, Hernandez Decl., Ex C.)  Between 2019 and 2021, the FDNY and city also "engaged in a variety of hostile conduct against Mr. Henriquez," which he alleges was retaliating.  (ECF No. 49, Henriquez Decl. ¶ 39.)

In April 2022, after Mr. Henriquez found out that the FDNY would be hosting a MSOC branded event in May 2022, without his permission, and after the FDNY had not hosted any MSOC events for two years in 2020 and 2021, Mr. Henriquez promptly sent a cease-and-desist letter dated May 10, 2022.  (ECF No. 51-1, Fletcher Decl., Ex. A.)  There is scant evidence before the Court regarding any FDNY hosted conference in 2022.  It was then

76

that the FDNY Parties responded by commencing this instant
lawsuit against Mr. Henriquez on May 31, 2022, and counsel for
Mr. Henriquez commenced good-faith settlement efforts, including
providing numerous documents and proposing various avenues to
Mr. Singleton to amicably resolve the case.  (ECF Nos. 1,
Compl.; 55-1, Fletcher Supp. Decl., Ex. B; 51-2, Fletcher Supp.
Decl., Ex. C.)

     Beginning in June 2022, the parties corresponded by
email about their respective settlement communications and
positions and continued their discussions at least until early
July 2022.  (ECF Nos. 55-1, Fletcher Supp. Decl., Ex. B; 55-2,
Fletcher Supp. Decl., Ex. C.)  At a conference on September 7,
2022, to discuss the instant preliminary injunction motion, this
Court ordered the parties to engage in settlement discussions
before Magistrate Judge Kuo, who held a settlement conference on
October 26, 2022.  (Minute Entry dated Sept. 9, 2022; Minute
Entry dated Oct. 26, 2022.)  Thereafter, Mr. Henriquez requested
a pre-motion conference on November 1, 2022 for the instant
motion.  (ECF No. 17, Henriquez Pre-motion Conf. Letter; 51,
Fletcher Decl. ¶¶ 5-6.]  In October 2022, while the parties were
in ongoing settlement discussions, Mr. Henriquez discovered that
the FDNY Parties intended to host yet another MSOC-branded event
in 2023, using the MSOC Mark and Acronym without Mr. Henriquez's
permission, and without the involvement of the original MSOC

77

coordinators, such as himself and Mr. Hernandez.  (ECF No. 49, Henriquez Decl. ¶ 41.)  Mr. Henriquez and Mr. Hernandez are planning a spring 2023 MSOC event that will directly compete with the FDNY event and has already caused confusion with registration, participants, speakers, and vendors.  (Tr. at 136-39; ECF No. 54, Henriquez Supp. Decl. ¶ 12.)  On November 1, 2022, within weeks of discovering the planned 2023 event, Mr. Henriquez requested a pre-motion conference for his motion for a preliminary injunction.  (ECF No. 17, Pre-Motion Conf. Letter.)

Mr. Henriquez's diligent efforts to protect his MSOC Mark and Acronym Mark are readily distinguishable from the facts in *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d. Cir. 1995), a case also cited by the FDNY Parties in their most recent submission.  (ECF No. 69, Singleton Feb. 22, 2023 Letter.)  The plaintiff in *Tough Traveler* waited four months after commencing suit before seeking a preliminary injunction. Similarly, *Citibank, N.A.*, 756 F.2d at 276, is also distinguishable where the plaintiff did not seek a preliminary injunction until nine months after it received notice of defendant's intentions to open a competing store, as is another case cited by the FDNY Parties, *BS Premium Holdings, LLC v. Premium Sweets & Desserts Inc.*, No. 21-CV-4872(EK)(TAM), 2022 WL 604064, at *7 (E.D.N.Y. Feb. 28, 2022), where the plaintiff did not bring suit until a year after discovering a competing

restaurant's use of a trademark, or *Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, 16-cv-5079 (JKG), 2016 WL 4367990, at *3, where the plaintiff did not bring suit for roughly eighteen months after becoming aware the trademark was being used. By contrast, after Mr. Henriquez learned that the FDNY Parties planned to host a 2023 MSOC-branded event, Mr. Henriquez engaged in settlement efforts, filed his answer and counterclaims on the dates ordered by the Court, and sought leave to move for a preliminary injunction within a month of learning of the plans for the 2023 conference.

