1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - X
                     :
3    THE CITY OF NEW YORK, et   :  22-CV-3190(KAM)
    al.,                  :
4                      :
        Plaintiffs,       :
5                      :  United States Courthouse
                      :  Brooklyn, New York
6   -against-          :
                      :
7                      :  January 17, 2023
                      :  9:00 a.m.
8    JUAN HENRIQUEZ, et al.,   :
                      :
9        Defendants.       :

10  - - - - - - - - - - - - - - - X

11     TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
       BEFORE THE HONORABLE KIYO A. MATSUMOTO
12           UNITED STATES DISTRICT JUDGE

13           A P P E A R A N C E S:

14  For the Plaintiff:      NEW YORK CITY LAW DEPARTMENT
                      Labor and Employment Division
15                    100 Church Street
                      New York, NY 10007-2601
16
                    BY:  GERALD E. SINGLETON, ESQ.
17                      GAVIN MACKIE, ESQ.

18  For the Defendant:      FLETCHER LAW, PLLC
                      246 Fifth Avenue, 3rd Floor
19                    New York, NY 10001

20                    BY:  JORDAN FLETCHER, ESQ.

21  Also Present:           Moira Archer

22  Court Reporter:         DENISE PARISI, RPR, CRR
                    Official Court Reporter
23                    Telephone: (718) 613-2605
                    E-mail:  DeniseParisi72@gmail.com

24

25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

1          (In open court.)

2          THE COURT:  All right.  This is a civil action, City

3   of New York, et al., versus Juan Henriquez, 22-CIVIL-3190.

4   This is a hearing on defendant, counter-plaintiff,

5   Mr. Henriquez's motion for preliminary injunction.

6          Will the parties, starting with plaintiff's counsel,

7   state their appearances, please.

8          MR. SINGLETON:  Gerald Singleton, New York City Law

9   Department, for the plaintiff.

10         THE COURT:  Good morning.

11         Who else?

12         MR. MACKIE:  Gavin Mackie from the New York City Law

13  Department for plaintiff.

14         THE COURT:  Thank you.  Good morning.

15         And who do we have for the defendant?

16         MR. FLETCHER:  Good morning, Your Honor.

17         Jordan Fletcher for defendant, Juan Henriquez, who

18  is sitting next to me.

19         THE COURT:  All right.  Good morning.

20         Are you ready to proceed?  It's your motion.

21         MR. FLETCHER:  Yes, I think we are, Your Honor.

22         THE COURT:  All right.

23         MR. FLETCHER:  I believe there may have been some

24  preliminary issues.

25         THE COURT:  All right.  What are those?

1        MR. FLETCHER:  First off, there was -- I guess

2   there's a declaration by a witness, Mr. Nahmod, on behalf of

3   the City.

4        THE COURT:  Yes.

5        MR. FLETCHER:  And the City had told me he was not

6   going to be testifying, and then they submitted a declaration

7   from him -- I guess last week -- that they are not making him

8   available for cross.

9        So I don't know what to do about that.  You know,

10  frankly, I don't -- I think his declaration should be struck.

11  I don't think his declaration matters terribly for the City's

12  case, but there are two places that it matters.  One is that

13  Mr. Nahmod -- Chief Nahmod claims personal knowledge of

14  certain facts that I don't actually think he has personal

15  knowledge of; and, two, he was also directly above Dr. Isaacs

16  in the chain of command --

17       THE COURT:  Yes.

18       MR. FLETCHER:  -- and approved certain activities,

19  so I do have concerns about him not being available for cross.

20       THE COURT:  All right.  Yes, the old rogue agent

21  theory -- or not really an agent theory.

22       Well, does the City want to be heard?

23       MR. SINGLETON:  Yes, Your Honor.

24       Abdo Nahmod is a retired chef.  He's been retired

25  for seven years.  He works for Northwell.  When he said he

1   would not appear, he says:  I'm retired.  I don't -- I'm done,

2   I don't want to appear.

3          THE COURT:  Well, he can't have it both ways.  He

4   submitted a declaration, which presumably was drafted by

5   counsel, so it wasn't a heavy lift for him, but he did submit

6   a declaration, so...

7          MR. SINGLETON:  He submitted the declaration

8   after -- he agreed to submit a declaration, and I wrongly

9   assumed that he was also going to be willing to testify, and

10  he said:  No, I'm not going to come.

11         He's not under my control.  I told him I would not

12  subpoena him.

13         THE COURT:  Well, somebody can somebody him.  The

14  defendant could.  But you are not subpoenaing him because he's

15  outside the jurisdiction?  Or why aren't you subpoenaing him?

16         MR. SINGLETON:  No.  He's in Nassau, and I -- out of

17  respect for him, I am not going to ask him to come.  I think

18  his declaration is largely redundant of what other chiefs say.

19  We'll have several chiefs testifying, including Elizabeth

20  Cascio, who is the chief of staff, and Jonathan Pistilli, who

21  is an EMS chief.

22         THE COURT:  Well, he says that he personally knows

23  that Doug Isaac's came up with the idea for the FDNY MSOC.  He

24  also says, in paragraph 5, that he recalls that Mr. Henriquez

25  prepared a design logo for the FDNY MSOC in or about 2015 to

1    be used to promote the FDNY MSOC, and he was personally

2    involved in the approval processes for the patch and a

3    challenge coin with the same logo.

4              MR. SINGLETON:  The design --

5              THE COURT:  He claims to be ignorant that

6    Mr. Henriquez had used the same or similar design for other

7    MSOC events.

8              So I don't know whether on cross we could have

9    ascertained the basis for his statement that he personally

10   knows that Dr. Isaacs came up with the idea, and also whether

11   he -- when he speaks about the MSOC logo, whether he's

12   discussing the FDNY MSOC logo or the other iterations that was

13   originally conceived by Mr. Henriquez in 2010 or '11.

14             2011 was it?

15             So, I mean, I do think there's some prejudice here.

16   He submitted a declaration, and he's refusing to be

17   cross-examined.

18             MR. SINGLETON:  Your Honor, if I may.

19             The logo and the challenge coin in that is not an

20   issue in this case.  We withdrew the copyright claim.  We

21   changed the logo.  We started using a different logo in 2019

22   when the dispute between the parties first arose.  We have not

23   used it.  We have a different logo today.  So it's really not

24   relevant.  It's a collateral fact.  It's not material to this,

25   and I would ask -- and I believe that the fact that regardless

1   of the fact that Mr. Henriquez allegedly came up with the idea

2   for the name, I think when you hear all the testimony, you

3   will find that that is not a material fact either, and I would

4   ask the Court to reserve decision and not strike it at this

5   point until we get to a later point.

6          THE COURT:  Is that satisfactory to defense counsel?

7   We can ignore it for now.

8          MR. FLETCHER:  Your Honor, I'm fine with ignoring

9   it.  I just want to correct one thing that Mr. Singleton said.

10         The logo is absolutely relevant because the logo has

11  the trademark on it, and it's a reflection of the brand.

12         THE COURT:  Right.

13         MR. FLETCHER:  There may not be copyright claims

14  right now, but the logo is the brand.  And to the extent that

15  the individuals of the FDNY knew that that logo was being used

16  in different forms elsewhere, that shows important knowledge.

17         THE COURT:  Wouldn't other FDNY witnesses be able to

18  admit that they knew that this MSOC logo was being used

19  elsewhere for other conferences outside of New York?

20         MR. FLETCHER:  Yes, I believe they would, Your

21  Honor.

22         THE COURT:  Okay.  We will reserve.  He was in the

23  direct chain of command between Mr. Henriquez and his

24  participation with Dr. Isaacs, and he, I believe, was a

25  superior officer to Dr. Isaacs; is that correct?

1        MR. SINGLETON:  Dr. Isaacs is not a superior

2   officer.

3        THE COURT:  No, but he supervised directly.  I'm

4   asking, what was the relationship between Mr. Nahmod and

5   Dr. Isaacs?  Wasn't he his superior?

6        MR. SINGLETON:  No, Your Honor.

7        THE COURT:  Okay.  What was the relationship?

8        MR. SINGLETON:  He's just the chain of command.  He

9   is one of the chief -- he is what they describe as FDNY

10  leadership.

11       THE COURT:  Okay.

12       MR. SINGLETON:  He makes command decisions.  He is

13  not directly over the FDNY Medical Bureau -- Bureau of Medical

14  Affairs, which -- where Dr. Isaacs is.

15       THE COURT:  All right.  So when you talk about chain

16  of command with regard to Mr. Nahmod vis-a-vis Dr. Isaacs, is

17  he in a higher position than Dr. Isaacs?

18       MR. SINGLETON:  He is certainly in a higher

19  position.

20       THE COURT:  Okay.  That's all that I wanted to know.

21       All right.  Is there anything else preliminarily?

22       MR. FLETCHER:  Yes, Your Honor, unfortunately.

23       So there was another declaration filed at about

24  9:00 p.m. last night by the City.

25       THE COURT:  I haven't seen it.

1          MR. FLETCHER:  Yeah.  I only happened to glance at

2     my email late last night.

3          THE COURT:  I mean, I worked on this all weekend,

4     and part of last week.

5          What was the other declaration filed last night?

6          MR. FLETCHER:  It was a declaration of Geoffrey

7     Burkart, who is not on their witness list, Your Honor.

8          THE COURT:  All right.

9          Do you want to exclude that as well?

10          MR. FLETCHER:  I mean, I feel like I should say yes

11     procedurally.

12          THE COURT:  Yes, procedurally as a matter of

13     fairness, it's really not appropriate, but what does this --

14     maybe I will ask Mr. Singleton to explain why this is

15     relevant.

16          MR. SINGLETON:  Your Honor, I found out about Mr. --

17     first of all, Mr. Burkhart is the CEO and founder of Guardian

18     Centers in Perry, Georgia.  It is a training facility that

19     provides training for federal government, DOD, all branches of

20     the military, and state and local government.

21          In terms of his relevance to this case, defendant

22     claims that they held a MSOC event at the Guardian Center in

23     2012 and in 2015.  Within the record now is an email and

24     testimony by Dr. Isaacs that he received an email from someone

25     at the Guardian Center -- some executive at the Guardian

1    Center saying:  That's not possible.  We didn't even open to

2    the public until December of 2012.

3            And this conference was allegedly in August of 2012.

4            In response to that, Mr. Henriquez put in a

5    supplemental declaration saying:  Oh, well that was just a

6    draft.  I know it wasn't open.  It was held -- acted when it

7    was -- at the Guardian Center when it was not open to the

8    public, and he tries to explain it away.

9            Over the weekend, I reached out -- well, he reached

10   out to me.  I got his contact information --

11           THE COURT:  Why didn't you put him on your witness

12   list?

13           MR. SINGLETON:  I didn't know -- I didn't have a

14   reason to call him.  I thought I had enough.  And what

15   happened is, over the weekend, I spoke to Mr. Burkhart --

16   Dr. Isaacs reached out to him -- actually, Mr. Burkart reached

17   out to Dr. Isaacs.  Mr. Fletcher had spoken to him twice last

18   week.  He tried to contact him.

19           So he reached out to Dr. Isaacs, Isaacs told me to

20   call him, I called him.  He says:  We never had any

21   conferences in two thousand -- we never had any MSOC

22   conferences at the Guardian Center, period.

23           And he was willing to give me a declaration.  I

24   drafted a declaration.  Then he gave it to his lawyers, who

25   don't want him to get involved in this --

1          THE COURT:  Well, he is involved.

2          MR. SINGLETON:  He says he's willing to cooperate,

3   Your Honor.  He says -- I think if the Court called him -- I

4   have his cell phone number -- he would gladly cooperate and

5   appear remotely, but right now, his attorneys said:  Do not

6   contact him directly, and so I can't contact him directly.

7   And he sent me a text saying:  I am there for you, I will do

8   whatever you want, let me know --

9          THE COURT:  Why don't you show us those texts.

10  Share them with Mr. Fletcher, please.  They're not privileged.

11         MR. SINGLETON:  Certainly, Your Honor.

12         THE COURT:  Have a look at those texts, please.

13         MR. MACKIE:  Your Honor, I have a courtesy copy for

14  the Court of the declaration, if you would like.

15         THE COURT:  My case manager printed it.  I still

16  haven't read it, but thank you.

17         MR. FLETCHER:  Okay.  Look, Your Honor, my feeling

18  is the City submitted it -- an email from a representative of

19  the Guardian Center that was an email exchange dated

20  October 2020 -- right, October of last year, last fall, with

21  Dr. Isaacs.  It's a hearsay exhibit, but the City new about

22  this since October.  They didn't add Burkhart or anyone from

23  the Guardian Center to their witness list.  This is basically

24  a declaration submitted on sur-reply at 9:00 p.m. last night.

25         At the end of the day, I don't intend to cross him.

1   I don't really care what he has to say.

2           Again, as a matter of procedure and fair play in

3   litigation --

4           THE COURT:  Well, it is an important issue because

5   Mr. Henriquez claims to have had at least one conference in

6   Georgia -- MSOC conference.  I don't really care where it

7   occurred, but he claims that there was an MSOC conference in

8   that he helped organize before the FDNY even got interested in

9   MSOC, or appeared to be thinking about conferences, and so I

10  don't know whether if it's at the Guardian Center, or some

11  other venue, or whether that's material and important.

12          I think the other fellow in that email that you are

13  referring to who communicated with Dr. Isaacs said:  You know,

14  there may be other documents somewhere, but if you give me an

15  idea where I might look, I can be of help.

16          In the response, the reply of Mr. Henriquez, he

17  said:  It could have been at the Guardian Center before it was

18  open to the public.

19          I don't know what difference that makes, but it

20  might have been an event there before it officially opened to

21  the public.  I think the email that you reference,

22  Mr. Fletcher, also talks about a December event.

23          So I'm just not sure whether this declaration is

24  going to add anything at all to the issue.  But, again, one,

25  procedurally, it's unfair because a sur-sur opposition was not

1  authorized; two, it came in at 9:00 p.m. last night,

2  supposedly; three, it was not authorized by the Court; four,

3  it doesn't allow cross-examination by defense counsel.

4          So it's grossly unfair and procedurally unwarranted,

5  and to the extent this gentleman thinks he can put in a

6  declaration and not be cross-examined because he doesn't want

7  to be involved, well, the declaration indicates that he has

8  agreed to be involved in some respect, and I think that it's

9  not really appropriate for me to consider it.  I can also

10 reserve on this and ignore it, but I don't see why, in

11 fairness to the defense, it's appropriate -- this kind of

12 last-minute, eleventh-hour, holiday-night-before-the-hearing

13 activity is fair and should be tolerated.

14         MR. SINGLETON:  Your Honor, if I may?

15         THE COURT:  Go ahead.

16         MR. SINGLETON:  We are at the outset of this case,

17 there has been no discovery.  The plaintiff just filed the

18 counterclaim.  The plaintiff filed this motion for preliminary

19 injunction after this dispute has been brewing for four years.

20 This man lives in Georgia beyond the jurisdiction of the

21 court.  He -- he says in his email to me -- notwithstanding

22 his attorneys admonition not to contact him -- after I got the

23 declaration, I just sent him an email saying:  Thank you.

24         And he wrote back saying:  You're welcome.  Standing

25 by if more is needed.  Good luck tomorrow.

1      He has -- he has told me he is absolutely willing to

2   comply.  It is his attorneys who, being very conservative, are

3   saying:  You're beyond jurisdiction of the court, I don't

4   think you should get involved.

5          THE COURT:  Well, okay, so he's going to follow his

6   attorney's advice, wouldn't he?

7          MR. SINGLETON:  The Court can reach out to him and

8   ask him if he will appear remotely.  I have his cell phone

9   number, and I think if he voluntarily appears at the request

10  of the Court, that solves all the problems.

11         We have several witnesses appearing remotely

12  already.

13         THE COURT:  You are asking me to contact a

14  represented party in my capacity as the judge --

15         MR. SINGLETON:  Your Honor --

16         THE COURT:  Don't interrupt me.

17         MR. SINGLETON:  Sorry.

18         THE COURT:  What is wrong with you?  I mean, you

19  don't interrupt.  I let you speak more than once.

20         My question is:  You're asking me to defy an

21  instruction by his attorney that he not speak or get involved

22  in this case.  I'm not going to be an agent or a vehicle to

23  breach the attorney-client relationship where the attorneys

24  have specifically instructed their client, you know, you are

25  beyond the jurisdiction of the court.

1          So for me to call at your request, I think, is

2    inappropriate.  You're not addressing the eleventh-hour nature

3    of this, so I'm inclined not to allow this declaration to be

4    part of the record.  There are other emails more

5    contemporaneous with -- I guess more recent in October, and

6    emails with Mr. Henriquez's colleagues regarding the Georgia

7    event.  I think those were an exhibit that the defendant

8    submitted with his initial moving papers, so I'm concerned

9    about the way this declaration came to be.

10          I'm finished.  You may speak.

11          MR. SINGLETON:  Your Honor, I wold ask that the

12    Court reserve decision, then.  The Court has a substantial

13    discretion in that area.  Many motions of this nature are

14    decided on papers without live testimony.  This is just one

15    witness, and I think his testimony is very germane, but it

16    is -- as to the eleventh hour, we've been working around the

17    clock here getting ready for a hearing here.  I just recovered

18    from COVID last week.  I just started testing negative last

19    Friday.  I've been working --

20          THE COURT:  We've all been facing the same

21    challenges.

22          MR. SINGLETON:  I understand, Your Honor, but I'm

23    saying this is -- when you say eleventh hour, we're preparing

24    for a preliminary injunction hearing, there has been no

25    discovery.  If this was in the normal course, we could have

1   expedited discovery, I could go down to Georgia, take his

2   deposition, and we wouldn't have this problem.  I think the

3   City will be extremely prejudice if you just put out -- you

4   exclude this very material testimony, but -- and I would ask

5   that the Court reserve decision and at least decide the issue

6   after hearing the rest of the testimony.

7           THE COURT:  You know, I think you are not addressing

8   the gross unfairness to the defense the way this was handled.

9   Obviously, Dr. Isaacs -- either with your direction or somehow

10  was in contact with Mr. Burkhart, he didn't just wake up

11  yesterday and say:  Oh, let me reach out for Dr. Isaacs about

12  the 2015 issue, that didn't just happen arbitrarily or by

13  happenstance.  There was some effort by someone in the FDNY to

14  get in touch with him -- or it could have been Mr. Fletcher's

15  efforts -- but he selectively chose to contact you rather than

16  Mr. Fletcher, and it is so late in the day, and I just think

17  it's unfair, and I do have discretion.  In my discretion, I

18  think it's grossly unfair to conduct yourself this way.  I had

19  dates for witness lists and, as far as I was concerned, this

20  case was fully submitted as of the defendants' reply, so I am

21  particularly troubled by this particular declaration, and I

22  will be willing to reserve on Mr. Nahmod, who wants not to be

23  bothered, but will be bothered enough to give a declaration

24  for the City.

25          Are you ready to move forward?  Is there anything

1   else I need to address?

2           MR. FLETCHER:  Yes, Your Honor.  I had one more

3   thing to say about that issue, but if Your Honor wants to move

4   on, we can move on.

5           THE COURT:  About what issue?

6           MR. FLETCHER:  About the Burkhart issue, which is

7   just that --

8           THE COURT:  Just make your record.

9           MR. FLETCHER:  Okay.

10          Mr. Singleton has had the document that he's

11  challenging that -- that Guardian Center screen shot -- the

12  document that Mr. Singleton is submitting, Mr. Burkart's

13  testimony, to challenge is a screenshot of a website.

14  Mr. Singleton has had that screenshot in his possession since

15  November 2019.  You can see that on Plaintiffs' Exhibit 18,

16  it's on the second and third pages of that exhibit, so this

17  isn't a new thing for the City.

18          The only other thing I will say about this issue,

19  Your Honor, is I believe you are going to hear testimony today

20  from Mr. Henriquez and Joseph Hernandez that discusses a 2012

21  event in Georgia that took place in part at the Guardian

22  Center, and that's all I have to say about that, Your Honor.

23          THE COURT:  All right.  I think the email was to

24  Moira Archer; correct?

25          MR. FLETCHER:  And Gerald Singleton.  This is page 2

1  of Exhibit 18.

2          THE COURT:  All right.  Thank you.

3          MR. FLETCHER:  I apologize, Your Honor, two more

4  housekeeping things.

5          I, myself, did submit two additional exhibits, X and

6  Y, on Sunday.  They are both documents that were previously in

7  the City's possession.  One is a portion of -- one comes from

8  the City's initial disclosures and the other document is a

9  City -- is an email communication between City employees that

10 occurred on City email servers, so I don't believe there

11 should be any surprise there.  But I brought courtesy copies

12 for the City and the Court today, and I will let Your Honor do

13 what you see fit with respect to those exhibits, but I do

14 believe they are relevant for impeachment purposes with

15 respect to one of the City's witnesses.

16         THE COURT:  All right.

17         Mr. Singleton has it or Mr. Mackie has it?  You've

18 given copies to them?

19         MR. FLETCHER:  Yes, on a Sunday and this morning,

20 Your Honor.

21         THE COURT:  All right.  And these are documents from

22 the City?

23         MR. FLETCHER:  One of the documents is entirely from

24 the City.  The other document, Exhibit X, is an email

25 communication that was between City employees, and then

1  Dr. Isaacs subsequently forwarded it to Mr. Henriquez outside

2  of the City, so that final portion wouldn't be on the City

3  servers, but I think everything else is.

4         THE COURT:  Okay.  Thank you.

5         Unlike the other categories of declarations, I think

6  that these are fairly considered by the Court given that they

7  were in the possession of the City and you're using these for

8  impeachment, so Defendants' X and Y -- do you have copies for

9  me?

10        THE CLERK:  It's on the desk.

11        THE COURT:  Oh, it's on the desk.  Okay.  I see.

12        Are you ready to proceed now?

13        MR. FLETCHER:  One last question, Your Honor.

14        I would ask that we be able to exclude witnesses

15 from the courtroom when they're not testifying today --

16        THE COURT:  Yes, that's fine.

17        Who are we excluding?

18        MR. FLETCHER:  Well, actually, I think

19 Mr. Hernandez -- he's muted here.

20        Joe Hernandez, can you hear me?

21        MR. HERNANDEZ:  I sure can.

22        MR. FLETCHER:  Can you please sign off the Zoom and

23 I will text you later?

24        MR. HERNANDEZ:  Sign off from Zoom?

25        MR. FLETCHER:  Yes, please.

1          Thank you.

2          MR. HERNANDEZ:  You got it.  Just give me some time

3    because I am traveling.

4          MR. FLETCHER:  Understood.

5          MR. HERNANDEZ:  Thank you, sir.

6          Thank you, Court.

7          THE COURT:  All right.  Thank you.

8          Are you ready to proceed?

9          MR. SINGLETON:  Just for clarity of the record,

10   Ms. Archer submitted a declaration, she is present, she is

11   FDNY legal counsel, she is with the FDNY Legal Bureau.  As I

12   understand it, Mr. Fletcher has no objection to her being in

13   the room.

14         THE COURT:  Will she be a witness?

15         MR. SINGLETON:  She submitted a declaration.  It's

16   up to him whether he cross-examines her.

17         THE COURT:  Are you calling her?

18         MR. FLETCHER:  I do intend to call her.

19         THE COURT:  All right.  Why don't we have her step

20   out.

21         MR. FLETCHER:  I had a conversation with Mr. Mackie

22   over the weekend, and I did say that I don't necessarily

23   object to Ms. Archer being here, but --

24         THE COURT:  All right.  If you don't object, it's

25   fine, she can stay.

1          MS. ARCHER:  Thank you.

2          MR. FLETCHER:  I apologize, Your Honor.  We didn't

3     discuss this at the pre-hearing conference either.

4          Would you like opening statements?  And are we doing

5     oral argument today?

6          THE COURT:  I've read all the briefs, so I would

7     appreciate the parties not taking time to reiterate all the

8     statements they've already made in their submissions.  The

9     submissions have been extensive, and I've reviewed everything,

10    so you can just call the witnesses and we'll start the

11    hearing.  I think this is all about credibility.

12         MR. FLETCHER:  In that case, Your Honor, I believe

13    we agreed that the declarations are going to serve as direct,

14    so it's up to the City to call their first cross witness.

15         THE COURT:  Oh, I didn't know that.  All right.

16         MR. SINGLETON:  Well --

17         THE COURT:  Maybe you want to call Mr. Hernandez

18    first so that he can --

19         MR. FLETCHER:  I had actually told him that -- I had

20    told him that he would be after Mr. Henriquez, because I

21    understood that the City wanted to cross-examine Mr. Henriquez

22    first.  If the Court would like to hear direct testimony from

23    Mr. Henriquez, I can do that.

24         THE COURT:  Is he going to say anything more than he

25    did in his declaration and his supplemental declaration?  He

1  may have to.

2  MR. FLETCHER:  He may have to.  I had planned to do

3  redirect after the cross.

4  THE COURT:  All right.  Why don't we start with the

5  cross and you can do redirect, all right?  Do you want to call

6  him first, Mr. Singleton?

7  MR. SINGLETON:  Yes, Your Honor.

8  THE COURT:  All right.  Sir, why don't you come up

9  on the stand.

10  THE COURTROOM DEPUTY:  Please raise your right hand.

11  (Witness sworn.)

12  THE WITNESS:  I do.

13  THE COURTROOM DEPUTY:  Please have a seat and state

14  and spell your full name for the record.

15  THE WITNESS:  Juan Henriquez.

16  THE COURT:  Will you spell it, please.

17  THE WITNESS:  J-U-A-N, last name H-E-N-R-I-Q-U-E-Z.

18  THE COURT:  Thank you.

19  You may proceed, Mr. Singleton.

20  MR. SINGLETON:  Your Honor, at this distance, may I

21  remove my mask to do the questioning?

22  THE COURT:  Sure.

23  (Continued on following page.)

24

25

1   **JUAN HENRIQUEZ**,

2            called as a witness, having been first duly

3            sworn/affirmed, was examined and testified as

4            follows:

5   CROSS-EXAMINATION

6   BY MR. SINGLETON:

7   Q    Good morning, Mr. Henriquez.

8   A    Good morning.

9   Q    Have you ever given a deposition or testified in the

10  court?

11  A    I have, as part of my job, yes.

12  Q    Pardon?  As part of your --

13  A    As part of my job, I do testify in courts.

14  Q    How many times have you testified in court?

15  A    Several times.

16  Q    In relation to what?  Actions against the City?

17  A    In some cases.  It's part of my job.  We respond to

18  crimes, accidents, and other things that lead either to

19  lawsuits or criminal proceeding.

20  Q    So if -- you testified as a witness with regard to

21  medical treatment you rendered in particular cases?

22  A    Yes.

23  Q    Are you taking anything that would impair your ability to

24  give complete and truthful testimony today?

25  A    No.

1   Q    Do you have any legal training?

2   A    I'm sorry?

3   Q    Any legal training?

4   A    No.

5   Q    Could you describe your educational background?

6   A    I'm college educated, training in para medicine and other

7   related subjects.

8   Q    You have substantial experience and training in computer

9   sciences; correct?

10  A    Yes.

11  Q    And you work in that field?  You derive revenue and

12  income in that field?

13  A    Sometimes, yes.

14  Q    You act as a web host and a web master for different

15  websites?

16  A    Sometimes.

17  Q    Are you currently acting as the web host and web master

18  for any entity related to MSOC?

19  A    I facilitate that, yes.

20  Q    What do you mean you facilitate that?

21  A    I -- I help out with their servers and some programming

22  or content management -- content management system.  I also do

23  it for the City, too.

24  Q    You also do what for the City too?

25  A    For New York Task Force One, I do a similar thing.

1   Q    The New York Task Force One, would you describe for the

2   Court what that is?

3   A    The FEMA urban search and rescue for New York.

4   Q    And when you say that's for the City, the FEMA Task Force

5   One is not a City entity, is it?

6   A    It's comprised of OEM -- or the City's Office of

7   Emergency Management -- FDNY, EMS, and NYPD.  FDNY, EMS,

8   OEM -- the Office of Emergency Management -- and the FDNY

9   firefighter.

10  Q    As you stated in your affidavit -- when you worked for

11  the Task Force, you wear a Task Force uniform; correct?

12  A    Yes, sir.

13  Q    You don't wear an FDNY EMT uniform or a paramedic

14  uniform?

15  A    Not all the time.  Sometimes, yes.

16  Q    You -- in your supplemental declaration, you made clear

17  that you get paid by the federal government for your work at

18  the Task Force -- you get paid by the City, but it's

19  reimbursed by the federal government; correct?

20  A    Yeah.  To my understanding, when we work for the Task

21  Force, it's under FEMA and they get FEMA funding to pay us.

22  So when we get deployed, we're active FEMA employees.

23  Q    So when you're working for the Task Force, you're working

24  for the federal government -- for FEMA?

25  A    Yes.  I don't know too much about how they work their

1    grants, but it's part of FEMA from grant funding.

2    Q    In this action, you claim that you and others of the

3    Medical Special Operations Community held MSOC branded events;

4    correct?

5    A    Yes, sir.

6    Q    What is the Medical Special Operations Community?

7    A    Well, we started as just a group of us from the national

8    system, special operations medical community, and when we came

9    up with the idea to get together, because there was nothing

10   really out there for us to get together, share our ideas, go

11   over training, go over past events and kind of learn from

12   everything that was happening around the system, we all kind

13   of formed that MSOC community, that Medical Special Operations

14   Community, and we would get together every time that we were

15   somewhere either delivering training or at an event to share

16   those ideas, and that's kind of how the MSOC evolved -- the

17   Medical Special Operations conferences evolved, or were

18   created.

19   Q    The Medical Special Operations Community, as you've

20   described it, is that a fluid group where members change over

21   time, or was that -- or are you talking about specific people

22   who banded together to do something?

23   A    It's almost always the same people.

24   Q    Okay.

25            And who are those people?  That would be you;

1   correct?

2   A     Yes, sir.

3   Q     And that would be Joseph Hernandez?

4   A     He's part of it, yeah.

5   Q     And that would be Vinny Johnson?

6   A     Yes, sir.

7   Q     And Vinny Johnson is a retired paramedic from the FDNY

8   who was your partner on your runs and while you worked as a

9   paramedic?

10  A     He worked at my station, yeah.

11  Q     At your station.

12        You were with Station 8; correct?

13  A     Lately, yeah.  That's my last assignment.

14  Q     How long have you been assigned to Station 8?

15  A     Since 2007.

16  Q     Okay.  So the entire period of your MSOC related

17  activities you were at Station 8.

18  A     Yes.

19  Q     Who was your supervisor at Station 8?

20  A     Specifically what?  Captain?  Lieutenant?

21  Q     Who gave you your work assignments and told you when

22  you're working?  You're working here today, you're working at

23  the Task Force this weekend.  Who gave you your assignments?

24  A     If depends.  If you are talking about the Task Force that

25  would come from HAZTAC or special operations, H-A-Z-T-A-C.

1           THE COURT:  H-A-Z-T-A-C.

2           THE WITNESS:  Yes, ma'am.

3           THE COURT:   Those assignments came from whom?

4           THE WITNESS:  From that division, from the special

5    operations command, from the FDNY EMS.

6    Q    So that's a SOC command -- special operations command --

7    and HAZTAC means hazard tactical; correct?

8    A    Yes, sir.

9    Q    And that's a special command?

10   A    Yes, sir.

11   Q    Okay.  And so you get your Task Force orders and your

12   assignments from the SOC command and the HAZTAC Unit.

13   A    Yes, sir.

14   Q    And who gives you your assignments to -- you're going to

15   work at Station 8 today, or another station, you're on for

16   Monday, your regular day off is X -- who gives you those

17   orders?

18   A    So if you are talking about just me showing up tomorrow

19   for a schedule, that would be -- the schedule for the station

20   is created by the captain of the station, and then the

21   lieutenants are the ones in charge that the schedules are

22   followed through.

23   Q    Who is higher; the captain or the lieutenant?

24   A    Sorry?

25   Q    Who is higher; the captain or the lieutenant?

1    A    The captain.

2    Q    So you get your orders from a captain or a lieutenant?

3    A    Directly from a -- when it comes to scheduling and those

4    issues, it would come from the lieutenant following the

5    captain's orders, who is following the division chief, who is

6    following the chief of EMS, who is following the

7    commissioner's orders.

8    Q    So there's a chain of command all the way to the

9    commissioner's office?

10   A    Yes, sir.

11   Q    And for you, above you -- directly above you there's a

12   lieutenant, then a captain, then -- who is Elizabeth Cascio?

13   A    I don't know what her actual title is now, but --

14   Q    Well in 2018, she became EMS chief of staff.

15         Did you know that?

16   A    Yes.

17   Q    What does the EMS chief of staff do?  What's your

18   understanding of her responsibilities?

19   A    She's in charge of staffing.

20   Q    For EMS?

21   A    For EMS -- yeah, I think EMS.

22   Q    Who is in charge of EMS in Manhattan?  That's called

23   Division 1?

24   A    It depends.  Are we just talking about me as a paramedic

25   or the medicine?  Because there's also a chain of command when

1    it comes to delivering medical care and following protocols,

2    and that would be the doctors.

3    Q    The doctors have a license to render medical treatment

4    and they supervise the medical care you administer in the

5    field; correct?

6    A    Primarily, yes.  There's other things that they do.

7    Q    And that's what the FDNY office of medical affairs does.

8    A    Primarily.  There's other things that they do also.

9    Q    And Pamela Lai is a medical director; correct?

10   A    Yes, sir.

11   Q    And Doug Isaacs is a medical director; correct?

12   A    Primarily, yes.

13   Q    Doug Isaacs doesn't evaluate your performance, does he?

14   A    He does.

15   Q    As a paramedic?

16   A    Yes, sir.

17   Q    Does Doug Isaacs -- have you seen -- you get a copy of

18   your evaluation each year, correct, to see it and comment on

19   it?

20   A    Yes, sir.

21   Q    And have you seen one where Doug Isaacs has had input

22   into your evaluation?

23   A    Yes, sir.

24   Q    Does Doug Isaacs have anything to do with your

25   assignments?

1  A    They -- they can because they -- if someone's not

2  performing their duties, he can actually restrict or have

3  someone shipped out or assigned somewhere else depending on

4  what the issue is.

5  Q    Do you have any personal knowledge that Doug Isaacs has

6  ever done that?

7  A    Yes, sir.

8  Q    Does Doug Isaacs approve overtime for you?

9  A    He has put in for overtime in the past for teaching

10 assignments, yes.

11 Q    Okay.  You do teaching assignments, okay.  Let's talk

12 about your teaching assignments.

13        You are -- what courses do you teach?

14 A    Within the fire department?

15 Q    You teach courses both within the fire department and

16 outside the fire department; correct?

17 A    Yes, sir.

18 Q    You teach courses for a company called Disaster Medical

19 Solutions; correct?

20 A    That's one of them, yes.

21 Q    And Disaster Medical Solutions is a company owned and

22 operated by Joseph Hernandez; correct?

23 A    Yes, sir.

24 Q    And for him, you teach a course called a Medical Team

25 Specialist course; correct?

1   A       Medical Team Training Medical Specialist, yes.

2   Q       Well, it's still called the Medical Team Specialist

3   course; correct?  MTS.

4   A       Yes, sir.

5   Q       To teach that course, you have to become FEMA certified;

6   correct?

7   A       Yes, sir.

8   Q       How many times have you taught a course for Joe

9   Hernandez?

10  A       Several.

11  Q       Several?

12  A       Yes.

13  Q       Well, more than ten?

14  A       Yes, sir.

15  Q       More than 20?

16  A       I'm not sure of the total count.

17  Q       What other entities outside the fire department do you

18  teach the MTS FEMA certified course for?

19  A       For FEMA directly.

20  Q       For FEMA directly.

21          Anyone else?

22  A       There's been instances at Guardian Center and also for

23  some military special operations groups.

24  Q       Do you have any personal contracts with the Guardian

25  Center?

1  A     Contracts?

2  Q     Yes.

3  A     No.  As -- well, when I'm actively teaching there, yeah,

4  as a contractor.

5  Q     When you actively teach at the Guardian Center, you are

6  there because Disaster Medical Solutions is the vendor

7  providing the instructors for the course; correct?  You are

8  paid by Joseph Hernandez --

9          THE COURT:  You are asking multiple questions one

10  after another.  Wait for an answer.  You've just asked two

11  questions without waiting for an answer.

12          Which question do you want him to answer first?

13          MR. SINGLETON:  The first question.

14  Q     You are there teaching because Disaster Medical Solutions

15  is the vendor providing instructors to the Guardian Centers.

16  A     It's not only Disaster Medical Solutions.  There's other

17  vendors, companies and government agencies that I have taught

18  for, there and other places.

19  Q     Mr. Henriquez, who pays you when you teach a course at

20  the Guardian Center?

21  A     Who is the vendor.

22  Q     Whoever the vendor is, correct.

23          And so you get paid, in some instances, by Joe

24  Hernandez's company, Disaster Medical Solutions; and, in other

25  cases, by some other vendor.

1    A    Or the company -- or the government.  Whoever -- depends

2    on what we're actually doing there.

3    Q    I see.

4          When you say "the government," the Guardian Center,

5    to your understanding, is a training facility that provides

6    training for the federal government, Department of Defense,

7    all branches of the military?

8    A    Yes, sir.

9    Q    Also provides training for federal, state, and local

10   agencies?

11   A    Yes, sir.

12   Q    And when you go down there, you're teaching an MTS FEMA

13   certified course?

14   A    That's not the only course that we -- that I teach there.

15   Q    What other courses do you teach at the Guardian Center?

16   A    There's also simulation training, and there's also other

17   events with some specialized groups that we do in that area

18   and at Guardian Center.

19   Q    Okay.  But you have no agreement with the Guardian Center

20   to provide any event there, do you?  Directly.

21   A    I'm not sure what you're asking me.

22   Q    Do you have any kind of contractual relationship -- an

23   oral contract, a written contract -- with the Guardian Center

24   to provide services or put on a conference at the Guardian

25   Center?

1          THE COURT:  You mean currently?

2          MR. SINGLETON:  At any time.

3   A    It depends on what we're doing there.  We've done several

4   events along with some specialized training, so the Guardian

5   Center, like you said, provides the facility and the

6   simulation to allow for certain training and certain

7   simulation of real life events.

8   Q    Sir, what I'm trying to understand is, you personally

9   don't have any contractual relationship with respect to that

10  event.  You are there because some vendor is there and you are

11  teaching for that vendor.

12  A    And the Guardian Center has contracted as individual

13  contractors also.

14  Q    The Guardian Center is contracted with the vendor, not

15  you.

16  A    Well, yes, with me.  We do hold --

17  Q    Have you ever gotten a paycheck from the Guardian Center?

18  A    Yes, sir.

19  Q    You have 1099s from the Guardian Center?

20  A    Years ago, yes.

21  Q    Years ago.

22  A    All depends on what we're doing there.

23  Q    Let's go back to the Medical Special Operations

24  Community.

25          Did that include Marco Girao?

1  A    That includes a lot of people that are -- yes.  He used

2  to be one of my partners.  He's contributed to the Medical

3  Special Operations Community.

4        THE COURT:  Mr. Singleton, will you spell that name,

5  please?

