293

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - X
                                    :
 3    THE CITY OF NEW YORK, et      :   22-CV-3190(KAM)
      al.,                          :
 4                                  :
              Plaintiffs,           :
 5                                  :   United States Courthouse
                                    :   Brooklyn, New York
 6      -against-                   :
                                    :
 7                                  :   January 18, 2023
                                    :   9:00 a.m.
 8    JUAN HENRIQUEZ, et al.,       :
                                    :
 9            Defendants.           :
                                    :
10    - - - - - - - - - - - - - - - X
```

```
11          TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
               BEFORE THE HONORABLE KIYO A. MATSUMOTO
12                 UNITED STATES DISTRICT JUDGE
```

```
13                  A P P E A R A N C E S :
```

```
14   For the Plaintiff:      NEW YORK CITY LAW DEPARTMENT
                             Labor and Employment Division
15                           100 Church Street
                             New York, NY 10007-2601
16
                             BY:  GERALD E. SINGLETON, ESQ.
17                                GAVIN MACKIE, ESQ.
                                  MELANIE ASH, ESQ.
18
     For the Defendant:      FLETCHER LAW, PLLC
19                           246 Fifth Avenue, 3rd Floor
                             New York, NY 10001
20
                             BY:  JORDAN FLETCHER, ESQ.
21
     Also Present:           Moira Archer
22
     Court Reporter:         DENISE PARISI, RPR, CRR
23                           Official Court Reporter
                             Telephone: (718) 613-2605
24                           E-mail:  DeniseParisi72@gmail.com
```

```
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

1          (In open court.)

2          THE COURT:  Hello.  Good morning, are we ready to

3    start?

4          Good morning, sir.

5          THE WITNESS:  Good morning, Your Honor.

6          THE COURT:  I will remind you, sir, you're still

7    under oath.

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  At this time, Mr. Henriquez's attorney

10   has some questions on redirect for you.  Are you ready?

11         MR. FLETCHER:  I am, Your Honor.

12   **JOSEPH HERNANDEZ**,

13       called as a witness, having been previously duly

14       sworn/affirmed, was examined and testified as follows:

15   REDIRECT EXAMINATION

16   BY MR. FLETCHER:

17   Q    Good morning, Mr. Hernandez.  Thank you for your time

18   this morning.

19         And just to be clear, your availability is okay for

20   the next half an hour, or hour or so?

21   A    Yes, sir.

22   Q    Okay.  Great.

23         THE COURT:  If your zoning folks show up, let us

24   know and we can fit you in elsewhere, all right, sir?

25         THE WITNESS:  Thank you, Your Honor.

1  Q    Mr. Hernandez, you testified yesterday that Mr. Henriquez

2  came up with the name Medical Special Operations Conference;

3  is that correct?

4  A    Yes, sir.

5         MR. FLETCHER:  I'm going to show you an exhibit.

6  It's been -- sorry.

7         It says:  Host disabled participate screen sharing.

8         THE CLERK:  We'll fix that.

9  Q    Mr. Hernandez, do you have the exhibits I sent you over

10 the weekends handy by any chance?

11 A    I do.  I would have to leave, I guess, the screen.  I'm

12 not that real great on it.  Do you want me to go to a

13 particular doc?

14        THE COURT:  I will try to screen share with you so

15 you don't have to leave the screen.

16        MR. FLETCHER:  That would be great.  If we can pull

17 up Exhibit B.

18        THE COURT:  D as in David, sir?

19        MR. FLETCHER:  B as in "boy."

20        THE COURT:  B as in "boy."

21        Thank you.

22        MR. FLETCHER:  I apologize for not checking this

23 piece before.

24        THE CLERK:   No, no, no.  It's usually not disabled.

25        MR. FLETCHER:  Mr. Hernandez, while we're figuring

1  this out, maybe we don't need the exhibit although maybe I

2  will need another exhibit.

3  Q    So yesterday you testified that there was a conversation

4  or conversations between yourself, Vincent Johnson and Juan

5  Henriquez around the time you came up with the idea of the

6  Medical Special Operations Conference; is that correct?

7  A    Yes.

8  Q    And it's your recollection that Mr. Henriquez came up

9  with the name Medical Special Operations Conference; is that

10 fair to say?

11 A    Yes.  Yes.

12 Q    Do you know whether there might be any documents that

13 confirm that event?

14 A    No.  Usually words are pretty much documents within that

15 kind of profession.

16 Q    Okay.  But that might have -- that conversation might

17 have occurred in or about 2010?

18 A    Correct.

19 Q    Okay.  Thank you.

20        You also -- well, let me ask you:  Who do you

21 understand owns the rights to the trademark Medical Special

22 Operations Conference?

23 A    Juan Henriquez does.

24 Q    Why do you understand that to be the case?

25 A    Because he filed for those particular trademarks and

1    protections.

2    Q    Did you know that he was filing for those trademarks and

3    protections?

4    A    Absolutely.

5    Q    Did you know at the time that he filed that he was filing

6    for those trademarks and protections?

7    A    Yes.  He discussed it.

8    Q    Did you have any objection to him claiming the rights for

9    himself?

10   A    Absolutely not.

11   Q    Did you have any understanding with him before that

12   filing that he was the owner of those trademarks?

13   A    I'm sorry, repeat that?

14   Q    Did you have any understanding with him prior to that

15   filing --

16   A    Yes.

17   Q    -- that he was the owner of the trademarks?

18   A    Yes.

19   Q    And what was that understanding based on?

20   A    Based on trust, partnership.

21   Q    Not a written --

22   A    Kind of the profession.

23   Q    Not a written --

24   A    Not a written agreement, correct.

25   Q    Separate topic.

1          Are you aware of a Medical Special Operations

2    Conference or MSOC-branded event occurring in Georgia in 2012?

3    A    Yes.

4    Q    Do you know -- do you know whether any portion of that

5    event occurred at or in conjunction with the Guardian Center?

6    A    Yes.

7    Q    Yes, you know, or yes, it did?

8    A    Both.  Yes I know, and yes, it did.

9    Q    Okay.  Thank you.

10         You were asked about your country -- not your

11   country.  Excuse me.

12         MR. FLETCHER:  Strike that.

13   Q    You were asked about your company, Disaster Medical

14   Solutions.  I think at one point --

15   A    Yes.

16   Q    -- it was -- you had partners and Mr. Mackie asked you if

17   it was a limited liability partnership.

18         I will represent that I went on the Florida website

19   and are you sure it's a limited liability partnership.  Might

20   be it a limit liability company?

21   A    That's what it is, LLC.

22   Q    Okay, thank you.

23         You were also asked about an MTS course that DMS

24   teaches; right?

25   A    Correct.

1   Q    And what does MTS stand for?

2   A    Yesterday we said that it stood for Medical Team

3   Suspensions.

4   Q    Medical --

5   A    It's an acronym that is derived from FEMA.  They came up

6   with that, FEMA MTS is the Medical Team Specialist course.  It

7   used to be called MTT.

8   Q    Okay.

9         Is there a difference between the MTS course and the

10  medical specialist course?

11  A    No.

12  Q    I'm sorry, yes or no?

13  A    No.  No, there isn't.

14  Q    Okay.

15        Is there -- does DMS teach any other types of

16  courses involving other kinds of instructors?  For example, I

17  don't know, K-9s, rescue, anything like that?

18  A    We have done K-9 training, under DMS, but that's not --

19  not what DMS was structured for.

20  Q    Okay.  So -- is the -- I'm sorry, finish.

21  A    No, it's okay.  Go ahead.

22  Q    So you have done K-9 trainings before?

23  A    Yes, we have.

24  Q    Okay.  And just so I --

25  A    It's part of the MTS.  It's part of the MTS.

1   Q     Okay.

2         So there are different parts of the MTS training; is

3   that fair to say?

4   A     Correct, yes, there is.

5   Q     Okay.

6         Have you ever done K-9 trainings at the FDNY MSOC,

7   other -- as part of the conference, or is it preconference?

8   A     We've done it as part of MSOC because it was for the

9   nonFEMA federal people.  They didn't need that portion of the

10  training because theirs is incorporated in the MTS, so we did

11  a separate one for all of the individuals that run K-9 teams

12  in upstate New York and the surrounding areas that were not

13  part of a federal team.

14  Q     And have you ever -- just to be clear, you've done that

15  K-9 course at the FDNY-hosted MSOC event?

16  A     Right.

17  Q     Okay.

18        You gave some colorful testimony yesterday.  At one

19  point I think you mentioned a SKIL saw amputation in Haiti.

20  First off, what is a SKIL saw?  Is that like a circular saw?

21  A     It's an industrial saw that anybody would use to cut

22  pipes, concrete, wood.  It's called a reciprocating saw.  It

23  moves within itself -- the blade.

24  Q     The kind of thing I might use in my garage or basement to

25  cut two-by-fours?

1  A    Yes.  At that time, in Haiti it was being used by a
2  rescue specialist to cut rebar and concrete to gain access to
3  an impinged 9-year-old female in an elementary school that
4  collapsed.
5  Q    Did I understand you correctly that it was also used to
6  actually conduct an amputation?
7  A    Unfortunately, there were no other tools available.  The
8  patient began to crash, which would have made her a victim, so
9  the decision was made to go ahead and basically remove the arm
10 and bring her out.  She now lives in the United States with a
11 prosthetic.
12 Q    Are we to understand that that is not the best medical
13 best practice for conducting a amputation?
14 A    One hundred percent.
15 Q    Okay.
16        So now, what -- you talked a lot about vendors at
17 the MSOC events.
18 A    Correct.
19 Q    What, if anything, does that story have to do -- if
20 anything, does that story have to do with vendors --
21 A    Sure.  You know, I'm returning -- if we would have been
22 in this country and that would have happened, we would all be
23 in front of the judge again.  And we felt it was unfair, even
24 though this was in a developing nation, and that could very
25 well happen here.  And so there was nothing but a GIGLI saw,

1   which is a wire saw with two rings that you can go back and

2   forth and cut a tree limb off.  And that's what many

3   physicians in the emergency department felt that we should

4   take with us.  However, there were many trauma surgeons that

5   disagreed with that.

6           So we approached several blade manufacturers that

7   are in the cadaver business and asked them if they could

8   assist us with the development of a blade that could be

9   attached to a reciprocating saw, but a medical grade blade

10  that was built specifically for cutting through bone, and then

11  that was later tested and proven in several skills events on

12  various cadavers with various physicians, from ER physicians

13  to trauma surgeons, to see how that worked, so.  And we used

14  different settings.

15  Q    So just --

16  A    -- ironically.

17  Q    Just asking the question again:  What did that have to do

18  with vendors at MSOC events?  Could you connect the dots for

19  us?

20  A    The vendors are bringing that blade, those saws, and the

21  things that we're not used to having inside the hole with us.

22  So changing the style of medicine to meet the austere

23  environment -- because it had not been up to that point, and

24  the only one that could do that for us is industry.  In

25  industry are called vendors.

1    Q    Okay.

2          And could you have brought those vendors to your

3    FEMA MTS courses?

4    A    That is not permitted.

5    Q    Why is that?

6    A    That is not --

7    Q    I'm sorry, why is that?  Why is that not permitted?

8    A    That's the rules that the federal government has.  They

9    don't want any vendor influence into the course.  It's a

10   neutral course.

11         THE COURT:  May I just interject.

12         I think the split screen may be working now.  Do you

13   want to try it?  Sorry to interrupt, but I think we got it.

14         MR. FLETCHER:  Yes, I do have that control now.

15   Thank you.

16         THE COURT:  All right.

17         Go ahead if you need to use it.

18         MR. FLETCHER:  I will in a minute.

19         Thank you, Your Honor.

20   Q    Vendors, MSOC.

21         So was there a benefit to having the MTS course and

22   the MSOC conference occur more or less at the same time?

23   A    It was game-changing and lifesaving for disasters.

24   Q    Explain more.

25   A    It gave medics and physicians the ability to be able to

1    provide greater lifesaving capabilities with the introduction

2    of the manufacturers, the vendors, the creators of those tools

3    to listen to us, and to hear what were the situations that we

4    were in, and what we needed as tools out in the environment.

5    Q    And as part of the MSOC, there are trainers teaching

6    classes; is that correct?

7    A    Correct.

8    Q    Okay.

9         Are these the same trainers that are also teaching

10   the FEMA class or are they different trainers?

11   A    These are the same trainers, but many more because in an

12   MTS there are only ten instructors and we are talking about a

13   pool of probably 40 instructors across the country.  And so --

14   including physicians and medics, and it was very important to

15   get a feel of everybody's decision, because the next step

16   would be to put it into a medical working group to approve

17   those tools that they have come up with to be able to be used

18   in a deployment.

19   Q    Were the trainer --

20   A    Kind of FDA-approved.

21   Q    Were the trainers getting paid to teach the MTS classes

22   course?

23   A    Yes, they are.

24   Q    Were they getting paid 1099s to teach MSOC courses?

25   A    They were not getting 1099s to do MSOC courses.  They got

1    1099 to do MTS courses.

2    Q     Did they get anything from the MTS courses?

3    A     They're honorariums and their expenses were covered.

4    Q     You were asked about MSOC -- the MSOC entity that I

5    believe you are the president of, right?  The Medical Special

6    Operations Community organization.

7    A     Yes, sir.

8    Q     That's a non-for-profit corporation; is that correct?

9    A     Correct.

10   Q     I think yesterday it might have been referred to as an

11   LLC.

12          Do you know whether, in fact, it's an LLC or a

13   corporation?

14   A     It was also created as an LLC, yes.

15   Q     If I told you that I went on the Florida website and I

16   saw that it was a corporation as opposed to an LLC --

17   A     It files as a corporation.

18   Q     Okay.  Thank you.

19   A     But it was formed as an LLC, yes.  You have to choose if

20   you are going to file as a corporation.  That's the way the

21   tax laws work.

22   Q     Okay.

23          Do you recall the year in which it was created?

24   A     Not offhand.

25   Q     Was it created in 2011, 2012?

*Hernandez - redirect - Fletcher*                                      306

1    A    Somewhere in that neighborhood.

2    Q    You don't know, I don't want you to guess.  I don't want

3    you to guess, so; do you know?

4    A    I'm not guessing.  Absolutely -- that's why I said at the

5    beginning, I can't recollect that.

6    Q    Okay.  No problem.

7              Let's talk about the audience for MSOC events.  I

8    think you said yesterday it's attended by folks in the Urban

9    Search and Rescue community; is that fair to say?

10   A    Yes.  And Special Operations community and the K-9

11   communities.

12   Q    And civilian medical community as well?

13   A    Correct.

14   Q    Okay.

15             It's not targeted at the general public, right?  I'm

16   not the target audience --

17   A    Correct.

18   Q    -- of MSOC?

19   A    Correct.

20   Q    And there are participants that go to the conference; is

21   that right?

22   A    Yes, there is.

23   Q    Are there also agencies that agree to host the

24   conference?

25   A    Yes.

1    Q    So I think --

2    A    The facilities.

3    Q    The facilities.

4         So I think yesterday we talked about Palm Beach Fire

5    and Rescue; right?

6    A    Correct.

7    Q    And I think there are some documents that show that they

8    hosted a MSOC in 2015.

9         Do you recall that event?

10   A    Correct.  Yes, I do.

11   Q    And you said that -- we looked at a document and you said

12   that it had been sent to the administration of the Palm Beach

13   Fire and Rescue.

14        Do you recall that?

15   A    It -- yes.

16   Q    I can pull up the document if you need to remember --

17   A    No, absolutely, I remember that.  They have to agree

18   on -- excuse me.

19   Q    Are you okay?

20   A    Yes, go ahead.

21   Q    Thumbs up?

22   A    Thumbs up.

23   Q    So is it fair to say that the administration of the Palm

24   Beach Fire and Rescue Department is also deciding whether or

25   not to host an MSOC event?

1   A    Correct.

2   Q    So are they paying for the event?

3   A    They are hosting it, yes, they are paying for the event.

4   Q    And they're making a choice whether or not they want an

5   MSOC event in their facility; is that fair to say?

6   A    Correct.

7   Q    Okay.

8        I think you were asked a lot of questions yesterday

9   about -- actually, I don't want to move yet.  Back to Palm

10  Beach Fire and Rescue administration.

11  A    All right.

12  Q    When they see the name MSOC or Medical Special Operations

13  Conference, do you have any reason to believe that they --

14  they know what they're getting?

15  A    Absolutely.  A lot of them wear the patches on their new

16  clothing and BDU's now.

17  Q    Sorry, could you explain that?

18  A    I said, yes, they're they proud of the courses that they

19  were able to underachieve during that period of time and still

20  not be on a FEMA team and they proudly wear the patches.  It's

21  part of their new uniforms that they wear for their special

22  operations commands.

23  Q    What, the MSOC patches that they have?

24  A    Correct.

25  Q    And so when they saw the name MSOC, they had a sense that

1   they know what they're getting in terms of --

2   A    Yes.

3   Q    -- what courses will be held at their facility?

4   A    The ones that they would choose, correct, or focus on --

5   that they would want us to focus on.

6   Q    Okay.  Thank you.

7            Okay.  You were asked some questions --

8            THE COURT:  May I just ask a question, please?

9            MR. FLETCHER:  Yes, please.

10           THE WITNESS:  Yes.

11           THE COURT:  Was the 2015 Palm Beach-hosted MSOC

12  event the first time that you saw Dr. Isaacs at such an event?

13  Or had you met him at other events?

14           THE WITNESS:  We had seen him at the New York event

15  prior to that, my understanding.

16           THE COURT:  What was the New York event?

17           THE WITNESS:  The MSOC FDNY.

18           THE COURT:  Okay.

19           Was that the first time you met him?

20           THE WITNESS:  Met him?  No, Your Honor.  Met him as

21  a student when he was trying to become a physician within the

22  FDNY within the Federal Urban Search and Rescue Task Force

23  that the City had.

24           THE COURT:  And approximately what year was that,

25  sir?

1          THE WITNESS:  About 2009, Your Honor, 2008.

2          THE COURT:  And did you take -- was this an MSOC

3   course that he was a student at or some other type?

4          THE WITNESS:  No, ma'am.  That wasn't created yet.

5   This was MTS and at that time, it was called the MTT Medical

6   Team Training.  It was still the FEMA Urban Search and Rescue

7   Medical Team Training, at that time it was called.

8          And that is the same course that runs today, it's

9   just not 40 hours anymore.  It's 59 hours in length.  And

10  every physician or paramedic that wants to be on the medical

11  side for a federal or state team is required to take this

12  training.

13         THE COURT:  All right.

14         So approximately 2009, at an MTT course, that's the

15  first time you encountered Dr. Isaacs when he was a student;

16  is that correct?  Is that what you said?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  Okay.  Thank you, sir.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Thank you.

21  Q    Mr. Hernandez, following up on the judge's questions, did

22  you maintain a relationship with Dr. Isaacs after that first

23  MTT course?

24  A    Very strongly, yes.

25  Q    Were you in communication with him?

1  A     On a -- what we would say, a business level is what we do

2  and also, on a personal level, yes.

3  Q     About how often did you speak with him?

4  A     Sometimes daily.

5  Q     And that would have been also during the period 2011,

6  2012?

7  A     Yes.

8  Q     Do you have any recollection of speaking to him about the

9  MSOC events that you and Mr. Henriquez and Mr. Johnson were

10  organizing in 2011 and 2012?

11  A     Yes, that's what made him excited to be able to be a part

12  of it.

13  Q     And now you testified -- you were asked a bunch of

14  questions yesterday about whether you knew or how you knew

15  that Dr. Isaacs knew that you and Mr. Henriquez were

16  continuing to hold MSOC events outside of the FDNY during 2013

17  to 2018 or '19; right?

18         Do you recall that?

19  A     Yes.

20  Q     And we've already talked about a 2015 event in Palm

21  Beach.

22         And Dr. Isaacs was at that event?

23  A     Correct, he was.

24  Q     There's a reference in your declaration to an event in

25  Ocala, Florida in 2018.

1    A    Correct.

2    Q    Do you recall Dr. Isaacs being at an MSOC-branded event

3    in 2018 in Ocala, Florida?

4    A    Yes, I do.

5    Q    Are you sure, as you sit here today, that that was an

6    MSOC and not just an MTS event?

7    A    As I mentioned yesterday, we do those dual events that

8    we've learned to be able to bring the vendors in.  So, we

9    cannot bring them in during the week of that MTS course, but

10   we sure are allowed to give them the platform under the

11   umbrella of the MSOC.

12   Q    Did Dr. Isaacs ever provide support to you or

13   Mr. Henriquez with respect to outside; so, nonFDNY MSOC

14   events?

15   A    There were -- there were other vendors that he had

16   connections with and that he would try to recommend that they

17   possibly get involved with USAR, and that we were one of the

18   folks that he -- that they might want to speak with.

19   Q    "We" were one of the folks that he -- that they might

20   want to speak.

21         Are you saying that MSOC or you, Joe Hernandez --

22   who are you referring to?

23   A    Both.  Either collectively or singly, just because of the

24   experience and the time in the system.

25   Q    So are you saying that Dr. Isaacs assisted you, Joe

1    Hernandez and MSOC in obtaining vendors for outside -- or MSOC

2    events outside of the FDNY?

3    A    Yes.  Yes.

4    Q    You talked a bit yesterday about an initial thought that

5    you might take the conference to California as opposed to

6    New York.

7              Do you recall that?

8    A    That's where it was originally planned for.  When that

9    failed, we went to New York, yes.

10   Q    Okay.  You also --

11             MR. FLETCHER:  Excuse me.  One second.  I need to

12   pull up a different exhibit.

13   Q    I think you also mentioned having some conversation

14   referencing someone named Scotty.

15             Do you recall that?

16   A    Yes.

17   Q    I'm going to pull up the document as soon as I find it.

18   A    Scott McKinney.

19   Q    Who is Scott McKinney?

20   A    You just mentioned his name.  Scotty.

21   Q    Yes.  Who is Scott McKinney?

22   A    Scott McKinney was one of the three, including myself,

23   working group curriculum writers for the FEMA MTS course where

24   the -- I was the co-person for that rewrite committee for

25   FEMA.  Scotty was on that committee, and another gentleman

1  from Arizona as was on that committee, Tripp McKinnon.

2  Q    Where did Scott McKinney work at the time?

3  A    San Bernardino, California.

4  Q    Thank you.

5        I just shared a document with you.  It's Exhibit Q

6  for this hearing.  I don't know if you can see it, but at the

7  bottom there's a Bates stamp HENR-267.

8  A    Yes.

9  Q    I think you mentioned having -- is this the email that

10 you're referring to or that you recalled yesterday?

11 A    Yes.

12 Q    If you see it, at the bottom it says:  Hosting in

13 New York is the better choice since Scotty is so slow to

14 respond?

15 A    Correct.  They were having a lot of natural events going

16 on in California at that time.  It was -- they had a lot of

17 wildfires at that time, kind of changing their hats.  They

18 play those dual roles out there.

19 Q    And this is dated August 2012.

20       Do you see that?

21 A    Yes, I do.

22 Q    Okay.

23       Now, I believe you may have testified yesterday that

24 you recall that Dr. Isaacs -- that you had this communication

25 about Scotty with Dr. Isaacs.

*Hernandez - redirect - Fletcher*                                    315

1          Do you see Dr. Isaacs on this email?

2     A    No, I do not.

3     Q    Okay.

4          Do you know whether you had this same conversation

5     with Dr. Isaacs, or might you have been misremembering?

6     A    We were making decisions without him.  He wasn't part of

7     the system, and didn't carry any weight, and the individuals

8     that you see on there are all FEMA members and the working

9     group that had been in the system since the '90s.

10    Q    The individuals -- I'm sorry --

11    A    The individuals -- the individuals named below, as you

12    see, Valerio Sandoval from Arizona, Michael Kurtz from

13    Pennsylvania, Anita Arnum and Merrill Bone, who since then has

14    passed away.

15    Q    Do you have any reason to believe that Dr. Isaacs knew

16    there was an intention to take the conference to California at

17    some point?

18    A    He knew the conference was going to be in California

19    prior to it being actually delivered at FDNY because we

20    couldn't do it in California.  When the parties that we knew

21    were coming to each, which are those that you see on that

22    email, agreed that New York would be the best choice if we

23    can't go to California, that's when FDNY was -- that's when

24    Doug was asked to approach FDNY regarding the conference we

25    had hosted there.

*Hernandez - redirect - Fletcher*                                                       316

```
1   Q    So why do you say that Doug knew that -- excuse me.

2         Why do you say that Dr. Isaacs knew that?

3   A    Because it was spoken verbally.

4         THE COURT:  By whom?

5         THE WITNESS:  By myself, the rest of the parties.

6         THE COURT:  And you spoke to Dr. Isaacs directly,

7   sir?

8         THE WITNESS:  Yes, ma'am.

9         THE COURT:  And you asked him to --

10        THE WITNESS:  I usually spoke to him on a regular

11  basis on the phone and on text.

12        THE COURT:  So can you tell us what you advised

13  Dr. Isaacs regarding the California hosting falling through

14  and asking him to arrange or convince FDNY to take on the

15  conference that year?

16        THE WITNESS:  Yes, Your Honor; that everyone there

17  who were on that list who were the speakers that were going

18  out to California, were in agreement that if they couldn't do

19  it, FDNY would be a great host and that nobody would hesitate

20  to go out there.

21        You know, of course there was talk on expenses and

22  how we were going to get to point A and point B and the hotels

23  aren't near the facility.  So there's a lot of things that

24  have to go under scrutiny, so the participants have to stay in

25  a hotel that's expensive, and how do we minimize those costs,
```

1   how do we travel those participants by bus to the facility

2   that's usually built purposely for disasters, so they're

3   usually not a place that EPA or those kind of folks like to

4   walk through because there's no rails on the stairs and things

5   are broken.

6            THE COURT:  Well, what did you specifically recall

7   about any conversations you had with Dr. Isaacs about hosting

8   in New York after California fell through?

9            THE WITNESS:  He was ecstatic that it was -- not

10  ecstatic that it fell through because that be wouldn't be fair

11  to say, but ecstatic that it was -- he was going to have a

12  chance to take it in and ask command at FDNY if that could be

13  delivered there.

14           THE COURT:  All right.  Thank you.

15           THE WITNESS:  Yes.

16  Q    Mr. Hernandez, I'm going to show you a portion of what's

17  been labeled Exhibit D for this hearing.  This is page 11

18  of 55 of Exhibit D.  It's Bates stamped HENR-56.

19  A    Yes.

20  Q    I will just represent to you this -- I don't have -- one

21  page before is the label MSOC 2014 at FDNY.  There's been some

22  testimony that the page you are looking at reflects potential

23  lecture topics for that year.

24  A    Yes.

25  Q    Do you -- does this -- does the information on this page

1   mean anything to you?

2   A    Yes, it does.

3   Q    So the names that you see in bold, do you recognize those

4   names?

5   A    All of them.

6   Q    Okay.

7           THE COURT:  May I just ask for a recollection?  I'm

8   looking at Defense Exhibit D, page -- you said 55?

9           MR. FLETCHER:  No.  I'm sorry 11 of 55.

10          THE COURT:  Page 11 of 55.  Thank you.

11  Q    I'm sorry.  Mr. Hernandez, you said you recognize the

12  names on this list?

13  A    Yes.

14  Q    Do you recognize them as part of the federal -- federal

15  teams, Federal Urban Search and Rescue Teams?

16  A    Yes.  Everyone there except for one person is part of the

17  federal system and everyone there has been part of the federal

18  systems before --

19  Q    Who was the person has not --

20  A    -- 2000.

21  Q    Who was the person --

22  A    That's Ricky Cue.

23  Q    Ricky Cue?

24  A    Correct.

25  Q    I see Dr. Isaacs -- I'm sorry, go ahead?

1    A    He's not an a federal team, but he's on a state team.

2    Q    And these individuals -- is everyone here from outside

3    New York or some people from New York and -- where are they

4    from?

5    A    They are from all over, so -- Joseph Barbera was one of

6    the original additions that was brought in with FEMA.  He was

7    from George Washington University and came in, in 1992, into

8    the system.

9         Juan Henriquez was in FDNY.  I was his instructor in

10   a class in Ocala back in the early 2000s.

11        Chris Ho is a physician, he's the son of a friend of

12   a physician who was early on during when FEMA was created in

13   1992.  Chris Ho is a physician in San Diego, California,

14   instrumental in delivering the MSOC for the first year.  He

15   was very big on trying to get it hosted somewhere either down

16   in southern California.

17        And Steve Chin is from LA.  He is a physician out of

18   LA County.  He was with us during the Haiti earthquake, also a

19   member of the FEMA team.

20        Ken Miller was one of the original FEMA curriculum

21   writers as the physician with me Scotty and Tripp McKinnon.

22   He is also from California.  Those three physicians were very

23   strong in trying to help get that out there and they agreed to

24   take it to New York, we can't make it happen.

25        Doug Isaacs was, at that time, an FDNY and I believe

1    he was also a physician on the federal team as well.

2            Jenn Brown is a personal friend.  She is a

3    veterinarian.  She lives in Tampa, Florida and she is on the

4    Task Force that I belong to, which is Florida Task Force II,

5    it's a FEMA task force.  She also teaches the K-9 portion for

6    Disaster Medical Solutions and has been with us since 2010.

7            Katie Roberts is a firefighter paramedic.  She is

8    also with Scott McKinney out in California, out in

9    San Bernardino, California.  She's very big on Haz-Mat, was

10   one of the instrumentors in trying to bringing MSOC out there.

11           George Hernandez, personal friend, no family

12   relation, he is a pediatric intensivist, with the University

13   of Miami.  He is on my federal Task Force as well.  Florida

14   Task Force II.

15           Michael Kurtz was an instructor, co-instructor with

16   me, he was the director of the Medical Working Group, he's out

17   of Pennsylvania Task Force I.

18           Scott McKenna -- that's a misspelling, it's Scott

19   McKinney -- again, a friend who is now retired and was out in

20   San Bernardino, one of the writers of FEMA curriculum.

21           Joe Holley is Tennessee Task Force I's medical

22   director.  He is out in Memphis, Tennessee, a physician who

23   has been in the system since 1994.  He was a student in 1994

24   when he took that class.

25           Ricky Cue was one of the new players on the block.

1   He's a physician, emergency room physician, with a military

2   background in Boston, and then later on Massachusetts Task

3   Force I asked him if he would consider being on the federal

4   team if the state team wasn't called to a disaster within

5   itself.

6           And then Dario Gonzalez, him and I were students

7   together in 1992.  He was the original physician in the FEMA

8   system along with Joe Barbera, we call them old dinosaurs on

9   the medical side.

10  Q    And Dario Gonzalez was with the FDNY; correct?

11  A    Correct.  He was the medical director for the FDNY.  He

12  was also a Task Force leader.

13  Q    Did Dr. Isaacs have any relationship with these -- apart

14  from Dario Gonzalez, did Dr. Isaacs have any relationship with

15  these individuals independent of you?

16  A    No, they came about -- those relationships came about

17  with him -- with us bringing him within the systems and making

18  friendships as he was able to go that.

19          The only other person that he was able to have a

20  relationship, of course, was Michael Kurtz, being instructor

21  in the federal system as well.  So he got to meet a few of the

22  instructors during that time that he was a student.

23  Q    Now, you mentioned several of these folks are from

24  California.

25          Did Dr. Isaacs know that these individuals were from

1  California?

2  A    Oh, yes, very much.

3  Q    And why were there so many people from California coming

4  to New York in 2014?

5  A    Well, there are eight federal task forces, so they

6  trounce everything else.  And that was the original plan for

7  the delivery of MSOC in 2012; was to be in California.  They

8  were the ones that were holding up the facilities there and

9  able to do the same thing that we asked Doug Isaacs to do with

10 FDNY later on.

11 Q    And it's your testimony that Dr. Isaacs had knew that

12 there had been an intention to go to California before

13 New York?

14 A    Yes, it is.  It's pretty evident, pretty strong that

15 that's where the majority of the instructors were coming from.

16 It would have saved MSOC money which, as a nonprofit, would

17 have been helpful.

18 Q    Now, so that's kind of the beginning of -- we've been

19 talking about California and, you know, the origins of MSOC

20 and New York versus California.

21       Are you aware of any conversations that occurred

22 later on about moving the conference to California that

23 because -- that Dr. Isaacs was privy to?

24 A    Yeah, the same year.  You know, everybody goes to dinner

25 together, everybody hangs out together, because we have to do

1    what's called "after-actions and hot washes".  It's a term

2    that's used to see how the participants felt we did, how did

3    it go, what was lacking, what equipment was lacking.  So we're

4    always hanging out together doing after-actions.

5              And Katie Roberts at that time made the comment of

6    it will be great to have this in California next year because

7    they felt that since they couldn't get it done the first year,

8    they would work twice as hard to get it done the following

9    near.  And the comment was:  See you in California next year.

10   Q    Do you recall when that was, when that comment was made?

11   A    During that year, can't remember the date or time, it was

12   during the evening after the classes had suspended.

13   Q    Do you recall who Katie Roberts made that comment to?

14   A    To our entire group, including Doug Isaacs.

15   Q    And did Dr. Isaacs have any reaction that you saw to that

16   comment?

17   A    At that point, no.  I thought he was pretty excited that

18   this thing would travel across the country.  That was the

19   intent, which would bring it back to New York.

20             THE COURT:  Wait.

21             He was excited that the MSOC would travel across the

22   country back to New York or to California the following year?

23             THE WITNESS:  I apologize.  That it would eventually

24   circle back around so East Coast, Central Division, West

25   Coast, and then bring it back around so that participants

*Hernandez - redirect - Fletcher*                                          324

1    across the country are able to do that, kind of schedule

2    themselves, hey, every three years it's coming back our way.

3            THE COURT:  All right.

4            So MSOC goes from East Coast, Central, West Coast,

5    back to East Coast, Central, West Coast; is that the --

6            THE WITNESS:  Yes --

7            THE COURT:  -- role of MSOC?

8            THE WITNESS:  -- Your Honor.

9            THE COURT:  Okay.  Thank you, sir.

10   Q    Because that was an intention, that wasn't something that

11   was actually happening at that time; right?

12   A    Correct.

13   Q    I will put out one more exhibit.

14   A    Even Canada is entertaining it right now.

15   Q    I'm showing you what's been labeled Exhibit M like "May"

16   and there's no -- this appears to be a text message thread.

17   A    Yes, it is.

18   Q    Okay.

19           And there's no actual time stamp in the text message

20   thread, but my personal understanding is this was from

21   November 2018.

22           Do you recognize this text message thread?

23   A    Yes.

24           THE COURT:  Wait.  You are not testifying.

25           May we just lay a foundation how you know it's from

*Hernandez - redirect - Fletcher*                               325

1    November 2018?

2              MR. FLETCHER:  Sure.

3    Q    Mr. Hernandez, do you recognize this text message thread?

4    A    Yes, I do.

5    Q    Do you know whose text message thread is it?

6    A    That's my text message thread.

7    Q    Okay.

8              I believe this text message thread was submitted as

9    an exhibit to a declaration that you provided to the Court.

10   A    Correct.

11   Q    Okay.

12             Do you recall that in your declaration you stated

13   that this text message thread was from November 9th, 2018?

14   A    Yes, sir.

15   Q    Okay.

16             THE COURT:  Thank you.

17             MR. FLETCHER:  Thank you.  My apologies, Your Honor.

18             THE WITNESS:  Yes, Your Honor.

19   Q    Do you see the text highlighted in yellow on this thread?

20   A    I do.

21   Q    It says:  The conference has become a nightmare and may

22   have to be cancelled.

23   A    Yes.

24   Q    Is that you speaking or Dr. Isaacs speaking?

25   A    That's Dr. Isaacs speaking.

1  Q    Did you have any understanding of why Dr. Isaacs texted

2  that to you?

3  A    He was getting friction from FDNY.  There's a division

4  between FDNY command that's fire-side, and EMS uses those

5  facilities, and so he was having some conflict.

6  Q    Thank you.

7        I'm going to move to Exhibit N.  This is another

8  text message thread that you submitted on your declaration and

9  you stated in your declaration it was dated December 14, 2018.

10       Do you recall that?

11 A    Yes.

12 Q    You see on the -- again, this is a thread between

13 yourself and Dr. Isaacs?

14 A    Yes, I do.

15 Q    Do you see on the left-hand side there's text

16 highlighted:  Your website completely separate from the

17 Foundation.  Sorry, I just want to be clear on my end before

18 sending an email to leadership.

19       Do you see that?

20 A    Yes, I do.

21 Q    Is that you or Dr. Isaacs speaking?

22 A    That's Dr. Isaacs.

23 Q    And then you respond:  If they don't get up there because

24 it doesn't work out, we will bring them down to Florida and

25 offer housing and meals as a package.

1              What are you talking about?

2    A    The individuals that attends MSOC a lot of times don't

3    have the funding.  They don't have the federal funding that

4    teams get the $1 million-a-year-plus for training, and so,

5    again, those rentals in New York got 200, $300 a day and bus

6    transportation makes MSOC very expensive and difficult, and

7    that's why I believe he was having such a hard time.

8              And in Florida, the Florida State Fire College has

9    housing, and has cafeteria, and offers that as part of their

10   package, and has a purposefully-built facility.

11             THE COURT:  May I ask a question, please?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Mr. Hernandez, when Mr. Isaacs texts:

14   Your website completely separate from the Foundation.

15             What website did you understand he was referring to?

16             THE WITNESS:  My understanding, he was referring to

17   the Disaster Medical Solutions website and also, to the MSOC

18   website.

19             THE COURT:  All right.

20             And when you say:  My website mentions nothing about

21   the Foundation.

22             What did you mean when you stated that, sir?

23             THE WITNESS:  The Foundation -- at that time, there

24   was talk about the funds that were returned and -- from

25   Disaster Medical Solutions, $10,000 to the Foundation.  And so

1  we had nothing with them on the particular website for there

2  to be any conflict, my understanding, with him.

3          THE COURT:  Okay.  Thank you.

4  Q   Mr. Hernandez, was there some -- did you perceive some

5  concern over an association between the Foundation and

6  Disaster Medical Solutions?

7  A   Yes.  There was some friction.

8  Q   Okay.  Actually, let me back up.

9          Had you ever had any conversations with anyone at

10 the FDNY about the MSOC or the DMS course other than

11 Dr. Isaacs and Mr. Henriquez?

12 A   Yes.

13 Q   Who was that with?

14 A   Chief Downey.

15 Q   Who is chief Downey?

16 A   Chief Joe Downey is in charge of Special Operations, the

17 task force leader for New York Task Force I.

18 Q   And he's also an FDNY chief; is that fair to say?

19 A   Correct.  Fire chief.

20 Q   And what were those conversations that you had with chief

21 Downey?

22 A   Chief Downey, as part of the FEMA system, very much

23 wanted the MTS course delivered at FDNY at Randall's Island.

24 Q   And did you ever deliver the MTS course at Randall's

25 Island?

1    A    We did.

2    Q    Do you recall when that was?

3    A    Not off the top of my head.

4    Q    Okay.

5         How many times did you deliver it at Randall's

6    Island?

7    A    Once.

8    Q    Was it delivered entirely at Randall's Island, or was

9    there somewhere else where portions of it took place?

10   A    Portions of it took place at ESU, emergency support unit,

11   which is the NYPD, and that was at Floyd Bennett Field, if I

12   recall.

13   Q    Why did a portion of the course occur at the NYPD

14   facility?

15   A    So at that particular time, Randall's Island did not have

16   a rubble pile, what we call concrete that's been purposely

17   knocked down and tunneled underneath so you can create

18   training within that confined space, same as everybody's

19   perspective and the ability to treat and to think.  And the

20   only field that existed in New York City was owned by ESU at

21   Floyd Bennett Field and it was a desire for Chief Downey to

22   eventually try to build one at FDNY at Randall's Island, which

23   he was successful.

24   Q    So you said you only did the MTS course once at --

25   A    Correct.

1    Q      -- FDNY.

2           Was there talk of trying to do -- was there talk on

3    either side of wanting to do it again?

4    A     Yes, there was.

5    Q     And what was that conversation?

6    A     The conversation was to have it delivered there and they

7    wanted to take over all of the course.  The Foundation wanted

8    to do the registration for the course, the collection of fee

9    for the course and run the course this time around.

10   Q     What was your response to that?

11   A     That was -- not able to do that.  Disaster Medical

12   Solutions, that's all of the individuals coming through with

13   the federal government for clearance because they're receiving

14   information that's pertinent to national security, and so the

15   Foundation does not have that capability, nor does the

16   Foundation have the capabilities of bringing in the

17   federally-credentialed instructors as Disaster Medical

18   Solutions did.  And also, that information was data and, as we

19   know data, is worth money, and we didn't want to share that

20   information with them at that time of them being able to have

21   all of those instructors under their database versus ours.

22   Q     And so is it your testimony that DMS declined to offer

23   the course again at FDNY?

24   A     Correct.

25           THE COURT:  Sir, you talk about the DMS course, but

1   this focus is on the MSOC courses, the conference.

2            Is DMS course, are those courses part of the MSOC

3   preconference courses?

4            THE WITNESS:  Yes, ma'am.

5            So the Medical Team Specialist course that Disaster

6   Medical Solutions teaches, that MTS course, which is the FEMA

7   Urban Search and Rescue Medical Team Specialist course, that

8   is usually done as a preconference to MSOC.  The instructors

9   were already there for that federal course and our intent was,

10  hey guys, you are already here, you've already flown out,

11  wherever we're at across the country, we could stay two days

12  extra and we can do a different population of emergency

13  responders that aren't part of a federal team and try and

14  bring the country up to speed in the different areas, we're

15  eventually going to need them on the big disaster anyway.  So

16  everybody's opinion was:  Of course.  They want to give back.

17           THE COURT:  All right.  Thank you.

18           THE WITNESS:  Sure.

19  Q    Mr. Hernandez, I think this is the last question.

20           If you can turn your attention to the text thread on

21  the right side of the exhibit in front of you.

22  A    Yes, sir.

23  Q    You see the highlighted text:  Foundation can never offer

24  this on its own?

25  A    Correct.

1   Q    Is that you speaking now?

2   A    Yes, it is.

3   Q    And then below you say:  We don't need them for anything.

4   A    Correct.

5   Q    And then Dr. Isaacs responds:  Agreed.

6   A    Correct.  Because he knew that we could move both the MTS

7   and MSOC basically anywhere in the country because it was so

8   desired to be there.

9   Q    So it was your understanding that what Dr. Isaacs was

10  communicating to you was that the course could be moved from

11  New York?

12          MR. MACKIE:  Objection, Your Honor.

13  A    One hundred percent.

14          THE COURT:  Let's ask him what -- what was your

15  understanding of Dr. Isaacs's statement:  Agree.

16          THE WITNESS:  From the threads earlier, that he was

17  tired and he agreed that we should either just move it or that

18  it could be moved, both.

19          THE COURT:  Okay.

20          And the reference to foundation, is that the FDNY

21  Foundation or some other foundation?

22          THE WITNESS:  Yes, Your Honor, FDNY Foundation.

23          THE COURT:  Okay.  Thank you.

24          MR. FLETCHER:  Thank you, Your Honor.  That's all

25  the questions I have.

1          THE COURT:  All right.  Is there anything else from

2     the plaintiffs on this for Mr. Hernandez before we excuse him?

3          MR. MACKIE:  Yes, I do have a few questions on

4     recross.

5          THE COURT:  All right.  Please.

6     RECROSS-EXAMINATION

7     BY MR. MACKIE:

8          MR. MACKIE:  Good morning, Mr. Hernandez.  I hope

9     you got a nice sleep.  I just have a few questions about a few

10    of the things you were just talking about.

11         First, I would like to go to Defendant's Exhibit B,

12    which your attorney was going to pull up before we had some

13    technical issues.

14         (Exhibit published.)

15    Q    So I have Defendant's Exhibit B on the screen here.

16         Do you recognize this?  I can move over so you can

17    see the whole thing.  We're looking only at the top portion of

18    the screen.

19         Do you recognize this?

20         THE COURT:  Can you get the date on there?

21    A    Yes.

22         MR. MACKIE:  It looks like.

23    Q    We can see the date in the upper right-hand corner.

24         Do you see the date in the upper right-hand corner

25    there in highlight?

```
1          THE COURT:  Just for the record, the date and time
2    is Thursday, October 7th, 2010, at 6:10 p.m.
3          MR. MACKIE:  Thank you, Your Honor.
4          THE COURT:  Okay.
5    Q    Is this an email communication between you and
6    Mr. Henriquez?
7    A    Yes.
8    Q    And in the highlighted portion here, it says:  I like
9    your idea for the Medical Operations Conference name better.
10         Was Medical Operations Conference the name that
11   Mr. Henriquez came up with at this point in time?
12   A    For the delivery of an event?
13   Q    Correct.
14   A    Mm-hmm.
15   Q    Okay.
16         So the name that was being discussed in 2010 at the
17   time of this email was Medical Operations Conference; is that
18   correct?
19   A    We were going back and forth with names, correct, and
20   that was one of them.  One of many.
21   Q    Okay.
22         And do you recall when, if at all, the word
23   "special" was added to that name?
24   A    Because it doesn't involve -- can't tell you what date,
25   but we know why.
```

1   Q     Okay.

2         When you were discussing your understanding of the

3   ownership of the trademark, I believe you said that your

4   understanding is that Mr. Henriquez owns the trademark because

5   he was the one who filed for the federal registration; is that

6   correct?

7               MR. FLETCHER:  Objection, mischaracterizes.

8   A     You're asking me the same question that was asked

9   earlier.

10              THE COURT:  Yes, sir.  This is redirect, so he can

11  ask.

12  A     Yes.  Yes.

13  Q     Thank you.

14        And --

15              MR. FLETCHER:  Your Honor, this is recross, not

16  redirect.

17              THE COURT:  Well -- yes, so he's confined to the

18  scope of your redirect, which was confined to the scope of the

19  cross, so -- all right.  So you are saying --

20              MR. FLETCHER:  He's saying:  You testified X.

21              But I don't think that's what Mr. Henriquez --

22              THE COURT:  Okay.

23        Be careful about mischaracterizing the testimony.

24  It's in the record, it speaks for itself.  You can ask about

25  subjects, but don't try to characterize what Mr. Hernandez

*Hernandez - recross - Mackie*                                         336

1    said because it is in the record and it will be in the

2    transcript if you order it.

3            MR. MACKIE:  Okay.

4    Q    I believe that you also -- well.

5            THE COURT:  Just give him a subject.  You do not

6    need to try to quote what he said.

7            MR. MACKIE:  I'm trying to ask about the testimony

8    that Mr. Hernandez gave on the redirect, that -- regarding his

9    understanding of the trademark ownership.

10           THE COURT:  All right.  So just ask him a question.

11           MR. MACKIE:  -- questions about what he said in

12   those statements, because --

13   Q    So, if this is not accurate, then you can correct me, but

14   I believe that you said your understanding that Mr. Henriquez

15   owned the marks was based on trust and understanding; is that

16   a fair characterization?

17   A    That's what I answered earlier?

18   Q    Correct.

19   A    Okay.  So are you filling me in with what I said?  Is

20   that -- asking me if I agree with what I said earlier?

21   Q    I'm asking you questions about the testimony you gave.

22           So you --

23   A    Correct.

24   Q    -- never had a direct conversation with Mr. Henriquez

25   regarding ownership of the MSOC trademark; is that correct?

*Hernandez - recross - Mackie*                          337

1    A    That's not true.

2    Q    Okay.

3         So other than general trust and understanding, what

4    direct question --

5    A    Conversation.  Conversation?  You said that we didn't

6    have any conversation.

7    Q    What conversations did you have with Mr. Henriquez about

8    trademark ownership?

9    A    The same ones that we talked about, that he owns the

10   trademark.

11   Q    Do you recall when those conversations took place?

12   A    Just like I said earlier when I was asked by Mr. Jordan,

13   I don't recall those times, but it was before we formed

14   everything and finalized the name, way before any conference

15   was ever delivered.  That's for sure.

16   Q    Have you ever used the name MSOC or the -- or the -- I'm

17   sorry -- the acronym MSOC or the name Medical Special

18   Operations Conference on your DMS website?

19   A    Absolutely.  I believe so.

20   Q    In what context have you used that?

21   A    If that's someone that usually follows within DMS, it

22   attracts people.  It's something else that's available, so if

23   they want to get ahold of an MSOC event, they could contact.

24   Like shared social media, get the message out.

25              THE COURT:  Does Mr. Henriquez agree with your

*Hernandez - recross - Mackie*                                        338

1    reference to MSOC on the DMS website, or have you discussed

2    whether or not he was all right with your --

3            THE WITNESS:  One hundred percent.  He put it on

4    there for us.  He does a lot of my IT, either him or Kayla

5    Reilly.

6    Q    Is there anyone other than Mr. Henriquez who is -- had

7    control of using the name MSOC in connection with DMS

8    services?

9    A    Well, anyone could, but we let Mr. Henriquez do that.  He

10   had a lot of hats to wear and that's one that he was willing

11   to wear.

12   Q    When you say "anyone could," what do you mean by that?

13   A    Vinny, myself, or Juan being part of the MSOC

14   organization, officers within the LLC, but it was Juan who

15   wanted to carry that mantle and we were more than happy to

16   give him that responsibility.  It was also his creation, so

17   why not?

18   Q    Understood.

19           But it was your understanding that you,

20   Mr. Henriquez, and Mr. Johnson all had permission and

21   control --

22   A    We just said that.  We just said that.  But we gave it to

23   him because he's the one who created it, so it was only

24   appropriate for him to be able to do that.

25   Q    I want to move on.

1          You discussed honorariums and expenses for MSOC

2    events.

3          Who paid those honorariums in the first few MSOCs?

4    A    The host agency who collected all the money.

5    Q    How much were the honorariums for instructors?

6    A    Depends where they came from and what the capabilities

7    were and, actually, what they gave up or declined.

8    Q    Where did the money come from?  It was from the --

9    A    You just asked me that question.  I said from the

10   vendors, from the participants, and collected by the host.

11   Q    Okay.

12         And where did any excess money go that wasn't paid

13   out in honorariums?

14   A    There was -- there's no excess money that was -- it's a

15   nonprofit, so we don't have any operating expenses.  There's

16   no employees.  It's meant to give back to the community and

17   that's exactly what we try to do, at least by maybe

18   a 98 percent return.  So Disaster Medical Solutions is able to

19   loan a lot of equipment until MSOC is able to establish the

20   cash, so we have no problem in doing that.  It just sits in a

21   trailer until it's used again.

22   Q    When you say "it's a nonprofit," I believe you just said

23   the expenses were collected and paid by the host agencies;

24   right?

25   A    Correct.

1  Q    So who is the nonprofit that you are testifying did not

2  have excess money?

3  A    There's two nonprofits, which one do you want to talk

4  about; the Foundation or about MSOC?

5  Q    I'm --

6  A    Do you know which one you want to talk about?

7  Q    I'm not talking about the Foundation.

8  A    Okay.

9  Q    I'm asking you questions about the first few MSOCs.

10 A    Okay.

11 Q    And you testified that the payment was collected and

12 disbursed by host organizations.  I don't believe that you

13 mentioned anything about a nonprofit until I asked about extra

14 expenses and extra money.

15          So I'm asking you where the excess money in the

16 first few MSOCs went?

17 A    There was no excess money.

18 Q    Thank you.

19 A    You're welcome.

20 Q    Other than the MSOC in Palm Beach, are you aware of any

21 MSOC events that were only open to a single department?

22 A    Other than the schedules that you see?  Not that I

23 believe.

24 Q    Okay.

25 A    And that particular department is a county, so there are

*Hernandez - recross - Mackie*                                341

1  several departments within the county, so you are incorrect in

2  making that comment.

3  Q    And is it your understanding that most MSOC events are

4  open to the wider medical special operations community?

5  A    It depends what the agencies want, but that was its

6  intent.

7  Q    Okay.

8        You mentioned that you were on a rewrite team for

9  the MTS course.  What year were you on that team?

10 A    Correct.

11 Q    Or years.

12 A    Can't recollect.  In the early 2000s, and in the 1900s.

13 Q    Do you know how --

14 A    It's been rewritten twice.

15 Q    So you served on both of the prior rewrite committees?

16 A    Correct.

17 Q    And do you know if there is -- are any plans to do

18 another revision?

19 A    Yes, there is.

20 Q    And do you know --

21 A    There always is.  Medicine is ever-changing.

22 Q    Are you going to be involved with the new rewrite

23 committee?

24 A    The contractor, Texas A&M, which is also known as TEEX,

25 asked us if we would deliver the pilot program at Texas A&M --

1    and I'm speaking about Disaster Medical Solutions -- to bring

2    the instructors and host that.  We signed a contract with TEEX

3    to be able to deliver that.  They are the national contractor

4    for the federal government.

5    Q    Do you know who is currently serving on a rewrite

6    committee?

7    A    Do not.

8    Q    Okay?

9    A    Shared information.  Privy to not you.  It's national

10   security and I would rather not give their names.  That has

11   nothing to do with MSOC.  You're talking about FEMA, Urban

12   Search and Rescue and the federal government.

13            THE COURT:  I will add, it also has nothing to do

14   with the issues in this case, so can we please focus on that,

15   please.

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  I just want to -- you have got a long

18   list, and we have a long day, and I have many other matters on

19   my calendar starting tomorrow.  So please, is there anything

20   else, sir?

21            MR. MACKIE:  Yes, Your Honor.

22            THE COURT:  How much more?

23            MR. MACKIE:  It was a long redirect and I have to --

24            THE COURT:  No, it was not, it was a 40-minute

25   redirect, so --

1           THE WITNESS:  Plus the time I spent with you

2    earlier.

3           THE COURT:  Can we please just move it along?

4           MR. MACKIE:  Yes, Your Honor.

5           Putting Exhibit D on the screen.

6           (Exhibit published.)

7    Q    This is Exhibit D at page 11 of 55.  It's HENR-0056.

8           You went through all of these names earlier.  I

9    don't need you to go through all of them again, I want to ask

10   about particular people.

11          You said that Chris Ho was instrumental in the first

12   MSOC, I believe; is that correct?

13   A    That is correct.

14   Q    Would Mr. Ho have personal knowledge of Mr. Henriquez's

15   claim of ownership over the name Special Medical Operations

16   Conference?

17   A    I don't know if he knows anything individually or as far

18   as who, but knows in general.

19   Q    Okay.  And --

20   A    I don't think the owning of a trademark had anything to

21   do other than the organization.  So that was -- that would be

22   nitpicking.  I don't think he needed that information, so it

23   was never asked.

24   Q    Do you know whether or not Dr. Isaacs maintained a

25   personal relationship with any of the individuals on this page

*Hernandez - recross - Mackie*                                    344

1  after first meeting them through you?

2  A     Of course.  He's on the FEMA team.  He's one of the 28

3  physicians on a team, so I'm sure that he'll possibly have

4  relationships even with the other counsels as they leave

5  FDNY's counsel or maybe stay.  Sure.  It's a professional

6  relationship.

7  Q     Okay.

8         So at the time of this conference in 2014, would

9  Dr. Isaacs have known many of these individuals personally?

10 A     He would have known some of them, of course.  We talked

11 about this starting in 2009 with some of those instructors.  I

12 made that comment earlier.  It's on the transcripts.

13 Q     In terms of expenses for MSOC, when you were discussing

14 the text messages that you saw before and I'm not going to

15 waste time by putting them back on the screen, but you saw a

16 number of -- well.

17        We were talking about the Florida -- the idea of

18 bringing the conference down to Florida in 2018 and you

19 discussed funding as a particular issue.  Why was funding an

20 issue for people attending MSOC as opposed to MTS?

21 A     As I explained yesterday and I will do it -- and earlier

22 today -- remember MTS?  It's between 3000 and $3500?  Remember

23 that I said that every FEMA team gets over a million dollars

24 for training and that part of those dollars are used for

25 individual trainings and disciplines?  Medical specialists

1    being one of them, medical team manager being another one?  So

2    if you are not on one of the 28 teams, Mr. Mackie, you've got

3    to pay money, and that's a funding source issue.  We talked

4    about that yesterday.

5    Q    I understand your testimony, Mr. Hernandez.

6              I am asking specifically, was the --

7    A    I'm just repeating it.  So that's funding.

8    Q    Was the funding, the federal grant funding that goes to

9    those teams, available to attend any MSOC conference?

10   A    That, I don't know.  That's up to each individual team.

11   You would have to contact each one.  They get to use their

12   money.  Their economists.

13   Q    Couple quick questions about the MTS course that you

14   taught at Randall's Island.

15   A    So we're back to MSA and not MSOC, which is what this

16   trial is about.

17   Q    You testified that MTS at Randall's Island was offered as

18   part of a preconference for MSOC; is that correct?

19   A    Correct.  That's correct.

20   Q    And was there any separate charge for individuals who

21   attended the MTS training to then attend the MSOC conference?

22   A    As I explained earlier, yes, there was.

23   Q    And so the $10,000 that you discussed that DMS collected

24   and sent to the foundation, is that for the conference

25   attendees who went to MTS and then MSOC?

*Proceedings*                                                                346

1    A      No.  That was a separate -- complete separate

2    registration.  MTS was handled separately.  Those checks are

3    either paid for, but the majority, about 90 percent, waits for

4    30-plus days to be received by their particular agencies.  So

5    DMS has nothing to do with that, as far as finances.

6           The conference was run separately, that's why it was

7    called a preconference, it was separate.  Once a

8    profit-for-agency and MSOC is a nonprofit, so those funds

9    could not be mixed.

10   Q    So is it your testimony that you did not collect fees for

11   the MSOC conference through your registration for the MTS

12   course that you offered?

13   A     Correct.

14          MR. MACKIE:  Okay.  No further questions.

15          THE COURT:  All right.  Is there any redirect from

16   the defendant?

17          MR. FLETCHER:  No, Your Honor.

18          THE COURT:  No?

19          All right.  Mr. Hernandez, thank you for your time.

20   Good luck to you with your home repair.  We are excusing you.

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Stay well.

25          (Witness excused.)

*Proceedings*                                                    347

1          THE COURT:  Who is your next witness?

2          MR. FLETCHER:  You want Dr. Lai?

3          I think the City is done, so it's my witnesses now

4   and I'm calling Dr. Lai.

5          THE COURT:  All right.

6          Hello, ma'am, come on up to the witness stand.

7          THE WITNESS:  Thank you.

8          THE COURT:  Thank you.

9          (Witness takes the stand.)

10         THE COURTROOM DEPUTY:  Good morning.

11         Please, raise your right hand.

12         (Witness sworn.)

13         THE WITNESS:  Yes.

14         THE COURTROOM DEPUTY:  Please have a seat.  Water is

15  here for you and state and spell your full name, please.

16         THE WITNESS:  Okay.

17         So my first name is Pamela, P-A-M-E-L-A my last name

18  is Lai, L-A-I.

19         THE COURT:  Thank you.  You may proceed.

20  **PAMELA LAI**,

21              called as a witness, having been first duly

22              sworn/affirmed, was examined and testified as

23              follows:

24         MR. FLETCHER:  Please give me one minute, Your

25  Honor, just to move things up.

1          THE COURT:  This is cross-examination of this

2     witness by the defendant.

3     CROSS-EXAMINATION

4     BY MR. FLETCHER:

5     Q     Good morning, Dr. Lai.

6     A     Good morning.

7     Q     My name is Jordan Fletcher, I represent the defendant in

8     this action, Juan Henriquez.

9          Dr. Lai, you said you've been -- you're currently a

10    deputy medical director at the FDNY; is that correct?

11    A     That is correct.

12    Q     And you've been at the FDNY since about 2011; is that

13    correct?

14    A     So it's a little bit complicated.  So I've been a

15    full-time deputy medical director for the Fire Department

16    since January of 2017.  I was a EMS fellow, so that's a

17    training physician to learn how to be a medical director, and

18    I was that fellow from 2011 to 2012.

19    Q     Okay.

20          And so after you were a fellow, did you at some

21    point have a more permanent position at the FDNY?

22    A     Not until 2017.  I was always just working per diem for

23    all my medical control facility between 2012 and 2017.

24    Q     But that was a per diem job at the FDNY; is that correct?

25    A     That is correct.

*La..-cross - Fletcher*                                                    349

```
 1   Q    During that period of time, is it fair to say that --
 2   well.
 3             You know Dr. Isaacs, is that correct?
 4   A    That's correct.
 5   Q    And is it fair to say that Dr. Isaacs had -- was a
 6   superior to you at the FDNY?
 7   A    We have the same position.
 8   Q    Did he have any -- sorry.  Go ahead.
 9   A    We're both deputy medical directors for the Fire
10   Department.
11   Q    Did he have any supervisory role over you at the FDNY?
12   A    No.  Not currently.
13   Q    At any time?
14   A    He was one of the program directors for the fellowship
15   program, along with Dr. Brad Kaufman.
16   Q    So when you were a fellow, he was the program director?
17   A    The program director for the fellowship.
18   Q    Did he have any role in getting you your per diem job at
19   the FDNY?
20   A    No.
21   Q    You testified that you did a lot of work on the FDNY MSOC
22   events; correct?
23   A    I do.
24   Q    Okay.  You do.
25             And you did?
```

1  A     And I did.  I did since the first MSOC.

2  Q     Okay.

3         What kinds of work did you do on the MSOC events?

4  A     So I mean, it has varied.  So since the beginning, I

5  have -- I've pretty much just -- my role was very minor in the

6  beginning.  I was just sort of there just to -- just to help

7  to, you know, proofread any documents or proofread like any

8  promotional materials.  I was also, more or less, just one of

9  the people just that Doug would just kind of run ideas by.

10 Like:  Oh, does this sound like a good topic.  Those sort of

11 things.

12        I also helped with the registration at the

13 conference.

14 Q     And in your role helping out producing the FDNY MSOC, you

15 also worked with the defendant in this action Juan Henriquez;

16 right?

17 A     Yes, I know Juan, yes.

18 Q     But you worked with him to produce the FDNY MSOC;

19 correct?

20 A     I worked with him on the -- some of the promotional

21 materials.  Like I said, I was sort of the proofreader or

22 copywriter, if you will, just to make sure everything looked

23 okay.

24 Q     So Mr. Henriquez asked you to proofread his documents?

25 A     Either him or it was usually through Doug that I

1    communicated most of the time with.

2    Q    But you had direct communications with Mr. Henriquez;

3    right?

4    A    Yeah, Juan and I were friends at that time, yes.

5    Q    And you had direct communications with him about the

6    documents he was creating for FDNY MSOC; right?

7    A    Yes.  I could call him or text him, yes, because we were

8    friends, yes.

9    Q    Okay.

10        And he called and texted you or emailed you about

11   the materials he was working --

12   A    It would go back and forth, yes.

13        THE COURT:  What documents was Mr. Henriquez

14   creating initially when you were involved in communicating

15   with him about the program?

16        THE WITNESS:  So initially, Your Honor, it would be

17   like the promotional flyer.  It could be, I don't know, any

18   other sort of like, you know, email blast or things that would

19   go out.  I would just kind of make sure that everything looked

20   okay or like that the grammar or language was appropriate.

21        THE COURT:  What about the courses?

22        THE WITNESS:  What about the courses?

23        THE COURT:  Did he do an outline of the courses that

24   would be offered, and the instructors?

25        THE WITNESS:  So he may have been the one to write

1   everything down in a document, and I might have looked over

2   that.  I don't -- I don't remember exactly which documents,

3   where they came from, who produced them, but -- but for -- a

4   lot of the times I would take a look at them, yes.

5              THE COURT:  Okay.

6              But to your knowledge, he had some role in creating

7   the curriculum or the plan for the conference?

8              THE WITNESS:  In terms of for the planning for the

9   conference, you know, it was -- it was -- again, I think that

10  it's sort of like a teamwork, but I think for the most part

11  that Doug Isaacs was the one that was creating the curriculum.

12  You know, I think that he would bounce ideas off of myself or

13  Juan or other people as well that he was close with and I --

14  that's how -- that's how we kind of worked to get things down.

15             THE COURT:  And was this preparation for this

16  conference authorized by the FDNY, or were you and Dr. Isaacs

17  just working on this independently of the FDNY with --

18             THE WITNESS:  No, this is always -- as far as I've

19  always known, this was always going to be work for the FDNY.

20             THE COURT:  And at about the time you first got

21  involved, what was your position with the FDNY?

22             THE WITNESS:  So in -- so my position from like,

23  2013 or kind of leading up to the 2013 conference, is that

24  what you're asking?

25             THE COURT:  Yes.  When you first got involved in

La  · cross · Fletcher                                             353

1    assisting with the MSOC.

2            THE WITNESS:  So I was just a per diem physician for

3    the Online Medical Control for the FDNY.

4            THE COURT:  Thank you.

5            MR. FLETCHER:  May I continue, Your Honor?

6            THE COURT:  Yes.

7    Q    So you mentioned publicity flyers that you saw -- that

8    Mr. Henriquez created.

9            Did you ever see an EAP or an event action plan

10   document?

11   A    Yes, I've seen that, yes.

12   Q    Okay.

13           Have you seen it from Mr. Henriquez?

14   A    I'm not sure if either Juan or if Doug had first given it

15   to me, but I have seen it and I know that Juan Henriquez did

16   help to create that document.

17   Q    Have you ever seen Mr. Henriquez's name at the bottom of

18   any of those documents saying:  Prepared by Juan Henriquez?

19   A    I do not remember specifically if I saw his name on the

20   bottom of that document.

21   Q    But it's your testimony that Mr. Henriquez would ask you

22   to comment on the documents he was creating for FDNY MSOC;

23   right?

24   A    Yeah.  It would either -- like I said, it would either be

25   him or with Doug that would ask me to take a look at the

1    documents.

2    Q    And did those requests or communications that you had

3    with Mr. Henriquez ever occur late in the evening?

4    A    I can't remember specifically when they would happen,

5    but, you know, like I said, Juan and I, as well as Doug and I

6    were all friends so that, you know, if there were

7    conversations that happened off-hours, that could have

8    happened, I'm not sure.

9    Q    But it's fair to say, it was a substantial amount of work

10   producing this event every year; right?

11   A    For everybody, yes.

12   Q    Have you ever written lectures for Dr. Isaacs?  Meaning,

13   have you ever written a lecture that Dr. Isaacs then gave?

14   A    I would help to create them, but it would never be solely

15   for me to give to him, but we would work together on lectures,

16   yes.

17   Q    That Dr. Isaacs would give?

18   A    We would do that as -- as he would do the same for me as

19   well.  Because a lot of times there are -- at least for us in

20   the office, we are the -- sort of like the ones -- like I

21   said, like, we would bounce ideas off of each other.  A lot of

22   times we would co-create lectures and they would be either

23   given by himself or that even like, if I had to give a lecture

24   at a hospital, he would help me create that as well.

25   Q    And you are aware that Mr. Henriquez also wrote lectures

1   for Dr. Isaacs; is that fair to say?

2   A    That part I am not aware of.

3   Q    You have no knowledge of that?

4   A    I do not, no.

5   Q    Do you have any knowledge of Dr. Isaacs taking credit for

6   having created work that other people created?

7   A    No.

8   Q    To be clear, you are a salaried employee at the FDNY;

9   correct?

10  A    Currently, I am a salaried employee.

11  Q    Were you a salaried employee during the period 2013 to

12  2019?

13  A    No.

14  Q    So what were you from -- when were you not a salaried

15  employee?

16  A    So from the end of my fellowship, so July 2012 until I

17  was hired full-time in January 2017.

18            THE COURT:  So you were not salaried, you were per

19  diem.

20            THE WITNESS:  I was not salaried, no.

21  Q    Per diem.

22            So that means you were paid by the day that you

23  showed up to work?

24  A    Yes.

25  Q    You're aware that the MSOC events at the FDNY were made

1   possible by the participation of a number of individuals

2   outside of the fire department; is that fair to say?

3   A    It's a collaborative effort from a lot of people,

4   including outside.  A lot of time we will get outside

5   speakers.  We have outside people to help us with a lot of the

6   preconference events, yes, but it was -- Doug Isaacs was the

7   one that was reaching out to people to organize and to help to

8   manage this event.

9            THE COURT:  Are you aware whether Dr. Isaacs ever

10   requested from Mr. Henriquez a contact list for individuals

11   who were involved in the MSOC conferences; lectures, vendors,

12   et cetera?

13            THE WITNESS:  I'm not sure I understand.

14            THE COURT:  Do you know whether Dr. Isaacs or you

15   ever asked Mr. Henriquez for a list of folks that were

16   involved in MSOC conferences?

17            THE WITNESS:  I was not a part of those

18   conversations, no.

19            THE COURT:  Okay.

20            So you were not aware of it.

21            THE WITNESS:  I was not aware, no.

22            THE COURT:  Okay.

23            What was your understanding of where Dr. Isaacs got

24   the contact information that he used to reach out to folks

25   when he was involved in planning these conferences?

1          THE WITNESS:  It -- I mean, he has -- he has a lot

2     of contacts throughout just both nationwide as well as

3     international.

4          THE COURT:  Do you know of the source of those

5     contacts?  Like, how did he meet them or become acquainted

6     with them?

7          THE WITNESS:  It would be through his work at the

8     fire department, but I don't -- I'm not sure I understand.

9          THE COURT:  Well, I'm just asking, did he meet these

10    folks at other conferences outside of New York?

11         THE WITNESS:  Oh, did he meet other people --

12         THE COURT:  Yes, that he then used to contact to

13    come and be involved in the MSOC FDNY conferences.

14         THE WITNESS:  I think that a lot of times like, yes,

15    we do meet a lot of different people, like, at different

16    conferences or different meetings that, you know, we would

17    then reach out to.  If it's going to be, like, work that he

18    does for the New York Task Force I or through the fire

19    department, yes.

20         THE COURT:  All right, thank you.

21         MR. FLETCHER:  May I continue, Your Honor?

22         THE COURT:  Yes.

23    Q    You just stated that you knew that the MSOC event at the

24    FDNY was produced with the help of individuals from around the

25    country; is that correct?

1  A    What do you mean by "produced"?

2  Q    Well, did you know that -- do you know Joseph

3  Hernandez -- Joe Hernandez?

4  A    I do know Joe Hernandez through Juan Henriquez.

5  Q    And through the FDNY MSOC events?

6  A    I -- I think I probably met him before, but I think that

7  when I was a fellow I probably met him before, but, you know,

8  I -- I knew -- I know of him and what he does, yes.

9  Q    And you knew that Joe Hernandez provided substantial

10 assistant to help make FDNY MSOC occur; is that true?

11 A    I don't know the specifics in terms of like, what his

12 contributions were because I never worked directly with him,

13 like, for the MSOC conference.  So I'm not sure what role he

14 played specifically for the FDNY MSOC.

15 Q    You knew that there were teachers at the conference who

16 came from around the country; right?

17 A    You mean, like, the -- you mean the FEMA instructors?

18 Q    The FEMA instructors.  So individuals from California;

19 right?

20 A    Yes.  I believe we had individuals from California.  We

21 have people from all over the country and all over the world

22 that attend the conference.

23 Q    Not just attendees, but people that made the conference

24 happen.  So the FEMA teachers; California; right?

25 A    So like I said, in terms of making the conference happen

*La · cross · Fletcher*                                                    359

1    or to produce the conference, that was done by the fire

2    department, but we do have outside -- you know, like I said,

3    we have speakers from other parts of the country.  We have

4    speakers from other parts of the world who contribute to, you

5    know, help to make the conference to what it is.

6    Q    Ma'am, you are aware that there were speakers at the FDNY

7    MSOC event who came from California; correct?

8    A    For that year, I don't remember exactly who came to

9    speak.

10   Q    I'm not asking about a specific year.

11   A    Okay.  So --

12   Q    Do you know Katie Roberts?

13   A    I do, yes.

14   Q    Katie Roberts comes from California; right?

15   A    Yes, I know that.

16   Q    She's on a federal team; right?

17   A    Yes.

18   Q    She spoke at the MSOC events; right?

19   A    I think that she has before, yes.

20   Q    Jenn Brown.

21          Do you know Jenn Brown?

22   A    Yes, I do know Jenn Brown.

23   Q    She is on a federal team; right?

24   A    Yes.

25   Q    She's a K-9 vet; right?

La _ · cross · Fletcher                                                    360

1   A    Yes.

2   Q    She comes from Florida; right?

3   A    Yes.

4   Q    A number of other individuals like them who spoke and

5   taught courses at the MSOC events came from outside of FDNY;

6   correct?

7   A    Yes.  That's correct.  That's what I said.

8   Q    Okay.  Thank you.

9        Dr. Isaacs knew that, too; right?

10  A    Yes, 'cause he would ask them to come to speak at the

11  conference, yes.

12  Q    Were you personally present when Dr. Isaacs asked those

13  individuals to speak?

14  A    No.

15  Q    So you have no personal knowledge of how those

16  individuals arrived at the conference; correct?

17  A    Yeah, that's correct.

18  Q    Now, you also knew that MSOC events happened outside of

19  the fire department; right?

20  A    Say that again.  I'm sorry.

21  Q    You also knew that MSOC events happened outside of the

22  fire department of New York; correct?

23  A    No.

24  Q    You had no knowledge of that?

25  A    I had no knowledge of that.

1   Q    You never had a conversation with Mr. Henriquez about

2   MSOC events outside of New York?

3   A    No, I have not.

4   Q    Okay.

5        And never with Dr. Isaacs?

6   A    Never with Dr. Isaacs either.

7   Q    You did teach, I think you said in a declaration, you

8   taught a FEMA MTS course for Joe Hernandez is that right?

9   A    Yes, that's correct.

10  Q    And you had no knowledge that there was an MSOC course

11  occurring shortly after that FEMA course?

12  A    I did not know.  I was not aware of that, no.

13       THE COURT:  Where was this that you taught?  Was it

14  in Maryland, August 2017?

15       THE WITNESS:  Yes, that's correct.

16       THE COURT:  Thank you.

17  Q    Did you know that Dr. Isaacs taught a class for

18  Mr. Henriquez and Mr. Hernandez in Palm Beach in 2015?

19  A    Yes, I was aware of that.

20  Q    Okay.

21       But you didn't know that was called MSOC?

22  A    I was not aware that it was called MSOC, no.

23  Q    So it's your testimony that Dr. Isaacs was the individual

24  responsible for creating the MSOC at the FDNY; is that right?

25  A    Yes.

1   Q    Do you know whether Dr. Isaacs had direct communications

2   with foundation leadership about that?

3   A    About the conference?

4   Q    Yes.

5   A    Yes.

6   Q    Okay.

7            With Jean O'Shea?

8   A    Yes.

9   Q    Did Dr. Isaacs have direct communications with FDNY

10  chiefs about the FDNY MSOC conference?

11  A    Yes, because we -- he would have to get approval and --

12  to say that this -- whatever that he would need in terms of

13  even like, the dates, locations, everything, needed to be

14  approved, yes.

15  Q    So Dr. Isaacs was required to seek approval from

16  Jean O'Shea or Chief Nahmod or other FDNY chiefs --

17  A    Yes, that is correct.

18  Q    -- for things related to the MSOC?

19  A    Yes, that is correct.

20  Q    Did you know Jean O'Shea to be personally involved in all

21  of the details of all of the FDNY MSOC events?

22  A    I don't know that and, especially during the first years,

23  I was never involved with any of those discussions.

24  Q    Did you have the impression that Jean O'Shea knew all the

25  details about the logistics of what was going to happen during

1   the planning process?

2   A    Well, like I said, she would have to approve in terms of

3   budgets and everything else, yes.

4   Q    Okay.

5         So she would have to approve it but --

6         (Witness enters/leaves the courtroom.)

7         THE COURT:  Have you instructed your witness they

8   should not enter the courtroom?

9         MR. MACKIE:  I apologize for that.

10        THE COURT:  Because it is disruptive.

11        All right.  Go ahead.

12  Q    So -- was that Jean O'Shea?

13  A    I think it was.

14        THE COURT:  Who was that person?

15        MR. MACKIE:  That was Jean O'Shea.

16        THE COURT:  Great.  All right.

17  Q    So you don't know whether Jean O'Shea had specific

18  details about the conference planning process while it was

19  going on?

20  A    I do not know that.

21  Q    You don't have any personal knowledge that she had -- she

22  was involved day-to-day; right?

23  A    Excuse me?

24  Q    You don't have any personal knowledge that she was

25  involved day-to-day in all of the things that Dr. Isaacs was

1    doing?

2    A    I do not -- I do not know.

3    Q    It was your understanding that Dr. Isaacs was doing that

4    and he would go ask for specific permissions from Jean O'Shea;

5    right?

6    A    As far as I know, yes.

7    Q    And the same with respect to FDNY chiefs.  They were not

8    personally involved in logistics of this conference; right?

9    A    So like I said I cannot speak in terms of what knowledge

10   that the other chiefs or the other -- you know, other parties

11   might have, I don't know.

12   Q    But you understood that Dr. Isaacs was responsible for

13   going to seek approval from those chiefs?

14   A    Yes.

15   Q    Related to the production of the conference; right?

16   A    Yes.

17   Q    Did you understand that Dr. Isaacs was communicating with

18   conference vendors and sponsors?

19   A    Yes.

20   Q    Okay.

21        And you understood that he received and managed

22   information related to the conference?

23   A    What do you mean by "information"?

24   Q    Who was going to speak, when they were going to speak,

25   how it was going to be sourced.

La   · cross · Fletcher                                                365

1   A    Yes.

2   Q    Materials, vendors, logistics.  That was what Dr. Isaacs

3   was managing; right?

4   A    He was managing the conference.

5   Q    Okay.

6            And you understood that he would pass information to

7   Ms. O'Shea or the FDNY chiefs when it was necessary to do so;

8   correct?

9   A    Well, like I said, I've never been a part of those

10  discussions, so I can't say like, you know, what information

11  was passed.

12  Q    But you understood that he was supposed to pass

13  information and seek approval where it was required?

14  A    I understand that part, yes.

15  Q    And if something was approved, he would communicate it

16  back to you or Mr. Henriquez; correct?

17  A    Yes.  Well, information that I needed to know, yes.

18  Q    And you understood -- it was your impression that

19  Dr. Isaacs was authorized by the FDNY and the Foundation to do

20  the things that you saw him doing; correct?

21  A    In terms of being authorized by the department?

22  Q    Yes.

23  A    Yes.  By the department, yes.

24  Q    And by the Foundation?

25  A    By the Foundation.

1    Q    And last question on this.

2              And when Dr. Isaacs would tell you:  I ask for

3    permission for X, subsequently X would happen.  So, for

4    example, Mr. Henriquez would give a flyer -- a promotional

5    flyer to Dr. Isaacs, Dr. Dr. Isaacs would pass that up the

6    chain of command for approval, Dr. Isaacs would say it was

7    approved and then that flyer would be used; correct?

8    A    Correct.

9    Q    By the FDNY --

10   A    Correct.

11   Q    -- and by the Foundation; correct?

12   A    Correct.

13   Q    Did Mr. Henriquez ever tell you he was concerned about

14   Dr. Isaacs running the FDNY MSOC event?

15   A    Not that I remember, no.

16   Q    He never told you he had financial concerns about the way

17   the FDNY MSOC was being run?

18   A    No.

19   Q    He never told you he had concerns about Dr. Isaacs's

20   ethics and the transparency?

21   A    Never.

22   Q    Never had a conversation.

23   A    Never.

24   Q    Do you have a personal relationship with Dr. Isaacs

25   outside of your employment?

1    A    We are -- we are good friends.  We are co-workers, yes.

2    Q    Have you ever had romantic relationship with Dr. Isaacs?

3    A    How is this relevant, my personal --

4         THE COURT:  It goes to your bias and other issues.

5    It is relevant.

6         THE WITNESS:  Why?

7         THE COURT:  Well, if you are biased.  It is

8    something that we can consider.

9    A    We did, but that was a very long time ago, and it was

10   very short.

11   Q    In 2014, you moved to an apartment directly across the

12   street from him on the East Side; correct?

13   A    I moved to an apartment.  I moved.

14   Q    And that apartment was very close to Dr. Isaacs's

15   apartment; correct?

16   A    It may be.

17   Q    Was it?

18   A    Yes.

19   Q    Thank you.

20        2018, FDNY MSOC conference.  There was -- there were

21   some people hanging out after the event in the evening one

22   night.  Prior to that, do you recall ever hearing about any

23   conversations about moving the MSOC to California?

24   A    Not that I can recall.

25   Q    Do you recall a conversation that you understood to have

1  happened between Katie Roberts from California and -- is it

2  Dr. Asaeda?

3          Do you know Dr. Asaeda?

4  A    I do know Dr. Asaeda, he's my supervisor.

5  Q    Do you recall a conversation -- that you understood that

6  a conversation occurred in 2018 during the time of the

7  conversation between Katie Roberts and Dr. Asaeda, with

8  Dr. Isaacs present, where Katie Roberts told Dr. Asaeda that

9  the conference was going to be moved to California the

10 following year?

11 A    So I remember Dr. Asaeda saying this in the past tense.

12 I don't remember who he said was present, but I remember that

13 he said that he had a conversation with Katie Roberts.

14 Q    That the conversation -- that the conference would be

15 moved to California the following year?

16 A    From what I can remember, it was her saying that they

17 wanted to have the conference in Virginia, but that was never

18 to say that it was to be approved or that it was already going

19 to be moved, no.

20 Q    Do you remember --

21          THE COURT:  Well, may I ask, would the FDNY have to

22 approve MSOC doing the -- planning to do the conference in

23 California or any other place outside of New York City?

24          THE WITNESS:  There was never any conversations for

25 that to even happen.

1           THE COURT:  To your knowledge, did the FDNY have to

2    approve where the MSOC held its conferences?

3           THE WITNESS:  I would believe so because it's the

4    FDNY conference, so I would think that the FDNY would need to

5    have an approval process if it was going to go somewhere else.

6           THE COURT:  I am talking not about the FDNY-hosted

7    MSOC conference.  I am talking about the MSOC conferences that

8    were being held all over the country; before the NY event, and

9    after the NY events.

10          THE WITNESS:  I mean, we would only just be

11   responsible for the FDNY MSOCs.

12          THE COURT:  So that was a separate arrangement,

13   correct?

14          The FDNY MSOC conference was separate from all the

15   other nationwide MSOC conferences that were going on before,

16   during, and after the FDNY-hosted MSOC conferences; am I

17   correct?

18          THE WITNESS:  I mean, like, I only knew of the other

19   MSOC conferences that Juan and Joe were doing.  I don't

20   remember the exact year that that happened.  That was, like,

21   probably after -- I think after 2018.  I don't remember the

22   dates for those, but that is not an FDNY event.

23          THE COURT:  Right.

24          THE WITNESS:  Is that what you were referring to?

25          THE COURT:  Yes.  I am talking about the MSOC

1    conferences that were done outside of New York City separate

2    from the FDNY elsewhere in the country.

3              THE WITNESS:  What's the question?  I'm sorry.

4              THE COURT:  So were you aware that MSOC was

5    providing conferences elsewhere in the country?

6              THE WITNESS:  I was aware of the ones, like, in --

7    like, I don't know, 2019 or, you know.  After there was the

8    dispute with everything, I knew of those conferences, yes.

9              THE COURT:  Okay.

10             And so, did you know in 2018 when Katie Roberts told

11   Dr. Asaeda that next year the MSOC would be in California, did

12   you know that they had planned to do it in California in 2018

13   but couldn't for whatever reasons.

14             THE WITNESS:  No, I did not.  I don't know any of

15   those planning discussions or anything like that.

16             THE COURT:  What did Dr. Asaeda say to you when he

17   told you about Katie Robert's statement that she was going to

18   be -- that the MSOC would be in California?

19             THE WITNESS:  I don't remember what his response

20   was, to be honest, but I just remember that he told Doug and

21   myself that conversation -- like, he had a conversation with

22   her.  I don't remember what his response was.

23             THE COURT:  Okay.

24             It was just in passing, matter of fact?

25             THE WITNESS:  Yeah, it was in-passing conversation,

1    yes.

2            THE COURT:  Okay.  Thank you.

3    Q    Dr. Lai, after hearing about that conversation between

4    Katie Roberts and Dr. Asaeda, you went and told a group of

5    people, including Mr. Henriquez, that Dr. Isaacs was having a

6    shitsy-fit; right?

7    A    I don't remember that conversation, and I don't -- would

8    not use that exact words.  That's not in my vocabulary to use

9    that.

10   Q    Would you have used some words like it; that Dr. Isaacs

11   is unhappy about this conversation?

12   A    I would -- I would probably say something like that,

13   yeah.

14   Q    Do you recall telling a group of people that Dr. Isaacs

15   was unhappy about that conversation?

16   A    I don't remember, no.

17   Q    Do you recall telling a group of people that Doug thinks

18   he's going to get fired?

19   A    I would never -- I don't remember any conversation where

20   he thought that he was going to get fired.

21   Q    And you didn't tell Mr. Henriquez that you and Dr. Isaacs

22   knew that there were issues with the conference but Dr. Isaacs

23   wasn't ready to tell the FDNY and foundation about the

24   movement?

25   A    There was -- as far as I knew, there was -- I don't

1    know -- I don't remember any conversations about moving the

2    conference.  I know that putting on a conference is very much

3    a hardship for everybody.  You know, this is -- in terms of,

4    you know, even with now being a full-time employee for the

5    fire department, you know, it's not something that I ever

6    thought or knew that I would ever be like, responsible for or

7    to help to be a part of.

8              It is a lot of work to do and I know that there were

9    a lot of frustrations over the years in terms of a lot of the

10   logistics, a lot of planning, a lot of the support.  I don't

11   remember any conversation for Doug saying that he would get

12   fired or he was worried about getting fired because of the

13   conference.

14             MR. FLETCHER:  Okay.  Thank you.  No further

15   questions, Your Honor.

16             THE COURT:  Anything else?  Would you like to

17   examine this witness?

18             MR. MACKIE:  One question, Your Honor.

19             THE COURT:  Sure.

20   REDIRECT EXAMINATION

21   BY MR. MACKIE:

22   Q    Dr. Lai, you were asked some questions about your

23   relationship with Dr. Isaacs outside of work.

24             Do you believe that -- sorry.  There was a reference

25   to a romantic relationship.

1          Do you recall around the years that that took place?
2     A    It was -- it was -- it was after my fellowship year, and
3     it was, you know, when I was, I don't know, about probably
4     like 2013, but it did not last very long.  And, I mean, we
5     remained friends just as I am friends with a lot of people.
6     Q    Understood.
7          Do you believe that your personal friendship with
8     Dr. Isaacs has any -- do you believe that your personal
9     friendship with Dr. Isaacs has had any effect on your ability
10    to testify truthfully today?
11    A    No.
12    Q    Thank you.
13              MR. MACKIE:  No further questions, Your Honor.
14              THE COURT:  When you were in the romantic
15    relationship with Dr. Isaacs in 2013, you were a fellow?
16              THE WITNESS:  No, I was not a fellow.
17              THE COURT:  Oh, you were a per diem.
18              THE WITNESS:  Per diem.
19              THE COURT:  And did you report to Dr. Isaacs at that
20    time as a supervisor?
21              THE WITNESS:  No.
22              THE COURT:  Who did you report to?
23              THE WITNESS:  It would be Dr. Asaeda.  He is the
24    chief medical director for our office.
25              THE COURT:  Okay.

*Proceedings*                                                    374

1         Was your relationship with Dr. Isaacs known to

2   Dr. Asaeda and others in the FDNY medical --

3         THE WITNESS:  No.  Because it was just a passing,

4   very short-lived event, and it didn't -- there's nothing that

5   became of it or anything else, so it was nothing to report.  I

6   was not a full-time employee, or there was no supervisors, I

7   don't know, type of relationship, so I don't...

8         THE COURT:  All right.  Thank you, ma'am.

9         Anything else from this witness?

10        MR. FLETCHER:  No, Your Honor.

11        THE COURT:  Okay, Dr. Lai, you are excused.  Thank

12  you for your time today.  Good luck to you, and have a good

13  day.

14        THE WITNESS:  Thank you.

15        (Witness excused.)

16        MR. FLETCHER:  Jean O'Shea is next.

17        THE COURT:  Okay.

18        There is an exhibits book up on the witness stand.

19  Does that need to be there?

20        THE CLERK:  They asked for it to be there.

21        MR. FLETCHER:  I hope there are two up there.

22        THE COURTROOM DEPUTY:  Yes.

23        THE COURT:  Hello.  Good morning.  Come on up to the

24  witness stand, ma'am.

25        (Witness takes the stand.)

*C Shea - cross - Fletcher*                                                375

1          THE COURTROOM DEPUTY:  Good morning.  Please raise

2    your right hand.

3          (Witness sworn.)

4          THE WITNESS:  I do.

5          THE COURTROOM DEPUTY:  Have a seat and state and

6    spell your full name, please.

7          THE WITNESS:  Jean O'Shea, O-S-H-E-A.

8          THE COURT:  Is it J-E-A-N?

9          THE WITNESS:  Correct.

10         THE COURT:  Thank you, you may proceed.

11   **JEAN O'SHEA,**

12         called as a witness, having been first duly

13         sworn/affirmed, was examined and testified as

14         follows:

15   CROSS-EXAMINATION

16   BY MR. FLETCHER:

17   Q    Good morning, ma'am.

18         My name is a Jordan Fletcher.  I'm an attorney for

19   the defendant, Juan Henriquez, in this case.

20         Ms. O'Shea, you are the executive director of the

21   FDNY Foundation; is that correct?

22   A    Yes.

23   Q    And the FDNY Foundation is, I guess it's formally

24   separate from the fire department; is that correct?

25   A    Correct.

1   Q     But there's a close connection between the department and

2   the Foundation; is that right?

3   A     Yes.

4   Q     Could you explain that connection to me?

5   A     Sure.

6          So basically we raise funds for the FDNY to help the

7   members save lives and protect property.  Our primary funding

8   effort is for fire safety education, so we have programs that

9   go out into the community to provide fire safety education,

10  CPR, and other community trainings.

11  Q     Do you raise funds for any organization other than the

12  fire department?

13  A     No.

14  Q     So your whole mission is to support the fire department

15  and fire safety; fair to say?

16  A     Correct.

17  Q     As the executive director you are the primary

18  decision-maker at the foundation; is that right?

19  A     Well, yes.  I mean, I report to a Board of -- 20 Board

20  members -- 26 members from the business community and the

21  commissioner, chief of department and former commissioners.

22  Q     So there are fire department chiefs and commissioners and

23  retired fire department chief and commissioners on your Board?

24  A     Correct.

25  Q     You state in your declaration that Dr. Doug Isaacs was

1  the principle organizer of the FDNY MSOC conferences; is that

2  correct?

3  A    Correct, yes.

4  Q    And you worked with him together in that capacity?

5  A    Correct.

6  Q    Okay.

7          But Dr. Isaacs was the one who sort of led the

8  charge on that; is that fair to say?

9  A    He led the charge after he reviewed the plan and idea

10 with the upper leadership of the department.

11 Q    Okay.

12         And you had direct communications with Dr. Isaacs

13 about those conferences; right?

14 A    Yes.

15 Q    And I've seen documents, it seems like Dr. Isaacs asked

16 for your approval for various materials and other issues

17 related to the conference; is that fair to say?

18 A    Yes, so long as, again, it was approved by the leadership

19 of the department.

20 Q    So your understanding was that Dr. Isaacs needed to get

21 approval from the FDNY leadership and also from you at the

22 foundation.

23 A    Correct.

24 Q    So for example, Dr. Isaacs sent you marketing flyers;

25 correct, for the conference for approval?

*C Shea - cross - Fletcher*                                                      378

1    A    Correct.

2    Q    He also asked for your approval for website content for

3    the conference website?

4    A    He would work with department people to put that

5    together, yes.

6    Q    And then he would show it to you and say:  Hey this is

7    what we're going to do; is this okay?

8         Right?

9    A    Correct.

10   Q    I saw an email exchange where he asked your approval to

11   post conference lectures on the websites.

12        Do you recall that?

13   A    Yes.

14   Q    And you were also involved in coordinating logistics with

15   Dr. Isaacs; right, to some degree?

16   A    Yes.

17   Q    But Dr. Isaacs was really the one in the day-to-day and

18   you were just there for support; is that fair to say?

19   A    Correct, Dr. Isaacs and the rest of the team from the

20   FDNY.

21   Q    Was it your understanding -- sorry.

22        MR. FLETCHER:  Strike that.

23   Q    It was your understanding that the FDNY chiefs from whom

24   Dr. Isaacs was seeking approval were also not involved in the

25   day-to-day of conference planning; correct?

*C Shea - cross - Fletcher*                                     379

1   A     Correct, yeah.

2   Q     I mean, they were chiefs --

3   A     Right.

4   Q     They didn't want to know the nitty-gritty?

5   A     Correct.

6   Q     They trusted Dr. Isaacs to plan everything and seek

7   approval where necessary; right?

8   A     Correct, yes.

9   Q     And you understood that that was all within the scope of

10  what Dr. Isaacs was entrusted to do by the department; right?

11  A     Correct.

12  Q     And you did, on a number of occasions, see Dr. Isaacs

13  seek approval and pass information to the FDNY chiefs;

14  correct?

15  A     Yes.

16            THE COURT:  To the best of your knowledge, did

17  Dr. Isaacs work with authority and permission from both the

18  Foundation and the FDNY in the acts and planning that he did

19  for the MSOC FDNY conference?

20            THE WITNESS:  Yes.

21            THE COURT:  Are you aware of any instances where

22  Dr. Isaacs took actions with regard to the FDNY-hosted MSOC

23  that were not approved by the Foundation or the FDNY?

24            THE WITNESS:  No, not to my knowledge.

25            THE COURT:  Thank you.

1   Q    But to some degree, Dr. Isaacs also acted independently,

2   right, in the sense that you were not on all phone calls that

3   Dr. Isaacs had about the conference.

4   A    Correct.

5   Q    You weren't on all the emails?

6   A    Correct.

7   Q    You didn't understand that all the FDNY chiefs were

8   involved on all Dr. Isaacs conferences-related phone calls and

9   emails; right?

10  A    Correct.

11  Q    So you knew Dr. Isaacs was having communications that you

12  were not personally privy to; correct?

13  A    Correct.

14  Q    But you relied on Dr. Isaacs that, if there was anything

15  important, he would bring it to your attention.

16  A    Correct.

17  Q    Now, I think you stated in your declaration that you had

18  limited contact with Mr. Henriquez in the course of planning

19  the MSOC events at the FDNY; right?

20  A    I wouldn't know him if I saw him.  I think I met him once

21  at one of our initial meetings.

22  Q    But you knew from Dr. Isaacs that Mr. Henriquez was

23  involved in conference planning; right?

24  A    I -- it was one of many names, yes.

25  Q    We can look at some documents.  I would love to not if we

1   don't have to, but do you recall ever receiving emails where

2   Dr. Isaacs said:  Juan Henriquez prepared this flyer, Juan

3   Henriquez prepared the website, check it out?

4   A    Again, I don't recall.  That would have went through, you

5   know, the department website developers.  I'm sure once it was

6   approved, I would have been sent it, yeah.

7   Q    You have some binders in front of you.  There should be

8   one -- one is definitely black and says Defendant's Exhibits

9   and it's got exhibits with letter tabs inside.

10           Do you see that?

11  A    I do.

12  Q    If you could turn to Exhibit D, and then there's page

13  numbers on the bottom left of the pages.  It's 5 of 55.  It's

14  an email.

15  A    Got it.

16  Q    Do you see that this is -- and this is for the record --

17  FDNY 383.

18  A    Oh, okay, yep.

19  Q    Do you see this is an email from Dr. Isaacs to yourself

20  and others dated December 20, 2013?

21  A    Yes.

22  Q    And you say:  Attached is the draft MSOC --

23           MR. FLETCHER:  Sorry.  Strike that.

24  Q    Dr. Isaacs says:  Attached is the draft MSOC flyer for

25  your review.  Juan again has done an amazing job.

1   A    Yes.

2   Q    Okay.

3        Did you know who Dr. Isaacs was referring to when he

4   said:  Juan has done an amazing job?

5   A    Yes.

6   Q    Who was he referring to?

7   A    Juan Henriquez.

8   Q    And Juan Henriquez was, in fact, cc'd on this email;

9   right?

10  A    Correct.

11       THE COURT:  What page was that again?  I'm sorry.

12       MR. FLETCHER:  I'm sorry.  It's 5 of 55 in

13  Exhibit D, Bates stamped F-383.

14       THE COURT:  Thank you.

15  Q    Do you recall that there was a website created for the

16  first MSOC event hosted by the FDNY in 2013?

17  A    I know there was, yes.

18  Q    Okay.

19       But that website was not created by the Foundation;

20  right?

21  A    We don't create websites.  The department creates the

22  websites.

23  Q    And that website was not created by the fire department

24  either; right?

25  A    No.

*C Shea - cross - Fletcher*                                             383

1  Q    That website for the 2013 event was created by Juan

2  Henriquez; right?

3  A    I don't know that.

4  Q    You don't know that.

5  A    No.

6          THE COURT:  But it wasn't created, you said, by the

7  Foundation or --

8          THE WITNESS:  No.  We work with the department

9  website developers and social media to do these kind of things

10  and I know they were involved with this.

11          THE COURT:  With the creation of a website?

12          THE WITNESS:  I thought so, yeah.

13  Q    Would those website developers be Joe Malvasio and Hugh

14  Lesner?

15  A    Correct.

16  Q    Joe Malvasio and Hugh Lesner did not create a website for

17  the first conference in 2013, right?

18          Do you know?

19  A    I don't know.

20  Q    You do know that at some point there was a donation

21  agreement --

22  A    Yes.

23  Q    -- signed between the Foundation and Mr. Henriquez;

24  right?

25  A    Correct, yes.

*C Shea - cross - Fletcher*                                             384

1   Q    I think -- did you sign that agreement?

2   A    I did.

3   Q    And was it your understanding that that was an agreement

4   under which Mr. Henriquez would create a website for the

5   Foundation for an MSOC conference?

6   A    My understanding, again, was that he was volunteering his

7   efforts for the conference.

8   Q    Okay.

9   A    The details of that, I don't -- I don't know if it was a

10  website or what it was.

11  Q    So if you turn to Exhibit 3 -- I'm sorry, E like

12  elephant, and the first Bates stamp on this is PTF-585.

13  A    Right.

14  Q    Do you see that this is the donation agreement?

15  A    Yes.

16  Q    Signed by you and Mr. Henriquez?

17  A    Yes.

18  Q    Do you see what the date of this agreement is?  It's in

19  the top paragraph.

20  A    November 2013.

21  Q    So that was -- November 2013 is after the first MSOC

22  conference, right?

23            THE COURT:  Before the first FDNY --

24  Q    After FDNY MSOC -- the first FDNY MSOC conference was

25  May 2013, right?  I'm not asking for a memory test.  If you

*C Shea - cross - Fletcher*                                                385

1    don't remember, I can show you a document.

2    A    Yes.

3    Q    It was May 2013?

4    A    Correct.

5    Q    So you signed the donation agreement after that first

6    conference; right?

7    A    Yes.

8    Q    And if you look down to the second "whereas" paragraph,

9    so it's three paragraphs into the agreement.  It's

10   highlighted.  It says:  The Foundation is hosting a Medical

11   Special Operations Conference at the fire academy May 15,

12   2014.

13            Do you see that?

14   A    Yes.

15   Q    It appears that this agreement is talking about the 2014

16   event; correct?

17   A    Yes.

18   Q    Okay.

19            So as you sit here today, do you recall whether

20   there was a website for the first event in 2013?

21   A    I do recall there was a website, yes.

22   Q    Okay.

23            Do you recall who created the website?

24   A    No, I don't.

25   Q    Did you ever see any event action plans for the FDNY MSOC

1    conferences?

2    A    Yes.

3    Q    Yes.

4         Let's look at one.  Exhibit D.  And let's look at

5    the event action plan for 2014.  This is page 14 of 55 in

6    Exhibit D.  The Bates stamp of the first page is HENR-36.

7    A    Okay.  Got it.

8    Q    It says FDNY MSOC 2014 EAP?

9    A    Correct.

10   Q    Do you recall whether you've ever seen this document

11   before?

12   A    Kind of looks familiar.

13   Q    Did you see these kinds of documents during the period of

14   time that the FDNY was -- during the period 2013 to 2019?

15   A    I'm sure I did.

16   Q    Okay.

17        Do you see at the bottom of this first page it says:

18   Prepared by Juan Henriquez?

19   A    I do.

20   Q    Do you recall whether you ever noted that Mr. Henriquez

21   was preparing these documents --

22   A    No.

23   Q    -- or documents like them?

24   A    No.

25   Q    Let's back up for a second.

*C Shea - cross - Fletcher*                                            387

1          You -- I believe you stated in your declaration --

2    maybe you did, maybe you didn't -- but was it your belief that

3    Dr. Isaacs came up with the idea for the FDNY MSOC events?

4    A    I -- my idea was there was a group of people that came up

5    with the idea of MSOC, including Dr. Isaacs.

6    Q    I'm sorry, ma'am, could you pull the microphone closer to

7    yourself?

8    A    Sure.

9          My understanding was there was a group of people

10   from the FDNY that came up with the idea as a way to support,

11   enhance training for our EMS side.  We had done a number of

12   conferences on the fire side and this was geared more toward

13   the EMS side.

14   Q    You can also pull the microphone towards you if that's

15   easier.  It moves, so whatever is best for you.

16         So you said your understanding was there was a group

17   of people.

18         Who was in that group?

19   A    I'm sure it was the chief of department, chief of EMS,

20   and a host of other people.  Again, it came to me with all the

21   approvals, let's move forward with this, this is a great

22   conference, a great benefit to the department, and to

23   emergency medical people, kind of across the country.

24   Q    When you say you're "sure," do you have any personal

25   knowledge of who came up with the idea?

*C Shea - cross - Fletcher*                                              388

1    A    No.

2    Q    Okay.

3         It was just, it seemed like it came from the

4    department.

5    A    Correct.

6    Q    And you don't personally know that Dr. Isaacs came up

7    with the name Medical Special Operations Conference; right?

8    A    I don't know.  I don't know.  Not sure.

9    Q    Okay.

10        You don't have any personal knowledge; right?

11   A    No.

12   Q    But to be clear, the Foundation in the FDNY used the name

13   Medical Special Operations Conference during the period 2013

14   to 2019; right?

15   A    Correct.

16   Q    And they used the acronym MSOC to refer to that event

17   during the same period; right?

18   A    Yes.

19        THE COURT:  Ma'am, when Dr. Isaacs first came to you

20   about the FDNY sponsoring the MSOC conference, did he explain

21   or did you know from other sources that MSOC had been

22   presenting conferences elsewhere in the country before

23   Dr. Isaacs came with the idea to do it in New York?

24        THE WITNESS:  No.

25   Q    So the FDNY and the -- excuse me.

1      The Foundation, which is what you knew, and the FDNY

2  I suppose, but you agreed to host the event in 2013; right?

3  A    Correct, yes.

4  Q    But from the start, there wasn't any intent to do it

5  every year forever; right?

6  A    There was.  My understanding was, yeah, this was

7  something we were going to do to support, you know, the fire

8  department and our EMS and, yes.

9          You know, the whole idea was it was a conference

10 that led us into EMS week.  Every year we have EMS week and

11 this was like, an added conference that we involved our EMS

12 members.

13 Q    So your understanding -- your recollection is that from

14 the very beginning, the FDNY and the Foundation were

15 wholeheartedly on board with this event; right?

16 A    Correct.  If the department felt it was beneficial.

17 Q    In other words the Foundation was going to get on board

18 with whatever the department wanted?

19 A    Correct.

20 Q    But you, yourself, had concerns about hosting those

21 events, right, at the beginning?

22 A    I don't know that I had concerns.  You know, I think that

23 it was brought to us, the leadership thought it was a good

24 idea, we saw the value in it, and we hosted it.

25 Q    Could you turn to Exhibit S in the binder in front of

1    you.

2    A    S?

3    Q    S like "Sam."

4    A    Okay.

5    Q    This is a document.  It's an email exchange without a

6    Bates stamp, but there's two emails on the page, the bottom

7    email is a -- an email from you to Dr. Isaacs, dated June 16,

8    2014.

9         Do you see that?

10   A    I do.

11   Q    Why don't you take a minute to read that.

12   A    Yes, I see it.

13   Q    Do you see how you're listing -- well, why not ask.

14        Does this email refer to the MSOC event at FDNY?

15   A    It probably refers to everything we do at the foundation.

16   You know, we're a very small staff, but I think, again, the

17   value outweighed any concerns and I think we tightened up any

18   concerns that we had.

19   Q    Let me back up.

20        So you talk about positives and negatives, right?

21   And do you see the number one below the negatives?  You say:

22   The MSOC is very labor-intensive for the FDNY Foundation.

23        So you're talking about the FDNY MSOC event in this

24   email; right?

25   A    Correct.

1  Q    And you're saying that there are positives, because it

2  brings good things to the department, but you're also saying

3  that it's very labor-intensive and EMS needs to provide more

4  support; right?

5  A    Correct.

6  Q    And the Foundation was not generating enough money from

7  the event.

8        Do you see that in number two?

9  A    Yes.

10 Q    Basically, all of the funds raised through MSOC were

11 expended MSOC and EMS week; right?

12 A    Right.

13 Q    So, basically, the conference was breaking even; is that

14 fair to say?

15 A    Yeah, I think so.

16 Q    Well, let me ask you:  EMS week, what is EMS week?

17 A    It's an opportunity to bring EMS together and really

18 recognize and acknowledge them for the great work that they

19 do.  So they have exhibits and they have events and, you know,

20 it's just a good opportunity to recognize and thank them for

21 their work.

22 Q    So it's entirely separate from the MSOC event; right?

23 A    It is, but, again, it was one of the reasons that we kind

24 of decided to move forward with MSOC.

25 Q    But EMS week, it's another separate program that the

1    Foundation does; is that right?

2    A    Correct.

3    Q    Okay.

4         So you were using revenues from MSOC to support EMS

5    week; is that correct?

6    A    Correct.

7         THE COURT:  Ma'am, you refer in this email to the

8    revenues that are generated.

9         Did Dr. Isaacs have access to that financial

10   information?

11        THE WITNESS:  Not to my knowledge, no.

12        THE COURT:  Do you know for sure, one way or the

13   other, whether Dr. Isaacs had access to the financial

14   information that was for revenues generated or expended for

15   the MSOC conference?

16        THE WITNESS:  I don't see -- no, I don't think so.

17        THE COURT:  Okay.  Thank you.

18   Q    Ma'am, turning back to this document.

19        So my question, revenues generated from MSOC were

20   being used to support other foundation activities; is that

21   fair to say?

22   A    Right.  Correct, yes.

23   Q    And between producing the MSOC and the other foundation

24   activities, it was a wash; is that what you're expressing in

25   this email?  "A wash" meaning there wasn't extra revenue.

1   A    Yes, correct.

2   Q    And it seems to me like you are expressing that the

3   Foundation wanted to make more money from the MSOC event

4   because it wasn't enough just to support MSOC and EMS week; is

5   that --

6   A    No, I don't think that's it.  I think we had concerns, it

7   was after the first year, you know, what we could do to

8   generate additional support for it.

9   Q    Okay.

10          But you do say the Foundation wasn't generating

11  enough funds from the conference; right?

12  A    Yes.

13  Q    And the next line you say:  It's not marketed enough,

14  attendance should be higher; right?

15  A    Correct, yes.

16  Q    Okay.

17          So this email appears to be you telling Dr. Isaacs

18  that there's some pros and cons of the event; right?

19  A    Correct, yes.

20  Q    But it's your testimony that there was no ambivalence in

21  your mind at that point whether the FDNY or the Foundation

22  would continue to host the event?

23          MR. MACKIE:  Objection, Your Honor.

24  Mischaracterizing her testimony.

25          THE COURT:  Well, ask the question without

1  characterizing her testimony.

2  Q    I'm looking at an email here that appears to express

3  ambivalence, to me, so I'm going to ask you:  Did you have any

4  ambivalence?

5  A    No.  You know, it benefitted the department.  It

6  benefitted EMS.  That was our goal.

7  Q    I'm going to move to actually a question that the Court

8  just asked you.

9         You knew that as part of the FDNY MSOC events

10  participants were able to get continuing medical education

11  credits; right?

12  A    Yes.

13  Q    Those are called CMEs; is that right?

14  A    Yes.

15  Q    Did you have any personal involvement in the personal

16  arrangements that were required to obtain CMEs for conference

17  participants?

18  A    No.

19  Q    Do you have any knowledge of what the financial

20  disclosures might have been that were required for reporting

21  to get those CME credits?

22  A    No.

23  Q    Okay.

24         Do you know whether or not there were financial

25  disclosures required?

*C Shea - cross - Fletcher*                                              395

1   A    No.

2   Q    And it's your testimony that you don't know whether

3   Dr. Isaacs had access to information that he would then

4   give -- or that would then be provided to acquire that CME

5   credit; right?

6   A    No.

7   Q    You don't know either way.

8   A    No, I don't.

9   Q    There were no FDNY MSOC events held between --

10            MR. FLETCHER:  Strike that.

11  Q    There was an FDNY MSOC event held in spring 2019; right?

12  A    Yes.

13  Q    And after that, there was not another event held until

14  spring 2022.

15  A    Correct.

16  Q    That was because of COVID?

17  A    Correct.

18  Q    You are aware that in 2018, at some point the FDNY's

19  Bureau of Information and Trials referred some allegations to

20  the Department of Investigations concerning Mr. Henriquez?

21  A    I just recently found that out, yes.

22  Q    You just recently found that out?

23  A    Correct.

24            THE COURT:  How did you find out?

25            THE WITNESS:  Through information from the

1    department Legal.

2              THE COURT:  Any of the lawyers sitting at the table

3    here?

4              THE WITNESS:  No.  It was in our briefing.

5              MR. MACKIE:  I would ask the witness not to answer

6    questions about communications with counsel.

7              THE COURT:  I'm not asking about the substance of

8    communications, just how she found out.

9              MR. MACKIE:  Understood.

10             THE COURT:  And from what lawyers.

11             She has answered it.  You can move on.

12             MR. FLETCHER:  Okay.

13   Q    So it's your testimony that you only recently found out

14   there was a Department of Investigation proceeding --

15   investigation taken out against Mr. Henriquez?

16   A    Yes.

17   Q    Okay.

18             But you do recall speaking to someone from the

19   Bureau Investigations and Trials in 2018?

20   A    I really don't recall.

21   Q    You don't recall?

22   A    I don't recall.  Sorry.

23   Q    Let's turn to Exhibit Y.

24             Before we look at this, let's talk about some

25   background.

1           At some point in 2018, you mentioned Joe Malvasio

2    and Hugh Lesner; right?

3           Did those individuals bring your attention to a

4    website link on the Foundation's MSOC website that linked to

5    an outside vendor?

6    A    Yes.

7    Q    Yes?

8           And that was regarding registration for a

9    preconference event for the FDNY MSOC; is that correct?

10          Do you recall?

11   A    I do recall.  I don't recall the details, but, yes, I do

12   recall a link.

13   Q    Okay.  You know what, let's do this.

14          Do you see the second paragraph on this page, and

15   for the record, it's PTF-7784.  It starts:  Paramedic Juan

16   Henriquez.

17   A    Yes.

18   Q    Could you take a minute to read that paragraph to

19   yourself.

20   A    Yes.

21   Q    Okay.

22          So you see that this paragraph discusses that on or

23   about April 9th, 2018, there was some communication about the

24   link between Mr. Henriquez and Mr. Malvasio?

25   A    Yes.

*C. Shea - cross - Fletcher*                                        398

1   Q    And then do you see at the bottom of that paragraph, it's

2   highlighted in yellow, Mr. Lesner, Mr. Malvasio and Ms. O'Shea

3   all stated that Paramedic Henriquez was not authorized to

4   create said link?

5   A    Yes.

6   Q    Did you ever tell a BIT's investigator that Mr. Henriquez

7   was not authorized to create the link?

8   A    I may have.  I don't remember.

9   Q    Okay.

10            But it's --

11  A    If it says I did, I guess I did.

12  Q    You don't recall the conversation, but it says here that

13  you did.

14  A    All right, yes.

15  Q    It says here that information apparently came from you;

16  right?

17  A    Yes.

18  Q    So you might have?

19  A    Yes.

20            THE COURT:  So the Foundation didn't want people

21  going to the website and clicking a link to register for the

22  FDNY-hosted MSOC conference?

23            THE WITNESS:  They wanted it to come to the website

24  that we had developed.

25            THE COURT:  The Foundation meaning "we" or someone

1    else?

2              THE WITNESS:  The Foundation meaning "we."

3              THE COURT:  Okay.

4              This is on the FDNY Foundation web page, so this is

5    the Foundation web page?

6              THE WITNESS:  Yes.

7              THE COURT:  And the link would direct people to the

8    conference registration?

9              THE WITNESS:  Yes.

10             THE COURT:  And what was the issue then if this was

11   on your website and they were linked to be able to enroll at

12   the conference as you wanted?

13             What was the problem with that?

14             THE WITNESS:  I think that it was a link that was

15   created by someone else on another server.

16   Q    Okay.

17             MR. FLETCHER:  Okay, Your Honor I may be able to

18   help with this, if I could continue?

19             THE COURT:  All right.

20   Q    Do you recall whether there was a link placed on the

21   Foundation's MSOC website that took people that clicked on

22   that link to the website a company called Disaster Medical

23   Solutions?

24   A    I remember that issue being brought up, yes.

25   Q    Okay.

*C Shea - cross - Fletcher*                                          400

1              And you recall -- sorry?  Was there anything else?

2    A    (No verbal response.)

3    Q    And you recalled, perhaps, Disaster Medical Solutions was

4    the company that provided the preconference medical specialist

5    course that year at the FDNY MSOC event?

6    A    I am not aware of that, no.

7    Q    Okay.

8              You know there's a podcast on the Foundation's

9    website that features Mr. Henriquez and Dr. Isaacs talking

10   about the 2018 conference --

11   A    Yes.

12   Q    -- is that correct?

13             Do you know whether that podcast talks at length

14   about the medical specialist course that was going to be

15   offered as a preconference event to the 2018 conference?

16   A    I don't really recall.  I vaguely remember the podcast,

17   but I don't know the details.

18   Q    Okay.

19             Anyway, turning back to the document, it appears

20   that you told the BIT's investigator that Mr. Henriquez was

21   not authorized to create that link; right?

22   A    Yes.

23   Q    Okay.

24             And that would have been -- you would have made that

25   communication to the BIT's investigator sometime during the

1  spring of 2018; is that fair to say?

2  A    Yes.

3  Q    If you go to the next page, the middle paragraph with all

4  of the highlighting, could you read that paragraph to

5  yourself, please.

6  A    Yes, I read it.

7  Q    Do you see the highlighted portion about the -- there was

8  a discrepancy between the number of attendees that were

9  registered in the Foundation's records and the number of

10  attendees that were actually going to come?

11  A    Yes.

12  Q    And there was a concern that Mr. Henriquez was, quote:

13  Surreptitiously adding names to the list without foundation

14  approval?

15  A    Yeah, that's what it says.

16  Q    Okay.

17        And did you understand that -- and the top of this

18  paragraph says:  Mr. Lesner, Mr. Malvasio, and Jean O'Shea

19  subsequently discovered these things.

20        Did you -- do you recall having communications with

21  the BIT's investigator about this?

22  A    I recall vaguely.  I don't remember our conversation.

23  Q    Do you have any reason to doubt that you told the BIT's

24  investigator --

25  A    No.

1   Q     -- what's written here?

2   A     No.

3   Q     Okay.

4         If you can turn back one exhibit to Exhibit X --

5   actually, stop.

6         So, again, these conversations all happened during

7   the spring of -- about during the spring of 2018; is that fair

8   to say?

9   A     Yes.

10        THE COURT:  Now, may I ask, did you have personal

11  knowledge about what you told the BIT's investigator about

12  these discrepancies?

13        THE WITNESS:  Yeah, we would know the list of

14  attendees.  We kept all of those documents, so I would have

15  known if one document had X number of names and there was

16  another one that had additional names.

17        THE COURT:  So there was a discrepancy between the

18  number of people who attended and the number of people who

19  actually paid to attend; is that right?

20        THE WITNESS:  That's what it sounds like, but we

21  always had, you know, guests come to the conference.

22        THE COURT:  There are guests; meaning, people who

23  attended that did not pay?

24        THE WITNESS:  Correct, yes.

25        THE COURT:  So would their names still be on the

1    attendee list?

2             THE WITNESS:  Yes.

3             THE COURT:  Would that be an explanation as to why

4    the number of attendees or the list of attendees would exceed

5    the number of actual paid attendees?

6             THE WITNESS:  I don't -- I don't know.  I'm

7    confused.  I don't know.

8             THE COURT:  Well, if you have a list of people --

9             THE WITNESS:  We would know who the guests were,

10   yes.

11            THE COURT:  Do you know how many people, roughly,

12   you would allow to be in attendance without paying?

13            THE WITNESS:  I don't know.  Fifty.

14            THE COURT:  Fifty?

15            THE WITNESS:  Fifty, 75.

16            THE COURT:  Ms. O'Shea, so that would have been a

17   comp list.

18   A    Correct.

19   Q    Were you always in possession of that comp list

20   personally?

21   A    Yeah.  We would have had the list on the Foundation.  We,

22   for security reasons, we supposedly had the list of everybody

23   who was attending.

24   Q    That would be like, when the conference was actually

25   happening; right?

1    A    Correct.

2    Q    But this was -- these communications happened a month or

3    two prior --

4    A    I wouldn't have that information.

5    Q    Okay.

6              Let's turn to Exhibit X?

7              THE COURT:  X?

8              MR. FLETCHER:  X like "xylophone."

9              THE COURT:  Thank you.

10   Q    You will see there are four pages to this exhibit.  The

11   first page doesn't involve yourself, but if you turn to the

12   second page, page 2 of 4.

13   A    Mm-hmm.

14   Q    Do you see the first full email at the top is from

15   Dr. Isaacs to yourself and Susan Wipper?

16   A    Yes.

17   Q    And then below that is an email preceding it from you to

18   Susan Wipper and Dr. Isaacs?

19   A    Yes.

20   Q    I believe it reads in reverse order, so these are dated

21   January 16, 2018.

22              Do you see that?

23   A    Yes.

24   Q    And the one at the bottom is time stamped 13:07 and the

25   one above it is time stamped 13:33.

*C Shea - cross - Fletcher*                                              405

1   A    Mm-hmm.

2   Q    Could you take a minute to read these emails, please.

3        Do you see in the bottom email from yourself to

4   Susan Wipper and Dr. Isaacs, you say:  I don't understand, how

5   can someone sign up for US&R specialist course for $2600 and

6   go to MSOC free?  How many do you expect through this?

7   A    Yes.

8   Q    Okay.

9        And then you see that Dr. Isaacs responds to you

10  that:  The cost of the conference is built into the price of

11  the course and will be forwarded to the foundation and the

12  expected class size is 30?

13  A    Yes.

14  Q    You see this is January 2018?

15  A    Yes.

16  Q    Okay.

17       So this and -- do you see the subject line is:  Re:

18  Website?

19  A    Yes.

20  Q    And in your email, you actually have, it looks like, an

21  edited excerpt of where it says:  Course fee $2600 includes...

22       Do you see all that text?

23  A    I do.

24  Q    Is that something that you cut and pasted from somewhere

25  else?

1    A    I don't recall.

2    Q    Okay.

3         But you see that you had this communication with

4    Dr. Isaacs in January; right?

5    A    Yes.

6    Q    Okay.

7         And that was several months before you gave your

8    interview with the Bureau of Investigation and Trials that we

9    looked at that was referenced just before; right?

10   A    Yes.

11   Q    Okay.

12        MR. FLETCHER:  No further questions.

13        THE COURT:  All right.

14        Any redirect?

15        MR. MACKIE:  A few quick questions on redirect.

16        THE COURT:  Okay.  Thank you.

17   REDIRECT EXAMINATION

18   BY MR. MACKIE:

19   Q    Good morning, Ms. O'Shea.

20   A    Good morning.

21   Q    I'm just going to ask you a few quick questions about the

22   testimony you just gave.

23        You were asked a number of times near the beginning

24   of your testimony about approvals -- the approval process and

25   what kinds of things need to be approved through the

1  Foundation.  So if, for example, you looked at a document that

2  was a flyer, if you had -- sorry.  Let me just go back to that

3  document.

4          So we're on Exhibit D at page 5 of 55.  It says

5  here:  Attached is a draft MSOC flyer for your review.

6          Do you recall reviewing this flyer?

7  A    Yes.

8  Q    And is this typical of the kinds of things that need

9  approval through the department and the Foundation before it

10 goes out to the public?

11 A    Yes.

12 Q    Okay.

13         And the -- later in the email it refers to seeking

14 approval from a number of different people.

15         Is that your understanding of the standard approval

16 process?

17 A    Yes.

18 Q    Okay.

19         If there was any money being spent on the

20 conference, would that have to be approved?

21 A    Yes.

22 Q    Okay.

23         What kinds of things did Dr. Isaacs have leeway to

24 do on his own without approval from the Foundation?

25 A    Nothing involving payments.  Nothing involving comp

1    guests.

2    Q    So if he wanted a comped guest for MSOC, he would have to

3    seek a foundation approval for that?

4    A    Or, you know, his -- or, you know, the leadership of the

5    department.

6    Q    Okay.

7         And if -- if he -- if he knew that someone else was

8    claiming ownership in any portion of the conference, would he

9    have to seek approval for that?

10   A    He would have to notify us, yes.

11   Q    Okay.

12        Back on this document, you will see Juan Henriquez

13   is cc'd on this and the email address used is Juan

14   Henriquez -- Mr. Henriquez is cc'd on this and the email

15   address that he uses is Juan.Henriquez@FDNY.NYC.gov.

16        Do you understand that to be Mr. Henriquez's

17   official fire department email address?

18   A    Yes.

19   Q    And so did you understand that this communication was

20   done in his official capacity as an employee of the fire

21   department?

22   A    Yes.

23        THE COURT:  This was not a communication from

24   Mr. Henriquez.  You said the communication was not done by

25   Mr. Henriquez in any capacity.  He was cc'd on it.

1              Is that what you wanted to ask her; whether he was

2    being copied on it?

3              MR. MACKIE:  If he is being copied and if the work

4    that he has referenced in this email was done in his official

5    capacity as an employee.

6              THE WITNESS:  Yes.

7              THE COURT:  Do you know whether he was paid for all

8    the time he spent on this conference?

9              THE WITNESS:  I wouldn't know.  As I say, we have so

10   many events.  Members volunteer their time, you know, all the

11   time, but, you know, he was doing it as a fire department

12   employee, was my understanding, yes.

13             THE COURT:  Do you know whether he volunteered any

14   of his time?

15             THE WITNESS:  I don't.  I am, I'm told he has and

16   I'm sure he has, yeah.

17             THE COURT:  Okay.  Thank you.

18   Q    I'm also -- you were also asked about Exhibit S, which I

19   have on the screen now.  You all have it in front of you.

20   It's cumbersome right now.

21             But so, do you see the date at the top of the email

22   on Exhibit S that you were asked about earlier?

23   A    Yeah.  June 2014.

24   Q    June of 2014.

25             So would that have been after the 2014 MSOC?

1    A    Yes.

2    Q    Okay.

3         So this was after the second year of MSOC; correct?

4    A    Correct, yes.

5    Q    And --

6         THE COURT:  It's after the second year or after the

7    first conference?  It's after the first and second conference?

8         THE WITNESS:  We had one in '13 and '14.

9         THE COURT:  Thank you.

10        THE WITNESS:  And the '14 one was in May.

11        THE COURT:  May?  Thank you.

12   Q    And what do you understand this email to be, given the

13   context of the date?

14   A    Well, just basically everything we do, we review, you

15   know, do pros and cons of it.  Again, the reason we did this

16   was to really help EMS, to do more for and with EMS.  We just

17   weren't doing enough and this was an opportunity, again, to

18   have a great conference so they could learn best practices,

19   share best practices, and then it would go right into EMS

20   week.  It was just an opportunity to kind of raise the bar and

21   highlight our EMS.

22        THE COURT:  Did your foundation approve annually the

23   FDNY MSOC conferences, or was it just -- was it your

24   understanding that they had ongoing approval to do it without

25   getting foundation approval?

1          THE WITNESS:  It was my understanding that it was

2    good for the department, it was good for EMS, and we would

3    continue it.  Of course --

4          THE COURT:  But did you formally approve it each

5    year that it was held?

6          THE WITNESS:  Well, no, I didn't, but whoever was

7    working on it would have to get commissioner/chief approval.

8          THE COURT:  Each year?

9          THE WITNESS:  Yes.

10          THE COURT:  And the Foundation as well?

11          THE WITNESS:  And then they would tell me, you know,

12    that the departments -- you know, can we do it again.

13          THE COURT:  And then would the Foundation formally

14    approve it at that point?

15          THE WITNESS:  Yeah.

16          THE COURT:  So each year?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19    Q    When you refer to revenue generated and the fact that the

20    Foundation does not generate enough funds from this

21    conference, what was your concern there?

22    A    You know, that we weren't getting enough responses or

23    underwriters, primarily.  That, you know, we needed to do

24    more.  And there was a lot of cost involved as far as our

25    staffing and stuff like that and we needed more volunteers to

C Shea - recross - Mackie                                          412

1   help out with that.

2   Q    The next sentence says:  Nearly all the funds raised

3   through MSOC were extended for MSOC and EMS week.

4          Was it your understanding that the Foundation had a

5   goal to appropriate funds for other activities aside from MSOC

6   and EMS week?

7   A    Yeah, you know, needs for EMS, yes.

8   Q    So your understanding was that the conference was

9   supposed to raise money for the Foundation to support EMS at

10  the fire department generally; is that accurate?

11  A    Yes.

12  Q    Just going to Exhibit X --

13         THE COURT:  When you say support for EMS, was that

14  in the way of equipment --

15         THE WITNESS:  Awards, ceremony, equipment,

16  training --

17         THE COURT:  So training could include allowing EMS

18  personnel to go to conferences to be trained?

19         THE WITNESS:  Yes.

20         THE COURT:  Thank you.

21  Q    And I'm just on Exhibit X, as in "xylophone," page 204,

22  and this is the email you were just looking at.

23         You expressed your concerns here about the funding

24  not being enough to go to MSOC and the response from Doug

25  Isaacs says here:  The cost of the conference is built into

1  the price of the course, it will be forwarded to the

2  foundation.

3          Do you recall if that money was ever forwarded to

4  the Foundation?

5  A   I don't recall.  So it would have been forwarded to the

6  Foundation from --

7  Q   That was my next question.  Do you recall who --

8  A   I don't know.

9  Q   -- might have forwarded the --

10         THE COURT:  Wait.  We had interruptions there.  I

11  didn't get any of that.  She was speaking.

12         What were you saying, ma'am?

13         THE WITNESS:  I don't recall if we got those funds,

14  but certainly we would have accounted for them.

15  Q   So you don't recall who would have sent those funds?

16  A   No.

17  Q   And you don't recall when they would have arrived, if

18  ever?

19  A   No.

20         THE COURT:  When the funds were being sent, if they

21  were to be sent for the preconference, would it be sent to the

22  Foundation at a specific official foundation address, or would

23  it be sent to someone like Dr. Isaacs at his home address?

24         THE WITNESS:  No.  It would be sent to the FDNY

25  Foundation.

*Proceedings*                                                    414

1              THE COURT:  There is an address for that?

2              THE WITNESS:  Yes.

3              THE COURT:  Thank you.

4              MR. MACKIE:  I have no further questions for her,

5      Your Honor.

6              THE COURT:  Do you have any other questions for this

7      witness?

8              MR. FLETCHER:  No, Your Honor.

9              THE COURT:  All right, ma'am, thank you.

10             THE WITNESS:  Thank you very much.

11             THE COURT:  Have a nice day.  Nice to see you.

12             THE WITNESS:  You as well.

13             THE COURT:  Have a good day.  Thank you for your

14     work.

15             THE WITNESS:  Thank you.

16             (Witness excused.)

17             MR. FLETCHER:  We call Moira Archer.

18             THE COURT:  All right.

19             (Witness takes the stand.)

20             THE COURTROOM DEPUTY:  Please raise your right hand.

21             (Witness sworn.)

22             THE WITNESS:  I do.

23             THE COURTROOM DEPUTY:  Please have a seat and state

24     and spell your full name, please.

25             THE WITNESS:  Sure.  My name is Moira, M-O-I-R-A,

 1   last name Archer, A-R-C-H-E-R.

 2           THE COURT:  Thank you.

 3           You know, your book is on the ELMO, sir?  Do you

 4   want to leave it there?

 5           MR. FLETCHER:  Doesn't matter.

 6   **MOIRA ARCHER**,

 7           called as a witness, having been first duly

 8           sworn/affirmed, was examined and testified as

 9           follows:

10   CROSS-EXAMINATION

11   BY MR. FLETCHER:

12   Q    Good morning, Ms. Archer.

13   A    Good morning, Mr. Fletcher.

14   Q    I just have a couple questions for you.

15           There was a number of communications back and forth

16   between yourself and Mr. Henriquez during the first period of

17   2019; right?

18   A    Correct.

19   Q    And I don't know that we need to go through them, but

20   they've been attached as exhibits here.

21           You're aware of that?

22   A    Yes.

23   Q    And at some point, I think in an email or a letter to

24   you, Mr. Henriquez told you that the acronym MSOC was owned by

25   the Medical Special Operations Community organization and that

```
 1   he had been given permission to use that; is that correct?

 2   A    Yes.  That was in November of 2019 -- I'm sorry, January

 3   of 2019.

 4   Q    I'm not trying to make a memory test here, so we can look

 5   at docs.

 6   A    Sure.

 7   Q    I also believe it was January, but I need you to say it,

 8   obviously.

 9        So is your recollection that it was January 2019 --

10   A    Yes.

11   Q    -- that he made that claim?

12   A    Yes.

13   Q    Okay.

14        But you know that the --

15        MR. FLETCHER:  Strike that.

16   Q    You understood that to mean an entity that was a -- like

17   a formal nonprofit organization, Medical Special Operations

18   Community, Inc.?

19   A    I understood it to be an entity.

20   Q    When you say "an entity," like a formal entity that is

21   incorporated?

22   A    A formal entity.  He used it in that context.

23   Q    You're aware that there's an entity called Medical

24   Special Operations Community, Inc.; right?

25   A    I am aware, yes.
```

1    Q     Okay.

2          And you know that it was incorporated in March 2019;

3    right?

4    A     Yes.  I believe I came to know that.

5    Q     Okay.

6          So that was two months after Mr. Henriquez said that

7    an entity owned the trademark; right?

8    A     Correct.

9    Q     Okay.

10         So you know, as a lawyer, that an entity that

11   doesn't exist can't own a trademark; right?

12   A     I don't know that specifically, but I would assume.

13   Q     You are an intellectual property lawyer --

14   A     I'm not an intellectual property lawyer.  I work on

15   licensing issues.  It's one of the things that I do.  I work

16   on the licenses that the -- you know, that the -- excuse me --

17   that the fire department, when we have requests to use the

18   FDNY trademark, I will work on putting together an agreement

19   that will provide permission for that.

20         I also am involved in some enforcement actions when

21   an employee, for instance, is selling a mug on eBay or an

22   Instagram with the FDNY trademarks on it.  I may reach out to

23   that employee and explain to them that they're not permitted

24   to do so and have that employee refrain from that conduct.

25   Q     Okay.

1           So as part of your job, you do trademark licensing

2    and enforcement for the FDNY?

3    A    That's part of what I do.

4    Q    Yes.

5    A    And some aspects of it.  Not all.  We work closely with

6    the City's law department.

7    Q    As your lawyer --

8           MR. FLETCHER:  Strike that.

9    Q    As a lawyer, you are familiar with the concept that if an

10   entity doesn't exist, that entity can't own property; right?

11   A    Yes.

12   Q    So when you came to learn that the entity Medical Special

13   Operations Community organization was formed two months after

14   Mr. Henriquez made that claim to you, you understood that

15   Mr. Henriquez's claim in January 2019 was probably legally

16   incorrect; right?

17   A    I don't -- I don't understand the question.  I thought

18   he -- I thought he was being inconsistent.

19   Q    There was an inconsistency --

20   A    Yes.

21   Q    -- between him saying that an organization that didn't

22   exist until March 2019 owned property in January 2019; right?

23   A    It was inconsistent.

24   Q    Yes.  Thank you.

25           And, in fact, I think there was a letter sent -- you

1  work for Carol Moran; right?

2  A    She's retired now, but yes.

3  Q    At the time you did in 2019?

4  A    At the time I did in 2019, yes.

5  Q    If you turn to Plaintiff's Exhibit 9.

6         MR. FLETCHER:  Strike that.  Please don't turn to

7  Plaintiff's Exhibit 9.

8  Q    In paragraph 9 of your declaration, you refer to that

9  January letter from -- I don't think it's up there.

10 A    Yeah, I don't have it in front of me.

11        THE COURT:  Do you want me to give her -- I have a

12 copy of it.

13        THE COURTROOM DEPUTY:  He can use the ELMO.

14        THE COURT:  You can use the ELMO also, the way your

15 colleague did.

16        MR. FLETCHER:  Okay.

17 Q    That is paragraph 9 of your declaration.

18 A    Okay.

19        I'm sorry, what are you referring to; the

20 highlighted portion?

21 Q    Yes, ma'am.

22 A    Yes.

23 Q    You see the --

24        THE COURT:  Slow down.  Give her a chance and stop

25 talking to so quickly, please.  We need to make a good record

1    here.

2    A    I'm ready.

3    Q    You see that you testified that -- that you did not

4    believe that Mr. Henriquez was correct when he said the

5    organization owned the trademark.

6    A    Correct.

7    Q    Okay.

8         I also think you state elsewhere in this declaration

9    that you did not understand Mr. Henriquez to be savvy about

10   trademark and copyright law.

11   A    I don't know if I used the word "savvy."

12        Do you want to flip to that paragraph so I can read

13   it?

14   Q    Do you see where my finger is?

15   A    Yes.

16        THE COURT:  I'm sorry, what paragraph?

17        MR. FLETCHER:  This is the second half of

18   paragraph 15.

19        THE COURT:  Okay.

20   Q    Do you see it became clear that Henriquez did not

21   understand the basic differences between trademark and

22   copyrights?

23   A    Yes.

24   Q    That was your impression at the time?

25   A    Yes.

1    THE COURT:  Can you explain that statement, ma'am?

2    THE WITNESS:  I can't see my whole --

3    THE COURT:  Okay.

4    Let her see the whole thing.

5    THE WITNESS:  It's kind of hard because it is split

6    on two pages.

7    THE COURT:  Right.  I know.

8    Can you give her a copy of her declaration, please.

9    Thank you.

10   THE WITNESS:  Thank you.

11   A    So if you look at the first bullet point underneath

12   paragraph 15, Mr. Henriquez is speaking to artwork promotional

13   materials, and the -- first he starts with MSOC acronym and

14   related artwork and other promotional materials, so -- he goes

15   on to say they're original works and that he has a trademark

16   for that, but the MSOC acronym, that's a separate issue.

17   That's -- I'm sorry.  Let me back up.

18   So he talks about that, and then he seems to be

19   conflating the ideas of trademark and copyright.

20   He goes on in the next bullet points to talk about

21   copyright for these materials and that he created them.

22   THE COURT:  So what is it where -- can you explain

23   where you believe he is confused?  Was it in the first bullet

24   point that you think he's confusing and conflating trademark

25   and copyright?

1          THE WITNESS:  Yes.  When he talks about -- when he

2     talks about original artworks, and then he has trademarks for

3     original art works, that appears to be -- he's not

4     understanding.  He's mixing copyrights and trademarks.

5          He's talking about original works, which is a

6     copyright concept, but he's intertwining that with saying he's

7     asserting his right that he has a trademark in that.  So, to

8     me, that demonstrated that he doesn't have a clear

9     understanding.

10    Q    Right.  So it's fair to say that you did not -- as a

11    lawyer, your impression was that Mr. Henriquez was not

12    particularly savvy about the differences in the meanings and

13    what it took to own a trademark or a copyright; is that fair

14    to say?

15    A    Yes.

16    Q    Okay.

17         And just finishing up that paragraph, you say

18    continuing to dialogue directly with him was pointless.

19    A    I don't know if I used those words.  Oh, yes, I did, I'm

20    sorry.  Yes.

21    Q    Okay.

22         Yes, you used those words; right?

23    A    Yes.

24    Q    So you've worked on this since 2019; right?  Or you

25    started familiarizing yourself with these events in 2019?

1  A    Yes.

2  Q    And have you continued to be involved --

3  A    Yes.

4  Q    -- since 2019?

5  A    I have.

6  Q    Okay.

7  A    I feel like I need to correct something about my

8  involvement, though.

9  Q    Sure.

10  A    I was never at -- this came up yesterday, that I was at a

11  meeting with the EEO office and Mr. Henriquez, and that never

12  happened.

13         THE COURT:  You were not at a meeting.

14         THE WITNESS:  I was never at a meeting with EEO

15  office.  That would have been way-beyond permissible for me to

16  sit it on -- that's a separate whole process, which is

17  confidential.

18         I did refer it to EEO office when we had a meeting

19  and he brought up the word "retaliation" and that same day I

20  referred it to the EEO office and they conducted whatever

21  their process is, but I never sat in on any of those

22  discussions or meetings.  I don't even know who the

23  investigator -- from appearance, I wouldn't know if she walked

24  into the room.

25  Q    Okay.

*Proceedings*                                                                    424

1           Is that it?

2    A    Yes.

3    Q    Okay.  Thank you.

4           So in all the time you've worked on this, have you

5    ever seen a piece of paper or any written document that states

6    that Mr. Henriquez was officially assigned to work on the FDNY

7    MSOC events as part of his employment?

8    A    No.  That wouldn't have been my involvement.

9    Q    Okay.

10          But you haven't seen such a document?

11   A    I haven't seen it.

12          MR. FLETCHER:  No further questions.

13          THE COURT:  Any redirect?

14          MR. MACKIE:  No, Your Honor.

15          THE COURT:  All right, ma'am, thank you.  You can

16   step back to counsel table.

17          (Witness excused.)

18          MR. FLETCHER:  Your Honor, I'm going to call

19   Dr. Isaacs next and I expect that's going to take a while.

20          Could we take a quick break and then we'll go into

21   Dr. Isaacs?

22          THE COURT:  Is he coming in?

23          MR. MACKIE:  He is here, yes.

24          THE COURT:  Why is it going to take a while?

25          MR. FLETCHER:  I mean, the actual cross-examination

1   might take a while.

2             THE COURT:  Oh, okay.

3             So you want to take a break.

4             MR. FLETCHER:  Yeah, can we take a break before we

5   start that?

6             THE COURT:  Sure.  Is ten minutes enough for

7   everybody?

8             We'll take ten.  Come back at ten of the hour,

9   please.

10            They're taking a ten-minute break, sir.

11            (A recess in the proceedings was taken.)

12            THE COURT:  Have a seat, please.  Let's get the

13   witness.

14            Good morning, sir.  Step up here.

15            (Witness takes the stand.)

16            THE COURTROOM DEPUTY:  Please, raise your right

17   hand.

18            (Witness sworn.)

19            THE WITNESS:  I do.

20            THE COURTROOM DEPUTY:  Please have a seat.  State

21   and spell your full name for the record.

22            THE WITNESS:  Sure.

23            My name is Douglas Aaron, A-A-R-O-N, last name

24   Isaacs, I-S-A-A-C-S.

25            (Continued on the following page.)

1   **DOUGLAS AARON ISAACS**,

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5   CROSS-EXAMINATION

6   BY MR. FLETCHER:

7              THE COURT:  You may proceed.

8   Q    Dr. Isaacs, my name is Jordan Fletcher, I represent Juan

9   Henriquez in this case.

10             Good morning.

11  A    Good morning.

12  Q    Dr. Isaacs, you stated in your testimony that you were

13  the primary planner and organizer of the MSOC events that

14  occurred at the FDNY; correct?

15  A    I was one of the major planners as part of FDNY, but,

16  yes, I was, I guess you consider the main planner for it,

17  correct.

18  Q    And that event occurred every year at the FDNY from 2013

19  to 2019; is that right?

20  A    Correct.

21  Q    When you say you are one of the major planners, that

22  means there are other people?

23  A    Well, within FDNY.  One component of FDNY, but we had

24  people from the Bureau of Training, Rescue School, but, you

25  know, I was organizer, I planned meetings with them, work on

1   CME in terms of one of the academic institutions, worked on

2   logistics.  So, I guess, I am organizer, but I'm one person as

3   part of a team at FDNY.

4   Q    So were you sort of the central person at FDNY and then

5   you would coordinate with other people where necessary?

6   A    Yes, that would be accurate.

7   Q    And as part of your role as the central person at FDNY

8   organizing this event --

9   A    Actually, it's not my job description, but as the medical

10  director for Medical Special Operations for the Fire

11  Department, I did play that major role.  It's not part of my

12  job description.

13  Q    But you understood yourself to be representing the FDNY

14  when you did this; right?

15  A    Correct.

16  Q    And you had been -- that understanding was confirmed by

17  your leadership?

18  A    I'm sorry, I'm not sure what the question was.

19          THE COURT:  Your understanding as representative of

20  the FDNY and the actions you took to organize or plan the MSOC

21  FDNY conferences, that was done with knowledge and approval of

22  leadership?

23          THE WITNESS:  Understood, thank you, Judge.

24  A    Correct, as FDNY representative, absolutely.

25  Q    Thank you.

1           In your capacity doing this for a number of years,

2   you communicated with vendors and sponsors; is that fair to

3   say?

4   A    I'm not sure sponsors, but companies distributing the

5   flyers.  But in terms of the financials and stuff, no, but

6   pushing out flyers -- just asking to help advertise, you know,

7   with the flyers because there are conference professional --

8   you know, certain EMS conferences, and just, you know, if they

9   could, you know, show the flyer and so on.  I did not deal

10  with any financials with them.

11          THE COURT:  Show the flyer of whom?

12          THE WITNESS:  Oh, I'm sorry.  Of the conference.

13          THE COURT:  Okay.

14          THE WITNESS:  It was help distribute flyers and so

15  on it, but it was the FDNY Foundation that deal with any of

16  the finances.

17  Q    I'm not asking if you controlled the finances.

18  A    I was just trying to clarify.  Sorry.

19  Q    Thanks.

20          My question to you is:  There were vendors that came

21  to the MSOC events at the FDNY; right?  City vendors.

22  A    Yes, that is correct.

23  Q    DMS was one of those vendors; is that fair to say?

24  A    They did not pay.  I mean, they came and -- and they --

25  Joe Hernandez and Juan Henriquez had asked could they have a

1   table and it was really the day of the event, if we had space,

2   they could have a spot.

3   Q    Okay.

4           But there were -- DMS wasn't the only one; right?

5   There were other industry private companies who provide

6   services or tools or equipment to the -- in the ***urban

7   search and rescue and medical service industry; right?

8   A    Yeah, emergency medical service industry, correct.

9   Q    Things like laryngoscopy equipment?

10  A    Fair enough, yeah.

11  Q    Mannequins that are used for trainings?

12  A    Correct.

13  Q    Things like that.

14          And you had direct communications with those

15  vendors; right?

16  A    When it came to logistics support, those who were

17  attending the conference, yes.

18  Q    Okay.

19          And you would maybe have communications asking them

20  to come to the conference; right?

21  A    Well, it's on the flyer, but yes, as part of, I guess,

22  advertising or pushing out, hey, we're doing this conference,

23  correct, I would forward them the flyer.

24  Q    I'm sorry, sir, is it your testimony today that your sole

25  job description for this conference was to distributes flyers?

1   A    No.

2   Q    Okay.

3        So let's talk about some of the other things.

4   A    Okay, please.

5   Q    Some of those vendors contributed money to the

6   conference; right?

7   A    Through the Foundation.

8   Q    Right.  That's fine.  Through the Foundation.

9        They gave money to the foundation for their booth in

10  a conference hall?

11  A    Yes.  That is correct.

12  Q    Like, there was a vendor hall.

13  A    Yeah, correct.

14  Q    So the conference, there would be speakers and meetings

15  and then you could go to like, a vendor hall and there would

16  be people with booths set up?

17  A    Yeah, it was a vendor --

18       THE COURT:  This is something I would like to ask

19  both the lawyer and the witness to do:  Wait until he finishes

20  his question and you wait until he finishes his answer and

21  please, slow down both of you.

22       THE WITNESS:  Sorry, Judge, I apologize.

23       THE COURT:  I want to make a record and it is hard

24  for the court reporter and for me to understand.

25  Q    So as part of the conference, there was a vendor hall;

1    right?

2    A     Correct.

3    Q     And so conference participants might attend a lecture and

4    then go check out what the vendors were --

5    A     Correct.

6    Q     -- were hawking, what their wares were; fair to say?

7    A     Yes.

8    Q     Not great English, but you understand what I'm saying;

9    right?

10   A     Yes, sir.

11   Q     Okay.

12         And did you also solicit sponsors or people who

13   could contribute financially to the event?

14   A     To the event?  Not -- I'm sorry, outside of companies?

15   When you say solicit --

16   Q     Anyone who might be able to support the event

17   financially.

18   A     I've had a personal friend who, on their own volition,

19   donated one year some money, but outside of -- I don't know of

20   anyone privately that gave money towards the event.

21   Q     When it comes to MSOC events, you don't have any

22   understanding of the word "sponsors"?

23   A     I attribute sponsors as either companies who want to have

24   a spot in the hall -- exhibit hall, or maybe there's private

25   industry or, you know -- sorry, private individuals that would

1   want to give money, that would be a sponsor, so that's how I

2   attribute sponsors.

3           Is there any other sponsors?

4   Q    I don't know, you ran the conference, sir, so I'm asking

5   you.

6   A    I'm asking about the definition of sponsor.  I want to be

7   able to answer your question.

8   Q    Okay.

9           I'm happy to go with your definition for now.

10          THE COURT:  Well, were there other sources of money

11  or equipment donated outside the FDNY toward the conferences?

12          THE WITNESS:  Well, the companies that were

13  attending there would give some soft supplies; meaning, like,

14  IVs, gauze, tourniquets and so on.  So these were companies,

15  only companies that were attending at the exhibit hall.  So

16  when we do the hands-on skill stations, you know, we had

17  enough supplies.

18          THE COURT:  Thank you.

19  Q    For another example in that vein, Joe Hernandez as part

20  of DMS would drive up a trailer of equipment every year to be

21  used in the preconference and then also in the conference

22  events; right?

23  A    That is incorrect, sir.

24  Q    He did not drive up a trailer of equipment?

25  A    The only time that I'm aware of was the 2018 when, as

1   part of the preconference, we did the Federal Medical Team

2   Specialist course and he was the -- he was -- it was

3   something -- I can expand on that, but that was the only year

4   that I recall him driving up with a trailer because it was a

5   course that he was running.

6   Q    Okay.  We'll talk about that course.  We'll get to it.

7   A    Okay.

8   Q    We're sort of still in the beginning, but thank you for

9   that.

10        And you had direct communications with FDNY

11  leadership about everything you were doing; right?

12  A    I -- since I'm not the final approval, anything I put

13  together, I would always forward that to the appropriate

14  leadership to give final approval, so that is correct.

15  Q    So that might be Chief Abdo Nahmod, for example?

16  A    Abdo Nahmod, yes.

17  Q    Any other chiefs you were seeking approval from?

18  A    Well, the division -- will, it depends.  There's a lot of

19  issues.  Chief of the Department -- you know, officially to go

20  ahead and have a conference, it will be signed off by the

21  Chief of the Department, the final approval.  So it would go

22  to just -- there's different parts of the conference I would

23  have to get approval.

24        So just to do the conference, the idea would be

25  forward every year to the chief of EMS.  So my chain of

 1  command, Dr. Asaeda, who is the chief medical director of

 2  office of medical affairs, which is my unit, and then we get

 3  final approval from the Chief of the Department and that's

 4  just approval to do the conference, but there's a lot of

 5  different components like, when it came to personnel, since I

 6  don't make personnel decisions.  So people are going to be

 7  detailed, what have you -- like, I would -- it varies, but I

 8  would always go through EMS operations, so whether it was a

 9  division chief who is responsible for a certain EMS division

10  or EMS operations.

11  Q    Was Chief -- is it Ahee or Ahee?

12  A    Roger Ahee.

13  Q    Is he someone who you sought permission from or approvals

14  from time to time?

15  A    At some point, because the personnel changed over the

16  years as you can imagine, with promotions and retirements and

17  what have you, he was a chief at some point.  I forgot how

18  long ago and what years of EMS training academy, but I did not

19  interact with him too much at all, not that I really recall

20  ever really interacting with him at all about the conference

21  now that I'm thinking about it.

22            THE COURT:  You can remove your mask, if you want.

23  Are you comfortable?

24            (Pause in the proceedings.)

25            THE COURT:  We are trying to keep everyone safe.

1   A    So Chief Roger Ahee, I don't recall any specific

2   interactions with him regarding the conference.

3   Q    But it's fair to say that there were a number of

4   individuals who were chiefs or people above you in the FDNY

5   command structure that you had to seek approval from for

6   various components of this conference.

7   A    Correct.

8   Q    Okay.

9          But those individuals weren't involved in the

10  day-to-day of producing the conference the way you were;

11  right?

12  A    Well, there's -- there's different phases of it.  The

13  actual planning and so on, like, for example, this Friday.

14  Friday I'm having a meeting with EMS academy, kind of talk

15  about different components of the conference, so there's

16  different plannings.

17         However, the day that we have the conference, we

18  have a whole team from EMS operations and the fire and rescue

19  school that, you know, run really, the operations of it.

20  Q    Okay.

21         So let's -- we'll talk about the actual event later,

22  but I want to talk about the planning of the conference for a

23  number of years; right?

24         So when you were planning this conference --

25         THE COURT:  Which one?

1          MR. FLETCHER:  All of them, 2013 to 2019.

2          THE COURT:  Okay.

3    Q    -- you acted independently at times, right?  There were

4    communications that you had with people that Chief Nahmod or

5    Jean O'Shea at the foundation were not privy to; right?

6    A    Only in the planning stages, involving the material,

7    correct.

8    Q    Developing materials.

9    A    Correct.

10   Q    Were you also involved in trying to find speakers for the

11   conference?

12   A    Correct.  And the reason we normally -- in order to --

13   for us to learn, just as much for others, I thought it was

14   important to have outside speakers, so people get good

15   exposure to what's going on around the country, around the

16   world.

17   Q    And there was marketing that was happening; right?  You

18   were involved in marketing?

19   A    Through the FDNY Foundation and the fire department

20   there's a lot of different marketing.  Through different

21   channels the Fire Department has.

22          THE COURT:  He just wants to know if you were

23   involved in any marketing.

24          THE WITNESS:  To a degree.  A role.

25   Q    And not just fire department, and not just foundation;

 1  right?  There was like, JEMS is an outside journal; right; is
 2  that fair to say?
 3  A    The trade journals are EMS World and JEMS.
 4  Q    And you had direct communications with those trade
 5  journals?
 6  A    Correct.
 7  Q    Okay.
 8        And Jean O'Shea wasn't with you in communicating
 9  directly with those trade journals; right?
10  A    Only one -- well, Susan Wipper, who works for the
11  Foundation, if there was some marketing by them, she would --
12  they would have a conversations because the Foundation was
13  paying for marketing, but in terms of, like, articles and so
14  on, yes, I was directly communicating with them regarding any
15  write-ups and so on.
16  Q    Okay.
17        So is it fair to say you organized a lot of these
18  things and then, if you needed approval from someone or you
19  needed logistical help from another part of the department,
20  you would go seek that approval and logistical help?
21  A    Every aspect I would have to get approval, correct.
22  Q    Okay.
23        But there were things that you were doing on your
24  own and then, if you needed approval, you would go seek that
25  approval; right?

1   A    Again, it depends on what it is.  At the end of the day,

2   I don't make any final decisions --

3   Q    I'm not asking if you made a final decision, sir.

4   A    But, of course, I have to do work on something, so it is

5   independent, your work, but always wearing my FDNY hat, I

6   guess, so to speak.

7        THE COURT:  Please, sir; listen to the question and

8   I think we can move this along a little more efficiently.

9        MR. FLETCHER:  Thank you, Your Honor.

10       THE COURT:  I think the question was:  Did you get

11  approvals when needed?

12       THE WITNESS:  Correct, yes.

13  Q    You did.

14       So there were times -- not all the time, but there

15  were times when you acted independently and there were times

16  when you believe you needed approval; right?

17  A    Again, I just want to answer your question.  Any

18  decisions, I would seek approval.

19  Q    But there were times when you acted independently;

20  correct?

21  A    I'm not trying to be difficult because I want -- when you

22  say "independently", are you talking about coming up with

23  topics, seeking out speakers?  Those type of things?  I just

24  want to clarify.

25  Q    Sure.

1    A    Yes, that is correct, then you can say I was acting

2    independently for those activities.

3    Q    You often used email to seek approval for different

4    activities; right; from the FDNY chiefs or from Jean O'Shea;

5    correct?

6    A    Correct.

7    Q    And you often forwarded those emails to Juan Henriquez;

8    right?

9    A    Some of them.  Again, as a personal, entrusted friend,

10   you know, I shared what I thought was relevant with him.

11          THE COURT:  Why did you do that?  Was it solely

12   because of friendship or because of the role he was playing in

13   coordinating and planning and --

14          THE WITNESS:  Purely as one of my -- I thought, one

15   of my closest, personal friends.

16          THE COURT:  It had nothing to do with his role in

17   the conference?

18          THE WITNESS:  No.  No, ma'am.

19          THE COURT:  So how many other trusted friends did

20   you share emails with, with the top brass of the FDNY and the

21   Foundation?

22          THE WITNESS:  Juan was one of my closest friends.

23          THE COURT:  Who else --

24          THE WITNESS:  On occasion, maybe with other people

25   if I thought it was appropriate, whether -- depends who I'm

1    working with.  It could have been one of the EMS officers if I

2    thought it was appropriate for them to know about something.

3    If it's another medical director, if I thought it was

4    appropriate, but certainly for Juan, you know, I -- you know,

5    I shared pretty much most conversations I've had or emails

6    that I thought were, you know, something I think he would want

7    to know.  As a friendship and probably not appropriate as my

8    job maybe, I don't know, but as a friend, a trusted friend, I

9    shared them with him.

10            THE COURT:  And that is the only basis for your

11   sharing with this close friend?

12            THE WITNESS:  Right.

13            THE COURT:  And you can't think of any other close

14   friends that you shared information with that were not part of

15   the FDNY structure and planning this conference?

16            THE WITNESS:  Sure.  Well, just to clarify that,

17   Juan played a role in planning, so I look at it as FDNY

18   capacity, but there are other officers like Joseph Spinelli,

19   who was, I think, a lieutenant at the time, Pamela Lai --

20            THE COURT:  Well, she was a friend and a colleague;

21   correct?

22            THE WITNESS:  Correct.

23            THE COURT:  Did you a share a lot of these emails

24   with her as well?

25            THE WITNESS:  There were so many different emails

1  when planning this.  Not every email, but I'm sure there's

2  some emails I forwarded to them.  You know, there's so many

3  things going on with planning this, so...

4         THE COURT:  All right.  Thank you.

5  Q    So was Mr. Henriquez involved in planning the FDNY MSOC

6  events in any way?

7  A    Yeah, he played a role, absolutely.

8  Q    Okay.

9         He did not have much direct communication with Jean

10  O'Shea or the FDNY chiefs, though; right?

11  A    Correct.

12  Q    You were the communication point with Jean O'Shea and the

13  FDNY chiefs; right?

14  A    Yes, sir.

15  Q    Juan is a paramedic; right?

16  A    Is a MSOC, that's correct.

17  Q    That's sort of like the lowest on the totem pole in the

18  EMS?

19  A    No.  I -- I -- that's a kind of strange way of saying it.

20  He's part of our medical special operations.  He's a

21  highly-trained medical specialist for our SOC Task Force as

22  well as our ***Federal Urban Search and Rescue Task Force.

23  He's an instructor for our rescue paramedic program.  So he's

24  actually, when it comes to paramedics, one of -- probably our

25  highest tier of trained individuals in the department from a

1    medical standpoint.

2    Q    I understand that Mr. Henriquez is highly trained and has

3    a wealth of experience inside and outside the department.  My

4    question, though, is about the EMS chain of command.

5              A paramedic is not an officer; right?

6    A    That is correct.

7    Q    Okay.

8              Are there ranks below officer level?

9    A    Well, different levels of certification.  You have

10   certified first responders, you have EMT basics and then

11   paramedic.  So, for example, if you're on-scene, the paramedic

12   is the highest ranking medical person, so they make medical

13   decisions, but in terms of an officer, yes, after that, it

14   becomes lieutenant, captain and so on.

15   Q    Are there any ranks between paramedic and the officer

16   ranks?

17   A    Not that I'm aware of, no.

18   Q    In your role as -- were you deputy medical director of

19   the FDNY Office of Medical Affairs back then?

20   A    As I am still now, correct.

21   Q    Okay.

22             And do you have any supervisory authority over

23   Mr. Henriquez?

24   A    I have no operational supervisory role at all.

25   Q    You do have an ability to have direct connections with

1  FDNY chiefs in a way that Mr. Henriquez did not have; correct?

2  A    That is correct.

3  Q    And that's because of your role as a doctor in the office

4  of medical affairs or something else?

5  A    As a deputy medical director, yes.  As a medical director

6  for FDNY, yes.

7  Q    You had access to decision-makers that Mr. Henriquez did

8  not have; fair to say?

9  A    Yes.

10 Q    And it's your understanding that Mr. Henriquez did not

11 have regular contact with those decision-makers personally?

12 A    That's not accurate.  We understand we have a rank

13 structure, a chain of command, but, you know, when we work

14 in -- there's relationships; meaning, he has often talked to

15 officers like -- I mean, he's got some very close friends that

16 were captains, chiefs, people he knew -- people at the highest

17 level of department.  So there's personal relationships.

18        So while we do have a structure of chain of command,

19 but certainly he had access to and spoke to chiefs anywhere

20 from, you know, any of the chiefs that were planning or

21 involved.  He has -- forget conference, just through any time

22 he has access to officers and it's not following a strict

23 chain of command.

24 Q    Did he talk to the chiefs regarding organizing the MSOC

25 conferences?

1  A    I don't recall of him talking about actual making

2  decisions or planning, but he may have shared information with

3  them.

4  Q    Okay.

5         About the conference?

6  A    Correct.

7  Q    You also had direct communications with Joe Hernandez

8  about these conferences; right?

9  A    Yes, because he was also a good friend, not my same

10  relationship I had with Juan, but he was a good friend and

11  often at the urging of -- by Juan reaching out to Joe, so...

12  Q    And you first met Joe Hernandez in or about 2009; is that

13  fair to say?

14  A    Actually, it was 2008.  He taught my federal -- my FEMA

15  Medical Team Specialist course and -- it's going to come to

16  me -- out west.  Memphis.  I took the 2008 Medical Team

17  Specialist course, and he was one of the instructors.

18  Q    Okay.

19         So Joe Hernandez, you first met him in the capacity

20  of your teacher; is that fair to say?

21  A    Yes, he was one of my instructors, that's correct.

22  Q    You continued to have communications after that course?

23  A    No, not for a while.  I met him at some of the Special

24  Operations Medical Association conferences, and -- but I

25  didn't quite know him -- when I got to know him better was in

1   2012.  I was acting as a shadow instructor in Medical Team

2   Specialist courses in Pennsylvania in 2012.  And then later

3   that year, also in Vegas.

4   Q    Okay.

5         So in or about 2012, you got to know him better?

6   A    That is correct.

7   Q    And was this -- so you talked about first taking the MTS

8   course in 2008 and then being a shadow instructor in 2012.

9         So were you, at that point, just getting involved in

10  sort of the FEMA Task Force system?

11  A    During -- actually, once I took the Medical Team

12  Specialist course in 2008, I was on the team.

13  Q    Okay.

14        THE COURT:  Of what?  What team?

15        THE WITNESS:  Of the federal -- our New York Task

16  Force I, which is made of half FDNY and half NYPD as part of

17  the federal system.

18  Q    And Mr. Henriquez is also on that team; right?

19  A    That is correct.

20  Q    Who is the main point of contact between Joe Hernandez

21  and the FDNY MSOC events?

22  A    Between Joe Hernandez and when we ran the FDNY MSOC

23  events?

24  Q    Yes.  How did Joe Hernandez become involved?

25  A    Really through Juan Henriquez.

1  Q    So it was Juan's personal relationship with Joe

2  Hernandez?

3  A    Correct, and their company DMS.

4  Q    Did you also have personal -- direct communications with

5  Joe Hernandez about the events?

6  A    Yes.

7  Q    On multiple occasions?

8  A    Yes.  I consider him a good friend.

9  Q    Beginning in about 2012?

10 A    I can't recall, but I would assume in 2012, since we were

11 planning it.

12         THE COURT:  You were planning in 2012 --

13         THE WITNESS:  For the 2013 conference.  I

14 certainly -- since this is the first year doing it, planning,

15 communication.

16         You have to understand, in the ***Urban Search and

17 Rescue system, there's a small group of us, not just Joe

18 Hernandez.  I was speaking to people around the country, but

19 Joe Hernandez was certainly one of them.

20 Q    And you also often sought Mr. Hernandez's input and

21 resources to produce the FDNY MSOC events; right?

22 A    So we've all -- very passionate about this field of

23 medicine, of special operations medicine, so Juan asked to be

24 involved when I brought up we're going to do a conference at

25 the urging of some of the people at the fire department that,

1   hey, we're one of the leaders of special operations around the

2   world.  You know, we had people who -- actually, Chief Ray

3   Downey, who developed the concept of ***urban search and

4   rescue.  So we are considered the leaders in the -- one of the

5   leaders in the world and so people said, medically, we've got

6   to protect our leadership and so, hence; the idea of the

7   conference.

8           So Juan asked to be involved and as a good friend,

9   I'm like, yes.  This is the fun part of the job when you get

10  to work on things together.  You know, it's not my specific

11  job description, but it's the fun part of the job of working

12  on projects together.

13          MR. FLETCHER:  Your Honor, I don't want to interrupt

14  Dr. Isaacs when he's testifying, but he's -- he wasn't

15  answering my question.  I think he might have misunderstood my

16  question.

17          THE COURT:  Okay.

18          MR. FLETCHER:  So I don't know whether to interrupt

19  him when he's going on let him finish.

20          THE COURT:  Well, this is cross-examination, so you

21  are free to ask questions that would call for a yes or no

22  answer whether he's either affirming or agreeing or not

23  agreeing.  You are free to use that form.

24          MR. FLETCHER:  I believe I did, which is why --

25          THE COURT:  All right.

1          So, sir, listen to the question and answer the

2     question.  Not some other question, all right?

3          If you need to say something more, that is the job

4     of your lawyer to bring it out, but right now listen to the

5     lawyer's question and answer that question.

6          THE WITNESS:  Yes.

7          THE COURT:  Thank you.

8     Q    Okay.  So I'm asking about Joe Hernandez.

9     A    Yes.

10    Q    Not Juan Henriquez, okay?

11         You sought -- you asked for Joe Hernandez's

12    resources and advice on multiple occasions related to the FDNY

13    MSOC events; right?

14    A    Yes.

15    Q    Okay.

16         You asked for his contact lists?

17    A    Can I clarify it when you say "contact list"?

18    Q    Yeah, you looked for a list of people that the FDNY could

19    market its event to?

20    A    It was specifically regarding his -- in the ***State

21    Urban Search and Rescue.  At Juan's once urging -- but I have

22    to clarify when you say contact list.

23         It was specifically at the urge of Juan that they

24    work with people at the State level, which I'm not familiar

25    with, I know people at the federal level.  So for that, yes.

1  He offered it.

2  Q    This is another yes or no question:  So you asked for one

3  of Joe Hernandez's contact lists to support the FDNY's

4  marketing events for its events; right?

5  A    It was more asking him to use his contacts to advertise

6  the conference.

7  Q    Okay.  We're going to look at that document in a second.

8  A    Okay.

9  Q    You did that.

10       Did you also ask for Joe Hernandez's input into

11  various FDNY MSOC conference materials?

12  A    Not materials, but ideas of topics.  That's what I

13  recall.

14  Q    Ideas for topics?

15  A    Yes, like when we -- every year we changed the topics of

16  the conference to keep it fresh, and what's new, so he was one

17  of many people I sought out.

18  Q    Okay.

19       THE COURT:  So you did not come up with conference

20  topics on your own.

21       THE WITNESS:  A lot of them.  Majority.

22       THE COURT:  All right.

23       But you sought advice from lots of people for

24  topics.

25       THE WITNESS:  Correct.  Around the country.

1    Correct.

2    Q    Just so I'm clear -- going back, but then we're going to

3    keep moving forward -- so the FDNY chiefs, like the leadership

4    that you sought approvals from for these conferences, they

5    were not personally involved in the day-to-day details of

6    planning and producing the conferences; right?

7    A    Parts of it.

8    Q    Parts of it they were and parts of it they were not?

9    A    Of the day-to-day, correct.

10   Q    Okay.

11        And Jean O'Shea was not personally involved in the

12   day-to-day of planning this event; right?

13   A    Only stuff that needed approval from the Foundation were

14   things that the Foundation had to work on.

15   Q    But if it didn't -- if you didn't think it needed

16   approval --

17   A    From the Foundation, correct, I would not seek out

18   Ms. O'Shea.

19   Q    Is that the same thing with the FDNY leadership; if you

20   didn't think it needed approval you didn't seek approval?

21   A    Well, I always sought approval, but would have to go to

22   the appropriate chain of command of who gives that approval.

23   Q    That's not my question.

24        If you didn't think it needed approval, you didn't

25   ask for approval; right?

1          THE COURT:  Yes or no?

2    A    I mean, I would always seek approval for decisions that

3    had to be made.  I'm trying to answer the best question.

4          So if it did not need approval, then I would make

5    decisions, but if it sought approval, I would seek -- I would

6    ask for approval.

7          THE COURT:  The question was whether there are some

8    decisions where you didn't seek approval.

9          THE WITNESS:  Oh, some.

10         THE COURT:  You decided on your own --

11         THE WITNESS:  Okay.  Yes.

12         THE COURT:  Listen to the question.

13   Q    You didn't ask for approval to send every single email

14   you sent regarding this conference; right?

15   A    No, I would not have to seek approval on everything.

16         THE WITNESS:  Judge, I thought it was in absolute

17   terms he was asking.

18         THE COURT:  No.  Just listen to the question, okay,

19   and if you want to say, well, not on everything, or not

20   absolutely, that's fine, but please listen to the question.

21   We can get through this much more efficiently.

22         THE WITNESS:  Yes, okay.  Understood.

23   Q    And you're a salaried FDNY employee; right?

24   A    Correct.

25   Q    And you have been during the entire period?

*Isaacs - cross - Fletcher*                                                452

1   A    I have what?

2   Q    You have been during the entire period 2013 to 2019.

3   A    Correct.

4   Q    So it's your testimony that you came up with the term

5   Medical Special Operations Conference?

6   A    Correct.

7   Q    Not FDNY MSOC, you came up with the name "Medical Special

8   Operations Conference"?

9   A    Well, it was always called FDNY Medical Special

10  Conference.

11  Q    So you had no knowledge of the phrase "Medical Special

12  Operations Conference" being used prior to its use in

13  connection with the FDNY Special Medical Operations

14  Conference?

15  A    Yes, that is correct.

16  Q    You never had any discussions with Mr. Henriquez about

17  prior MSOCs or Medical Special Operations conferences

18  occurring before the FDNY MSOC?

19  A    No prior MSOC -- if you want it just for short --

20  conferences, that is correct.

21  Q    There's some binders in front of you.

22  A    Sure.  Which one?

23  Q    There's a binder that says:  Defendant's Exhibits.  It's

24  black.  Black and white is convenient.

25            Let's look at Exhibits C.

1          Do you see that's an email exchange -- sorry,

2   HENR-35, Bates stamp.

3          Do you see that's an email exchange between you and

4   an email address caprefil@Yahoo.com?

5   A   I'm sorry, I opened up to C, as you stated, and I see one

6   Joe Hernandez, and Juan, and then some others.  Hold on.  Oh,

7   okay.

8          THE COURT:  The number on the page that he referred

9   you to is HENR-35.

10         THE WITNESS:  Yes.

11  Q   Okay.

12         You see that email?  It's two emails?

13  A   Correct.

14  Q   Sir, do you see it's an email exchange between Doug

15  Isaacs and caprefil@Yahoo.com?

16  A   Correct.

17  Q   And caprefil@Yahoo.com is Mr. Henriquez's personal email;

18  is that correct?

19  A   Correct.

20  Q   Also there's -- it looks like there's two email addresses

21  for you at the bottom email.  There's one DAIsaacs74@aol?

22  A   Yes, that's my personal AOL account.

23  Q   The one above it was an FDNY account?

24  A   Correct.

25  Q   So you see that this email exchange occurred on June 29,

1    2012; right?

2    A    Correct.

3    Q    Okay.

4          And that's almost a year before the first FDNY MSOC

5    event; right?

6    A    Yes.  I guess less than a year, but correct.

7    Q    Okay.

8          And you see the subject line is:  Re:  MSOC NY.

9    A    I see.

10   Q    And do you see Mr. Henriquez in his email to you says:  I

11   attached a draft to show how we would do it in New York.  It

12   follows the same structure as the previous MSOC events.

13   A    Okay.  I actually called him after this --

14   Q    I haven't asked you a question.

15   A    Okay, sorry.

16         Yes, I see what's written there.

17   Q    Okay.

18         So did you understand, as you sit here today, that

19   Mr. Henriquez is referring to previous MSOC events?

20   A    I did not see that at the time.

21   Q    You didn't see that --

22   A    I don't recall seeing this in terms of other MSOC events.

23   Q    I'm sorry?  Let me ask a question.

24         So your testimony today is that when you received an

25   email apparently attaching some sort of draft document from

1  Juan saying:  Here's a draft to show you how we would do it

2  New York, it follows the same structure as previous MSOC

3  events; you did not understand that to be referring to MSOC

4  events that happened before Mr. Henriquez sent this email to

5  you in June 2012?

6  A    Correct.  I'm not sure what he was talking about at the

7  time.

8  Q    You had no idea?

9  A    No.

10 Q    Okay.  Let's look at the next side:  The formula is the

11 same tweaked.  Just tweaked it to what we have available here.

12 It all depends on how much support we get from the rest of the

13 FDNY.  Joe and Vinny are it.

14 A    Again, I'm not sure what that meant.

15 Q    Okay.  I haven't asked you a question.

16       THE COURT:  Let him ask the question, all right,

17 sir?

18       THE WITNESS:  Okay.  Sorry, Judge.  I apologize.

19 Q    Okay.

20       Did you understand Mr. Henriquez to be referring to

21 Joe Hernandez?

22 A    Yes.  With the line Joe and Vinny, correct.

23 Q    All right.

24       And Vinny is Vincent Johnson?

25 A    That's correct.

1          THE COURT:  What page are you talking about, sir?

2          MR. FLETCHER:  This is the same exhibit, Exhibit C.

3   It's just a one-and-a-half-line email exchange.

4          THE COURTROOM DEPUTY:  Judge, can he just put the

5   document on the ELMO?

6          THE COURT:  Yes.  I am not sure I have that

7   particular page.

8          MR. FLETCHER:  Really?

9          THE COURT:  Exhibit C.  Oh, I see, I see.  The

10  second sentence of that email.  I see.

11         MR. FLETCHER:  Are we all together here?

12         THE COURT:  Yes.

13         MR. FLETCHER:  I'm just making sure the binders

14  didn't get mixed up.

15  Q    Okay.

16         So it's your testimony today that you have no idea

17  what Mr. Henriquez is talking about.

18  A    Correct.

19  Q    Okay.

20         And you see above you said:  Thanks, Juan.

21  Exclamation point.

22  A    I see that.  It's my frequent response, but, you know, I

23  could be teaching and be just acknowledging him.

24  Q    Okay.  Let's look at another document.

25         Could you turn to Exhibit P?  P like "Peter."

1    A    Understood.

2    Q    Actually, before you get there, stop for a second.

3         You said when you were asking for Joe Hernandez's

4    contact list, you were asking for State Urban Search and

5    Rescue contact lists?

6    A    Correct.

7    Q    Okay.  So now let's look at this exhibit.

8         Do you see the top email is an email from you to

9    Mr. Henriquez, dated July 2014 -- July 7th.

10   A    I see -- yeah, July 7, 2014.

11   Q    Okay.

12        And you say:  Can you please send me your MSOC

13   contact lists, including Joe's.  We need to give them to Susan

14   for marketing.

15   A    I do not recall.

16   Q    I didn't ask you a question.

17        Do you see that?

18   A    I see that, yeah.

19   Q    Do you recall sending this email?

20   A    I do not.

21   Q    Okay.

22        Do you think Susan refers to Susan Wipper at the

23   foundation?

24   A    Yes, the only Susan I know at the FDNY.

25   Q    Did she handle marketing for the FDNY MSOC events?

1  A    No, not marketing.

2         THE COURT:  What?

3         THE WITNESS:  No, she does not do marketing.

4  Q    She didn't do any marketing work for the FDNY MSOC

5  events?

6  A    No, that wasn't her role.

7  Q    Okay.

8         So why did Susan Wipper at the foundation want MSOC

9  contact lists for marketing?

10  A    Again, I do not know.  I don't recall this email.  I

11  don't recall ever seeing it.  I went through my archives.

12  I've never seen this.  I don't recall ever seeing this before.

13  Q    And you have no recollection of why you asked -- I mean,

14  this is you; right; Doug.Isaacs@FDNY.NYC.gov?

15  A    That's absolutely my name, yes.

16  Q    You have no recollection of why you asked for an MSOC

17  contact list for Mr. Henriquez or Joe Hernandez?

18  A    No, I don't recall ever seeing this before other than

19  related to this hearing.

20  Q    Is it your testimony that you did not send this email?

21  A    All I can say is I do not recall sending this email.

22  Q    Let's look at the email below from Mr. Henriquez back to

23  you.

24         THE COURT:  Same day?

25         MR. FLETCHER:  Same day, July 7, 2014.

*Isaacs - cross - Fletcher* 459

1          THE COURT:  At 6:33?

2          MR. FLETCHER:  At 6:33.

3   Q    So about an hour after you sent your email, Mr. Henriquez

4   says:  Attached, stand by for the other, can I call you later?

5   Juan.

6          And do you see, highlighted, it looks like there was

7   an attachment to that email that Mr. Henriquez sent to you.

8          Do you see that?

9   A    I see this in front of me, correct.

10  Q    And you see the document reflects what appears to have

11  been an attachment, an Excel file?

12  A    Yes.

13  Q    Okay.

14         And you see that the title of the Excel file is

15  2012_MSOC_GA_full?

16  A    Yes, I see that.

17  Q    Okay.

18         And as you sit here today, you have no recollection

19  of whether that was an Excel file relating to a 2012 MSOC

20  event in Georgia?

21  A    I do not recall ever seeing this email, also searching my

22  archives.  I have not seen this email before, and it's not in

23  my archives.

24  Q    Okay.

25         So you don't recognize this?

1    A    No, I do not.

2              THE COURT:  Sir, do you recall whether or not

3    Mr. Hernandez ever sent you -- I'm sorry.

4              Do you recall receiving a 2012 MSOC Georgia list of

5    contacts --

6              THE WITNESS:  No.

7              THE COURT:  So you are saying you never received it.

8              THE WITNESS:  I do not recall ever receiving any

9    list from Joe Hernandez.

10             THE COURT:  Or --

11             THE WITNESS:  Or Juan Henriquez.

12   Q    And you don't recall ever asking for it?

13   A    I do not recall asking for it, but asking them to

14   advertise for us.

15   Q    You recall asking them to advertise?

16   A    Yes.  The flyer.

17   Q    But you don't recall ever asking for a contact list?

18   A    Correct.  I don't have any contact list from them.

19   Q    You said you asked for a SUSAR contact list; right?

20   A    To my recollection, if I may, I just asked if we can

21   distribute this at the urging of Juan to the SUSAR system, so

22   I can't recall asking for a list, but asking for their help

23   on, I guess, advertising the conference.

24             MR. FLETCHER:  Your Honor, do we have realtime right

25   now?  Is there a way to read back the transcript from an

1   answer that was given previously?

2           THE COURT:  We can ask the court reporter if she can

3   find it.

4           MR. FLETCHER:  There was a prior reference to SUSAR.

5   The SUSAR contact list.  I would love to see -- what

6   Dr. Isaacs said.

7           THE COURT:  Would you mind, ma'am, reading the Q and

8   A?

9           We will have to wait a moment while she looks for

10  it.  Was it at the beginning or -- I know it was close to the

11  beginning; wasn't it?

12          MR. FLETCHER:  Yeah, it was pretty close to the

13  beginning.  It was maybe ten minutes in.

14          THE COURT:  Yes.

15          MR. FLETCHER:  The beginning went long.

16          THE COURT:  Yes.

17          (Record read.)

18          THE COURT:  There was mention about state contacts.

19          Is that what you mean by SUSAR, sir?

20          MR. FLETCHER:  It could be.

21  Q    Dr. Isaacs, you said state contacts earlier; right?

22  A    The State Urban Search and Rescue, right.

23          THE WITNESS:  Which is SUSAR, right.

24          (Pause in the proceedings.)

25          MR. FLETCHER:  Your Honor, another way to do this

1   would be, we can continue and I think at some point we're

2   probably going to have to take a lunch because this is taking

3   a while and we can look for that during the break and come

4   back to it, if we need to.

5           THE COURT:  All right.  The court reporter needs to

6   eat lunch, too, but all right.

7           MR. FLETCHER:  I mean, I'm happy to wait now.  I

8   don't know what's more efficient.

9           THE COURT:  It is your call.

10          THE COURT REPORTER:  I can do it at lunch, Judge.

11          THE COURT:  Okay.

12          MR. FLETCHER:  So let's just move on.

13  Q    Dr. Isaacs, do you generally have problems with your

14  memory?

15  A    No.

16  Q    Have you taken -- like, are you on any medication right

17  now?  Have you taken anything or consumed anything that would

18  affect your ability to testify and recall things today?

19  A    No.

20  Q    Okay.

21          You've never had any injuries that would affect your

22  memory?

23  A    No.

24  Q    Let's look at Exhibit D.

25  A    Can you repeat that, please?

1    Q    Exhibit D.

2          So we'll start on the first -- the first page of

3    actual documents in Exhibit D, it's page 2 of 55.  It's an

4    email, it's Bates stamped HENR-15.

5    A    You said 2 of 55?

6    Q    2 of 55, yes?

7    A    Let me just read it, please.

8          Okay.

9    Q    Okay.

10         So this is an email from you to Mr. Henriquez dated

11   November 24, 2012, and you will see there's a highlighted

12   portion where you're asking Mr. Henriquez to:  Forward you a

13   draft of the assigned lectures we had discussed at the station

14   the other week.  Let me know where the speakers recommended by

15   Mike and Joe would fit in.

16   A    I see the email.

17   Q    First of all, do you recall sending this email?

18   A    It was -- I can't specifically, but it would seem

19   appropriate.

20   Q    No.

21         Do you recall sending this email?

22   A    Can't remember specifically, no.

23   Q    So the answer is:  No, you don't recall?

24   A    Let me -- just let me read it again, please.

25         Yes, I do believe I recall this email now.

1    Q    You do.

2         So you sent this email?

3    A    Yes.

4    Q    Okay.

5         And you see that you're asking Mr. Henriquez to,

6    quote:  Forward me -- meaning you -- the draft of the assigned

7    lectures that you and Mr. Henriquez had discussed at the

8    station the other week.

9    A    I see the highlight, correct.

10   Q    Okay.

11        So -- so you're asking Mr. Henriquez to forward you

12   drafts of lectures --

13   A    That him and I reviewed when I stopped by his station and

14   we sat down, correct.

15   Q    So who created those drafts?

16   A    I can't recall because we go back and forth with drafts,

17   so I can't recall the original, who put in electronic form,

18   what would have gone back and forth, but in terms of the

19   discussion, that was based on our discussions.

20   Q    All right.

21        Well, if you're sending Mr. Henriquez a request to

22   send you a document, it seems fair to say that Mr. Henriquez

23   has that document and you don't have that document; right?

24   A    That's reasonable, yes.

25   Q    Okay, great.

1          And when you say:  Let me know where the recommended

2    speakers by Mike and Joe would fit in.

3          Joe is -- do you see that?

4    A    Yes, Mike Kurtz and Joe Hernandez.

5    Q    Who is Mike Kurtz?

6    A    Mike Kurtz is a medical specialist from the Pennsylvania

7    Task Force I.

8    Q    He was one of your teachers as well; correct?

9    A    One of -- yes, one of my instructors.

10   Q    For the FEMA Task Force program; right?

11   A    And whose program I shadowed, correct.

12   Q    And Joe is Joe Hernandez.

13   A    That's correct.

14   Q    So Mike Kurtz and Joe Hernandez suggested speakers for --

15   actually, we don't have a foundation.

16          This email is referring to the FDNY MSOC event;

17   correct?

18   A    The FDNY MSOC event.

19   Q    The first one -- this is --

20   A    November --

21          THE COURT:  One at a time.

22   Q    This is November 2012, you're in the process of planning

23   the 2013 event; right?

24   A    Yes, finalizing the event, correct.

25   Q    Well, finalizing in November 2012?

1  A    Part of the plan.

2  Q    Let's look at the next document.

3  A    Sure.

4  Q    Do you see this is an email from yourself to a number of

5  people?

6  A    Correct.

7  Q    Okay.

8       That -- who is Grumpymedic@aol?

9  A    It was one of our rescue paramedics and one of our

10 Medical Team Specialists for our New York Task Force I.

11 Q    Okay.

12      And he was with the FDNY?

13 A    Yes.

14 Q    And Vincent Johnson?

15 A    Also at the time with FDNY, in the same position as Juan

16 and the grumpy paramedic there.

17 Q    And the reference to Louis Cook is, he was a battalion

18 commander; is that correct?  Or HAZTAC commander?

19 A    Captain.

20 Q    Of HAZTAC?

21 A    Correct.

22 Q    At FDNY?

23 A    Correct.

24 Q    So Captain Cook was involved in the discussions from the

25 beginning; fair to say?

1   A    Not from the beginning, that's incorrect.

2   Q    Well, this is March 2013.

3           So, from early on.

4   A    He was, as I recall, he was going to be running one of

5   the skills stations.

6   Q    For 2013?

7   A    That's correct.  That was his only role.

8   Q    Okay.

9           And do you see the highlighted text:  Between myself

10  and Juan, we have spoken to you about the overall concept for

11  the conference.

12  A    Correct.

13  Q    So is it fair to say that you and Juan were the people

14  with the most information about this event?

15  A    Correct.

16  Q    Okay.

17          And the last line you say:  In the meantime, if you

18  have any questions, please do not hesitate to contact either

19  Juan or myself.

20  A    Yes.

21  Q    And again, that's Mr. Henriquez.

22  A    That is correct.

23  Q    Let's look at the next page.

24  A    Okay.

25  Q    That appears to be a flyer for the MSOC 2013 event at the

*Isaacs - cross - Fletcher*                                          468

1   FDNY; correct?

2   A    That is correct.

3   Q    And Mr. Henriquez designed that flyer; correct?

4   A    Yes.  He offered to do it and he did a nice job here.

5   Q    And there was a website for the 2013 event, too; correct?

6   A    Correct.

7   Q    Okay.

8           And that was FDNYMSOC.com?

9   A    That sounds right.  I can't recall exactly.

10  Q    That website for the 2013 event, the domain was owned by

11  Juan Henriquez; right?

12  A    So this is not -- I don't know 'cause it's not one of my

13  area of expertise.  I don't know.  It was in conjunction with

14  the Foundation.

15  Q    So you had nothing to do with it.

16  A    I -- Juan offered to help with the website and we have

17  Dave Salemi, S-A-L-E-M-I, from the foundation -- Juan had me

18  communicating with Dave Salemi from the FDNY Foundation.

19  Q    So you have no personal knowledge of Juan Henriquez

20  creating a website independently of the FDNY and foundation

21  for the 2013 event?

22  A    For the first-year event, I'm not aware of independently

23  of him doing the website.

24  Q    No recollection.

25  A    Again, I know he worked in conjunction with them, but I

1    don't know who controlled it, so to speak.  Whatever the

2    domain, it's not my area of expertise.

3    Q    And you never sought approval from FDNY leadership for

4    want to create that website independent of the foundation and

5    the FDNY?

6    A    No.  That would have to go through the FDNY Foundation.

7    I don't have the --

8    Q    That's not my question.

9    A    I would have sought approval.

10   Q    You -- it's your testimony that you did not personally

11   seek approval?

12   A    No.  That isn't correct.  I would have sought approval

13   anything -- I'm trying to answer.  I would have sought

14   approval, but not get involved in the details of the website.

15   Q    Did you seek approval?

16   A    Yes.

17   Q    So you did.  You asked for approval from the Foundation

18   and the FDNY for Mr. Henriquez to create a website

19   independently of the foundation and the FDNY in 2013?

20   A    In 2013, in anticipating of the 2014 conference, yes, I

21   did reach out and asked if Juan could take charge of the

22   website.  That would have been in 2013.

23   Q    That's not my question, sir.

24   A    Okay, sorry.

25   Q    In anticipation of the 2013 event, did you seek approval

1    from the FDNY and foundation for Mr. Henriquez to create a

2    website independent of the FDNY and foundation?

3    A     Regarding the conference, I do not recall.

4    Q     You might have?

5    A     I do not recall of him independently because --

6    Q     You don't recall specific and extensive email

7    communications back and forth with leadership at the FDNY and

8    foundation that you're seeking approval for Mr. Henriquez to

9    create a website independent for the 2013 event?

10   A     I do.  I recall in 2013, absolutely asking them for Juan

11   to run the website.  Absolutely.  I just don't -- I thought it

12   was in regards to the following year conference, not for the

13   original conference; but absolutely, I did send an email

14   asking the Foundation for approval to -- at Juan's urging, to

15   the domain or run the website.  That is correct.

16   Q     For the 2013 event?

17   A     I do not recall if it was the 2013.  My understanding was

18   for the following year.  This is in the fall, getting -- or

19   whenever it was, anticipating the 2014, but I do specifically

20   remember asking -- speaking to Ms. O'Shea and then sending her

21   an email -- or vice versa -- and asking approval, at Juan's

22   urging, to be able to take over and run the website based on,

23   you know, some of our frustrations from the first year.

24   Q     Well, was there a website at all in the first year?

25   A     Yes.

1    Q    Who created the website?

2    A    I -- as I recall, I believe it was Dave Salemi from the

3    FDNY Foundation.

4    Q    And it's fair to say that if there were email

5    communications between you and the Foundation and the FDNY

6    asking for approval for Mr. Henriquez to create a website, and

7    those communications occurred before the 2013 event, that

8    would have related to the 2013 event; right?

9    A    I do not recall any communications --

10   Q    That's not what I'm asking you.

11        THE COURT:  Please, listen to the question for the

12   umpteenth time.

13        THE WITNESS:  Sorry, Judge.

14   Q    It's fair to say that if the communications that you

15   recall -- and I hear you, you don't know when they happened --

16   but it's fair to say that if they occurred before the 2013

17   event, they're related to the 2013 spring event; correct?

18   A    I think that would be a fair statement.

19   Q    You wouldn't ask for approval for a 2014 event before you

20   even did 2013; correct?

21   A    That would make sense, a plan, correct.

22   Q    Okay.

23        And it's your testimony today that you just don't

24   remember whether you asked for approval before or after the

25   2013 event?

```
 1   A    I can't recall, but when the approval was requested.

 2   Q    Okay.

 3        We don't have those documents in evidence today, but

 4   maybe one day we'll look at them.

 5        THE COURT:  You mean the emails from Dr. Isaacs

 6   seeking approval for Mr. Henriquez's to create a website --

 7        MR. FLETCHER:  For the 2013 event.

 8        THE COURT:  For 2013.

 9        MR. FLETCHER:  Yes, Your Honor.

10        THE COURT:  So as an officer of the court, you are

11   representing those emails to exist?

12        MR. FLETCHER:  You know, I'm going to double-check

13   on my laptop during lunch.

14        THE COURT:  Okay.

15        MR. FLETCHER:  But my recollection is they have been

16   produced by the City.  I made a choice not to include them in

17   all of this because I didn't think I needed to.

18        THE COURT:  Well, do you have any -- is it your

19   position that Juan Henriquez never created a website for the

20   2013 event?

21        THE WITNESS:  So my recollection that Juan assisted

22   Dave Salemi from the Foundation, they worked together, but

23   Dave Salemi was the -- the key person from the Foundation with

24   the website that first year.

25        THE COURT:  Who was the webmaster or the person who
```

1   had control of the website for the 2013 event?

2   A    Dave -- my understanding, Dave Salemi and the Foundation.

3             THE COURT:  Do you know whether Mr. Henriquez ever

4   had the website for the 2013 event on his server?

5             THE WITNESS:  No.

6             Judge, could I just expand on one point?  Would that

7   be okay or no?

8             THE COURT:  Yes, but generally, your lawyer would

9   ask you to do that.

10            Did you want to say something more?

11            THE WITNESS:  Yes.

12            Juan had informed me because of frustrations that

13  things weren't done in a timely manner in that website, Juan

14  sent me an outline and asked me to forward it to the

15  foundation to argue why he should run the website and that's

16  what I put in my email to Jean O'Shea.

17            THE COURT:  Do you know roughly what year this was

18  sent and what month?

19            THE WITNESS:  It was following the first year we did

20  the conference.

21            THE COURT:  Do you know if the Foundation even had a

22  website for the FDNY-hosted Henriquez events before the first

23  2013 conference?

24            THE WITNESS:  Before the 2013?

25            THE COURT:  Yes.  Did the Foundation have a website

1    for that, for registration or anything else?

2              THE WITNESS:  We've had previous conferences, but

3    not -- MSOC, but there was other conferences from --

4              THE COURT:  Right.

5              My question is about the MSOC.

6              THE WITNESS:  Oh, not for MSOC, not before 2013.

7              THE COURT:  Okay.  Thank you.

8    Q    But it's your recollection that someone created a website

9    for the 2013 event; right?

10   A    Right.

11   Q    And at some point you know that there was a donation

12   agreement signed between Mr. Henriquez and the Foundation;

13   right?

14   A    Correct.

15   Q    And is it your recollection that that donation agreement

16   reflected that Mr. Henriquez was going to create a website for

17   the 2014 event?

18   A    Correct.

19   Q    Okay.

20             And is it -- do you recall that the domain was

21   FDNYMSOC.com?

22   A    It was FDNY MSOC, I guess, .com.  That sounds

23   appropriate.

24   Q    Do you recall that that website was hosted on

25   Mr. Henriquez's personal server for the 2014 event?

1  A    It's not my area of expertise, but I believe that was the

2  case, but it's not my area of comfort with websites and

3  dealing with computer servers.

4          THE COURT:  Just what you know, sir, not that you

5  have to know how it works.

6          THE WITNESS:  Yeah, I believe so.  I don't -- don't

7  know.

8  Q    Okay.  But so it's your testimony that you believe

9  that -- I'm sorry, it's David Salemi is that right?

10 A    I believe Dave Salemi left after the first year.

11 Q    Okay.

12         But you believe Dave Salemi created the website in

13 2013?

14 A    Correct.

15 Q    And then did Juan take over that website or did he create

16 an entirely new website in 2014?

17 A    I do not recall, again, having him work with others in

18 the Fire Department working on the website.  I did not get

19 into those details with the website.

20 Q    Okay.

21         So let's turn to page 6, so we're just skipping

22 ahead two pages?

23         THE COURT:  6 of 55.

24         MR. FLETCHER:  6 of 55, and 7 of 55.

25         THE COURT:  Defendant's Exhibit D.

1          MR. FLETCHER:  And these are FDNY 350 and FDNY 351.

2          THE WITNESS:  Are you talking about 6 of 55?

3          MR. FLETCHER:  Yes.

4          THE COURT:  6 and 7 of 55, Defense Exhibit D.

5          THE WITNESS:  Okay.

6    Q    This is an email exchange or appears to be an email

7    exchange that covers a couple pages and some back-and-forths.

8          Do you see that?

9    A    Yes, I see back-and-forth emails, correct.

10   Q    And there's communications back and forth between Joseph

11   Malvasio and Mr. Henriquez.

12   A    Correct.

13   Q    And then on page 7 of 55, you write to several people at

14   the FDNY, including Joseph Malvasio and Mr. Henriquez:  I

15   included Juan Henriquez who developed the website.

16   A    Where?

17         THE COURT:  This is an email, dated January 14th,

18   sent at 11:13 a.m., it's the second one on page 7 of 55.

19         THE WITNESS:  Okay.  I was on the wrong page.  I

20   apologize.

21   A    Okay.  I see that.

22   Q    Okay.

23         So it appears that in January 2014, you believed

24   that Juan Henriquez developed a website for the FDNY MSOC;

25   correct?

1  A    Yes.  To the point he was running the website, correct.

2  Q    Okay.

3           Question:  The donation agreement, you received that

4  from someone at FDNY legal or Jean O'Shea and passed that to

5  Juan Henriquez to sign?

6  A    I've seen it, but I -- there was -- that was whoever --

7  either Jean O'Shea or Legal and Juan Henriquez, that was

8  between them, but I was cc'd on it and have a copy.

9  Q    So you didn't personally transmit the agreement to

10 Mr. Henriquez; you believe you were cc'd on it?

11 A    I don't recall, I certainly was involved in the

12 communications, but I don't recall who sent it or what have

13 you.

14 Q    Let's turn back a couple pages to that flyer for FDNY

15 MSOC for 2013, the first flyer.

16           THE COURT:  Let's talk about the page number,

17 please.

18           MR. FLETCHER:  I apologize.  It's 4 of 55, Defense

19 Exhibit D, HENR-271.

20           THE COURT:  Do you have it, sir?

21           THE WITNESS:  Yes, Judge.

22 Q    Was it your idea to call this event MSOC 2013 at FDNY?

23 A    I do not recall making the title.  Juan had taken the

24 information, made the flyer, so I do not recall calling it

25 that at FDNY.

1   Q    Do you recall it ever being referred to as:  MSOC year at

2   FDNY?

3   A    No.

4   Q    No?

5   A    We always referred to it as FDNY MSOC.

6   Q    Let's skip ahead a couple of pages to page 10 of 55 in

7   this same exhibit.  It's Bates stamped HENR-55.

8   A    Okay.

9   Q    Do you see this page, sir?

10  A    Yes.

11  Q    Do you see at the top it's written:  Medical Special

12  Operations Conference.

13            And then underneath:  MSOC 2014 at FDNY?

14  A    I do recall this document that -- I developed it.  It was

15  changed by him and it was changed back.

16  Q    Sorry, so you're saying that you were the original

17  author --

18  A    I believe.  I thought I was.  This looks like my type of

19  writing, but I do recall this particular document.

20  Q    Were you the first person to create this document?

21  A    I thought so, but I certainly was involved in preparing

22  the document, but I --

23  Q    So you have seen this document before?

24  A    I'm trying to remember the title on top, but everything

25  else, yes.

1  Q    Did Juan Henriquez create this document?

2  A    I don't know if he created it or I did.  I can't recall

3  this.

4  Q    Let's look at the next page, the facing page.  It says:

5  Potential lecture topics.

6  A    Yes.

7  Q    Do you see all the names in bold?

8  A    Correct.

9  Q    Okay.  Joe Barbera.

10        Do you see that name?

11  A    Yes.

12  Q    He is not an FDNY -- he's not someone from the FDNY;

13  right?

14  A    That is correct.  He's --

15  Q    You met him through Mr. Henriquez and Joe Hernandez;

16  correct?

17  A    Actually, I don't recall from them.  He was, I thought,

18  recommended by Michael Kurtz.

19  Q    Did you have any prior relationship with Joe Barbera

20  before this?

21  A    I can't recall if I have ever spoken to him or not before

22  that.

23  Q    Let's move down two lines, Chris Ho.

24        He's not an FDNY person; right?

25  A    Correct.  He's from California.

1   Q    He's from California Task Force?

2   A    Yes.  California, one of the federal task forces.

3   Q    So Chris Ho is on a federal task force?

4   A    Sorry.

5   Q    You believe Chris Ho is on a federal government task

6   force?

7   A    Yes.  His father was my instructor, yes.

8   Q    Did you have a personal relationship with Chris Ho before

9   he was brought into the conference by Joe Hernandez and Juan

10  Henriquez?

11  A    No.  When I emailed him asking him, no, that was the

12  first time is when I asked him to speak.

13  Q    Steve Chin, also from outside the FDNY?

14  A    Correct.

15  Q    You were introduced to him by Juan Henriquez and Joe

16  Hernandez?

17  A    I don't recall who asked me -- who introduced me, I can't

18  recall.

19  Q    Ken Miller, outside the FDNY?

20  A    Again, I can't recall who made introductions.

21  Q    I didn't ask you that question.

22  A    I'm sorry.

23  Q    Ken Miller is from outside the FDNY.

24  A    Yes, I'm sorry, he's from California.

25  Q    He's from California.

1      You don't recall who introduced you to Ken Miller?

2  A    I do not.

3  Q    Jenn Brown, she's from Florida right?

4  A    Correct.

5  Q    Joe Hernandez is from Florida; right?

6  A    Yes.  Juan and Joe, yes.  Introduced me.

7  Q    She does K-9 work, she's a vet; right?

8  A    Correct.

9      THE COURT:  Mr. Hernandez and Mr. Henriquez

10 introduced you to Jenn Brown?

11     THE WITNESS:  Correct.

12 Q    Jorge Hernandez, also from outside of New York?

13 A    Correct.

14 Q    Also introduced to you by Joe Hernandez and Juan

15 Henriquez?

16 A    Actually Patty Cantwell, C-A-N-T-W-E-L-L.

17 Q    And you were introduced to Patty Cantwell through

18 Mr. Henriquez and Mr. Hernandez; correct?

19 A    Yes.

20 Q    Michael Kurtz we've discussed.

21     "Scott McKenna", it says.  Do you understand that to

22 refer to Scott McKinney?

23 A    Yes.

24 Q    He's -- he was -- he's a retired fire captain from

25 Sacramento?

*Isaacs - cross - Fletcher*                                             482

1   A    Yes.  He taught my 2008 class.  He was the lead

2   instructor.  I met him.

3   Q    Did you personally reach out to Scott McKinney or was it

4   Joe Hernandez or Mr. Henriquez who personally reached out to

5   Scott McKinney?

6   A    I don't recall.

7   Q    Is he sometimes called Scotty?

8   A    Yes.  Scotty.

9   Q    Joe Holley.  Also outside FDNY?

10  A    Yes.  In Memphis, correct.

11  Q    And introduced to you by Joe Hernandez and Juan

12  Henriquez?

13  A    I met Joe Holley in my Memphis class in 2008.

14  Q    Did you personally reach out to him, or did Mr. Hernandez

15  and Mr. Henriquez reach out to him?

16  A    I do not recall the initial context.

17  Q    Ricky Cue, who is he?

18  A    He's a physician from Massachusetts, Task Force I in the

19  Boston area.

20  Q    Mr. Hernandez and Mr. Henriquez asked him to participate;

21  correct?

22  A    I can't recall.  I thought it was Michael Kurtz, but I

23  can't recall specifically.

24          THE COURT:  Did you reach out for him?  Did you

25  personally reach out for this individual, Mr. --

1           THE WITNESS:  I was in communication with all the

2     speakers, but in terms of the introduction, I can't recall.

3           THE COURT:  All right.

4           But do you know who reached out for Ricky Cue to

5     participate in the FDNY MSOC 2014 conference?

6           THE WITNESS:  As asking them, that would come from

7     me.  In terms of the contacts, I don't know where I got the

8     contact from, but I would do the introduction like, asking

9     them to speak.  I asked people to speak at the conference.

10    Q    Dario Gonzalez is with the FDNY; right?

11    A    He's also deputy medical director, correct.

12          THE COURT:  Is he still a deputy medical director?

13          THE WITNESS:  Correct.

14          THE COURT:  How many deputy medical directors are

15    there?

16          THE WITNESS:  Now, we have nine.

17          THE COURT:  So Dario Gonzalez and Dr. Lai and you

18    are among the nine, currently?

19          THE WITNESS:  Correct.

20    Q    Doctor -- excuse me.  Dario Gonzalez has been with the

21    FDNY for quite some time; correct?

22    A    Correct.

23    Q    Have you ever had personal conflict with him?

24    A    Yes.

25    Q    And, in fact, you were opposed to Dario Gonzalez

1  participating in the early MSOCs; correct?

2  A    I can't recall when we had certain conflicts, but he

3  represented the leadership, so I would have included him, so

4  I'm not sure -- I don't recall any conversations of excluding

5  him, no.

6  Q    You never -- you don't recall any conversations with

7  Mr. Henriquez saying, I don't want Dario Gonzalez and

8  Mr. Henriquez saying, we need him?

9  A    I don't recall Juan saying we need him.  I don't want

10  Dario Gonzalez, but I realized politically I had to.

11  Q    Did Mr. Henriquez participate in helping you realize

12  that?

13  A    I had a lot of -- I shared all my conversations with Juan

14  as my close friend.  I would, you know -- a sounding board.  I

15  didn't look at him as a role.  It was just friends talking

16  about this all.  I would talk through with him, I had a

17  trusting relationship with him.

18  Q    So as a friend you understood Mr. Henriquez to be telling

19  you that Dario Gonzalez had to be included in this event.

20  A    I don't recall him telling me he had to because it wasn't

21  Juan's decision, but he could have made the argument for it.

22  I could see that.

23            THE COURT:  Well, was Dario Gonzalez in a -- you

24  said he was in the chain or something.

25            What was his role vis-a-vis you or his rank

1   vis-a-vis you?

2          THE WITNESS:  Understood.

3          So we have the same City title as deputy medical

4   director; however, he was the medical director for New York

5   Task Force I.

6          THE COURT:  Did you want that job?

7          THE WITNESS:  Eventually, but wasn't -- eventually,

8   but I did not ask -- I mean, I wasn't asking for the job, but

9   it was his job, but I'm sure eventually, yes, I would have

10  liked that job.

11         MR. FLETCHER:  Can I continue, Your Honor?

12         THE COURT:  Yes.

13  Q    Let's turn the page on this exhibit.  Now we're on 12

14  of 55, Exhibit D, Bates stamped HENR-53.

15         Do you see this page, Dr. Isaacs?

16  A    Yes, I do.

17  Q    Do you see at the top of the page it's highlighted:  MSOC

18  2014 at FDNY?

19  A    I see that.

20  Q    You don't have any idea why it says MSOC 2014 at FDNY?

21  A    I don't ever recall seeing this document with that.  No.

22         THE COURT:  Did you create this document?

23         THE WITNESS:  I don't know, Your Honor, who created

24  it.

25  Q    Dr. Isaacs, you were the point-person for this event at

1    the FDNY; right?

2    A    Correct.

3    Q    Did you review all these planning documents as part of

4    your role for the FDNY being the point person for this

5    conference?

6    A    There was a lot of draft documents circulating.  I mean,

7    yes, I would have seen documents related to the conference.

8    I've never seen Excel document with MSOC 2014 FDNY.  That

9    would have been funny-looking to me.  It wouldn't have been

10   appropriate because it was FDNY MSOC.

11   Q    So when you see MSOC 2014 FDNY, does that suggest

12   something other than FDNY MSOC to you?

13   A    No, because I wasn't aware of any other MSOC.

14            THE COURT:  Well, why would this nomenclature be

15   inappropriate, as you just said?

16            THE WITNESS:  Well, it -- because we would call --

17   my documents were FDNY MSOC.  I never would have run -- I

18   wouldn't have ever written a title on something and I don't

19   recall ever seeing this particular document that would say:

20   MSOC 2014 FDNY.  That doesn't make sense to me.

21            THE COURT:  All right.

22            So who decided the appropriateness or

23   inappropriateness of the conference title being either MSOC

24   2014 at FDNY or FDNY MSOC 2014?  Who was that decision-maker?

25            THE WITNESS:  Well, I would -- I would come up with

1  that title and then just making sure, go up the chain of

2  command, having any issues with this.  Again, I would never

3  have called it that.  That makes no sense to me.

4  Q    What's the difference?  Why is MSOC, year, at FDNY

5  different than FDNY MSOC?

6  A    Because it would be -- because it's such a ubiquitous

7  term in special operations, so it would have been FDNY Medical

8  Special Operations Conference.  We would never refer to

9  anything at FDNY.

10 Q    What does that signify to you if there is an MSOC

11 conference at the FDNY?

12 A    It just doesn't look appropriate.  I just -- I can't

13 answer it.

14 Q    I need to understand why.

15        You're saying it's not appropriate.  I want to know:

16 What's the difference?

17 A    Because I've never referred it to that.  It wouldn't make

18 sense to me.

19 Q    So you're saying that you very tightly controlled the use

20 of the term "FDNY MSOC"?

21 A    No, but that's how it was referred to it as:  FDNY MSOC.

22 Because that's who we were.

23 Q    So it's not that it's inappropriate, it's just that you

24 never said anything else?

25 A    I don't recall ever seeing anything else because it's our

1   medical special operations.  Like, it wouldn't say special

2   medical operations -- it would be the part or New York's

3   Medical Special Operation.

4   Q   So you don't recall ever seeing this formulation anywhere

5   else in any of the other planning materials for the FDNY MSOC

6   event?

7   A   Except for the Word document that we reviewed earlier.

8   Q   And never again?

9   A   I do not recall.

10          THE COURT:  So that flyer that we looked at earlier,

11  you don't recall seeing that?

12          THE WITNESS:  I don't recall seeing it at MSOC at

13  FDNY.  It just doesn't --

14  Q   Actually, let's go back to that flyer for a second.

15          THE COURT:  Page 4 of 55 on Defense Exhibit D, that

16  has a photograph and says:  MSOC 2013 at FDNY.

17          Are you saying you don't recall seeing this either?

18          THE WITNESS:  I don't recall that title

19  particularly.  I mean, I recall the rest of this flyer, but I

20  don't recall, like, FDNY because it's -- -- you know, I've

21  always -- my mind referred it as FDNY MSOC.  I've never seen

22  an "at".  I don't -- it's the only conference that we did and

23  I just don't recall that.

24          THE COURT:  This is the only conference the FDNY

25  did?

1         THE WITNESS:  Well, Medical Special Operations
2   Conference that we were doing.  Just -- when -- I always
3   referred to it as FDNY MSOC or just MSOC.  I don't recall I
4   would ever see like, "at".  That would not look normal, but I
5   just can't recall specifically what drafts or what I saw, but
6   that wouldn't seem appropriate.
7         THE COURT:  Well, did you, for example, attend an
8   MSOC conference at another location --
9         THE WITNESS:  No.
10        THE COURT:  -- at Florida or anywhere else?
11        THE WITNESS:  Never.
12        THE COURT:  Never, okay.
13  Q    You've never attended an event outside of the FDNY that
14  was called MSOC?
15  A    Correct.
16  Q    Okay.  Before we get to that, let's keep talking about
17  this.
18        This flyer from 2013 that says:  MSOC 2013 at FDNY.
19        Do you see the very next page, page 5 of 55, it's
20  got a Bates stamp FDNY 383?
21  A    I'm sorry, which page are you referring to, Counsel?
22        THE COURT:  Page 5 of 55.
23        THE WITNESS:  Okay, I see page 5.
24        THE COURT:  It's an email to you and others dated
25  December 20th, 2013, at 12:47 p.m.

1          THE WITNESS:  Okay.

2    Q    Do you see attached is the draft MSOC flyer -- actually,

3    I should stop.

4          This is an email from you to Jean O'Shea?

5    A    Correct.

6    Q    Okay.

7          And others?

8    A    Correct.

9    Q    It appears to attach an MSOC flyer, a PDF?

10   A    This wouldn't have been the appropriate flyer, though.

11   Q    Okay.

12         So you're saying the flyer we were just looking at

13   is not the flyer that you sent for approval?

14   A    Correct, because this -- if it was in December of 2013,

15   it would have been for the 2014 conference.

16   Q    Okay.  Fair point.

17         Just to be clear, though.  You did say:  Juan, once

18   again, has done an amazing job; right?

19   A    Absolutely.

20   Q    Referring to the flyer?

21   A    Yes.

22   Q    Because he created the flyer for 2014?

23   A    He did the first couple years at his request.  He offered

24   to do it, and yes.

25   Q    Okay.  Thank you.

1              Let's skip ahead to page 32 of 55 in the same

2     exhibit.

3     A    Correct, yep.

4     Q    This document begins with the Bates stamp HENR-81 and

5     continues.

6     A    Okay.

7     Q    Do you see this is -- it says:  FDNY MSOC 2015 event

8     action plan?

9     A    Correct.  That Juan created, correct.

10    Q    Juan created this document?

11    A    I believe so, yes.

12    Q    Okay.

13             And did you review this document at some point?

14    A    I would have looked at it, but we didn't -- we didn't

15    really use it, so...

16    Q    You didn't use this document?

17    A    Yes, because the event action plan, it was all over the

18    place, so the chief -- I forgot which chief it was, I believe

19    it was Chief Pataki maybe, we ended up not using it.  That, I

20    recall.

21             THE COURT:  Well, when you say "event action plan",

22    are you referring to the document on page 33?

23             THE WITNESS:  Well, Your Honor, I believe that this

24    was the front page of it, 32.  And then 33 would have been the

25    subsequent pages.

*Isaacs - cross - Fletcher*                                                    492

1          THE COURT:  Okay.

2          THE WITNESS:  It's a multipage document.

3          THE COURT:  But you saw it.

4          THE WITNESS:  If -- there was an event action plan I

5    did look at.  So, whether it was this specific one, I can't

6    tell you, but --

7          THE COURT:  But you can recall this one the chief

8    didn't like, Chief Pataki didn't like it?

9          THE WITNESS:  I believe it was Chief Pataki didn't

10   like it.

11         THE COURT:  You recall specifically with regard

12   specifically to this particular EAP draft?

13         THE WITNESS:  Correct.

14         THE COURT:  How do you recall that.

15         THE WITNESS:  Because I was in the HAZTAC training

16   office at the fire academy and he was reviewing it --

17         THE COURT:  My question is geared to this particular

18   draft that starts at page 32 and continues.

19         THE WITNESS:  I can't say this particular draft, but

20   Chief Pataki ended up developing his own.

21         THE COURT:  Okay.

22         This is not Chief Pataki's draft?

23         THE WITNESS:  A lot of stuff again, that we did --

24         THE COURT:  Do you know if this is Chief Pataki's

25   draft?

*Isaacs - cross - Fletcher*                                        493

1              THE WITNESS:  No, it is not.

2              THE COURT:  Okay.

3              Is this Mr. Henriquez's draft?

4              THE WITNESS:  It would look like it.

5              THE COURT:  Thank you.

6   Q    Were there multiple forms of event action plans for the

7   MSOC conference?

8   A    Correct.

9   Q    In any event, we're looking at -- if I look at the second

10  page of this, do you see at the top it's highlighted:  MSOC

11  2015 at FDNY?

12  A    Yes, I see that highlighted.

13  Q    Okay.

14              But you don't recall ever seeing that?

15  A    No.

16  Q    Okay.

17              But did you participate in Chief Pataki's decision

18  to write another EAP for the 2015 event?

19  A    I start working with him, but I was busy with other

20  responsibilities and left it up to him.

21  Q    So -- but it's fair to say that someone reviewed this

22  document, assuming that this was created by Mr. Henriquez,

23  someone reviewed Mr. Henriquez's document and decided that it

24  didn't do what they wanted it to do?

25  A    Correct.  You are missing -- this -- the document that

1    you provided shows information, but in terms of the actual

2    operational part here, you're missing the rest of the pages.

3    Q    Right.  I know.  I created this exhibit, so --

4    A    I understand, but you are missing the operational part.

5    Q    So if we look at 46 of 55 --

6    A    Yes.

7    Q    -- does that page reflect the beginning of the

8    operational part or what you are calling the operational part?

9    A    I believe so.

10   Q    Okay.

11            Back up for a second.  If we back up to page 14

12   of 55.

13   A    Okay.

14   Q    Do you see how this is the first page of a number of

15   pages for the 2014 FDNY MSOC EAP?

16   A    Yes, and -- yes.

17   Q    And this was created by Juan Henriquez?

18   A    Except for the -- for page 14, yes, but the following

19   page, I would have written.

20   Q    The medical plan page?

21   A    The description.

22   Q    Okay.

23            But everything else in this document was written by

24   Mr. Henriquez?

25   A    On page 14?

1   Q    Apart from the page that you wrote.

2   A    I would have to look through this, sir, but a lot of the

3   documents -- can you give me an opportunity, just a minute to

4   look it through this?

5             (Pause.)

6             THE COURT:  Just for clarity of the record:  Page 15

7   of 55 is created by Dr. Isaacs, correct?  Is that what he

8   said?  He's referring to page 15 of 55?

9             MR. FLETCHER:  No, I think he said 15 of the

10  personal pagination.

11            THE WITNESS:  The description I would have written.

12            MR. FLETCHER:  I think he's saying 28 of 55 --

13            THE WITNESS:  No, sir.

14            THE COURT:  15 of 55, description --

15            THE WITNESS:  Yeah.  Welcome to the FDNY Medical

16  Special Operations Conference.

17            THE COURT:  Did you want to continue your review, or

18  have you finished?

19            THE WITNESS:  Thirty seconds, please.  I wrote the

20  medical plan.

21            THE COURT:  Page what?

22            THE WITNESS:  29 of 55.

23            THE COURT:  Okay.

24  Q    Sorry, was that 28 of 55?

25            THE COURT:  29.

1          THE WITNESS:  28 of 55.

2          THE COURT:  28, okay.

3          THE WITNESS:  That's the medical plan.

4          THE COURT:  Okay.  Thank you.

5          THE WITNESS:  The information for this would have

6    been provided to him.

7    Q    But apart from the parts that you just said you prepared,

8    your best recollection is that Mr. Henriquez prepared this

9    document?

10   A    Provided all the information that he was given.

11   Q    By who?

12   A    Myself, operations, others, people who handle logistics.

13   Q    So let's skip ahead to 46 of 55, again, the 2015 EAP

14   page.

15   A    Yes.

16   Q    Would this have just been the cover page, like the

17   document we were just looking at, and then it would have been

18   followed by a number of pages that would have made up the

19   operational portion of the EAP?

20   A    Yes.  It says page 1, so that would look appropriate.

21   Q    And then if we can skip ahead to 51 of 55.

22   A    Yes, are you referring to the FDNY MSOC 2016?

23   Q    Yes.  That was the EAP for the 2016 event, or the first

24   page of it?

25   A    Correct.

1  Q    Do you see at the bottom it says:  Prepared by Juan

2  Henriquez?

3  A    Yes.

4  Q    And the next page, if you turn over to one next page, you

5  see 52 of 55.

6  A    52 of 55?

7  Q    Yes.

8  A    Yeah.

9  Q    You see that says:  MSOC -- FDNY MSOC 2017 event action

10 plan?

11 A    Yes.  On top of 52 of 55, correct.

12 Q    Then the next page 53 of 55, you see again it says:  MSOC

13 2017 at FDNY?

14 A    Again, I don't recall seeing it in that form.

15         THE COURT:  Do you recall seeing anything else about

16 the document?

17         THE WITNESS:  I would have to look at it.

18         THE COURT:  Please, do.

19         MR. FLETCHER:  That's the rest of the document, I

20 believe, Your Honor.  That's been included here.  I -- in

21 order not to submit hundreds of pages of exhibits, I cut off

22 some of the exhibits.

23         THE COURT:  I understand, but he said he doesn't

24 recall this page or this document.

25         THE WITNESS:  I can't recall the documents, but,

1    again, referring to 53 of 55, I don't recall us using that

2    term MSOC 2017 at FDNY.  It's not consistent as you see some

3    of the other documents when we say FDNY MSOC and the year.

4    Q    But do you recall ever seeing this document or seeing

5    documents that look like this?

6    A    Certainly similar.  I can't say this specific document,

7    but similar.

8    Q    Okay.

9          Let's turn one more page.

10   A    Are you referring to the FDNY MSOC 2017 --

11   Q    Correct.

12   A    Okay.  Yes.

13   Q    And you see at the bottom also prepared by Juan

14   Henriquez?

15   A    Yes, I do.

16          THE COURT:  Page 54?

17          MR. FLETCHER:  Yes, Your Honor.

18   Q    So Juan Henriquez was preparing these EAPs every year;

19   correct?

20   A    I believe this may have been the last year he did it.

21          THE COURT:  Well, that wasn't the question.

22          THE WITNESS:  Oh, yeah, for the previous years,

23   yeah.  This year and previous, yes.

24   Q    Okay.

25          And he did that at your request; right?

1  A    No.  He offered.

2  Q    Okay.

3       And you said:  Yes, please do it?

4  A    Yes.  I mean, he wanted to do it and...

5  Q    So as the point-person for the FDNY, you said:  Yes,

6  please prepare an EAP?

7  A    Correct.

8  Q    Now, you previously said that -- I forget his name.  Was

9  it Chief Pataki?

10 A    That was only one year.  The chiefs changed every year in

11 terms of who was assigned by EMS operations to be, what we

12 call, the medical branch director for the event.  It's the

13 EMS -- senior EMS operations officer kind of running the

14 actual operations.

15 Q    So it was only one year that Mr. Henriquez's EAP was not

16 used; correct?

17 A    Actually, most of the years we did not use it.

18 Q    But you asked him to produce it.  You said yes, please

19 produce it?

20 A    Yes -- well, he offered, but yes.

21 Q    Okay.

22       And we've seen a couple years he apparently gave

23 them to you -- I don't -- you received the documents; right?

24 He gave them to you, he said:  Hey, I'm going to do this.  You

25 said:  Please do it.  He gave you the documents?

1    A     We all kind of -- yes.  We all kind of did it, yes.

2              THE COURT:  Would you then pass those on, or would

3    you make changes to it before you passed it on for -- up the

4    ranks for approval?

5              THE WITNESS:  Others would have eyes on it, and

6    operations would have looked at it.

7              THE COURT:  How did they get it?  Did you pass it

8    on, or did Mr. Henriquez give it directly to those people?

9              THE WITNESS:  I can't recall.  However, if I did

10   send it, I would cc Juan on it.

11             THE COURT:  Okay.

12             Do you know --

13             THE WITNESS:  I don't know if I directly did it or

14   Juan.

15             THE COURT:  Did you give authority to Juan to send

16   it directly to your superiors or the Foundation?

17             THE WITNESS:  Well, they wouldn't be -- operations

18   is not in charge of, like, my office.

19             THE COURT:  Okay.

20             Did you give authority to Mr. Henriquez to pass his

21   EAP directly to the people in the FDNY or foundation who had

22   to approve it?

23             THE WITNESS:  To EMS operations, yes.  They were the

24   ones he would forward it to, if I asked him to; correct.

25             THE COURT:  All right.

1          So if you got it and Mr. Henriquez did not send it

2    on to others, would you be the person to send it on to the

3    Foundation or the chiefs in the FDNY who had to approve it?

4          THE WITNESS:  So I could have given -- I can't

5    recall -- if I would have done it directly or I could have

6    told him hey, you can go ahead and forward that.  I can't

7    recall to that detail.

8          THE COURT:  When Chief Pataki said he had issues

9    about the EAP that Mr. Henriquez drafted, were any of his

10   criticisms directed specifically at the nomenclature used?

11   And by that I mean whether it was FDNY MSOC 2015 EAP or MSOC

12   at FDNY 2015 EAP.

13         THE WITNESS:  I can't recall specifically, but I

14   know -- sorry, I recall specifically regarding the actual

15   operational plan.

16         THE COURT:  Okay.

17         Thank you.

18   Q    Let's look at another exhibit.  Could you turn to

19   Exhibit F, please.

20         MR. FLETCHER:  Actually, Your Honor, can I ask you a

21   logistical question about our timing today?

22         THE COURT:  I would like to keep going.

23         MR. FLETCHER:  I'm not asking to take a break right

24   now.

25         THE COURT:  Okay.  Well, the most important person

1    on that score is our court reporter.

2            How do you feel about a lunch break?  Would you like

3    to have one now, ma'am?

4            THE COURT REPORTER:  I can wait a little bit, Judge,

5    if you want to keep going.

6            MR. FLETCHER:  I would prefer to keep going.  I

7    know, Your Honor, the Court has a hearing at 3:00, so I just

8    want to make sure we build in time for all of these things.

9            THE COURT:  Well, it will only be a short hearing.

10           MR. FLETCHER:  So maybe we should keep going for a

11   little while and then take a break?

12           THE COURT:  As long as our court reporter is fine

13   with it, I'm fine with it.

14           (Pause in the proceedings.)

15           THE COURT:  Okay.  Fifteen more minutes.  You do not

16   have to finish then, but we will take a break at that time.  I

17   hope you will finish by then, but if you do not, you do not.

18           MR. FLETCHER:  I wish.

19           THE COURT:  Okay, I do, too.

20   Q    Let's look at Exhibit F, Dr. Isaacs.

21           This is the -- the first part of this exhibit is

22   Bates stamped HENR-231.

23           Do you see this is an email from Mr. Henriquez's

24   personal email account to your personal email account on

25   October 9, 2014?

1    A    Correct.

2    Q    Okay.

3          So this was after the 2014 conference and before the

4    2015 conference; right?

5    A    Correct.

6    Q    Now, do you see the very first line:  FDNY MSOC 2015 must

7    happen?

8    A    Yes.

9    Q    Now, the reason Mr. Henriquez is telling you that is

10   because you had told them that the Foundation at FDNY were

11   reluctant to continue holding the conference; right?

12   A    Reluctant in the lack of -- I felt, at that time, lack of

13   support.  And also, Juan not responding to me for quite some

14   time.

15   Q    So the FDNY was reluctant to hold the conference between

16   Juan -- because Mr. Henriquez was not responding to you?

17   A    No.  But for me, the amount of work I do, it was a

18   tremendous amount of work.  It was overwhelming for me.  And,

19   again, this is something I enjoyed doing with my close friend.

20   You know, he -- and he was not responding to me and -- and so

21   also, I just felt sometimes lack of support from a lot of

22   areas including, at the time, the Foundation.  I felt, you

23   know, I needed more resources.

24   Q    So you had a conversation with the Foundation earlier

25   that summer where Jean O'Shea said:  We're not making enough

1  money with this event.

2          Right?

3  A    I don't recall that conversation.  That possibly could

4  have been just the cost.  I don't know all the cost involved.

5  The Foundation can answer that part.  You know, but just like

6  with anything, I'm human, it's a lot of work on top of all my

7  other responsibilities, and I really spend hundreds and

8  hundreds and hundreds of hours every year working on this

9  conference.

10 Q    Okay.

11         So it felt like a big burden for you; correct?

12 A    It's a lot of work, yes.

13 Q    And you're also -- you work in the ER as well, is that

14 correct?

15 A    That is correct.

16 Q    So it's a lot of work for you personally?

17 A    Yes.  Fair to say.

18 Q    Before Mr. Henriquez sent you this email, you had told

19 him that the Foundation wasn't sure it wanted to keep doing

20 the event; right?

21 A    I can't recall my specific conversations, but it -- I

22 can't recall.  That may have been the case.  It sounds

23 appropriate.

24 Q    Jean O'Shea did express reservations about the event;

25 right?

1    A    She was supportive, but she stressed, I guess, concerns.

2    Q    That the event was not profitable enough; correct?

3    A    I'm not sure about the profits because I didn't know what

4    the cost was.  I don't see that side.

5    Q    That's not what I asked you.

6             I said:  Jean O'Shea told you that the event was not

7    profitable enough for the Foundation; correct?

8    A    That could have been the case, yes.

9    Q    Jean O'Shea told you that there needed to be more

10   marketing for the event; correct?

11   A    I'm not sure about the marketing, but I don't know what

12   changes she recommend, I haven't had a chance to review emails

13   from her, but she could have made suggestions that would be

14   appropriate, I guess.

15   Q    And then in October 2014, this email, Mr. Henriquez tells

16   you:  FDNY MSOC 2015 must happen.

17             Right?

18   A    Yeah.

19   Q    So he pushed to make the conference happen that year

20   because you were feeling overburdened?

21   A    So you have to put it in context again --

22   Q    It's a yes or no question, sir.

23   A    He didn't push me to do it.  That wasn't his decision to

24   do it.  He wanted to see the conference happen.

25   Q    Okay.

1         And he says:  I've been working on it and everything
2    should be done two weeks from now.
3         Right?
4    A    I have no idea what that meant.
5    Q    And:  The site will be up on Monday and flyers should be
6    ready on Tuesday?
7         No idea what that means?
8    A    Well, it's pretty evident.  You know, if the site is
9    going up and the flyers, yes.
10   Q    This image --
11   A    Yes.
12   Q    -- that we're looking at --
13   A    Yes.
14   Q    -- Medical Special Operations Conference Fire Department
15   of City of New York.
16        What is this?
17   A    We refer to it as a patch.  That was developed in 2014.
18   Q    By Mr. Henriquez; right?
19   A    Yes.  While we're at the fire academy, yes.
20   Q    Are you familiar with the term -- do you know the word
21   "rocker"?  When it comes to patches, are you familiar with the
22   term "rocker"?
23   A    Yeah, the helmet, correct.
24   Q    A rocker is a helmet?
25   A    Well, it's a sticker you put on your helmet, I thought.

1  Q    Kind of like a patch or a coin or a sticker?  Like, it's

2  a logo --

3  A    It's a patch.  Those are patches, but rockers are

4  stickers you put on your helmet.

5  Q    Is this the entire sticker, or is it just a portion of a

6  sticker?

7  A    My understanding, it's just a general reference.  It

8  doesn't say how much.  It's just rockers we put on our --

9  stickers on our helmets -- sticker that goes on a helmet.

10        THE COURT:  Well, looking at this exhibit, it's

11  Exhibit F, first page, 1 of 3, that logo, there's a

12  highlighted word there that says:  Coin.

13        THE WITNESS:  Yes.

14        THE COURT:  Do you understand this to be a patch or

15  a coin, or is the shape indicative of the word "coin".

16        THE WITNESS:  We use it interchangeably because we

17  make patches into challenge coins, so we kind of use it

18  interchangeably.

19        THE COURT:  Now, the words "Fire Department City of

20  New York" at the bottom, what is that part of the logo called?

21        THE WITNESS:  I'm not sure if it's got a specific

22  name.

23        THE COURT:  Have you ever seen this patch before for

24  Medical Special Operations Conference with the eagle logo, and

25  all the other illustrations on there, with the name of another

1  fire department or city or other entity on the bottom?

2        THE WITNESS:  The only time I ever recall was with

3  our conference, because Juan had shown me a draft -- it was

4  green and white -- and myself and Dr. Lai gave him feedback

5  during breaks in our class.  It was a green and white

6  picture --

7        THE COURT:  Where was this?

8        THE WITNESS:  Randall's Island, the fire academy.

9        THE COURT:  What year?

10        THE WITNESS:  2014.

11        THE COURT:  This was after the first 2013.

12        THE WITNESS:  Yeah, this was the final draft that

13  Juan did the artwork.

14        THE COURT:  Is this the first time that there was

15  such a patch or a coin for the MSOC slash FDNY conference?

16        THE WITNESS:  Yeah, 2015 was the first time that we

17  did a patch, had T-shirts made, challenge coins ordered, yes.

18        THE COURT:  Thanks.

19  Q    The challenge coins, that kind of like conference swag?

20  A    Well, it's not just conference.  It started from the

21  military.  A tradition started in the Air Force, what have

22  you.  It was kind of like, mostly respect, whatever, when you

23  give someone a challenge coin.

24  Q    And you wanted to have challenge coins made for the FDNY

25  MSOC event?

1   A    I can't recall the specific conversation, but Juan and I

2   had discussed it would be fun to have a patch for the

3   conference and --

4   Q    So it was Mr. Henriquez's idea to create challenge coins?

5   A    Well, the patch itself, I can't recall if I said I would

6   have the challenge coins made.  I did order them as I had the

7   T-shirts made.  I don't recall about actually making the

8   challenge coins.  I can't remember that conversation.  Could

9   have been.  It's plausible.  I just can't recall.

10  Q    And you never saw Mr. Henriquez wearing a Medical Special

11  Operations Conference patch featuring similar logo in years

12  prior to this?

13  A    No.

14  Q    If we move to the second page of this, you see

15  Mr. Henriquez writes at the bottom:  Website will be final by

16  Monday.

17  A    Okay.

18  Q    Did you understand him to be referring to the conference

19  website for the FDNY?

20  A    Seems appropriate, yeah.

21  Q    And then he says:  I have two versions of the flyer.

22  A    Mm-hmm.

23  Q    Would that have been the conference flyer?

24  A    There was a Spanish version we made -- he made.

25  Q    So two versions of the conference flyer; one in English,

1  and one in Spanish?

2  A    It could have been that or one for our members of

3  service, the fire department members.  I -- maybe -- that, I

4  can recall.  There was three versions of -- one in Spanish,

5  one in English, but there was also one with -- for the fire

6  department members because we gave them special pricing.

7  Q    And then Mr. Henriquez says:  I just have to speak to two

8  potential presenters that will bring some international and

9  military presentations.

10  A    Yes.

11  Q    Is that the kind of thing that Mr. Henriquez did for this

12  conference, find presenters to present?

13  A    Some of them.  The majority I found over the years, but,

14  yes, that would be appropriate.

15  Q    You found the majority of the conference presenters over

16  the years?

17  A    Huh?

18  Q    You found the majority of the conference presenters over

19  the years?

20  A    Yes.

21  Q    And then the next page at the top:  I will show you the

22  schedule with topics.

23  A    Yes.

24  Q    Mr. Henriquez is referring to an FDNY MSOC conference

25  schedule?

1    A    I'm sorry.  Are you talking about the 3 of 3?

2    Q    At the top of 3 of 3, yes.

3    A    Yes.

4    Q    And that goes along -- sorry.  You also sought outside

5    media coverage of these events from JEMS, the Journal of

6    Emergency Medical Services?

7    A    JEMS, yeah, EMS World.  Multiple ones.

8    Q    A.J. Heightman is a responsible person at JEMS, is that

9    correct?

10   A    I believe his title was editor-in-chief.

11   Q    Did you introduce Mr. Henriquez to the individuals -- to

12   A.J. Heightman and others as one of the key individuals

13   responsible for this conference?

14   A    Any article -- I can't remember specific, but any article

15   I -- Juan and others, I would always promote because I

16   appreciate the work they do.

17   Q    That's not what I asked you, sir.

18   A    I would have introduced Juan as certainly one of the

19   people that helped plan it, correct.

20   Q    Would you have included other people from the FDNY on an

21   email like that or only Juan?

22   A    I don't recall who I would include on the email.  I don't

23   recall specifically of any conversations, so...

24   Q    So let's turn back in this exhibit to page 9 of 55.

25   A    Okay.

1    Q    This is Bates stamped FDNY-393.

2    A    Please give me one second, please.

3    Q    No problem.

4    A    Let me, please, read it.

5         Okay.

6    Q    You see this is an email from yourself to a number of

7    people, all of whom I believe, other than Mr. Henriquez,

8    appeared to be outside of the FDNY; is that correct?

9    A    These would have been, I believe, folks from JEMS.  They

10   are the company PennWell.

11   Q    PennWell owns JEMS?

12   A    Yes.

13   Q    This email is dated March 2014; right?

14   A    March 13th, 2014.

15        THE COURT:  Sorry, is this Exhibit F or some other

16   exhibit?

17        MR. FLETCHER:  I apologize, Your Honor.  We're on

18   Exhibit D.  I may have -- we're moving around a lot.

19        THE COURT:  Exhibit D, page 9 of 55?

20        MR. FLETCHER:  Yes, Your Honor.

21        THE COURT:  Gotcha.  Thank you.

22   Q    So you begin this email:  Thank you for your support.

23        And then you're speaking, I gather, to the folks

24   from JEMS for the:  Thank you for your support?

25   A    Give me one second, please.

1            The only name I can recall was A.J. Heightman, which

2    was the second one next to Bill Carey.

3    Q    But you composed this email.

4            So you sent it to a lot of people; right?

5    A    It may have been a response from A.J. Heightman, but --

6    yes, it looks like I wrote this email.

7    Q    And do you see in this email to a bunch of folks at an

8    outside medical journal -- which was covering the conference;

9    right?

10   A    Right.  They wrote an article, I believe.

11   Q    Do you see the highlighted portion:  I included Juan

12   Henriquez, one of our senior rescue medics and USAR medical

13   specialist, who has been instrumental in the development of

14   this conference in making it the success it has become.

15   A    Yes.

16   Q    Do you see that?

17   A    Yes.

18   Q    So of all the people at the FDNY who were working on this

19   event, you credited Mr. Henriquez to a group of journalists

20   outside of the fire department as the person who has been

21   instrumental in developing the conference.

22   A    Yes.  I -- yes.

23   Q    Do you have a military security clearance?

24   A    Do I?  I do not.

25   Q    You do not.

1          Do Mr. Hernandez and Mr. Henriquez have military

2   security clearance, to your knowledge?

3   A    They both did not serve in the military, that I recall,

4   so no.

5   Q    That's not the question.

6          Do you know whether they have clearance to obtain

7   documents?

8   A    I do not know that.

9   Q    And you don't know whether they ever provided you

10  materials from military sources that they may have been

11  allowed to provide you, but that you did not have access to

12  personally?

13  A    I don't know.

14  Q    But they provided you a lot of materials; right?

15  A    As I did to them, yes.

16          THE COURT:  What materials did you provide to them,

17  being Hernandez and Henriquez?

18          THE WITNESS:  You have to remember, this conference

19  is one thing.  We all work in the USAR environment, Urban

20  Search and Rescue, so there's a lot of presentations I

21  prepared, materials, or maybe medical articles.  So, they were

22  good friends, so we exchanged things all the time.

23          THE COURT:  And this was in relation to the

24  conferences that you were planning with Mr. Henriquez?

25          THE WITNESS:  Well, it was just -- when we exchanged

 1   stuff, it was just in general, but also it would have been

 2   stuff for the conference, so both.  It wasn't, say, specific

 3   to the conference, but it could have been to other activities.

 4            THE COURT:  Involving EMT work and --

 5            THE WITNESS:  The USAR environment.  It's a unique

 6   body of medicine, so...

 7            THE COURT:  Thank you.

 8   Q    Did you know that Mr. Henriquez and Mr. Hernandez were

 9   organizing Medical Special Operations Conference events

10   outside of the FDNY?

11   A    No.

12   Q    You had no idea?

13   A    The only thing I recall was the Medical Team Specialist

14   courses.

15   Q    An MTS course.

16   A    Course, correct.

17   Q    That was a FEMA course that was offered by DMS?

18   A    Yes.  They were one of -- yes, the FEMA course; correct.

19   Q    Are you allowed to have -- or is someone who hosts a FEMA

20   MTS course allowed to have outside vendors contribute to that

21   course?  If you know.

22   A    You mean equipment or -- can you be more specific for me,

23   please?

24   Q    Are you allowed to have a conference hall with vendors

25   outside of your MTS course?

1  A    Well, are you referring specifically to ours or just in

2  general?  I just want to be able to --

3          THE COURT:  He was specifying the FEMA-related --

4  A    Generally, we do not have vendors during a Medical Team

5  Specialist course.

6  Q    And that's because FEMA doesn't allow it; right?

7  A    That would not be appropriate.

8  Q    Because it would be vendors influencing a federal

9  FEMA-sponsored activity; correct?

10 A    Yes, it could be perceived as that; correct.

11 Q    But with the MSOC event, you could have vendors; right?

12 A    We only had vendors -- a vendor exhibit after the course

13 was over.

14 Q    But you could have vendor exhibits in connection with the

15 MSOC events; right?

16 A    Conference.  Specifically conference.

17         THE COURT:  Is this a good time for a lunch break

18 for the court reporter and for counsel?

19         MR. FLETCHER:  Let's do -- can we do one more set?

20 I think ten minutes, tops, or do you want to go now?

21         THE COURT:  Well, 15 minutes ago she said 15 more

22 minutes.

23         MR. FLETCHER:  Your call.

24         THE COURT:  I really defer to the court reporter on

25 this because your fingers are the ones doing the hard work

1   here.

2            THE COURT REPORTER:  That's fine, 15 more minutes.

3            THE COURT:  Fifteen?

4            MR. FLETCHER:  I think we can go -- I just have --

5            THE COURT:  All right.  Fifteen more minutes.

6            MR. FLETCHER:  There's a logical breaking point in

7   there.

8            THE COURT:  Okay.

9   Q    So you had no idea that they were outside medical special

10  operations courses; right?  You just said that.

11  A    Medical Special Operations Conferences.

12  Q    Conferences.

13  A    Yes.

14  Q    You had no idea that there was anything called MSOC

15  happening outside of the Fire Department of New York; right?

16  A    Not until 2019.

17  Q    Okay.

18           So 2015 you went to Palm Beach and taught a course

19  at the Palm Beach Fire Rescue; right?

20  A    Correct.

21  Q    And you had no knowledge that that was called an MSOC?

22  A    No.  I only knew it as a West Palm Beach class that Joe

23  Hernandez asked me to speak on my area of expertise.

24  Q    You just thought it was an MTS course?

25  A    No, it wasn't an MTS course.

1  Q    It was just a class that Joe asked you to speak about --

2  A    I have a presentation that Joe has seen me -- asked me to

3  present a lecture, and, as a friend, I went down there and did

4  him a favor.

5  Q    And no knowledge that it was called MSOC?

6  A    No.

7  Q    Okay.

8        Let's look at Exhibits R, shall we?

9  A    Sure.

10  Q    So you see this is an email from Joe Hernandez to

11  Mr. Henriquez, you, your personal email, and then there's

12  LewisDMT@gmail.

13        Is that Louis Cook?

14  A    That is Louis Cook.

15  Q    He's the HAZTAC commander?

16  A    Not any longer.  I don't think he is at that time.  He

17  left the department.

18  Q    In 2015?

19  A    I don't know what year he retired, but he was working for

20  them, for DMS, but -- I believe at that time he was retired.

21  Q    Okay.

22        But he had been involved -- he was also involved in

23  one of the earlier FDNY events I think we saw --

24        THE COURT:  We've been begging you repeatedly not to

25  interrupt the question.

1   Q    Louis Cook was involved in, you said, a skill station at

2   one of the first MSOC events at the FDNY?

3   A    Yes, a hazmat skills station.

4   Q    Okay.

5         Before 2015.

6   A    Correct.

7   Q    And at the time he was still, you believe -- you recall

8   that he was still employed and not yet retired?  When he did

9   the skills station.

10  A    Well, as skills station, he was the captain of the HAZTAC

11  battalion that first year 2013.

12        THE COURT:  For the FDNY?

13        THE WITNESS:  Correct.  2013.

14  Q    And now we're in January 2015, but you don't know whether

15  Louis Cook was still there or had retired?

16  A    I believe he retired by then.

17  Q    Okay.

18        Do you see the title of this email is:  Palm Beach

19  MSOC?

20  A    Yeah.  I do not recall seeing anything with Palm Beach

21  MSOC.

22  Q    You received this email, right?  It's got your personal

23  email address?

24  A    That is my email address.

25  Q    Okay.

1              The DAIsaacs74@gmail?

2    A    That is correct.

3    Q    At some point you moved from AOL to Gmail or did you keep

4    both email addresses?

5    A    I've kept both, but I migrated as much as I could to

6    Gmail.

7    Q    So you received an email -- this was January.

8              The Palm Beach event that you taught at was in March

9    or April of that year; is that fair to say?

10   A    Um...

11   Q    It's not in front of us.  I'm just asking if you recall.

12   A    I recall, I believe, it was around March of that year.

13   Q    So this was January -- end of January, and you got an

14   email from Joe Hernandez who asked you to teach a course in

15   Palm Beach titled Palm Beach MSOC.

16             Did you read this email?

17   A    I don't recall the title.  I do recall some of the

18   content of the email.

19   Q    Okay.

20             So let's talk about the content.

21   A    Sure.

22   Q    It appears that Joe Hernandez is talking about -- well,

23   he's talking about a DMS US&R or FDNY rescue medic program

24   being brought to other small cities; right?

25             Is that referring to sort of -- some sort of rescue

*Isaacs - cross - Fletcher*                                                     521

1    medic protocol?

2    A    No.  It's referring to our FDNY rescue paramedic program

3    for which I was the medical director or -- and still am.

4    Q    It also refers to DMS's US&R program; right?

5    A    Right.  Can I expand on that or...

6    Q    Nah.

7    A    Okay.

8    Q    Sorry, that was not terribly respectful.

9         Please, don't.

10         THE COURT:  The word is:  No.

11   Q    You see that Joe Hernandez refers in the second line to

12   saying:  Hey, maybe we should call this new course that we're

13   going to do:  MSOC medic.

14         Do you see that?

15   A    Okay.

16   Q    Did you see that when you first received this email?

17   A    It does vaguely sound familiar.

18   Q    Okay.

19         So you see Joe Hernandez is talking about calling

20   something unaffiliated with the FDNY MSOC, right?

21         MR. MACKIE:  Objection, Your Honor, I believe he's

22   mischaracterizing the document.  It speaks for itself.

23         THE COURT:  All right.

24         Well, do you see that Joe Hernandez uses the term

25   "MSOC medic".

1          THE WITNESS:  Yes.

2   Q    And he's not talking about the MSOC FDNY conference;

3   right?

4   A    No.

5          I could tell you what he's referring to.

6   Q    What's he referring to?

7   A    He was looking to take the rescue paramedic program and

8   monetize it through DMS and teach it around the country.  The

9   program that I developed.

10  Q    Well, he's talking about an FDNY program, but also a DMS

11  program; right?

12  A    No, DMS is a company.  He was specifically talking about

13  the rescue paramedic program.

14  Q    Joe Hernandez isn't affiliated with the FDNY; right?

15  A    That is correct.

16  Q    So why would Joe Hernandez think that he could use the

17  acronym MSOC on a program that he was going to take around the

18  country unaffiliated with the FDNY?

19  A    Well, I think he was asking the question.

20  Q    So he thought you could give him permission to call it

21  MSOC medic?

22  A    It's friends discussing ideas.  I assume this is how this

23  email reads.

24  Q    Do you believe the FDNY owns the acronym MSOC?

25  A    It's a generic name.  I don't think anyone owns MSOC.

1    Q    You don't think it can be owned?

2    A    No.  It's a generic -- medical special operations.  It's

3    a ubiquitous term.  We've been calling ourselves medical

4    special operations since I've been in the rescue paramedic

5    program.

6    Q    Have you ever seen the acronym MSOC used before these

7    conferences started?

8    A    I saw it as a private business that was unrelated to fire

9    and rescue services when I Googled it.

10   Q    You saw something called --

11   A    But it was unrelated to -- it was just MSOC, but it was a

12   business name --

13   Q    Prior to 2013?

14   A    When I was looking up the name; correct.

15   Q    So you did a Google search for the name MSOC before 2013?

16   A    Well, twenty -- 2012 when I was looking up, you know,

17   coming up with, thinking about names and what have you and I

18   was just seeing if there's anything out there.  Same as Juan.

19   He looked, too.

20   Q    And so you did a Google search and you came up with the

21   idea MSOC; right?

22           You came up with that name?

23   A    The Medical Special Operations Conference, yes.

24   Q    And the acronym; right?

25   A    Well, we just made it called MSOC.  I just -- like FDNY,

```
 1   it's Fire Department of New York called FDNY.

 2   Q    So you came up with the idea for both of those; right?

 3   A    Yeah.

 4   Q    Okay.

 5              And then, you did a Google search to see if anyone

 6   else was using them in 2012?

 7   A    Yes.

 8   Q    And you found one business; is that right?

 9   A    I saw something that was unrelated to anything and I

10   vaguely remember it, and I don't know if they said MSOC, but

11   it was something similar to along those lines.

12   Q    You found something called MSOC unrelated to the entire

13   field of urban search and rescue medicine; right?

14   A    Nothing related to fire.  Nothing related to medical,

15   fire, EMS.  It was -- it was -- it was unrelated to our field

16   of emergency services.

17   Q    Okay.

18              Are you aware of the name Medical Special Operations

19   Conference ever being used prior to your events?

20   A    No.

21   Q    You also taught an event in 2018 Ocala, Florida; correct,

22   for Joe Hernandez?

23   A    Yes, Medical Team Specialist course; correct.

24   Q    And you don't recall that also being branded MSOC, or

25   being associated with an MSOC event?
```

1   A    No, it was a FEMA course.

2   Q    Let me ask you a question.

3        Joe Hernandez contributed a whole lot to the FDNY

4   MSOC event, right?  We looked at all the instructors he

5   brought in.

6   A    I would not agree with that comment, sir.

7   Q    Okay.

8        We looked at all the instructors that Joe Hernandez

9   previously brought in; right?

10  A    I never said he contributed all those instructors.

11  That's not correct.

12  Q    He facilitated your relationships with those instructors;

13  right?

14  A    I believe some of them, but not all of them.  And that

15  was for the first year, yeah, first year or two.

16  Q    And you asked Joe for input into topics and lectures and

17  presenters for these conferences?

18  A    Him and others throughout the country.

19  Q    Not my question.

20  A    Yes.

21  Q    You asked Joe --

22  A    Absolutely, I asked him his input.

23  Q    And Joe Hernandez brought you down to speak at a couple

24  of events in Florida 2015, 2018?  I understand they weren't

25  called MSOC --

1   A    I know, but he spoke at the class.  The other one I was

2   an instructor for his federal class.  Or course.

3   Q    So for one of those you got paid; right?

4   A    Well, as a FEMA instructor; correct.

5   Q    And the testimony is a little confused right now, but we

6   looked at an email where you asked for Joe Hernandez's MSOC

7   contact list.

8            I know you don't recall that email.

9   A    That is correct, yeah.

10  Q    You may have given some testimony about wanting state

11  contacts.

12  A    SUSAR, yes.

13  Q    So here's my question.

14  A    Sure.

15  Q    Did you think that Joe Hernandez was giving you all of

16  this support to help the FDNY?

17  A    As my friend, and, yes, as part of FDNY, absolutely.  As

18  my friend, as I help him, helped Juan.  These -- these -- not

19  just acquaintances, these were my goods friends, especially

20  Juan.  He was one of my closest friends.  Or at least I

21  thought he was.

22  Q    So these were your friends who were just helping your

23  career out of the goodness of their heart.

24  A    My career?  I don't put my name on anything.  I do it for

25  the love of the field.  I'm very passionate about it.  I give

1   my whole life to this.  So when you say that, it's like --

2   I -- this is what I do all the -- I work almost seven days a

3   week.

4          So Juan's passionate about it.  Joe is.  These are

5   my good friends that I became close over the years, along with

6   others, like Michael Kurtz, and others.  And so we do it for

7   the love of the field.  We're very passionate about it.  And

8   I -- I don't think anyone can outwork me.  I've been -- I work

9   almost seven days a week.  And so one of your emails that you

10  refer to when Juan is like:  Oh, this must happen.

11         Because I was angry.  I didn't feel I was getting

12  support.  I was overwhelmed.  He wasn't being responsive, and,

13  at some point, you know, I'm human, like everyone else, and I

14  was hesitant to move forward.

15  Q    Okay.

16         And so my question is:  You believed that

17  Mr. Henriquez and Mr. Hernandez were providing you all of this

18  support just to help the FDNY and to help you put on this

19  conference?  That's a yes or no question.

20  A    Yes.

21         MR. FLETCHER:  Okay.  This is probably a good time

22  to break for lunch.

23         THE COURT:  All right.  Let's take a break.

24         You can step off.

25         (Witness steps down.)

*Proceedings*                                                    528

1          THE COURT:  How much time does everybody need?  I

2    would like to take as little as possible.

3          I do have a 3:00 o'clock criminal conference, so we

4    could start and then just take a quick ten minutes for the

5    conference.  It's just a status.

6          MR. FLETCHER:  That's fine with me, Your Honor.

7    However the Court wants to do it.

8          MR. MACKIE:  That's fine for us, Your Honor.

9          THE COURT:  So how about, it is now seven minutes

10   after 2:00.  Shall we return at 20 of the hour?  2:40?  Half

11   an hour?

12         MR. FLETCHER:  That's great, Your Honor.

13         THE COURT:  All right.  Perfect.  Half an hour.

14         THE WITNESS:  Yes, ma'am.

15         THE COURT:  Nice to see you.

16         (Lunch recess taken.)

17         (Continued on next page.)

18

19

20

21

22

23

24

25

1                 **A F T E R N O O N   S E S S I O N**

2            (In open court.)

3            THE COURT:  Let's proceed.

4            We should briefly also discuss a scheduling issue.

5    I have a three o'clock criminal conference.  Tomorrow I have

6    three matters -- criminal cases and a civil case.  Friday

7    looks the same, sentencing and some matters.  I am concerned

8    about the pace of this hearing.  I would like to be able to

9    issue my decision.  I understand that there's planning going

10   on by the plaintiffs probably -- although I don't know for

11   sure, because I haven't heard -- using the contested mark and

12   I also understand that the parties have ordered the transcript

13   on a 30-day time frame.

14           I will say that they bare the risk that my decision

15   will come at a time when it may be very inconvenient for the

16   parties to reassess their positions vis-à-vis my decision in

17   the context of the ongoing planning for the 2023 conference.

18   And I don't know how the parties want to deal with that, but

19   I'm only going to be able to go as fast as you go.

20           MR. FLETCHER:  Your Honor, with --

21           THE COURT:  You collectively.

22           MR. FLETCHER:  -- with respect to the hearing, I

23   don't know that I'm intending to call any other witnesses

24   after Dr. Isaacs.

25           THE COURT:  Okay.

*Proceedings*                                                    530

1          MR. FLETCHER:  So if we're ability to finish with

2     Dr. Isaacs today, then I think we're done with testimony.

3          THE COURT:  Are the parties going to want

4     post-hearing submissions or not?

5          MR. FLETCHER:  I have submitted a whole lot of

6     briefing.  I don't know about the City.

7          MR. MACKIE:  I don't think that we'll require

8     post-hearing submissions, Your Honor.

9          THE COURT:  All right.  I mean, primarily I'm here

10    to listen to the testimony and make credibility determinations

11    where there's a disagreement among the parties about what

12    happened and who said what to whom, et cetera.  So that's, you

13    know, been helpful to have this hearing, and I want to thank

14    everybody for appearing here who did testify, so let's

15    continue, then.

16         MR. FLETCHER:  Your Honor, if I can just ask a

17    question.  Do you have any sense of what -- like, when we

18    might be able to expect a decision on this motion, or --

19         THE COURT:  I start a three-week trial Monday in a

20    criminal case, and I have three other trials that are

21    currently in the process of being briefed for post-trial

22    motions -- civil cases -- so I cannot tell you when, but I'm

23    certainly going to do it -- do my best to try to reach a

24    decision on this before the conference.

25         I mean, I don't want to say right now what my

1   initial feelings are, especially since we have a witness on

2   the stand, and which way I think the decision will go.  I may

3   have more latitude to do this after the witnesses are

4   finished.

5          Just to let the parties know where I'm headed, or

6   think I'm headed, and whether they want to have a last-ditch

7   attempt to try to resolve this, otherwise I will make the

8   decision.  I've been urging the parties to try to resolve it.

9   I know that you've all tried.  I have to say that there are

10  many troubling things that have come out to my attention

11  regarding the issues in this case.

12         So I'm sorry I can't be more specific.  I'm just

13  telling you that it's been very busy.

14         MR. FLETCHER:  Understood, Your Honor.  We're

15  obviously here at the Court's convenience, so we appreciate

16  that.

17         THE COURT:  All right.  Do you want to resume, sir?

18         MR. FLETCHER:  Yes, please.

19  BY MR. FLETCHER:

20  Q    Dr. Isaacs, did you ever have any conversations with

21  Mr. Henriquez where Mr. Henriquez told you that he expected

22  FDNY MSOC profits, if there were any, to go back to the HAZTAC

23  battalion or equipment for first responders and FDNY?

24  A    No.  That wouldn't be appropriate.

25  Q    Did Mr. Henriquez ever tell you that he wanted the

1  conference to be as financially accessible as possible?

2  A    No.

3  Q    You understand that Mr. Henriquez is a union paramedic;

4  correct?

5  A    Correct.

6  Q    And he spends his days riding around in an ambulance, to

7  your understanding; is that fair to say?

8  A    Most of the time.

9  Q    And he doesn't have a computer to work on MSOC -- FDNY

10  MSOC events while he's in an ambulance; correct?

11  A    He brings his computer.

12  Q    He brings his computer and works on it in his ambulance?

13  A    I've seen it, yeah.  He also goes back to the station.

14  They just do not sit in an ambulance.  They also can stay at

15  his EMS station.

16  Q    So you believe that Mr. Henriquez did all of his MSOC

17  planning work while on the clock as an FDNY paramedic?

18  A    Not all of it.  You know, it's -- I told Juan when we

19  used to speak about the conference, I tried to do it during

20  work hours it, though we spoke often because we were good

21  friends, and there's a lot of stuff we talked about, and so --

22  if it was work-related, I tried to limit that to during his

23  work hours.

24  Q    But, to be clear, you don't believe that he spent -- that

25  he did all of his MSOC planning work while he was on the clock

1   as an FDNY paramedic; right?

2   A    I wouldn't expect so.

3   Q    And he wasn't provided equipment or software by the FDNY

4   to do that planning work; right?

5   A    He never asked for any.

6   Q    He was not provided equipment --

7   A    Right.

8   Q    -- or software; right?

9        You did not officially task or assign Mr. Henriquez

10  to work on FDNY MSOC events; right?

11  A    The planning -- sorry -- do that again.  I apologize.

12  Q    You did not officially task or assign Mr. Henriquez to

13  work on the planning and organization of FDNY MSOC events;

14  right?

15  A    No, I can't make assignments.

16  Q    You don't have that power; right?

17  A    Correct.

18  Q    And you never asked anyone in the FDNY chain of command

19  to reassign Mr. Henriquez from working as a paramedic to

20  working to organize the FDNY MSOC; right?

21  A    The plan, yes, I did not ask.

22  Q    You did not ask.

23  A    That is correct.

24  Q    And you are not aware of any paper piece that reflects

25  the FDNY officially tasking Mr. Henriquez to work on FDNY MSOC

1    events; right?

2    A    Well, he would have to speak to his captain.  That's

3    permission to attend meetings or get overtime, so that's

4    between him and his captain.

5    Q    So you believe Mr. Henriquez asked for permission from

6    his captain to assist you with the FDNY MSOC organization?

7    A    I believe he would have asked.

8    Q    Do you have any personal knowledge of any such

9    conversations?

10   A    I do not.

11              THE COURT:  Do you know whether Mr. Henriquez ever

12   used his personal computer or FDNY computer to work on the

13   MSOC planning while on duty in his ambulance as an EMT?  Do

14   you know whether he ever did that?

15              THE WITNESS:  Yes.  I --

16              THE COURT:  You observed him?

17              THE WITNESS:  Yes, because I would sometimes meet

18   him out in, what we call, the field, out in the street, or at

19   his EMS station, so I know he had his computer, we talked

20   about stuff.

21              THE COURT:  But do you know whether he was using his

22   computer for the MSOC while on duty in his ambulance?

23              THE WITNESS:  Yes.

24              THE COURT:  And he has Wi-Fi in the ambulance?

25              THE WITNESS:  I believe he brought his own.

1          THE COURT:  His own what?

2          THE WITNESS:  Wi-Fi.  Our medics EMTs can't use the

3    ambulance Wi-Fi, so they would have to bring -- if he was

4    going to use Wi-Fi, he would have to have brought his own

5    Wi-Fi or what have you.

6          THE COURT:  All right.  So you observed him in his

7    ambulance actually doing work on the MSOC conference, or was

8    it you met him while he was on duty and you would discuss the

9    conference when he wasn't in his ambulance on duty?

10          THE WITNESS:  It is both.  I've directly saw him

11    working on his computer on the conference.

12          THE COURT:  All right.  And were you riding along

13    with him?

14          THE WITNESS:  No, but they have, what we call, cross

15    street locations where they sit and wait for a job -- sit and

16    wait for an assignment.

17          THE COURT:  Did you go to those cross street

18    locations and meet Mr. Henriquez?

19          THE WITNESS:  Yeah.  He would ask me to stop by,

20    yes.

21          THE COURT:  All right.  How long would you meet with

22    him?

23          THE WITNESS:  It varies because if he gets an

24    assignment, he's got to go, so it all depends on how busy it

25    is in the city.

1          THE COURT:  Right.  How much time on average would

2     you meet with him at a cross street location?

3          THE WITNESS:  I don't think it was that long.  I

4     just can't recall.  It could be 10, 15, 20 minutes.  Not more

5     than that, I don't think.

6          THE COURT:  All right.  And would you meet for the

7     purpose of having him provide information, or you providing

8     information to him, or would he actually be doing typing

9     and --

10          THE WITNESS:  It was both.  We would discuss it and

11     he was working on it, so it was, like, bidirectional, and he

12     was working on it, too.

13          THE COURT:  And there was a time when you felt that

14     because Mr. Henriquez wasn't responding to you that you could

15     not go forward with the conference because you were too

16     overwhelmed with work?

17          THE WITNESS:  Well, he kind of went silent not just

18     about the conference --

19          THE COURT:  Yes?

20          THE WITNESS:  Well, that was part of it, yes.

21          THE COURT:  All right.  Thank you.

22          THE WITNESS:  Yes, ma'am.

23     BY MR. FLETCHER:

24     Q    Dr. Isaacs, the FDNY MSOC enabled participants to get

25     continuing medical education credits; right?

1    A    Correct.

2    Q    Those are called CMEs?

3    A    Yes, continual medical education credits.

4    Q    CME?

5    A    Yes.

6    Q    And those were sort of provided by outside institutions;

7    is that right?  Like, North Shore --

8    A    Yes.  North Shore LIJ.

9    Q    There were some others, too?

10   A    It's now called Northwell Health and also New York State

11   Department of Health.

12   Q    And so they had to certify the credits or the CMEs;

13   right?  How does that work?

14   A    Well, for Northwell, that was for the physicians, nurses,

15   and physician assistants.  It's very strict, their application

16   process, so I would have to file out an application.  It's a

17   lot of work and detail.

18          For paramedic CMEs, it's a simpler process.  They

19   did accept what Northwell did, so it was much easier, where I

20   would fill out some other information and I would have someone

21   from the EMS academy assist me, if needed, for the paramedic

22   CMEs.

23   Q    And I think you recall you participated in a podcast for

24   the FDNY Pro Mr. Henriquez; do you recall that?

25   A    Yes.

1   Q     And during that podcast you talked about the availability

2   of CME credits; right?

3   A     Correct.

4   Q     Now, Mr. Henriquez, as part of his work on the FDNY MSOC

5   was responsible after the conference for helping to obtain the

6   CME credits for the participants; right?

7   A     That's incorrect.

8   Q     Were there any financial disclosures required to obtain

9   CME credits for participants?

10  A     No, just for the presenters.

11  Q     So for someone -- so for presenters, if they needed CME

12  credits, you had to provide financial disclosures to Northwell

13  or LIJ or whoever was facilitating that credit; right?

14  A     I apologize.  So I understand your question; who fills

15  them out you're saying would have to -- the conflict of

16  interest forms are for the presenters and if there's found a

17  conflict of interest -- it's for the CME office to determine

18  whether they can offer a credit if there's a conflict.

19  Q     So is it your testimony -- I'm going to ask you this.

20        It was required by North Shore or anyone else who

21  was providing those CME credits after 2016 that you give them

22  certain financial disclosures about the conference; right?

23  A     Yes.

24  Q     Yes?

25  A     You have a conflict of interest form and a budget.

1   That's what I have to supply.

2   Q    A budget?

3   A    Yeah.

4   Q    Okay.

5            And that budget talked about revenues and expenses

6   of the conference; right?

7   A    In general.  Proposed, but not --

8   Q    Did it have line items on it?

9   A    I can't recall, because I would not fill that out.

10  Q    But you possessed those documents; right?

11  A    I do not recall about the financials because I asked the

12  Foundation.

13  Q    So did the financial --

14           MR. FLETCHER:  Strike that.

15  Q    Did the Foundation submit those financial reports

16  directly to the CME provider, or did you do it?

17  A    I believe they did the direct correspondence.

18  Q    So you had nothing to do with providing financials to the

19  CME provider.

20  A    Maybe for the speakers, or part of it, what the cost, but

21  not all of it.  I knew, generally, how much the speakers would

22  cost.

23  Q    So that would have been Jean O'Shea who was providing the

24  financials to the CME provider?

25  A    Her or a one of her -- a representative from the

1    Foundation.

2    Q    So Jean O'Shea would know about it; right?

3    A    I would think if someone else within her Foundation did

4    it, they would have to speak with her before they send

5    anything, I would imagine.

6    Q    So you didn't have access to any of the budget or the

7    financial information that was provided to CME providers?

8    A    I apologize, are you talking about the Northwell CME

9    office or are you talking about the attendees?  You said

10   providers.

11   Q    Let's start with Northwell CME office.

12   A    Yes.

13   Q    Did you have access to any of the budgets from the FDNY

14   MSOC that were provided to the Northwell CME office?

15   A    It was the preconference proposed budget, yes.

16   Q    You had access to a budget?

17   A    A proposed one, yes.

18   Q    Not a final one?

19   A    No.  We didn't have to provide a final one.

20   Q    Did you have electronic access to that document?

21   A    Electronic form.

22   Q    Did you have a hardcopy of that document ever?

23   A    No, not that I can recall.

24   Q    Is it your testimony that Mr. Henriquez was never

25   involved in providing that information to Northwell?

1    A    I don't recall -- I filled out the application, worked

2    with the CME office.  Juan had no direct communications with

3    them.

4    Q    I'm sorry, you do recall whether Mr. Henriquez ever gave

5    that information to the CME or you don't?

6    A    No, I do not recall Juan giving any direct information to

7    the CME office.  Application was in my name, and I completed

8    the application.

9    Q    So it was all you doing the post-conference CME work, or

10   the preconference CME work.

11   A    If I got additional information, like the sign-in sheets,

12   like, Juan may have helped that.  I know Dr. Lai has been

13   doing that for years, providing the sign-in sheets for me

14   because you need that, or -- so there might be, but -- and

15   the -- but I would submit that.

16   Q    But not budgets; right?

17   A    No.

18   Q    Mr. Henriquez never had access to a budget?

19   A    He may have.  You know, generally could have been a cost

20   and I may have shared that, wasn't his role, but, you know,

21   maybe potential vendors.  I mean, wasn't hard for us to figure

22   out, how many vendors, what they pay.  It was advertised.  And

23   then also what the speakers cost, but when it came to other

24   expenditures, you know, I don't know what the meals are, what

25   buses cost, and any other -- the Friday night event at our

1    fire museum, I don't --

2    Q    Were there a lot of budget documents for this event?

3    A    I can't recall.  There might have been a couple, but in

4    terms of the final -- like, the real-world kind of budget the

5    Foundation has, I wouldn't have that budget.

6    Q    You did have access to a preconference budget, though,

7    that you gave to the CME office; right?

8    A    Some of the costs that I was aware of, yes.

9    Q    Yes, you had access to a document that reflected the

10   conference budget?

11   A    Yes.

12   Q    And it was a Foundation document, or was it an FDNY

13   document?

14   A    It was just the application filled out.

15   Q    Did it reflect actual budget information for the

16   conference?

17   A    Proposed.

18   Q    Did you give that document or show that document to

19   Mr. Henriquez ever?

20   A    I may have.  I mean -- I may have.  I mean, again, I'm

21   very transparent, I share everything with Juan.  I mean, it

22   wasn't -- whether he saw it or not, I certainly would have

23   showed him if he wanted to or I provided it to him.

24   Q    Did you show it -- you showed Mr. Henriquez the FDNY's

25   budget informs because he was your friend?

1  A    It's part of -- he's involved with me of the event, yeah.

2  Wasn't -- I didn't look at it as a level, who's whatever

3  title.  I mean, just, you know, he was involved in, you know,

4  plan, but he wasn't involved with the CME, but I could have

5  showed him a copy, the application I filled out, you know,

6  it's hard to say.  I mean, I wasn't -- I didn't create silos

7  where, you know, constrict what he can see or not.

8  Q    Okay, so you don't recall?

9  A    Fair enough, yeah.

10       MR. FLETCHER:  Should we continue, Your Honor?  Or

11  do we need to --

12       THE COURT:  We will keep going until they show up.

13  One of our parties is here.  Are they both here?  Are you both

14  here?

15       THE COURTROOM DEPUTY:  Mr. Chase is not.

16       THE COURT:  Mr. Chase is not.

17       MR. CREIZMAN:  No, Mr. Chase is.

18       THE COURT:  Oh, he is.

19       Let's take a quick break and have a status.  And the

20  Government is here, too.

21       (Witness exits the courtroom.)

22       (Recess taken.)

23       (Witness resumes the stand.)

24       MR. FLETCHER:  Are we back?

25       THE COURT:  Yes, we are back.  Everyone is back.

1  BY MR. FLETCHER: (Continuing)

2  Q    Dr. Isaacs, did Mr. Henriquez ever express concern to you

3  that certain expenses being claimed by the Foundation for the

4  MSOC conferences had actually -- well, reflected work that he

5  had done for free on the conferences?

6  A    No.

7  Q    Never?

8  A    Nope.

9  Q    Did he ever express concern to you that equipment that

10 had been provided to the conference for free was being claimed

11 as an expense by the Foundation?

12 A    No.

13 Q    Did Mr. Henriquez ever provide free equipment to the

14 conference?

15 A    He had purchased, on his own, plastic balls.

16 Q    Okay.

17        They were, like, Chucky E. Cheese balls -- pit

18 balls?

19 A    Not Chucky E. Cheese, but that's what someone referred to

20 it as.

21 Q    They were blue; right?

22 A    I thought they were red, but maybe.

23 Q    And there were maybe thousands of them; right?

24 A    I do not know how many.  A lot.  I just don't know how

25 many.

1  Q    They had to be large enough to completely engulf a human;

2  correct?

3  A    Correct.

4  Q    The volume of them.

5       And Mr. Henriquez was never reimbursed for that;

6  right?

7  A    He never asked permission to purchase them.

8  Q    That's not what I asked you.

9       He never was given money by the FDNY to pay him back

10 for that.

11 A    Right.

12          THE COURT:  Were these balls used by the FDNY in any

13 conference or for any training?

14          THE WITNESS:  It was for -- yes, for a skill station

15 that Juan had did.

16          THE COURT:  For a skill station that Juan had what?

17          THE WITNESS:  Juan was doing a trench as part of our

18 skills for the conference.  He was at the trench skill

19 station, so it was for that station he was involved in.

20 Q    Could you pick up the white binder in front of you and

21 turn to Exhibit 3?

22 A    Sure.

23 Q    Is that -- the top of that page, which is HENR-351, is --

24 it says:  MSOC 2017 org chart; is that right?

25 A    Yes.  The HENR-00351, is that what you're referring to?

*Isaacs - cross - Fletcher*                                                                546

1    Q    Yes.

2    A    Yes.

3    Q    And that organizational chart reflects the org chart for

4    the actual event in 2017, not for the organization of the

5    event or the planning, but for the day of the conference;

6    right?

7    A    Correct.

8    Q    And Mr. Henriquez created this document; right?

9    A    I'm not sure.

10   Q    You didn't create this document; right?

11   A    No.  It may have been Chief Pataki.

12   Q    But you don't know who created this document?

13   A    I thought it was Chief Pataki.

14   Q    Might it have been Mr. Henriquez?

15   A    I think org charts Chief Pataki did.  I do not believe he

16   did this.

17   Q    You don't believe Mr. Henriquez did this, but you don't

18   know personally; right?

19   A    I believe that Chief Pataki did it.

20   Q    So Chief Pataki is at the top.  You see him there?

21   A    I see him.

22   Q    And sort of the really long, horizontal line, that's a

23   few lines down from the top.

24            Do you see that?

25   A    Yes.

1  Q    I see Captain Mary someone, transportation group.

2       Do you see her?

3  A    Yes, I do.

4  Q    And next to her is someone who is a lieutenant; is that

5  right?

6  A    That is correct.

7  Q    And then someone with DC, is that deputy chief?

8  A    Yes.  The same rank as Chief Pataki; correct.

9  Q    Okay.  So we've got a captain, a lieutenant, a deputy

10 chief.  Next to that is BC.

11      Is that battalion commander?

12 A    Battalion chief at the fire academy.

13 Q    Next to that is captain; is that right?

14 A    Correct.

15 Q    All the way over on the right is another captain; is that

16 right?

17 A    Correct.

18 Q    And then just between them is Paramedic Juan Henriquez;

19 right?

20 A    Correct.

21 Q    So for the day of the event, in this org chart, you have

22 captains and a lieutenant and deputy chiefs and battalion

23 chiefs, and a paramedic; is that right?

24 A    Correct.

25 Q    Okay.

1           And paramedic is a significantly lower rank than all

2    of those other officers; correct?

3    A    Correct.  This is a conference, not field operations, but

4    correct.

5    Q    Okay.

6           And, apparently, those officers felt comfortable

7    having a paramedic at the same level of the hierarchy as them;

8    fair to say?

9    A    I don't know.  I didn't speak to them.

10   Q    But it did happen; right?  This did reflect the actual

11   organization of the actual 27 events; correct?

12   A    I don't know if this was the final draft.  I don't know

13   if -- again, I don't know if this was the final version that

14   we used.

15   Q    But you believe Deputy Chief Pataki created it; right?

16   A    I may be confused.  I do not know for sure who did it.

17   Q    If Deputy Chief Pataki created it, Deputy Chief Pataki

18   felt comfortable with it, even if it was a draft; right?

19   A    Yeah, I assume.  Whoever drafted it felt comfortable with

20   it.

21   Q    But you didn't draft it, so you don't know?

22   A    That is correct, I did not draft it.

23   Q    For the 2018 conference, DMS came up to do a

24   preconference medical specialist course; right?

25   A    Correct.

1    Q    And that was a pretty big deal for the FDNY; right?

2    A    I'm not sure what you mean by a big deal.  I mean,

3    it's --

4    Q    On the podcast we talked about, I think you spent quite a

5    lot of time talking about how this was the first year it was

6    going to be happening and how it was a really big deal for the

7    FDNY.

8    A    Okay.  In the spirit of conversation for a podcast, I may

9    have said it was a big deal.

10   Q    It was a big draw for the FDNY that this DMS class was

11   going to be happening.

12   A    I do not think that it impacted the conference.

13   Q    Well, it was something you chose to promote in the

14   podcast; right?

15   A    Sure, but it's a small number of people taking the class.

16   Q    It's an expensive class; right?

17   A    Yes.

18   Q    As compared to the MSOC -- the regular MSOC conference,

19   the DMS class is substantially more expensive; right?

20   A    I probably would disagree on that.

21   Q    How much was the MSOC conference ticket?

22   A    I don't know, but we -- in terms of -- because the fire

23   department paid for a lot of the expenses, as well as for the

24   course, for the medical specialist course, they were classes

25   that the fire department pay for it.

1  Q    So that's not my question.

2  A    Okay.

3  Q    My question is:  For a participant, the MSOC conference

4  costs a couple hundred dollars; right?

5  A    I apologize.  I apologize.  I misunderstood your

6  question.

7         For an attendee to take the class, yes, it is a lot

8  more expensive.

9  Q    The MTS class?

10 A    Yes.

11 Q    But you had told Jean O'Shea about the MTS class and that

12 it was going to be happening; right?

13 A    I had to get approval from her and others that it was

14 okay to do it.

15 Q    And you knew that there was a link embedded into the

16 Foundation MSOC website that took people out to the DMS

17 website to register for that preconference course; right?

18 A    It was to -- I was told by Juan that it had to place

19 to -- some link to register.  I didn't understand it at the

20 time, but, yes.

21 Q    But -- so you knew that the link would be on the

22 Foundation website; right?

23 A    I can't recall because they were speaking with Joe

24 Malvasio and -- the webmaster.  I wasn't intimately involved

25 with that part.

1    Q    You had no communications with them about that?

2    A    No, that's not necessarily the case.  I would have

3    communicated with -- asking Ms. O'Shea, Joe Malvasio:  Juan

4    and Joe Hernandez says FEMA wouldn't allow it to be on the

5    Foundation website, so as I'm starting to recall it, so

6    that -- however they register -- there's two components of the

7    program of that course.  There's the computer-based training

8    and the instructor-led training.  So Joe Hernandez, along with

9    Juan, said FEMA would not allow at a Foundation website the

10   registration would actually have -- as I'm starting to

11   recall -- would have to be through DMS.

12   Q    Okay.

13            So my question is:  You had conversations with Jean

14   O'Shea to let her know that there was a website -- that there

15   was a link to the DMS website on the Foundation's website;

16   right?

17   A    I had conversations.  I don't recall my exact

18   conversation with Jean.  She would have -- she would have

19   referred me to Joe Malvasio.

20   Q    Okay.  Let's look at Exhibit X in the black binder.

21            So there's a couple pages of emails here.

22   A    Okay.

23   Q    Feel free to take a look, but I'm going to be asking you

24   about -- I'm going to start asking you about the second page,

25   page 2 of 4.

*Isaacs - cross - Fletcher*                                                         552

```
 1    A    Okay.  So just read all four pages?

 2    Q    Yeah.  Take a second to read all four pages.

 3    A    Okay.

 4    Q    So let's look at page 2 of 4.

 5    A    Okay.

 6    Q    The bottom email from Jean O'Shea to Susan Wipper and

 7    yourself.

 8    A    Okay.

 9    Q    You see she's asking you about signing up for the US&R

10    specialist course for $2,600.

11    A    Yes.

12    Q    That was the med spec course, the DMS med spec course for

13    the MTS course?

14    A    Yes, that's correct.

15    Q    And she's asking:  How can you sign up for that course

16    and then go to MSOC for free?  And:  How many people are you

17    expecting?

18              Do you see that?

19    A    Yes, I do.

20    Q    And you received that email; right?

21    A    I believe there was confusion by the Foundation, yes.

22    Q    You received that email; right?

23    A    Yes.  That looks -- yes.

24    Q    And then you responded very shortly thereafter --

25              THE COURT:  Why don't you just give dates and times
```

1    once again.

2            MR. FLETCHER:  Yeah, sorry.

3    Q    The first email is Tuesday, January 16th, 2018, at 13:07.

4    And the email directly above it is the same day at 13:33.

5            THE COURT:  This is Dr. Isaac's response to

6    Ms. O'Shea?

7            MR. FLETCHER:  Yes.  Dr. Isaacs' response to Jean

8    O'Shea and Susan Wipper.

9    Q    And you tell her that the cost of the conference is built

10   into the price of the course.

11           I assume that's the med spec course; is that right?

12   The MTS course?

13   A    Yes.  The price for the course would allow for admission

14   to the conference.

15   Q    Okay.

16           And you expected 30 people to sign up for the MTS

17   course?

18   A    Um --

19   Q    I mean, you said that.

20   A    Yeah.  That's what they proposed, yes.

21   Q    I don't know what you expected or not, but you told her

22   that information.

23   A    That was expected, yes.

24   Q    Okay.

25           So if we go backwards one page to page 1 of 4.  You

1   can see at the bottom Jan 16, 1:33, you forwarded -- I guess

2   basically immediately, because the time stamp is the same --

3   you forwarded immediately to Mr. Henriquez?

4   A    Which -- I'm sorry, which email.  I see -- I apologize.

5   Q    Yeah, it's a confusing page, but --

6   A    Yes.

7   Q    So at the very bottom of that page, there's a blue line.

8   A    Yes.

9   Q    You see it says January 18th at 1:33 p.m. --

10  A    Yes, I see that now.

11  Q    -- Isaacs, Doug; and then it says:  Wrote.  And then it's

12  blank.

13  A    Okay.

14  Q    And it's just your -- your signature, the FDNY, so you're

15  forwarding this email chain?

16  A    Yep.

17  Q    To Mr. Henriquez; right?

18  A    Mm-hmm.

19  Q    And then directly above at 14:05, Mr. Henriquez says to

20  you:  Was this not discussed previously with them?

21       Do you see that?

22  A    Yes, I do.

23  Q    Okay.

24       And then above that at 2:12 p.m. you write to

25  Mr. Henriquez:  Yes, I had spoken with her.  She just forgot.

1          So according to this email chain you had multiple

2   conversations with Jean O'Shea about the DMS course; right?

3   A    Yes.  I had conversations with her.

4   Q    Specifically about the DMS course and how the

5   registration would be run?

6   A    Yes.

7   Q    Do you know, as you sit here today, whether you did, in

8   fact, have multiple conversations with Jean O'Shea about this

9   subject?

10  A    I had conversations.  I can't recall how many, but yes, I

11  had conversations with Ms. O'Shea.

12  Q    Okay.

13          THE COURT:  This was about the conference fee, sir?

14          THE WITNESS:  Yes.  Specifically more so the

15  conference fee.

16          THE COURT:  Okay.

17  Q    And as it related to the MTS course?

18  A    Correct.

19  Q    At some point later that year you asked Joe Hernandez to

20  send a ten thousand dollar check to the Foundation; correct?

21  A    No.  Joe Hernandez said I'm going to send you a check.

22  How -- he asked how should you send it and I'm like, whatever

23  is easiest for you.

24  Q    And you asked him to send it to your home address;

25  correct?

1   A    I can't recall where to send it.  I was trying to make it

2   easier, whatever he wanted.

3   Q    So you don't recall whether you asked him to send it to

4   your home address?

5   A    He may have.  I don't know.  I can't recall.  Maybe.

6   Again, it's not a check for me, so...

7              THE COURT:  But does the Foundation have a mailing

8   address or a PO box where --

9              THE WITNESS:  I'm sure they do.

10             THE COURT:  -- Mr. Henriquez could have sent that

11  check?

12             THE WITNESS:  Sorry, Judge.

13             Yes, there's a mailing address to headquarters, I

14  would think.

15             THE COURT:  So Joe Hernandez, do you recall that he

16  sent it to your home?

17             THE WITNESS:  I do not recall if he sent it to my

18  home.  But, again, it was a friend of friend, and he just

19  want -- he -- him and Juan were fighting about the check.  I

20  was not directly -- it was Juan and him fighting about it

21  and -- there was a lot more it to it, but -- and then Joe was

22  like:  I just want to send it in.  And I vaguely recall:

23  Whatever you want -- or however you want to send it, Joe.  I

24  mean, it's not written to me.  It's written to the Foundation.

25             THE COURT:  Did you give him your home address?

*Isaacs - cross - Fletcher*                                          557

1    THE WITNESS:  He already had my home address.  We

2    were friends, so he would have had my home address already.

3    THE COURT:  And you're just saying it's Joe

4    Hernandez who decided to send a $10,000 check to you for the

5    Foundation?

6    THE WITNESS:  I can't recall the final decision.

7    Again, I may have said to Joe:  Whatever is easiest for you.

8    You know, we're on the phone.  He's all -- he was

9    kind of angry, yelling at me, so I just can't recall the

10   conversation.

11   THE COURT:  Is he angry at you, is that why he's

12   yelling at you?

13   THE WITNESS:  Well, he was angry at the situation

14   because my communication with Juan regarding the course, and

15   they asked to push to do it.  I didn't want to do it.  But

16   it's supposed to be key-turn operation, no work for me or the

17   department, and then it ended up being a lot of work.

18   Q    Do you recall a text message thread between yourself and

19   Joe Hernandez where you asked Mr. Hernandez to send the check

20   to your home?

21   A    It could have happened.  I'm sure you have it here.  If

22   that is, then it would have happened.

23   Q    I don't have it here today.  I'm asking --

24   A    I don't recall, but -- and, again, if -- in my

25   conversation with Joe, it may have happened.  I don't know.

1   Q     Okay.  Thanks.

2               THE COURT:  Is there any reason why you would have

3   had it sent to your home instead of the Foundation address?

4               THE WITNESS:  It was just -- if I was, it was just

5   ease of access for Joe.

6               THE COURT:  Why would it be easier?  I mean, all he

7   has to do is address it, put a stamp on it, and put it in the

8   mailbox.  So how is it easier to send it to a home address,

9   yours, or the Foundation address?

10              THE WITNESS:  Because I thought in order to resolve

11  the conflict that was happening, I don't know how long it

12  takes for mail to come through the fire department through --

13  you know, the City mailing office, and there was a lot of

14  emotions with Juan and Joe, and I may have made it:  Hey, send

15  it to me and I will bring it over to Jean O'Shea.  You know,

16  that could have been probably a plausible reason why.  I mean,

17  that's the only reason why if -- I just want to get this

18  resolved.  This was a very uncomfortable situation.

19              With Juan, Joe, the department was questioning

20  things, and it was the tension -- I didn't want it.  I wanted

21  to resolve this and move forward.  Like, it was very

22  emotionally charged.  I -- for Juan and Joe, and my friends, I

23  only thought the best.  Like, you know, listen, this is

24  probably a misunderstanding, and I just want it to get

25  resolved.  I was under a lot of pressure.  And for them, and

1    they are fighting.  I had an email that Joe Hernandez texted

2    me:  Sorry.  A message how he's pissed off at Juan because

3    Juan was hammering him about the money, and Joe was driving

4    back to Florida with his trailer, and they were fighting.  The

5    department seemed -- the Foundation and others were

6    questioning things, and I wanted this resolved.

7                 THE COURT:  This is in what year?  I'm sorry.

8                 THE WITNESS:  2018.  The whole issue started with

9    the Medical Team Specialist course that the EMS did.  All

10   this -- issues that Juan and -- Juan pressured me, he really

11   wanted to do this course and I never talked to Joe directly

12   about doing the course.  Juan said:  Joe does everything, you

13   don't have to do anything.  And that was farthest from the

14   truth.  It was a lot of work and the rest is what happened.

15   Q    Did you ever participate in any conversations about the

16   MSOC conference moving to California?

17   A    No.  It was brought up to me, but I did not -- I did not

18   say we're moving it to California.  Someone -- Katie Roberts

19   from California, I was pretty upset at the Friday night

20   museum, and I said:  I don't think I'm going to do this

21   anymore.  And Katie was like:  Hey, bring it to California.

22   I'm like:  Katie, it's not the time.  She also mentioned to

23   Glenn Asaeda, my medical director, and I had shared this

24   conversation with Juan, and Juan said some choice words about

25   her.  He wasn't a big fan of hers, and he wanted to write her

1   an email, but I said:  No, it's Katie.  Let it go.  Don't make

2   decisions during emotional times, so...

3   Q    So let me back up.

4        Katie Roberts told -- is it Dr. Asaeda or

5   Chief Asaeda?

6   A    Dr. Asaeda.

7   Q    Katie Robert told Dr. Asaeda that -- what did she tell

8   Dr. Asaeda as far as -- let me ask you a question:  Were you

9   present for this conversation?

10  A    Not with Dr. Asaeda, no.

11  Q    Okay.

12       So what is your understanding of the conversation

13  that took place between them?

14  A    Dr. Asaeda told me that:  Hey, Katie just came up to me,

15  said you're upset and she suggested maybe to you about

16  bringing this to California, and, you know, and that was the

17  extent of the conversation.

18  Q    And that's all Dr. Asaeda said to you?

19  A    I can't remember any further comments after that.  You

20  know, we're at the fire museum, it was a Friday night event,

21  and I just remember -- I can't remember the rest.  I knew I

22  was just upset about something and then we just moved on.

23       THE COURT:  You can remember being upset but you

24  can't remember why you were upset?

25       THE WITNESS:  It was something related to the event.

1   I think it was the wreath -- we do -- I believe that was the

2   time we do a wreath-laying ceremony to honor World Trade

3   Center first responders and others that perished that day.

4   And at the site, we do a wreath-laying ceremony, and there was

5   a mix-up with the order.  We got it done, but it should --

6   that's something, you know, we hold, you know, close to us,

7   and it should not have happened.

8          We got a wreath.  Chief Pataki got it done.  I gave

9   him my credit card, I remember that, but I was pretty upset

10  because of all the things to mess up on, how could we mess up

11  on that.

12         THE COURT:  So when Dr. Asaeda told you that Katie

13  Roberts had told him that she wanted to move the event to

14  California, he just said it?  Or could you describe his

15  demeanor or his -- what he conveyed to you with regard to his

16  views with -- of that news?

17         THE WITNESS:  I'm sorry, the words that Katie said

18  to him, I apologize if that's what I said.  Katie Roberts

19  said:  Doug seems upset, he may be done, maybe, what do you

20  think about if we move this conference to California.

21         THE COURT:  Oh, so she told Dr. Asaeda that you

22  seemed to be done with the conferences --

23         THE WITNESS:  Well, because I had spoken to her, I

24  had vented to her before that, and I said:  I don't know if I

25  can keep doing this.  And I was really upset.

1          And she mentioned to me:  Oh, maybe if you don't

2    want to do this, we can do this in California.

3          That was my conversation, you know, with her.  And

4    then she went and spoke to Dr. Asaeda.

5          THE COURT:  But you don't know what she actually

6    said to him or --

7          THE WITNESS:  Katie said:  Hey, you know, if Doug is

8    done doing this -- and those were -- I remember his words --

9    she said:  Maybe he'll do it in California.

10         MR. FLETCHER:  May I continue, Your Honor?

11         THE COURT:  Yes.

12   Q    So it's your testimony that you had no emotional reaction

13   to the information from Dr. Asaeda about Katie Roberts talking

14   about California?

15   A    I was annoyed.  Not as annoyed as Juan, but I was

16   annoyed.

17   Q    Annoyed about what?

18   A    You know, here I'm pretty upset about the situation and

19   here she's already, you know -- you know, just -- you have to

20   know Katie and others, and, you know, oh, maybe we'll just do

21   it there.  And I just didn't think it was the right time

22   and -- I was actually not upset her talking to me about it.  I

23   was upset that she had a conversation with Dr. Asaeda about

24   it.  That's what I was upset about.

25   Q    And then you went and told Mr. Henriquez about this?

1   A    I joined them later in the night.  Not right away, but

2   during the night, we went out for drinks with others and I

3   spoke to Juan about it.

4   Q    You told a lot of people about this; right?

5   A    Probably a few.  I wouldn't say a lot, but I told a few

6   people, sure.

7   Q    Joe Hernandez?  Other people?

8   A    I don't know if I told Joe particularly.  I may have.  I

9   mean, Joe was there.  I mean, a lot of people.  I know I

10  specifically told -- I believe Dr. Lai and Juan.

11  Q    Why?  If it was just something that Katie kind of said as

12  an aside that didn't have anything to do with anything; right?

13  You know --

14  A    It was just her -- like, here she's making -- like, she

15  sees I'm upset and is taking that advantage of:  Oh, maybe

16  we'll move it out there, you know, if you don't want to do it

17  here anymore.

18          And, you know, I just thought it was poor timing and

19  just, I was in an upset mood, so I didn't think -- I don't

20  know, it was her taking advantage there.  It's like certain

21  personalities that people like to take advantage of these, and

22  I took that as that opportunity that she was doing.

23  Q    So you went and told several other people in a bar

24  afterwards about that.

25  A    I know I discussed it with Juan, and he was upset, and

1    then I mentioned it to Dr. Lai.

2    Q    Did Katie Roberts come up to you again at some point and

3    say:  See you next year in California?

4    A    No, she never said that to me.

5            THE COURT:  Did the MSOC conference, wasn't it going

6    to be in California at one point and then once that fell

7    through, they brought it to New York?

8            THE WITNESS:  No, I've never heard of any conference

9    in California.  The only thing I was going to go out to

10   California to do was teach --

11           THE COURT:  That is not my question.

12           Were you aware --

13           THE WITNESS:  No.

14           THE COURT:  -- whether the MSOC conference had been

15   planning to hold that conference in California at any time?

16           THE WITNESS:  No.

17           THE COURT:  Okay.

18   Q    Let's turn to Exhibit H.

19   A    Okay.

20   Q    Actually, I apologize.  That's not the correct exhibit.

21   Exhibit M.  M like Mary.

22           This is a text message thread?

23   A    Yep.

24   Q    Your name is at the top of this.

25   A    Correct.

1   Q    Why don't you take a look at it and tell me if you

2   recognize it.

3   A    It seems like something that I could have communicated.

4   Q    Do you recognize this text message thread?

5   A    It's been quite a few years, but, yeah, I -- yeah, I

6   can't recall details, but this seems like, you know, a text

7   message from me, because I -- there's information on there

8   that only I would have known.

9   Q    Okay.

10          Do you know who you are speaking with?

11   A    Probably either Joe or Juan.

12   Q    Do you understand that on this page you are on the left

13   side and the other person is on the right side?

14   A    That is correct.

15   Q    Okay.

16          Do you see the question:  Have you ever heard of

17   Envision?

18   A    Yes.

19   Q    Okay.

20          Is that the kind of thing that Juan would have said

21   or Joe would have said?

22   A    Either one.

23   Q    Okay.

24          So we don't know who you are speaking to; is that

25   correct?

1  A    Knowing -- you said Envision.  I think Joe's son was

2  going to go to work for Envision, so this would be Joe

3  Hernandez.

4  Q    So here you think you are speaking with Joe Hernandez;

5  right?

6  A    Now I believe I am, now that it clicked in about

7  Envision.

8  Q    Do you see the highlighted portion:  The conference has

9  become a nightmare and might have to be cancelled?

10  A    Yes.

11  Q    Okay.

12        And that's something you told Joe Hernandez?

13  A    I did because this is -- this was emotional texts, and

14  stuff going on with Juan and the department and Joe, and it

15  was very stressful for me.

16  Q    Now, there's a date at the top of this text, but it's not

17  the actual text.  It doesn't come from the actual text thread,

18  so I will just ask you:  Do you know whether that might be a

19  correct date for this text thread?

20  A    It would have been following, I know, after that 2018

21  conference when all the problems came up.  I don't know what

22  month.  If you're saying that's not the month, you know, I

23  don't know if that is -- is that the correct month, November?

24  I don't know, but it would have followed after the 2018

25  conference because that's when all the drama started.

1   Q    But it might have been November, is that fair to say?

2   A    Fair to say.

3   Q    And "the drama," was it the question about the DMS

4   medical specialist course; is that the drama you're referring

5   to?

6   A    No.  The drama, if you must know, is when -- Juan getting

7   upset and Joe in trying to work these things out, and them

8   individually yelling at me, and I remember telling Juan:

9   Listen, big picture, let it play out.  I'm sure there's

10  nothing -- there's nothing wrong.  I believe the best in the

11  two of them, and let's get through this.  But big picture, we

12  have a lot of great things to work on together.  This is

13  bigger -- you know, it's a conference, we'll get through it,

14  and we'll move on, you know, working together.

15         And then, you know, the two of them got nasty and

16  yelling and started -- you know -- you know, it's -- again,

17  not so much Joe I care about, but Juan was one of my closest

18  friends, and I trusted, and I guess, you know, conferences

19  mean more than that, so...

20  Q    Okay.

21         So, just to be clear -- excuse me.  Excuse me.

22         THE WITNESS:  Judge, could you give me a couple

23  minutes, please?

24         THE COURT:  Yes.

25         (Witness exits the courtroom.)

1          (Pause.)

2          (Witness resumes the stand.)

3          THE WITNESS:  Sorry, Judge.

4          THE COURT:  No worries, there's water if you like it

5    or whatever else you need.

6          THE WITNESS:  I'll be fine.

7          THE COURT:  All right.

8    Q    Are you feeling a little bit better?

9    A    I'm fine, thank you.

10   Q    Okay.

11         We can continue?

12   A    Yes.

13   Q    Do you want to take your mask off?

14   A    Oh.

15   Q    Okay.

16         So you said you had a falling-out with Mr. Henriquez

17   and Mr. Hernandez over the 2018 conference?

18   A    They had a falling out with me, yes.

19   Q    Over what?

20   A    It -- Juan was making wildly false accusations.  I did --

21   I just -- 'cause I was Juan's friend and I didn't feel like

22   doing the conference, and I met with the chief of the

23   department after I told the chief of EMS, I don't want to do

24   this, even though it's being advertised.  And he's like, well,

25   we really need to do this.  And I said:  It's not my job.

1          So I was asked five -- ten minutes later to go with

2    Chief Booth to meet with the chief of the department,

3    Chief Leonard.  The three of us met, and Chief Leonard asked:

4    I understand you are being loyal to your friend.  I don't know

5    what's going on.  It's just Legal told him he couldn't

6    participate right now at the conference.

7          I said:  What do I tell him?  He's my friend, and

8    he's made big contributions.  I mean, it's not fair.  Like, I

9    didn't know what was going on, and my loyalty was to Juan.

10   This is a conference, and Chief Leonard -- I was surprised, he

11   was very calm, and he goes:  I respect you greatly, just

12   please reconsider, and please let me know.

13         My first phone call as soon as I left that office

14   was Juan, and Juan starts to accuse me on the phone:  I know

15   what was said in there.  I'm like:  Juan, I just left the

16   office and, like, how would you know what was said in the

17   meeting, I just left the meeting.  And he started getting

18   nasty with me and -- and then after that -- and before that,

19   there was issues with him and Joe regarding we are going to

20   try to do the course again as preconference.

21         And then Joe and Juan were manipulative because the

22   Foundation was concerned, and I forgot what the concerns were,

23   they want the registration to go through the Foundation

24   website for the Medical Team Specialist course, and I said:

25   Joe, they said that you can charge whatever you want for the

1    course, you will get the monies for it, whether it's

2    26 hundred or whatever the course, but they need to make sure

3    they, you know -- I mean, Joe Malvasio can probably speak on

4    this more than me for sure.  And then Joe was like, no, FEMA

5    won't allow it.  All this -- and it being untruths.  And

6    because we ran a course last year and I did it through the

7    FDNY Foundation website, and, you know, FDNY ran the course.

8              So, you know, the two of them, I'm not sure what was

9    going on.  They sent -- they had -- I think they had their own

10   agendas, and I feel I was used.

11   Q    Okay.

12             THE COURT:  May I know, unless this is completely

13   unrelated, what were the accusations that you say that

14   Mr. Hernandez and Mr. Henriquez were making?  And were they

15   against you or someone else?

16             THE WITNESS:  It was against the fire department

17   Foundation saying FEMA would not allow this to -- them to do

18   registration to Foundation.  Joe and Juan wanted to control

19   everything.  And I said:  I don't understand.  They've already

20   said -- and Liz Cascio, who got involved, said:  Listen --

21   because I met with her, and she goes:  Listen, Joe Hernandez,

22   DMS, they can charge whatever they want, everything will be

23   transparent, but the registration has to go through the

24   Foundation website.

25             And I explained it to Joe.  It made sense to me and

1   Joe said:  No, FEMA would not allow this.  I don't -- you

2   know, I didn't understand it.  I understand a little bit more

3   now, I think, but people had agendas, so...

4   Q    All of that happened, you said, during the conference

5   during 2018, immediately after the conference?

6   A    This happened in the fall, like during this November kind

7   of time, September, October, November, during the planning.

8            THE COURT:  So 2017?

9            THE WITNESS:  No.  2018 -- 2018.

10           THE COURT:  Okay.  So this --

11           THE WITNESS:  These problems -- sorry, Judge.

12           THE COURT:  That's all right.  I just needed the

13   dates.

14           THE WITNESS:  The problems did not happen until

15   during the conference of 2018.  There was a question that -- I

16   guess concerns.  I got contacted by Carol Brown, who is head

17   of legal, one of the assistant commissioners at the fire

18   department.  They had concerns about, I guess, the website or

19   something.  I didn't understand it and then it was -- that's

20   why the emotional and then the stress and the -- what was

21   promised by Juan really about the course.  After this

22   conference was over and then months later on, it -- issues

23   came up after the 2018 conference that led into the fall.

24           MR. FLETCHER:  Your Honor, may I continue?

25           THE COURT:  Yes.

1   Q    So during the summer of 2018, were you in a fight with

2   Joe Hernandez?

3   A    I was not fighting anyone.  They were yelling at me.

4   Q    They were angry at you over conference registration and

5   the DMS MTS course?

6   A    Where the registration was going to take place.

7   Q    And that was causing a lot of stress, they were very

8   angry at you, you're saying.

9   A    Well, it was a combination of things.  I'm not sure when

10  there's some investigation on Juan, I'm not sure when I was

11  notified -- I mean, when I went through my emails --

12  Q    Sir, during the summer of 2018, was Joe Hernandez angry

13  at you?  Did you understand him to be angry at you?

14  A    I'm not sure when he was angry.  He was angry the summer

15  or the fall.

16  Q    After the conference?

17  A    I don't know when he got angry, but I can't tell you what

18  month it occurred in.

19  Q    Okay.

20       So it might have been the summer and it might have

21  been the fall of 2018; right?

22  A    That is fair, yes.

23  Q    Okay.

24       Let's look at Exhibit L, it's just back one.

25       Is this also a text message thread between yourself

1   and Joe Hernandez?

2   A      I apologize, I'm on the wrong -- one second.

3          Yes.

4   Q      Okay.

5          So the thread on the left, the date at the top is

6   July 16, 2018.

7   A      Okay.

8   Q      And you see Joe Hernandez says to you:  Hey, Doug, are

9   you still in for the class in Ocala in August 27th to 30th?

10         And you said:  I'm in, with an exclamation point.

11  A      Yep.

12  Q      So he invited you to teach a class for him in August;

13  right?

14  A      Okay, yes.

15  Q      And you were excited to participate, yes?

16  A      Love to teach, yes.

17  Q      Okay.

18         And then in the one on the right, there's a date

19  July 24th:  Hi, Doug, I sent you a copy of flight itinerary.

20  Do you think the ultrasound folks might want to come out to

21  play in Ocala?

22         Do you see that?

23  A      Yes, I do.

24  Q      So in July Joe Hernandez doesn't seem to be angry at you;

25  right?

1  A    Yeah, I don't think all the issues had started bubbling

2  over.

3  Q    Did you go to Ocala, Florida in August to teach a class

4  for Joe Hernandez?

5  A    The FEMA course, yes.

6  Q    August 27th to 30th?

7  A    Yeah, if that's what the dates -- I can't -- I just

8  remember it was 2018.  But If you say so.

9  Q    Was Joe Hernandez angry at you at the end of August in

10 2018?

11 A    No, not if I'm there.

12 Q    So the issues that had arisen before the conference with

13 respect to the registration didn't cause Joe Hernandez to be

14 angry at you at the end of August of 2018?

15 A    We haven't even opened up registration yet for the next

16 year.  This had nothing to do with the 2018 him being upset

17 and -- with me until for the 2019 conference.

18 Q    Oh, so the stress didn't start until the 2019 conference?

19 A    Yes, but that all started after this course, probably

20 September, October, November, December of the fall, in the

21 winter of 2018, anticipating the 2019 conference.

22 Q    Okay.

23        So in the fall of 2018, that's when Joe Hernandez

24 got angry at you; right?

25 A    Me, the department, whoever -- he was just angry.

*Isaacs - cross - Fletcher*                                                    575

1   Q    So we looked at -- in Exhibit M if you flip ahead.

2   A    Okay.

3   Q    This, you said, may or may not have happened in November.

4   This is the thread we looked at already.

5   A    Okay.

6   Q    And you told Joe Hernandez:  The conference has become a

7   nightmare and may have to be cancelled.

8          And his response is:  Wow.  Have you heard of

9   Envision?

10         Right?

11  A    Okay.

12  Q    So doesn't -- was Joe Hernandez angry at you when this

13  text thread happened, whenever it happened?

14  A    Probably hadn't started yet.  Probably went to -- into

15  December, I don't know, but obviously not then.

16  Q    Okay.

17         Let's turn to Exhibit N?

18  A    N?

19  Q    N.

20         Does this also look like a text message --

21  A    Yep.

22  Q    -- thread between you and Joe Hernandez?

23  A    Yep.

24  Q    And do you see where you ask him on the left side:  Is

25  your website completely separate from the Foundation?

1    A    Yeah.  This is what I was talking about.  He wanted a

2    separate registration because it was a FEMA issue he was

3    telling me.

4    Q    Okay.

5              And then he says to you:  If they don't get to go up

6    there because it doesn't work out, we will bring them down to

7    Florida and offer housing and meals as a package.

8              Do you see that?

9    A    Yes, I do.

10   Q    And so he's referring to the MSOC conference?

11   A    No.  The FEMA course.

12   Q    Okay.

13             So he's saying --

14   A    This is specifically about the FEMA course.

15   Q    Okay.

16             So he's saying if it doesn't work out up in

17   New York, we'll bring it to Florida?

18   A    Yes.

19   Q    Okay.

20             He doesn't seem angry.

21   A    It's all starting.  It was during this time, I don't know

22   what the date is -- oh, you said December.  So this is me

23   saying -- so I'm trying to communicate with the parties from

24   Joe and the fire department.

25             I don't know much about websites, so I'm clarifying

1  with Joe:  Hey, you're saying it has to be separate from the

2  Foundation.  That's when I said:  I'm trying to be clear on

3  this, so I can tell you -- tell them what you're saying,

4  because Joe wasn't talking directly with the fire department

5  on this issue.

6  Q     And then Joe says to you:  Foundation can never offer

7  this on its own.

8          And then you say:  They have no concerns to do so

9  but are concerned about their nonprofit status.

10          And then he says:  We don't need them for anything.

11          And you say:  Agree.

12          Right?

13  A     To run the course, they didn't need the Foundation;

14  however, as a nonprofit Jean O'Shea and, I think, Liz Cascio

15  just said:  Listen, we have to protect and make sure

16  everything is transparent, why registration had to go through

17  the Foundation with the monies then being provided to Joe and

18  DMS.

19  Q     Okay.

20          So your understanding is this is about the MTS

21  conference -- the MTS course, not the MSOC conference?

22  A     Correct.

23  Q     Is that correct?

24  A     That is correct, sir.

25  Q     Okay.

1          THE COURT:  So is it at this time that you believe

2     Joe Hernandez is upset with you?

3          THE WITNESS:  It's me, it's the situation --

4          THE COURT:  Is this the timeframe when you believe

5     he was upset?

6          THE WITNESS:  It started escalating, yes.

7          THE COURT:  And he mentions that his website doesn't

8     mention the Foundation.

9          Did you understand that to mean the Fire Department

10    of New York Foundation?

11         THE WITNESS:  Sorry, Judge, you mean:  The

12    Foundation can never offer this on its own?

13         THE COURT:  He says:  My website -- this is on the

14    left column?

15         THE WITNESS:  Yes.

16         THE COURT:  My website mentions nothing about the

17    Foundation.

18         THE WITNESS:  Right.  I took that as the FDNY

19    Foundation.

20         THE COURT:  Okay.  And doesn't want to.

21         And you respond:  Understood.

22         THE WITNESS:  Correct.

23         THE COURT:  Was he yelling or was he upset with you

24    at that time?

25         THE WITNESS:  There was a couple times where we

1  spoke on the phone, and I told him, I said:  Joe, I'm trying

2  to understand this.  And I'm asking Juan, and I think --

3  retrospect, I realized I was being manipulated, but I don't

4  know why -- I still don't understand why he was insisting that

5  everything goes through them when it's part of our conference.

6  That was the issue.  So I'm not sure -- I'm not the best one

7  to answer this, but there was concerns expressed by the

8  webmaster Joe Malvasio; hence, you know, issues -- and issues

9  for Juan, I guess, and that's when all this kind of started.

10          Again, began to escalate, and Joe was yelling at me

11  on the phone, and I said:  Joe I'm just trying to understand

12  this because I gave -- told him what Liz Cascio said.

13          Liz said:  Hey, have everything go to the website,

14  we'll give you all the money.

15          And I said:  Joe, isn't that the same thing?  You

16  get all the money -- whatever you charge.  He didn't really

17  care what he charged for the course as long as it was

18  transparent, and they would give you all the funds that people

19  signed up for.

20          It seemed like common sense to me, but I don't know

21  what his agenda was at that time.

22  Q    But it's your testimony that you kept working on the

23  MSOC -- the FDNY MSOC because of your friendship with Juan

24  Henriquez and because Mr. Henriquez was pushing you to do it?

25          MR. MACKIE:  Objection, Your Honor.  That

1   mischaracterizes.

2           THE COURT:  Okay.

3           Try not to characterize the testimony.

4   Q    You previously described a conversation you had with a

5   chief where you told that chief that you didn't want to keep

6   working on the conference, but you kept working on the

7   conference because of your allegiance to Juan.  That's what I

8   understand.

9           If that's incorrect, you let me know, but that's why

10  you kept working on the conference; because of your allegiance

11  to Mr. Henriquez?

12  A    I'm sorry, I'm confused what you're asking me.

13  Q    You know what --

14          THE COURT:  You described a conversation with your

15  chief of the unit and the department where you told them you

16  didn't want to work on the conferences going forward, and you

17  were asked to reconsider and keep working.

18          THE WITNESS:  Sure.

19          THE COURT:  And this was for the 2019 conference;

20  right?

21          THE WITNESS:  That would have been for the 2019

22  conference.

23          THE COURT:  Yes.  And you kept working on it.

24          THE WITNESS:  So I took a couple days, or a week, I

25  spoke to some of my friends, including my mentor outside the

1    fire department, Dr. Neil Richmond, R-I-C-H-M-O-N-D.  He's --

2    he's been my mentor in EMS and a good friend and he told me,

3    you know, if the chief of department is asking you to do it,

4    you really should be doing it because you're not protected and

5    I could potentially -- you know, I was anxious, you may lose

6    your job.  That's -- he was saying that, not the department,

7    but Dr. Richmond was saying that -- I asked, what should I do?

8         And he recommended:  Doug, I would go ahead and do

9    the conference since it's already advertised and then see

10   where you're at from there.

11        So I talked to Juan about it, and I told him, you

12   know, my thoughts.  Again, no threats whatsoever was made by

13   the fire department, but it was me being a little paranoid,

14   and I'm not used to dealing with the drama that was happening,

15   and I told, you know, Juan:  I just want to get through this,

16   and, you know, since they already advertised for the

17   department, and -- but I said:  Big picture, we'll get through

18   this.  At the end of the day, I believe in you.  Nothing had

19   happened, whatever is going on, and then we'll -- big picture,

20   we have a lot of great things to work on together, so...

21        THE COURT:  So did you continue working with

22   Mr. Henriquez?

23        THE WITNESS:  No.

24        THE COURT:  Okay.

25        You just did it on your own?

1          THE WITNESS:  Yes, as I had been.

2          THE COURT:  With the other support people.  The

3    many, many people you use.

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  Okay.

6    Q    When did that conversation with Mr. Henriquez occur?

7    A    I do not recall.

8    Q    Would it have occurred in 2019?

9    A    I'm not sure when it occurred.  It would be before the

10   conference.

11   Q    Before the conference --

12   A    Because Juan and I had already -- I'm sorry.

13   Q    So at some point, we looked at some text messages between

14   yourself and Joe Hernandez.

15   A    Okay.

16   Q    Where you are talking about the -- what you say -- you're

17   talking about the DMS MTS course whether it should be held in

18   New York or down in Florida.

19   A    That was Joe Hernandez, not me saying that.

20   Q    Oh.  Well, that was the communication.

21        Do you recall that?

22   A    Yes.

23   Q    Do you think that might have happened in December of

24   2018?

25   A    My conversation with Juan?

*Isaacs - cross - Fletcher*                                      583

1   Q    Your conversation with Joe Hernandez.

2          THE COURT:  I think they established based on

3   Defense Exhibit N and the date on the text message.

4          Isn't that already in the record?

5          MR. FLETCHER:  It is from another witness, Your

6   Honor.

7          THE COURT:  No.  He just testified that this text

8   thread between Dr. Isaacs and Joe Hernandez was regarding the

9   MTS conference, not the MSOC.

10          MR. FLETCHER:  Yes.

11          THE COURT:  Do we need to go over this again?

12          MR. FLETCHER:  No.  I'm just trying to set a

13   timeline, Your Honor.

14   Q    You had that conversation about the MTS conference with

15   Joe Hernandez; right?

16   A    In this text, yeah.

17   Q    Was your conversation with Mr. Henriquez after that

18   conference with Joe Hernandez?

19   A    I do not recall my conversations with Juan.  We spoke

20   frequently, but I -- I don't know when my conversation

21   happened with Juan.

22   Q    But it would have been in the months prior to the 2019

23   conference?

24   A    It was in regards to the 2019 conference.

25   Q    And Mr. Henriquez said:  Go ahead with the 2019

1901 of 331 PageID

1   conference?

2   A    No.  He was upset and then sent me a message that I

3   then -- I said, Juan, let's talk.  And then he sent me an

4   email and I forwarded it to the -- at this point, like I was

5   shocked and I just was so shocked at what was going on that he

6   turned on me and -- and I -- at this point, I'm like:  This is

7   getting uncomfortable, and I forwarded this to -- I'm not sure

8   if it was Ms. Archer or whoever.  You know, I was just getting

9   uncomfortable, and I just -- I couldn't reason with him or

10  talk to him about it, so...

11  Q    One other set of questions.

12        Mr. Henriquez never expressed concern to you about

13  any financial improprieties with respect to the management of

14  the FDNY MSOC event; right?

15        MR. MACKIE:  Objection, Your Honor.  This has been

16  asked and answered.

17        MR. FLETCHER:  It's okay.  I will ask another

18  question.

19        THE COURT:  I honestly can't remember.

20        Okay.  Ask another question.

21  Q    Mr. Henriquez -- is it your testimony that Mr. Henriquez

22  never expressed concern over unrelated dinners being billed as

23  MSOC events?

24  A    I have no idea what you're referring to.

25        THE COURT:  So the answer is no.

*Isaacs - cross - Fletcher*                                                      585

```
 1            THE WITNESS:  No.  I'm sorry.
 2   Q    Or accepting dinner from vendors?
 3   A    Whose accepting it?
 4   Q    I'm just asking you.  Mr. Henriquez --
 5   A    No.
 6   Q    -- never expressed concern about dinner --
 7   A    No.
 8   Q    -- with vendors?
 9   A    No.
10            THE COURT:  One at a time.  Let's get the question,
11   please.
12   Q    Mr. Henriquez never expressed concern about dinner with
13   vendors?
14   A    No.
15   Q    Mr. Henriquez never expressed concern to you about
16   vendors being asked to donate funds to the conference in
17   exchange for preference in FDNY procurement?
18   A    No.
19   Q    That would have been improper; right?
20   A    Yes.  Considering my position, yes.
21   Q    Your position on an equipment committee for the FDNY?
22   A    Yes.
23   Q    Did Mr. Henriquez ever express concern to you regarding
24   business that you had with your brother consulting for African
25   governments?
```

1   A    Wasn't -- it was a pizza business.  It was not consulting

2   with governments.

3   Q    So nothing about providing fire -- like, expertise to

4   African governments?

5   A    No.  It was an opportunity, I thought, for Joe Hernandez

6   and Juan with DMS, but not -- I was in the pizza business.

7   Q    You had a pizza business in Africa?

8   A    Yes.

9   Q    With your brother?

10  A    Yes.

11  Q    And Mr. Henriquez never expressed concern to you that the

12  profits from MSOC events were not going to purchase equipment

13  for FDNY HAZTAC personnel?

14  A    No.

15             MR. FLETCHER:  Nothing further, Your Honor.

16             THE COURT:  All right.  Any redirect of this

17  witness?

18             MR. MACKIE:  Few points, Your Honor.

19             THE COURT:  Okay.

20             (Pause in the proceedings.)

21             THE COURT:  I'm sorry, what?

22             MR. SINGLETON:  I just asked if he needed anybody

23  else because I have to bring them over from headquarters.

24             THE COURT:  Oh, today?

25             MR. SINGLETON:  But he said no, so I'm going to let

1    people go.

2              THE COURT:  Okay.

3              Please proceed.

4              MR. MACKIE:  Thank you, Your Honor.

5    REDIRECT EXAMINATION

6    BY MR. MACKIE:

7    Q    Good afternoon, Dr. Isaacs.

8    A    Afternoon.

9    Q    You were asked before -- I'm just going to ask you a few

10   direct questions about some of the testimony that you just

11   gave.

12             You were asked about sponsorships and whether you

13   ever procured sponsorships for the conference; is that

14   correct?

15   A    Correct.

16   Q    And you said that you never procured any sponsorships for

17   the FDNY MSOC conference?

18   A    I would send flyers out to companies if, you know...

19   Q    When you say in paragraph 14 of your declaration,

20   referring to Mr. Henriquez, that:  He was not involved in

21   seeking sponsorship donations which took a lot of time and

22   follow-up.

23             What did you understand that to mean?

24             THE COURT:  This is his declaration?

25             MR. MACKIE:  This is the declaration of Douglas

1    Isaacs on paragraph 14.

2              THE COURT:  Oh, so you're asking him what he meant?

3              MR. MACKIE:  Yes.  What he meant in his own

4    declaration.

5              THE COURT:  Okay.  I just wanted to be clear.

6              MR. MACKIE:  Yes.

7    A    Referring to all the logistics from -- I used to

8    communicate with all the speakers arranging the honorarium to

9    pay for their travel, hotel, the logistics, the flights.  I

10   was, you know -- I organized meetings with the fire academy,

11   with rescue school, EMS academy.  All those different

12   plannings, logistics.

13             So when I said I was communicating also, companies

14   that were part of who were going to be exhibitors, arranging

15   if they want to give soft supplies to help out with the skill

16   stations.

17   Q    Thank you.

18             And in terms of recruiting speakers and doing those

19   initial phone calls, did you have to seek approval each time

20   that you were going to contact someone to be a potential

21   speaker?

22   A    When you say "approval," from the fire department?

23   Q    From the fire department or the Foundation.

24   A    No.

25   Q    If they agreed to be a speaker and come to the

1  conference, would you then have to seek approval?

2  A    Not for the individual.  But in order to -- in terms of

3  to cover their costs, yes.

4  Q    Thank you.

5        Can you turn in Defendants' Exhibits to Exhibit C.

6  This is an email that we looked at earlier.

7  A    Am I using one of the notebooks?

8  Q    Yes.  In the defendants' notebook, it should be black,

9  Exhibit C.

10        I believe, correct me if I'm wrong, when you were

11  talking about this earlier, you said you don't recall having

12  seen this email; is that correct?

13  A    I can't recall.

14  Q    So you -- the line from Mr. Henriquez says:  I attached a

15  draft to show how we would do it in New York.

16        Do you remember ever receiving a draft from

17  Mr. Henriquez of an event plan?

18  A    No, not until -- not originally from him.  It was through

19  conversations, structure, ideas, and I did speak to other

20  people in our USAR community, from Mike Kurtz to others.  So I

21  spoke to a bunch of people.

22  Q    Did you ever base the initial 2013 conference off of

23  other previous conferences that may have taken place in terms

24  of structure?

25  A    Not in terms of structure.  No, not in terms of

1  structure.  You know, I looked at -- I don't recall any

2  structure.  It just evolved over time every year and changed a

3  little bit.  After the first year it kind of changed, but the

4  structure was the same.  So, no, I did not base it off any

5  other conference.

6  Q    Can you, in the same binder, turn to Exhibit P?

7  A    P?

8  Q    P like "Peter."

9  A    Yes.

10  Q    And this email exchange is another one that we looked at

11  earlier and the date on this is Monday, July 7th, 2014.

12  A    Correct.

13  Q    So would this have taken -- was this email exchange after

14  the second annual FDNY MSOC?

15  A    Correct.

16  Q    And why were you looking for an MSOC contact list in July

17  a couple months after the second MSOC, if you recall?

18  A    I'm not sure.

19  Q    But when you refer to, in your text message:  Can you

20  please send me your MSOC contact lists?

21          Do you know what that would have meant at that point

22  of time?

23  A    I -- I -- I have no idea.  I don't recall this email.

24  The only thing, again, I asked Joe Hernandez was about the

25  SUSAR.

1          THE COURT:  What?  I'm sorry?

2          THE WITNESS:  The only thing that, you know, Juan

3    was sharing with me that Joe knew the SUSAR community.  That's

4    the State Urban Search and Rescue Teams.

5    Q    Okay.

6          We're going to move quickly through these things in

7    the interest of time.

8          So on the same binder, Exhibit D, at page 4 of 55 --

9    A    Yes.

10          MR. MACKIE:  And the Bates number, for the record,

11    is HENR-271.

12          THE COURT:  Thank you.

13    Q    And we looked at this a little bit earlier.

14          What do you recall about this flyer?

15    A    Now that it was shown to me, the title on top, the MSOC

16    2013 at FDNY, which I don't recall that, I'm not sure what

17    else, though.

18    Q    At the bottom, right-hand page under:  For hotel and more

19    information.

20          And then there's a website down there; correct?

21    A    That's the Foundation website, correct.

22    Q    Is that the only website that you are aware of that was

23    used in connection with the 2013 MSOC?

24    A    Correct.  Dave Salemi Foundation.

25    Q    Can you turn to the next page?  This is 5 of 55.

1                MR. MACKIE:  For the record, this is FDNY 383.

2    Q    And this is an email that, again, you looked at earlier

3    that appears to be from Doug Isaacs to a number of people at

4    FDNY or the Foundation dated December 20th, 2013.

5                And this says:  Attached is the draft MSOC flyer for

6    your review.  Juan once again has done an amazing job.

7                Do you recall what flyer this was referring to at

8    that time?

9    A    This would have been for the 2014 conference.

10   Q    Okay.

11               And do you recall there being an attachment to this

12   email?

13   A    I mean, I wrote it, so I mean there must have been an

14   attachment, yes.

15   Q    But there is no attachment on the next page of this;

16   correct?

17   A    I don't see one here.

18   Q    Okay.

19               Turning to the next page, and this is another email

20   exchange, this is page 6 of 55, 6 and 7, and this is FDNY 350

21   and FDNY 351.  So this is another email exchange that you

22   discussed earlier.

23               And I just want to clarify, once again:  What year

24   was this talking about?  What conference year was this

25   discussing?

1  A    It would have been the 2014, the second year of the

2  conference.

3  Q    Thank you.

4        Moving forward to page 10 of 55.  This is HENR-55.

5  And earlier you discussed the title at the top and you were

6  confused by that title; is that right?

7  A    Correct.

8  Q    And a few pages later, I'm turning to page 14 of 55 now.

9  This is HENR-36, what's the title on the top of this page?

10 A    FDNY MSOC 2014 EAP.

11 Q    Do you understand there to be a significant difference

12 between the phrasing "FDNY MSOC" versus the phrasing "MSOC at

13 FDNY"?

14 A    Yes.

15 Q    And what is your understanding of the difference?

16 A    The one on top of the EAP draft FDNY MSOC 2014 would have

17 been the correct title.

18 Q    And so this title "FDNY MSOC" is the title that you used

19 in all promotional materials?

20 A    Correct.

21 Q    Okay.

22        Can we turn ahead in the same exhibit?  We're still

23 on Defendant's Exhibit D, at page 54.  This is 54 of 55.

24        MR. MACKIE:  HENR-171, for the record.

25 Q    And this is, I believe you testified earlier, this is

1    another version of an event action plan; is that correct?

2    A    Correct.

3    Q    And at the bottom left corner, it says:  Page 1 of -- and

4    then there's a blank after that.

5    A    Correct.

6    Q    Is that the form that these would usually take that it

7    would be blank?

8    A    No.  I mean -- also it would say blank, you know -- it

9    wouldn't just be blank page.  If there was a blank page that

10   followed, it would say blank for a reason, but we didn't have

11   blank pages.

12   Q    And is -- what would have been after this in the event

13   action plan?

14   A    Probably description of the conference like we had in the

15   previous example.

16   Q    Okay.

17          Can I ask you to go to the other binder, Plaintiff's

18   Exhibit 3.  This is the org chart that you were looking at

19   before?

20   A    Okay.

21          THE COURT:  I'm sorry, what exhibit, sir?

22          MR. MACKIE:  This is Plaintiffs' Exhibit 3.

23          THE COURT:  Okay.  Thank you.

24   Q    Who else on this org chart would have contributed to the

25   event action plan that we were just looking at for 2017?

1   A    Chiefs Pataki, Bills.  I think those two would have been

2   the main people from EMS operations because they would have

3   operationalized the conference.  We have a huge transport

4   sector.  We have rescue school, fire academy.  I mean, the

5   department -- the amount of support on game day, the day of

6   the conference, the support is amazing that the fire

7   department gives.

8   Q    And that support is all detailed in the EAP?

9   A    It may have mentioned -- it may not have everyone -- it

10  would not have everyone's names, but, yes, in the EAP, it

11  operationalized all the issues, like, for the event.

12  Q    So would it be possible for a single person to create the

13  entire EAP alone?

14  A    The EAP was just making the document.  It's not the

15  actual -- they are not actually necessarily making the plans,

16  per se.

17  Q    Okay.

18       Sticking with the Plaintiffs' Exhibit 3, you walked

19  through the different levels of authority on the org chart,

20  and I want to just ask about the position of Mr. Henriquez

21  here.

22       Is there a reason that he was given, apparently,

23  increased authority?

24  A    It was to give him a position because you see he has no

25  one under him, so he has no authority over anyone.

1  Q    So based on this chart, it doesn't appear that anyone was

2  reporting to Mr. Henriquez during this conference?

3  A    Yes.  People -- you would not be reporting to Juan.

4  Q    What was the job of a resource coordinator?

5  A    I think he was there to assist me.  I mean -- I don't

6  think -- I mean, he was there to assist me with the

7  conference.

8           THE COURT:  So is that what resource coordinator

9  means?

10          THE WITNESS:  Yes.

11          THE COURT:  It doesn't mean that he's coordinating

12 all the different resources --

13          THE WITNESS:  Oh, no.

14          THE COURT:  -- that are contributing to the

15 conference?

16          THE WITNESS:  He's not coordinating the resources

17 there, no.

18          THE COURT:  So are assistants generally listed on

19 these kinds of org charts?

20          THE WITNESS:  Sorry, Judge, when you say

21 "assistants," you mean these names here or additional

22 personnel?

23          THE COURT:  Yes.  You're saying that -- I thought

24 you said that Mr. Henriquez, in the capacity of resource

25 coordinator, was your assistant.

1           THE WITNESS:  Well, so we --

2           THE COURT:  So who else has assistants listed on

3     this org chart?

4           THE WITNESS:  Maybe "assistant" isn't the best word,

5     but gave him that role -- to give him that role, because he

6     did help with planning, so -- I mean, you are talking about

7     others who would have had -- who didn't have assistants or --

8           THE COURT:  No.  What I am trying to understand is

9     if Juan Henriquez's role was as your assistant, but his title

10    says resource coordinator, but you're saying basically he was

11    an assistant.  I am trying to understand whether there are any

12    other assistants to any of these folks listed on this org

13    chart.

14          THE WITNESS:  Yeah, so a lot of these people in the

15    org chart, when they -- like, for example, Captain Oleg -- I

16    can't pronounce the name -- all that ALS, BLS, those are units

17    and members that are running the specialty units, so each of

18    these sections have people within there.

19          THE COURT:  Right, but they are units, not people;

20    right?

21          THE WITNESS:  Well, they are -- they do cover

22    people.  It would be impossible with the amount of resources

23    that we give, you can't list all the different names in there.

24          THE COURT:  I understand.  But there is no one

25    specifically listed here as an assistant; correct?

1          THE WITNESS:  Actually, yes.

2          THE COURT:  Does anyone else have resource

3    coordinator as a designation on this chart?

4          THE WITNESS:  Lieutenant Klein, equipment

5    coordinator.

6          THE COURT:  Not resource coordinator.

7          THE WITNESS:  Yeah, resource, I'm not sure exactly.

8    It's just a general term.  It's not like a specific role,

9    per se.

10         THE COURT:  Okay, so you don't really know what that

11   means; is that correct?

12         THE WITNESS:  Yeah, I don't know whether resource

13   coordinator, that name, I didn't come up with that.

14         THE COURT:  Let's move on.

15   Q    Can you please turn back to the other binder, Defendants'

16   Exhibit R, and just a few questions about this Exhibit.

17         Do you recall what the context of this Exhibit was?

18   A    Yes.  Joe Hernandez and also Juan want to take our rescue

19   paramedic program.  I had written medical protocols called

20   "rescue paramedic protocols" in 2010 that a lot of agencies

21   around the country were using.  I also developed a very robust

22   curriculum for the program.  We had, at the time, about a

23   hundred rescue paramedics and officers, and we were -- and,

24   again, this was all borne out after 9/11 in New York City and

25   we were a model that a lot of cities have been looking at.

1   And so I was a little uncomfortable with this because I took

2   this, well, they're trying to monetize this.  I was

3   uncomfortable with this.

4   Q    Okay.  And someone has highlighted the term "MSOC medic"

5   in the third or fourth line down.

6            What did you take that to mean?

7   A    I had no idea what he was talking about, but I was

8   concerned why the rescue paramedic -- the rescue medic was in

9   there.

10  Q    And in the next sentence there, it says:  Doug, you would

11  also -- Doug, you would do also with -- and then it goes on.

12  I'm not sure where the break is.

13           What did you understand that to mean?

14  A    That was my understanding because I gave a few talks.  I

15  gave one on the use of a medication called Ketamine, about

16  field limb amputation.  I was a little upset when I was there

17  because Joe Hernandez took one of my guidelines I wrote on

18  field limb amputation and put DMS all over it.

19  Q    Can you please, in the other binder, Plaintiffs'

20  Exhibit 4, and you can turn to the third page of that.  And I

21  apologize, it's not Bates stamped, but this is the third page

22  of Plaintiffs' Exhibit 4.

23  A    Sorry, it's Exhibit 4, you said?

24  Q    Yes.  You can look through the first couple pages if you

25  like, but I'm going to ask you about the third page.

1    A    Yes.

2    Q    Is this the lecture outline that you were just

3    describing?

4    A    Yes.  I had wrote this.

5    Q    And on the bottom left it said:  Prepared by Doug Isaacs,

6    slash, Joe Hernandez; is that right?

7    A    That's correct.

8    Q    Did Joe Hernandez assist you in preparing this outline?

9    A    No.

10   Q    Did you prepare this for Disaster Medical Solutions?

11   A    No.

12   Q    Okay.

13           MR. SINGLETON:  One more exhibit, Your Honor.

14           THE COURT:  Did you send this to Mr. Hernandez?  Or

15   how did he get it?

16           THE WITNESS:  I give it to all the attendees at the

17   conference because, as part of a preconference, I do a field

18   limb amputation course.  I have surgeons from all over

19   New York City and I made this as a handout to all the

20   attendees.

21           THE COURT:  For the Florida conference or some other

22   conference?

23           THE WITNESS:  For FDNY conference.  And Joe is my

24   friend, I shared all my documents with him, so I would have

25   certainly, you know, if appropriate, would have sent it to him

1    if he asked for it.  I give it out already, so...

2    Q    Okay.

3         And can we -- one more exhibit, Exhibit 1 --

4    Plaintiffs' Exhibit 1.

5    A    Yes.

6    Q    This is an email exchange between yourself and -- who is

7    the other email address?

8    A    Juan's Yahoo email address, Caprefil.

9    Q    And this is Monday, July 9th, 2012, and the subject line

10   says:  Some ideas of what's out there.

11   A    Yes.  This is --

12   Q    Can you just explain what this email is and why this was

13   sent to you?

14   A    So, to put it in context, the fire department had run two

15   EMS-related conferences in the past two years, but the chief

16   that was doing it, she says:  It's too much.

17        I said:  Okay.  I was the medical director at the

18   academy, and now at rescue, and I said:  Oh, we'll do it.

19   Because people are saying we should be projecting our

20   leadership around the country in our special operations.

21        So, you know, we've all generally talking about,

22   outside of the FEMA training, it would be great to have

23   someplace to talk about medicine.  So I was like, we're doing

24   a conference.  And I talked to Juan and I had done some

25   research and Juan sent me an email:  Hey, this is what's out

1  there.  And I said:  There's a lot of work involved.  And

2  basically he was, you know, a good friend of mine, and he was

3  excited about it.  I was, other people were, and he said -- he

4  did a search as well and this is what he sent that was out

5  there right now in the medical special operations area, so to

6  speak.

7  Q    Did Mr. Henriquez at this time mention that he had ever

8  planned any other conferences similar to the one that you were

9  discussing?

10 A    Never.

11 Q    And did this email include any mention of the term MSOC?

12 A    No.

13 Q    When do you remember creating that term?

14 A    It could have been around that time because I spoke to

15 Chief Downey at rescue to get his kind of blessing.  And then

16 speak to others within the department, at the time was

17 Dr. John Freese, who was the chief medical director of my

18 office, also a good friend of mine, and he gave me the

19 go-ahead.  And Chief Downey told me to go speak to the

20 Foundation and then the ball started rolling.

21        And then I remember it being outside of our Training

22 Building 12 talking to Juan and said:  Oh, what are we going

23 to call it?  I said:  Well, we're medical special operations.

24 I don't know if we can call it medical special operations.

25 That's kind of plain.  Medication special operation

1    conference, but then we realized FDNY adds meaning to that.

2    Medical special operations is a ubiquitous term, because in

3    the military, civilian-side, fire, EMS, police agencies, not

4    only around the US, but around the world, use medical special

5    operations or special operations in everything.  Every

6    department has special operations.  And we felt that having

7    the FDNY means something in the world, and so that's -- we

8    kind of -- I kind of came up with the name, and that's when we

9    moved forward and -- as a department, to plan for it.

10            MR. MACKIE:  Thank you.  No further questions.

11            THE COURT:  Anything else from this witness?

12            MR. FLETCHER:  Very briefly, Your Honor.

13   RECROSS-EXAMINATION

14   BY MR. FLETCHER:

15   Q    Dr. Isaacs, you were asked about Exhibit P, so let's take

16   a look at it really quick.

17   A    P you said, sir?

18   Q    P like "Peter."

19            So this is the email on July 7th, 2014, when you

20   asked Mr. Henriquez to:  Please send me your MSOC contact

21   lists including Joe's, we need to give them to Susan from

22   marketing.

23   A    Okay.

24   Q    And it's your testimony that you don't recall sending

25   this email and you don't recall why you might have sent it;

1   right?

2   A    Yeah, I -- I mean, I can make a presumption, but, I

3   mean --

4   Q    But as you sit here today, you don't know.  Or you don't

5   recall.

6   A    I don't recall, no.

7   Q    Okay.

8           Can we look at Exhibit S?

9   A    Yes.

10  Q    So do you see that this is -- the bottom is an email from

11  Jean O'Shea to you on June 16th, 2014, at 12:40.

12  A    Yes, I do.

13  Q    And then at 12:44 you forward it directly to

14  Mr. Henriquez?

15  A    Yes, I do.

16  Q    Okay.  Four minutes later.

17          And do you see Jean O'Shea is -- appears to be

18  telling you some positives and negatives of the Foundation and

19  the FDNY hosting the MSOC event?

20  A    Correct.

21  Q    Do you see number three at the bottom:  Not marketed

22  enough, attendance should be higher?

23  A    Yes.

24  Q    Jean O'Shea told you on June 16th that the marketing

25  needed to be better for the FDNY MSOC event; right?

1   A    That's -- yes, that's what it says.

2   Q    Then three weeks later about, on July 7th, you sent

3   Exhibit P to Mr. Henriquez; right?

4   A    Okay.

5   Q    Do you still not have any recollection of why you would

6   have sent Exhibit P to Mr. Henriquez?

7   A    I don't recall, but again, I can make some -- I can make

8   some guess on it.

9        THE COURT:  Not guessing.  Just what you recall.

10  A    I don't recall specifically.

11  Q    Okay.

12       MR. FLETCHER:  That's it with this document, sir.

13  Q    Exhibit R.

14       So is it your testimony that this email from Joe

15  Hernandez to Mr. Henriquez, Louis Cook, you, and Vinny Johnson

16  is about taking your rescue medic program outside of the FDNY

17  and branding it MSOC?

18  A    That -- that's what he wrote.

19  Q    No.  I'm sorry, sir, that's not what he wrote.

20       So I'm asking you if --

21  A    No.

22  Q    -- you're characterizing this document as him taking --

23  Joe trying to take your rescue medic program outside the FDNY.

24  A    Correct, but not really to MSOC.  Right, but not

25  really -- yes, I saw this as him trying to take the rescue

1  paramedic program outside the FDNY.

2  Q    And it had never been held anywhere else outside the FDNY

3  before?

4  A    The rescue paramedic program?

5  Q    Yes.

6  A    I -- it couldn't have been.  I developed it, in terms of

7  the materials.

8  Q    So no one else was doing it?

9  A    The FDNY rescue paramedic program?

10  Q    A -- some kind of -- well, it might be -- you see Joe

11  says:  It might be perfect op to start introducing the DMS

12  US&R or FDNY rescue medic program?

13  A    Again, I took that as him talking about the rescue

14  paramedic program because many cities' agencies were asking

15  for our protocols and training curriculum.

16  Q    But you didn't think it was a good idea; you were against

17  taking your program outside of New York.

18  A    Well, I was taken aback that he has a business and trying

19  to monetize our -- the rescue paramedic program, I was uneasy

20  about that, so...

21  Q    When you saw this email, did you see the reference to

22  MSOC medic?

23  A    I see it now.  Again, I don't know in terms of, you know,

24  what -- I remember looking at this.  I remember Joe asking

25  about the rescue paramedic program.

1   Q    Did you ever tell Mr. Hernandez that you objected to

2   taking the FDNY medic program outside of the FDNY?

3   A    I just didn't follow up with him on it.

4   Q    But you didn't say, hey, that's not a good idea or hey, I

5   don't think we should do that?

6   A    I expressed my concerns to Juan.

7   Q    But you didn't have any communications with Mr. Hernandez

8   about this?

9   A    No, most of my communications were with Juan.

10  Q    And you didn't ever tell Mr. Hernandez we shouldn't use

11  the acronym MSOC outside of the FDNY?

12  A    I was uneasy about that when I saw that and I thought he

13  was just making a suggestion, but it really didn't go

14  anywhere, the conversation, so...

15  Q    And you don't recall seeing the words "Palm Beach MSOC"

16  on this email; right?

17  A    Never, no.

18  Q    Okay.

19       THE COURT:  May I ask, Joe Hernandez in his email

20  says, quote:  It may be perfect op to start introducing the

21  DMS US&R or FDNY rescue medic program to other smaller cities.

22       So with reference to the DMS US&R, that's not part

23  of the FDNY rescue medic program; is it?

24       THE WITNESS:  No.  That's the FEMA course.

25       THE COURT:  So he's proposing that it might be an

1    opportunity to introduce either the DMS US&R or the FDNY

2    rescue medic program to smaller cities, based on what he wrote

3    here?  I am just quoting it.

4            THE WITNESS:  Yes.  I don't take it as that because

5    that's a FEMA course and I -- I took that as because the

6    rescue paramedic program is a much higher level course than

7    the Urban Search and Rescue and so -- it's -- he would have

8    had to make his own course.  If he was going to make his own

9    DMS search and rescue course, then -- but I took that as, you

10   know, FDNY, because we had a lot of agencies around the

11   country were asking for the protocols I had written and the

12   other curriculum, so -- and he knows that because people

13   talked about it around the country when I wrote the protocols.

14           THE COURT:  Did you understand what he meant when he

15   said:  St. Petersberg, Hillsborough County has almost same and

16   we did their training?

17           THE WITNESS:  I have -- I have no idea what that's

18   in reference to, to be honest.

19           THE COURT:  Okay.

20           MR. FLETCHER:  May I continue, Your Honor?

21           THE COURT:  Yes.

22   Q    Exhibit 4, it's in the white binder.

23   A    Yes.

24   Q    This is the outline for your -- well, there's a couple

25   pages.

1  A    Yes.

2  Q    The first two pages appears to be a schedule and then --

3  and then after that we are talking about an outline for a

4  field limb amputation course?

5  A    Yes.

6  Q    Okay.

7        So it's your testimony that even though at the

8  bottom this says:  Prepared by Doug Isaacs MD and Joe

9  Hernandez, medical specialist -- the content on these pages is

10 exclusively your own?

11 A    Well, I did the research and organized it and, yes, put

12 it together.

13 Q    Okay.

14       So this is all your content?  It had never been

15 produced before you created it?

16 A    Again, I looked -- again, are all the words mine?  No,

17 but the articles I read, organizing it, and putting this

18 document together, yes, I put this together.

19 Q    Okay.

20       So someone -- so maybe Joe Hernandez wrote some of

21 the words on this page?

22 A    No, he did not.  The only thing he put was his DMS on

23 there.

24 Q    You created the field limb amputation course for the

25 FDNY; correct?

1    A    Yes, I did.

2    Q    Now, the FDNY's field limb amputation course or protocol

3    was not the first field limb amputation course or protocol;

4    right?

5    A    Others -- I mean, I didn't really see any, other than

6    hospitals.

7    Q    You are not aware of any others aside from some hospitals

8    in the FDNY's when you created yours?

9    A    The only thing I recall is Michael Kurtz sharing a

10   PowerPoint that his Task Force worked on in Pennsylvania.

11   Q    So you've taken a lot of FEMA certifications courses;

12   right?

13   A    Yes.

14   Q    And you are a member of FEMA Task Force I in New York?

15   A    New York Task Force I; correct.

16   Q    So you should know that FEMA has a field limb amputation

17   course that predated the FDNY's; right?

18   A    First time I'm hearing about this.

19   Q    Never heard about that before?

20   A    In fact, FEMA, our urban search and rescue teams --

21   actually there is no formal course I'm aware of.

22   Q    Is there a protocol, a FEMA protocol?

23   A    They did not put it -- no.  They did not put it into the

24   curriculum formally until I'm the lead on the rewrite of the

25   FEMA vouching specialist course right now, and I just -- I

1    wrote the lecture for this course.

2    Q    And Mr. Hernandez did not help you create the FDNY field

3    limb amputation course?

4    A    No.  He just talked about blades with me; he wanted to

5    try different blades out.

6    Q    But when you were creating the field limb amputation

7    course for the FDNY, you had conversations with Joe Hernandez

8    about it?

9    A    He asked to come to it.

10           THE COURT:  Just answer the question.

11           THE WITNESS:  Yes.

12   A    No.  I did not -- other than talking about blades, I

13   don't recall any conversations of designing our field limb

14   amputation course, nor did I ever see any FEMA amputation

15   course that I can recall.

16           MR. FLETCHER:  No further -- actually, one further

17   question, Your Honor.

18   Q    Exhibit 1 --

19           THE COURT:  May I ask, before we move on, did Joe

20   Hernandez ever tell you about his work in Haiti and having to

21   do with field amputation on a nine-year-old person who was

22   trapped in the rubble?

23           THE WITNESS:  He shared a video with me.

24           THE COURT:  Okay.

25           And that was in 2010 that he was in Haiti assisting

*Isaacs - recross - Fletcher* 612

1    with earthquake relief; is that right?

2            THE WITNESS:  Yeah, it was during the earthquake.

3    He was not involved in it himself, but, yes, he shared a video

4    with me that -- and then he told me about it, as well as

5    others.

6            THE COURT:  So you don't know if Mr. Hernandez was

7    in Haiti --

8            THE WITNESS:  I don't know --

9            THE COURT:  -- assisting with relief?

10           THE WITNESS:  I don't know if he was in Haiti

11   himself.  His Task Force was.

12           THE COURT:  Okay.

13   Q    Exhibit 1.

14   A    Yes.

15   Q    So this is the email exchange on July 9th, 2012?

16   A    Yes.

17   Q    Where Mr. Henriquez sends you some links and some

18   information about what he found about other similar

19   conferences out there, and he said he didn't find much; right?

20   A    Yes.

21   Q    Okay.

22           Did you ask him to send you this email, or did he do

23   this research on his own?

24   A    We -- we were on the phone talking about it and -- and I

25   can't recall, but I think he did his search, I did my own.  So

1    I think it's just the excitement of doing this conference.

2    Q    So you don't recall whether he -- so you were just

3    talking about it together and he said:  Hey, let me send you

4    some information?

5    A    Well, I was going to go ahead and do the conference.  He

6    was excited and wanted to be part of it.  And I said:  There's

7    a lot of work involved.  And so I think he went ahead and did

8    his search and wrote me this email.

9    Q    Okay.

10             And this is July 9, 2012; right?

11   A    That is correct.

12   Q    Okay.

13             THE COURT:  And did he suggest major topics in this

14   email?  He lists a bunch of topics and make some suggestions

15   for speakers.

16             THE WITNESS:  I'm sorry, Judge, which line are you

17   looking at?

18             THE COURT:  It says -- after the links, he says:  As

19   you can see, there isn't much in the form of symposium or

20   actual focus conference.  The materials and resources are

21   definitely there.  I think some of the major topics should

22   be -- then he lists topics with some of the suggested

23   speakers.

24             THE WITNESS:  These were just overall, kind of,

25   general comments, not, like, specific topics, per se.

*Isaacs - recross - Fletcher*                                            614

1            THE COURT:  He called them major topics.

2            THE WITNESS:  Yes, just major areas of -- and

3    then -- but not the actual presentations and so on.

4            THE COURT:  Okay.

5    Q    So if we could turn to Exhibit C now.  It's in the other

6    binder.

7            So we've looked at this email before where --

8    June 29, 2012 -- so a little over a week prior to that email

9    exchange, and the highlighted email reflects Mr. Henriquez

10   telling you, quote:  How we would do it in New York, it

11   follows the same structure as the previous MSOC events; right?

12   A    I see that.

13           (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                      615

1    (Continuing)

2    Q    And the subject line is:  Re:  MSOC NY, right?

3    A    I see.

4    Q    You understand that to be MSOC New York?

5    A    It's what he wrote.

6    Q    But you don't recall ever receiving this email, right?

7    A    I do not recall.

8    Q    Okay.

9              MR. FLETCHER:  No further questions, Your Honor.

10             THE COURT:  Okay.

11             Anything else from this witness?

12             MR. SINGLETON:  No.

13             THE COURT:  All right, you are excused.  Have a nice

14   day.

15             THE WITNESS:  Thank you, Judge.

16             (Witness excused.)

17             THE COURT:  Are there any other witnesses that

18   either party wishes to present?

19             MR. FLETCHER:  Not from me, Your Honor.

20             THE COURT:  How about the Defense?

21             MR. SINGLETON:  No, Your Honor.

22             MR. MACKIE:  No, Your Honor.

23             THE COURT:  Okay.  So, let's figure out how to move

24   forward.

25             As I said, I have a lot of my plate, we will try to

Proceedings                                            616

1  do our best to get a decision out to you.  Our court

2  reporter -- why don't you tell us about any logical issues

3  regarding the transcript, if the parties have ordered it or

4  want to order it.

5            THE COURT REPORTER:  So the City just requested a

6  seven-day, an expedited delivery.  So I am going to discuss

7  with the other reporters and see what we can come up with.  I

8  think maybe seven-day might be reasonable for us.

9            THE COURT:  Can they arrange to split the cost with

10  the other lawyer?

11            THE COURT REPORTER:  It will be cheaper if they do

12  it that way.

13            THE COURT:  Okay.

14            You can save money if you can do it that way.

15            MR. SINGLETON:  Very good.

16            MR. FLETCHER:  We can discuss.

17            I'm on board for a 30-day, I don't know about the

18  seven-day.  We had previously discussed a 30-day transcript.

19  This is the first I am hearing about seven days.

20            THE COURT:  Okay.  Well, hopefully, they will work

21  it out.

22            So that is it.  Do the parties want post-hearing

23  submissions or do you feel like you have papered this to

24  death?

25            MR. FLETCHER:  I am happy to stand on my -- what

Proceedings                                              617

1   we've submitted, Your Honor.  If the Court feels it would be

2   helpful, I am glad to, but...

3           THE COURT:  Look, I think it boils down to,

4   ultimately, credibility determinations based on what the

5   documents say, based on what the witnesses have testified to

6   and what they have not testified to.  I will do my best to get

7   you a decision as soon as I can.

8           MR. SINGLETON:  Thank you, Your Honor.

9           THE COURT:  Is there any effort or possibility that

10  this can get resolved or are you pretty much -- I know there

11  has been some emails submitted saying someone is off, but if

12  there is any hope, I think that would ultimately be the best

13  way for everybody because everybody goes away a little bit

14  happy and a little bit unsatisfied, but that is what a good

15  settlement is.

16          I can send you to the magistrate judge if that would

17  be helpful, Judge Kuo.  If you do not think that that would

18  work, we could just have you meet together, but I have a

19  sense, unfortunately, that this has become personal and

20  personalities are in the way, and people feel very personally

21  invested in this whole thing, so maybe settlement is not a

22  possibility?  In which case I will make a decision.

23          MR. FLETCHER:  I am always happy to discuss

24  settlement, Your Honor.  Obviously, I think a resolution is in

25  my client's interest as opposed to litigating for the next

Proceedings                                                    618

1    however many years against the City that's going to throw

2    whatever resources it's going to throw at this.

3    Unfortunately, the PI motion happened to be after the last

4    settlement attempt failed.

5          My feeling today is I don't -- I don't know whether

6    just the fact of the hearing without a decision will change

7    the calculus talking settlement or not.  It may be that the

8    parties need a decision from the Court.

9          THE COURT:  Well, I will tell you that I do not find

10   there was undo delay.  I think there was good explanation as

11   to why the PI was requested when it was requested given that

12   there were ongoing settlement discussions.

13         In terms of credibility determinations, I found that

14   Mr. Henriquez and Mr. Hernandez were credible on many points.

15   Dr. Isaacs seemed unable to recall certain e-mails or points.

16   That was concerning.  But if he does not recall, he does not

17   recall.  And I believe that Mr. Henriquez and Mr. Hernandez

18   were using MSOC and had created MSOC and the terms, you know,

19   before Dr. Isaacs's purported creation of the term, but that

20   is -- I mean, look, I will review the transcript very

21   carefully again and all of the Exhibits, but this is my

22   initial impression after two days of listening to testimony

23   and observing witnesses as they testified.

24         MR. SINGLETON:  Your Honor, I would request

25   permission to submit a ten-page memo on the delay issue.

Proceedings                                      619

1          THE COURT:  Well, you have already briefed it, sir.

2    I know you have briefed it.  I have read it.

3          MR. SINGLETON:  Your Honor, this dispute was brewing

4    for four years.  The fact that they hired Mr. Fletcher as a

5    new attorney in the last year does not change the calculus.

6    It doesn't revive and excuse the delay of the four years.  And

7    it was six month even from then, from the time he -- the case.

8          There was never any serious settlement discussions

9    going on.  He asked me to sign a confidentiality agreement, I

10   agreed to that.  He asked for documents, I agreed to that.

11   But the demands were rejected within a day.  There was no

12   meaningful settlement discussions going on.

13         THE COURT:  I am not going to ever tell a party that

14   they cannot make submissions, but I have reviewed the

15   declarations of Mr. Fletcher and Mr. Singleton regarding MM

16   supporting emails; not just between Mr. Fletcher and the

17   representatives of the FDNY and the foundation, but I think

18   there were efforts.  I think that at least some of the parties

19   believed they were engaged in good faith settlement

20   negotiations along the way.

21         So I do not know what else you would want to add to

22   that, sir.  You have already put in a declaration regarding

23   settlement efforts and your view of it.  I mean, what more

24   could you tell me?

25         MR. SINGLETON:  Your Honor, there are a lot of cases

Proceedings                                                    620

1   on delay.

2          THE COURT:  I know about those cases, sir.

3          MR. SINGLETON:  Okay.

4          Then I will rest on my briefs.

5          THE COURT:  There are cases also that say when there

6   are settlement efforts going on --

7          MR. SINGLETON:  There were no settlement efforts

8   going on in the last four years, that's the point.  There was

9   nothing.  And both parties were holding their own conferences

10  with no, no evidence of confusion.  And, in fact, he had 500

11  people last year, up almost a hundred percent from the prior

12  year.  That's not evidence of confusion.

13         THE COURT:  Do we have evidence in the record on

14  that?

15         MR. SINGLETON:  Yes, Your Honor.

16         MR. FLETCHER:  There's testimony that Mr. Henriquez

17  hosted a conference last year.  There's also lots of testimony

18  that the Fire Department did not hold a conference between

19  2019 and 2022.  So, the first conference that they hosted was

20  2022.  Mr. Henriquez testified that he learned about that

21  weeks prior.  We sent a cease and desist letter before the

22  conference.  The lawsuit was filed shortly after the

23  conference and here we are.

24         MR. SINGLETON:  Your Honor, they both --

25         MR. FLETCHER:  And there's a new conference

Proceedings                                    621

1   happening that he discovered in November.  And we moved for a

2   PI.

3          THE COURT:  Is MSOC -- being the Medical Special

4   Operations conference -- being used by the FDNY for the 2023

5   conference?

6          MR. FLETCHER:  We believe it is.

7          THE COURT:  That is why we are looking at the

8   injunction.  Okay.

9          MR. FLETCHER:  Yes, ma'am.

10          THE COURT:  All right.

11          Well, I will get you a decision.  And the conference

12   is in May?

13          MR. FLETCHER:  We believe so.  I don't think there's

14   testimony in the record from them, but you could ask them.

15          THE COURT:  I think Ms. O'Shea testified that,

16   generally, the conferences are in May to coincide with EMT

17   week or something.

18          Is that when the conference is being held?  In May?

19          MR. SINGLETON:  It's scheduled for May 4th to

20   May 7th of 2023.  It's on the website.  It's been there for a

21   long time.

22          THE COURT:  Well, I am not looking on the website,

23   sir, but thank you.

24          MR. SINGLETON:  Okay.

25          THE COURT:  May 4th to May 7th, 2023.

Proceedings                                          622

1          All right.  Is there anything else?

2          MR. FLETCHER:  I don't think so, Your Honor.

3          THE COURT:  All right.

4          Thank you.  Have a good day, everybody.

5          MR. FLETCHER:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7

8          (Matter concluded.)

9

10                         ooo0ooo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB       OCR       CRR

623

1                        I N D E X

2

3    WITNESS                                    PAGE

4

5    JOSEPH HERNANDEZ

6        REDIRECT EXAMINATION BY MR. FLETCHER    294

7        RECROSS-EXAMINATION BY MR. MACKIE       333

8    PAMELA LAI

9        CROSS-EXAMINATION BY MR. FLETCHER       348

10       REDIRECT EXAMINATION BY MR. MACKIE      372

11   JEAN O'SHEA

12       CROSS-EXAMINATION BY MR. FLETCHER       375

13       REDIRECT EXAMINATION BY MR. MACKIE      406

14   MOIRA ARCHER

15       CROSS-EXAMINATION BY MR. FLETCHER       415

16   DOUGLAS AARON ISAACS

17       CROSS-EXAMINATION BY MR. FLETCHER       426

18       REDIRECT EXAMINATION BY MR. MACKIE      587

19       RECROSS-EXAMINATION BY MR. FLETCHER     603

20

21

22

23

24

25