UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

CITY OF NEW YORK, by and through the
FDNY, and the FDNY FOUNDATION, INC.,

                                                Plaintiffs, :

                v.

JUAN HENRIQUEZ,

                                          Defendant.

ECF CASE
22-cv-03190-KAM-PK

-------------------------------------------------------------------- X

JUAN HENRIQUEZ,

                        Counterclaim Plaintiff, :

                v.

CITY OF NEW YORK, by and through the
FDNY, the FDNY FOUNDATION, INC., and
GERALD SINGLETON,

                        Counterclaim Defendants. :

-------------------------------------------------------------------- X

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

MURIEL GOODE-TRUFANT
Acting Corporation Counsel
   of the City of New York
Attorneys for Plaintiffs and
   Counterclaim Defendants
City of New York
100 Church Street, Room 20-093
New York, New York 10007
Tel (212) 356-2036
Cell: (917) 734-7906; (646) 830-1066
gsinglet@law.nyc.gov

Of Counsel:
    Gerald E. Singleton
    Gavin Mackie

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................1

ARGUMENT....................................................................................................................5

I     THERE WAS NO "MEETING OF THE MINDS" CONCERNING THE
MATERIALS TERMS NECESSARY FOR AN IMPLIED LICENSE................5

II    NON-WAIVABLE MUNICIPAL CONTRACTING RULES PRECLUDE
RECOGNITION AND ENFORCEMENT OF AN IMPLIED LICENSE.............8

III   LICENSEE ESTOPPEL DOES NOT APPLY.......................................................9

IV   DR. ISAACS HAD NO ACTUAL OR APPARENT CONTRACTING
AUTHORITY TO ENTER INTO A TRADEMARK LICENSE..........................11

V    HENRIQUEZ'S PRIOR STATEMENTS ARE INCONSISTENT WITH
HIS CLAIM OF AN IMPLIED LICENSE............................................................12

VI   HENRIQUEZ'S TRADEMARK REGISTRATION IS NOT ENTITLED
TO A PRESUMPTION OF VALIDITY PRIOR TO THE DATE OF
ISSUANCE.............................................................................................................13

VII  HENRIQUEZ'S HAD NO PROTECTABLE OR LICENSABLE
TRADEMARK RIGHTS IN THE MSOC MARKS IN 2013.............................16

VIII THE MSOC MARKS HAD NOT ACQUIRED DISTINCTIVENESS
AND SECONDARY MEANING AS OF 2013 WHEN THE FDNY
FIRST STARTED USING THE MARKS.............................................................17

IX   HENRIQUEZ HAS PRODUCED NO EVIDENCE REGARDING ANY
OF THE FACTORS FOR ASSESSING SECONDARY MEANING.................21

X    PLAINTIFFS HAVE A RIGHT AS A "PRIOR USER" TO USE THE
MSOC MARKS NOTWITHSTANDING THE SUBSEQUENT
SECTION 2(f) REGISTRATION.........................................................................23

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*20th Century Wear, Inc. v. Sanmark-Stardust Inc.,*
 747 F.2d 81 (2d Cir. 1984), cert. denied, 470 U.S. 1052 (1985) ..............................22

*27-24 Tavern Corp. v. Dutch Kills Centraal,*
 No. 14-CV-1625 (FB) (RER), 2015 WL 5772158 (E.D.N.Y. Sept. 14, 2015) ......................18

*ABKCO Music, Inc. v. Sagan,*
 50 F.4th 309 (2d Cir. 2022) ..................................................... 5-6

*Airday v. City of New York,*
 406 F. Supp. 3d 313 (S.D.N.Y. 2019)...................................................... 8-9

*Arcadian Phosphates, Inc. v. Arcadian Corp.,*
 884 F.2d 69 (2d Cir. 1989).................................................................7

*BigStar Ent., Inc. v. Next Big Star, Inc.,*
 105 F. Supp. 2d 185 (S.D.N.Y. 2000)........................................... 14-15

*Birnbaum v. Birnbaum,*
 73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989) ........................7n.3

*Bourne v. Walt Disney Co.,*
 68 F.3d 621 (2d Cir. 1995)..................................................................6

*Bristol-Myers Squibb Co. v. McNeil P.P.C., Inc.,*
 973 F.2d 1033 (2d Cir. 1992).........................................................17, 22

*Carson Optical, Inc. v. Prym Consumer USA, Inc.,*
 11 F. Supp. 3d 317 (S.D.N.Y. 2014)............................................. 22-23

*City of New York, v. Henriquez,*
 98 F.4th 402, 414 (2d Cir. 2024) ............................... 13, 16, 20-21, 24

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,*
 830 F.2d 1217 (2d Cir. 1987)........................................... 17-18, 21, 22

*Clairol Inc. v. Gillette Co.,*
 389 F.2d 264 (2d Cir. 1968)..............................................................16

*De Forest Radio Tel. Co. v. United States,*
 273 U.S. 236 (1927) ..........................................................................5

*Design Options, Inc. v. Bellepointe, Inc.*,
940 F. Supp. 86 (S.D.N.Y. 1996) ....................................................................8

*Dinaco, Inc. v. Time Warner, Inc.*,
346 F.3d 64 (2d Cir. 2003).............................................................................11

*Dual Groupe, LLC v. Gans-Mex LLC*,
932 F. Supp. 2d 569 (S.D.N.Y. 2013) ...........................................................17

*Erchonia Corp. v. Bissoon*,
410 F. App'x 416 (2d Cir. 2011) .....................................................................18

*Estate of Airday v. City of New York*,
No. 22-1081-cv, 2023 WL 4571967 (2d Cir. Jul.18, 2023).............................9

*Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*,
93 N.Y.2d 584, 589, 715 N.E.2d 1050, 693 N.Y.S.2d 857 (1999) ..................9

*FDIC v. Providence Coll.*,
115 F.3d 136 (2d Cir. 1997)........................................................................ 11-12

*Ford v. Unity Hospital*,
32 N.Y.2d 464, 299 N.E.2d 659, 346 N.Y.S.2d 238 (1973)............................12

*Gluco Perfect, LLC v. Perfect Gluco Prods.*,
No. 14-CV-1678-KAM-RER, 2014 WL 4966102 (E.D.N.Y. Oct. 3. 2014)......7n.3

*Gortat v. Capala Bros.*,
585 F. Supp. 2d 372 (E.D.N.Y. 2008) ..........................................................7n.3

*Granada Bldgs., Inc. v. Kingston*,
58 N.Y.2d 705, 444 N.E.2d 1325, 458 N.Y.S.2d 906 (1982)......................8, 10

*Hallock v. State*,
64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984)..........................12

*Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*,
418 F. Supp. 2d 501 (S.D.N.Y. 2006) ........................................................ 16-17