Furthermore, Mr. Henriquez has presented evidence of the harm that FDNY-hosted MSOC events will cause to his goodwill and the MSOC brand (ECF No. 49, Henriquez Decl. ¶¶ 42-49), by diligently pursuing his legal rights by sending communications to FDNY officials to cease using his Marks, registering his MSOC trademark with the USPTO, and engaging in what he believed to be good-faith discussions with the FDNY parties. (Tr. at pp. 134-35.) Courts have consistently held that when a delay is caused by "ignorance of [opponent's] competing product or [the movant's] good-faith efforts to investigate the alleged infringement," such delay is not fatal to a claim of irreparable harm. *Tough Traveler*, 60 F.3d at 968; *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (noting that a "plaintiff's making good-faith efforts to investigate" may

justify delays in seeking relief (citation and quotation marks omitted)); *Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc.*, No. 22-cv-1375, 2022 WL 3045038, at *4 (E.D.N.Y. Aug. 2, 2022)("Because plaintiff has diligently and swiftly sought to defend its legal rights from the time of [discovery of infringement], there is no delay negating the presumption of irreparable harm.")

The Court notes the unique facts of this case, that it was the FDNY Parties who escalated their dispute with Mr. Henriquez by filing a federal court lawsuit, after Mr. Henriquez asserted his rights and engaged in good-faith efforts to resolve all issues, and placed Mr. Henriquez in a defensive position. Accordingly, any purported "delays" in Mr. Henriquez pursuing a preliminary injunction and counterclaims against the FDNY Parties will not negate irreparable harm because Mr. Henriquez acted promptly and in good faith. Because Mr. Henriquez has ardently and swiftly sought to protect his legal rights since he learned that the FDNY Parties intended to host a 2023 event using Mr. Henriquez's protected Marks, the Court finds that there was no delay negating the presumption of irreparable harm to Mr. Henriquez.

The Court notes that Assistant Corporation Counsel Gerald Singleton has declared that there "were no meaningful settlement discussions" and that "on June 30, 2022, Defendant's

counsel sent me an email with formal settlement proposal, which
I promptly rejected the next day." (ECF No. 52-2, Singleton
Decl. ¶ 10; (see also ECF No. 69, Singleton Feb. 22, 2023 Letter
(Mr. Singleton detailing the multiple times he "immediately
rejected" any settlement proposals.).)  The FDNY parties also
elaborate in their opposition papers that the settlement
discussions were not "meaningful" because the FDNY Parties
lacked "any reason to believe [Mr. Henriquez] would consider a
change of name or cease using the MSOC Marks for the FDNY MSOC,
which has become a very prestigious event associated with the
FDNY and FDNY Foundation." (ECF No. 52-1, FDNY Opp. at 4.)  Mr.
Singleton does not dispute that in September 2022, the Court
ordered the parties to appear for a settlement conference before
Judge Kuo, which was held on October 26, 2022. (ECF No. 69,
Singleton Feb. 22, 2023 Letter at 2.)

        The Court finds that the FDNY Parties' outlook on what
would have constituted "meaningful" settlement discussions and
Mr. Singleton's declaration evinces serious questions as to the
FDNY Parties' good-faith negotiations, which the Court had
presumed when they appeared in late October before Judge Kuo for
a settlement conference.  Mr. Henriquez has offered credible and
persuasive reasons and sufficient factual support for any delay
including "ignorance regarding defendant[s'] alleged
infringement, good-faith attempts to investigate that

infringement, and diligent pursuit of settlement negotiations."
*Goat Fashion Ltd. v. 1661, Inc.*, No. 19-cv-11045, 2020 WL
5758917, at *5–6 (S.D.N.Y. Sept. 28, 2020).  The Court therefore
concludes that Mr. Henriquez's claim of irreparable harm is not
rebutted by any delay.