6        MR. SINGLETON:  Marco, M-A-R-C-O, Girao,

7  G-I-R-A-O.

8  Q    And he is an FDNY paramedic?

9  A    Yes, sir.

10 Q    Longstanding paramedic; started in two thousand -- when

11 did you start?

12 A    2001.

13 Q    He started in 2001; correct?

14 A    Yes, sir.

15 Q    So he's been there as long as you have.

16 A    He used to be my partner, yes -- coworker, yes.

17 Q    He's a FEMA-certified instructor as well.

18 A    Yes, sir.

19 Q    He teaches MTS courses; correct?

20 A    Yes, sir.

21 Q    And he's part of the Medical Special Operations

22 Community.

23 A    Yes, sir.

24        He contributed.

25 Q    So far we've identified Joe Hernandez, Marco Girao, Vinny

1   Johnson, yourself; correct?

2          Anyone else who played a prominent role in the

3   Medical Special Operations Community?

4   A    Outside of the FDNY?

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SINGLETON (Continuing):

2   Q    Outside of the FDNY -- you say the medical special

3   operations community is a little -- it's not incorporated,

4   correct?

5        It's not incorporated, it's not an LLC, it's not a

6   corporation, correct?

7   A    No.

8   Q    It's not a partnership, correct?

9   A    Well --

10       THE COURT:  Do you mean legal partnership?

11  Q    I'm asking does it have any legal -- does it have any --

12  is it a legal entity?

13  A    It's a nonprofit.

14  Q    The medical special operations community is a nonprofit?

15  A    Yes, sir.

16  Q    Do you not mean the Medical Special Operations Community,

17  Inc., which you incorporated in 2019, is a 501(c)(3)?

18  A    Correct.

19  Q    I'm talking about the medical special operations

20  community which you say started to hold conferences and came

21  up with the idea in 2012.

22       Is that a 501(c) charity?

23       MR. FLETCHER:  Objection, mischaracterizes

24  testimony.

25       THE COURT:  First of all, this far exceeds the scope

1    of direct and declaration, but I think also your question does

2    mischaracterize.  So, I'll sustain the objection.

3    Q    Putting aside the entity that was formed in 2019, MSOC,

4    Medical Special Operations Community, Inc., that's a Florida

5    entity, correct?

6    A    It was organized in Florida, yes.

7    Q    It was incorporated in Florida.

8         And Joe Hernandez is the president?

9    A    Yes, sir.

10   Q    And you are a vice president?

11   A    Yes, sir.

12   Q    And Vinny Johnson is a vice president?

13   A    Yes.

14   Q    Is Marco Girao involved?

15   A    As an officer or administrator?  No.

16   Q    In any capacity.

17   A    A contributor, yeah.

18   Q    Anyone else?

19   A    Hundreds, yes.

20   Q    Hundreds.

21        You stated in your answer to the second amended

22   complaint in this action that you didn't share in any of the

23   profits of the MSOC events that were held in 2011 and '12,

24   correct?

25   A    I don't share in any of those.

1   Q    Did the MSOC community file tax returns for events that

2   were held in 2012 and -- 2011 and 2012?

3   A    Well, we weren't organized as a nonprofit, so this was

4   very grassroots.  It was when we were coming together.

5        Like I said, the way it came about is because we

6   never had a chance to, like, share our experiences, our

7   knowledge, techniques, so we would do it every time that we

8   would get together during, like, training events.  Or if we

9   were out doing a mission and we had a chance to get together,

10  we would invite the locals, as far as, like, other local

11  agencies or other local first responders in the area, so that

12  we can share some of our experiences and lessons learned.

13  Q    There were many task force -- the country is divided into

14  many different task force by district, right?

15  A    Yes, sir.

16  Q    And New York is Task Force 1, but there's a task force in

17  Pennsylvania, correct?

18  A    Yes, sir.

19  Q    And you know paramedics from the Pennsylvania task force.

20  A    Yes.

21  Q    When you say you get together with other people and share

22  experiences and knowledge, you're talking about the people you

23  meet from other task force and other training events where

24  you're teaching, correct?

25  A    It's open to everyone.

1    Q    It's open to anyone.

2         Everyone?

3    A    First responders primarily is the focus.

4    Q    Well, could I be a member?

5    A    If you'd like to learn about it, yes.

6    Q    Let me ask you, to take the MTS FEMA course that you

7    teach, there are certain qualifications for that; correct,

8    prerequisites?

9    A    Yes, sir.

10   Q    You have to either be a medical doctor or a paramedic or

11   EMT, correct?

12   A    Yes, sir, for the federal program, yes, sir.

13   Q    For the course you teach?

14   A    Well, depends on who the audience is.

15        If it's for a military, federal, local, because not

16   all agencies or -- depending on where the group, where the

17   team is located, their protocols and their criteria may be

18   different.  It's not -- the medical specialist course outside

19   of the FEMA program may differ in some ways and some

20   qualifications may not be the same or prerequisites may not be

21   the same.

22   Q    Is it fair to say the people who are attending this

23   course and these programs are highly trained, highly

24   sophisticated parties?

25        THE COURT:  Are you talking about the FEMA courses

1  or the other courses?

2  Q    Let's start with the FEMA MTS courses that you teach at

3  the Guardian Center.

4         Are they -- is that a highly sophisticated audience,

5  highly trained?

6  A    I'd just like to add they're not all at the Guardian

7  Center.  They're throughout the country.

8         The Guardian Center, I don't know if they're still

9  teaching the medical specialist course right now.

10 Q    Okay.  The MSOC events that you hold in conjunction with

11 the medical special operations community, are the attendees of

12 those events highly trained first responders?

13 A    Not all.

14 Q    Is the audience predominantly highly trained first

15 responders?

16 A    Not all.

17 Q    Okay.  How many people attended the 2011 MSOC event?

18        THE COURT:  Which one?

19 Q    2011 MSOC event in Wichita, Kansas, sponsored by an

20 equipment supplier named Bernhard.

21        MR. FLETCHER:  Objection, foundation.

22 A    I don't think there was --

23        THE COURT:  Wait.  There's an objection.  I haven't

24 ruled on it.

25        You said foundation?

1          MR. FLETCHER:  Yeah, 2011 in Wichita, Kansas, I

2     don't know where that comes from.

3          THE COURT:  Do you want to make a proffer or lay a

4     foundation, Mr. Singleton?

5          MR. SINGLETON:  Exhibit A.

6          (Exhibit published.)

7     Q    Do you see that?

8          Is that what you call the first MSOC event that you

9     had in 2011?

10    A    A more organized of the early ones, yes, but that was not

11    in Wichita.

12    Q    That's not what?

13    A    That wasn't in Wichita.  You said Wichita.

14    Q    Where was this?

15    A    That was done through Ferno military -- wait.

16         THE COURT:  Why don't you show him the exhibit?

17         Do you want to see it?

18         THE WITNESS:  It's all blurry on the screen.

19         MR. SINGLETON:  Sorry, I don't know what I just did.

20         THE COURT:  Just give him the exhibit.

21         MR. SINGLETON:  Is that clear enough?

22         THE COURT:  He's only seeing the first few lines.

23         Why don't you give him a hard copy so he can

24    recognize --

25         MR. FLETCHER:  Your Honor?

1          THE COURT:  Give it to him.

2          MR. FLETCHER:  I have a full binder as well.

3          THE COURT:  Give it to him so we don't waste time.

4          Defense Exhibit A?

5          MR. SINGLETON:  Yes, your Honor.

6          THE COURT:  And it's Page 1 of Exhibit A,

7    Mr. Singleton, or is it all the pages in Exhibit A?

8          MR. SINGLETON:  Well, there's two pages to this.

9          THE COURT:  My Exhibit A has multiple pages.

10          MR. SINGLETON:  Yes, this is the first page.  The

11    second page --

12          THE COURT:  What page do you want him to look at?

13          I have double-sided pages, and there are one, two,

14    three, four double-sided pages that comprise Defense

15    Exhibit A.

16          So, which one are you referring to, sir?

17          MR. SINGLETON:  Well, I was referring to the agenda,

18    but, okay, if we could just focus on Page 1 of the agenda.

19          THE COURT:  Okay.

20          MR. SINGLETON:  What's on the screen.

21          THE COURT:  Okay.

22   Q    It says Medical Special Operations Conference (MSOC),

23   correct?

24   A    Yes, sir.

25   Q    Where did this take place?

1   A    I believe this was in Ohio.

2   Q    In Ohio.  I stand corrected.  It was Ohio.  And this

3   was -- okay.

4            Now, on the second page, at the bottom, it says

5   prepared by Juan Henriquez, correct?

6   A    Yes, sir.

7   Q    Now, on this agenda, it doesn't show any logo; correct,

8   your emblem, what we call the MSOC logo?

9   A    I'm sorry?

10  Q    What you've referred to as your MSOC logo, design logo,

11  it's not on this document, correct?

12  A    This is not the complete document.

13  Q    I'm just asking, it's not on these two pages?

14  A    Not on these two pages.

15  Q    And if you'll turn to the third page, this is the flier

16  you prepared for the event?

17  A    Yes, sir -- well, it's internal, yes, sir.

18           MR. SINGLETON:  I don't know if I can adjust this

19  upward; can I?

20           THE COURTROOM DEPUTY:  Yes.

21           THE COURT:  They'll help you.  One moment.

22           MR. SINGLETON:  I'd like to get it high enough so I

23  can see the entire page.

24           THE COURT:  It should zoom in and out.  You can make

25  it smaller so the whole page can be on the screen.

1              MR. SINGLETON:  Okay.  I think that does it.

2    Q    And this was a flier you prepared for this conference?

3    A    Internal flier, yes.

4    Q    "Internal flier" what does that mean, it was just handed

5    out at the conference?

6    A    Well, we sent that to people within the community,

7    especially the locals.  We were there doing a training in that

8    area.

9    Q    Do you have any idea how many fliers you sent out?

10   A    I can't remember.

11             THE COURT:  Is this in the Ohio area, you're saying?

12             THE WITNESS:  Yes, ma'am.

13   Q    At the bottom, it says Ferno, correct?

14   A    Yes, sir.

15   Q    And Ferno is an equipment supplier for your community.

16   They provide medical equipment for first responders.

17   A    Yes, the company does, yes.

18   Q    And Aster Medical Solutions in the middle, that is Joe

19   Hernandez's company, correct?

20   A    Yes.

21   Q    That's the company you work for on occasion as a FEMA

22   instructor?

23   A    Yes, sir.

24   Q    And Ferno, again, is on the other side, military systems,

25   correct?

1    A    Yes, Ferno Military.

2    Q    Anything on this website that indicates Medical Special

3    Operations Community or you personally?

4    A    On this flier?

5    Q    Yeah.

6    A    No.

7    Q    Well, this is your exhibit.

8         The next one, if you'll turn the page, is -- that's

9    your design logo, correct?

10   A    Yes, sir.

11   Q    That's what you call the MSOC design logo.

12   A    Yes, sir.

13   Q    And you have another flier out for a different MSOC

14   event.  This is the event -- the next page, this is the event

15   you say occurred at the Guardian Center in Perry, Georgia, on

16   August 17 to 19, 2012, correct?

17   A    Well, partially.

18   Q    "Partially," I'm not sure, what does that mean?

19   A    Well, so, the one in 2012, again, grassroots, small.  We

20   were there for military training in the area and --

21   Q    Grassroots and small --

22        THE COURT:  Can he finish his answer before you

23   interrupt him?

24        MR. SINGLETON:  I'm sorry, I thought he was.

25        THE COURT:  I was waiting for the answer to your

1   question.

2   A    It was kind of, like, how this evolved.  We were there

3   for certain training.  And as part of this, we decided to come

4   together with some of the people that we had there, inviting

5   the local first responders from the USAR community and just

6   local agencies.

7         Part of this is -- well, in 2012, was to kind of

8   make them aware or showcase the new training facility that was

9   opening up there since our main focus at that time was on

10  simulation or simulation training.  And they were giving -- as

11  part of this, they allowed us to have a tour and also a small

12  simulation at the site.

13        THE COURT:  Do you know who you were dealing with at

14  the Guardian Center or who the other members of the MSOC

15  community were dealing with at the Guardian Center for this

16  small portion of the MSOC conference that was held in Georgia

17  in 2012?

18        THE WITNESS:  So, we learned about it from the

19  military group that we were working with.  And then I'm not

20  sure who -- the name of who the actual point of contact was,

21  but they organized that part of it, the tour.

22        I mean, the entire facility wasn't finished yet, but

23  there were some structures still standing that are still being

24  used now.  It used to be a missile facility.

25        THE COURT:  So, you conducted in August of 2012 a

1  simulation, an MSOC simulation, at the Guardian Center in

2  conjunction with the military training?

3           THE WITNESS:  We were there doing a separate

4  military training.

5           THE COURT:  Okay.

6           THE WITNESS:  And then we had our meeting at the

7  hotel with everyone that showed up, both days.  And then they

8  gave them -- we headed over to -- one exit over on the highway

9  to the facility, and they --

10          THE COURT:  The Guardian Center?

11          THE WITNESS:  The Guardian Center facility.

12          And then they showed them some of the things that

13 they were building and some of the things that were in the

14 process of completion and what -- their capabilities and what

15 they would be able to do there or train there.

16 Q    The part that's the MSOC -- what you call the MSOC

17 conference, that took place at a hotel with a small group of

18 people, correct?

19 A    Yes, sir.

20 Q    And was that less than 30 people?

21 A    I can't -- I would say maybe more because as far as,

22 like, the people who were assigned to the training was -- that

23 participated in this were maybe a little bit over ten.  So,

24 with the people who came to the meeting, to the conference, I

25 would say more than 20 people, maybe.

1   Q    I'm talking about attendees, so about 20 people?

2   A    Probably more.

3   Q    That's why I gave 30, but okay.

4        Well, about 30 people?

5   A    I can't give you an exact number.

6   Q    Okay.  Less than 50?

7   A    Probably, yeah.

8   Q    And going back to this flier here, it says this is for --

9   this was, you said, sent out to the community, local community

10  of first responders.  The Guardian Center was not open to the

11  public, you say, at this point in time.

12            MR. FLETCHER:  I apologize, objection, foundation.

13            This has not been called a flier by Mr. Henriquez.

14            MR. SINGLETON:  If I mischaracterized it as a flier,

15  I stand corrected.

16  Q    You created this as an internal document and you sent it

17  to people in the local community; correct, first responders?

18  A    So, this is, like, a landing page, if you know what that

19  is.  When you go to a website, there's a page that has

20  information on it.  So, this was -- what we're looking at

21  right here is a screen shot of a content management system

22  page.

23  Q    When you say "content management system," it's what we

24  lay folks would call a web page on somebody's website,

25  correct?

1   A     Yes, sir.

2   Q     And the website that this web page was on at the time was

3   Disaster Medical Solutions website, correct?

4   A     Yes, sir.

5   Q     Joe Hernandez's company.

6   A     Yes, he helped out a lot.

7   Q     The company you teach for.

8   A     Yes, sir.

9   Q     And when it says at the bottom here, "Early registration

10  is highly recommended.  Register at www.usarmedicine.com,"

11  you've explained now in your supplemental declaration that

12  that website did, in fact, exist at the time this -- before

13  this because that website you didn't purchase until 2013 and

14  it couldn't have been used for registration in 2012, correct?

15  A     So, that, when the page is active and posted, not in

16  draft, would have been a button.  And that's what it was, a

17  button for a form to have whoever was going to come, so we

18  knew who were coming, to leave their name and their e-mail

19  contact.  It wasn't required, but it was a form just to kind

20  of -- like a sign-up sheet.

21  Q     So, you're saying there was a form on Joe Hernandez's

22  website where you could register for this event, correct?

23  A     Yes.

24  Q     And you're saying you created this document, which you've

25  offered to the Court as an exhibit, for an event that took

1    place in 2012, correct?

2    A    Yes, sir.

3    Q    And you're responsible for putting in usarmedicine.com?

4    A    So, we were going to use this domain in 2012, but the

5    time that I had to actually create an entire website under

6    this domain wasn't enough.

7          So, what you're looking at, that's an HTML code for

8    that particular button.  If you scrolled down, it would have

9    been more HTML code and redirections on there.

10   Q    Okay.  This event, though -- just to back up a little,

11   this event was not open to the public.  It was open only to

12   first responders.  Highly sophisticated, well trained, first

13   responders.  And a small group at that.

14         THE COURT:  Can you explain what you mean by "highly

15   sophisticated"?

16         You've said that several times in your papers.  I

17   don't really know what a highly sophisticated -- as opposed to

18   well trained or highly trained, what does highly sophisticated

19   mean in the context that you're using it so we all understand

20   your use of the term?

21         MR. SINGLETON:  What I mean by sophisticated -- and

22   if you don't agree with my definition, please correct me --

23   they are discerning people, they are at least college

24   educated.

25   Q    They are looking at content you've created to decide

1  whether to go to a conference that you're advertising and they

2  are being asked to pay --

3          They were asked to pay how much for this event?

4  A    Nothing.  It was free.

5  Q    Nothing, it was free.  So, there was no profit for this

6  event.

7  A    No.

8  Q    It was not a business, so to speak.

9  A    Well, we all contribute whatever resources we have to

10  make it happen.

11  Q    I understand.  You're all first responders getting a gift

12  together to share information and knowledge.

13          But you're not running this at that time as a

14  business for profit.  You are not charging a fee, there are no

15  revenues, there's no profits to be divided --

16          THE COURT:  Again, multiple questions.  You need to

17  break it down.

18          MR. SINGLETON:  Okay.

19          THE COURT:  These complex questions are not going to

20  be acceptable.

21          MR. SINGLETON:  Okay.  I'm sorry.

22          THE COURT:  What question do you want him to answer

23  first?

24  Q    This was not a commercial endeavor?

25  A    It's never been.

1  Q     Never been.  In fact, you've never made any profits from

2  any of the MSOC events you've held, correct?

3  A     Never.  I've contributed my own money into it.

4  Q     Let's go back to this web page content that we're looking

5  at on the screen.

6            It doesn't reference the medical special operations

7  community, correct?

8  A     On this page?  No.

9            THE COURT:  Sir, may I understand, this lawsuit is

10  about the Medical Special Operations conference, not the

11  Medical Special Operations Community copyright or trademark;

12  is that correct?

13            THE WITNESS:  Yes, ma'am.

14            THE COURT:  I guess I'm not understanding the

15  relevance of the use of the word "community" versus the

16  multiple use of medical special operations "conference" in

17  these documents.

18            MR. SINGLETON:  If I might try to clarify.

19  Q     Going back to that page there, you say:  Open to all

20  first responders --

21            Second column here:  Open to all first responders,

22  medical professionals working in urban search and rescue.

23            Let's start with that.  Urban search and rescue,

24  you've referred to USAR.  USAR is an acronym for Urban Search

25  And Rescue, correct?

1    A    Yes.

2    Q    And there's a FEMA -- FEMA uses that term, FEMA USAR,

3    correct?

4    A    So do others, yes.

5    Q    Among others.

6    A    Yes.

7    Q    Many people use that.

8    A    Yes, sir.

9    Q    And "disaster medicine," many people use that, correct?

10   A    Yes, sir.

11   Q    And as we talked about, even within the FDNY there's a

12   SOC, Special Operations Command.

13           They use the term Special Operations Command,

14   correct?

15   A    Yes, sir.

16   Q    And there's an association, a well-known association that

17   has a conference called SOMA.

18           Are you familiar with SOMA?

19   A    Yes, sir.

20   Q    And SOMA is Special Operations Medicine Association?

21           What is it?

22   A    Special Operations Medical Association.

23   Q    Special Operations Medical Association.  And they hold

24   conferences using the term "special operations medicine."

25   A    Yes, sir, but for military.

1   Q    For military.

2   A    We have developed our conferences based off of SOMA.  We

3   actually received guidance from some of the SOMA founders.

4   Q    So, that's among the resources you draw upon to share

5   information at your MSOC events.

6   A    Yes, sir.

7   Q    SOMA information and resources.

8   A    Most of it, yes.

9   Q    And when you say that's really more geared towards --

10  what did you say, military?

11         THE COURT:  SOMA, he said.

12  A    SOMA is a military conference, yes.

13  Q    As opposed to open to all first responders; is that

14  right?

15  A    Yes, sir.

16  Q    So, there was -- just to close this loop here for this

17  one, there was no fee charged for attendance at this gathering

18  at the hotel nearby the Guardian Center.

19  A    Nothing.

20  Q    Turning to the last page of the document --

21         THE COURT:  Just for the record, Bates No. HENR13.

22  Q    At the bottom, you say:  Plans POC.

23         "POC" is point of contact?

24  A    Yes, sir.

25  Q    And that's Joe Hernandez, yourself -- who is Nate

1  Commiskey?

2  A    He was a liaison.  I don't remember if he was for one of

3  the facilities or if he was actually for one of the groups.

4  Q    Is he a first responder?

5            Is he with a task force?

6  A    I'm not sure.

7  Q    Is he a member of the medical special operations

8  community?

9  A    I don't think so.

10  Q    How about Scott Brantley?

11  A    No.

12  Q    No what, not a member of the medical special operations

13  community?

14  A    No, I don't think he's part of --

15  Q    And not a task force member.

16  A    No.

17  Q    Have you ever taken any courses in trademark law?

18            Copyright law?

19  A    No, sir.

20  Q    When you applied to register the name Medical Special

21  Operations Conference as a trademark with the U.S. Patent and

22  Trademark Office, did you seek legal advice from an attorney?

23  A    No, sir.

24  Q    You did that on your own.

25  A    Through a service, yes.

1  Q     Through a service.  What do you mean "through a service"?

2  A     Kind of like a patent and copyright service.

3  Q     Did you actually get advice from a person or is that like

4  you buy a form?

5        Is it a website that you buy a form?

6  A     Yeah, and they kind of guide you through the process.

7  Q     Okay.

8        THE COURT:  May I ask you, sir, when did you first

9  conceive of and use MSOC or Medical Special Operations

10 Conference?

11       THE WITNESS:  So, we came up with the idea, like,

12 when -- because we used to attend the SOMA military

13 conferences, and the whole purpose of the MSOC was to kind of

14 create that and bridge that into the civilian side.  And we

15 started to, you know, hold small meetings throughout the

16 community, kind of organize and develop the conferences.

17       Finally, the meetings and talks started back in

18 around 2010, late 2010 into 2011, and then we started to kind

19 of execute that.  But the only time that we were able to do it

20 was during training and in places that we knew that all the

21 instructors would be at.

22       THE COURT:  So, you said you began to "execute."

23       Is that when you began to hold conferences?

24       THE WITNESS:  Yes.

25       THE COURT:  And were they usually adjacent to SOMA

1  training or some other kind of training?

2          THE WITNESS:  Yes.

3          THE COURT:  For the civilians.

4          THE WITNESS:  Yes, because it made it easy for us

5  because that way we would have the instructors or the

6  presenters in that area.

7          THE COURT:  So, would your MSOC conference training

8  be different from a SOMA training?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.

11          MR. SINGLETON:  May I continue?

12          THE COURT:  Yes.

13  Q    I just want to backtrack a little.

14          We said that for the 2012 conference, you said there

15  was no fee charged, it was free to attend, correct?

16  A    Yes, sir.

17  Q    Was that true of also the 2011 MSOC event in Ohio,

18  Ferno-sponsored?

19  A    Yes, there was no payment.

20  Q    No payment.

21          At either of those conferences, did you offer a

22  FEMA-certified MTS course?

23  A    With these two, it was a different type of training.  It

24  wasn't the official FEMA training.

25  Q    It wasn't.

1          So, no certifications of any kind?

2   A    There were certifications, but not for the MTS.

3   Q    Who was the certification issued by?

4   A    For that one, it was National Registry.

5   Q    What is the National Registry?

6   A    National EMS Registry, NAEMT, National Association of

7   Emergency Medical Technicians, for one particular training;

8   and then TEC.

9          THE COURT:  TEC?

10          THE WITNESS:  Well, it's TECC, Tactical Emergency

11   Casualty.

12          THE COURT:  Tactical Emergency Casualty.

13          And what does the other "C" stand for?

14          THE WITNESS:  Critical, Technical Emergency Critical

15   Care.

16          THE COURT:  Critical Care.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Thank you.

19          So, those are the certifications that you were

20   providing.

21          THE WITNESS:  That's what we were providing.

22   Q    Did you have to apply in advance to obtain authority to

23   issue certifications on behalf of the National Registry?

24   A    There is a fee for that entity to issue those

25   certifications.

1    Q    Okay.  When you teach at these outside events, you said

2    you also teach at the FDNY, for the FDNY.

3              Same type of training?

4    A    At the FDNY, it's the rescue medic training, FDNY EMS

5    rescue medic training.

6    Q    You teach a course to FDNY rescue medics?

7    A    Yes, sir -- well, I help.  I don't do it all by myself.

8    Q    You're allowed as an FDNY employee and EMS paramedic, or

9    paramedic, you're allowed to take outside employment, correct?

10             You work with Joe Hernandez.

11   A    Yes, sir.

12   Q    And there are times when you understand that given the

13   nature of the engagement, you have to seek approval to engage

14   in certain works because there's a conflict of interest,

15   correct?

16   A    As a paramedic for the FDNY EMS, the only time I was told

17   that we have to report any outside work is if we're working

18   for a hospital within our response area because it's a

19   conflict of interest because of fear of patient steering.

20   Q    Well, let me ask you this --

21   A    Or anything that is in competition with my agency.

22   Q    Anything that's in competition.

23             So, you would never at a nonFDNY training event wear

24   your FDNY uniform, correct?

25   A    If it's not FDNY, no, sir.

1   Q    Right, because it would falsely suggest that it was

2   sponsored or endorsed by the FDNY if you did, correct?

3   A    Outside of the FDNY.

4   Q    And when you say in your declaration, "Well, I can wear

5   my uniform.  I can wear it to line-of-duty death funerals,"

6   what you're saying is, "I'm allowed to wear my uniform to a

7   funeral because I'm representing the FDNY," correct?

8   A    Yes, sir, it's a show of respect.

9   Q    As a member of the FDNY.

10  A    As a member of the deceased's family team, yes.

11  Q    What do you understand wearing the uniform signifies?

12  A    Allegiance.

13  Q    To the FDNY?

14  A    To the community, yes, sir.

15  Q    You entered into a donation agreement with the FDNY

16  Foundation when you agreed to create content for their website

17  to promote the FDNY MSOC, correct?

18  A    Well, I created their -- they didn't have a website, so I

19  created the website for the MSOC hosted at the FDNY.

20  Q    So, when you and Dr. Isaacs first got together and talked

21  about this, you said, "Okay.  We have to have a website."

22           So, you, with your computer experience, you went out

23  and purchased the domain name from GoDaddy, correct?

24  A    Yes.

25  Q    And you purchased other domain names, correct?

1    A    For the FDNY?

2    Q    For anybody.  This is what you do on the side.  You serve

3    as a webmaster, web host.  You provide hosting services.

4         Correct?

5    A    Yes, sir.

6    Q    So, you purchased other domain names.

7    A    Yes.

8    Q    usarmedicine.com, for example?

9    A    I didn't purchase it.  That one belongs to Hernandez.  It

10   was part of several that we purchased.

11        Since then, it's been transferred over because we

12   used that for the guidelines, which is part of the MSOC.

13   Q    So, usarmedicine.com belongs to Joe Hernandez --

14   A    At that point.  He was the one who initially crafted it.

15   Q    And he still owns it.  And if you go to usarmedicine.com,

16   it will take you -- it redirects to the Disaster Medical

17   Solutions website, correct?

18   A    Now it does, yes.

19   Q    How long is it redirected to that website?

20   A    Since late 2013, early 2014?  I'm not sure, can't say for

21   sure.

22   Q    And in 2013, when you were you doing this website for the

23   FDNY, you bought the domain name initially fdnymsoc.com,

24   correct?

25   A    Yes, sir.

1    Q    And that domain name was then later transferred to the

2    FDNY Foundation, correct?

3    A    Yes, that was the intention.

4    Q    You no longer own it.

5    A    No, sir.

6    Q    And now it redirects to -- it's still there, but it

7    redirects to fdnypro.org, correct?

8    A    Yes.

9    Q    And you were given access to that website at the time

10   because you were a trusted FDNY employee, correct?

11             MR. FLETCHER:  Objection.

12             Which website?

13             MR. SINGLETON:  fdnymsoc.com.

14             THE COURT:  "At the time" being when, sir?

15             MR. SINGLETON:  2013.

16             THE COURT:  So, did you create the FDNY website in

17   2013 and also buy the fdnymsoc.com domain name?

18             THE WITNESS:  Yes.  And they were all running on my

19   server.

20             THE COURT:  Okay.

21             THE WITNESS:  The FDNY didn't have an FDNY MSOC

22   website, the Foundation didn't have a very structured website,

23   so I used -- part of it was all within the network of the

24   MSOC, so it was on the same stack of servers.

25   Q    Right.  And the donation limit was intended to make clear

1  that you are donating, volunteering, your services with

2  respect to that endeavor.

3         THE COURT:  What endeavor, the website?

4         MR. SINGLETON:  Creating the website, buying the

5  domain name, setting up fdnymsoc.com, and creating content for

6  it.

7  A    So, that came later.  There were other issues too, where

8  part of it was I was allowed to use the FDNY patch or logo on

9  it.  And some of the cross-traffic from that, we were getting

10 nonrelated e-mail asking about employment and all this stuff

11 that had nothing to do with the MSOC.

12 Q    So, the MSOC logo came off or what happened?

13        The MSOC logo that the FDNY used, that wasn't until

14 2015.

15        MR. FLETCHER:  Objection, mischaracterizes

16 testimony.

17        THE COURT:  Sustained.

18        Plus there are two questions once again.

19 Q    You created a version of your FDNY MSOC logo for the FDNY

20 that had either the words Fire Department City of New York or

21 FDNY or FD Rescue School, correct?

22 A    Yes, sir.  It's kind of how the logo is created.  We have

23 a rocker for the city, the agency, whatever you want to call

24 it.  It's kind of like what we wear on our uniforms and have

25 our unit as a rocker.

THE COURT: What's a "rocker"?

THE WITNESS: It's wording identifying your unit, who you work for, or location, or, you know, the base that you're stationed at, where you deploy from.

And that's kind of like how we add a rocker to the bottom of the patch of the logo, to describe where that MSOC is being held at or what agency or what entity's deploying.

THE COURT: So, the logo is created, and is it always then put on to a patch or just is a logo that is on the website and talks about the MSOC partnership with the host?

THE WITNESS: All of it. It's also put on a patch, it's put on coins.

THE COURT: I see.

THE WITNESS: We create a coin for every MSOC after every event.

THE COURT: Can I ask you, when did you create the MSOC logo which is part of Defense Exhibit A?

I believe it's page -- I can't read the page number, but...

THE WITNESS: Page 4.

THE COURT: Page 4, is that the Medical Special Operations Conference logo that you created?

THE WITNESS: Yes, ma'am.

THE COURT: And when did you do that, sir?

THE WITNESS: That was in around 2010 I started

1  working on it.  The initial draft was a little bit different.

2  In 2011 is when I finalized a lot of it and it was more

3  public.

4          Each one of those things that are in there, as far

5  as like the eagle, the shovel, the Maltese cross, the Star of

6  Life, the hazardous materials trefoil, and the hurricane sign,

7  along with the world, they each have a meaning.  And none of

8  it relates to the FDNY.

9          I'll give you an example.  The 28 feathers on each

10 wing, it stands for each FEMA USAR team.  The eagle is looking

11 down at the Star of Life, which signifies medicine.  The pole

12 from the shovel that the eagle is striking down into the

13 ground digging with the snake coming around it is like a

14 caduceus, like the medical sign.  The globe has the four

15 regions of Interact, which is the UN International Urban

16 Search and Rescue program.  And then you have your haz mat

17 trefoil and your hurricane signifying disaster and you have

18 your Maltese for fire or fire department, which is the

19 international sign for it.

20          THE COURT:  So, did you conceive of all these

21 components that became the Medical Special Operations

22 Conference logo?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  And that was in 2010?

25          THE WITNESS:  Late 2010, probably early 2011.

1          THE COURT:  Is Page 4 a draft in progress?

2          THE WITNESS:  No, this is the final.

3          THE COURT:  And when did you first start using it in

4    conjunction with the conferences?

5          THE WITNESS:  In 2011, we already -- that's when I

6    started putting it out there and identifying it was a

7    conference.

8          Yeah, the rocker, like I said before, was added on

9    depending on where we were going to be and who was sponsoring

10   it or who was the supporter for that.

11         THE COURT:  So, the rocker, an example would be on

12   Page 5.

13         THE WITNESS:  Yes.

14         THE COURT:  Where underneath the Medical Special

15   Operations Conference logo it says Perry, Georgia.

16         THE WITNESS:  Yes, ma'am, that's where we were.

17         THE COURT:  Is that the rocker part of it?

18         THE WITNESS:  Yes.

19   Q    And is it correct that that's the first time you used it

20   publicly?

21   A    No -- well, no, because this would have been around 2012

22   with the Perry, Georgia.  We had used it the previous year

23   too.

24   Q    But you didn't provide any exhibits or anything showing

25   such a use in 2011.

1   A     I can look.  Like I said, it was a long time ago.

2           THE COURT:  Where did you use it in 2011, if you can

3   recall?

4           THE WITNESS:  On e-mails and paperwork.

5

6           (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION (Continued)

2          THE COURT:  But was there any use that was imposed

3  to the public?

4          THE WITNESS:  Yes.  On the e-mails and

5  communications to invite.

6  BY MR. SINGLETON:

7  Q    Was it used on Joe Hernandez's website in 2011?

8  A    As the landing page, yes.  I'm sorry, in 2011?

9  Q    Yes.

10 A    No, in 2011, it was part of the training that we were

11 doing.  It was almost, like, post cards, a flier.

12 Q    Can you recall whether you used it on any website in

13 2011?

14 A    As a standalone, maybe as a landing page in 2011.

15 Q    And if, in fact, that happened -- you said maybe -- would

16 that be Joe Hernandez's website, Disaster Medical Solutions?

17 A    No.

18 Q    Whose web page?

19 A    So that would have been on my server.

20 Q    Well, your server hosts other people's websites, correct?

21 You're just acting as the server.

22 A    Okay.

23 Q    Well --

24 A    Yes.

25 Q    So whose website was it landing on?

1    A      Like I said, I can't remember if I actually created a

2    full page for Ohio.  I know we did give out cards with a flier

3    for, like, a postcard size card that had the logo for that

4    event.  I don't remember -- and I'm sorry -- if I actually

5    created a full landing page.

6    Q      Okay.  And when you're talking about the rocker -- so

7    every time you used this subsequent to 2000 -- let's say,

8    subsequent to 2012, where we see the Perry, Georgia rocker,

9    you would put -- you're saying, well, when I used if for FDNY,

10   I would use an FDNY rocker, so it would say FDNY Rescue School

11   or Fire Department of the City of New York, correct?

12   A      Yes, sir.

13   Q      Okay.  And the first time you used it at the FDNY was

14   2015, correct?

15   A      Because --

16   Q      Just not because; yes or no?

17   A      It was late 2014, going into 2015, yes.

18   Q      For the 2015 MSOC event conference?

19   A      Yes, sir.  That said Fire Department of New York, yes,

20   sir.

21   Q      And that had to go through an approval process within the

22   department which included Abdo Nahmod, who was a chief?

23   A      Yes, sir.

24   Q      You know that for a fact?

25   A      Well, the discussion was, because the way I had it

1   originally was just New York, and we always would want to give

2   more credit to the bigger sponsor or host, and that required,

3   yes, that we get full approval to put Fire Department of New

4   York on it.

5   Q    Okay.  And had you to get approval for that even though

6   it was a co-branded event and they were -- by your claim, the

7   FDNY MSOC is just a flagship event for your brand of MSOC

8   events, correct?

9   A    Well, we could have also called it Medical Special

10  Operations Conference with a NYPD rocker on it because they're

11  also providing -- they contributed to the New York -- and

12  still do contribute to the New York event.

13  Q    I don't think you're answering my question.

14       Your position is that the FDNY MSOC is really

15  they're hosting a big event for you, for your brand, you own

16  the good will associated with their holding a conference every

17  year, you own the good will, because you're saying I own the

18  MSOC mark, and everything the FDNY does is pursuant to this

19  implied license, and therefore I own all the good will,

20  correct?

21  A    Yes.  We brought that to the FDNY.  You know, they all

22  understood, and that's how it was supposed to work out.

23  Q    And you don't have an e-mail specifically to anyone at

24  the FDNY saying, I'm bringing this event to you, this is

25  really an MSOC branded event that belongs to the medical

1   special operations community or to me, Juan Henriquez?  You

2   don't have any e-mail that says that, and you don't have any

3   coordination --

4           THE COURT:  One question at a time.

5   Q    You don't have any such e-mail, correct?

6   A    No.  But -- I'm sorry, you're making it sound like I'm

7   trying to make it, like, you know, I want credit or, like, I

8   want someone to kind of pay me homage or something towards

9   creating it.  You're saying, like, I had to go to someone and

10  say, hey, this is mine.  Like, it was all understood.  Doug

11  and everybody else involved knew that we were -- how we were

12  bringing it.  We explained to them how it would work.  And I

13  was included in that in the process of selling it to the fire

14  department.

15          THE COURT:  When you say selling, are you meaning

16  for monetary gain or just --

17          THE WITNESS:  Not for monetary.

18          THE COURT:  -- or convincing them?

19          THE WITNESS:  Convincing them, because they didn't

20  really understand how it will all work out with the resources

21  that we had.

22  Q    And when you say you were one of the people who was

23  involved in selling it, I mean, you mean convincing them that

24  this is a good idea, that they should get behind this, and

25  sponsor these events, correct?

1  A     Yes, sir.

2  Q     And you were one of many people who were involved in that

3  endeavor of getting them to support MSOC?

4  A     It wasn't that many.  It was only, at that point, through

5  Doug and I.

6  Q     Well --

7          THE COURT:  Doug is Doug Isaacs?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Okay.  Just for the record.

10  A     It was on the FDNY here in New York, was myself and Doug

11  Isaacs, but everyone else throughout the country and the MSOC

12  community were also contributing, because we weren't

13  originally planning to do it here.  We were in talks with

14  another one of other friends from California with another

15  place in Florida was another discussion too at the beginning.

16  Q     When you say, so on the FDNY side, it was just you and

17  Doug who were trying to sell it to FDNY leadership, correct?

18  A     We were the ones, yeah.

19  Q     And the leadership you were trying to sell it to included

20  who?

21  A     So at that time, it went through different people.  The

22  SOC command offices, they understood it better because they

23  were more in-tuned with the training that we do and the

24  resources that we have at Randall's Island, and the FDNY

25  facilities as opposed to the higher members or part of the

1  FDNY who really didn't understand anything about special

2  operations or anything as far as training and stuff, all the

3  resources we had at Randall.

4  Q    You say SOC command.

5        Is there a name involved?  Is there someone at SOC

6  command who was involved in that initial decision?

7  A    They were several.  It went from -- we were pitching it

8  to a lot of people.