*Hello I Am Elliot, Inc. v. Sine*,
No. 19 Cv. 6905 (PAE), 2020 WL 3619505 (S.D.N.Y. July 2, 2020) ...............22

*Hi-Tech Pharmacal Co. v. Hi-Tech Pharms. Inc.*,
No. 05-CV-2674, 2007 WL 1988737 (E.D.N.Y. July 5, 2007)..........................18

*Idaho Potato Comm'n v. M&M Produce Farm & Sales*,
335 F.3d 130 (2d Cir. 2003), <u>cert</u>. <u>denied</u>, 541 U.S. 1027 (2004) ............. 9-10

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023) ...................16

*JFK Holding Co., LLC v. City of New York,*
    68 A.D.3d 477, 891 N.Y.S.2d 32 (1st Dept. 2009)....................................................8

*Klein v. Frenkel,*
    No. 14-cv-2719-ADS-ARL, 2015 WL 13721693 (E.D.N.Y. Feb. 19, 2015).........................13

*Knights Armament Co. v. Optical Sys. Tech., Inc.,*
    654 F.3d 1179 (11th Cir. 2011) ....................................................................18-19

*Krolick v. Sloane,*
    No. 17 Civ. 0881 (RA), 2021 WL 5280990 (S.D.N.Y. Nov. 11, 2021)...............................7

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,*
    15 F. Supp. 2d 389 (S.D.N.Y. 1998) .............................................................16

*Lear, Inc. v. Adkins,*
    395 U.S. 653 (1969)...............................................................................9-10

*Maas v. Cornell Univ.,*
    94 N.Y.2d 87, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999)....................................6, 9

*Marshall v. Marshall,*
    No. 08-CV-1420, 2012 WL 1079550 (E.D.N.Y. Mar. 30, 2012)..................................21

*Microban Prods. Co. v. API Indus., Inc.,*
    No. 14 Civ. 41(KPF), 2014 WL 1856471 (S.D.N.Y. May 8, 2014)...............................6

*Morgans Group LLC v. John Doe Co.,*
    No. 10 Civ. 5225, 2012 WL 1098276 (S.D.N.Y. Mar. 31, 2012) .................................22

*Murphy v. Provident Mut. Life Ins. Co,*
    923 F.2d 923 (2d Cir. 1990)........................................................................22

*Nadel v. Play-By-Play Toys & Novelties, Inc.,*
    208 F.3d 368 (2d Cir. 2000) ........................................................................9

*Oscar Prods., Inc. v. Zacharius,*
    893 F. Supp. 250 (S.D.N.Y. 1995) .................................................................7

*Papa v. New York. Tel. Co.,*
    72 N.Y.2d 879, 528 N.E.2d 512, 532 N.Y.S.2d 359 (1988)......................................8

*PaperCutter v. Fay's Drug Co., Inc.,*
    900 F.2d 558 (2d Cir. 1990).....................................................................14, 18

*Park West Galleries, Inc. v. Franks,*
    No. 12 Civ. 3007 (CM), 2012 WL 2367040 (S.D.N.Y. June 20, 2012)...............................13

*Pavlica v. Behr,*
397 F.Supp.2d 519 (S.D.N.Y. 2005)..................................................................6

*Privado Mktg. Grp. LLC v. Eleftheria Rest Corp.,*
No. 13 Civ. 3137 (ER), 2017 WL 1167332 (S.D.N.Y. Mar. 27, 2017)....................7

*Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.,*
295 F.R.D. 18 (E.D.N.Y. 2013)..........................................................................5

*Ralston Purina Co. v. Thomas J. Lipton, Inc.,*
341 F. Supp. 129 (S.D.N.Y. 1972)....................................................................22

*Russo v. Banc of Am. Sec., LLC,*
No. 05 CIV. 2922 (DAB), 2007 WL 1946541 (S.D.N.Y. June 28, 2007)...............7

*See v. Govt. Emples. Ins. Co.,*
No. 21-CV-00547-PKC-JMW,
2022 WL 2467695 (E.D.N.Y. Mar. 22, 2022) ....................................................11

*Supreme Wine Co. v. American Distilling Co.,*
310 F.2d 888 (2d Cir. 1962)..............................................................................19

*TCPIP Holding Co. v. Harr Communs.,*
244 F.3d 88 (2d Cir. 2001) ...............................................................................14

*Time, Inc. v. Petersen Publ'g Co. L.L.C.,*
173 F.3d 113 (2d Cir. 1999)...............................................................................17

*Tonawanda Street Corp. v. Fay's Drug Co., Inc.,*
842 F. 2d 643 (2d Cir. 1988)..............................................................................14

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,*
487 F.3d 89 (2d Cir. 2007) .................................................................................9

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.,*
No. 12 Civ 3599, 2013 WL 866867 (S.D.N.Y. Mar. 8, 2013) .............................23

*Viacom Int'l, Inc. v. Fanzine Int'l, Inc.,*
No. 98 Civ. 7448 (KMW), 2000 WL 1854903 (S.D.N.Y. July 12, 2000) ...............5

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
529 U.S. 205 (2000).........................................................................................14

**Statutes**

Lanham Act § 2(f), 15 U.S.C. § 1052(f).....................................................15, 17, 23

Lanham Act, § 33(a), 15 U.S.C. § 1115(a).............................................................15

**Other Authorities**

Fed. R. Evid. 801(d)(2) ............................................................................................13

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:28 ..........................19

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:32 ..........................13

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:34 .....................15, 23

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16.18.50 ......................23

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:34 ..........................18

https://www.merriam-webster.com/dictionary/host ...............................................20n.5

RESTATEMENT THIRD, UNFAIR COMPETITION § 13, comment ......................................19

Rule 801 ............................................................................................................13

## Preliminary Statement

Plaintiffs, City of New York, by and through the FDNY (the "City") and the FDNY Foundation, Inc. (collectively, "Plaintiffs" or the "FDNY") respectfully submit this supplemental memorandum of law regarding the questions posed by the Second Circuit in its decision vacating the preliminary injunction issued by this Court.[1] The Second Circuit held that the MSOC marks at issue are inherently descriptive and unprotectable unless they had acquired distinctiveness and a secondary meaning as a source indicator in 2013, before the FDNY first started using the marks.