### 2.   *Presumption of Harm*

The Court, having found that delay does not negate Mr.
Henriquez's presumption of harm, next considers the presumption
of harm itself, and finds that Mr. Henriquez will suffer
irreparable harm.  Though the Court notes that Mr. Henriquez has
already "satisfied his burden of showing irreparable harm",
*Tough Traveler* at 967, the Court will complete the analysis.
The Court finds, based on the evidence in the record, that Mr.
Henriquez will suffer "an injury that is neither remote nor
speculative, but actual and imminent and one that cannot be
remedied if a court waits until the end of trial to resolve the
harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d
Cir. 2005).  Irreparable harm exists in a trademark case "when
the party seeking the injunction shows that it will lose control
over the reputation of its trademark pending trial," because
reputation is "not calculable nor precisely compensable." *Power
Test Petroleum Distribs., Inc. v. Calcu Gas, Inc*., 754 F.2d 91,
95 (2d Cir. 1985).

Mr. Henriquez has shown that he, and his MSOC name and acronym, will be irreparably harmed because he will lose control over the use of his Marks and the reputation of MSOC events, and suffer the confusion and loss of attendees, vendors, trainers, speakers, corporate sponsors, state and federal funding streams for training events, and MSOC's goodwill in the medical first responder community.  The FDNY Parties assert that for years the MSOC events at FDNY and other MSOC events across the country have concurrently taken place, and that this should demonstrate there is no harm continuing to do so.  But the Court finds this argument unpersuasive, because as discussed at length above, all of the FDNY-hosted MSOC events prior to the FDNY-hosted 2022 and anticipated 2023 events were organized and developed by Mr. Henriquez, who had control over the MSOC reputation nationally.

The FDNY Parties offer no evidence of any MSOC event in which Mr. Henriquez did not participate or provide his consent to use the MSOC Marks.  The unauthorized use of the MSOC Marks by the FDNY Parties, without the consent of Mr. Henriquez or involvement of Mr. Henriquez and the original MSOC coordinators, at the 2023 or further MSOC events would cause loss and harm to the reputation of MSOC-branded events already taking place.  Mr. Henriquez, as the creator, original organizer, and coordinator of the MSOC Mark and Acronym, has devoted over a decade of his own time and funds to his vision

that has driven the success of the MSOC conferences thus far.
Any conference using the MSOC Marks without Mr. Henriquez's
consent, input, and coordination, would be, if not lower in
quality, different in quality and will cause confusion.  And,
for a protected mark like MSOC, any risk of diminished standards
would cause irreparable harm.  *Omega Importing Corp. v. Petri-
Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)("Where there
is . . . such high probability of confusion, injury irreparable
in the sense that it may not be fully compensable in damages
almost inevitably follows . . . [I]f an infringer's product is
of poor quality, or simply not worth the price, a more lasting
but not readily measurable injury may be inflicted on the
plaintiff's reputation in the market.")

Mr. Henriquez also plans on hosting his MSOC event in
the spring of 2023 in New York and has provided evidence that
the FDNY Parties' unauthorized use of the MSOC Marks has already
confused vendors and attendees.  (ECF No. 49, Henriquez Decl. ¶¶
42-45.)  Specifically, Mr. Henriquez has provided evidence of
instances in which the FDNY Parties' unauthorized use of Mr.
Henriquez's protected MSOC Marks has already caused, and will
continue to cause, confusion and the loss of control by Mr.
Henriquez of the MSOC Mark and Acronym and MSOC events in New
York.  In October and November 2022, Mr. Henriquez received
inquiries from vendors who were confused about the relationship

between Mr. Henriquez's MSOC event and the FDNY Parties'
unauthorized MSOC branded event.  (*Id*. ¶ 43.)  Mr. Henriquez
also explained that given the limited time and funds for these
identical events, attendees and instructors may likely have
capacity and resources to only participate in only one of the
conferences.  (*Id*. ¶ 44.)  Furthermore, the two conferences are
identical in their use of the MSOC Marks, but the conferences
will be providing different resources—with the FDNY event
lacking certain programs and federal accreditations that past
MSOC attendees have had opportunities to obtain and have come to
expect.  (*Id*. ¶ 46; ECF No. 54, Henriquez Supp. Decl. ¶ 12.)  At
this time, it is not possible to calculate how many emergency
medical professionals would be so misled, or whether Mr.
Henriquez and the original MSOC coordinators would be able to
re-establish their decades-long relationships with these
professionals.