9        THE COURT:  "We," meaning, you and Dr. Isaac?

10       THE WITNESS:  Dr. Isaacs, also, my partners.  We

11  were just really excited on trying to have it hosted in New

12  York City.

13  Q    Is it fair to say that you and Doug Isaacs were not the

14  decision-makers in this respect?

15  A    As far as?

16  Q    Whether the FDNY was going to get behind it?

17  A    No.  Well, I wasn't, for sure.

18  Q    And Doug Isaacs wasn't either, to your understanding?

19  A    He had a lot more power than I did to make that happen.

20  He actually got it to happen.

21  Q    Your understanding is he was one of the pitcher, the

22  sellers of the idea, not one of the decision-makers as to

23  whether the FDNY and/or the foundation would get behind it?

24  A    Well, my understanding was that he was one of the

25  decision-makers, and it just had to go up the chain of

1  command.

2  Q    And what was that based on, that understanding that he is

3  as decision-maker?

4  A    Our communications.  My experience in the FDNY.

5  Q    Based solely on your communications with Doug Isaacs,

6  correct?

7  A    And others.

8  Q    Who else?

9  A    As far as, like, just initial talks with different chiefs

10  within the organization.

11  Q    That's what I'm trying to get to, which chiefs did you

12  have to talk to?

13  A    Three were several Gary Downey.

14  Q    You said Downey?

15  A    I'm sorry.

16  Q    You said Downey?

17  A    Chief Downey.  It was a lot of the guys from SOC, from

18  the special operations command, because they understood or

19  they understand the national system.

20  Q    And the only name you recall is Downey?

21       MR. FLETCHER:  Objection.  Mischaracterizes.

22       THE COURT:  Sustained.

23  Q    Who do you recall besides Downey?

24  A    I can't say for sure because it's been so many years and

25  so many different people throughout the different years.  So

1  for me to just say one person, I don't want to say the wrong

2  thing.  I know --

3           THE COURT:  There were others as far, as you can

4  recall?

5           THE WITNESS:  There were others.

6  Q    Did you create pitch documents of proposal of, say,

7  here's what we're going to bring?

8  A    So, yeah, I did.  I kind of showed them some of the

9  things that we had done.  A lot of conversations about how it

10 would have happened in New York, how we would organize it at

11 our facility -- well, the stuff we would be doing at Randall

12 or in FDNY facility.

13 Q    So at that point in time, then, you're saying that I told

14 them about 2011 and 2012, and said we'll bring this kind of

15 thing to the FDNY in 2013.  Yes?

16 A    Yes, sir.

17 Q    And did you say did you say this is my property, this is

18 going to be my MSOC-branded event and you're just the hosting

19 it for -- you're just hosting it?

20 A    Not like you said it.  But it was kind of understood that

21 we've done it before we're bringing it here.  I told him the

22 story of how we created it.  Some of the things that as far as

23 like branding that I created.

24 Q    But you didn't talk with them or anyone at that point in

25 time or time after that about, here's the deal, you charge a

1   fee, I get a piece of it, there's a license agreement, I'm

2   going to get some of the share in the profits with the --

3           MR. FLETCHER:  Objection.  Compound.

4           THE COURT:  Sustained.

5   Q    Was there any discussion about the terms upon which the

6   FDNY would guess get to use the MSOC brand?

7   A    Just with Doug, and it was kind of understood in the

8   meetings in the way that I created the documents, and

9   everything else for it, and advertising.

10  Q    What were the terms that were understood by Doug based on

11  your communications with Mr. Isaacs?

12  A    That we were bringing the MSOC for the FDNY host and that

13  we would provide all our resources money, whatever, needed to

14  be contributed to make it happen.

15  Q    Are you saying you contributed money to the 2013 --

16  A    To all the MSOCs.

17  Q    To all the MSOCs?

18  A    Yes, sir.

19  Q    And did you submit bills to the FDNY?

20  A    Well, no, because it was for the MSOC.  The only one that

21  I requested I be paid for was for -- well, not the only one,

22  one of, I might have done it before, two.  So the major one

23  was because of these plastic balls.  So we came up with a

24  training idea for an engulfment for when someone falls in a

25  silo or some kind of heavy mud.  So the idea wasn't -- we had

1  done this outside of New York and we wanted to recreate it at

2  the Randall's facility -- was to purchase a whole bunch of,

3  like, plastic balls like they have at the -- like Mc Donald's

4  or Check E. Cheese, and I bought -- at first, Doug had told me

5  that the foundation would purchase them.  Then he told me

6  after advertising it, putting it down into action and

7  promoting it and getting the instructors to teach the class

8  from out west, Doug told me that the foundation would not be

9  able to purchase them.  And, you know, so I asked him, if I

10 lay out the money now, would I guess reimbursed for that

11 later, and he said, sure, we'll work it out, and I went ahead.

12 And that was one of the two that I laid out money, expecting

13 to get reimbursed for.

14 Q    Let me ask you, these balls --

15        THE COURT:  Did you get reimbursed?

16        THE WITNESS:  No.

17 Q    For what year was that?

18 A    I think that was for 20 -- I believe that was for 2015 or

19 maybe later, because we did use them again.  And they

20 eventually -- which is kind of, like, what the MSOC is about,

21 eventually, that equipment was used to train the rescue medic

22 program and other training at Randall's Island, because we

23 used it for that too after that.  Which is kind of, like, how

24 we run the MSOC, whatever pieces of equipment or things that

25 we develop for it, we like for the local agency or host agency

1    or anyone who will benefit in that area to have it so that

2    they can use it in their training.

3    Q    Okay.  So at the FDNY MSOC out on Randall's Island, that

4    three-day event, the -- these plastic balls you purchased were

5    used in a skill station exercise, correct?

6    A    Yes, sir.

7    Q    And the skill station is one that you organized, that was

8    the skill station you were responsible for organizing,

9    correct?

10   A    Well, I organized all of them.  The way it works is we

11   have a playbook, you know, and it's created from, like,

12   lessons learned.  We all contribute to it and we come up with

13   what simulations can we have at this year's event or at this

14   lead up event, and then --

15              THE COURT:  When you say, we, do you mean the MSOC

16   community or the MSOC community plus the host organization?

17              THE WITNESS:  So this would be the MSOC community.

18   This would be everyone that's out there involved in the system

19   or in this.

20              THE COURT:  So the playbook includes types of

21   exercises or simulations that MSOC would bring as part of its

22   conference training?

23              THE WITNESS:  Yes.

24   Q    And how many different skill stations were there?

25   A    Depends on what year.

1   Q    The year you used the plastic balls for the first time.

2   A    So --

3          MR. FLETCHER:  Objection.  He said he doesn't

4   remember.

5          THE COURT:  It's been asked and answered.

6   Q    Okay.

7   A    So there would be at least four, because we generally

8   would have at least 200 people or about 200 people

9   participating.  So the way we work it is we would break them

10  down in groups of four through each skill station, so there

11  would be at least four.  But what we would do sometimes is

12  subgroup them at the skill stations.  So we would have many

13  skill stations within one skill station.

14  Q    Let me ask you, the MSOC community that you say was

15  involved in putting together these skill stations, that

16  included Denny Johnson who was an FDNY paramedic?

17  A    Yes.

18  Q    And that included Marco Girao, who was a FDNY paramedic?

19  A    And others from outside of the FDNY, yes.

20  Q    Were there many other FDNY in-house people involved in

21  putting on the MSOC conference?

22  A    At New York, yes.

23  Q    Yes.

24  A    Yes, sir.  There was also NYPD and other organizations,

25  as well.

1  Q    I'm going to jump now.

2         You -- in your supplemental declaration, you talked

3  about confusion, that people are going to be confused by

4  between the two conferences, and you say that your conference

5  now attracts upwards of -- in 2022, over 500 people, correct?

6  A    Yes.

7  Q    And in the year before that, you say it attracted over, I

8  think you said 200?

9  A    It was probably a little bit more than that.

10 Q    So there was a substantial jump in attendance between,

11 what was it, '20, and '22?

12 A    So the difference is, because it's not just all medical,

13 so there's other disciplines, because the facility where we

14 in in 2022 were a lot larger and allowed for those other

15 disciplines to be involved.  So we would -- the space was

16 available and also the training that we wanted to do for those

17 other disciplines was also available.

18 Q    In 2022 when you had 500 attendees, were these

19 attendees -- did they have to pay a fee to attend?

20 A    Yes, sir.

21 Q    Pardon?

22 A    Yes.

23 Q    How much did they have to pay?

24 A    Well, it depends what courses they were taking and if

25 they were staying for the full conference or not.

1  Q    So you offered an MTS, FEMA certified MTS medical team

2  specialist course, correct?

3  A    There were several courses, FEMA courses, certifiable

4  courses, and other.

5  Q    Several courses?

6  A    Yes, sir.

7  Q    Okay.  And let's just take one of them.  Let's take the

8  MTS FEMA certified course.

9        How much do you charge a fee for that?

10  A    So with the FEMA courses, they have to go through FEMA,

11  right, because you can't associate FEMA with any, like,

12  for-profit vendor that would influence the FEMA cache.  So

13  FEMA doesn't allow for anyone outside of their contracted

14  vendor to advertise or influence or introduce their product

15  that's not already in their cache of equipment.  So that has

16  to be done -- well, certain courses have to run through their

17  own registration process.

18  Q    Okay.  But how much do you -- you advertise it as an MSOC

19  event, we're going to give a course, and it'll be a FEMA

20  certified MTS course and what do you ask registrants to pay

21  for that course?

22  A    Just the value of the course.

23  Q    How much do you ask them to pay?

24  A    This -- like, right now, it would be anywhere from 27 to

25  28.

1    Q    Hundred dollars?

2    A    Yes, sir.

3    Q    This is not a, like, going to a supermarket in a

4    spontaneous decision, this is a lot of money, correct?

5    A    And it pays for the equipment and protective equipment

6    that's being used, yes.

7    Q    You're asking attendees to shell out upwards of $2,800?

8    A    Yes, sir.

9    Q    And is there a cheaper version?

10         Can I attend a three-day conference for less than

11   $300?

12   A    So, the $2,800 is for the course.  As part of the course,

13   they attend the conference.  The conference itself is 250 to

14   $300, depending on what they're opting into at the conference.

15   They're basically just paying for what they're using.

16   Q    So it's an à la carte menu kind of thing?

17   A    Yes, sir.

18   Q    I can sign up for the conference alone and I'd pay

19   approximately $300, and I can also attend a course and pay

20   another $2,800?

21   A    Which is what you would be paying if you were taking it

22   somewhere else, yeah.

23   Q    Okay.  If you're saying if I took it at Guardian Center

24   or I took it someplace else where they have FEMA certified MTS

25   courses, correct?

1   A      Yes, sir.

2   Q      But my point is, this is not a spontaneous decision, this

3   is a targeted -- I'll use the word sophisticated -- but

4   educated consumer who's being asked to spend a lot of money,

5   correct?

6   A      Yes.  But there's also other courses, such as the TECC

7   course, the veterinary course, and we're set up the same way,

8   and the cost for those, they're two-day courses that we tend

9   to deliver prior to the conference, so they're called

10  pre-conference courses which are 200 to $300 depending --

11          THE COURT:  So these are part of MSOC the

12  pre-conference courses?

13          THE WITNESS:  Yes.

14  A      So we make the courses available to kind of entice the

15  groups to come in.  It also allows them to use their federal

16  or state grants to attend the course, and then be able to stay

17  for the conference afterwards.  So a lot of the attendees or

18  participants that are taking those courses would be paying

19  with their federal grant or their state grant with their team

20  training fund.

21  Q      So today, the attendees, they apply differently to the

22  federal government for grant money or do you, the community,

23  apply?  I'm a little lost here.

24          Who is getting the grant money to pay for these

25  things?

1  A     So their teams are allowed -- their agencies are the ones

2  receiving grant funding for training.  There's specific

3  training that they will use it for.

4  Q     So you're saying, for example, maybe the Palm Beach Fire

5  Rescues Department gets some money from FEMA, and they can

6  send some of their members to go get a course, and that's how

7  they pay for their course?

8  A     Yes, sir.

9  Q     And do you know, do you get the money directly from the

10 participant or do you get it from the agency?

11 A     It all depends on how they have it set up, because

12 sometimes, like I said, it all depends on how they're doing

13 it.  I'm not the expert on that.  But as I understand it,

14 sometimes the participants would pay ahead and then get

15 reimbursed because some agencies will also pay, like, a per

16 diem for them travel and pay any other expenses outside of the

17 training, and they incorporate that into that.  That's not

18 always the case with all of the attendees or individuals.

19 Q     Well, when you say they might work different ways and

20 they might get reimbursed, they would get reimbursed by their

21 agency, correct.

22       They lay out the money, they get reimbursed, you're

23 not involved in that financial transaction, correct?

24 A     No.

25 Q     No?

1  A     No.  So when I go out for the task force, it's the same

2  way.  Some training -- depending on what it is, some training

3  is already paid for part of the grant funding.  There's also

4  FEMA facilities where you can only get certain type of

5  training where everything -- you don't have to spend anything.

6  All housing, food, and the material for the course are already

7  provided for you, along with the flights.

8             In other cases, I would have to pay up and bring

9  back vouchers to get reimbursed.

10 Q     So previously, you said you in connection with all MSOC

11 branded events that you put in, you don't make any money, the

12 community doesn't make any money, you don't make any money,

13 and basically, what you're telling me now, all this money

14 that's being paid to attend is really cost to cover being

15 financed by some state and local agency?

16 A     Yes, sir.

17 Q     So it's not -- you're not in it for the profit?

18 A     No.

19 Q     It's not a business endeavor?

20 A     And it's always been the goal that if there is any money

21 generated, it goes back into the community.  One of the goals

22 to -- for bringing the FDNY which I was very proud to bring in

23 the MSOC to New York, was the fact that any funds that would

24 be generated -- and this was well discussed with Doug and

25 others -- was that anything that was generated would be going

1  back to the special operations command within the FDNY EMS,

2  and that was one of the issues that kind of boiled up because

3  I was still dragging around mannequins with no heads.  Like, I

4  wasn't seeing where any of those funds were going to benefit

5  our units or us.

6  Q    Okay.  So you said though, you said the community and I,

7  we don't make any money from this, it's basically the fees

8  that are charged is the cost to cover proposition that goes to

9  FEMA, it pays for the course itself, correct?

10 A    Yes, sir.

11 Q    So if there are no profits, where are the extra money

12 coming that you're giving back to the first responder

13 community?

14 A    So the money that they're charging for the conference

15 ticket, anything that doesn't go to, like, the course or to

16 the certifying agency, that money that they're charging for

17 the conference attendance is supposed to go back to the

18 community, to the first responder community.

19 Q    Well, that's what I'm trying to get it to.  You say

20 you're the MSOC community, this is your branded conference.

21       Now are you telling me there is a profit built into

22 this mix that you are giving back to the first responder

23 community, or is it just cost to cover?

24 A    When you're charging for attendance, it's to cover for

25 any resources, right, that you would need.  Anything left over

1  is supposed to go back to the first responder community.  In

2  the FDNY's case, it was supposed go back -- the discussion was

3  that it was going to go back to the FDNY EMS Special Operation

4  Command and also the SOC command.

5  Q    I'm talking about your branded conference.  In 2022, you

6  said, we had an MSOC-branded conference, we had 500 attendees.

7        Was there money generated over and above the moneys

8  that paid for the FEMA course and the expenses of running the

9  thing, was there a profit generated?

10 A    Yeah.  And that was spent on the resources and also what

11 we do is, if there is money generated, we do, like, a

12 scholarship thing where we allow some agencies who don't have

13 the resources or funds to send their members, especially with

14 the more local agencies, to send their members to federal

15 certifying courses.  We kind of cover that cost with some of

16 that money that's generated.

17 Q    And when you say, we, you're now talking about the MSOC

18 Medical Special Operations Community aid that was formed in

19 2019 as a large corporation and registered with the IRS as a

20 501(c)(3), you're talking about that entity, correct?

21 A    Yes, sir.

22 Q    But I want to know, prior to 2019, going all the way back

23 to 2012 when you said, we weren't making any money, we never

24 made any money, were there any profits that were given back to

25 the first responder community?

1    A    We didn't charge for tickets.

2    Q         So the answer is no, there were none?

3    A    No.  Not at the beginning, no.

4    Q    Okay.  Nothing before 2019, in fact?

5    A    No.  There was -- because when the conferences became

6    larger, that's when there was a need to actually start

7    charging for fees just to cover transportation, equipment, and

8    other resources, because you would have to pay for some of

9    that stuff ahead of time.

10   Q    Okay.  I'm going to move on to another topic.  But before

11   I do, you made reference to the FEMA cache and, cache -- just

12   so the record is clear, cache is spelled C-A-C-H-E?

13   A    Yes, sir.

14   Q    And that refers to a -- for want of a better word -- a

15   warehouse of supplies?

16   A    So I used it as the -- describing the FEMA cache list.

17   It's a list that FEMA has which strictly details what

18   equipment a federal USAR team should have.

19   Q    The cache is all the equipment that's needed in a

20   disaster, correct?

21   A    And for training.

22   Q    Okay.  And so you are assigned on occasion, by SOC

23   command, to go work for the New York Task Force One, and they

24   tell you, go work at the cache, correct?

25   A    Yes.

1  Q    I'm just trying to clarify, because you used that term,

2  and I just want to be clear what it means.

3  A    Sorry.

4  Q    Now, the falling out between you and the FDNY in 2019, it

5  occurred because you say you observed financial improprieties

6  in the records you saw which indicated that money wasn't going

7  back to the first responder community as had been promised,

8  correct?

9  A    Yes, sir.

10 Q    And the FDNY foundation is a 501(c)(3) charity, correct?

11 A    Okay.

12 Q    Yes?  Do you know?

13 A    Yes, sir.

14 Q    And it's got a board of directors and there's chiefs in

15 the fire department who sit on that board, correct?

16 A    Yes, sir.

17 Q    And the only records you -- did you have access to the

18 books and records of the FDNY foundation?

19 A    I was given access, yes.

20 Q    What records exactly did you see that you say?

21       There are public records, they file a tax return as

22 a 501(c)(3) charity.

23       Did you see anything besides a publicly filed

24 document?

25 A    So I don't know if it's public or not.  So Doc Isaacs

1   showed me some records and it was generally expenditures or

2   things related to the conference, and -- in document form and

3   in a digital format.

4   Q    So Dr. Isaacs -- correct me if I'm wrong, Dr. Isaacs gave

5   you some kind of a listing of the expenses for the current and

6   current FDNY MSOC, including, speaker fees and whatever,

7   transportation and stuff, correct?

8   A    Yes, sir.

9   Q    And the money for that to pay for the FDNY MSOC, you're

10  aware that the FDNY foundation sent solicitations to outside

11  vendors like could be FERNO, but it could be other people,

12  other third parties asking them, contribute 10,000, 15,000,

13  20,000, correct?

14  A    Yes.  I know, because I provided a lot of those contacts

15  and some of those vendors that still contribute to this day

16  are friends of mine.

17  Q    But those solicitation efforts were conducted by the FDNY

18  Foundation, correct, you weren't writing the letter, signing

19  the letter saying please contribute?

20  A    I wrote my own letters and contacted the vendors also.

21  Q    And how much did you raise in speakers fees?

22  A    I'm not sure, because it all went to the -- whatever the

23  host event did.

24  Q    It went to the foundation?

25  A    To the host.

1   Q     The host was, you say, the foundation, the FDNY --

2   A     The FDNY.

3   Q     And the FDNY Foundation?

4   A     Yes, sir.

5   Q     You didn't write any checks for speaker fees, correct?

6   A     No, sir.

7   Q     The MSOC community didn't provide speakers to speak at

8   the FDNY conferences, correct?

9   A     We did.  There were a lot of speakers also that didn't

10  get paid, instructors that to this day were not paid, we're

11  just there volunteering our time, or through being able to be

12  there because their organizations has allowed them to use

13  training funds to be there.

14  Q     Okay.  There's a difference, though.  With respect to

15  Guardian Centers and Joe Hernandez through Disaster Medical

16  Solutions acting as a vendor, providing speakers, providing

17  instructors such as yourself to teach an MTS, that's not what

18  happened with the FDNY.

19          You're saying that other people who are trained,

20  Marco Girao, and yourself, other people who are FEMA-certified

21  instructors who are employed by the department donated their

22  time and taught courses, correct?

23  A     Yes, sir.

24  Q     They were not paid like Joe Hernandez was, his company

25  was paid, to offer that course?

1  A      So the only time that there was any payment, I guess,

2  going to Joe's company was when we introduced the medical

3  specialist course in New York which is for the MSOC which is

4  held in both the NYPD facility and the FDNY facility.

5  Q      And the first time that happened was 2018?

6  A      So we held courses -- because you're trying to just focus

7  on the medical specialist course.  We've held courses from the

8  beginning, and the ones that we can hold without having to pay

9  out to the certifying agencies such as FEMA or the NAEMT or

10  TECC would be done on a volunteer basis.  Like, the

11  instructors would not be getting paid, the equipment would be

12  all volunteer.  Joe has been there from the beginning, and

13  just because his company's name appears anywhere in here,

14  amongst other companies, is because they're all contributing.

15  A lot of them are not asking for any money back.  If anything,

16  they're giving money into --

17  Q      Right.  And you're saying that all of this is done on a

18  voluntary contributory donation basis with no expectation of

19  making profits.

20          This is not a money enterprise, it's not a business,

21  correct?

22  A      No.  It's not supposed to be, no.

23  Q      I got it.  And you say, well, there were other courses at

24  the FDNY teaching, but I'm asking in 2018, there was a

25  pre-conference?

1    A     Yes, sir.

2    Q     And Joe Hernandez's company, Disaster Medical Solutions,

3    was going to present a FEMA certified MTS course as a

4    pre-conference to the FDNY MSOC for that year, correct?

5    A     Yes, sir.  We did.

6    Q     And it was going to take place in the days before the

7    actual weekend, correct?

8    A     The pre-conference, yes.

9    Q     And for that one, it was a charge of $2,500?

10   A     So it's a full week.

11   Q     I'm asking, was there a charge for $2,500?

12   A     It was 2,000 something.  I'm not sure how much it was at

13   that time.

14   Q     And that money was collected by Joe Hernandez's company,

15   Disaster Medical Solutions, correct?

16   A     Through the FEMA process, yes, sir.

17   Q     You were working with Joe Hernandez at that time,

18   correct?

19   A     So for the New York conference?  Medical specialist

20   course for the MSOC at FDNY.

21   Q     For that pre-conference, you were working with Joe

22   Hernandez?

23   A     Yeah.  And all the other vendors.

24   Q     And you created a link that you posted on the FDNY MSOC

25   website that took you to Joe Hernandez's website to register,

1   correct?

2   A    Yes, sir.  And that's the way it was set up --

3   Q    I'm just asking --

4        THE COURT:  One at a time.

5        Once again, counsel, let him answer.  You've

6   interrupted him numerous times before he can finish his

7   answer.  I'm having trouble hearing all of what he's trying to

8   say.  I would ask you to speak up, please, a little bit.

9        Also, I don't think you need to raise your voice.

10  This is not a jury trial.  You don't need to adopt the tone

11  that you've adopted.  Just please ask the question one at a

12  time and let the witness answer.

13       What was your question, Mr. Singleton?

14  Q    You created a link on the FDNY website for the FDNY

15  conference for that year that took people directly to Joe

16  Hernandez's Disaster Medical Solutions website, correct?

17  A    Yes, sir.  Everyone was aware of that, and it was part of

18  the process, the registration process for that course.  There

19  were other courses also that had a similar registration.

20       THE COURT:  This is in 2018, sir?

21       THE WITNESS:  Well, every year.  It all depends on

22  the course, and if it's -- you know, what the guidelines are.

23       THE COURT:  So it would take the user either to Joe

24  Hernandez's website or to another website, depending on the --

25       THE WITNESS:  Depending on the course.

1       THE COURT:  The pre-conference course?

2       THE WITNESS:  Depending on the pre-conference

3  course, yes.

4       THE COURT:  And it was done through the FDNY MSOC

5  website?

6       THE WITNESS:  Yes, ma'am.  For the FDNY-hosted

7  event, yes, ma'am.

8       THE COURT:  Okay.

9  Q    And the understanding was that any profits that from

10  pre-conference were going to be paid over to the foundation,

11  FDNY Foundation?

12  A    If there were any profits generated from that, yeah.

13  Q    And then as a result of that, the FDNY, as you put in a

14  document today, referred -- I would characterize it as a

15  misunderstanding; is that correct, about what happened that

16  year?

17  A    I'm not sure what document.

18  Q    Okay.  You put in a new exhibit, I think an Exhibit 1?

19       THE COURT:  Defendants were using letters.  So is it

20  a defense or a plaintiffs' exhibit?

21       MR. MACKIE:  It says Defense Exhibit Y, Your Honor.

22       THE COURT:  Y.  Thank you.

23  Q    Okay.  This is what you put in, Exhibit Y, and this is

24  what happened in 2018 with that pre-conference, correct?

25       This arises out of that pre-conference for 2018?

1    A    Yes.

2    Q    And the FDNY was of the belief that you had registered

3    people and they got into the conference for free and it was

4    mishandling of funds, correct?

5    A    Yes.

6    Q    And so the FDNY referred it to the New York City

7    Department of Investigation to investigate, correct?

8    A    Yes, sir.

9    Q    And they concluded that no harm, nothing bad happened

10   here, correct?

11   A    So they concluded that it was unsubstantiated when I

12   showed them the proof.  This document was, when I saw finally

13   saw it, very troubling to me, because they knew that this late

14   in that whole process was there, and why they decided to kind

15   of make it seem like I was trying to create something that

16   they weren't aware of that maybe make it seem like I was

17   trying to generate money outside of the conference was very

18   troubling to me.

19   Q    I understand that.  And I'm saying that they concluded

20   that there was no wrongdoing on your part?

21   A    DOI did.

22   Q    Pardon?

23   A    The Department of Investigation did.

24   Q    The department of investigation, correct.

25        And you're aware that Joe Hernandez's company

1    donated $10,000 to the FDNY Foundation, correct?

2    A     Yes.   That was part of it, because, like, the other

3    events that we held, the conference ticket was also worked

4    into that fee, and also, the facilities charge which there

5    wasn't supposed to be any.   If there was any left over for a

6    facilities charge would be a normal course or that type of

7    training would be also given over to the foundation to

8    distribute to the community or to our FDNY EMS HAZTAC or SOC

9    group.

10              (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS EXAMINATION

2   BY MR. SINGLETON: (Continuing.)

3   Q    And that year, there were about 30 registrants for the

4   preconference paying $2500 for the --

5            THE COURT:  That year being 2018, sir?

6            MR. SINGLETON:  2018, yes.

7   Q    In that year at that preconference, there were about

8   20 -- 30 attendees for that preconference to take that FEMA

9   certified medical team specialist course; correct?

10  A    Yes, sir.

11  Q    And to go to the conference itself, as you -- as with

12  your conferences, that was $300, approximately; correct?

13  A    I don't remember what the charge was exactly for just the

14  conference for that year.  I would have to look back.

15  Q    And there were discounts given to people to go; correct?

16  A    Well, part of the MSOC, obviously, is to help or give

17  back to the community as much as we can, so there are, I

18  guess, comp -- complimentary tickets that are given out to

19  military and other certain groups or individuals.

20  Q    Okay.  So the FDNY gives out comps to military, and it

21  also gives discounts to different groups.

22  A    It's at all the MSOCs, yes.  Outside of FDNY and the FDNY

23  is part of it.

24            THE COURT:  Who gives the discount?  The MSOC or the

25  host --

1          THE WITNESS:  The individual of the agency gives a

2    discount.  Instead of paying full price to attend, they either

3    attend for free or they get a lower price.

4    Q    All right.  But what -- I'm trying to connect the dots

5    here.

6          And so there was approximately $200 to $300 charge

7    for people to attend the conference itself as opposed to the

8    course.

9    A    Yes, sir.

10   Q    And you had about 30 attendees, and the misunderstanding

11   that arose as a result of this preconference was that people

12   were getting into the main conference who registered and paid

13   Joe Hernandez's company $2500 and they got in for free;

14   correct?

15   A    That was part of the understanding.

16   Q    That was part of the understanding --

17   A    That they -- that the medical specialist is part of the

18   conference.  The people who were signing up, like I said

19   before, who were paying to attend the course, that's a way for

20   us to get them there, so they had access to the conference.

21   Q    So you're saying that was the deal; that was the

22   understanding going in.

23   A    Yes, sir.

24   Q    And you're saying that why this FDNY investigation arose

25   because somebody got crossed wires and miscommunications and

1    didn't understand that.

2    A    Yeah, well, that's what I assumed at that point.

3    Q    Okay.

4    A    And I explained that to you and Ms. Moira when we had our

5    meeting of all the other issues along with that.

6    Q    And DOI agreed with you -- agreed that, okay, that's what

7    was supposed to happen; correct?

8    A    So I showed them the documents and stuff and they said

9    that it was -- as far as I know, that it was unfounded.

10   Q    And I said Disaster Medical Solutions, as part of that

11   investigation, donated $10,000 to the FDNY foundation;

12   correct?

13   A    It wasn't part of the -- that the investigation was part

14   of the whole thing.  That was the plan from the beginning.

15   It's how it's done at the FDNY; it's how it's done outside of

16   the FDNY.

17          The vendors that we allow to participate understand

18   that.  They all are -- the majority of them are people who

19   come from the special operations community and want to get

20   back and do get back.

21   Q    So you --

22          THE COURT:  So the vendors that work with the MSOC

23   community and the conferences donate money to the host first

24   responders?

25          THE WITNESS:  To the host, yes.

1       So -- you know, outside from Joe, there's many

2   companies and friends who have done that from the beginning.

3   That's how we've gotten to this point.  If it wasn't for their

4   support, we would not be here.

5           You know, the helicopters that ITTS drove up from

6   Kentucky to bring to one of the first few conferences where we

7   could have a simulated medevac event and high angle simulation

8   at the FDNY facility on Randall's Island, that was all donated

9   and done for free, including the course material, the

10  equipment, and the instructors, and that's -- that's -- you

11  know, that's how MSOC is.  That's how we organize it.

12  Q    Okay.  My point was that Joe Hernandez's company donated

13  $10,000; correct?

14  A    Yes.

15  Q    And $10,000 is roughly equal to 30 people times 250 to

16  $300; correct?

17  A    I believe the total amount that he contributed was more

18  than $10,000.

19  Q    Okay.  And you don't know whether that contribution was

20  made after the investigation was started, whether it was an

21  after-the-fact contribution, or it was paid before the

22  conference -- before the preconference?

23  A    So I believe possibly both.  I'm not sure -- quite sure

24  of the dates because a lot of -- like I mentioned before, some

25  of these courses are paid through POs, so they don't actually

1    get the money until after the -- their member attends, so some

2    of that might have been given after the fact when the agency

3    or the PO was actually paid.

4              THE COURT:  PO being?

5              THE WITNESS:  A pay order.

6              THE COURT:  Pay order, okay.

7    Q    All right.

8              So now we have this DOI investigation and you

9    meeting with them, and this is all misinformation, and you're

10   wrongly accused.  As a result of this, you send an email to

11   the FDNY saying I've heard rumors that the DOI is

12   investigating; correct?

13   A    Yes.

14   Q    And you said:  You know, my lawyer says you should stop

15   using the term.

16             Correct?

17   A    Well, you're skipping ahead.  There were several

18   conversations going on.  Obviously, my goal, even until this

19   day, is not to disrupt anything.  I haven't even told everyone

20   exactly what the FDNY is trying to do because I don't want

21   that to get out there and cause any issues for the larger

22   community, for the people that actually benefit from this.

23             So this just didn't happen at that point.  There

24   were, you know, many discussions about it.  I wasn't really

25   sure what was going on until I understood that I was being

1    retaliated against for bringing certain issues up to certain

2    people.

3              THE COURT:  Who would you say retaliated against

4    you?

5              THE WITNESS:  So not only this, there were other --

6              THE COURT:  Was the DOI investigation, in your view,

7    a retaliatory act by somebody in the FDNY or the City?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Who do you think that is?

10             THE WITNESS:  So some of the names that are listed

11   here.

12             THE COURT:  In the Defense Exhibit Y?  Is that the

13   one --

14             THE WITNESS:  Yes.

15             THE COURT:  -- you are referring to?

16             THE WITNESS:  Yes, ma'am.

17             At the same time after I made these things known, I

18   was also charged internally for just different things.  I was

19   charged by the Bureau of Investigations and Trials within

20   the -- within the fire department.  You know, and every single

21   time, they would call me in and do things like me showing up

22   and cancelling the meeting right when I showed up, to go to

23   three or four meetings for them to drop the charges, or claim

24   that they were unsubstantiated, and they did this several

25   times.  I was never ever convicted, or whatever you want to

1  call it, of doing anything wrong because I -- I -- I have

2  always been honest with them and showed them proof that I

3  wasn't ever doing anything wrong.

4          THE COURT:  So the DOI and the FDNY Bureau of

5  Investigations both started investigations of your conduct and

6  both ended up with unsubstantiated findings?

7          THE WITNESS:  Yes.  And it wasn't all done at once.

8  When one failed, they would come up with something else, and

9  then I would go through that.

10         And, at the same time, you know, I have people such

11 as Doug telling me, like:  Oh, no, no, let's just continue on

12 and get this together.  It will all be worked out.  It's just

13 a misunderstanding.

14         THE COURT:  Okay.  So Doug Isaacs was then

15 reassuring you that things were going to work out and just

16 keep going as you were doing?

17         THE WITNESS:  Yes, ma'am.

18         THE COURT:  And were there events that precipitated

19 the FDNY's referal to the DOI for the Bureau of Investigations

20 that you are aware of?  Did you have some sort of

21 communication, or meeting, or disagreement with

22 representatives that then were followed by these

23 investigations?

24         THE WITNESS:  So to me it became obvious that it

25 was -- that it all started to happen after I -- I told them

1  about the things that I thought were going on.

2         THE COURT:  Wait.  After you told who?

3         THE WITNESS:  Well, obviously Doug and I had to have

4  discussions about that from 2017 on.

5         THE COURT:  Okay.  So in 2017, you started telling

6  Doug Isaacs what?  That there were --

7         THE WITNESS:  That there were issues with -- with

8  the money and with the vendors.  I told Ms. Moira and --

9         THE COURT:  Moira who is sitting at the table there?

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  When did you tell Moira?

12        THE WITNESS:  At our meeting in November.

13        THE COURT:  November of?

14        THE WITNESS:  It was 2019.

15        THE COURT:  Okay.

16        THE WITNESS:  I also spoke with the EEO office

17  because at that point there were other people who had the same

18  concerns that made it known that were not of Hispanics or

19  minorities that were not being charged with anything, or

20  approached by anyone, or dealt with, or treated the way I was

21  being treated.

22        THE COURT:  So in terms of retaliation, which you

23  say took the form of a DOI and an FDNY Bureau of Internal

24  Investigations, who do you think instigated those, or who do

25  you know instigated those, or were you told?

1          THE WITNESS:  I don't want to accuse anyone just on

2   hearsay, but I can go by the facts.  You know, this happened

3   after I brought up my concerns.  It continued to happen after

4   I spoke about what was going on with me, but I -- I know it

5   had to do with this, because before that, I had no issues

6   within the FDNY or anything that would affect my career in a

7   negative way.

8          THE COURT:  Did any FDNY representative or attorney

9   ever say anything to you that led you to believe that your

10  speaking up was going to be met with retaliation or, you know,

11  an investigation by the FDNY?

12         THE WITNESS:  I don't know if it's appropriate for

13  me to say here, but during our meeting with Ms. Moira and

14  Mr. Singleton, he told me that, you know, I better -- if I

15  value my job, I should think about what -- what I was -- you

16  know, about this thing.  I don't remember the exact quote, but

17  he did say if I value my job, you better, you know, think

18  about this or who you work for.

19         THE COURT:  Did you take that as a threat?

20         THE WITNESS:  Yes, ma'am.

21         THE COURT:  And it was during the meeting?

22         THE WITNESS:  It was during the meeting.  That's

23  when it became obvious to me that it wasn't a meeting to kind

24  of openly discuss all the issues and kind of come to an

25  agreement and maybe someone -- they weren't clear on the

1  facts.  That's how I went in there, because I didn't go in

2  there with -- with anyone.  I didn't go in there with a

3  lawyer; I didn't go in there with a union rep.  I did ask if I

4  could record the conversation.  Mr. Singleton told me no.

5          THE COURT:  Were you told you could not bring a

6  union rep or a lawyer?

7          THE WITNESS:  My union rep couldn't make it at that

8  point, so they -- they gave me the option to continue on

9  without my union rep or not and I did because I thought it was

10  an open discussion in trying to figure out what the issues

11  were and what's going on to fix it.  I do want the FDNY to be

12  a part of this.  You know, that's not what we intended this

13  thing to be, to keep anybody out, or to cause any issues

14  amongst the community.

15          THE COURT:  So after Mr. Singleton made this

16  statement that if you value your job, et cetera, is that when

17  the DOI and the fire department Bureau of Investigations

18  started?

19          THE WITNESS:  Around that time, yes, ma'am.

20          THE COURT:  Was it after that?

21          THE WITNESS:  Yes, ma'am.

22          I even sent -- I think this is important to say -- I

23  even sent an email to Ms. Moira after I met with DOI, after we

24  had the meeting, letting her know that I wasn't sure if I

25  could speak to them because the DOI had an investigation, and

1    I asked her to -- I cc'd one of the investigators, and I guess

2    she -- she responded and said, you know, it was up to me if I

3    wanted to continue to speak to Ms. Moira about this; that it

4    was my choice if I wanted to or not; and that they couldn't

5    speak on ongoing investigations.

6              THE COURT:  Oh, so she told you that it was your

7    choice whether to speak to them, but they were not going to

8    speak to you?

9              THE WITNESS:  No, no.  To continue to speak to them.

10   Ms. Moira had written me an email, and I answered back saying

11   I'm not sure if I'm able to speak to you.  I don't -- I don't

12   remember what the exact words were, but my response was:  I'm

13   not sure if I can speak to you because of the DOI

14   investigation, and I cc'd the DOI investigator in it.  And the

15   DOI investigator responded saying that they don't comment on

16   investigations, and that it was up to me if I wanted to

17   continue to speak to Ms. Moira or not, or to answer their

18   email.

19             THE COURT:  Did the person you are referring to as

20   Ms. Moira, did she make any statements similar to the one made

21   by Mr. Singleton at the meeting about valuing your job and

22   making you feel that your job is being threatened?

23             THE WITNESS:  No.  She actually -- because I also

24   mentioned in the meeting that I had gone to the EEO and had

25   not -- the FDNY EEO and I had not gotten a response yet and I

1  started the process the federal EEO.

2          So, Ms. Moira, after that meeting, she actually did

3  contact the FDNY EEO, and I went into a meeting afterwards --

4  and I appreciate that she did that; that they booked a meeting

5  afterwards with her and an FDNY EEO representative -- and I

6  told them exactly everything, but they said they would get

7  back to me, and I never heard from them again.

8          THE COURT:  Okay.  Thank you.

9          Do you have anything else?

10          MR. SINGLETON:  Yes, Your Honor.

11          THE COURT:  How much more do you have?

12          MR. SINGLETON:  Another 40 minutes?

13          THE COURT:  All right.  Because you have a very long

14  witness list, so are you intending to call all the witnesses

15  on your list?