Defendant Juan Henriquez ("Defendant" or "Henriquez") argues that, notwithstanding his numerous inconsistent statements and lack of compliance with well settled municipal contracting rules, a reasonable person would conclude that he implicitly granted a license to the FDNY to "host" Medical Special Operations Conferences ("MSOC") for his benefit starting in 2013, such that all of the goodwill and the accruing secondary meaning attributable to the FDNY MSOC Conferences would inure solely to his benefit. He further argues that, as of 2022, when his Section 2(f) registration became effective, both the MSOC word mark and acronym had acquired a secondary meaning among the attendees of such conferences, who mainly consisted of fellow FDNY first responders, indicating that such conferences originated with him individually (as opposed to the FDNY or the so-called "MSOC Community" referenced in his pleading), largely based on the FDNY's use of the marks as a purported implied licensee from 2013 to 2018. Notably, however, Henriquez does not argue that the MSOC marks had acquired secondary meaning as of 2013, based on the two sparsely attended conferences that he produced with the MSOC Community in Ohio and Georgia in 2011 and 2012. Aside from a couple of flyers, Henriquez

---

[1] Plaintiffs reiterate their position that the Second Circuit did not direct this Court to reconsider Defendant's motion for a preliminary injunction. We are still at a very preliminary stage of the litigation, with a pending motion to dismiss being held in abeyance, which raises dispositive issues that should be considered before or at least in conjunction with this motion.

produced little evidence regarding those conferences and he offered no evidence regarding acquired secondary meaning at that time. He also did not offer testimony from any fellow FDNY employee to support his arguments.

Context matters, as the Second Circuit made clear in ruling that the MSOC marks are inherently descriptive, as well as in its remarks during oral argument about the widespread use of the words comprising the word mark in the first responder community. If the need for a license to use such descriptive words is still not obvious today, it beggars the imagination to argue it would have been obvious to FDNY officials in 2013, absent compelling proof demonstrating that the words had a secondary meaning at that point in time.

On the hearing record before the Court, there simply is no factual basis for finding an implied license or invoking licensee estoppel. The implied license argument rests on the fact that Henriquez presented the idea of having such conferences to his friend and colleague, Dr. Doug Isaacs, who agreed it was a good idea, and that the Plaintiffs subsequently agreed to and did in fact host such conferences. However, it is factually undisputed that Henriquez did not claim ownership of the MSOC marks or assert that the FDNY needed permission to use the marks until 2019, when for the first time he stated in writing that *he had been given permission to use the marks by the MSOC Community*. See Archer Dec. (ECF 52-3), at ¶ 6 and Pl. Ex. 13 and 14 (ECF 52-26 and 52-27). It is also undisputed that Henriquez never discussed a license with Dr. Isaacs, much less with any FDNY official with actual authority to enter into a license agreement.

There is no evidence whatsoever that Dr. Isaacs had actual or apparent authority to bind the FDNY to a license agreement, express or implied. Plaintiffs submitted numerous sworn declarations from FDNY officials, which stand unrefuted, attesting to the fact that Dr. Issacs lacked any such contracting authority and could not bind the City to a trademark license agreement. See

Isaacs Dec. (ECF 52-4), at ¶¶ 6, 9; Pistilli Dec. (ECF 52-12), at ¶ 8; Rush Dec. (ECF 52-7), at ¶7;

Nahmod Dec. (ECF 52-13, at ¶4.

Henriquez did not squarely address the questions posed by the Second Circuit at the

preliminary injunction hearing, despite his burden to do so, and he now seeks to fill the evidentiary

void with the conclusory argument that Dr. Issacs was tasked by the FDNY with organizing and

running the FDNY MSOC conferences and sought permission from FDNY officials whenever

needed. But it does not logically follow that Dr. Isaacs' supposed knowledge of an unvoiced claim

of trademark ownership should be imputed to FDNY officials in order to infer the existence of an

implied license.[2] The argument assumes that the MSOC marks were already imbued with

---

[2]   In granting a preliminary injunction, this Court appears to have relied heavily on a couple of
    emails and a brochure and logo created by Henriquez with a rocker showing year location, as
    evidence that "FDNY officials" agreed to "host" conferences for Henriquez's benefit, despite
    the ambiguous nature of the documents and the FDNY's prominent use of its own federally
    registered trademarks in all public facing materials. See *City of New York v. Henriquez*, No.
    22-CV-3190 KAM-PK, 2023 WL 2186340, at *3 (E.D.N.Y. Feb. 23, 2023). The Court quoted
    an email that Henriquez sent to Dr. Issacs (Ex. C, ECF 49-3), where Henriquez used the MSOC
    acronym as shorthand in a vague and generic sense to refer to the kind of conference he
    envisioned for the FDNY, and not as a reference to the 2011 and 2012 conferences held in
    Ohio and Georgia, which he never specifically referenced in any email or other document that
    he sent to Dr. Isaacs. The Court also quoted the July 9, 2012 email (ECF 52-14; FDNY Opp.
    Ex. 1) from Henriquez to Dr. Isaacs, which clearly refers to generic medical special operations
    conferences ("The following are a small example of what exists out there in regards to special
    operations [urban search and rescue] medical conferences/ discussions outside of the usual
    med-spec classes, working group meetings and redundant literature.... I have several other
    ideas, but I'll [j]ust keep going on forever."). This email is consistent with Henriquez's
    statements to Dr. Isaacs and his podcast interview with Elizabeth Cascio (ECF 52-15; Pl. Opp.
    Ex. 2) (https://www.fdnypro.org/s3-e1-the-fdny-medical-special-operations-conference-
    msoc-with-dr-doug-isaacs-and-paramedic-juan-henriquez/) that there was a "void" and need
    for such conferences; it does not state that Henriquez and/or the MSOC Community were
    already producing such conferences. Notably, there is no evidence to indicate that Henriquez
    ever sent flyers, brochures, or any other document for the 2011 and 2012 conferences to Dr.
    Isaacs. But even if he had specifically referenced the earlier conferences, it would not serve as
    a red flag and notice of a claim of trademark ownership and the need for a license to use such
    inherently descriptive words.

secondary meaning in 2013, such that the need for permission would have been obvious to Dr. Isaacs and FDNY officials having contracting authority.

Not any City employee can enter into binding contracts on behalf of the City, and a party wishing to contract with a municipality is charged with knowledge of the laws restricting contracting powers. An implied license is subject to the same rules that govern oral and written licenses; there must be a "meeting of the minds" on all material terms. Henriquez's inability to describe the terms and particulars of the supposed implied license thus dooms his claim. He fails to identify its contemplated length, or the consideration for the license, or any other of the material terms of a trademark license. Instead, he relies on vague statements concerning the surrounding circumstances, which are equivocal and not indicative of a "meeting of the minds."

There are special laws applicable to municipal contracts, which cannot be waived and estoppel principles generally do not apply to municipalities. The New York City Charter requires that all contracts entered into by the City be in writing, approved as to form by the City's Corporation Counsel, and registered with the Comptroller. Any contract not approved consistent with these procedures is unenforceable as a matter of law. Thus, even though theoretically a trademark license may be spelled out from the conduct of the parties in a private setting, a contract with a municipality may not be implied when applicable statutes expressly prohibit it.

As the Second Circuit ruled, absent a finding that the MSOC marks had a secondary meaning in 2013, the FDNY did not need Henriquez's permission to use the MSOC marks because the marks were inherently descriptive. There would have been no reason for the FDNY to agree to a license at that point in time, even if Henriquez had specifically raised the subject of his claimed ownership and requested that the FDNY agree to a license. But that never occurred.