The Court finds that the confusion created by the
FDNY's unauthorized use of Mr. Henriquez's Marks will cause harm
to the Medical Special Operations Conference name and acronym.
A mark risks becoming the victim of "genericide" when the public
appropriates the trademark term as a name for the product
itself, a process "set in motion by two, often concurrent
processes, namely, (i) the trademark owner's failure to police
the mark, resulting in widespread usage by competitors, and (ii)

the public's inability to call the product by any other name than the trademarked term." H*orizon Mills Corp. v. QVC, Inc*., 161 F. Supp. 2d 208, 214 (S.D.N.Y. 2001) (collecting cases). Here, medical professionals all over the country will reasonably expect the 2023 unauthorized FDNY-hosted MSOC event to be identical to the MSOC conferences that Mr. Henriquez has coordinated with the FDNY in the past, with the MSOC event that Mr. Henriquez plans to host in 2023, and with the MSOC events that Mr. Henriquez has hosted and will host in other states. They will assume the same level of coordination, programming, accreditation, and ethos of the conference (not-for-profit, training, information gathering and sharing) that Mr. Henriquez has sought to protect since 2011.

Even if emergency medical professionals understood that the FDNY's MSOC events no longer involved the original MSOC coordinators, the FDNY Parties' unauthorized use of Mr. Henriquez's MSOC Marks for their own conference will cause all conferences to be similarly referred to as "MSOC" or "Medical Special Operations Conferences," weakening and genericizing Mr. Henriquez's MSOC mark and rendering the MSOC Marks ultimately vulnerable to attack or deregistration as generic in the fullness of time. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 13-14 (2d Cir. 1976); *see also Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 42-43 (2d Cir. 1994) (discussing

trademark dilution).  The damage caused by the erosion of the
Medical Special Operation Conference Marks by the FDNY Parties
is significant, ongoing, and difficult to quantify.

Moreover, the Court cannot look past the unique
circumstances of this trademark case, in which the FDNY Parties
requested assistance from and collaboration with Mr. Henriquez,
to host MSOC events, initially using the MSOC Marks with his
permission, but then becoming a direct competitor by
subsequently using, without Mr. Henriquez's permission, the
identical MSOC name and acronym to market the FDNY Parties' own
conference in 2022 and 2023.  These facts are sufficient to
establish that Mr. Henriquez has lost or will continue to lose
control over the MSOC reputation in the marketplace.  "One of
the most valuable and important protections afforded by the
Lanham Act is the right to control the quality of the goods
manufactured and sold under the holder's trademark." *El Greco
Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d
Cir. 1986).  Indeed, through their unauthorized use of the MSOC
Marks, the FDNY Parties have become a competitor by entering the
market of longstanding emergency medical professionals
conferences organized nationally by Mr. Henriquez, and it is
realistic to anticipate that Mr. Henriquez and other
coordinators of the original Medical Special Operations
Conference brand will lose considerable control over, and good

87

will from the national MSOC events.  Mr. Henriquez's loss of
control over MSOC's reputation is compounded by the FDNY
Parties' apparent effort to misappropriate his MSOC Marks by
arguing that the FDNY trademark and FDNY brand name appear along
with the MSOC Marks.  Mr. Henriquez has permitted the MSOC Marks
to appear with dozens of other fire departments across the
nation, in locales where Mr. Henriquez and the MSOC community
have created, organized, and produced MSOC events, but those
locales, unlike the FDNY Parties, have not attempted to assert
rights to Mr. Henriquez's MSOC Marks.  (ECF No. 52-1, FDNY Opp.
at p. 12)(referring to the "prominent use of the famous FDNY
trademarks in conjunction with all uses of the MSOC Marks for
the FDNY MSOC.")  This case presents a specific instance of
irreparable harm not redressable by damages, or, at the very
least, harm not reparable except by equitable injunctive relief
against the FDNY Parties.