16          MR. SINGLETON:  I am not.  He has the right to

17  cross-examine.  That's the agreement.

18          THE COURT:  All right.  I'm just going by the

19  witness list that you submitted on behalf of the plaintiff.

20          MR. SINGLETON:  I submitted declarations, and we've

21  agreed that that would be the direct testimony.

22          THE COURT:  Okay.

23          MR. SINGLETON:  He has the right to cross-examine

24  them.

25          THE COURT:  Are we expected to have to continue this

1  into tomorrow?

2          MR. SINGLETON:  I believe so, Your Honor.

3          THE COURT:  What?

4          MR. SINGLETON:  I believe so.

5          THE COURT:  All right.  See if you can get through

6  it, please.  You said 40 minutes?

7          MR. SINGLETON:  Yes, Your Honor.

8          MR. FLETCHER:  I apologize.  Can I take, like, a

9  two-minute bathroom break?

10          THE COURT:  Sure.  You can take a break.

11          You can step down and take a break, if you would

12  like.  Everyone else could take a break.

13          THE WITNESS:  Should I leave this here?

14          THE COURT:  Yes.  You will probably need it.

15          (A recess in the proceedings was taken.)

16          THE COURT:  Are we ready to proceed?

17          MR. SINGLETON:  Yes, Your Honor.

18          THE COURT:  Please do.

19  BY MR. SINGLETON:

20  Q    Your Exhibit Y is a memo dated August 6, 2018.  That's

21  the referral from the FDNY to the DOI; correct?

22  A    Yes, sir.

23  Q    The meeting that you referred to, at which I allegedly

24  made a statement to you, and with Moira Archer, was a year

25  later, November 6th, 2019; correct?

1    A    Yes, sir.

2    Q    Okay.  And prior to that meeting, you said you had been

3    talking to a DOI investigator, and you asked him:  Does a

4    meeting -- they want to meet with me.  Can I go?

5            And you said -- he said:  You're free to go to the

6    meeting if you want; correct?

7    A    No.  That was after.

8    Q    That was not the meeting?

9    A    That was in the email to Ms. Moira.

10   Q    That was not the meeting that I attended?  I attended one

11   meeting with you; correct?

12   A    Yes, sir.

13   Q    Okay.  That's not the meeting?

14   A    No.  You're saying that I met with a DOI investigator;

15   that I asked him if I should meet with you.

16   Q    And you're saying that's not the meeting you're talking

17   about?

18   A    So I didn't see this until I actually met with the

19   investigator.  I was made aware, as it's clear in my emails,

20   all I heard was rumors --

21   Q    I understand that.

22   A    Okay.

23   Q    But there was an ongoing DOI investigation; correct?

24   A    At that time, I didn't know that it was a full-on

25   investigation.  All I knew was that there were rumors and, you

 1   know, I asked different people, including Isaac, and no one

 2   could give me a straight answer.  The most that I got was that

 3   there were some issues with my work with the MSOC.

 4   Q    All right.  At some point, you spoke to a DOI

 5   investigator; correct?

 6   A    I was made aware that it was a DOI investigation and I

 7   was to -- to meet with them in person.  I had spoken to

 8   someone on the phone at that time, yeah.

 9   Q    Who was it that told you that -- from the DOI that you

10   can go to the meeting or not go to the meeting?

11   A    It wasn't permission to go to the meeting.  It was

12   permission to answer her email to me.

13   Q    Okay.  You said that you chose to go to a meeting, and

14   you had an opportunity to bring a union rep, but he wasn't

15   available, and you chose to go to the meeting anyway; correct?

16   A    He was running late, like I told you and Ms. Moira that

17   day, correct.  We had a meeting at 9 Metro Tech, at

18   headquarters.  We were waiting for my union rep.  I told you

19   guys that he was running late and he might not be able to make

20   it.  You guys gave me the option to go ahead with the meeting

21   without the union rep.

22   Q    All right.  At that time, the DOI investigation was still

23   ongoing?

24   A    I didn't know it was a full-on DOI investigation.  I

25   didn't know what the nature of the issues were with me.  I

1   didn't -- I thought that it was actually them investigating

2   what -- the issues that I brought up.  I didn't think it was

3   something directly related to me until I started hearing

4   rumors saying that:  No, it's for you.

5         And that's when I started to write the emails to

6   other people besides the ones that were in direct

7   communication with me.

8   Q    Okay.

9         But at the time you met with Ms. Archer and myself,

10  November 6th, 2019, it was still an ongoing DOI investigation.

11  You know what the status it, you were hearing rumors, but you

12  were in contact with a DOI investigator.

13  A    I was hearing rumors about a DOI investigation.

14  Q    And you heard from a DOI investigator.

15  A    At that -- around that time, yes.

16  Q    Okay.  And you knew his name.  You corresponded with him

17  by email.

18  A    Yes.

19  Q    Okay.  And subsequent to that meeting on November 6th,

20  2019, you're saying there was another investigation commenced,

21  the BIT's investigation, Bureau of Investigations and Trials;

22  correct?

23  A    There were many after that.

24  Q    Many?

25  A    Several.

1  Q     You -- as a result of that in 2019, you held your

2  first -- you set up the corporation down in Florida and you

3  held your own MSOC branded event; right?

4  A     It wasn't the first, right.  The --

5  Q     You helped a branded event that year.

6  A     Yeah.

7  Q     And you were trading letters were the FDNY.  You were

8  saying:  I own the name.  It's a name that belongs to the

9  community.

10         And the Department is saying:  No, it belongs to us,

11  and we're going to have our conference, and you should stop.

12         Correct?

13  A     The conversations with them were about this, about the

14  rumors going on, saying that -- at that point, what was

15  hearing that -- that it was my work on the MSOC, and I told

16  the FDNY -- at that point, I was like:  You know, if there's

17  something serious going on, like, that's it.  I'm hearing all

18  these different things.  Let's just stop.  Don't -- if -- you

19  can't use it anymore until we figure this out and we can move

20  on.

21         And it's very clear in all my communications that I

22  said:  Let's clear this up so we can move on.

23  Q     Okay.  So there are back and forth -- emails going back

24  and forth, and you're saying:  Don't use this until it's

25  cleared up.

1      And they're saying:  You can't use it.  It belongs

2  to us.

3          THE COURT:  Let's say -- what is "it" as you are

4  asking your questions?  Don't use "it."  What are you

5  referring to?

6  Q    You, at that point in time -- there are emails going back

7  and forth, and you're saying:  The term "MSOC" in Medical

8  Special Operations Conference are -- belong to the Medical

9  Special Operations Community, and that they gave me permission

10 to use it, and until this is all resolved, stop using it.

11         Correct?

12 A    So MSOC when it -- when its meaning is Medical Special

13 Operations Community, yes.  MSOC when it's meaning Medical

14 Special Operations Conference, yes.  MSOCC, when it's meaning

15 Medical Special Operations Community Conference, yes.  But I

16 didn't -- I knew that there was an understanding that they --

17 that they were allowed to use the name until they were not

18 allowed to host it or use it.  There wasn't --

19         THE COURT:  "They" being who?

20         THE WITNESS:  The FDNY --

21         THE COURT:  Okay.

22         THE WITNESS:  -- or -- that was the understanding

23 from the beginning.  We -- they would just provide the hosting

24 and the resources and the sponsorship.

25 Q    Mr. Henriquez, is it fair to say that you said:  Stop

1    using those terms, and they said:  We're not going to stop.

2    We -- those are our terms.

3    A    After our meeting.

4    Q    After your meeting with Ms. Archer and myself?

5    A    Yes.

6    Q    And after that meeting is when the BIT's proceeding was

7    brought; correct?

8    A    Yes.

9    Q    And the BIT's proceeding, you were charged with --

10   charges and specifications that, in substance, were that you

11   are holding your own conference and that you've been told not

12   to have that conference, and you're charged with

13   insubordination.

14   A    That was much later.  That was later on.  The original

15   charges were things that weren't even related to this.

16   Insubordination, disobeying the commissioner -- I don't know

17   if we submitted it, but they're in there.

18              THE COURT:  Is there an exhibit we can relate to to

19   help the witness recall?  Which exhibit is it?

20              MR. SINGLETON:  It's not an exhibit.

21   Q    But this is all related to MSOC; correct?

22   A    Not all of it, no.  There were a lot of unsubstantiated

23   charges that were on there that had nothing to do with any

24   conference or anything.  It was just in there just for no

25   reason.

1  Q     All right.  And --

2            THE COURT:  Well, is it Defense Exhibit K?

3            MR. FLETCHER:  I don't believe it is, Your Honor.

4            THE COURT:  Oh, okay.

5            MR. FLETCHER:  Or Mr. Henriquez is not describing

6  what I understand it --

7            THE COURT:  Oh, this is something else.  One of the

8  other investigations that he referred to?

9            Were you talking about Defense Exhibit K?

10            THE WITNESS:  This is one of the last ones in 2021,

11  but this one actually talks about employment or have any

12  financial or other interest -- direct or indirect -- which is

13  in conflict with the proper discharge of his official duty.

14  And every time -- every single charge, every single thing that

15  they tried either came back unsubstantiated or just got

16  canceled, including, in some of the dispositions, that they

17  wrote that these things should not have gone to charges.

18  Q     Mr. Henriquez, you are a civil service employee; correct?

19  A     Yes, sir.

20  Q     And you are represented by a union?

21  A     Yes, sir.

22  Q     And that's subject to a collective bargaining agreement;

23  correct?

24  A     Yes, sir.

25  Q     And the Collective Bargaining Agreement defines the

1    responsibilities of a paramedic; correct?

2    A    Yes, sir.

3    Q    And so the hearing officer who was charged with this, at

4    the end of the hearing on the MSOC matters, he concluded that

5    this is not something related to the Collective Bargaining

6    Agreement.  This should have not been escalated to a

7    disciplinary matter under the Collective Bargaining Agreement,

8    and that this looks like an intellectual property dispute, and

9    I recommend that the FDNY withdraw the charges, and they did.

10              MR. FLETCHER:  Objection.  Mr. Singleton is

11   testifying.  Can we clarify what --

12              MR. SINGLETON:  I'm asking a question.

13              THE COURT:  Stricken.  No.  If you are referring to

14   document Defense Exhibits K, it speaks for itself, so let's

15   not characterize it.

16              MR. SINGLETON:  It is not Exhibit K.  It's a

17   different proceeding.

18              THE COURT:  Well, what are you referring to?

19   Because you are testifying otherwise.  You want to get up here

20   and take an oath and testify, you are welcome to.  We've

21   talked about this before.  You are both a fact witness or

22   someone who has knowledge of the facts, and you're testifying

23   as part of your questioning of this witness.  That's troubling

24   to me.  But why don't you refer to an exhibit if you are going

25   to ask him questions about this particular issue.

1          MR. SINGLETON:  It is Exhibit K.  I'm sorry, Your

2     Honor.

3          THE COURT:  Okay.  That's what I thought.

4     Q    It reads:  It is alleged that in or about November 2019,

5     Paramedic Henriquez violated the above provision of the EMS

6     Operating Guide Procedure in that he created an advertising

7     flyer and registration website for a company named Medical

8     Special Operations Community advertising the MSOC annual

9     Medical Special Operations Conference --

10         THE COURT:  No, I can read it, sir.  You don't need

11    to read it into the record.

12         MR. SINGLETON:  Okay.

13         THE COURT:  Just ask your question.

14    Q    And then at the end it says:  Recommendations, on the

15    second page.  And it says:  Based on my findings detailed

16    under case 157 20 D -- which I believe refers to an earlier

17    disposition -- along with the evidence provided by the

18    department advocate, Paramedic Henriquez and his union

19    representation, I hereby recommend that the charge against

20    this member be dismissed.  This is a civil issue involving

21    intellectual property, and it should not have been escalated

22    as a disciplinary matter.

23         Did I read that correctly, sir?

24    A    Yes, sir.

25    Q    And then, as a result of your meeting with Moira Archer

1   and myself on November 6th, you suggested that you were being

2   retaliated against because you're Hispanic; correct?

3   A    And because of this, yes.

4   Q    And you said I filed a complaint with the EEO; correct?

5   A    Yes, sir.

6   Q    And then Ms. Archer said:  I have to report this.  I'm

7   duty-bound to report this to the EEO.

8           Correct?

9   A    Yes, sir.  Yes, sir.

10  Q    And then you met with the EEO -- an EEO -- someone from

11  the EEO office, Nicholette Douglas; correct?

12  A    Yes.  And Ms. Archer.

13  Q    And Ms. Archer at the same time?

14  A    Yes, sir.

15  Q    Okay.  And the EEO concluded that there was no

16  discrimination; correct?

17  A    I don't know.  They never followed up with me.  I don't

18  know if there was an investigation.  I don't know what they

19  did.

20  Q    Okay.  Did you report this threat that I allegedly made

21  to the EEO?

22  A    Yes, sir.

23  Q    Did you report this --

24  A    FDNY EEO or federal?

25  Q    Either one.

1  A    Yes.

2  Q    To which?

3  A    Both.

4  Q    Both, okay.

5        So you filed a complaint with the -- you filed a

6  complaint with the US EEO?

7  A    Yes.

8  Q    Okay.

9  A    I started the process.  I made them aware at the FDNY EEO

10  meeting with Ms. Archer that I did do that, and they kind of

11  assured me that they were going to take care of this and that

12  they would follow up with me.  Ms. Douglas said she would give

13  me a call and follow up.  They never did.

14  Q    Well, let's focus on the federal one first.

15        Did you file a formal complaint with the United

16  States Equal Employment Opportunity Commission?

17        THE COURT:  Asked and answered.  He said yes.

18        MR. SINGLETON:  I asked if it was a formal

19  complaint.

20  Q    Was it a written complaint?

21  A    It was a written complaint, and I had a meeting with --

22  scheduled a meeting downtown Manhattan.

23  Q    And in the written complaint, did you refer to the

24  alleged threat that I made?

25  A    I wrote everything in there, yes, sir.

1  Q    Okay.  And with Ms. Douglas, you're saying you reported

2  it to her as well?

3  A    Yes, sir.

4  Q    And did you call the DOI investigator and report this

5  alleged threat to him as well?

6  A    No.

7  Q    No.

8  A    It wasn't part of the questioning.  I reported the issues

9  that I found to the DOI also.

10 Q    All right.  I'm going to change topics.  We'll move

11 along.

12          In 2019, you also filed for a USPTO -- a trademark

13 registration from the US Patent and Trademark Office; correct?

14 A    Yes, sir.

15 Q    And they initially rejected your application, said:  The

16 words "Medical Special Operations Conference" are merely

17 descriptive.

18 A    They didn't reject it.  They -- it was in regards to the

19 use of the word "conference."

20 Q    They sent you a letter, correct, an office action letter?

21 A    Yes, sir.

22 Q    And that speaks for itself.  I will leave it at that.

23          THE COURT:  What exhibit is it, please?

24          MR. SINGLETON:  I believe it's one of the exhibits

25 to the second amended complaint.  I'm sorry, it's not an

1  exhibit for this -- this hearing.  I can provide it.

2          THE WITNESS:  I don't see it.

3          MR. FLETCHER:  I do believe it's Exhibit 5 to the

4  second amended complaint.  I don't think it's an exhibit here

5  in evidence.

6          THE COURT:  Okay, so neither party has offered this.

7          MR. SINGLETON:  Not for this hearing.

8  Q    You submitted an amended publication where you said that:

9  I have been using the mark on a substantially exclusive and

10 continuous basis for the five-year period preceding the date

11 of my publication.

12         Correct?

13 A    Yes, sir.

14         THE COURT:  What date was your amended publication?

15 Do you remember?

16         THE WITNESS:  I don't.

17 Q    It was in 2020; correct?

18 A    I'm not sure of the day.  I would have to go home and

19 look.

20         THE COURT:  Do we have it as an exhibit?

21         MR. SINGLETON:  I believe the amended publication

22 is an --

23         THE COURT:  Good.  Okay.

24         MR. SINGLETON:  -- exhibit to the second amended

25 complaint.

1          THE COURT:  Oh, okay.  But neither party has offered

2    that either?

3          MR. SINGLETON:  Not on this hearing.

4          THE COURT:  Okay.

5    Q    Do you have an understanding of what the term "secondary

6    meaning" means with respect to the use of a trademark?

7    A    Well, from what I understand is, is you've been using the

8    mark or the term and it's gained, I guess -- it's gained

9    notoriety, or it's gained a meaning of those -- like, with the

10   MSOC, those words together, "Medical Special Operations

11   Conference," come to mean something for the public to expect;

12   that if you see a Medical Special Operations Conference, you

13   kind of have an idea of what you are purchasing or getting

14   into; that it's going to be certified, valued training; and

15   that you will meet with stakeholders and people within the

16   community or the service that you are expecting from that --

17   from that mark, from that brand.

18   Q    Is there the --

19          MR. SINGLETON:  Withdrawn.

20   Q    Have you spent money advertising the MSOC trademarks as

21   you define them?

22   A    Yes, sir.

23   Q    How much money?

24   A    I can't tell you a total.  It's just --

25          THE COURT:  Can you estimate?

1   Q    More than a thousand dollars?

2   A    It's probably more than a thousand dollars, yes, over the

3   years.

4   Q    Over the years.

5        Collectively over the years, more than a thousand?

6   A    Yes, sir.

7   Q    Where did you spend this money?  Did you put adds in

8   magazines or something?

9   A    It's just for the FDNY-hosted event, or all together?

10  Q    No.  Exclude the FDNY-hosted events.  Your branded

11  events.

12  A    Well, they're all part of my conference -- part of the

13  MSOC, so I spent money for all of them, including the FDNY

14  events.

15  Q    I'm asking -- I'm asking, did you advertise specific MSOC

16  branded events that you held over the years?

17  A    Yes, sir.

18  Q    And excluding the FDNY MSOC events, did you advertise

19  just your events in other locations?

20  A    Yes, sir.

21  Q    And how much did you spend in advertising those?

22  A    Collectively, probably over a thousand dollars.

23  Q    And where did you -- did you advertise?  Buy ads in

24  magazines like JEMS --

25  A    Social media.  Also distribution lists, you know, word of

1   mouth.  Wherever I knew the focus group or potential attendees

2   would be.

3   Q    When you say "social media," did the Medical Special

4   Operations Community have a Facebook page?

5   A    No.  So you can advertise as an individual also.  Not

6   necessarily just Facebook, but you can do it with many of the

7   social media, like Facebook, Instagram, Twitter.

8   Q    Is it your testimony that you paid for advertising on

9   Facebook, Instagram, Twitter?

10  A    Yes, sir.

11  Q    Do you have checks and things?  Yes?

12  A    Well, credit cards.

13  Q    Okay.  And when you say "collectively over the years,"

14  that's more than a thousand dollars?

15  A    Over the years for all of them, yes.

16  Q    Okay.

17  A    And not just for the social media stuff, but also for

18  prints, flyers, and cards, and coins and stuff.

19  Q    I mentioned a publication JEMS.  What is JEMS?  Do you

20  know?

21  A    The Journal of Emergency Medical Services.

22  Q    Okay.  Do you know what EMS is?

23  A    Emergency Medical Services.

24  Q    And that's -- there's a publication called EMS; right?

25  A    EMS?

1    Q     Is there not?

2          THE COURT:  If he doesn't know, move on, otherwise

3    you're testifying.

4          MR. SINGLETON:  Okay.

5    Q     What publications are you familiar with that serve the

6    first responder community besides JEMS?

7    A     The Journal of Special Medicine; the Journal of Medicine;

8    JEMS, like you said; Emergency Medicine World.  There's quite

9    a few.  I just can't think of all of them right now.

10   Q     Are you aware of any unsolicited media coverage, articles

11   about your MSOC-branded events apart from the FDNY?

12   A     We've had locals in different places, yeah.

13   Q     You didn't offer any evidence of that on this hearing;

14   correct?

15   A     I don't -- I don't think so, no.

16         THE COURT:  Can you me what, if you recall, in terms

17   of unsolicited media coverage, in what venues you've had that

18   occur for your MSOC conferences?

19         THE WITNESS:  So, in Georgia, I know there was a --

20   like a reporter doing a story about what we were doing there

21   with the group, and also we discussed about the facility that

22   was going to be opening up, and we also discussed what the --

23   what we were doing as far as, like, meeting there and having

24   that -- the conference.  In -- in -- in -- in South Carolina,

25   there was a small -- there was another write-up about the MSOC

1   that we held there in Columbia.

2   Q    Did you submit any of that to the USPTO in support of

3   your amended application to register the Medical Special

4   Operations Conference as a trademark?

5   A    Those articles?

6   Q    Yes.

7   A    I don't think so.

8   Q    Okay.  The only thing you submitted was your attestation

9   that I've been using it for five years; correct?

10  A    No, because at that point they required more documents,

11  so I sent them some of the organizational documents, some of

12  the flyers, some of the cards.  Their issue was with the use

13  of the word "conference" by itself, because, from what I

14  understand, you know, the word "conference" by itself had --

15  you couldn't -- you couldn't trademark it.

16          My thing is, together it's come to mean the Medical

17  Special Operations Conference.  It's already -- you know,

18  people by now already understand what the MSOC is and what we

19  do throughout the country, and we do have -- we built up that

20  following throughout --

21  Q    And is it your understanding that without that --

22          THE COURT:  He was still answering the question.

23          Go ahead.

24  A    Well, we built -- throughout the years, we built up that

25  following.

1   Q    Is it your understanding that without that evidence of

2   secondary meaning, that the mark could not be registered?

3   A    Yes.  And that's why I provided it and they approved the

4   registration.

5   Q    And is it true that one of the attestations, that one of

6   the statements you made in support of the application is that

7   no one else has any right to use this mark, no interest in

8   this mark, except for licensees and authorized users?

9   A    Yes, sir.

10  Q    Okay.  And is it true at the point you sign that amended

11  application there was a full blown dispute between you and the

12  FDNY over ownership of the mark?

13  A    You're saying full blown, but that was the issue.  The

14  fact that Doug and others were telling me that -- that

15  everyone knew that there was a misunderstanding and that we

16  were going to settle it.

17          So at the same time that we were having those

18  conversations, I was working on the 2019 FDNY-hosted event.

19  Those documents for the 2019 -- that incident command document

20  was created by me.  Doug just kept pushing me to finish

21  everything and let's not make a big deal, we're working this

22  out.

23  Q    Mr. Henriquez, I'm not --

24  A    I had no belief that anyone -- that -- that's what I

25  wanted to clear up, and that's why I reached out to you guys

1  because, at that point, I felt that not everyone -- that there

2  was something wrong, because why would you guys say something

3  like that being that it was understood that -- how the MSOC

4  was supposed to run and be hosted by the FDNY.

5  Q    Mr. Henriquez, I'm not talking about 2019.  I'm talking

6  about 2020 when you submitted your amended application.  At

7  that point in time, it was clear that you were claiming

8  ownership of the mark, you were holding your own conferences,

9  and the FDNY was claiming ownership of the marks and holding

10  their conferences; correct?

11  A    Yes, sir.  The FDNY did not host the 2020 conference.  I

12  thought that they already had understood that they weren't

13  going to be able to host it, and I thought that they were

14  planning to do something else to change the name because that

15  was the rumors that I was hearing, that they were re-branding,

16  which -- which kind of became obvious to -- or I thought it

17  was obvious in the fact that they kind of created a new logo

18  along with conference that they were planning to do.  I didn't

19  know that they were going to continue to call it an MSOC or

20  Medical Special Operations Conference.

21

22            (Continued on the following page.)

23

24

25

1    CROSS-EXAMINATION (Continued)

2    BY MR. SINGLETON:

3    Q    There were letters from the FDNY Legal Bureau to you

4    saying, don't use the name, it's our name, correct?

5    A    Yes, sir.

6    Q    And there were letters from your attorney to the FDNY

7    saying, don't use the name, it's my client's name, I'm going

8    to sue for trademark infringement, for copyright infringement,

9    correct?

10   A    That came after, yes.

11   Q    After, but before the time you filed your amended

12   application?

13            MR. FLETCHER:  Objection.  Foundation.

14            THE COURT:  Sustained.

15   Q    All right.

16            THE COURT:  May I ask, did the 2020 conference ever

17   occur or was it canceled due to COVID?

18            THE WITNESS:  Well, I had an outside conference.

19   I'm not sure, they didn't have one in 2020.  There were two

20   years that they didn't have one.

21            THE COURT:  So the two years being 2020 and 2021?

22            THE WITNESS:  I think that.

23            THE COURT:  Okay.

24            THE WITNESS:  Or they did it as something else.  I'm

25   not sure.

1          THE COURT:  But you hosted an MSOC conference in

2     2020?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Where was that?

5          THE WITNESS:  So that was a hybrid virtual event.

6     So it was coordinated online with members of different

7     agencies throughout the country and one outsider in Italy,

8     streaming live training events and also presentations.

9          THE COURT:  And this was in 2020?

10         THE WITNESS:  I believe it was 2020 or 2021.

11         THE COURT:  Did you say and or did you say or?

12         THE WITNESS:  Or.

13    Q    Mr. Henriquez, you had lawyers representing you in 2021,

14    correct, Chris Albanese?

15    A    Yes, sir.

16    Q    The law firm of White and Hilferty?

17    A    Yes, sir.

18    Q    And they filed a claim for you in state court alleging

19    retaliation and whistleblowing, White and Hilferty?

20    A    For the EEO, yes, sir.

21    Q    And you filed that complaint this year, correct?

22    A    So I'm not sure when they sent the letter or complaint to

23    you guys, because even when we speak, I let you know that I

24    was speaking to a lawyer at that point when I told that there

25    were issues with my work and the retaliation started.

1  Q    So you weren't aware that a purporting to represent you

2  had sent a letter to the FDNY saying --

3  A    No, I was aware, but I can't say the exact date that they

4  sent the letter.  I would have to look at that.

5  Q    And then you had your current lawyer, Mr. Fletcher, send

6  a letter this year saying you're still infringing on my

7  client's rights in May?

8  A    So the other law firm is handling -- and I spoke about

9  that in one of the e-mails -- why they couldn't go meet with

10 you guys was because they don't handle -- they weren't going

11 to handle the trademark issue.

12 Q    Did you read their letter?

13 A    I'm sorry.

14 Q    Did you see their letter that they sent to the fire

15 department?

16 A    Which one?

17 Q    They sent a letter in 2021 -- I'm sorry, they sent a

18 letter in 2021 saying that we represent Juan Henriquez and

19 we're writing for a number of things, including his claims for

20 copyright and trademark infringement?

21 A    So it was more than one letter, but I believe they did

22 mention that to them.

23 Q    So it's fair to say you have known of this dispute with

24 the department since at least 2019?

25 A    I didn't see it at a complete dispute at that time

1  because I was being told that this is a misunderstanding,

2  let's work this out, continuing to work on this, we're working

3  together.  So people who are in a dispute don't work together.

4  Q    But we're in a dispute and nothing's happening as far as

5  you're concerned, and you have two separate lawyers write

6  letters threatening trademark litigation, correct?

7           THE COURT:  In 2019 or thereafter?

8           MR. SINGLETON:  In 2020 and 2021, and you sent --

9  you personally sent a response in 2019 saying, stop using the

10 mark.

11          MR. FLETCHER:  Objection.

12          There are four or five questions in there.

13          THE COURT:  I don't know what to do about -- I'm

14 just cautioning this lawyer over and over again, except

15 maybe --

16          MR. SINGLETON:  I withdraw the question.

17          THE COURT:  I don't know what to do, sir.  I've

18 tried to be patient with you.

19          Just one at a time, please.

20 Q    You had two separate law firms send letters on your

21 behalf in 2020 and 2021 threatening trademark litigation,

22 correct?

23 A    My trademark lawyer is here.  The other law firm may have

24 spoken about the trademark issue because they told the full

25 story that I told them as to what was going on and why there

1  was retaliation and everything else that came with that.  I

2  don't think that they were trying to handle trademark.

3              MR. FLETCHER:  Your Honor, can I instruct

4  Mr. Henriquez not to disclose privileged conversations between

5  himself and counsel.

6              THE COURT:  Right.  Please don't.

7              In terms of what your lawyer said to you or what you

8  said to your lawyer, that's all privileged.  So he shouldn't

9  be asking you about that and you shouldn't answer those

10  questions.

11             THE WITNESS:  I'm sorry.

12             THE COURT:  And hopefully your lawyer will jump up

13  and object quickly if that happens.

14 Q    Do you have any evidence of actual consumer confusion,

15 customer confusion?

16 A    Yes, sir.

17 Q    And could you describe that for us?

18 A    So with the vendors or with public or with participants

19 or with volunteers, instructors?

20 Q    Anyone who said, hey, I registered for your course, I

21 thought you were the FDNY or vice versa?

22 A    Yes.  So we -- and I'm being -- continuing to be asked if

23 we're still supporting -- because it's getting out there --

24 you know, people have asked me if we're supporting the event

25 in New York anymore, if we're not.  They see the changes in

1   the logo, they see the fact that certain things aren't --

2   weren't made available in the last conference that the FDNY

3   had, so they were asking if myself and others that bring that

4   to the conference were still involved.  And I've --

5   participants have asked me if it's not the same, could they

6   still go and then still be available to receive some of the

7   other benefits that they would get for participating in an

8   MSOC event.  And the vendors, I've had several e-mails from

9   vendors asking me if this was a -- if the FDNY event was part

10  of the same MSOC event or not.

11          THE COURT:  So you have people who would otherwise

12  be attending the New York posted MSOC event, participants,

13  vendors.

14          Who else did you mention?  Volunteers?

15          THE WITNESS:  Well, also the instructors, right.

16  Like I said, I don't want to cause any animosity or any issues

17  or anything like that.  Our instructor are still supporting

18  some of the courses or skills at the FDNY-hosted event because

19  we told them that, you know, to not cause any issues.

20  Q    Mr. Henriquez, have you gotten any complaints or

21  inquiries from a prospective registrant or an actual

22  registrant for your course who says, I thought this was the

23  FDNY MSOC, I want my money back or vice versa that says,

24  you -- that I purchased this thinking there was some

25  connection between you and the FDNY?

1    A    Yes.

2    Q    And did you provide any such proof on this motion?

3    A    No.  This happened recently.

4    Q    Okay.  You testified --

5         THE COURT:  Wait, what happened recently, somebody

6    wanted their money back or someone was confused about --

7         THE WITNESS:  Someone was confused.  I didn't know

8    that they were planning to do a 2023 until we started to get

9    these inquiries, and one of the groups was bringing several

10   members from their team in hopes that they be able to

11   participate in a course, and they were asking if that was

12   going to be held in New York or if the course was going to be

13   made available in New York or not.

14        THE COURT:  It was an MSOC course?

15        THE WITNESS:  It was supposed to be in 2023, this

16   year, that they're hosting.

17        THE COURT:  But it was an MSOC course that they were

18   wondering about?

19        THE WITNESS:  An MSOC pre-conference course that we

20   make available, and they were confused because they didn't see

21   it if their prints, in their advertisement online.

22   Q    Was this -- how many instances of this occurred?

23   A    A couple.

24   Q    When you a say, a couple, do you mean two?

25   A    Several.  Like, maybe eight.

1   Q    And do you have e-mails or how did these --

2   A    I have text messages.  I have e-mails.

3   Q    You have e-mails from these people stating what --

4   A    I have text messages and I have e-mails.

5   Q    Okay.  You haven't provided them yet?

6   A    I can get them from my phone downstairs.

7   Q    You'll provide them?

8   A    If you need them, yes.

9   Q    I certainly do.

10          Mr. Henriquez, I'm almost done.  You've testified

11   that you've never been the subject of -- you testified you've

12   been the subject of multiple BITs proceedings, Bureau of

13   Investigation Trials?

14   A    Yes, sir.

15   Q    And is it your testimony that you've never been

16   disciplined for insubordination?

17   A    Once in my career, and it was because of a

18   misunderstanding and that was early on.

19   Q    In 2014, correct?

20   A    Yes.  I think so.

21   Q    And you were accused of -- you were charged with

22   insubordination, failing to follow the direction of a

23   supervisor, and an altercation with a fellow paramedic,

24   correct?

25   A    There was no altercation.  There was a -- so they -- I

1   was supposed work with someone who was a new medic, and

2   there's a time where we're supposed to log into the symptom to

3   let the system know that we're available to receive emergency

4   calls.  The person, the new medic, my partner for that day was

5   nowhere to be found, and I couldn't log into the system

6   without their badge number, their number I didn't know.  So I

7   was given an order to log on without having a number for that

8   person to log on.  So after, you know, I told them, I can't

9   find him, how am I going to log on without the person's

10  number, and then they finally found him, and the captain --

11  right before they found him, the captain came out and said,

12  hey, log on, and I told her I don't have his number, how am I

13  going to log on.  So they wrote me up.  So then my partner for

14  that day finally came from wherever he was and we went on

15  about our day.  The following days after, I got charges for

16  insubordination for not, you know, obeying a direct order, and

17  she didn't want to let it go, so it went to BITs.  When I went

18  to BITs, they threatened me that the case, for them to resolve

19  it, although I have proof, a statement from the person that he

20  wasn't around and that I did not know his number, they told me

21  that the case would take several months to years to resolve

22  for them to fix it, but if I agreed to just taking a one

23  admonish, that it'll go away within six months or something,

24  and I wouldn't have any issues, I would be able to work and

25  continue and do overtime and everything else and be part of

1    the task force and all that.

2    Q     In that proceeding, it was alleged that you said, if I

3    have to work with you, this will be the worse day of your

4    career if I have to work with you?

5    A     No.

6    Q     Did you say that?

7    A     No.  That was all cleared up.

8    Q     Did you say that?

9    A     No, sir.

10   Q     And you accepted discipline of a reprimand and six months

11   probation, correct?

12   A     Yes.  It was a one admonish and that was supposed to be

13   on my record for six months, according to them.

14   Q     Okay.  And you have -- you're a civil service worker

15   represented by a union?

16   A     Yes, sir.

17   Q     And you have a union representative.

18         Did you -- after this November 6th meeting with

19   Ms. Archer and myself, did you report the threat to the union

20   and file a grievance?

21   A     So all that was done through the EEO, and they -- and

22   when I went to the BITs cases, I brought that up also to not

23   only the union, and the union also repeated what I had told

24   them, but to the BITs investigator, along with all the other

25   stuff that I uncovered.

1  Q    Okay.  Let me ask that again:  Did you report my alleged

2  threat to the union, did you file a grievance?

3  A    Yes, sir.  Well, we didn't file a grievance, but I did

4  report it to them.

5  Q    To who?

6  A    To the union.

7  Q    In writing?

8  A    During my report, phone conversations, during the BITs

9  investigations, every time I went there, when it came up, I

10  discussed it with them.

11  Q    Mr. Henriquez, again, you're referring to the BITs

12  proceeding.

13       I'm asking you, in response to this alleged threat I

14  made in a meeting on November 6, 2019, where you say I

15  threatened your job, did you report that to the union, to your

16  union representative?

17  A    Yes, sir.

18  Q    Was it done in writing?

19  A    It was in communications, yeah.  It was in my statement,

20  yeah.

21  Q    You're saying it was done orally?

22       THE COURT:  I'm sorry, what?

23  Q    It was done orally, in a conversation, in-person meeting?

24  A    Conversation, my statement in writing, yes.

25  Q    In a statement in writing?

1    A     Yes, sir.

2    Q     Okay.  You gave an interview -- you were interviewed by

3    FDNY Chief of Staff Elizabeth Cascio about the origins of the

4    FDNY MSOC, correct?

5    A     Yes, sir.

6    Q     And in that interview you said write upfront at the

7    beginning of the interview that there was a void, there was

8    nothing out there like this where people could get to together

9    and share their experiences, correct?

10   A     Yes, sir.  So that was a podcast to promote the

11   FDNY-hosted event.

12   Q     And now you're saying in a supplemental declaration that

13   you were told to restrict your remarks to the FDNY, don't

14   mention other ones?

15   A     So the way it was phrased was that this is going to focus

16   on the FDNY to promote the FDNY, just basically focusing on

17   what we were doing at the FDNY.

18   Q     And how would it hurt to say that I have other MSOC

19   branded events and the FDNY is the flagship MSOC event from my

20   brand?

21           THE COURT:  What?  You wanted -- you're asking why

22   he didn't say that?

23           MR. SINGLETON:  Yes.

24           THE COURT:  If you can answer, go ahead.

25   A     I didn't know I had to say it that way.  But I did

1   mention it in the podcast, and then looking at some of the raw

2   stuff from that podcast, they cut it or edit it from what they

3   put out to the public.

4   Q    And the statements that you allegedly made then that were

5   excised from the posted version are -- contain fully in your

6   supplemental declaration?

7   A    Yes.

8            MR. SINGLETON:  I have nothing further.

9            THE COURT:  Do you want to redirect?

10           MR. FLETCHER:  I do want to redirect.

11           How is the day going to go?  Should we break?  I can

12   redirect now?  Should we just the go through?

13           THE COURT:  Would you like a short lunch break?

14           MR. FLETCHER:  I wouldn't mind gathering my thoughts

15   on a short lunch break.

16           THE COURT:  Can you come back at 1:25?

17           MR. FLETCHER:  Absolutely, Your Honor.

18           THE COURT:  1:25.  All right.

19           I just want to say, for the record, just based on

20   this ongoing issue with Mr. Singleton being front and center

21   in some of these meetings and testimony regarding his alleged

22   threats, threatening Mr. Henriquez's job, the Second Circuit

23   does provide discretion for a Court to disqualify counsel who

24   ought to be called as witnesses if a lawyer has been involved

25   in key issues involving the lawsuit.

1          The Second Circuit says, it's not whether the

2   attorney will be called as a witness, or whether the plaintiff

3   plans to call the attorney, but whether the attorney ought to

4   be called.

5          These are very serious allegations, in my view, that

6   an attorney representing the plaintiff in this case has made

7   threats against a member of the FDNY for engaging in protected

8   activity.  It's concerning to me and I know Mr. Singleton has

9   represented himself as the only lawyer among the Corporation

10  Counsel's huge legal staff who knows intellectual property.  I

11  don't know whether that is accurate or not, but it is

12  troubling to me.  And I think that there may -- I don't know

13  if there are some ethical issues that are being raised here.

14         Rule 3.7A of the New York Rules of Professional

15  Conduct addresses a situation where an attorney may be called

16  as a witness.  And it specifically says, a lawyer shall not

17  act as an advocate before a tribunal in a matter in which the

18  lawyer is likely to be a witness or on a significant issue of

19  fact unless the testimony relates solely to an uncontested

20  issue.  It's clear Mr. Singleton does not agree that he made

21  that statement, he doesn't agree with the witness' testimony,

22  but the testimony relates solely to the nature and value of

23  legal services rendered in the matter.

24         It is very concerning to me.  So I just want to

25  raise it as I've raised it previously.

1      MR. SINGLETON:  Your Honor, may I?

2      THE COURT:  Yes.

3      MR. SINGLETON:  My -- first, there is a pending

4  state court action filed by Mr. Henriquez in which these

5  allegations are made.  I am not representing the City in that

6  action.  It allegations retaliation whistleblowing, and all

7  this stuff.