There is no factual basis for an argument that the MSOC marks had acquired secondary meaning as of 2013 when the FDNY first began using the marks. Henriquez does not even make such argument. Instead, he argues that the marks had acquired secondary meaning at much later date when the parties became competitors, which is utterly irrelevant because the FDNY had already established rights as a "prior user" to continue to use the marks for its conferences. Moreover, there is no evidence in the record concerning any of the factors considered by courts in determining the existence of secondary meaning.

## ARGUMENT

### I

### THERE WAS NO "MEETING OF THE MINDS" CONCERNING THE MATERIALS TERMS NECESSARY FOR AN IMPLIED LICENSE

Finding an implied license to use trademarks based on the circumstances surrounding the parties' dealings requires a very fact-specific inquiry. Notably, an implied license is frequently alleged as a defense to a claim of infringement, e.g., *Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*, 295 F.R.D. 18, 24 (E.D.N.Y. 2013), but in that context it does not give rise to any ongoing rights. On the other hand, an implied license is rarely invoked offensively to support a claim of ownership of ownership and damages for infringement, as in this case.

As the Second Circuit noted recently, "[s]ome courts use a narrow test, finding an implied license only where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it,'" while "[o]thers have applied a more permissive test by which consent 'may be inferred based on silence where the copyright holder knows of the use and encourages it." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022).

In all of the cases cited by Defendant regarding implied licenses (Def. Supp. Mem., at 5-6), beginning with *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927), a patent

case, the question of ownership of protectable intellectual property was not in issue, and the focus of the inquiry was whether the undisputed owner of a patent, copyright or trademark had consented to the use of the property by virtue of the owner's conduct. In this case, however, Henriquez did not claim ownership of the marks when the Plaintiff first began using the marks, and his ownership of a protectable marks is very much in dispute. And here the Second Circuit had held as a matter of law that Henriquez has no protectable interest in the marks, unless the marks have acquired secondary meaning. That alone distinguishes and render inapposite all of the implied license cases cited by Defendant.

In *ABKCO*, a copyright case, the Second Circuit did not address the issue of which test applies because that case involved a compulsory license, noting that it has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found" and has had no occasion to decide which test to adopt," but it emphasized that both the narrow and more permissive tests require a "meeting of the minds", which did not exist where a compulsory license was required. 50 F.4th at 320.

In this case, Henriquez bears the burden of proving the existence of an implied license. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995); *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41(KPF), 2014 WL 1856471, at *13 (S.D.N.Y. May 8, 2014) (the party alleging the existence of an implied license "bears the burden of demonstrating that there was 'a meeting of the minds as determined by contract law.'") (quoting *Pavlica v. Behr*, 397 F.Supp. 2d 519, 526 (S.D.N.Y. 2005)).

Proof of an implied-in-fact contract requires proof of the same elements as an express contract. See *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93-94, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999). And courts have held that the proponent of an alleged oral contract has "a particularly

heavy burden to establish objective signs of the parties' intent to be bound." *Krolick v. Sloane*, No. 17 Civ. 0881 (RA), 2021 WL 5280990 (S.D.N.Y. Nov. 11, 2021) (rejecting claim of implied contract). The burden is heavier because "a primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989).[3]

Henriquez must establish "all essential terms" of a license, such as offer, acceptance, and consideration "with sufficient definiteness that the Court can interpret its terms." *Privado Mktg. Grp. LLC v. Eleftheria Rest Corp.*, No. 13 Civ. 3137 (ER), 2017 WL 1167332 (S.D.N.Y. Mar. 27, 2017), quoting *Oscar Prods., Inc. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995). While an implied license can be shown to exist by circumstantial evidence, the evidence must establish the elements of contract formation — including mutual assent evincing the intention of the parties to be bound by specific contractual terms. *Russo v. Banc of Am. Sec., LLC*, No. 05 Civ. 2922 (DAB), 2007 WL 1946541, at *4 (S.D.N.Y. June 28, 2007).

The undisputed evidence in this case makes clear that there was no meeting of the minds. Here, the material terms necessary for a trademark license, such as the term of the license, quality control, termination, royalty rates, were never discussed, let alone agreed to. The mere fact that Defendant worked on the FDNY MSOC conferences at the request of the FDNY "cannot be considered an implicit acceptance of any request for a license because no such request was

---

[3] Henriquez owes a fiduciary duty of good faith and undivided loyalty to the City as a full time employee and he had an obligation to affirmatively disclose his adverse ownership interest in the MSOC marks. See *Gluco Perfect, LLC v. Perfect Gluco Prods.*, No. 14-CV-1678-KAM-RER, 2014 WL 4966102, at *22 (E.D.N.Y. Oct. 3. 2014). The focus of the fiduciary duty analysis is not whether an employee violated an employment contract, but rather the employee's duty of "'undivided and undiluted loyalty,' barring self-dealing, use of confidential information, and other conflicts of interest." *Gortat v. Capala Bros.*, 585 F. Supp. 2d 372, 377 (E.D.N.Y. 2008) (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989)).

outstanding." *Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, No. 98 Civ. 7448 (KMW), 2000 WL 1854903, at *4 (S.D.N.Y. July 12, 2000).

The record here is plainly insufficient to establish an implied license under either the "narrow test" or the more permissive test described above. It is inconceivable that the Second circuit would sustain a finding of an implied license on this record. An implied license "cannot arise out of the unilateral expectations of one party." *Design Options, Inc. v. Bellepointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) ("There must be objective conduct that would permit a reasonable person to conclude that 'an agreement had been reached.'"); *Papa v. New York Tel Co.*, 72 N.Y.2d 879, 528 N.E.2d 512, 532 N.Y.S.2d 359 (1988) ("The mere expectation that a contract will be entered into does not constitute a contract.").

## II

### NON-WAIVABLE MUNICIPAL CONTRACTING RULES PRECLUDE RECOGNITION AND ENFORCEMENT OF AN IMPLIED LICENSE

Municipal contracts which violate express statutory provisions are invalid. *Granada Bldgs., Inc. v. Kingston*, 58 N.Y.2d 705, 708, 444 N.E.2d 1325, 458 N.Y.S.2d 906 (1982). "A party contracting with [a municipality] is chargeable with knowledge of the statutes which regulate its contracting powers and is bound by them." *Parsa v. State of New York*, 64 N.Y.2d 143, 147, 474 N.E.2d 235, 485 N.Y.S.2d 27 (1984). To be enforceable, an agreement with the City must be in writing, approved as to form by the Corporation Counsel, and registered with the Comptroller. See *JFK Holding Co., LLC v. City of New York,* 68 A.D.3d 477, 477, 891 N.Y.S.2d 32 (1st Dept. 2009); *Airday v. City of New York*, 406 F. Supp. 3d 313, 319-320 (S.D.N.Y. 2019) (holding that

implied contracts are unenforceable as a matter of law), aff'd sub. nom., *Estate of Airday v. City of New York*, No. 22-1081-cv, 2023 WL 4571967 (2d Cir. Jul.18, 2023).[4]

"Under New York law, an implied contract requires consideration, mutual assent, legal capacity, and legal subject matter." *Estate of Airday*, 2023 WL 4571967, at *2, citing *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 381-82 (2d Cir. 2000) and *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999)). "The manifestation of mutual assent must be 'sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.' Id., quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 693 N.Y.S.2d 857 (1999)).