### D.   Balance of the Equities and the Public Interest

Finally, the Court finds that the balance of the
equities and the public interest weigh in favor of granting Mr.
Henriquez's motion for a preliminary injunction.  In determining
whether the balance of the equities tips in Mr. Henriquez's
favor and whether granting the preliminary injunction would be
in the public interest, the Court "must balance the competing
claims of injury and must consider the effect on each party of

the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The FDNY Parties have repeatedly asserted that its trademarked FDNY logo and FDNY name provided the MSOC events publicity and capital in previous years.  Though the FDNY Parties may incur some expense in ceasing the use of the term, Medical Special Operations Conference and MSOC, or renaming the FDNY's conferences, the FDNY Parties have demonstrated their ability to rebrand by using a new design, other than the one Mr. Henriquez originally designed for MSOC with the FDNY rocker.  On January 18, 2019, Ms. Archer wrote Mr. Henriquez, "Notwithstanding the above, the Fire Department wishes to avoid protracted debate on this issue and has, therefore, elected to proceed with using another MSOC design for this year's conference."  (ECF No. 52-21, FDNY Opp., Ex. 8.)  The Court now orders that the FDNY cease using the "Medical Special Operations Conference" Mark and "MSOC" Acronym Marks.

As for the hardships to Mr. Henriquez, it is he who has expended considerable personal time and funds creating, organizing, and maintaining the MSOC events, and marketing the conferences in New York and in other states.  The confusion

89

caused by the 2023 FDNY-hosted event and references to Medical Special Operations Conference and MSOC would adversely affect Mr. Henriquez's goodwill that he has built for the MSOC brand across the country.  Mr. Henriquez has demonstrated that he would be irreparably harmed by the FDNY Parties' continued unauthorized use of Mr. Henriquez's "Medical Special Operations Conference" and "MSOC" Marks.  The equities therefore weigh decidedly in favor of the Counter-Plaintiff, Mr. Henriquez.

The public interest also favors enjoining the FDNY Parties from using Medical Special Operations Conference and MSOC Marks.  The Second Circuit has long held that there is a "strong interest in preventing public confusion." *ProFitness Physical Therapy Ctr.*, 314 F.3d at 68.  The FDNY Parties' use of the MSOC Marks has caused, and continues to cause, substantial confusion in the market, and the public interest would be served by eliminating that confusion.  As discussed *supra*, it is in the interest of potential attendees who expect to earn certain certifications at an MSOC event, to not mistakenly register for a 2023 FDNY event that would be different in quality than the MSOC event hosted by Mr. Henriquez and fail to provide the benefits registrants expect.  (ECF No. 54, Henriquez Supp. Decl. ¶ 12; Tr. at pp. 136-39.)  Therefore, the public interest would be served by a preliminary injunction in this case.

**CONCLUSION**

For the foregoing reasons, the Court concludes that Counter-Plaintiff Mr. Henriquez is entitled to a preliminary injunction enjoining Counter-Defendants, the FDNY Parties, from using the trademarked words "Medical Special Operations Conference" name and "MSOC" acronym, because Mr. Henriquez has established not only the validity of his common law and statutory rights to the Marks, but he has also demonstrated a likelihood of success; irreparable harm absent injunctive relief; that the balance of hardships tips decidedly in his favor; and that the public interest weighs in favor of granting him an injunction.

Rule 65 "allows a preliminary injunction to become effective only upon the applicant's positing of an amount that the district court determines adequate." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004). The Court will fix an adequate amount for the bond based on the costs, if any, of eliminating Mr. Henriquez's Marks from the FDNY Parties' 2023 conference marketing materials. To comply with the preliminary injunction, the FDNY Parties are required to cease any and all use of the disputed MSOC Marks discussed herein and modify their advertising and business practices accordingly.

In accordance with the foregoing, IT IS HEREBY ORDERED that Counter-Plaintiff's application for a preliminary

injunction is GRANTED as follows, Counter-Defendants are prohibited from: (1) using Mr. Henriquez's trademarked Medical Special Operations Conference Mark and MSOC Acronym Mark without his permission, in connection with charitable fundraising, special events, training courses, and other goods or services; and (2) using the Medical Special Operations Conference Mark and MSOC Acronym Mark, name, logo, design, or source designation in connection with the FDNY Parties' services and goods that are produced, provided, sponsored, authorized by, or connected to Mr. Henriquez.  This injunction shall remain in effect until further order of this Court.

**SO ORDERED.**

/s/ Kiyo A. Matsumoto
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York

Dated: Brooklyn, New York
       February 23, 2023