8      THE COURT:  I'm not worried about that action.  I'm

9  worried about this action.

10     MR. SINGLETON:  And in this action, my involvement

11 did not start until 2019, when the rights or whatever has to

12 do with this trademark dispute already were -- those are the

13 facts that are relevant, not what I did or said in 2019.  Has

14 nothing to do with the trademark issue.  But I understand Your

15 Honor's position, and there is a dedicated --

16     THE COURT:  There's a real concern.  The integrity

17 of my proceeding, not the state court proceeding, this

18 proceeding, where threats allegedly were made against a member

19 of the FDNY, highly decorated, for asserting rights that he

20 believed he had, and has so far demonstrated that he created

21 the logo, he created this term, and he had used it as early as

22 2010, and that a lawyer, an officer of this Court, has

23 allegedly made this statement, a threat, against an FDNY

24 officer's job.  That's concerning to me.  And I think it does

25 call into question the integrity of this proceeding.

1        MR. SINGLETON:  Your Honor --

2        THE COURT:  But I'm going to think about it over

3    lunch.

4        MR. SINGLETON:  The allegation was only recently

5    surfaced about this threat, it was no in earlier proceedings

6    or papers.  It was not made to any other tribunal.  And the

7    law department has a dedicated attorney who deals with just

8    ethical issues.  We take this very seriously.  I've consulted

9    with a number of deputy chiefs and that person and has been

10   advised there is nothing right at the moment for any reason

11   for disqualification.  But if Your Honor disagrees, someone

12   else will take over.

13       THE COURT:  Well, you have a colleague here, right?

14       MR. SINGLETON:  He is going to do the next witness.

15       THE COURT:  You're versed in this case?

16       MR. MACKIE:  Yes, Your Honor.  And I'm prepared to

17   do the cross of the other witness that's going to be appearing

18   today for Mr. Henriquez.

19       THE COURT:  All right.  Well, I would also add that

20   you submitted a declaration on this issue, and so I am

21   concerned.  I didn't put you in this position, sir, and I

22   raised it with you well before the hearing.  So I will give

23   this further thought.  But let's take a break.

24       Now that I've event up part of the lunch hour, why

25   don't you come back at 1:30.  All right.  Thank you very much.

1          MR. FLETCHER:  Your Honor.

2          THE COURT:  Yes.

3          MR. FLETCHER:  How long might we go today?

4          To the extent that we need the full day, how late

5   does the full day go?

6          THE COURT:  We'll go to 5:15.  We can go later

7   tomorrow, but I have a doctor's appointment.

8          MR. FLETCHER:  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.  You can step

10  off.  Thank you.

11          (The witness steps down.)

12
          (Continued on the following page.)
13

14

15

16

17

18

19

20

21

22

23

24

25

1        A F T E R N O O N   S E S S I O N

2              (In open court.)

3              THE COURT:  We're ready, yes.  On the record.

4    REDIRECT EXAMINATION

5    BY MR. FLETCHER:

6    Q    Mr. Henriquez, I want to ask you about the 2011

7    conference in Ohio, the fern sponsored conference.

8    A    Yes, sir.

9    Q    If you could turn to Exhibit A and it's Page three of

10   eight.

11             THE COURT:  Just a point of order, have the parties

12   stipulated to each other's exhibits because aim not -- you

13   know, I know it's less formal than an actual trial, but I'm

14   assuming that when the lawyers are referring to exhibits and

15   there's no objection there's an agreement that that exhibit

16   may be in evidence for nigh consideration.  Am I understanding

17   correctly?

18             MR. FLETCHER:  We don't have a prior agreement, Your

19   Honor.

20             THE COURT:  Okay.  Well, can we just set some ground

21   rules right now, because the plaintiff's counsel showed a

22   bunch of exhibits and there were no objections and they

23   weren't formally moved into evidence, but I'm treating them as

24   they were in evidence.

25             Is that acceptable to everybody?

1    MR. SINGLETON:  Yes, Your Honor.

2    MR. MACKIE:  Yes, Your Honor.

3    MR. FLETCHER:  Your Honor, responding to your

4  question, I'm happy to proceed that we'll assume everything is

5  agreed that it can be moved into evidence unless someone

6  objects to the exhibit when it's shown.

7    THE COURT:  Does plaintiff's counsel agree to that,

8  as well?

9    MR. MACKIE:  Yes, Your Honor.

10    THE COURT:  Okay.  Great.  Thank you.

11 Q    So Mr. Henriquez, if we can go to Page 3 of Exhibit A.

12 A    Yes, sir.

13 Q    It says Medical Special Operations Conference at the top?

14 A    Yes, sir.

15 Q    And I think you previously testified that that is a flier

16 relating to an event in Ohio in 2011; is that correct?

17 A    Yes, sir.

18 Q    Do you see there's an e-mail address, to register, please

19 e-mail MSOC@YAHOO.COM?

20 A    Yes, sir.

21 Q    Who controlled that e-mail address?

22 A    At that time, I did.

23 Q    I'm sorry?

24 A    At that time, I did.

25 Q    So you received e-mail at MSOC@YAHOO.COM in 2011?

1    A    Yes, sir.

2    Q    Thank you.  If you could turn to the next page, Page 4.

3    It's the page with the logo on it.

4    A    Yes, sir.

5    Q    Do you know what we're looking at here?

6    A    So that's the logo, the MSOC logo.

7    Q    And where does this depiction of the logo come from?

8    A    So I created it, you know, after several drafts and

9    sketches and kind of putting together meaningful items into it

10   that depicted what the MSOC community stands for, put it

11   altogether and kind of built it up.

12   Q    So I guess, let me rephrase the question.

13        Do you see how in the lower left corner of that

14   image, it almost looks like crumpled paper or something?

15        THE COURT:  You mean the copy itself?

16        MR. FLETCHER:  Yes.

17   Q    The copy, if I'm looking at the graphic, do you see some

18   shading that looks different in the lower left corner?

19   A    Yes.

20   Q    And if you turn back to Page 3 that we just looked at.

21   A    Okay.

22   Q    Do you see that the top right corner of that appears,

23   like, the image is a little bent?

24   A    Yes.

25   Q    Okay.  When I look at this, I wonder whether it was a

1   piece of paper that's been imaged.

2          Do you know whether this is a piece of paper or not?

3   A    Yes.

4   Q    And whose piece of paper was this?

5   A    It's my piece of paper.

6   Q    So when we're looking at the medical special operations

7   page, this is a piece of paper that you created an image of?

8   A    Yes, sir.

9   Q    Do you know whether that's the case with Page 4, with the

10  logo?

11  A    Yes.

12  Q    Yes, it is --

13  A    Yes.

14         THE COURT:  Sir, pull the microphone towards you,

15  please.

16         MR. FLETCHER:  This better?

17         THE COURT:  Yes.

18         MR. FLETCHER:  My apologies?

19         THE COURT:  That's all right.

20         MR. FLETCHER:  So are we back on the Zoom screen or

21  no?

22         THE COURTROOM DEPUTY:  Hold on.

23         THE COURT:  Can I ask a question, please, about

24  Defense's Exhibit A.  Pages 1 and 2, what is that?

25         I was asking him just to identify what Pages 1 and 2

1    of Defense Exhibit A is.

2              THE WITNESS:  So this is part of the planning

3    document for that event.  I create an ICS or IAP, so incident

4    command structure, IAP, incident action document, and then the

5    EAP, event action plan.  So this is -- this doesn't go

6    anywhere.  This is just for our planning, and we also get the

7    schedule out of this to hand out if there is a schedule.

8              THE COURT:  So this is an internal document that you

9    created?

10             THE WITNESS:  That became a schedule for the event.

11             THE COURT:  Thank you.

12             MR. FLETCHER:  May I continue, Your Honor?

13             THE COURT:  Yes.

14   Q    So Mr. Henriquez, if you turn your attention to the

15   computer monitor in front of you, you should see another image

16   of what is Page 4 of Exhibit A.

17   A    There's nothing on there.  I'm sorry, there's nothing on

18   the screen right now.

19             THE COURTROOM DEPUTY:  It should be there now.

20             THE COURT:  Do you see it?

21             THE WITNESS:  No.  Now something went on.

22             THE COURT:  Do you see the image?

23             THE WITNESS:  Yes, ma'am.

24   Q    All right.  So do you see -- to my eye, this appears to

25   be the same image as the image on Page 4, except with a little

1   greater fidelity?

2   A    Yes, sir.

3   Q    Do you see at the bottom left corner of this image, it

4   appears to be crumpled paper?

5   A    Yes, sir.

6   Q    Did you create this image.

7        Do you know whether you created this image?

8   A    Yes, I did.

9   Q    Was it a scan of a piece of paper that you created?

10  A    Yes.

11  Q    Or a photograph?

12  A    Yes.

13  Q    Do you know whether it was a photograph or a scan?

14  A    That was a scan.

15       THE COURT:  You mean, what we see on the screen is?

16       THE WITNESS:  What you guys are looking at is a scan

17  of a old printout.

18  Q    So you would have taken the printout and placed it flat

19  down on the scanner?

20  A    Yes.  To be able to e-mail it.

21  Q    And do you see how there appears to be something bleeding

22  through the other side of the piece of paper?

23       Can you see that on your screen?

24  A    Yes.

25  Q    Do you see at the very top, it appears that the words,

1   Medical Special Operations Conference appears to be bleeding

2   through?

3   A    Yes, it looks like it.

4   Q    And below it, there's a dark black bar?

5   A    Yes.

6   Q    And then midway in what's bleeding through, there appears

7   to be two squares on either sides of the page?

8   A    Yes.

9   Q    If you flip back to Page 3.

10  A    Yes.

11  Q    Do you see medical special operations at the top?

12  A    Yes.

13  Q    Excuse me, Medical Special Operations Conference at the

14  top?

15  A    Yes, sir.

16  Q    And then a black bar below blow it?

17  A    Yes.

18  Q    And then the two black squares on the far side of the

19  page?

20  A    Yes, sir.

21  Q    Looking at this, do you believe there's any chance that

22  the logo depicted in Page 4 of Exhibit A was printed on the

23  reverse side of what we see at Page 3 on Exhibit A?

24          MR. MACKIE:  Objection, Your Honor.

25          THE COURT:  Based on.

1    MR. MACKIE:  He's calling for speculation and it's

2 not clear what the relevance is and it's not relevant -- he

3 was not asked about this on the cross-examination, and this

4 was a redirect.

5    MR. FLETCHER:  He was asked when the logo was first

6 used and this would establish a date that the logo was first

7 used.

8    THE COURT:  To the public, you mean.

9    MR. FLETCHER:  Well, we can ask him whether this was

10 used to the public, yes.

11    THE COURT:  I think it does -- it is relevant

12 because there's an issue as to when the MSOC nomenclature was

13 used, and the witness has personal knowledge because he

14 produced, from what I understand, both Pages 3 and 4; is that

15 correct?

16    THE WITNESS:  Yes, ma'am.

17    THE COURT:  And it was in connection with what

18 conference?

19    THE WITNESS:  So looking at it, this was around the

20 same time.  So it must be connected to the FERNO or to Ohio.

21    THE COURT:  Ohio --

22    THE WITNESS:  -- during that time.

23    THE COURT:  And are the dates depicted on Page 3,

24 the dates that the Ohio conference occurred?  Yes.

25    THE WITNESS:  Yes, ma'am.

1           THE COURT:  I'll overrule the objection.

2           MR. FLETCHER:  Thank you.  That is everything on

3    this page.

4           THE COURT:  Is this, Pages 3 and 4, the first time

5    you used Medical Special Operations Conference that is for the

6    Ohio 2011 conference or had you used similar types of fliers

7    or web pages in the past?

8           THE WITNESS:  We've used -- I used them -- the M

9    Associate or Medical Special Operation Conference before this,

10   for our meetings that grew into what is now, the conference.

11          THE COURT:  So when you say, for meetings, that's

12   for the group that you described as the community?

13          THE WITNESS:  Yes.  So it's a smaller group, so it

14   wasn't 60, 100 people to be able to call it a conference.

15          THE COURT:  So is this the first time you used

16   Medical Special Operations Conference and the logo in

17   connection with people outside the -- what you've described as

18   the MSOC community to sponsor a conference?

19          THE WITNESS:  This was the more organized one.

20   Before this, we used the Medical Special Operations Community

21   Conference or MSOCC, and it all kind of evolved into what it

22   is now.

23          So this was the first time that we kind of really

24   got it well organized.  Like I said, we developed that

25   following within the community and developed the brand,

1   basically, of what an M Associates or Medical Special

2   Operations Conference is.

3            THE COURT:  Okay.  Thank you.

4            THE WITNESS:  You're welcome.

5   Q    And to be clear, Mr. Henriquez, so this flier that we're

6   looking at that you believe we're looking at the front and

7   backsides of this flier at 3 and 4 of Exhibit A, was this

8   distributed to the public?

9   A    Yes.

10  Q    And before you started using the phrase, medical special

11  operations deference to describe what you were doing, are you

12  aware of anyone else using that phrase to describe the kinds

13  of events you were holding?

14  A    Not Medical Special Operations Conference.  We looked

15  into that.

16  Q    Are you aware of anyone using the acronym, MSOC, to

17  describe the kinds of events you were holding or other events?

18  A    Not related to medical special operation.

19           MR. FLETCHER:  Thank you.

20  Q    Let's -- just looking at the next page, the Guardian

21  Center page.

22           To be very clear, did you and others organize an

23  M-S-O-C or an MSOC branded event in Georgia in 2012?

24  A    Yes, sir.

25  Q    Did some portion of that event occur at or in connection

1  with the Guardian Center?

2  A    It was part of -- yes.  It was part of it.  The tour of

3  what would be later opened to the public, the Guardian Center.

4  Q    And so is it fair to say that maybe other portions of the

5  event happened elsewhere?

6  A    Yes, sir.

7  Q    But in Georgia in 2012?

8  A    Yes, sir.

9  Q    And I think it was your testimony that Mr. Isaacs knew

10 that you had been hosting outside events; is that correct?

11 A    Yes, sir.

12 Q    How did Dr. Isaacs know?

13 A    Because we discussed it.  We were, you know, I believed

14 him to be a friend.  He was well aware of what we were doing

15 outside of the Fire Department of New York, almost from the

16 beginning.  He wasn't fully part of the national system yet,

17 but he was highly interested and he was working his way into

18 becoming one of the medical team manages for the team, and he

19 showed interest in bringing that to New York.

20 Q    And do you have any reason to believe that Dr. Isaacs

21 knew there was an event at the Guardian Center or in Georgia

22 in 2012?

23 A    Yes.  He was aware of all of them.  I mean, around this

24 same time when I got back, we actually had a discussion about

25 what we did and how it went, and how we put it together, and

1  there was a new simulation device that someone introduced to

2  us.  Like I said before, we were doing work with the military

3  for certain things, and he was interested in that, also.  I

4  remember it because when we had the discussion, it was right

5  around the same time as his birthday, and one of the guys was

6  making fun of him getting older and stuff.

7          THE COURT:  So you said, you're talking back.  Was

8  that from the Ohio or the Georgia conference?

9          THE WITNESS:  This is when we're talking about the

10 Georgia conference.

11 Q    So that would be have been late summer 2012 or some time

12 thereabouts?

13 A    Yes.

14 Q    And late summer 2012, were you also in the beginning

15 stages of planning the first MSOC at the fire department?

16 A    Yes.

17 Q    And I think you've said that other people at the fire

18 department knew that you were engaged in outside MSOC

19 activities; is that correct?

20 A    Yes, sir.

21 Q    You mentioned Chief Downey.

22 A    Yes.

23 Q    I apologize.  I may be misquoting you.

24       You said Chief Downey was someone that you had

25 pitched the fire department MSOC to, right?

1   A     Yes.

2            THE COURT:  You mean the FDNY?

3            MR. FLETCHER:  Yes.  The FDNY MSOC.

4   Q     Could you turn to Exhibit R?

5            THE COURT:  Before you do that I have, one other

6   question regarding Defense Exhibit A.

7            Sir, on page, it's marked HENR8, and the heading is,

8   Medical Special Operation Conference Guardian Center Perry,

9   Georgia, August 17 to 19, 2012.

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  If the conference was held at other

12  sites other than the Guardian Center, and if the Guardian

13  Center was only being used for a tour and one simulation in

14  connection with the conference that you were holding, why does

15  it say that it's at the Guardian Centers, plural?

16           THE WITNESS:  So it was also used to kind of promote

17  that.  But the whole idea behind it was here's a simulation, a

18  facility that's going to be used in the future that's going to

19  be opened not public.  There were training exercise or certain

20  events that happened prior to the facility opening.  I don't

21  know if I can get too into that.  But as far as this, it was

22  putting that in there was, you know, because we made it a

23  point give everyone, at least, a tour or access or make them

24  aware of what this training facility was going to be about

25  that was opening in their area.

1          THE COURT:  All right.  Thank you.  I'm sorry.

2     You can move on.

3          THE WITNESS:  You're welcome.

4          MR. FLETCHER:  One follow up on that.

5     Q    Mr. Henriquez, when you say there were things happening

6     before the Guardian Center opened, but you don't know if you

7     can get into that, what do you mean?

8     A    As far as matters of national security, I guess,

9     training.

10    Q    So there were trainings that the public should not know

11    about or cannot know about?

12    A    In the area.

13    Q    Thank you.  I'm sorry, can you turn to Exhibit R.

14    A    Yes.

15    Q    So we're skipping ahead a little bit in time.  I

16    apologize for that.  But do you see that Exhibit R is an

17    e-mail dated 2015, January 30, from Joe Hernandez, to several

18    people, including yourself?

19    A    Yes, sir.

20    Q    And the e-mail address is LuisDMT@Gmail.com, whose

21    address is that?

22    A    I believe that's Louie Cook, Captain Louis Cook.  He's

23    now retired.

24    Q    Who is Captain Louis Cook?

25    A    He was the captain of the FDNY EMS HAZTAC, H-A-Z-T-A-C

1  battalion under SOC.

2  Q    And so does that mean he was one of your superior

3  officers?

4  A    Yes, sir.

5  Q    And next to Louis -- next to Captain Cook's e-mail

6  address, you see DAIsaacs74@Gmail?

7  A    Yes, sir.

8  Q    Whose e-mail address was that?

9  A    That's one of Doug's, Doug Isaac's -- Dr. Isaacs'

10  e-mails.

11  Q    And the subject line of that e-mail includes the words,

12  Palm Beach MSOC?

13  A    Yes, sir.

14  Q    What is this e-mail referring to?

15  A    So that was planning for the lead-up conference that we

16  were planning on in Florida for that year.

17  Q    And that conference was called an MSOC?

18  A    Yes, sir.

19  Q    And is it fair to say if they're on this e-mail thread

20  that both Captain Cook and Dr. Isaacs knew that the word --

21  the acronym MSOC or Medical Special Operations Conference was

22  being used elsewhere?

23  A    Yes, sir.

24  Q    By yourself and Joe Hernandez?

25  A    And others, yeah.

1   Q    Do you have any reason to believe that Captain Cook knew

2   about outside MSOC events before this e-mail was sent?

3   A    Yes, sir.

4   Q    How is that?

5   A    Because we all had the discussions, even before we

6   brought it to the FDNY, so he was aware of what we were doing

7   and how we were doing it and how it came to be.

8   Q    Thank you.  If you could turn back two exhibits to

9   Exhibit P.

10  A    Yes.

11  Q    Do you see this appears to be an e-mail exchange between

12  Dr. Isaacs and CapRefill@YAHOO.

13  A    Yes, sir.

14  Q    Whose e-mail address is CapRefill@YAHOO?

15  A    That's one of mine.

16  Q    A personal e-mail address?

17  A    Yes, sir.

18  Q    And this e-mail change is dated July 7, 2014?

19  A    Yes, sir.

20  Q    And do you see Dr. Isaacs is asking you to send, quote,

21  your MSOC contact lists, including Joe's.  We need to give to

22  Susan for marketing?

23  A    Yes.

24  Q    Who's Joe here?

25  A    That's Joe Hernandez.

1   Q    And who is Susan?

2   A    That's Susan Wipper.

3   Q    Who is she?

4   A    She works for the FDNY foundation.

5   Q    Do you recall or have any understanding of why Dr. Isaacs

6   was asking you for an MSOC contact list?

7   A    So he had made me aware that the foundation may not want

8   to continue to sponsor the MSOC.  They wanted to get more

9   advertisement to reach out to more contacts, so myself, Joe,

10  and others, provided some of our contact lists, especially the

11  ones that we had used before.  So this is one of several files

12  that I sent him, the names and contacts that could be shared,

13  to give to them so they could add them to their mailer.

14  Q    When you say their mailer --

15  A    The FDNY.

16  Q    And the foundation?

17  A    And the foundation's.

18  Q    Were those contact lists related to the FDNY MSOC event

19  or other events?

20  A    And other events, also.

21  Q    Do you see at the bottom of the page, it's highlighted.

22  It looks like there's a file attached that says

23  2012_MSOC_GA_full.

24  A    Yes, sir.

25  Q    And that appears to be a Excel file?

1  A    Yes, sir.

2  Q    Do you know what that attachment would have been?

3  A    That was contacts from MSOC's from Georgia from that

4  time, that year.

5  Q    Thank you.  Let's turn to the first website for the

6  FDNY-hosted MSOC event.

7        That was in 2013, right?

8  A    Yes.

9  Q    I think you testified before that you acquired that

10 website?

11 A    The domain?

12 Q    The domain.

13 A    Yes.

14       THE COURT:  What exhibit, sir?

15       MR. FLETCHER:  Oh, we're not looking at an exhibit.

16       THE COURT:  Sorry.

17       MR. FLETCHER:  I'm just talking about the web

18 domain.

19 Q    And that -- was what was the web domain?

20 A    FDNYMSOC.com.

21       (Continued on the following page.)

22

23

24

25

1   BY MR. FLETCHER (Continuing):

2   Q    And you purchased that web domain.

3   A    Yes, I did.

4   Q    And where was it hosted?

5   A    On one of my servers.

6   Q    Was there a website created -- associated with that web

7   domain?

8   A    Yes, sir.

9   Q    Who created that website?

10  A    I did.

11  Q    Was there any -- and that was for the 2013 event; is that

12  correct?

13  A    Yes, sir.

14  Q    The first event ever held at the FDNY.

15  A    Yes.  And it also carried over to the 2014.

16  Q    The web domain carried over.

17  A    The web domain and the server.

18  Q    If I'm just focusing on 2013, did the FDNY or Foundation

19  have any ownership or control over that website?

20  A    No.

21        THE COURT:  Who directed you to purchase the web

22  domain fdnymsoc.com?

23        THE WITNESS:  That was the discussion with Doug

24  Isaacs.

25        THE COURT:  Did he indicate that he was authorized

1    by someone in the Fire Department or the Foundation to ask you

2    to do this work?

3              THE WITNESS:  Yes.

4              THE COURT:  What did he tell you about that?

5              THE WITNESS:  Because there wasn't a -- the

6    Foundation said that they didn't have the means to hold or

7    host a portal like what we were doing outside of the FDNY.

8    And, so, the website -- the purpose of the website also served

9    to organize some of the guideline meetings and shared

10   documents within the community outside of the FDNY and in

11   FDNY.  They didn't have the means to do that.

12             So, the discussion was I already have that, so, you

13   know, now for the FDNY, we need a domain to kind of direct

14   people to that site.

15             THE COURT:  Did Dr. Isaacs give you any reason to

16   believe that he was acting on his own or that he was acting

17   with the authority and consent of the FDNY and the FDNY

18   Foundation?

19             THE WITNESS:  The whole time.

20             THE COURT:  What did he specifically say on that

21   score?

22             THE WITNESS:  So, he was working as -- they were

23   part of his team, the FDNY team.  But his -- the way he told

24   it to us was that, you know, the higher-ups, they don't really

25   understand how it works as far as, like, the special

1  operations medicine, so he was more like an interpreter for

2  them but they were aware of how the conference event was going

3  to work.

4          That's why he brought me on as far as to sell it to

5  them, to promote it to them, so that they can agree to host it

6  and we would get all the approvals that we needed to be able

7  to host it in New York.

8          THE COURT:  So, as far as you knew, were you

9  purchasing this domain name with the knowledge and authority

10 of the FDNY or the FDNY Foundation?

11         THE WITNESS:  Yes.

12         And the thought was or the discussion was and what

13 happened eventually was that once the Foundation updated their

14 site, their servers, which I was told they were working on,

15 all of that was going to be transferred over, as far as, like,

16 the boldfacing landing page and the domain.

17         THE COURT:  What does it cost to purchase a domain

18 name?

19         THE WITNESS:  Depends on how long you purchase it

20 for.  So, that one I purchased for three years, and it came

21 out to about 60 something dollars.

22         THE COURT:  Okay.  And did you spend your own money

23 on this or --

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Did you ever get reimbursed by the FDNY

1    or the FDNY Foundation for the domain purchase?

2         THE WITNESS:  No.

3         MR. FLETCHER:  May I continue, your Honor?

4         THE COURT:  Yes, I'm sorry.

5    Q    Mr. Henriquez, if you could turn to Exhibit D, D like

6    dog, I want to look at Page 4.

7    A    Yes.

8    Q    What am I looking at?

9         This says MSOC 2013 at FDNY.

10   A    This was one of the fliers that I created for the first

11   event that we handed out to the public.

12   Q    And that's the Fire Department's shield at the top?

13   A    Yes.  That was one of the fliers, yeah.

14   Q    If you look at the bottom of the page on the right, it

15   says:  For hotel and more information, go to

16   fdnyfoundation.org.

17   A    Yes.

18   Q    So, if I get this flier in 2013 and I click on

19   fdnyfoundation.org, what do I see?

20   A    You would go to what the old FDNY Foundation website

21   would have looked like.  And on it, they had the banner for

22   the MSOC, which when clicked on redirected to the landing page

23   that I had on my server for the FDNY MSOC for that year.

24   Q    So, if I'm interested in attending this conference in

25   2013, I go to the fdnyfoundation.org website, I click on that

1  link, I see a banner, and I click on that banner, and it goes

2  to your separate website; is that correct?

3  A    Yes.

4  Q    Was it your understanding that the FDNY Foundation was in

5  control of and approved that redirect from their website to

6  your website?

7           MR. MACKIE:  Objection, your Honor.

8           THE COURT:  If you know.

9           Yes?

10           MR. MACKIE:  The question is leading.

11  Q    Do you know whether the FDNY Foundation approved that

12  redirect on their website?

13  A    Yes.  We had the discussion.

14           So, the reason why this one was this way was because

15  it was about promotion, right?  So, someone who got this flier

16  would click or go to the FDNY Foundation website so that the

17  Foundation can be promoted in hopes of, you know, someone that

18  goes on there who may not necessarily decide to go to the MSOC

19  would see all the other offerings of the Foundation, maybe

20  even donate to the Foundation, which is kind of how we run

21  MSOC.

22           THE COURT:  Can I just clarify for the record that

23  what you refer to as Page 4 is Bates stamped HENR00271?

24           MR. FLETCHER:  Thank you, your Honor.

25           THE COURT:  Thank you.

1  Q     And I think you testified that -- well, at some point
2  there was a donation agreement signed between yourself and the
3  Foundation, correct?
4  A     Yes.
5  Q     Was that before or after the 2013 FDNY-hosted event?
6  A     Way after the 2013.
7  Q     I'm sorry, you said way after?
8  A     Yeah, it was after that.
9  Q     Did you have any reason to want that donation agreement
10 to be signed?
11 A     Yeah, definitely, just to keep things moving along.
12        Also, to kind of keep things separated, the fact
13 that I was using their logo posted on my personal website and
14 documents.  Also, because of the calls and e-mails about
15 employment in the FDNY.  So, that was part of it also.
16        THE COURT:  When you say you were using their logo,
17 can you tell us who "they" are and what logo you're talking
18 about?
19        THE WITNESS:  The FDNY logo and the Foundation logo
20 and there was also other fliers containing -- that I created
21 containing the FDNY Special Operations Command logo and the
22 FDNY EMS HAZTAC logo.
23        THE COURT:  On Page 271, which I think your lawyer
24 referred to as Page 4, are there any FDNY logos that are
25 depicted here?

1        THE WITNESS:  Yes, ma'am.  There's one on the top

2   right, above MSOC 2013 at FDNY, and there's one on the bottom

3   right towards the FDNY Foundation.

4        THE COURT:  All right.  Thank you.

5        THE WITNESS:  You're welcome.

6   Q    To be clear, you were concerned about using the FDNY's

7   intellectual property on your own personal website?

8        MR. MACKIE:  Objection, your Honor.  Leading again.

9        THE COURT:  Try to avoid -- I think he's really

10  seeking clarification.  He talked about being concerned about

11  using "their" logo.  He wanted to know whose logo and, also,

12  which logo.  So, he's just clarifying.

13       MR. FLETCHER:  Thank you.  I will do my best not to

14  lead, your Honor.

15       THE COURT:  Okay.

16  Q    Turning to another topic, Mr. Henriquez, you have

17  discussed the role of outside individuals who you've called

18  the MSOC community in producing MSOC events at the FDNY; is

19  that correct?

20  A    Yes, sir.

21  Q    What role did those individuals play in MSOC events at

22  the FDNY?

23  A    Well, it depends on what we're talking about.  We had

24  instructors, vendors providing equipment, people who just came

25  in to support logistics, to help out in any way that they

1    could with whatever resources or skills that they have.

2    Q    So, if you turn -- we're still in Exhibit D.  If you'll

3    turn to Pages 10 and 11, which are HENR55 and 56.

4    A    Yes.

5    Q    What am I looking at here?

6    A    So, this is part of a planning document for the 2014

7    hosted at the FDNY.

8    Q    And did you create this planning document?

9    A    Yes, sir.

10   Q    I have a question.  Do you see how at the top of Page 10,

11   which is HENR55, it says Medical Special Operations

12   Conference; and then below it, MSOC 2014 at FDNY?

13   A    Yes.

14   Q    Why does it say -- the formulation MSOC 2014 at FDNY,

15   what is the significance of that, if any?

16   A    It's an MSOC event being held or hosted at the FDNY in

17   New York.

18   Q    And was it your decision to put those words on this page

19   or someone else's decision?

20   A    It was my decision.

21   Q    If you turn to the next page, HENR56, do you see it says

22   "potential lecture topics" near the top of the page?

23   A    Yes, sir.

24   Q    And above it, it says FDNY Fire Academy, Randall's

25   Island, Conference May 17 to 18?

1  A     Yes, sir.

2  Q     So, below potential lecture topics, there's a number of

3  topics and then names in bold next to them; do you see them?

4  A     Yes, sir.

5  Q     What are we referring to?

6         What are the -- what's the content that's not in

7  bold?

8         So, not the names, but the topics, what are those?

9  A     Those are lecture topics.  So, those are the titles for

10 the lecture topics.

11        Normally, I would, after referencing whatever

12 content we wanted to include for that year or for that agency

13 or MSOC, I would put together a plan of what the lectures

14 would be and then decide on who would be the best subject

15 matter expert on it and then provide them with a list of

16 bullet points of what they should include in their lecture.

17        So, you're looking at the titles for those lectures

18 listed on there.

19 Q     And who came up with these lecture topics?

20 A     I did.

21 Q     I'm going to start with the first line.  It says USAR

22 Past, Present, and Future, and then Joe Barbera.

23 A     Yes, sir.

24        MR. MACKIE:  Your Honor, this is well beyond the

25 scope of the cross-examination on redirect.

1         THE COURT:  The cross by Mr. Singleton also went

2    well beyond the scope of the declaration and I gave him

3    latitude, so I'm going to exercise the same courtesy to

4    defense counsel here.

5              MR. FLETCHER:  Your Honor, also, for what it's

6    worth, Mr. Henriquez I believe definitely testified about the

7    outside individuals who were contributing to the FDNY MSOC

8    events.

9              THE COURT:  Okay.  So, you're reviewing the lecture

10   topics and the presenters.

11             MR. FLETCHER:  Yes, your Honor.

12   Q    Who is Joe Barbera, if you know?

13   A    He's from Virginia.  He's one of the medical team

14   managers who is basically a grandfather who was there from the

15   beginning of the National Urban Search and Rescue Response

16   System.

17   Q    And how did Joe Barbera get connected to the 2014 MSOC

18   event at FDNY?

19   A    He's part of the community, the MSOC community.

20   Q    Who brought him in to the event?

21   A    We did.

22   Q    I'm sorry, who is "we"?

23   A    Myself, Joe Hernandez, and others who helped organize the

24   conference.

25   Q    Did Dr. Isaacs have any prior relationship with him

1    before --

2    A    Not before this, no.

3    Q    Next line I believe is your name, correct?

4    A    Yes.

5    Q    Below that, Chris Ho?

6    A    Yes.

7    Q    Who is Chris Ho?

8    A    He's a medical team manager from California.

9    Q    Same question, who brought him into the event?

10   A    We did.

11   Q    "We" meaning?

12   A    Myself, Joe, and others who recommended him.

13   Q    So looking down at this list, I don't want to go

14   line-by-line through this, but you see Dr. Isaacs's name here.

15   It looks to be about a dozen names.

16           How many of these people are affiliated or employed

17   by the FDNY?

18   A    So, other than Doug, the only other person for that year

19   on this list is Dario Gonzalez.

20   Q    Does that mean that all of the other names on this list

21   come from outside the FDNY?

22   A    Yes, sir.

23   Q    And how were they first connected to the FDNY MSOC

24   events?

25   A    Through us.

1   Q    "Us"?

2   A    Myself and others who helped organize.

3   Q    Did Dr. Isaacs have any prior connection to them?

4   A    Not at that time.

5   Q    Who is Dario Gonzalez?

6   A    He's another one of our medical directors.  At that time,

7   he was the medical team manager for the New York Task Force 1

8   FEMA team.  And he's also one of the grandfathers.  He was

9   also there at the beginning when the National Urban Search and

10  Rescue Response System started.

11  Q    How is -- I'm sorry, is it captain, your director?

12       What's his title, Dario Gonzalez?

13  A    He's a medical director.

14  Q    So, Mr. Gonzalez, how was he brought into the event?

15  A    Dario also teaches in the national system and we had

16  discussions about that.  He's actually involved with a lot of

17  stuff outside the FDNY and we approached him about this.

18       Doug might have had some issues with him being there

19  because they really didn't get along and he was also vying for

20  his position at this time.  But we decided, being that he's

21  one of the founding members of the National Urban Search and

22  Rescue Response System, we wanted him to present on that.

23  Q    I'm sorry, you said "he" was vying for his job.

24       Who are you referring to?

25  A    Doug, Dr. Isaacs.

1  Q    Dr. Isaacs wanted Dario Gonzalez's job?

2  A    At that time, yes.

3  Q    And, so, your understanding was that Dr. Isaacs didn't

4  want Dario Gonzalez involved in the event?

5  A    At that time, yeah, he had complained about him.

6  Q    Why was Dario Gonzalez involved in the event, then?

7  A    Because he was the best person as a subject matter expert

8  for that topic.

9  Q    So, who made that decision to include him?

10 A    We all did as far as, like, organizing; myself, Joe, and

11 others from outside who are part of the system.

12 Q    And did Dr. Isaacs agree with that.

13 A    Yes.

14 Q    You talked a lot during the cross about preconference

15 events and then the MSOC events, and I just want to be clear

16 what the distinction is between those two things.

17       So, actually, let's take a look a few pages ahead in

18 Exhibit D.

19            THE COURT:  Exhibit what?

20            MR. FLETCHER:  Same exhibit, D, like dog.

21 Q    While we're moving forward, if you just flip through the

22 next few pages of this exhibit, a couple pages up is HENR36.

23 It's Page 14 of 55.  It says FDNY MSOC 2014 EAP.

24 A    Yes.

25 Q    What's an "EAP"?

1  A    Event Action Plan.

2  Q    You referred to a playbook earlier, is this the same

3  thing?

4         Is the EAP the same as the playbook or is it

5  something different?

6  A    It's similar, right?  So, this is the MSOC at the FDNY

7  event action plan.  So, in here, you'll only find things

8  related to organizing the FDNY-hosted event versus the larger

9  playbook where we kind of plan and take in all the data and

10 information and kind of organize that and decide where and

11 when we can best present it.

12 Q    And who created this document?

13 A    I did.

14 Q    So the following pages, the following several pages --

15 it's kind of a long document -- you created all of this?

16 A    Yes, sir.

17         THE COURT:  Page what, please?

18         MR. FLETCHER:  This would be Page 14 to Page 29.

19         THE COURT:  Well, that didn't answer --

20         Starting on Page 14, how much after that did you

21 create, sir?

22         MR. FLETCHER:  For the 2014 AEP.

23         THE WITNESS:  All of it.

24         THE COURT:  So, that goes up to --

25         THE WITNESS:  28 -- actually, 29.  That was a

1   parking placard that I created with a scan code.

2           THE COURT:  29 of 55?

3           THE WITNESS:  29 of 55, yes, ma'am.

4           THE COURT:  Nothing beyond that?  No.

5           THE WITNESS:  The other one is for another --

6   something else.

7   Q    If we skip now to Page 32 of 55, Bates stamp, again,

8   HENR81, you see that it says FDNY MSOC 2015?

9   A    Yes, sir.

10  Q    Event action plan?

11  A    Yes, sir.

12  Q    And the logo on the front of this EAP, what logo is this?

13  A    That's the MSOC logo.

14  Q    The MSOC logo, but I see it says Fire Department City of

15  New York at the bottom.

16  A    This is the MSOC logo for the Fire Department of New York

17  hosted event?

18          THE COURT:  Is that what you called the tracker?

19          THE WITNESS:  The rocker, yes.

20          THE COURT:  Rocker.  And the rocker part is the Fire

21  Department City of New York?

22          THE WITNESS:  Yes, ma'am.

23  Q    If you skip ahead -- sorry, just to be clear, did you

24  create this event action plan for 2515?

25  A    Yes, I did.

1  Q    If you skip ahead two pages to Page 34 of 55, you see it

2  says proposed dates and then there's a heading for

3  "preconference" and then there's a heading for "conference"?

4  A    That's right.

5  Q    Do you see that?

6        So, what's the difference between preconference and

7  conference?

8  A    Like I mentioned earlier, the preconference is

9  opportunity for participants to come in and take either more

10 focused workshops or a full-on course prior to attending the

11 conference that they choose to.

12 Q    And the conference hosts for the FDNY events and the New

13 York events is the FDNY; is that correct?

14 A    Yes, but we also -- other agencies also support the MSOC

15 in New York or at FDNY.  So, we do deliver courses or

16 workshops in other facilities from other agencies in New York

17 City.

18 Q    And are those other courses -- I'm sorry, are those the

19 conference courses or preconference courses?

20 A    The preconference courses.

21 Q    The preconference courses might be affiliated with other

22 agencies or individuals; is that correct?

23 A    Yes.

24 Q    Does the FDNY host the preconference courses?

25 A    Some.

1   Q    But not all?

2   A    Not all.

3   Q    If you skip ahead to Page 39 of 55, this is Bates stamped

4   HENR88.

5   A    Yes.

6   Q    Do you see it says medical special operations guidelines

7   meeting at the top?