## III

## <u>LICENSEE ESTOPPEL DOES NOT APPLY</u>

Licensee estoppel is an equitable contract doctrine that has no application to the facts of this case. "The general rule of licensee estoppel provides that when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes." *Idaho Potato Comm'n v. M&M Produce Farm & Sales*, 335 F.3d 130, 135 (2d Cir. 2003), cert. denied, 541 U.S. 1027 (2004). In *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), a patent case, the Supreme Court adopted a balancing test and held that the contract doctrine of licensee estoppel did not apply, stating:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the

---

4   Defendants' implied license theory also runs afoul of the applicable statute of frauds, since both parties' performance extended beyond a year.

use of ideas which are in reality a part of the public domain. . . . We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

395 U.S. at 670-671.

In *Idaho Potato*, the Second Circuit noted that the *Lear* balancing test "has been frequently applied to trademark licensing contracts" but "courts have done so only after considering the public interest in trademarks." 335 F.3d 136 ("Even when courts have not expressly applied the *Lear* test, they have recognized that agreements related to intellectual property necessarily involve the public interest and have enforced such agreements only to the extent that enforcement does not result in a public injury."). In *Idaho Potato*, the Second Circuit held that an explicit estoppel provision in a written license agreement did not prevent the licensee from challenging the validity of a certification mark.

The only case cited by Defendant invoking licensee estoppel based on an implied license is *L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.*, No. 09-CV-0913 WOB, 2011 WL 5024356 (S.D. Ohio Oct. 20, 2011), aff'd, 533 F. App'x 615 (6th Cir. 2013), which involved a family squabble concerning Larry Flynt's Hustler enterprise. Larry Flynt owned incontestable registered trademarks and he allowed his brother to use them for a retail store in Ohio. The court found that the brothers indisputably entered into an implied licensing arrangement by their conduct, under which defendants paid licensing fees for years to the plaintiffs, uninterrupted and without protest, until family dynamics soured the brother's relationship and defendants refused to pay. That case is plainly inapposite.

As the New York Court of Appeals noted in *Granada Bldgs., Inc. v. Kingston*, 58 N.Y.2d 705, 708, 444 N.E.2d 1325, 458 N.Y.S.2d 906 (1982), "estoppel is unavailable against a public agency." Indeed, there does not appear to be any federal trademark case that has applied the rule

of licensee estoppel against a municipal entity, much less affirmatively in a case involving an alleged implied license where the subject of a license was never mentioned or discussed.

The FDNY has been using the MSOC marks for more than a decade, building goodwill and a following among thousands of first responders. Based on the record, it has a right to compete with Henriquez and use the MSOC marks. The doctrine of licensee estoppel plainly has no application.

IV

## DR. ISAACS HAD NO ACTUAL OR APPARENT CONTRACTING AUTHORITY TO ENTER INTO A TRADEMARK LICENSE

There is no factual basis for finding that Dr. Isaacs had actual authority to bind the City to an implied license based on his own conduct. And there is no evidence of any statements or conduct by FDNY officials that could serve as the basis for a finding that he possessed apparent authority. The record contains undisputed sworn statements by several FDNY officials that Dr Isaacs lacked actual authority and that a license was never discussed. FDNY officials also testified that Henriquez never mentioned or claimed ownership of trademark rights and that such a claim, if made, would have raised red flags, requiring conflict of interest waivers and special approval.

"Actual authority is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, [the agent] is privileged to do because of the principal's manifestations to [him or her]," while "[a]pparent authority arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the [agent] purporting to act for [it]." *See v. Govt. Emples. Ins. Co.*, No. 21-CV-00547 (PKC) (JMW), 2022 WL 2467695, at *6 (E.D.N.Y. Mar. 22, 2022) (quoting *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68-69 (2d Cir. 2003)). "The existence of 'apparent authority' depends upon a factual

showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal--not the agent." *FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997), quoting *Ford v. Unity Hospital*, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). The inquiry centers on the "words or conduct of the principal – [i.e., FDNY officials, not Dr. Isaacs] – and communicated to a third party [Henriquez], that give rise to the appearance and belief that the agent [Dr. Isaacs] possesses authority to enter into a transaction [a license to use trademarks]." *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984).

As Second Circuit noted in *FDIC v. Providence*, "[t]he general rule in New York is that a third party 'who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.'" 115 F.3d at 140, (quoting *Ford v. Unity Hospital*, 32 N.Y.2d at 472). Thus, Plaintiffs would only be bound by an implied license based on the actions of Dr. Isaacs if he actually had such authority – which he did not – or if he was cloaked with either actual or apparent authority by FDNY officials, which he was not. Accordingly, there is no factual or legal basis for finding that Dr. Isaacs has actual or apparent authority to bind Plaintiffs to an implied license.

## V

### HENRIQUEZ'S PRIOR STATEMENTS ARE INCONSISTENT WITH HIS CLAIM OF AN IMPLIED LICENSE

Henriquez made prior statements that are inconsistent and irreconcilable with his claim of ownership of the MSOC marks and his implied license theory. He told Dr. Isaacs that there was "not much in the way of symposiums or focused conferences" and agreed "to contribute any resources that I have." Isaacs Dec. (ECF 52-4), at ¶27 and Pl. Ex. 1 (ECF 52-14). He also recorded a podcast with Dr. Isaacs and Elizabeth Cascio, in which he described the "void" that existed

before the first FDNY MSOC in 2013. Isaacs Dec. (ECF 52-4), at ¶28; Cascio Dec. (ECF 52-6) and Pl. Ex. 2 (ECF 52-15). ([https://www.fdnypro.org/s3-e1-the-fdny-medical-special-operations-conference-msoc-with-dr-doug-isaacs-and-paramedic-juan-henriquez/](https://www.fdnypro.org/s3-e1-the-fdny-medical-special-operations-conference-msoc-with-dr-doug-isaacs-and-paramedic-juan-henriquez/)). Henriquez never mentioned his involvement in producing other conferences or his claim of trademark ownership in the email or the podcast.