8   A    Yes.

9   Q    What is this page referring to?

10  A    So, this is -- this is a project that we have ongoing

11  with the MSOC and it's also one of the main things that we

12  were trying to achieve from the beginning, and it's a

13  get-together and come up with some kind of universal protocols

14  or guidelines as far as when it refers to treatment, care,

15  techniques, or operations for the urban search and rescue

16  medical specialist group.

17  Q    So, this page references a meeting that you were going to

18  have to develop that protocol?

19  A    Yes, sir.

20  Q    And did that meeting occur?

21  A    Several years, yes.

22  Q    It occurred for several years?

23  A    Yes.

24  Q    Did it occur during the main conference or was that

25  before the main conference?

1   A    Before.

2   Q    And were the attendees FDNY personnel or the full

3   community or -- strike that.

4          Who were the attendees?

5   A    It included everyone who is a major stakeholder and part

6   of the system.

7   Q    The national system?

8   A    The national system, yes.

9   Q    Did it occur on FDNY property?

10  A    For the New York-hosted events, one of them did.  It was

11  at 9 Metrotech.

12  Q    This page, at the top it says host hotel.

13  A    Yes.

14  Q    Do you know if the 2015 meeting occurred at an FDNY

15  facility or outside of an FDNY facility?

16  A    If I can remember correctly, this might have been at the

17  hotel.

18  Q    Okay.  Thank you.

19          If you move to the next page, 40 of 55, it says MSOC

20  preconference, Friday, May 15.

21  A    Yes, sir.

22  Q    Then skip ahead two pages to 42 of 55.  This is HENR91.

23  It says laboratory session, and underneath North Shore LIJ Bio

24  Skills Education Center; do you see that?

25  A    Yes, sir.

1   Q    What does this page reflect?

2   A    This is for the bio skills or cadaver lab out in Long

3   Island at the North Shore facility.

4   Q    This was a preconference event?

5   A    Yes.

6   Q    And it was not hosted at an FDNY facility?

7   A    It wasn't at an FDNY facility, no.

8   Q    What is North Shore LIJ?

9   A    North Shore Long Island Jewish Hospital.

10  Q    Was North Shore Long Island Jewish Hospital the host for

11  this preconference event?

12  A    Yes.

13  Q    Did the FDNY design this event?

14  A    Did the FDNY design it?

15  Q    Yes, did anyone -- strike that.

16         THE COURT:  What contribution did the FDNY make to

17  this program preconference event at LIJ?

18         THE WITNESS:  It's the other way around.  North

19  Shore LIJ provides the facility and facilitates the cadavers

20  and the room for the skills station or the workshop that they

21  provide.

22  Q    I'm going to ask you another related question.  You were

23  asked a lot about Disaster Medical Solutions, Joe Hernandez's

24  company.

25  A    Yes, sir.

1    Q    You said Disaster Medical -- you said DMS --

2    A    Yes.

3    Q    -- which I'll use to refer to Disaster Medical Solutions.

4    A    Yes.

5    Q    DMS puts on FEMA courses of some sort; is that correct?

6    A    And other courses, yes.

7    Q    And what are the -- is it a medical specialist course?

8    A    Yes, sir.

9         THE COURT:  Why don't you just ask him what courses

10   rather than leading him?

11   Q    Was DMS putting on the MSOC, the main conference?

12   A    They supported it along with others, yes.

13   Q    How did it support it?

14   A    Equipment, instructors, data.

15   Q    Did DMS support the preconferences in any way?

16   A    Yes.

17   Q    How?

18   A    Same things; instructors, equipment, data.

19   Q    Mr. Singleton asked you about MSOC conference revenues

20   and you mentioned ticket sales.

21   A    Yes, sir.

22   Q    And you also, I believe, mentioned vendors.

23   A    Yes, sir.

24   Q    How did the vendors generate revenues for MSOC

25   conferences?

1    A    They would donate -- in this case, they would donate to

2    the Foundation for advertising space.  Some of the other

3    vendors would just donate their equipment, time, instructors,

4    or any other resources that they had.

5    Q    You were also asked about marketing for the MSOC events.

6    You were asked about any marketing that you did and you spoke

7    about the money that you contributed.

8              Did you contribute any time to marking?

9    A    All year round.

10   Q    Do you have any idea how much time you contributed?

11   A    A lot.  Like I said, this thing is ongoing all year.  I

12   try to promote it as much as I can, especially when I go out,

13   outside of New York, to teach within the community, including

14   both the civilian and military side.

15   Q    Were you ever paid for that time?

16   A    No.

17   Q    You were asked about -- let's talk about the logos.

18             So, we saw the logo -- in the beginning of my

19   redirect, we talked about a logo you created and used in

20   connection with the Ferno event in Ohio in 2011, and a few

21   minutes ago we looked at a logo that you created for the FDNY

22   in 2015; is that correct?

23   A    Yes, sir.

24   Q    Do you have any -- do you recall when you first created

25   the FDNY MSOC logo?

1  A    So, I had the rocker of New York initially in 2013.  But

2  being that the FDNY or the fire department was the primary

3  host and sponsor, I wanted that included on there like we've

4  done for those companies and also facilities where we held

5  MSOC events at.

6            So, it was just a matter of changing the rocker to

7  say Fire Department City of New York.  So, from 2014 I already

8  had that in mind before we were allowed to actually put it out

9  to the public.

10            THE COURT:  When did you first use FDNY as a rocker

11  for that logo?

12            THE WITNESS:  Publicly?

13            THE COURT:  Well, for an FDNY-hosted event.

14            THE WITNESS:  So, internally, close to the end of

15  2014, I was already using it as my draft copies of the

16  incident plan for the following year.

17            THE COURT:  So, the first time it was used with the

18  FDNY rocker was for the 2015 FDNY?

19            THE WITNESS:  I believe so, yeah.

20  Q    Before you created the MSOC logo with the FDNY rocker,

21  had you had any conversations with Dr. Isaacs about that logo?

22  A    Yes.

23  Q    When did you have conversations with him?

24  A    Well, it wasn't just one conversation, it would just come

25  up because of the attendees and other instructors and people

1    who were participating would show up with the coins and

2    patches from previous events.  And one of the things that, you

3    know, it's like there's a thing where if you're at a bar or

4    you're out to dinner, if you show your coin first and if it's

5    something -- if it's a coin that's hard to get -- this is

6    really big within the community -- and you pull it out first

7    and it's one of those unique things, that person, you know,

8    pays for everybody else type or buys a round for everyone.

9              So, it would come up because other guys would have

10   something from either a previous MSOC or something related to

11   MSOC.

12   Q    When you say a "previous MSOC," are you referring to an

13   FDNY MSOC or a nonFDNY MSOC?

14   A    NonFDNY or MSOC event outside of New York.

15   Q    So, you're saying you had conversations with Dr. Isaacs

16   about coins from outside MSOCs?

17   A    Yes.

18              MR. MACKIE:  Objection, your Honor.  Leading.

19              THE COURT:  Overruled.

20   Q    I'm sorry, the answer was?

21   A    Yes.

22   Q    And could you refresh me, the context was at a bar or

23   some other event?

24   A    It's one of the things because people also like to

25   exchange coins and patches.  You know, it's kind of swag.  So,

1   up until that point we really didn't have anything for the

2   FDNY saying New York or anything else.

3           I also wore shirts from outside MSOC events which

4   made conversations come up about that.

5           The first T-shirts that were sold that had the MSOC

6   FDNY logo, MSOC with the FDNY rocker logo, on the T-shirt were

7   purchased by Doug to be sold at the FDNY MSOC.

8   Q    And that was in 2015?

9   A    Yeah, that was in 2015.

10  Q    So, I'm going to move you back.  You said you had

11  conversations about T-shirts or other swag.

12          Are you saying you had conversations with Dr. Isaacs

13  about T-shirts or other swag or something else?

14  A    Dr. Isaacs and other people.

15  Q    And that was before you created the actual FDNY rocker

16  MSOC?

17  A    Logo, yes, sir.

18          THE COURT:  When you say with others, other than

19  Dr. Isaacs, was it other FDNY employees?

20          THE WITNESS:  Other FDNY employees, NYPD, people who

21  were aware of the conference, but also with attendees.

22          That was some of the feedback because for the

23  earlier MSOC hosted at FDNY, they weren't selling anything

24  that said MSOC on it.  Most of the stuff that they put out was

25  either Foundation T-shirts or FDNY T-shirts, nothing that said

1    MSOC on it or anything.

2            THE COURT:  So, just a straight FDNY or FDNY

3    Foundation garment or hat?

4            THE WITNESS:  Yeah, things that you can get online

5    from the CityStore or you can buy at one of their

6    quartermasters.

7            THE COURT:  Thank you.

8            THE WITNESS:  You're welcome.

9    Q    And if you could, skip ahead to Exhibit H.

10           THE COURT:  May I just ask, did Dr. Isaacs direct

11   you to design a logo with MSOC and a rocker for the FDNY to be

12   used?

13           THE WITNESS:  He didn't direct me, but it just

14   became more urgent that we get approval to start printing and

15   getting that rocker on there, getting approval to put it out.

16           THE COURT:  Can you explain the approval process

17   from your point of view?

18           THE WITNESS:  So, it's like when we design patches

19   for our unit on the day-to-day, it has to be -- it has to go

20   up the chain of command to be approved to be worn in public or

21   to attach it to our uniforms.

22           THE COURT:  So, were you involved in getting the

23   approval for the MSOC FDNY rocker patch or logo or was

24   somebody else?

25           THE WITNESS:  To approve adding the rocker to it?

1    THE COURT:  Yes.

2    THE WITNESS:  That was Doug.  Doug approved that.

3  Q    Mr. Henriquez, have you ever seen any document that

4  reflects Dr. Isaacs actually getting approval?

5  A    Not formally, no.  I was just told that we got it, it's

6  okay.

7  Q    Did anyone from the fire department ever object following

8  the introduction of the FDNY rocker MSOC logo?

9  A    No.

10  Q    To be clear, it was on all of the planning documents that

11  you created?

12  A    Yes, sir.

13  Q    Did various individuals from the FDNY see those planning

14  documents?

15  A    Yes, from planning staff to everyone else.

16  Q    If we could turn to Exhibit H.

17  A    Okay.

18  Q    This is the third page.  I don't know that it has a Bates

19  stamp on it, but it's the page with the large logo on it.

20  A    204?

21  Q    3 of 3.  The logo says Medical Special Operations

22  Conference and then the rocker says Palm Beach County Fire and

23  Rescue?

24  A    Yes.

25  Q    What is this?

1  A    That was for a lead-up event, an MSOC event, happening in

2  Florida.

3  Q    Was this used publically in connection with the Florida

4  meeting?

5  A    Yes.  This is one of the patches and coins that came out

6  of the event that was in that e-mail, the discussion between

7  Joe, myself, Louie, Tripp, and Dr. Isaacs, and I forget who

8  else was on there.

9          THE COURT:  What year was this Palm Beach County

10  Fire and Rescue event?

11          THE WITNESS:  This was around the same year.  I

12  believe this was around 2015.

13  Q    If you go backwards one page, to the Page HENR119.

14  A    Okay.

15  Q    You see it says instructor cadre at the bottom, and then

16  line one is:  Physician, FDNY Assistant Medical Director and

17  Special Ops Command?

18  A    Yes.

19  Q    Do you know what that refers to?

20  A    Yes, that's referring to Doug Isaacs.

21  Q    Why is that referring to Doug Isaacs?

22  A    Because he was the one doing that presentation or that

23  skill station.

24  Q    And where was that presentation held?

25  A    That was the one in Florida.

1   Q      Palm Beach County?

2   A      That's it.

3   Q      Do you have any reason to believe that Dr. Isaacs was

4   aware of the Palm Beach County Fire Rescue logo that we just

5   looked at in 2015 in Palm Beach County?

6   A      Yes, he was aware of that.

7          THE COURT:  Why do you say that?

8          THE WITNESS:  Because when we -- it was a smaller

9   event and some of the guys that showed up already had an MSOC

10  patch Velcroed onto their shirts.  So, he was kind of

11  commenting on the fact that we should do that.

12  Q      I'm going to turn from the logos now.

13  A      Sure.

14  Q      You were asked about financial documents that you got

15  that belonged to either -- the Fire Department from the

16  Foundation.

17  A      Correct.

18  Q      You said you got them from Dr. Isaacs; is that correct?

19  A      Yes, sir.

20  Q      And you said you had digital and hard copies?

21  A      Yes, sir.

22  Q      Did you ever have any conversations with Dr. Isaacs in

23  the coarse of receiving those?

24  A      Several.

25  Q      What was the nature of those conversations?

1  A      The fact that there were expenditures on there for

2  certain things that the Foundation or individuals that were

3  listed as the ones performing the services were not true.

4  Because I was the one doing those things, and here I saw that

5  they were claiming expenditures for those services that I was

6  providing for them.

7  Q      Services that you were providing for free?

8  A      Yes.

9  Q      Did you have conversations with Dr. Isaacs about that

10 fact?

11 A      Several, yes.

12 Q      And what did Dr. Isaacs say to you about that?

13 A      That he was going -- at the beginning, you know, "I'll

14 take care of it," it was always, "I'll take care of it, it's

15 just that they don't understand how things run."  He always

16 had an excuse.  Every year or every time it was something

17 different.

18        One of the troubling things towards when all this --

19 when I had to take action and kind of address everyone and

20 basically go above my rank by sending those e-mails was the

21 fact that one time we were in his car in the parking lot at

22 Randall's Island at the training course that we taught, and he

23 showed me the documents on his laptop and he made the

24 statement, "Don't get mad," because on it, again, were

25 services that I was providing and that others had provided and

1   also equipment that was brought up at no cost being listed as

2   expenditures on there.

3         And I got upset.  I'm not gonna lie, I got upset and

4   I said some things.  And he also made the statement that you

5   know, just, "Let's take it easy.  We'll handle this.  You

6   don't know what they do to people like you."  And at that

7   point, I didn't -- you know, was it because of my race, was it

8   because of the whistleblowing, or was it because I was talking

9   out of line?

10        And that was one of the times that we had a

11  discussion about those issues.  And he said --

12        THE COURT:  When was this?

13        THE WITNESS:  So, it all started late 2016.  That

14  particular incident happened at a -- after a rescue medic

15  course.  I believe it was in -- towards the beginning of the

16  fall of 2018.

17        THE COURT:  When he made that comment, "Take it

18  easy.  You don't know what they do to people like you," was he

19  angry or was it just -- how would you describe his tone and

20  demeanor when he said it?

21        THE WITNESS:  So, the whole time I thought he was on

22  my side because he was also upset at some of those things too.

23  He had expressed discontent with certain people on the

24  Foundation side and within the FDNY.

25  Q    I believe when talking about these issues on cross, you

1    said something about vendors.  I don't...

2          Can you tell me generally, without going into

3    specifics about who said what to who, could you tell me

4    generally the nature of your concern?

5          THE COURT:  Conversation with whom?

6          MR. FLETCHER:  I'm sorry.  When Mr. Singleton was

7    asking Mr. Henriquez about this topic, about his concerns

8    about the FDNY -- the FDNY MSOC financial administration, I

9    believe I recall Mr. Henriquez using the word "vendors" as an

10   aside, but he didn't explain it.  And I'm just asking him to

11   explain it generally, what does he mean.

12   A    In regard to the confusion with the vendors?

13   Q    Let me ask you this:  Did you ever have any

14   communications with Dr. Isaacs about problems related to

15   conference vendors?

16   A    Several, yes.

17   Q    Without getting into specifics, can you tell me the

18   general nature of those problems?

19   A    Certain vendors reported that they were being approached

20   to facilitate their services for things outside of relating to

21   MSOC.

22         THE COURT:  They were approached by whom?

23         THE WITNESS:  By FDNY personnel.

24         THE COURT:  When was this?

25         THE WITNESS:  So, that started early on, in 2017,

1    when I first started to hear about that.  But I also saw signs

2    of that right off the beginning in 2014 and so on.

3              THE COURT:  So, they're being asked to provide the

4    same services that they had provided to MSOC?

5              THE WITNESS:  To provide services relating to their

6    products for their services for things outside of the MSOC.

7              THE COURT:  What does that mean?

8              Give us an example.

9              THE WITNESS:  Things that would involve city

10   contracts or FDNY contracts with vendors.

11   Q    And why were you uncomfortable about that, if you were?

12             Did you have any feelings about that?

13   A    A lot, yes.

14   Q    What were they?

15   A    That's not what the MSOC was intended to do.  It wasn't

16   about, you know, getting inside information for certain

17   things.  And it's against the rules.

18

19             (Continued on the following page.)

20

21

22

23

24

25

1  REDIRECT EXAMINATION

2  BY MR. FLETCHER: (Continuing.)

3  Q    And to be clear, you had communications with Dr. Isaacs

4  about that?

5  A    Yes, sir.

6  Q    Did you have communications with anyone else on the FDNY

7  MSOC team about that?

8  A    The FDNY MSOC team?

9  Q    Yeah.  The individual -- I'm sorry.  Were there people

10 other than Dr. Isaacs that you worked with on a regular basis

11 to produce the FDNY MSOC at the FDNY?

12 A    I can't recall everyone.  I know people who -- I

13 mentioned it to people that -- that helped on the FDNY side.

14 Pam was aware of that.

15 Q    I'm sorry, who is Pam?

16 A    Pam Lai.  Dr. Pam Lai.

17 Q    So you had a communication with Dr. Lai about your

18 concern regarding vendors?

19 A    Yes, sir.

20 Q    Did she say anything to you in response?

21 A    Yeah, that it shouldn't be happening.

22 Q    And, to be clear, did you ever report those concerns to

23 anyone else in, sort of, the chain of command or the high up

24 at the FDNY or the City?

25 A    Well, once we started openly discussing all that, yes, I

1    did.  Including when we had our meeting, I brought up that

2    there were issues with that.

3            THE COURT:  When you had your meeting --

4            THE WITNESS:  When we had our meeting with Moira and

5    Mr. Singleton.  That was part of the whole -- you know, I

6    openly discussed all this with them, and the EEO.

7    Q    So let's talk about the DOI investigation in 2018 that

8    you spoke about earlier.

9            Let's start with Exhibit Y.

10           So Exhibit Y appears to be a document created by the

11   FDNY's Bureau of Investigation and Trials.

12           Do you see that?

13   A    Yes, sir.

14   Q    And it's dated August 2018?

15   A    Yes, sir.

16   Q    And you had sort of discussed generally -- and I think

17   Mr. Singleton was discussing -- that this relates to an

18   allegation that you were improperly -- you had improperly

19   added a link to -- excuse me -- the FDNY MSOC website

20   directing people to a DMS FEMA course; is that correct?

21   A    Yes, sir.

22   Q    And do you see in the middle of the second paragraph on

23   the first page towards the top it says:  On April 9th, 2018,

24   Paramedic Henriquez sent an email to Hugh Lesner and Joseph

25   Malvasio -- I'm skipping -- in which Paramedic Henriquez

1    stated that he created a separate website link on the official

2    FDNY Foundation web page allowing individuals to sign up for

3    the FDNY MSOC conference.

4            Do you see that?

5    A    Yes, sir.

6    Q    And then at the bottom of that paragraph it's highlighted

7    Mr. Lesner, Mr. Malvasio and Ms. O'Shea all stated that

8    Paramedic Henriquez was not authorized to create said link.

9    A    Yes, sir.

10   Q    And then on the next page, page 2, Bates stamped PTF785,

11   in the middle there's some text highlighted:  The number of

12   attendees included on the official FDNY Foundation list

13   exceeded the number of people who actually paid to attend

14   official FDNY MSOC conferences leading Mr. Lesner,

15   Mr. Malvasio, and Ms. Shea -- I think that's a typo -- to

16   suspect that Paramedic Henriquez surreptitiously added the

17   names of individuals to the official FDNY MSOC conference list

18   who never actually paid to attend the FDNY's official program

19   but instead paid $2600 to Disaster Medical Solutions with the

20   expectation that the FDNY MSOC program was included.

21           Do you see that?

22   A    Yes, sir.

23   Q    And at the end of this document, the next page, the

24   recommendation is that, quote, We are referring this matter to

25   your office.

1          I think meaning the Department of Investigation.

2          Do you see that?

3    A    Yes, sir.

4    Q    So do you understand this document to mean that in

5    August 2018 the BIT referred this issue to the DOI?

6    A    Yes, sir.

7    Q    On the apparent belief that you were -- on the apparent

8    belief that you had improperly added a link to the website?

9    A    Yes, sir.

10   Q    And were surreptitiously adding names to the MSOC list?

11   A    Yes, sir.

12   Q    So if we can move back on exhibit to Exhibit X now.

13         And if you go to page 2 of 4, the second page in

14   that exhibit.

15   A    Yes.

16   Q    Do you see an email from Jean O'Shea to Susan Wipper and

17   Doug Isaacs dated January 16, 2018?

18   A    Yes, sir.

19   Q    Can you tell us in your own words what you believe

20   Ms. O'Shea is saying or asking?

21   A    In the middle one?

22   Q    In the middle one, yes.

23         THE COURT:  This is at 13:07?

24         MR. FLETCHER:  I'm sorry?

25         THE COURT:  The time is 13:07?

1     MR. FLETCHER:  Yes.

2     THE COURT:  On January 16, 2018, okay.

3  A    So she's asking about the medical specialist course,

4  asking, I guess, how it worked.  This was well after we -- we

5  had meetings explaining how all the preconferences would work

6  for that year.

7  Q    And if you look at the email directly above it from

8  Dr. Isaacs to Ms. O'Shea at 13:33 -- same date -- Dr. Isaacs

9  tells her:  The cost of the conference is built into the price

10 of the course and will be forwarded to the foundation?

11 A    Yes, sir.

12 Q    The expected class size is 30?

13 A    Yes, sir.

14 Q    So this was on January 16, 2018; correct?

15 A    Yes, sir.

16 Q    I think -- you testified earlier, quote, They knew the

17 link was there regarding the website.

18        What were you referring to when you said that?

19 A    Exactly this.

20 Q    What is "this"?

21 A    So everyone was aware of how each year's plan would work.

22 Obviously, we need approval for certain things, and everyone

23 was kept up to date on -- on how everything was supposed to

24 work for that year's event.

25 Q    And yet nevertheless later that year in August, the BIT

1  referred the matter to the DOI?

2  A    Yes.

3  Q    Based on, apparently, statements by Jean O'Shea?

4  A    Yes, sir.

5  Q    Thank you.

6  A    I actually complained.  If you look at my response to

7  when I was forwarded that email, I asked Doug again:  Was this

8  not discussed with them previously?  Was this not discussed

9  previously with them?

10           Meaning, we already had several meetings about this.

11 Why are they asking about it again.

12 Q    You were asked about the podcast that you appeared on

13 with Dr. Isaacs.

14 A    Yes, sir.

15 Q    Do you recall the date of that podcast, on or about?

16 A    I don't remember the exact date, but I believe it was

17 around 2015 or later, 2018.

18 Q    I believe it was 2018.

19           Do you recall what you were promoting on the

20 podcast?

21 A    So this -- yeah.  So this was for the FDNY podcast -- for

22 the FDNY-hosted MSOC podcast, and it was basically -- from

23 what I was told, it was just to focus on the MSOC at FDNY and

24 promote the FDNY.

25 Q    Do you recall whether the preconference event organized

1    by Disaster Medical Solutions was discussed on the podcast at

2    all?

3    A     For the non-edited -- can you repeat that again?

4    Q     Do you recall whether the final podcast referenced that

5    DMS course at all?

6    A     Yes, it did.  We did mention the course on that packet.

7    Q     Why did you mention it?

8    A     Because it was part of the conference for that year.

9    Q     It was a big draw for attendees; right?

10   A     Oh, big one, yes.

11             THE COURT:  And it mentioned the medical

12   specialist --

13             THE WITNESS:  -- course.

14             THE COURT:  And that was a preconference course?

15             THE WITNESS:  That was a preconference course for

16   that year.

17   Q     And that's the same course that you were investigated by

18   the DOI for?

19   A     Yes.

20   Q     So, in other words, you and Dr. Isaacs promoted that

21   specialist course on the FDNY podcast; is that correct?

22   A     Yes.  It was a big deal to host it in New York.

23   Q     You testified that originally you had considered having

24   the, sort of, big MSOC event held in California as opposed to

25   New York; is that correct?

1   A     Yes.

2   Q     Did you have any -- ever have any conversations about

3   having the conference in California?

4   A     Yes.

5   Q     When?

6   A     So around 2017, especially with all the rumors and issues

7   coming around, and some of the things that we saw, we kind of

8   discussed having the larger conference move west, and it was

9   always the intent to have it hosted -- or the larger event to

10  be hosted in different areas throughout the country to give

11  everyone an opportunity to attend.

12  Q     When you said with all of the issues coming up, what do

13  you mean?

14  A     Well, the things that we discussed earlier as far as some

15  of the documents that I discovered and the issues that I

16  brought up.

17  Q     The financial documents?

18  A     Yes.

19  Q     Did you ever have any conversations with Dr. Isaacs about

20  moving the conference to California?

21  A     Yes.

22  Q     When?

23  A     Well, from the beginning, you know, everyone understood

24  that the larger event -- so the way it would work is we hold a

25  larger event and smaller lead-ups and smaller MSOC conferences

1    throughout, that way to not -- so that we could not compete

2    with the larger event, what we mostly put all our focus and

3    resources.  And then we would scale down that host to a

4    smaller or lead-up event and then host a conference in another

5    region to give attendees, or potential attendees, from that

6    area a chance to attend one of the larger events.

7    Q    And in or about 2018, did you ever have any conversations

8    with Dr. Isaacs about moving the conference to California?

9    A    Yes.

10            So there was an incident during the 2018 conference

11   where one of our members had told Dr. Asaeda that we were

12   going to be moving the conference -- because we all had been

13   having discussions about it -- moving it over to California.

14   And during one of the evening nights out, or gatherings, she

15   mentioned it to Dr. Asaeda, who's Dr. Isaacs' boss, that we

16   would be moving the conference, and I wasn't there, but

17   immediately after it happened, called me up, came and -- Doug

18   called me up and met with me, and he was really like just

19   frazzled.  He was like:  Oh, my God, I can't believe she did

20   that.  Like, really freaking out, like, frazzled.  I didn't

21   understand why he was acting that crazy.  And also Pam was

22   with him, so she was like -- basically, like, calm down.

23            THE COURT:  Is Pam the one who told --

24            THE WITNESS:  Dr. Pam Lai.

25            THE COURT:  She's not the one who told Dr. Isaacs'

1   boss about the move --

2           THE WITNESS:  No.  No.  Katie Roberts from

3   California, one of our instructors that we have that comes

4   down to help out with the FDNY and other MSOCs.

5           THE COURT:  Is this an FDNY-sponsored conference in

6   2018?

7           THE WITNESS:  So this was at the FDNY-sponsored

8   conference night out or gathering that we had for that night,

9   one of the weekends.  And she, in conversation, had told

10  Dr. Asaeda about it, and then Doug was kind of freaking out

11  about it, and he was just upset that she had told him and --

12  and that that should have come from him.  That was his excuse

13  to me.  'Cause I was also wondering:  Why are you getting so

14  crazy about this?  Like, that's the whole thing with the MSOC

15  anyway, and we were already planning to do it, so...

16  Q    Just so I understand, Katie Roberts from California made

17  a comment to Dr. Asaeda, who is Dr. Isaacs' boss; is that

18  correct?

19  A    Yes, sir.

20  Q    Do you know whether Dr. Isaacs was present for that

21  comment or not?

22  A    Yes, he was.

23  Q    How do you know that?

24  A    Because he told me.

25  Q    And so you found out about this conversation from

1    Dr. Isaacs?

2    A    Yes, sir.

3    Q    Was this conversation discussed by anyone else?

4    A    So -- yeah. So Pam was there. Mr. Singleton mentioned

5    Marco Girao. He was -- we also discussed that, amongst

6    others. I can't recall everyone, but Joe knew about it, Tripp

7    knew about it -- Marl (ph) knew about it, because they were

8    out with them.

9    Q    How did all these people come to know about it?

10    A    Because they were there with them, and -- and -- you

11    know, obviously they see something like that, and we're

12    talking off to the side, and they want to know what's going

13    on, and I just basically told them. And they were in -- I

14    don't know if they were in the discussion when it happened,

15    but they were there. But, you know, all of a sudden, this

16    commotion happens and they're like: Well, what's going on?

17    And I told them after I spoke to Doug what had happened.

18         THE COURT: So why did Dr. Isaacs say he did not

19    want you to move the conference to California?

20         THE WITNESS: He didn't say he didn't want us to.

21    He was upset that Katie had told Dr. Asaeda that night.

22         THE COURT: But did he explain why he was upset?

23         THE WITNESS: That it came from her and not him.

24    That was his excuse. I don't know what the real situation was

25    with that.

1  Q    Why did he say he was upset that it came from Katie

2  Roberts and not from him?

3  A    You would have to ask him that.

4  Q    He didn't tell you any reason; he didn't give you any

5  reason at the time?

6  A    He said he had not told -- that he didn't think that

7  Dr. Asaeda knew about that.

8  Q    But it was your understanding at the time that Dr. Isaacs

9  knew your intention was to move the conference to California?

10 A    Yes.

11        And, just to clear it up, it's not like we're

12 permanently moving it to California.  It's just to give

13 everyone a chance to hold the larger event.  And then, you

14 know, if we move it to California, they do it for a certain

15 amount of time, and then it would be decided to move to

16 another larger event -- or a larger host.

17 Q    We spoke -- or you spoke earlier about the BITs decision

18 that I think is reflected in Exhibit K.

19 A    Yes.

20 Q    You see this document is dated March 2021?

21 A    Yes, sir.

22 Q    Sir, to be clear, this BITs proceeding happened after

23 your conversation in November 2019 with Mr. Singleton and

24 Ms. Archer; is that correct?

25 A    Yes, sir.

1    Q    The registration, the trademark registration with the

2    USPTO, do you recall Mr. Singleton asked you whether you

3    provided a statement to the USPTO saying that you were the

4    owner of the mark and had used it exclusively for five years?

5    A    Yes, sir.

6    Q    When you gave that statement to the USPTO, did you

7    believe it to be true?

8    A    Yes, sir.

9    Q    Why did you believe it to be true?

10   A    Because it's the facts.  It's what I -- that's what it

11   is.  I created it.

12   Q    Well, the FDNY used it for a long time; right?

13   A    As part of the host, yeah.  That's how the MSOC works.

14   So, you know, the same way we did it in other places from the

15   beginning.

16   Q    So it was your belief when you made that statement to the

17   USPTO that the FDNY's use of the MSOC and acronym trademarks

18   for a number of years did not affect your ownership of the

19   mark?

20   A    Yes, sir.

21   Q    You applied for that trademark under your own name;

22   correct?

23   A    Yes, sir.

24   Q    But you are not the only person in the MSOC community;

25   right?

1   A    No, I'm not.

2   Q    There are a lot of other people.

3   A    Yes, sir.

4   Q    Joe Hernandez seems to have played a large role; is that

5   correct?

6   A    Yes, sir.

7   Q    Sir, why did you apply using your own name as opposed to

8   anyone else's name?

9   A    Because the conference idea and format is mine.  I

10  created that.

11  Q    You created the idea of the conference.

12  A    Yes.

13  Q    Did you have any understandings with anyone else that you

14  were the owner of the mark?

15  A    As far as like a signed agreement?

16  Q    No.

17  A    Yeah.  Well, everyone knew, and -- within the community

18  knows that I am one of the principals that organizes this, and

19  they know the story of how it came about.

20  Q    So it's your understanding that other people believe you

21  to be the owner of the trademark?

22  A    Yes, sir.

23  Q    And, just so I'm very clear, that understanding is based

24  on what?

25  A    On the facts.

1   Q    Is it based on a written document?

2   A    So, in our community, we base a lot on our word.  And I

3   had this discussion with Mr. Singleton when we had the

4   meeting.  The fact that he told me that his brother was a

5   fireman, you know, I expressed that to him, that this is how

6   we work.  Our word is bond.  You know, we rely on the things

7   we say because someone's life may depend on it, and that

8   applies to everything in our life.  And it's also the case

9   with this.  Why am I going to question anyone if they gave me

10  their word?  They are my friend.

11          THE COURT:  So what word was given to you?  And by

12  whom?  About what?  When you say "the word."

13          THE WITNESS:  Depends who we are talking about.  So

14  other members of the community, like, let's say, Joe Hernandez

15  for an example because his name is coming up, he understands

16  that the conference is my thing.  You know, other things --

17  other projects that revolve around the MSOC, or the medical

18  special operations and these projects that we do, belong to

19  other people and some belong to him.

20          There's other trademark marks that were used in --

21  while delivering or hosting the FDNY MSOC that belong to Joe

22  and that -- other marks that belong to others that contribute

23  to the MSOC, but we all understand who's -- who's -- who owns

24  what, or who came up with what, because history is a very

25  important thing to us, culture.

1      MR. FLETCHER:  May I continue, Your Honor?

2      THE COURT:  Yes.

3    Q    Mr. Henriquez, you've been dealing with this conflict

4    with the City since late 2018, or early 2019; is that right?

5    A    Yes.

6    Q    What has the effect on your life been during the last

7    four years?

8    A    Personally?  A lot.  It's taken away a lot from my

9    family, from me, from my career.  Even the injury that I was

10   involved in with -- recently that might be a career-ending

11   injury for me is related to this because I wasn't given the

12   opportunity to switch my tour because I wasn't allowed to

13   because of some other things that were going on as far as

14   certain individuals, and also the investigations.  I ended up

15   working on a tour that I would normally not have been working

16   on and got assaulted and had my thumb --

17         THE COURT:  I'm sorry, what happened?

18         THE WITNESS:  I was assaulted and had my thumb

19   basically detached internally from my hand and --

20         THE COURT:  You were assaulted by someone you were

21   assisting?

22         THE WITNESS:  By someone I was assisting on the

23   street.  I'm not going to totally, like, say this wouldn't

24   have happened if it wasn't for this, but the fact that I was

25   on that tour not wanting to be on that tour, and the fact that

1    I couldn't change my tour because of this, I see it as maybe

2    something that came about because of that.

3           Having to go to these investigations knowing that I

4    didn't do anything wrong and going to the meetings or to meet

5    with -- with investigators and having the meeting being

6    cancelled either an hour, or even minutes, after I got there

7    before the meeting --

8           THE COURT:  Who cancelled these meetings?

9           THE WITNESS:  I'm sorry?

10          THE COURT:  Who were the meetings with?  And who

11   cancelled them?

12          THE WITNESS:  So the investigators from BITs, from

13   the fire department.  It wasn't just this that's on here.

14   There were other things that -- I was relieved of duty on a

15   day -- on my vacation day on -- during the pandemic when I --

16   because I told them:  Hey, you know, my -- at that time, my

17   mother and my father-in-law were sick with COVID, and I was

18   seeing them at the hospital, but I also wanted to help out.

19   So I called them and told them:  Hey, I want to be around.

20   They're not allowing visitors -- because they only allow one

21   person -- so I told them I may have some hours to help out,

22   and that whole week I had taken off because, at that point, my

23   mom was already far long.  And I showed up, and way before

24   my -- if I was not on vacation, my tour would have started

25   three hours after, and I was there three hours early, and I

1  told them:  If I get a phone call, I've got to leave, I won't

2  be able to do this favor for you guys.

3          And that's what happened.  My sister-in-law called

4  me that my father-in-law now, they wanted to intubate him, and

5  I told them on the way out I was going to leave, and I told

6  them I can't stay, so they -- they told me:  No, you have to

7  stay.  You're already -- you're here, you have to stay.

8          I'm like:  I'm on vacation.  I can't.  I have to go

9  take care of this.

10         And one of the chiefs who is -- who is directly

11 involved with this relieved me of duty, and I ended up having

12 to go to these BITs investigations for that with proof that I

13 was on vacation, but they did the same thing that they did

14 with this one and the others.  Within hours or minutes of

15 going to the -- to the meetings, to the investigations, they

16 would cancel it until, finally, you know, having the meeting

17 and showing them the proof and then getting a piece of paper

18 or phone call from my union rep saying that:  Oh, it was

19 unfounded.

20         So for many years I've been going through that.

21 Those are things that I kept to myself, haven't discussed with

22 my family or anybody else, and that's all come from me trying

23 to do the right thing.

24         THE COURT:  And do you believe it arises out of your

25 involvement in the conferences that were hosted by the FDNY

1   and the assertion of your rights?

2          THE WITNESS:  Yes, ma'am.  Directly.  I didn't have

3   any issue before any of this, or before me reporting any of

4   it, or actually going above my rank to report any of that.

5          THE COURT:  And are you referring to what you

6   believe to be financial irregularities where there are items

7   being billed for services that were provided for free and that

8   kind of thing?

9          THE WITNESS:  That, the EEO, the issues with the

10  vendors.  Everything I had discussed with all of them.  I had

11  no issues before that.  You know, I had -- I'm one of the most

12  highly decorated members in that department.

13         I'm sorry.

14         THE COURT:  That's all right.

15         MR. FLETCHER:  May I continue, Your Honor?

16         THE COURT:  Yes.

17  Q    You are not making money from MSOC conferences; right?

18  A    No.  Never have.

19  Q    Why are you still fighting this?

20  A    Well, because of my integrity, my honor.  And the reason

21  why I started the MSOC, and why we all started, is to -- so I

22  had incidents in my career where there were members trapped --

23  our members, FDNY members -- trapped during a collapse fire,

24  and I treated them, and my treatment in that situation made

25  a -- made a huge difference, but I felt that -- you know,

1    learning more, I felt that there were things that I could have

2    done, or that we should have done, that would have probably

3    helped even more, and that's kind of like the passion that --

4    that helped me devote my -- my life, basically, to some of

5    these projects that -- that we created including the MSOC

6    conferences and other things that I'm involved with.

7    Q    Let me ask you a different way.

8         Why are you still fighting for this trademark?

9    A    Because of what it means to the community and others.

10   This is not a money thing.  This is not an ego thing.  This is

11   not something to advance anyone's career.  This is just what

12   it is.  It is a form -- a format, a platform for us to get

13   that information out, to get that training out to others to be

14   able to come together in something else out of just a training

15   event or an actual incident.

16        MR. FLETCHER:  Okay.  I have no further questions,

17   Your Honor.

18        THE COURT:  Do you have any recross, Mr. Singleton?

19        MR. MACKIE:  Yes, Your Honor.  I will handle the

20   recross, if that's okay with Your Honor.

21        THE COURT:  Okay.  I think that's a little bit

22   unusual, but if -- is it because of our discussion before

23   lunch that you are doing the recross, sir?

24        MR. MACKIE:  I believe so, yes, Your Honor.

25        THE COURT:  All right.  Then you may proceed.

1         Just to be clear, I have not sua sponte disqualified

2    Mr. Singleton, but I've raised very serious concerns about his

3    involvement in key points in this case, especially the alleged

4    threat against Mr. Henriquez's job, and we have all heard him

5    testify about how this has affected him, all of this, so I

6    will give you permission.

7         May I ask one question?  Who is the person who

8    joined you at counsel table?

9         MS. ASH:  Your Honor, Melonie Ash.  I appeared in

10   the case just last week, middle of the week, I think.