Those statements constitute admissions by a party opponent and are admissible for the truth of their contents. Fed. R. Evid. 801(d)(2). As noted in the Advisory Committee Notes to Rule 801, "[a] party's own statement is the classic example of an admission." See also *Klein v. Frenkel*, No. 14-cv-2719-ADS-ARL, 2015 WL 13721693 (E.D.N.Y. Feb. 19, 2015) (holding that statements made by a party emails constitute party admissions that are admissible); *Park West Galleries, Inc. v. Franks*, No. 12 Civ. 3007 (CM), 2012 WL 2367040, at *8 (S.D.N.Y. June 20, 2012) (same). Statements falling under the hearsay exclusion provided by Rule 801(d)(2) are admissible "even if it 'admitted' nothing and was not against the party's interest when made." Notes of Advisory Committee on 2011 Amendments to Fed. R. Evid. 801.

## VI

### HENRIQUEZ'S TRADEMARK REGISTRATION IS NOT ENTITLED TO A PRESUMPTION OF VALIDITY PRIOR TO THE DATE OF ISSUANCE

Henriquez continues to argue that his Section 2(f) trademark registration is entitled to a presumption of validity. That is not correct and that registration is completely irrelevant to the questions posed by the Second Circuit. As the Second Circuit held, "the proper presumption, as Henriquez's counsel acknowledged at oral argument, was that the marks are inherently descriptive but had acquired secondary meaning that permitted registration." *City of New York, v. Henriquez*, 98 F.4th 402, 414 (2d Cir. 2024).

Henriquez has the burden of proof as to secondary meaning because the FDNY's alleged infringement commenced in 2019 before the effective date of his Section 2(f) registration. See 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:32 (2024-1 ed.) ("MCCARTHY") ("The burden of proof of secondary meaning is upon the party attempting to establish legal protection for a non-inherently mark. This means the plaintiff in an infringement suit."), citing *Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F. 2d 643, 647-648 (2d Cir. 1988) ("[Plaintiff] bore the burden of proving secondary meaning in this case, because it was the party seeking to obtain legal protection for its mark."). The hearing record lacks a sufficient factual showing that the MSOC marks had acquired a secondary meaning before the FDNY first began using the mark to host its conferences in 2013.

As noted in *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 201 (S.D.N.Y. 2000), "ordinary words only borrowed or adapted rather than created, belongs in the public domain and cannot be appropriated to merchandise exclusively the products of one particular seller. Other potential entrants share an interest in using such words in connection with the advertisement and sale of goods and should not be foreclosed from using descriptive terms to label their products." See also *PaperCutter v. Fay's Drug Co., Inc.*, 900 F.2d 558, 562 (2d Cir. 1990) ("As to descriptive terms, a person cannot by mere adoption and use, obtain exclusive rights in words that describe the attributes of the goods, services, or business to which the words are applied . . . ." (internal quotation marks omitted)). The Second Circuit has explained that policy considerations generally "disfavor[] the grant of protection to descriptive marks," because "[a]ccording trademark exclusivity to a descriptive mark would inhibit competitors from using descriptions of their competing products." *TCPIP Holding Co. v. Harr Communs.*, 244 F.3d 88, 93-94 (2d Cir. 2001).

A descriptive mark therefore qualifies for trademark protection only when it has acquired "secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 212-213 (2000).

While registration of a mark on the Principal Register constitutes prima facie evidence of the validity of the mark, of its registration, of the registrant's ownership, and of the registrant's exclusive right to use the mark for the goods and services specified in the registration, this evidentiary effect "shall not preclude an opposing party from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." 2 McCARTHY, § 15:34, quoting Lanham Act, § 33(a), 15 U.S.C. § 1115(a). Moreover, as noted above, the presumption flowing from § 2(f) registration does not apply to allegedly infringing uses occurring prior to the date of the registration, i.e., August 8, 2020.

Professor McCarthy notes that "[i]f a mark was registered in the Patent and Trademark Office by acceptance of proof of secondary meaning under § 2(f), then this creates a presumption that the mark is in fact distinctive and a valid trademark. The presumption to which a § 2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration. If the alleged infringement began before the mark was registered, then a § 2(f) registration does not create a presumption of secondary meaning dating back to before the mark was registered." McCARTHY, § 15:34 (footnote omitted).

"While section 2(f) of the Lanham Act (see 15 U.S.C. § 1052(f)) permits registration of merely descriptive terms, the corresponding protection it accords demands, as a precondition, proof that the mark has acquired secondary meaning in its market. This test refers to demonstrable evidence that the mark, by means of sufficient marketing, sales, usage and passage of time, has established distinctiveness in commerce, measured by the extent to which it has become identified in the public mind with the particular source of the goods." *BigStar Entertainment,* 105 F. Supp.

2d at 196. Thus, at all stages, Henriquez bears the burden of proving that the marks had acquired secondary meaning before the FDNY's use began.

**VII**

**HENRIQUEZ'S HAD NO PROTECTABLE OR LICENSABLE
TRADEMARK RIGHTS IN THE MSOC MARKS IN 2013**

As inherently descriptive marks, Henriquez possessed no protectable rights in the MSOC marks in 2013, unless he can prove that the marks had acquired secondary meaning. As noted in *Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006), "[n]ot every use of a mark will suffice to create enforceable rights." Rather, "the 'talismanic test' for sufficient prior use in commerce is whether a person's use of the mark was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 396 (S.D.N.Y. 1998).

"'[A] mark tells the public who is responsible for a product' or, in this case, for a conference." *City of New York v. Henriquez*, 98 F.4th at 410, <u>quoting</u> *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 146 (2023). But as Justice Kagan pointed out in *Jack Deniel's*, a mark "is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand)." <u>Id</u>.

Remarkably, opposing counsel cites *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 269 n.9 (2d Cir. 1968), for the proposition that even if the MSOC marks had not acquired secondary meaning as of 2013 and were not protectable, they nonetheless would have been licensable because they would have been "eligible for placement on the USPTO's Supplemental Register – indicating that the marks were in the process of developing secondary meaning and therefore capable of becoming distinctive." (Def. Supp. Mem., at 12), *Clairol* says no such thing. To the contrary, *Clairol* and its

progeny hold that registration on the Supplemental Register - which is not case here – creates no substantive rights in an unprotectable mark. Id. ("most marks registered on the supplemental register will not, *prima facie*, receive protection as valid trademarks, for their very presence on that register indicates a preliminary determination that they are not distinctive of the applicants' goods.") The Second Circuit has said nothing about rights in a non-protectable descriptive mark being impliedly licensable based on a purported licensor's unspoken desire to develop secondary meaning. In *Clairol,* the Second Circuit affirmed Judge Weinstein's denial of two successive motions for a preliminary injunction because, like here. there was nothing in the record to show that the alleged descriptive marks had acquired secondary meaning.