11        THE COURT:  Okay.  Are you part of the team, ma'am?

12        MS. ASH:  I'm trying to get up to speed with respect

13   to the -- because of the issues Your Honor has raised.

14        THE COURT:  Okay.  Welcome.

15        Go ahead, sir.

16        MR. MACKIE:  Thank you, Your Honor.

17        I just have a few questions on cross.

18   RECROSS-EXAMINATION

19   BY MR. MACKIE:

20   Q    Good afternoon, Mr. Henriquez.

21   A    Good afternoon.

22   Q    May I please turn your attention to Defendants' Exhibit A

23   and this is page 4 of 8, Defendants' Exhibit A.

24   A    Okay.

25   Q    So you went -- you went through this pretty extensively

1   with your counsel.  I just had a couple questions on this

2   document.

3           Along the left-hand side, it looks like there are a

4   series of numbers and color patches.

5           Can you explain what those are?

6   A    So those are color IDs from a pallet that belonged to the

7   patch.

8   Q    And were those color IDs included when this patch went

9   out publicly?

10  A    Not on the final one.  You're talking about the hash mark

11  with the -- yes, no, those were removed and the patch was left

12  on.

13  Q    Okay.  Can we go back to the page before?  This is

14  Defendants' Exhibit A at page 3, Bates stamped AGMR05.

15          And I believe that when you were talking with your

16  attorney earlier you testified that these two were publicly --

17  this page and the following page were publicly disseminated in

18  connection with the Ohio conference in January and February of

19  2011; is that right?

20  A    Yes, sir.

21  Q    So is it fair to say that the second page here --

22  Exhibits 4 -- was not part of the original flyer that went out

23  with the page before it?

24          THE COURT:  Sorry, this is Exhibit A, sir?

25          MR. MACKIE:  This is Defendants' Exhibit A.

1        THE COURT:  Okay.  You said Exhibit 4, I thought.

2        MR. MACKIE:  Page 4 of Exhibit A.  I apologize, Your

3  Honor.

4        THE COURT:  Okay.  It's labeled page 5 of 8, that's

5  why I'm a little confused.  Are you talking about -- I'm

6  sorry, you're talking about the patch?

7        MR. MACKIE:  I'm talking about the patch.  Sorry

8  about that.

9        THE COURT:  Page 4 of 8.

10  Q    So is it fair to say that the document here, page 4 of 8,

11  this patch, with the color logos, was not the same document

12  that ultimately went out publicly?

13  A    It is, but in -- the hashtags were removed.

14  Q    Okay.  But so this document itself is not a direct copy

15  of something that was publicly produced; is that correct?

16  A    It is a direct copy.  It was something that I used as a

17  draft, and also the final copy that went out.  So it was

18  handed out to others, because this was part of the whole

19  explanation I gave before of what the meanings were, and we

20  were trying to make everyone aware of how -- what the make-up

21  or the meaning of the patch was to kind of get people to

22  understand that it -- it related to them or that they were

23  somehow connected to it.

24  Q    Understood.

25  A    Because the colors also have meaning also.

Q     Thank you.

          THE COURT:  Do we have a color example of this patch

in the record anywhere as an exhibit by either plaintiff or

defendant -- the original?

          MR. FLETCHER:  I believe right now the black and

white is the only copy I have.

          THE COURT:  I feel like I saw it somewhere, but --

          THE WITNESS:  You might have seen it with other --

with a rocker on it.

          THE COURT:  You don't have one just of the original

patch?

          THE WITNESS:  Of just with nothing on it?

          THE COURT:  Right.  As far as you know.  The lawyers

should know the answer to that question.

          MR. MACKIE:  I don't believe there's a color version

of that page, Your Honor.

          THE COURT:  Okay.

          MR. SINGLETON:  I've seen one in the -- we started

searching for documents.  I have seen one in our document

production, which I produced to Mr. Fletcher, of the version

that was presented for approval to the department in 2015.

          THE COURT:  That's with the FDNY rocker on it.

          MR. SINGLETON:  Right.

          THE COURT:  I was just talking about the original --

          MR. SINGLETON:  I don't know that it had a rocker on

1    it.  It was just --

2              THE WITNESS:  It had a rocker.  The ones for the

3    FDNY obviously had the FDNY rocker on it, or fire department

4    City of New York --

5              THE COURT:  I was just talking about the original

6    logo or patch that you created at the very beginning, and the

7    best representation of that is Defense Exhibit A, page 4 of 8;

8    is that right?

9              THE WITNESS:  So this is a printout of what went out

10   in Ohio that had this on it.  I mean, I -- I do have the

11   file --

12             THE COURT:  Okay.

13             THE WITNESS:  -- because this is part of that

14   template.

15             THE COURT:  Okay.  With the original colors?

16             THE WITNESS:  With the original colors and

17   everything and, you know, the metadata.

18             THE COURT:  The metadata will show that it was

19   created in 2010 or '11?

20             THE WITNESS:  If it's the original file template,

21   yes.

22             THE COURT:  Thank you.

23   Q    Can you please turn to be Exhibit D?  It is one of the

24   pages you were going over with your attorney.  Exhibit D,

25   page 14 of 55, which is Bates stamped HENR36.

1          And you testified that you created this document; is
2    that correct?
3    A    Yes, sir.
4    Q    And that's your name at the bottom for --
5    A    Yes, sir.
6    Q    And then you went through a number of other pages, and
7    you said, I believe, that your -- everything between HENR36
8    and HENR51 you created; is that correct?
9    A    Yes, sir.
10   Q    Can we go one page back?  So this is HENR50.
11   A    Yes, sir.
12              THE COURT:  HENR50?
13              THE WITNESS:  Yes.
14              THE COURT:  Page what of what?  I'm sorry.
15              MR. MACKIE:  That is page 28 of 55.
16              THE COURT:  Okay.  Thank you.
17   Q    And just drawing your attention to the bottom of this
18   document, this one says:  Prepared by medical unit leader
19   Dr. Doug Isaacs.
20              Is that correct?
21   A    Yes.
22   Q    So why is Dr. Isaacs' name on this document?
23   A    So what you're looking at, and how these EAPs come about,
24   it's modeled after the FEMA incident command system document.
25   So this particular page is about the medical response plan in

1  case there is a medical emergency, and who is in charge of

2  that, as far as if there is someone that gets hurt; who is

3  going to come to help; who would be in charge of the medical

4  care that's provided for that person; and what facility,

5  depending on the injury, they would be transported to, and who

6  would be notified.

7         Dr. Isaacs was in charge of the medical response for

8  that, or the medical unit leader for that part of it.  I'm not

9  a doctor, so I can't sign off on that.

10        THE COURT:  Did you create this document, or did

11  Dr. Isaacs?

12        THE WITNESS:  So the form itself, I created it.  He

13  just filled in the information.

14        THE COURT:  Okay.  And so when you say "a medical

15  response," you are talking about if during the conference

16  somebody gets hurt or has a medical crisis, Dr. Isaacs would

17  be in charge of the response?

18        THE WITNESS:  Yes.  So coordinating medical care for

19  an injured or someone suffering from a medical condition, and

20  that applies to the preconference and during the conference.

21        THE COURT:  Thank you.

22        THE WITNESS:  You're welcome.

23  Q    A few pages later in this, I want to turn to page 48 of

24  55 in the same Exhibit D, which has the Bates number FDNY 430.

25  A    Yes, sir.

1   Q     What is this flyer?

2   A     So this is the flyer I created for the 2015.

3   Q     Okay.  And in other documents that you've produced and

4   that you've created, some of them say MSOC or the year MSOC

5   and then FDNY; right?

6   A     Yes, sir.

7   Q     So why does this one say FDNY MSOC 2015?

8   A     As opposed to the other flyers, they're all -- so the

9   same way we do it with every other host, we -- as far as like

10  visibility or promotion for the city, state, agency, company,

11  we put their name in front of the MSOC.

12  Q     Okay.  So why -- in certain circumstances it seems that

13  you have the MSOC first at a particular location; is that

14  right?

15  A     With the planning and some of the information that's put

16  on -- with the planning documents and some of the information

17  that's put on there, so that it's understood that it's the

18  MSOC at FDNY, the MSOC at, you know, California or wherever.

19  Q     What is your understanding of the difference between

20  those two phrases?

21           THE COURT:  What two phrases, sir?

22           MR. MACKIE:  I apologize.

23  Q     What is the difference -- what is your understanding of

24  the difference between saying FDNY MSOC versus MSOC at FDNY?

25  A     It's just the way we built it out.  So for -- to help the

1   host facility or the City is kind of to identify that where

2   that MSOC conference is being held, so there's really no

3   difference because everyone knows what an MSOC is.  It's just

4   a matter of where that particular one is being held at.

5   Q     So do you think that there is --

6         MR. MACKIE:  Strike that.  I can move on.

7         THE COURT:  Can I note, just for the record, the

8   first sentence of page 48 of 55 reads:  The FDNY, in

9   partnership with the FDNY Foundation, is hosting the third

10  annual Medical Special Operations Conference, MSOC.

11        So that host relationship is spelled out in sentence

12  number one of this document, it appears.

13        MR. MACKIE:  Thank you, Your Honor.

14  Q     When -- can I just ask you about that?  Where it says

15  "Third Annual Medical Special Operations Conference," was this

16  the third conference that the MSOC community held using the

17  name MSOC?

18  A     At FDNY.  At the New York, yes.

19  Q     Okay.  So this was the third FDNY MSOC conference?

20  A     Yes.

21  Q     So you created this flyer; right?

22  A     Yes, sir.

23  Q     So why did you say it was the third annual MSOC without

24  specifying that it was the third annual FDNY hosted MSOC?

25  A     Because it's obvious from the flyer.  It's the FDNY MSOC.

1   It's the third FDNY MSOC that we held in New York.

2   Q    Okay.  We'll move on.

3        You testified a number of times that you put in and

4   devoted many hours of your own time to creating the FDNY MSOC

5   conferences; is that right?

6   A    Yes, sir.

7   Q    Did you ever spend time while you were on the clock as a

8   paramedic working for MSOC?

9   A    Yes.

10  Q    Did you ever spend time when you were not on the clock as

11  a paramedic working for MSOC?

12  A    Yes.

13  Q    How much time off the clock would you say you spent?

14  A    Throughout the years, I -- thousands.

15  Q    Thousands of hours?

16  A    Hours, yes.

17  Q    And when you were working on the MSOC while on the clock,

18  did you understand -- were you being compensated for that

19  time?

20  A    Yes.

21       So let me clear that up.

22       So my day to day as a paramedic of a FDNY EMS rescue

23  ambulance is to be out on the street responding to medical

24  emergencies or special situations that they have.  Sometimes

25  the week or the weekend would conflict with me being out on my

1   regular shift, so what they would do is, if that happened,

2   they would assign me.  So I would be working my regular --

3   what would be my regular shift in the field over at Randall's

4   Island because I had to be there, or wherever the MSOC event

5   was taking place.  That was the only time I can say for a fact

6   that I was on the clock, but it was just because of the need

7   for me to be there and the conflict with -- with me being on a

8   shift.

9           THE COURT:  So this is during the conference?

10          THE WITNESS:  That was during the actual event when

11  it was going on.

12          THE COURT:  When you were on a shift, you would be

13  assigned to go to the venue at Randall's Island and you would

14  be paid by the FDNY for that time because it was part of your

15  usual shift?

16          THE WITNESS:  Yes.

17          THE COURT:  Thank you.

18          THE WITNESS:  You're welcome.

19  Q    So aside from the weekend of the conference, did you do

20  work on the MSOC conference preparation for the conference

21  during your working hours as a paramedic?

22  A    If it conflicted with my -- my shift, my regular

23  ambulance shift.  I'm not -- I'm not in admin; I don't work in

24  an office.  I work in the field.  Just the rescue paramedic on

25  street.

1    THE COURT:  So is the only time that you get paid

2  for your MSOC work by the FDNY when there is an MSOC event

3  that you must be present at?

4    THE WITNESS:  Yes.

5    THE COURT:  Do you ever get paid just to do MSOC

6  planning work?

7    THE WITNESS:  No.  Not at all.

8  Q    Do you do any MSOC planning work while you are on the

9  clock for your regular shift, say, in downtime when you are

10  traveling around?

11  A    I can't, because I don't have the equipment to do it.

12  I'm not sitting on a desk in front of a computer with the

13  software that I need to do some of this stuff.

14  Q    Okay.  When you receive a special assignment to go to

15  MSOC during the weekend of the conference, or the week before

16  the conference if you need to be there, who makes that

17  assignment?

18  A    Dr. Isaacs arranged that.

19  Q    Dr. Isaacs arranges that?

20  A    Yes.

21  Q    What does that mean?

22  A    He's the one that, I guess, makes it happen or assigns

23  me.

24  Q    Does Dr. Isaacs have authority within the FDNY command

25  structure to assign you to a particular tour of duty?

1   A     I would say yes because it happened.

2   Q     When did that happen?

3   A     Almost every time that there was a conflict or that I

4   needed to be somewhere.

5   Q     Okay.  Did you understand whether or not Dr. Isaacs had

6   to get permission in order to do that from someone else at

7   FDNY?

8   A     I don't know what the procedure behind the scenes is for

9   that.  You know, if I had to be somewhere, he would just say:

10  Okay, we'll just have you do your ambulance shift at wherever,

11  you know, Randall's Island, or if we were out at one of the

12  preconference facilities outside of the FDNY, wherever I

13  needed to be.

14          THE COURT:  So would you be there with your

15  ambulance ready to --

16          THE WITNESS:  No.  I would be there as part of the

17  preconference or conference event.

18          THE COURT:  So Dr. Isaacs would arrange for you to

19  be serving your shift at this special assignment location?

20          THE WITNESS:  Yes.

21  Q     With regard to the financial improprieties that you

22  allege you saw in documents that Dr. Isaacs showed you, did

23  you ever report those financial improprieties to anyone at

24  FDNY other than Dr. Isaacs?

25  A     Yes.

1   Q     Who did you report that to?

2   A     It was in the discussion with Mr. Singleton and Moira.

3   And also during the EEO -- again, with Douglas and

4   Ms. Moira -- at the different BITs hearings, at the DOI, at --

5   with BITs officers.

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continued)

2   BY MR. MACKIE:

3   Q    And so in all of those conversations, you made

4   allegations to people within the department that you saw

5   financial records that were billing for things that you knew

6   should not have been billed for?

7   A    Yes.  There's other things with that, also.

8   Q    What other things?

9   A    Well, had their investigation been done, I would have

10  provided all the information.

11          I just got to say that I'm a little bit concerned if

12  we go into full detail with this, and me going on the record

13  saying anything more if I don't need to about that because

14  it's already caused enough problems to where we are now.  But

15  I'm open to, if they want to -- you know, from the beginning

16  when I raised those concerns, here I am, this is me, this is

17  what I know, this is the issues that I have, that I found, and

18  you know, you take it from there.  That's the way it's

19  supposed to work.

20          MR. FLETCHER:  Your Honor, if I can interject.

21          One of the things that has happened in this case

22  with Mr. Singleton is that when I brought some of these issues

23  to Mr. Singleton's attention during June of last year,

24  Mr. Singleton responded by threatening Mr. Henriquez with

25  defamation claims, if he were to make these claims, if he were

1   to state these facts publicly.  So I've instructed him to do

2   that he should avoid -- I don't want Mr. Singleton to expose

3   himself to further retaliation by the City, and there are

4   concerns about him implicating other individuals in potential

5   corruption activities.

6               MR. SINGLETON:  Your Honor, may I respond?

7               THE COURT:  Go ahead.

8               MR. SINGLETON:  When this was brought up, he made

9   very serious allegations of corruption on the part of

10  Dr. Isaacs taking kickbacks.  I said these are very serious

11  charges.  You're making allegation of criminal conduct.  I

12  have an obligation, under Mayoral Executive Order 60, to

13  report these to DOI and whoever else.  I said if you have you

14  any proof -- any information, provide it to me, otherwise, you

15  should understand that these kinds of allegations are libelous

16  per se.  That's what I said.  And nothing was provided.

17              THE COURT:  Have you thought about maybe the fact

18  that he didn't feel comfortable reporting it to you after you

19  had threatened his job.  I mean --

20              MR. SINGLETON:  I didn't threaten his job.

21              THE COURT:  How do you know he didn't report it?

22              MR. SINGLETON:  Your Honor, I did not threaten his

23  job.

24              THE COURT:  Well, I know that's an issue in dispute

25  which is why I think it's good that you're, at least for now,

1   you know, taking a somewhat lesser role in this case.  But

2   that is the testimony of this witness under oath.  You haven't

3   been sworn as a witness to deny it.  I don't know that you

4   will be.  But my point is, that you may have told him that

5   these are defamatory.  I don't know legally whether it would

6   be if he's reporting wrongdoing to a lawyer for the fire

7   department or who's representing the fire department.  But

8   whether he reported it is not known to me or to you, it's only

9   known to the defendant and his attorney.  So let's leave it

10  there.  I don't think that's really at the crux of this

11  lawsuit, although, it is a troubling aspect of it.

12          MR. MACKIE:  Thank you, Your Honor.  Just a couple

13  more quick topics.

14  BY MR. MACKIE:

15  Q    On the issue -- you had testified that you were

16  approached by vendors in 2017 about them being approached

17  privately by FDNY personnel.

18          Who were the vendors that approached you?

19  A    That would be part of that investigation.

20  Q    So your attorney is going to instruct you not to answer

21  questions on that?

22          MR. FLETCHER:  I would like to instruct him not to

23  answer that question.

24          THE COURT:  Again, I think it's of marginal

25  relevance right now.

1          MR. MACKIE:  Understood.

2          THE COURT:  I think it's enough that he testified to

3   some other financial improprieties that he believed existed

4   and his attempt to report it, and then what he believes is

5   retaliatory actions against him because of that.  So I think

6   we should move on.

7          MR. MACKIE:  We'll move on, Your Honor.

8          MR. FLETCHER:  If I could lodge one other objection

9   based on the relevance, Your Honor.

10          We're here today for a preliminary injunction hear

11   about trademark rights.

12          THE COURT:  Right.  Exactly.  We're going way far

13   afield, and I gave latitude to the original cross of this

14   witness, well beyond the scope of the declarations that were

15   provided on direct, but I think this is not the venue for some

16   of these issues to be aired, especially, you know, here in

17   open court.  If he wants to make complaints to proper

18   authorities, whether they be state, local, or federal, that's

19   up to him.  But we don't need to know for purposes of this

20   hearing.

21          MR. MACKIE:  Okay.  Understood, Your Honor.

22   Q    I just have a couple more questions about your exclusive

23   use of the trademark for five years prior to the filing your

24   application.

25          So you said that there was an understanding that

1  FDNY was using intellectual property that you created; is that

2  correct?

3  A    Yes, sir.

4  Q    Did you ever have a written agreement with anyone at FDNY

5  about that?

6  A    Other than that agreement about the website, I didn't

7  have anything else.

8  Q    Okay.

9  A    I didn't feel there was a need if everything already had

10  been discussed and everyone understood, including Dr. Isaacs.

11  Q    Okay.  Did you have any licensing agreement with anyone

12  else who was producing MSOC conferences starting in 2011?

13  A    In writing.

14  Q    In writing?

15  A    No.

16  Q    Did you have an oral agreement with any of those people?

17  A    It was understood.

18  Q    When you say it was understood, how do you know that it

19  was understood?

20  A    The same way that we brought it no New York City or to

21  the fire department.  It's not something that they're doing,

22  it's something we're bringing to them that I created.  And I'm

23  very gravely that they decided to participate in it.  But

24  everyone understood that it's not just a New York thing, it

25  belongs to everyone in the community.  It's something that I

1  created so that everyone in the community can benefit from it.

2  Q    And when you were discussing this with your attorney

3  before, you said that everyone in the community understands

4  that you are one of the principals; is that correct?

5  A    Yes.

6  Q    Who are the other principals, who else would you include

7  in that group?

8  A    Everyone that comes together to help out.  Depends on if

9  we're talking about MSOC as the big picture, it's all of us.

10  It's everyone that's involved in the special operations

11  medical community that provides their time, their resources,

12  their funding.  I consider them part of the team, just as

13  everyone else that supports them.

14  Q    Okay.  Aside from Joe Hernandez, are there any other

15  particular principals who had an understanding that you were

16  the sole owner of the trademark, MSOC?

17  A    Yes.  Almost everyone involved knows that I hold, you

18  know, the playbooks, the creation, the content, the direction,

19  all the -- I guess, the -- they understand that I'm the one

20  that knows everything about MSOC.  I'm the one who makes it

21  happen, basically.

22  Q    And did you ask any of these other principals who share

23  this understanding to testify in connection with this

24  litigation?

25          MR. FLETCHER:  Object -- no, it's okay.

1          THE COURT:  Can you repeat the question, sir.

2   Q    Did you ask any of the other principals who share this

3   understanding to testify in connection with this litigation?

4   A    I didn't think that there was a need to.

5          If you're talking about anyone that contributes to

6   this?  I'm not sure who you're asking me about.

7   Q    You had testified that the basis of your claim of

8   ownership was not based on any written agreement, but was

9   based on a common understanding among the principals of the

10  MSOC community that you were the creator and sole owner of the

11  MSOC trademark; is that correct?

12  A    Yes.

13  Q    So who are those other people was my first question?

14  A    We can go down a whole list of people that contribute to

15  the MSOC.

16         THE COURT:  That's not what he's asking, sir.  He's

17  asking who understood your role in the MSOC creation,

18  management, presentations.

19         THE WITNESS:  So major contributors, Joe Hernandez's

20  name keeps coming up, Doug Isaacs, everyone that we've seen on

21  here in communications and planning.  Everyone that was

22  involved in any of the MSOC knows that I'm the one who creates

23  the images, the content, the EAPs, that puts together the

24  format, who helps decide what events or pre-conference courses

25  will take place.  Everyone knows me.  They know that.

1  Q      And you believe that based on that understanding, they

2  also understood that you were the sole owner and creator of

3  the MSOC trademark?

4  A      Yes.

5           MR. MACKIE:  No further questions, Your Honor.

6           THE COURT:  I asked -- may I ask you a question,

7  please?

8           When you were dealing with Dr. Isaacs about bringing

9  the MSOC conference to the FDNY, was that your idea or was it

10  Dr. Isaacs' idea to do that or was it a joint discussion?

11           THE WITNESS:  It was joint.  And I was actually

12  really proud that we were going to possibly be bringing it to

13  New York City, like I mentioned before, because not only was

14  something that I created happening, were we doing these

15  conversations, it was actually becoming a reality, but also

16  the fact that it was becoming my home, my house, and my unit,

17  my brothers and sisters would be benefiting from it.  So that

18  was really exciting to me.  So it was, kind of, like,

19  eventually, I wanted that to happen.

20           THE COURT:  So when Dr. Isaacs gave the lecture at

21  the Palm Beach County fire training center in 2015, who

22  invited him?

23           THE WITNESS:  I did.

24           THE COURT:  And did Joe Hernandez also?

25           THE WITNESS:  He also invited him.  It was all part

1    of the same plan.

2              THE COURT:  I see.  Okay.

3              THE WITNESS:  He wasn't the only one that was out

4    there.  It wasn't just Joe, myself, and Doug.  The veterinary

5    that we used here in New York and outside of New York, he was

6    there also.  Other people from Ohio and from California.

7              THE COURT:  So do you agree with Dr. Isaacs'

8    statement that since 2012, he has planned and organized the

9    FDNY MSOC with your assistance?

10             THE WITNESS:  Well, together.  I wouldn't say that I

11   was just, like, taking direction from him, because I'm the one

12   with the playbook.  You know, I had the whole format, the

13   content, the connections, the network, so to make it happen

14   here, yes, we worked together just, like I worked together

15   with other similar people in the same position outside of

16   here, in other agencies, in other cities.

17             THE COURT:  Was there an FDNY-hosted MSOC conference

18   in 2020, 2021, or 2022?

19             THE WITNESS:  I believe there was one in 2022.

20             THE COURT:  And were you involved in that one?

21             THE WITNESS:  No.

22             THE COURT:  Thank you.  Did anyone have any other

23   questions for Mr. Hernandez -- I'm sorry, Henriquez?

24             MR. FLETCHER:  Just one clarifying on the judge's

25   last point.

1  REDIRECT EXAMINATION

2  BY MR. FLETCHER:

3  Q    When did you learn about the 2022 FDNY MSOC event?

4  A    When it was about to happen.

5  Q    Do you recall when that was?

6  A    Might have been March or early March of that year -- I'm

7  sorry, late March of that year.

8         The reason why I didn't think -- the reason why I

9  didn't think that it would -- that they would be able to do

10 it -- stupid me -- but at that point, you know, I didn't think

11 they had the secret sauce, the EAP, the format, the platform,

12 the connections.  But obviously, through doing it together and

13 I shared so much, that they were able to do it with some of

14 the federal courses.

15        THE COURT:  So the federal courses that were part of

16 the pre-conference courses were not offered?

17        THE WITNESS:  No.  I believe that the 2022, if I'm

18 correct, had no federal courses in it or certifiable courses,

19 other than the ETCC.

20        MR. FLETCHER:  And so at some point -- and I'll just

21 refresh everyone's recollection -- Mr. Henriquez does make a

22 statement in his declaration about when he discovered the 2022

23 event.

24 Q    At some point after discovering it, did you cause a cease

25 and desist letter to be sent to the City?

1   A      Yes.

2   Q      And then this lawsuit resulted from that?

3   A      Yes.

4            MR. FLETCHER:  No further questions, Your Honor.

5            THE COURT:  Anything else from the plaintiffs?

6            MR. MACKIE:  No, Your Honor.

7            THE COURT:  Okay.  Sir, you can step down.  Thank

8   you.

9            THE WITNESS:  Thank you, Your Honor.

10           THE COURT:  Who's next?

11           THE WITNESS:  Do I leave these here?

12           THE COURT:  Is the defense -- is the plaintiff going

13  to be using its exhibits for the next witness?  Should we

14  leave this binder there?

15           MR. MACKIE:  Your Honor, the next witness is going

16  to be over zoom.  But we will use those tomorrow.

17           THE COURT:  Did you give that witness documents?

18           MR. FLETCHER:  I have sent him documents, yes.

19           MR. MACKIE:  And we were informed that we were going

20  to use the Court's Zoom screen share feature, put them on the

21  screen for him.

22           (The witness steps down.)

23           (Judge confers with law clerk.)

24           MR. SINGLETON:  Your Honor, I've got two witnesses

25  waiting back at headquarters to come over based on what we

1   talked about before, Pamela Lai and Elizabeth O'Shea.  But

2   given that we're starting at 4:00 for Joe Hernandez, and Your

3   Honor has indicated that we're only going to 5:15, I'm not

4   sure we're going to get to them at all today.  But I'm not

5   sure that's clear yet.  So are we going to start one of them

6   at 5:00, 5:10.

7          THE COURT:  I don't know how much you have, and I

8   don't know how much the other lawyer has.  I wish I had the

9   answer, but only you know the answer to that.

10          MR. SINGLETON:  I'll keep them on hold.

11          MR. FLETCHER:  Your Honor, Mr. Hernandez asked me

12   for a five-minutes heads up.

13          THE COURT:  Yes.  Why don't y'all take a 5-minute

14   break while Mr. Hernandez gets on Zoom.

15          (A recess was taken.)

16          MR. MACKIE:  Your Honor, I don't mind starting if

17   you're okay with them walking in --

18          THE COURT:  Fine.  We don't have a jury.  We can

19   start.

20          You can call your witness and then we'll ask him to

21   take an oath.  So please identify your next witness.

22          MR. MACKIE:  We're -- I'm calling for cross

23   examination, Mr. Joe Hernandez, who is put forward by defense.

24          THE COURT:  All right.  Mr. Hernandez, would you

25   raise your right hand and take an oath to tell the truth.

1          THE WITNESS:  Yes.

2          (The witness was sworn and/or affirmed in by the

3     courtroom deputy.)

4          THE WITNESS:  Yes.

5          THE COURTROOM DEPUTY:  Please state and spell your

6     full name for the record, please.

7          THE WITNESS:  Jose Hernandez.

8          THE COURT:  Did you say Jose?

9          THE WITNESS:  Yes, ma'am.

10         THE COURT:  Last name with a Z?

11         THE WITNESS:  Yes, ma'am?

12         THE COURT:  You may proceed.

13         MR. MACKIE:  Thank you.

14         (The witness takes the stand.)

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1  **JOSE HERNANDEZ,**

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5  CROSS-EXAMINATION

6  BY MR. MACKIE:

7  Q    Good afternoon, Mr. Hernandez.  Thank you for joining us

8  today.  I'm just going to ask you some questions relating to

9  this case, your knowledge on it, and your declaration that you

10 submitted, in particular.

11             So my first question is you are the president of

12 DMS; is that correct?

13 A    I am one of the managing partners, correct.

14 Q    Who else is a managing partner at DMS?

15 A    My wife and son.

16 Q    What are their names please?

17 A    Laura Hernandez, Matthew Joseph Hernandez.

18 Q    Thank you.  What does DMS stand for?

19 A    Disaster Medical Solutions.

20 Q    Okay.  And when you said you're one of the partners, this

21 a limited liability partnership?

22 A    Yes, it is.

23 Q    When did you create DMS?

24 A    DMS, I believe was created in June of 2010.

25 Q    And so aside from your wife and your son, who you

1    mentioned, are there any other employees of DMS?

2    A    No.

3    Q    Okay.  What does DMS do?

4    A    DMS delivers the FEMA urban search and rescue medical

5    team specialist course across the country.

6    Q    Aside from the -- so if I said the acronym, MTS, do you

7    have an understanding of what that means?

8    A    That's the medical team specialist.

9    Q    So aside from the MTS courses, does DMS ever put on other

10   events?

11   A    There are other events alongside DMS at the same time,

12   99 percent of the time?

13   Q    What would those other events be?

14   A    That would be the medical special operations conference

15   or events.

16   Q    And does the medical special operations conference always

17   occur at the same time as DMS MTS courses?

18   A    Yes.

19   Q    Okay.  How do you host MTS courses?

20   A    I'm not understanding you.

21   Q    I apologize.  It was a bad question.

22          Without you -- so you testified before that you

23   don't have any employees, right?

24   A    Correct.

25   Q    So who puts on these conferences for DMS?

1  A     Disaster Medical Solution contracts 1099 with individual

2  contractors, physicians, paramedics, veterinarians.

3  Q     Okay.

4  A     Government agents, military personnel, et cetera.  They

5  come in to teach for Disaster Medical Solutions, individuals

6  that are federally credentialed instructors.

7  Q     So you contract with federally credentialed FEMA

8  instructors for various courses, correct?

9  A     For the MTS courses you described earlier.

10  Q     Just for the MTS courses, right?

11  A     That is correct.

12  Q     And what form does that contract take?

13  A     Not understanding.

14  Q     Do you have a written agreement with the people that you

15  hire to do these MTS courses?

16  A     Written agreement, understanding of agreement, yes.  Not

17  necessarily understanding why -- what you're trying to find

18  out as far as a written agreement.

19  Q     Well, when you file -- so you said that they were 1099

20  contractors; is that right?

21  A     Correct.

22  Q     So they provide you with tax information, you provide

23  them --

24  A     Correct.

25  Q     But in terms of an actual sort of contract laying out

1  exactly when they will be teaching or what they will be

2  teaching, you don't have a written agreement on that?

3  A    Yes.  The class is arranged through Disaster Medical

4  Solutions and/or through Texas A&M University, also known as

5  TEEX and/or the federal government, and then Disaster Medical

6  Solutions puts the federal credentialed instructors, along

7  with the equipment cache, and delivers that program for either

8  federal or state governments.

9  Q    Okay.  How many conferences does DMS hold annually?

10  A    That all depends on the budget year and who's in power.

11  Q    What do you mean by that?

12  A    Well, it's how much money does FDNY get a year every

13  year, is the same or does it change depending on how economics

14  are doing.  That would be basically be the same thing.  Since

15  everything is federally funded and state funded, it would all

16  depend on how the federal government's budget and/or that

17  particular state's budget.  So i.e. and/or pandemic --

18          THE COURT:  Sir, slow down.  Just try to take a

19  breath and go a little slower.  You started talking about the

20  pandemic.  You said everything, is state or federally funded,

21  and then you started to talk about pandemic.

22          THE WITNESS:  In the pandemic year of 2020, no

23  classes were taught.  Last year, there were six.

24          THE COURT:  Last year being 2022?

25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  What about 2021?

2          THE WITNESS:  I believe that there were four.  I

3     have to go back and look.  My memory is a little tossed after

4     the last hundred days.

5     BY MR. MACKIE:

6     Q     So you believe though that in 2020, DMS did not host any

7     conferences?

8     A     During the COVID year, no.

9     Q     Did you have any conferences planned in 2020 that

10    couldn't go forward because of COVID?

11    A     Yes.

12    Q     What were those?

13    A     That was that medical team specialist course scheduled in

14    the State of Florida prior to the brakes being put on by the

15    CDC, and that probably was around March, if I believe.

16          Do you remember those dates, counsel?  As you bring

17    these up, do you remember the dates of when the CDC suspended

18    everybody face-to-face training in 2020, 2021?

19    Q     I don't recall exactly, but I --

20    A     Then I don't either.

21    Q     -- but I believe it was in March.

22    A     Yeah, yeah.

23    Q     So when you --

24    A     It's pretty hard to go back.

25    Q     I understand.

1          When you teach MTS courses through DMS, what kinds

2   of people attend those courses?

3   A     Federal, state, military, Department of Justice, FBI,

4   Secret Service.

5   Q     Okay.  Is there any particular training or skills

6   required to attend the MTS course?

7   A     You need to be a physician and/or a paramedic, nurse

8   practitioner that belongs it a federal, state, and/or

9   government agency.

10  Q     Okay.  Do you know the approximate annual revenue that

11  DMS currently makes?

12  A     Not off the top of my head.

13  Q     But do you draw a revenue from DMS?

14  A     Does -- is DMS a for-profit company, is that what you're

15  asking me?

16  Q     Correct.

17  A     Correct.  It is.  Has it shown any profit, probably not

18  very much.

19  Q     Okay.

20  A     It was coerced to pay out a payment, so it kind of rides

21  up and down.

22  Q     Understood.

23         Do you own the website USARmedicine.com?

24  A     I do not.

25  Q     Do you know who does own that website?

1  A    I do not.

2  Q    Okay.  Do you know --

3  A    My e-mail is USARmedic@bellsouth.net.

4  Q    Okay.  So I'm going to quickly share a document with you.

5  This is Plaintiffs' Exhibit 23.

6        Do you recognize -- not the document itself, but

7  just that name at the top where I'm highlighting USAR medic --

8  or USARmedicine.com?

9  A    I don't use that.

10  Q    You don't use that, okay.

11        And are you aware of what website that main goes to

12  or is associated with?

13  A    Not particular.

14  Q    Okay.  Does DMS have its own website?

15  A    It does.

16  Q    What is the domain name for that website?

17  A    DisasterMedicalSolutions.com.

18  Q    Would it surprise you to learn that the USARmedicine.com

19  domain redirects to DisasterMedicalSolutions.com?

20  A    That could be possible.  Our IT department or the fellow

21  that does our IT possibly linked those.  That's way beyond my

22  pay grade as an old man.

23  Q    Understood.  Who is it that does your IT?

24  A    My IT has been done by both Juan Henriquez and by my

25  daughter and by my son-in-law.

1   Q     Okay.  And did any of those people receive payment from

2   DMS for their IT assistance?

3   A     No.

4   Q     Moving on to -- are you familiar with the acronym SUSAR,

5   S-U-S-A-R?

6   A     Yes, I am.

7   Q     What is SUSAR?

8   A     State urban search and rescue.  It's the brother from

9   another mother.  It's the stepchild.  There are 28 federal

10  teams, and several states, i.e. Upstate New York at the

11  capitol, cannot have a federal team, the feds only have so

12  much funds available.  So the states always want to be

13  protected in certain areas and especially the ones that don't

14  have a federal team.  So they've created an infrastructure

15  within themselves, i.e. New York Task Force Two is upstate out

16  of the capitol, and that runs where the National Fire Academy

17  is for the State of New York.  So it gives you an idea on

18  state urban search and rescue.  New Jersey at one time was one

19  of those teams until they became a federal team after New

20  Mexico dropped out.  Just trying to play in the sandbox with

21  the feds and how the emergency manages across the country when

22  they visit the grocery store for teams during a disaster, they

23  need the functions of ESF9, they can go to a federal and/or a

24  state agency to seek for help.

25  Q     Are you familiar with any conversations held by the State

1  Urban Search and Rescue Alliance?

2  A    Yes.

3  Q    And what are those conferences?

4  A    They hold a conference every year.

5  Q    Who attends those conferences?

6  A    Same people that you asked about who attends these

7  classes.  And then sometimes, they are folks that may be can't

8  afford to be sent.  So i.e., the federal teams, the USAR, the

9  urban search and rescue that you saw without the S, acronym.

10 Those teams are federally funded over a million dollars a

11 year, so these teams have training dollars, i.e. the states

12 aren't as lucre, and so it changes the personnel.  So for the

13 State Urban Search and Rescue Conferences, sometimes there are

14 individuals who try to pay for themselves or looking for a

15 scholarship and/or are at the top level and sent by their

16 agencies.  It's a broad spectrum.

17 Q    Okay.  So are the courses that you host at DMS similar to

18 the kinds of instruction that takes place at SUSAR?

19 A    The conferences that DMS does?

20 Q    Correct.  The --

21 A    DMS does not do conferences.

22 Q    The courses that you do, is the content similar to what

23 is produced at the SUSAR conferences?

24 A    No.  A required federal class that is five days in

25 length, in addition to a 13-hour CBT, computer based training

1   program, no it is totally different than a SUSAR two or three

2   day conference.

3   Q    Is the -- sorry --

4   A    IT -- DMS teaches a course, SUSAR offers a conference.

5   Q    I understand.

6        Have you ever attended an MSOC-branded conference?

7   A    Absolutely.  I created it.

8   Q    When you say you created it, what does that mean?

9   A    We came up with the acronym, MSOC, later had the logo

10  designed by a pretty interesting gentleman.

11  Q    And when you say, we came up with the name, MSOC, or the

12  acronym MSOC, who is we?

13  A    Myself, Jose Hernandez, Vincent Johnson, and Juan

14  Henriquez.  It came after the acronym from a conference we had

15  attended back in 2009 and 2010 called SOMA, Special Operations

16  Medical Associations which was only for the military.  We

17  thought it would be a great idea to do this for the civilian

18  side and we thought MSOC would be fantastic.

19  Q    Okay.  So you had previously attended SOMA conferences?

20  A    Correct.

21  Q    How many of those did you attend?

22  A    Oh, probably five.  Spoke at several.  Had my son's

23  presentation -- I'm a gold star father.  Navy seals held a

24  presentation for him, so that was one of the days.

25  Q    And did Mr. Henriquez attend those SOMA conferences?

1  A    Yes, he did.

2  Q    Did Dr. Isaacs attend the SOMA conferences?

3  A    Yes.  We invited him to try to attend.  We kept trying to

4  persuade him and see if he would be interested in the idea

5  that we had, and I believe that he attended 2010 or 2011, not

6  real sure.