Furthermore, the few cases cited by Defendant all involved controlled use of the marks at issue by a licensee pursuant to an express written license agreement. See *Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 507 (S.D.N.Y. 2006) ("licensees had to sign lengthy licensing agreements"); *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 571 (S.D.N.Y. 2013) (parties entered into a written Management Agreement). None of the cases cited by Defendant involved an alleged implied license.

## VIII

## THE MSOC MARKS HAD NOT ACQUIRED DISTINCTIVENESS AND SECONDARY MEANING AS OF 2013 WHEN THE FDNY FIRST STARTED USING THE MARKS

Descriptive marks may be protected only if they have acquired secondary meaning. See 15 U.S.C. §1052(f). Secondary meaning attaches if 'the consuming public primarily associates the term with a particular source.'" *Bristol-Myers Squibb Co. v. McNeil P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir. 1992) (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir. 1987); *Time, Inc. v. Petersen Publ'g Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir. 1999) ("Secondary meaning attaches when the name and the business have become

synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business.").

A party seeking to establish secondary meaning need not demonstrate that the consuming public knows the name of the producer, but must 'show that the purchasing public associates goods [or services] designated by a particular mark with but a single — although [potentially] anonymous — source.' *Centaur Communications,* 830 F.2d at 1221; see also *Erchonia Corp. v. Bissoon,* 410 F. App'x 416, 418 (2d Cir. 2011) ("[S]econdary meaning is established only in cases where an ordinary buyer associates the mark in question with a single source, though that source may be anonymous."). Thus, if a product or service, or a conference, uses inherently descriptive marks that can reasonably be perceived as originating from different sources, then the mark does not qualify as a trademark.

Additionally, it is Henriquez's burden "to establish that the [MSOC] marks acquired secondary meaning before [the FDNY] began using its allegedly infringing mark." See *Hi-Tech Pharmacal Co. v. Hi-Tech Pharms. Inc.,* No. 05-CV-2674, 2007 WL 1988737, at *10 (E.D.N.Y. July 5, 2007); *27-24 Tavern Corp. v. Dutch Kills Centraal,* No. 14-CV-1625 (FB) (RER), 2015 WL 5772158 (E.D.N.Y. Sept. 14, 2015), report and recommendation adopted, 2015 U.S. Dist. LEXIS 132049 (E.D.N.Y. Sept. 29, 2015) (denying preliminary injunction). See also *PaperCutter v. Fay's Drug Co., Inc.,* 900 F.2d at 564 ("To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark.").

Thus, if the senior user cannot demonstrate that its use of the term acquired secondary meaning before the junior user commenced its use, there can be no infringement, "for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the

18

scene." 2 McCarthy § 16:34; accord *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1189 (11th Cir. 2011) (holding that where the senior user's descriptive mark did not acquire secondary meaning prior to the junior user's first use, the senior user "has no protectable rights in the mark" and the junior user "cannot be liable for trademark infringement based on rights to a mark that [the senior user] cannot enforce").

As Professor McCarthy notes, "[a]s a general rule of thumb, the more descriptive the term, the greater the evidentiary burden to establish secondary meaning. That is, the less distinctive the term, the greater the quantity and quality of evidence of secondary meaning is needed to prove the requisite degree of distinctiveness." 2 McCarthy § 15:28. See *Supreme Wine Co. v. American Distilling Co.*, 310 F.2d 888, 889 (2d Cir. 1962) ("We hold that the word 'supreme' is so totally lacking in distinctiveness, originality and uniqueness that, in the absence of ***compelling proof*** that it has acquired secondary meaning to the buying public, it is not entitled to trademark protection.") (emphasis added); Restatement Third, Unfair Competition § 13, comment e (1995) ("Highly descriptive terms , for example, are less likely to be perceived as trademarks and more likely to be useful to competing sellers than are less descriptive terms. More substantial evidence of secondary meaning thus will ordinarily be required to establish their distinctiveness."). Here, there is no compelling proof.

There are only a few documents in the record pertaining the MSOC conferences that Henriquez claims to have organized and produced in 2011 and 2012 for the then fledgling MSOC Community. For purposes of this motion and the inquiry into whether and when, if ever, the MSOC marks acquired secondary meaning, it is incumbent on Henriquez to show that the marks point to a single source, even if anonymous; otherwise the marks are merely being used in a descriptive sense. And Henriquez must establish that the MSOC marks had became more than merely

descriptive marks when the Plaintiffs began using such marks to "host" the first FDNY MSOC conference in 2013.

Henriquez submitted a flyer for a Medical Special Operation Conference, which took place in Ohio in 2011. He stated that it was produced by the MSOC Community, and not himself individually. (Henriquez Dec., ¶ 4; Ex, A (ECF 89). According to the flyer, the event was "hosted" by a medical equipment supply company named FERNO. FERNO's name appears prominently and repeatedly in the flyer (three times) and in the only other document produced by Henriquez relating to that event, namely, a program agenda, in which FERNO is mentioned nine times.[5] The MSOC Community, on the other hand, is not mentioned by name anywhere in those documents. The MSOC acronym appears nowhere in the flyer, but is defined at the beginning of the agenda as the Medical Special Operations Conference, not the MSOC Community. Thus, these uses are merely descriptive and not source indicative.

Although Henriquez stated in his supporting declaration that he created a graphic MSOC Logo that "was displayed on publicity materials" for that conference (Henriquez Dec., at ¶5), the logo does not appear in the flyer or the agenda, and Henriquez has produced no promotional materials relating to the 2011 conference showing the logo. Thus, there was nothing to corroborate his testimony, some twelve years after the event, about the use of the logo in a trademark sense, which was his burden to prove. Stated differently, he provided nothing which shows that first responders attending that conference would have had any reason to believe that either he or the

---

[5] The commonly understood meaning of the word "host" in this context is the person or entity producing the event. See https://www.merriam-webster.com/dictionary/host ("a person who receives or entertains guests socially, commercially, or officially"; "a place or organization that provides facilities and services for an event or function"). From the evidence presented, attendees would have had no reason to believe that any person or entity other than FERNO was the host, producer and organizer of the 2011 conference.

MSOC Community produced the 2011 conference. As the Second Circuit emphasized, "we must consider what 'medical special operations' signified to those to whom the marks were addressed: prospective MSOC attendees." 98 F.4th at 414.

The few documents submitted by Henriquez with respect to the 2012 conference that took place in Perry, Georgia, likewise do not point to a single source. The flyer Henriquez submitted prominently referred to the Guardian Center, the training facility where the conference was held. It vaguely refers to "Urban Search and Rescue", which an attendee might infer was a possible hosting entity, and it also provides an email at usarmedicine.com to register for the conference, which presumably means "urban search and rescue" medicine. The MSOC acronym and the graphic MSOC logo appear in the flyer for the 2012 conference, but again MSOC is specifically defined to mean Medical Special Operations Conference, rather than the MSOC Community and, thus, first responders and attendees seeing the flyer would not have any reason to think that the MSOC Community or Henriquez was the singular source of that conference.