7          THE COURT:  This is a SOMA conference, sir?

8          THE WITNESS:  Yes, ma'am.

9          Yes, Your Honor.  I didn't see who speaking to me.

10         THE COURT:  That's all right.

11  Q    And I don't want to mischaracterize your testimony here,

12  so I'm just going to try to clarify what you said.

13         You had said the -- you came up with the name for

14  the MSOC conferences --

15  A    We.  We.  I said we.  Remember, you wanted me to clarify

16  the word, we.

17  Q    So you, in the plural sense, those of you who were in

18  discussions at this point of time, came up with the name MSOC

19  or the acronym MSOC, and I think did you say it was based on

20  the SOMA conference?

21  A    That's what gave us the idea as each one of the three of

22  us were pitching back and forth what we had thought the

23  acronym and the name should be.

24  Q    And is SOMA a registered trademark; do you know?

25  A    I have no idea.  You'd have to contact them.  I believe

1    so.

2    Q    Did you understand that there's only one group of people

3    who is authorized to use the name, SOMA, in connection with

4    conferences?

5    A    You're the one telling the story.  I have no idea.

6    Q    Okay.

7    A    But we've had individuals from SOMA attend MSOC.

8    Q    Okay.  Might come back to that in a bit.  But I want to

9    ask a little bit about MSOC and how this came to be.

10        What is your understanding of the term, MSOC

11   community?

12   A    Pretty much what it spells out, medical special

13   operations community.  Those that are involved in medicine and

14   those are involved in little bit different than working inside

15   of a hospital or working inside of a normal ambulance where

16   they're cog, a little bit more of osier-type treatment,

17   hanging upsides down in a place where you probably wouldn't

18   want to be.

19   Q    And so the individual words in there, medical special

20   operations, are those all words that you've encountered in a

21   number of different areas?

22        THE COURT:  Well, can you explain?  When you say --

23   Q    So I'm going back to SOMA, S-O-M-A, I believe you said

24   that that stands for special operations medical -- what was

25   the A?

1    A    Association.

2    Q    Association.  And are you aware of any other places that

3    the terms, special operations medical are used?

4    A    Yeah.  In MSOC, medical special operations community.

5    Q    Okay.  Are you aware of that term ever being used in

6    connection with a fire department?

7    A    No.  Not until after it was brought up to our attention.

8    Q    Okay.  Have you ever heard the time special operations

9    command?

10   A    Absolutely.  I retired as a fire chief for 30 years.  I

11   was in the fire service, and I was in charge of special

12   operations command, so absolutely.  But it was in the City of

13   Miami, down in Florida, South Florida.  So it's a very

14   relative terms across the country.  Every fire department and

15   every police department that has a Special Operations

16   Division, i.e., SWAT, that's a special operations command.

17   Q    And are there certain -- did the fire department that you

18   worked in Palm Beach, was there a medical portion of the

19   special operations command?

20   A    I didn't work in Palm Beach, but yes, where I worked

21   there was a special operations medical command.

22   Q    I apologize.

23   A    South Florida Urban Search and Rescue is one of the 28

24   federal task force --

25              THE COURT:  Sir, you'll have to slow down.  Our

 1   court reporter is trying to speak --

 2              THE WITNESS:  I'm sorry.  I speak Spanish and I

 3   speak with my hand.  I apologize.

 4              THE COURT:  That's all right.  Just please speak

 5   slowly.

 6   A    Yes, I did not work for Palm Beach County.  You have your

 7   information incorrect.  I worked down -- so I was part of the

 8   Urban Search and Rescue South Florida Task Force.  I was the

 9   medical coordinator, and I was a special operations medical

10   chief for that.

11              And also served as medical special operations

12   command during our stay at several other disasters, including

13   the World Trade Center.

14   Q    Understood.  So is it fair to say that the term, medical

15   special operations command was somewhat widely in use prior to

16   the formation of the MSOC community?

17   A    It was written as a form of structure and that's what

18   those words led to because the last word, command, gave you

19   where exactly that is, as opposed to medical special

20   operations community kind of sounds different, where it's part

21   of a bunch of people, not just one.

22              So i.e., it's not just that particular industry, but

23   a whole bunch, because community could also involve you.  If

24   you were a legal counsel for the special operations side, you

25   would be part of the special operations community in helping

1    those possibly that needed that type of assistance to be able

2    to do different protocols.

3          I.e., when a paramedic or physician crosses state

4    lines, they're not allowed to serve in medical capacities that

5    they would serve in their state, unless there's a disaster

6    declaration.  And we always love legal counsel to hang out.

7    So you, sir, could also be part of the special operations

8    community.

9          THE COURT:  Sir, I have a question.  This is the

10   judge.

11         THE WITNESS:  Yes, ma'am.  Yes, Judge.

12         THE COURT:  This case involves the use of the term

13   Medical Special Operations Conference, MSOC.  So let's try to

14   focus on that, counsel, if you don't mind in your questions.

15         MR. MACKIE:  Yes, Your Honor.

16         THE WITNESS:  I was wondering why I was being asked

17   other questions.

18         THE COURT:  I'm giving him a little bit of latitude,

19   but I think it's time to return to the issues at hand, and the

20   declaration that you signed which is why you're being

21   cross-examined on those statements.

22         THE WITNESS:  I apologize for being in the vehicle,

23   but my background's a empty house with studs in it.

24         THE COURT:  I'm very sorry about the loss that you

25   sustained both with your home and also your son.

1          THE WITNESS:  Thank you, Your Honor for even hearing

2    that.

3    Q    Are you familiar with the organization, MSOC Community

4    Inc.?

5    A    Yes.

6    Q    What is -- how are you familiar with them?

7    A    Well, it's an Inc. Or an org?

8    Q    What is your understanding -- I'm sorry, we'll go back.

9          Is there a nonprofit group with the name MSOC

10   Community that you're familiar with?

11   A    Yes, it is.

12   Q    What is your affiliation with that group?

13   A    I am one of the officers in that LLC.

14   Q    Okay.  And what is your understanding of what that name

15   means, what that stands for?

16   A    Medical Special Operations Community was formed as a

17   nonprofit for those that were from the tribal areas, state

18   areas, county areas, indigenous populations that couldn't

19   afford the 3,000 to 3,500-dollar course, the MTS course that

20   the federal government made mandatory.  So to give them a

21   little bit of the knowledge that those physicians and medics

22   had, we thought we'd form a nonprofit and pay back do the

23   things at our cost.

24   Q    And the name in the non-profit and the letters used MSOC

25   as used in the name of the nonprofit, what do those stand for?

1    A    Same thing you just said, medical special operations

2    community, medical special operations conference.

3    Q    Okay.  So when you use MSOC and then name community after

4    it, does that refer to medical special operations conference

5    community?

6    A    No.  I don't use -- I didn't use that afterwards.  That's

7    something that you just came up with.

8    Q    Well, is that the name of the LLC that you --

9    A    No.  Medical Special Operations Community holds a medical

10   special operations conference.

11   Q    Okay.  So I'm trying to figure out what's the name of the

12   LLC.

13   A    You said it yourself.  Did you look it up in the Florida

14   Sunbiz.  It's medical special operations community.

15        I mean, I would think you guys would have looked

16   that up prior to asking that question.

17        THE COURT:  Sir, wait for the questions, okay.

18   Thank you.  So we can keep this going, if we allow the lawyer

19   to ask his questions.  If there's an objection by counsel for

20   Mr. Henriquez, I will rule on it.  But otherwise, he'll ask

21   the questions, Mr. -- I'm sorry, what is your name again?

22        MR. MACKIE:  Mackie, M-A-C-K-I-E.

23        THE COURT:  Okay.  Mr. Mackie will ask you the

24   questions.  Thank you.

25        (Continued on the following page.)

1  BY MR. MACKIE (Continuing):

2  Q    I'm going to put up your declaration.

3            MR. MACKIE:  This is the declaration submitted by

4  Mr. Hernandez in connection with this motion.

5  Q    I want to draw your attention to paragraph eight, when

6  you say in January 2011, you and Mr. Henriquez produced the

7  first of many events using the name Medical Special Operations

8  Conference; is that correct?

9  A    Correct.

10 Q    Who else was involved in producing the Medical Special

11 Operations Conference at that time?

12 A    I mentioned two of them earlier, I'm not sure if you

13 noted.  That was Vincent Johnson.

14 Q    Was there anyone aside from Vincent Johnson?

15 A    No.

16 Q    And then on paragraph ten, you say in connection with the

17 first MSOC events, Mr. Henriquez created a branded logo

18 featuring the MSOC mark and other design graphics; is that

19 correct?

20 A    Correct.

21           THE COURT:  Paragraph ten?

22           MR. MACKIE:  Paragraph ten.

23           THE COURT:  Thank you.

24 Q    Was anyone else involved in the creation of the MSOC

25 logo?

1   A    No, other than him asking ideas, what we thought.

2   Q    So, back up in paragraph eight, where you say

3   Mr. Henriquez was the person who came up with that name, is

4   that referring to Medical Special Operations Conference?

5   A    Correct.

6   Q    How do you remember it specifically that Mr. Henriquez

7   rather than Mr. Henriquez in concert with you and Mr. Johnson

8   came up with this name?

9   A    You started to speak and fading away from the mic or a

10  lot softer.

11  Q    I'll try to ask again.

12       Can you hear me okay?

13  A    I can hear you okay.

14  Q    So, what is your basis for the statement that

15  Mr. Henriquez was the person who came up with that name?

16  A    The question was asked.  I answered the question.

17       THE COURT:  He wants to know how you remember that

18  Mr. Henriquez came up with this name.

19       THE WITNESS:  Well, there were only three of us

20  there and Vinny is not exactly the one who would probably come

21  up with the name but would definitely agree to support.  Just

22  difference in personalities as far as creativity.

23  Q    I believe that you testified earlier that the three of

24  you together came up with the idea and the name after

25  attending --

1  A    You asked for the word "conference," "medical special

2  operations," and going back and forth.  You know, you kind of

3  go back and forth when you're sitting at a table with your

4  other counselors going back and forth, but one of you

5  eventually comes up with that word as opposed to three of you

6  and the rest agree.  That's usually how it happens.

7          So, to my knowledge or to my recollection, that's

8  what I can recollect.  It's been pretty rough.

9  Q    Understood.  What was Mr. Henriquez's role in producing

10 this first January 2011 conference?

11 A    We're all friends and partners, right?

12 Q    Okay.  What does that mean?

13 A    Well, you asked me about the MSOC LLC.

14 Q    No, I'm referring to in your declaration when you say:

15 Mr. Henriquez and I produced the first of many events using

16 the name Medical Special Operations Conference.

17 A    Correct.

18 Q    What was Mr. Henriquez's role in that?

19          And then I'll ask later what was your role, but,

20 first, what was Mr. Henriquez's role?

21 A    Making sure the conference went off.  Everything that it

22 takes to deliver a conference.  Two guys, three guys working

23 at it.  It's a pretty long list; teaching, hands-on, writing,

24 creating, calling, scheduling, indicating.

25 Q    At that point of time, in January 2011, was your role

1  essentially the same as Mr. Henriquez's role in producing the

2  conference?

3  A    Sure.  Whatever we could not do individually, we tried to

4  task each other.

5  Q    And a little further down in that paragraph, you say:

6  The first MSOC-branded conference was held in Ohio sponsored

7  by an industry supplier called Ferno as well as my then brand

8  new company DMS.

9         Is that correct?

10  A    Correct.

11  Q    What was the role of DMS in producing this conference?

12  A    The role of DMS was to try and get Ferno to understand

13  their importance in the equipment for urban search and rescue

14  outside of normal EMS.

15  Q    So, at this time -- I believe earlier you testified that

16  DMS only hosts MTS courses; is that right?

17  A    That's correct.

18  Q    Was there --

19  A    But you can't have any MTS courses without industry.

20  Industry is what provides our tools for us to be able to

21  provide treatment and be able to take you out of a rubble

22  pile.

23         And things were just coming out of learning -- we

24  had just returned from the Haiti earthquake in that January,

25  if you remember back then, in 2010.  And, so, it was very

1    important to try and work with industry in the urban search

2    and rescue environment, which was DMS teaching the MTS course;

3    i.e., an amputation was done with a Skilsaw.  So, we needed

4    industry real bad in Haiti.  Happened here, we'd all be

5    important.

6    Q    Was there a time when DMS produced more than just MTS

7    courses?

8    A    No, we have not.  I retired, so I kind of didn't want to

9    get crazy being a businessman.  I was more of a practitioner.

10   Q    So, what was the relationship between DMS and this MSOC

11   conference in 2011?

12   A    Well, if we go back to the conversations we had earlier

13   that I have described to you, the MTS course, remember, was

14   between three and thirty-five hundred dollars, the typical

15   tribal county, some counties, some cities, some austere areas,

16   came out for an MTS course and five days away.

17          So, the thought was to give back to the community

18   after we worked for so many years.  And I asked my colleagues

19   out there to come on the system since 1992 so they could give

20   back.  And that's what we did with MSOC because that's what

21   SOMA did.  SOMA was put together with the speakers usually

22   starting with retired military folks that didn't ask for

23   honorariums.

24   Q    Aside from the January 2011 conference that you wrote

25   about in paragraph eight, were there other medical special

1  operations conferences that were hosted or co-sponsored by

2  DMS?

3  A    Not in 2011, no.

4  Q    Were there at any point in time other MSOC conferences

5  that were sponsored or hosted by DMS?

6  A    Are you alluding to item nine?

7  Q    Well, it's not clear in paragraph nine that there's no

8  mention of DMS, so --

9  A    Correct.

10 Q    Was DMS a sponsor on that conference?

11 A    DMS didn't deliver an MTS course in 2012 there.

12 Q    And in 2011, in coordination with the MSOC --

13 A    DMS did not produce an MTS course.  DMS was there trying

14 to find out about industry and trying to bring industry

15 standards into this particular...

16        But because there are certain things that can't be

17 done during a FEMA-equivalent course, i.e., vendors and/or

18 industry cannot be singled out for creation of certain

19 inventions and/or thinking that are going to change the

20 pancake.  It's just not the right place.  MSOC was created to

21 do that with vendors.

22 Q    So, okay.  When did you first learn that FDNY was going

23 to host an MSOC event in 2013?

24 A    We -- I didn't first find out, we asked Doug if he would

25 help us host this class because California couldn't get it

1    together that year and they were the biggest supporter.

2            California has eight federal teams.  They're the

3    largest sponsors of the federal urban search and rescue

4    system.  You can see why probably Palo Alto started it all.

5    And because they just couldn't get it together with a facility

6    in LA County, LA City, San Diego, et cetera, et cetera, we

7    asked Doug, and Doug said that he would approach FDNY.

8            We had a relationship outside of Doug with FDNY

9    prior as well.

10           THE COURT:  Doug is Doug Isaacs, sir?

11           THE WITNESS:  Yes, your Honor.  I apologize.

12           THE COURT:  That's all right.  Just for the record,

13   just need to make it clear.

14           You asked Doug Isaacs roughly what month and year?

15           THE WITNESS:  Oh, it was after I taught him in a

16   class for the urban search and rescue, an MTS course.  I would

17   say somewhere around 2009, 2010, somewhere in that

18   neighborhood.  Or maybe even just after that.  I don't think

19   he had been sent to a class yet.  Somewhere in that

20   neighborhood.  I'd have to look -- at that time, DMS was not a

21   company and I taught for the federal system.  The federal

22   system was the one that put out the education courses,

23   different than what it is today.

24           THE COURT:  All right.  Thank you.

25           THE WITNESS:  Yes, ma'am.

1   Q     Just in order to clarify that, I've put on the screen

2   paragraph seven of your declaration, in which you said that

3   your conversations with Dr. Isaacs occurred during the SOMA

4   conference in about 2010 or 2011; is that accurate, to your

5   memory?

6   A     Yeah, but that has nothing to do with the medical team

7   specialist, so obviously it was before 2010.  So probably

8   2009, as I mentioned first.

9   Q     So, you believe that you had spoken with Dr. Isaacs about

10  creating a conference prior to this SOMA conference in 2010?

11  A     Dr. Isaacs wasn't one of the medical directors within the

12  USAR system.  At that time, he was trying to get into the

13  system.  Dario Gonzalez was the physician in charge.

14        And at that time, he was trying to be able to do

15  that.  We thought it would be a great feather in his cap if he

16  could pull it off and have FDNY sponsor the first MSOC

17  conference.  And it happened.  MSOC at FDNY went off with a

18  charm.

19        And if you remember, that was the first time, MSOC

20  at FDNY; do you recall that?

21  Q     That was in 2013, the MSOC at FDNY 2013.

22        I want to go back to another thing that you said

23  before we go on to that.  You said prior to FDNY hosting MSOC

24  in 2013, you said, "We had a prior relationship with FDNY."

25        I was just asking, who do you mean by "we" in that

1  statement?

2  A     Well, I responded to the World Trade Center in 2001.  I

3  was there for 15 days.  I attended the first medical team

4  specialist course in the United States with Dr. Dario

5  Gonzalez, when we first formed the FEMA medical teams.  And,

6  so, the relationship started back in 1992 to '94.

7  Q     So, the "we" in that statement, was that you?

8          Is there anyone else that you -- I'm trying to

9  figure out, were you referring to your company DMS as having a

10  prior relationship with FDNY?

11  A     Basically, all the elder instructors that are there all

12  had relationships with FDNY.  We all respond basically to the

13  same disasters.  It usually takes more than one federal team.

14  Out of the 28 federal teams, 21 were in your backyard in New

15  York; the rest went to the Pentagon.

16  Q     What was your involvement in planning MSOC at FDNY 2013?

17  A     It was our creation, so it was to bring everything

18  together and see how we could bring vendors and those that

19  were outside of the system, to see if there was an interest,

20  which there was a strong interest, bring those that could

21  afford $50 or those that couldn't afford anything at all and

22  ask them to sit at that same table with everyone else that was

23  at a higher caliber, those that hadn't started their special

24  operations command but only were wanting and willing to.

25  Q     So, were you personally involved in creating planning

1    documents for the 2013 conference?

2    A    I didn't write the documents, no, but I did talk a lot.

3    Q    When you said I talked a lot --

4    A    That means somebody else probably put that information in

5    the document so that we could have an outline, so that we

6    could have presenters.

7         I'm old.  I was the one in the system since '92, so

8    we used the contacts that I had across the country, in

9    California specifically because they were going to host the

10   conference first.  And, so, those physicians that were out

11   there, three in particular, I asked them if they would come

12   across the country.

13        So, yes, there was a lot of planning going on and

14   efforts.

15   Q    So, you personally solicited people to offer --

16   A    Yes.

17   Q    -- to be instructors at the FDNY 2013 MSOC?

18   A    That is one of many, yes.  I've used them at other MSOC

19   events throughout the country, not just at FDNY.

20   Q    Who at FDNY did you personally talk with regarding MSOC

21   in 2013?

22   A    I didn't take it to command.  Doug walked it in to

23   command as a physician.

24   Q    Did you talk to anyone other than Doug Isaacs at FDNY in

25   connection with the 2013 MSOC?

1   A     No.  He was our liaison.

2          If you remember at that time, FDNY and EMS were kind

3   of two separate brothers living in other homes.  There is a

4   relationship there but there isn't a relationship there.  So,

5   FDNY is a fire-based; EMS is, as we say, medical-based.  And,

6   so, they have separate commands, separate infrastructures, and

7   they're just one of the pieces within the fire department or

8   the fire for the USAR team.

9          And, so, they brought it in because it was the

10  medical side.  Sometimes medical does not look real fun with

11  all the work that goes on to be able to get into a disaster

12  structure.

13  Q     Understood.  Did you ever internally, so not with anyone

14  at FDNY but amongst the group of you that were planning these

15  conferences, did you ever talk or discuss a licensing

16  agreement?

17  A     Nope.

18  Q     Did you have an understanding that there was an implicit

19  licensing agreement between your community and whoever was

20  hosting MSOC events?

21  A     No.  The only things those communities would ask us for

22  is if we had a certificate of liability in case anyone was

23  hurt, and whether it was a profit or not-for-profit company,

24  so that they would be able to join in.

25  Q     And did you have any concern in 2012, 2013, about other

1   groups using the acronym MSOC to host their own conferences?

2        MR. FLETCHER:  Objection, foundation.

3   A    Yeah, as I got a little bit smarter going from a

4   practitioner to a businessman.  It's like going from law

5   school to becoming lawyer, passing the bar.  Things progress

6   as you get out of your particular role, little sharper now

7   than you were then.

8   Q    So, you never had any conversation directly with Doug

9   Isaacs in 2013 about who owned the MSOC name?

10  A    I didn't think that was necessary, no.

11  Q    Why did you think it was not necessary?

12  A    Because Doug knew the understanding that that was ours.

13       THE COURT:  Why do you say Doug knew that MSOC was

14  yours?

15       What indications did he --

16       THE WITNESS:  Because every year he had to try and

17  present it to FDNY to see if they would carry the conference.

18  This was an every-year thing.  He had to approach FDNY every

19  year and see if it would be okay to host this.

20       And the last year, I believe in '18, he was so

21  frustrated with what was going on, he had had it.  He didn't

22  really want to do it anymore because it was such a conflict.

23  Q    Just bringing up the declaration once more.

24  A    Little louder, Mr. Mackie.

25  Q    Just bringing up the declaration once more.

1        Can you see that okay?

2    A    Uh-huh.

3    Q    In paragraph 13, you say:  I understood Dr. Isaacs to be

4    acting as a representative of the FDNY and Foundation in

5    connection with the MSOC event.

6    A    As we discussed earlier, he was the point person to go to

7    FDNY; correct, from EMS go to Fire, then from Fire basically

8    to Foundation, being the money pocket.

9    Q    What made you believe that Dr. Isaacs was acting as a

10   representative of FDNY?

11   A    He worked for FDNY, right?

12        Is that correct?

13   Q    I'm just asking you what was your basis for

14   understanding --

15   A    I believe he worked for FDNY.  I was led to believe.  He

16   wore the uniform of FDNY and drove one of FDNY's cars, had a

17   radio, responded on their federal team roster.  So, I believe

18   he worked with FDNY.

19   Q    Did you believe that Mr. Henriquez worked for FDNY?

20   A    He wore a uniform, he was rostered, he was sent by FDNY

21   to a class that I taught way back when in Ocala with several

22   other paramedics from FDNY and physicians.

23   Q    Did you believe that Mr. Henriquez was a representative

24   of the FDNY?

25   A    I don't know how much FDNY allows one person to be

1    representative, so that's a big word to use --

2    Q    I'm trying to understand the basis for your statement

3    that:  I understood Isaacs to be acting as a representative of

4    the FDNY.

5    A    So, I have nobody else going between me and him?

6                My statement was talking about Doug Isaacs, correct?

7                So, why would you refer back to Juan Henriquez?

8                That's not who I mentioned.  So, now you're asking

9    me another question.  Let's stick with number 14.

10   Q    Mr. Hernandez --

11   A    Yes.

12   Q    When I asked you in paragraph 13 why you understood

13   Dr. Isaacs to be acting as a representative of the FDNY, your

14   answer to me was that you thought he worked for FDNY.

15   A    Correct.  Doug Isaacs sent me e-mails that he had been in

16   communication with upper command from FDNY and the Foundation

17   in approval of the conference.

18                Does that mean that he is a representative?

19                He had told me he was.  He told me he's able to

20   deliver this course, so I believed him.

21   Q    When did he tell you that he was acting as a

22   representative of the FDNY?

23   A    When he told me he would try and get the conference

24   delivered there, when he was the one sending the e-mails back

25   and forth.  And I would believe he's the representative when

1   he asked me to personally send a $10,000 check to his home

2   address in the Foundation's name.  That's a representative of

3   the FDNY and the Foundation.

4           He sent me an e-mail asking me for $10,000 that he

5   sent to his home address -- he sent me his home address with

6   his apartment number and asked me to write the check or,

7   actually, a cashier's check written out to the New York

8   Foundation.  So, that to me is a representative.

9   Q    Thank you.

10  A    Does that answer everything?

11  Q    I believe that answers my question on the representative

12  portion.

13  A    Okay.

14  Q    Now on paragraph 13 -- on paragraph 14, one more down,

15  you say:  I understood then and believe now that Dr. Isaacs

16  knew that Mr. Henriquez and I were intending for the FDNY to

17  act only as a host for the MSOC event.

18          What is that understanding based on?

19  A    If you remember and recall in your notes that it was

20  first going to be delivered where?  In the West Coast, in

21  California.  And there are e-mails back and forth between me

22  and Doug that says:  Since California was too slow to get this

23  on, can we go ahead and do it in New York?

24          And there was also discussion between individuals

25  from California of having the MSOC event back in California

1    the following year.

2    Q    But Dr. Isaacs never said anything to you that indicated

3    he was hosting an event, correct?

4    A    That he was hosting --

5              THE COURT:  He or the FDNY?

6              MR. MACKIE:  That FDNY was hosting.

7    A    What do you mean?  We did host one there.

8    Q    Your statement, though, says:  I understood then and

9    believe now that Dr. Isaacs knew that Mr. Henriquez and I were

10   intending for the FDNY to act only as a host.

11   A    Correct.

12   Q    So, what is your basis for believing that Dr. Isaacs knew

13   your subjective intent?

14   A    Because he wanted it before, California.  And we weren't

15   going to do it there until California backed out, according to

16   the e-mails back and forth between me and Doug.  And that's

17   why New York was picked second.

18   Q    And would your --

19   A    And Doug mentioned that he was happy to see this go out

20   to what we call the Central Division.  We were looking at

21   Chicago and Western Division, which was California, the

22   following year.

23   Q    In the next portion of that statement, you say:  We did

24   not intend to transfer ownership of the event or any

25   intellectual property associated with the event to the FDNY or

1  Foundation.

2          What ownership is that referencing?

3  A    Ideas of the conference, set-up of the conference, the

4  way we organize our admission fee, our reimbursement fees, my

5  point of contacts.

6          People pay a lot of money for those contacts.  They

7  wanted it in their database.

8  Q    And did you provide those contacts to FDNY?

9  A    Yes, sadly enough.

10 Q    Was there anything that you did not provide to FDNY in

11 terms of ownership of the event?

12 A    No.  I even provided the Foundation $10,000 after the

13 event.

14 Q    When you say "after the event," what are you referring

15 to?

16 A    After an MSOC event that we had at FDNY in 2018.

17 Q    So, on paragraph 17, a little further down in your

18 declaration, you say:  At no point during our communications

19 before or after the first MSOC at FDNY did Dr. Isaacs dispute

20 or object to our communicated intention that FDNY's role was

21 simply to serve as a host.

22          In what forum did you communicate that intention to

23 Dr. Isaacs?

24          MR. FLETCHER:  Objection, asked and answered.

25 A    Verbally and through e-mails.

1          THE COURT:  Don't ask the question again, all right,

2    sir?  We have it answered now.

3    Q    Jumping forward to paragraph 19 of your declaration, you

4    refer to a number of MSOC conferences that you hosted outside

5    of New York City independent of the FDNY and the Foundation,

6    and you say these occurred at least in the years 2015, 2017,

7    2018, 2019, '21 and '22.

8          Do you recall where any of those events took place?

9    A    Well, I can see that you already tried to set me up and

10   you see that 2020 was not in there.  You had asked me earlier,

11   so that shows you that 2020, I was correct now that that

12   recollects my mind.

13         No, I'd have to go back and try to find each one of

14   those.

15   Q    And were all of these hosted in connection with MTS

16   courses that were produced by DMS?

17   A    Most of the time they were.  I can't tell you that all

18   the time they were, but most of the time try and get that

19   other wing in.

20   Q    Do you recall if there were any MSOC conferences that

21   occurred independent of any kind of MTS course?

22   A    Yeah, before we were doing the MTS courses.

23         You mentioned them earlier.  And what you asked me

24   earlier, you're asking me the same thing; remember, Ferno?

25   Q    Yes.

1   A    Okay.

2   Q    Aside from 2011 and 2012 --

3   A    That's not what you asked me.

4   Q    Aside from to '11 and 2012 --

5   A    Okay.

6   Q    -- are you aware of any MSOC conferences that took

7   place --

8   A    We did one in West Palm Beach.  You didn't bring that one

9   up.

10  Q    So, in 2015, you say DMS and Mr. Henriquez flew with Dr.

11  Isaacs -- I'm sorry, I'm on paragraph 21 of the declaration

12  now.

13        In 2015, DMS and Mr. Henriquez flew Dr. Isaacs to

14  Palm Beach, Florida, to be an instructor at an MSOC-branded

15  event hosted by Palm Beach County Fire and Rescue; is that

16  correct?

17  A    That's correct.

18  Q    Was DMS -- sorry, what was DMS' involvement with this

19  event?

20  A    That's not what -- they contacted us through DMS.  They

21  are not a federal team, but they wanted to try and get as much

22  education as they could.  DMS was their only point of contact.

23        And after that, we let them know that there was

24  another branch that could also be involved since DMS only

25  taught the MTS course.  And that's when we decided to do an

1  MSOC event there.

2  Q     So, the conference or event that you refer to in

3  paragraph 21, that did not include an MTS course; is that

4  correct?

5  A     Correct.

6  Q     But it did use the MSOC brand?

7  A     It used our LLC, yes, it did.

8  Q     When you say "it used our LLC," what do you mean by that?

9  A     MSOC, medical special operations community, that we

10 delivered at the medical special operations conference.

11 Q     And when you refer to the MSOC-branded event in 2015, is

12 that referring to the medical special operations conference or

13 community?

14 A     The community is the name of the position.  The

15 conference is what happens.

16 Q     Okay.

17 A     So, that's the event that goes out and trains or teaches,

18 but the conference goes away once those dates are over and the

19 community still exists so that we can have shared information,

20 shared questions, shared vendors, shared ideas, shared

21 protocols.

22        So, the community always stays.  MSOC always stays.

23 Just the event comes and goes.  It's trying to get information

24 from all the federal teams out to the rest of the country so

25 we can share medical protocols and information and ideas

1  across the country.

2         MR. MACKIE:  I'm going to share Plaintiffs' Exhibit

3  4 with the witness.

4  Q    Do you recognize this document?

5  A    Yes.

6  Q    And where it says FL US&R, is that referring to the urban

7  search and rescue team that we discussed earlier?

8  A    That's Florida.

9  Q    Right, so it's a Florida urban search and rescue team?

10 A    Correct, that is -- it's Florida USAR training.  So,

11 you're training USAR components to a Florida team.

12        There's no name there, right?  That's open.

13        So, I belong to FLTF 2, FLTF 1, FLTF 4.  There's

14 no -- they're not a number, so they don't exist as a task

15 force.  So, it's general education, general knowledge, but in

16 the urban search environment to a Florida team.

17        Is there any reason why that stands out to you?

18 Q    I'm just trying to clarify what's on the document here.

19 A    Sure.

20 Q    Did you consider -- first of all, what is this document?

21        You said you recognize this.  What is this?

22 A    Looks like our schedule, right?

23 Q    You tell me.

24 A    That's our schedule of our presentation.

25 Q    Was this a schedule for the Palm Beach event?

1  A    Yes, on line three it says Palm Beach County Fire Rescue

2  Training Center.

3          THE COURT:  When you say "our", sir, are you

4  referring to MSOC?

5          This is an MSOC event or no?

6          THE WITNESS:  This event was, yes.  That was the

7  first thing he brought up.  Yes, your Honor.

8          THE COURT:  Thank you.

9          THE WITNESS:  It was the content of training within

10  that MSOC event, your Honor, called USAR because that's kind

11  of the content for disaster training.  It's urban search and

12  rescue.  That's what's done in an urban search and disaster

13  environment.  That's the emergency support function line that

14  FEMA has created for disaster response.

15          THE COURT:  Thank you.

16          THE WITNESS:  Yes, your Honor.

17  Q    So, you said that this was an MSOC event.

18          Why is there nothing on the schedule that says MSOC?

19  A    Because it was just for them.  It wasn't open to anyone

20  else.  This was a private event just for the Palm Beach County

21  Fire Rescue.

22  Q    This was not a conference that was open to the public?

23  A    Nope, correct.

24          No conference is really open sourced to the public.

25  If you wanted to come, I would have to vet you to make sure

1    that you had credentials to be able to come through.

2    Q    Okay, but --

3    A    And we don't necessarily need to put MSOC on a schedule.

4    It has nothing to do with the institution.  This is internal.

5         This is an internal document and not an advertised

6    document, correct?

7    Q    Yup.

8    A    And sometimes when we do austere training, Mr. Mackie,

9    i.e., live tissue training, we don't put a lot of stuff on

10   there.  I don't think that's a topic of discussion here at

11   this court.

12        THE WITNESS:  I don't think your Honor would like to

13   hear that.  The live tissue training is a very touchy subject.

14   And, also, the use of cadavers, mangled cadavers for extreme

15   science and training.  So, sometimes we don't put those out.

16        THE COURT:  You give the training but you don't put

17   it on your written agenda; is that right?

18        THE WITNESS:  Yes, ma'am.  You can't.  I'd have PETA

19   and everybody there, you know?  It's just...

20        Like your weapons of mass destruction brain and we

21   can't put the same thing.  You're just not allowed to

22   advertise that.

23   Q    I'm sharing with you now what's marked as Defendant's

24   Exhibit G?

25   A    Okay.

1   Q    This is on page three of that exhibit.

2   A    Okay.

3   Q    It's the bottom of the page marked HENR118 --

4   A    Okay.

5   Q    -- for the record.

6        Is this -- well, what is this?

7   A    It's an outline.  They want an outline of what we would

8   be able to do so they can justify their cost, their sending of

9   members, their loss of time pulling people out of service,

10  hiring overtime to cover, and why should we even bring this

11  group in?  Who are they?

12  Q    Is this the same course that Dr. Isaacs taught at?

13  A    Correct.

14  Q    And at the top, where it says medical special operations

15  conference, is that consistent with the other materials that

16  you produced for this course.

17  A    Yeah, that's not going to the students, it's going to

18  administration to be able to approve a course, correct?

19       And if you see down there mangled extremity,

20  amputation, that's why we don't a lot of times put that out.

21  Social media.

22       You're done with that?

23  Q    I've done with that right now.

24  A    But you could see the content in that letter.  That's why

25  a lot of times things don't get out to the public.  That makes

1  sense.

2  Q    Understood.  I'm going to go back to your declaration for

3  just a minute.  And you know, if this is the same answer as

4  how he knew about New York, you can just give me that.

5           But on paragraph 20, where you say, "Dr. Isaacs knew

6  and has always known that various MSOC-branded events were

7  being held outside of New York," what personal communications

8  are you referring to --

9  A    Redundant question.  I answered that for you.

10 Q    These are the same communications that you are referring

11 to --

12 A    Communications, communications didn't change.  You're

13 just asking me the same question on a different page.  The

14 answer is still the same.

15           Correct?

16           MR. MACKIE:  Just a few more questions, your Honor.

17           THE COURT:  It's close to 5:15, so go ahead, just do

18 those few more.

19           MR. MACKIE:  Sure.

20 Q    Are you aware of any licensing agreement that has ever

21 been written or entered into between anyone claiming ownership

22 of the MSOC trademark and any other person?

23 A    No.

24 Q    Did you ever discuss a licensing agreement with

25 Mr. Henriquez?

1  A     No, Henriquez was a partner.

2  Q     And to your knowledge, has anyone who has hosted an MSOC

3  conference ever paid a licensing fee to Mr. Henriquez or any

4  member of the MSOC community?

5  A     No.

6            MR. MACKIE:  No further questions right now, your

7  Honor.

8            THE COURT:  All right.  So, Mr. Hernandez, thank you

9  very much for your time.  We are going to continue with you

10  tomorrow morning.

11            Would you be available at 9 a.m. to -- we can

12  accommodate you if that's not possible.  Mr. Henriquez's

13  attorney has the right to ask you some questions, but we'll

14  arrange it.

15            THE WITNESS:  Sure.

16            THE COURT:  What would work for you?

17            MR. FLETCHER:  I think I probably need 20 minutes,

18  half an hour tops.

19            THE COURT:  Twenty minutes to half an hour he needs.

20            What time would you like to reschedule.

21            THE WITNESS:  There's no way to continue, your

22  Honor?

23            THE COURT:  Today?

24            THE WITNESS:  Yes, ma'am.

25            THE COURT:  I would, but I have a doctor's

1  appointment.  I'm really sorry.

2          THE WITNESS:  I have to meet with the zoning

3  department tomorrow.  I'll try it in the morning.  They come

4  and go, it all depends on what happens.  It's Lake County

5  coming through and deciding if we're going to be able to build

6  or not.

7          THE COURT:  I see.  Do you think you'll be free

8  between 9 and 9:30 or should we schedule it after that?

9          THE WITNESS:  I would try at that time, would

10  probably be the best.  Maybe they haven't made it back out

11  there yet.

12          15, 20 minutes?

13          THE COURT:  We can accommodate your schedule.

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  If they come and you need to deal with

16  them, and I understand why you do, we will just put you on for

17  some other time.

18          THE WITNESS:  Okay, but I think 9 would work.  Thank

19  you.

20          THE COURT:  All right, great.  We'll get you started

21  at nine.  Thank you very much.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  I'll ask everyone to show up a little

24  before nine so we can get started promptly at nine.

25          Thank you very much, sir.  You're excused for the

1  day.

2           Be well.

3           THE WITNESS:  Thank you very much.

4           THE COURT:  So, counsel, I'll see you tomorrow, say

5  8:55, 8:50, so we can make sure the equipment is working and

6  get Mr. Hernandez back.

7           Is there anything else I need to deal with this

8  evening before we adjourn for the day?

9           MR. FLETCHER:  I don't have anything, your Honor.

10          THE COURT:  I hope we'll be able to finish by

11  tomorrow.

12          MR. FLETCHER:  Your Honor, I think we should be able

13  to.

14          THE COURT:  I do have a criminal matter on at three.

15          It shouldn't take more than ten minutes or so, you

16  think, Ms. Jackson.

17          THE COURTROOM DEPUTY:  Yes, about ten minutes.

18          THE COURT:  It's a status conference in a criminal

19  case.

20          So, we will continue and keep going until we're

21  finished.

22          MR. FLETCHER:  Thank you.

23          THE COURT:  Everybody get home safely.

24          Thank you.

25          If anyone wants to order the transcript of our

hearing, please speak to the court reporters, give them your
information.  If you don't think you need it, then that's
fine, but I think it may be helpful to everybody.

MR. FLETCHER:  Thank you, your Honor.


(Matter adjourned until Wednesday, January 18, 2023,
at 9 o'clock a.m.)


ooo0ooo

1                    <u>I N D E X</u>

2

3      <u>WITNESS</u>                                                    <u>PAGE</u>

4

5      **JUAN HENRIQUEZ**

6          CROSS-EXAMINATION BY MR. SINGLETON              22

7          REDIRECT EXAMINATION BY MR. FLETCHER           149

8          RECROSS-EXAMINATION BY MR. MACKIE              219

9          REDIRECT EXAMINATION BY MR. FLETCHER           242

10     **JOSE HERNANDEZ**

11         CROSS-EXAMINATION BY MR. MACKIE                246

12

13

14

15

16

17

18

19

20

21

22

23

24

25