In sum, there were only two MSOC conferences before the first FDNY MSOC conference, which were sparsely attended, and there is no evidence as to how they were advertised or promoted, if at all.

IX

**HENRIQUEZ HAS PRODUCED NO EVIDENCE REGARDING
ANY OF THE FACTORS FOR ASSESSING SECONDARY MEANING**

Six factors have been identified by the courts to help establish secondary meaning. They are (a) advertising expenditures; (b) consumer studies linking the mark to a source; (c) unsolicited media coverage of the product; (d) sales success; (e) attempts to plagiarize the mark; and (f) the length and exclusivity of the mark's use. See *Centaur Communications*, 830 F.2d at 1222; *Marshall v. Marshall*, No. 08-CV-1420, 2012 WL 1079550, at \*16 (E.D.N.Y. Mar. 30, 2012).

While each factor does not have to be proved and no single factor is determinative, Henriquez must satisfy a "heavy" burden because "proof of secondary meaning entails vigorous evidentiary requirements." *20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 747 F.2d 81, 90 (2d Cir. 1984), cert. denied, 470 U.S. 1052 (1985) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F. Supp. 129, 134 (S.D.N.Y. 1972)).

While "[n]o precise guidelines are applicable and no single factor is determinative," the Second Circuit has emphasized that taking all the factors into consideration, "the crucial question is whether the public is moved to buy a product because of its source." *Murphy v. Provident Mut. Life Ins. Co,* 923 F.2d 923, 928 (2d Cir. 1990). Stated differently. "the fundamental question [] is whether 'the primary significance of the term in the minds of the consuming public is not the product [or service] but the producer [or provider]." *Bristol-Myers Squibb,* 973 F.2d at 1041(quoting *Centaur Communications,* 830 F.2d at 1221). Henriquez must show that "a substantial segment" of the relevant consumer group makes the "requisite association between the product and the producer." *Morgans Group LLC v. John Doe Co.,* No. 10 Civ. 5225 (KMW)(HBP), 2012 WL 1098276, at *5 (S.D.N.Y. Mar. 31, 2012). As the Second Circuit moted,/, the relevant consumers are first responders, who are sophisticated.

Defendant was required to plead the factual basis for his claim of secondary meaning. The FAAC (ECF 88), however, does not allege facts concerning any of the six factors that are considered by courts in determining whether a mark has acquired secondary meaning and it fails to state a plausible claim in that respect. See *Hello I Am Elliot, Inc. v. Sine,* No. 19 Civ. 6905 (PAE), 2020 WL 3619505 (S.D.N.Y. Jul. 2, 2020) (granting motion to dismiss and denying motion for a preliminary injunction) ("Secondary meaning evidence . . . is properly within plaintiffs' knowledge and control. . . . Therefore, if plaintiffs have as-yet-unpled evidence of secondary

meaning, they should be able to supplement the AC"); *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 343-344 (S.D.N.Y. 2014) ("Plaintiffs have failed to allege facts that would support a plausible inference that their trade dress acquired secondary meaning") (complaint dismissed, leave to amend denied.); *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599, 2013 WL 866867, at *7 (S.D.N.Y. Mar. 8, 2013) granting Rule 12(b)(6) motion to dismiss, with leave to replead, based on failure to adequately plead secondary meaning in unregistered trade dress).

On this motion, Henriquez has not produced any evidence of advertising expenditures; unsolicited media coverage, revenues or sales success for the 2011 and 2012 conferences. Nor is there any such evidence for the subsequent MSOC events he allegedly produced. On this record, it cannot said that he has met the "vigorous evidentiary requirements" necessary for a showing of acquired secondary meaning.

Henriquez filed his trademark application with the USPTO in 2019 He has had approximately five years to gather evidence and muster his proof of secondary meaning, assuming any such evidence ever existed. His failure to produce any such evidence should be dispositive.

## X

### PLAINTIFFS HAVE A RIGHT AS A "PRIOR USER" TO USE THE MSOC MARKS NOTWITHSTANDING THE SUBSEQUENT SECTION 2(F) REGISTRATION

Plaintiffs began using the MSOC Mark prior to Henriquez's federal trademark registration, and they have a common law right as a "prior user" to continue using the marks notwithstanding the federal registration issues to him in August 2020. "[A] § 2(f) registration does not create a presumption of secondary meaning dating back to before the mark was registered." 2 MCCARTHY, § 15:34. "Neither application for nor registration of a mark at the federal level wipes out the prior

nonregistered, common law rights of others. The nonregistered rights of a senior user continue and are not erased by the later federal registration of a junior user." 2 McCarthy, at §16.18.50.

Plaintiffs have spent years building goodwill in the FDNY MSOC and they ceased using Henriquez's MSOC logo in 2019 after he asserted claims of ownership in the marks and the need for a license. The FDNY has always prominently used its own federally registered trademarks to distinguish its conference and after more than a decade of use there is no meaningful evidence of consumer confusion. Accordingly, Plaintiffs have a right as a prior user to continue using the MSOC marks for the FDNY MSOC.

XI

## ALL OF THE *POLAROID* FACTORS STRONGLY FAVOR PLAINTIFFS AND SHOW NO LIKELIHOOD OF CONFUSION

Plaintiffs incorporate the arguments in their prior brief regarding the *Polaroid* factors (ECF 52-1). As the Second Circuit has emphasized, "the marks' inherent strength dominates the *Polaroid* analysis here." 98 F.4th at 416. Furthermore, the analysis must be conducted by reference to the "market in which the mark is used." Id. at 414, quoting *Morningside Grp. Ltd. v. Morningside Cap Grp., L.L:C.*, 182 F.3d 133, 139 (2d Cir. 1999). In this case, the mark's weakness is "especially important" and, therefore, the MSOC marks warrant "extremely narrow" protection unless a combination of other *Polaroid* factors "strongly" indicates a likelihood of confusion." Id. at 415. Here, all of the *Polaroid* factors strongly favor Plaintiffs and indicate a lack of confusion. Thus, Defendant has not shown that he is likely to succeed on the merits and his motion for a preliminary injunction should be denied.

## CONCLUSION

Based on the foregoing, Defendant's motion for a preliminary injunction should be denied.

Dated: New York, New York
August 2, 2024

MURIEL GOODE-TRUFANT
Acting Corporation Counsel
of the City of New York

By _Gerald E. Singleton_

Gerald E. Singleton
Assistant Corporation Counsel
100 Church Street, Room 20-093
New York, New York 10007
Tel (212) 356-2036
Cell: (917) 734-7906; (646)830-1066
Fax: (212) 356-2038
gsinglet@law.nyc.gov
Attorneys for Plaintiffs