# Exhibit 1

**Transcript of April 11, 2025
Pre-Motion Conference**

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

        -----------------------------X  Docket#
        THE CITY OF NEW YORK et al.,  : 22-cv-03190-KAM-PK
                                      :
                      Plaintiffs,     :
                                      :
            - versus -                : U.S. Courthouse
                                      : Brooklyn, New York
        JUAN HENRIQUEZ et al.,        :
                                      : April 11, 2025
                      Defendants      : 10:43 a.m.
        -----------------------------X
```

          TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
                BEFORE THE HONORABLE PEGGY KUO
                UNITED STATES MAGISTRATE JUDGE


**A    P    P    E    A    R    A    N    C    E    S:**


**For the Plaintiff**:          **Gerald E. Singleton, Esq.**
                                Via telephone
                                New York City Law Department`
                                100 Church Street
                                New York, NY 10007


**For the Defendant**:          **Jordan Fletcher, Esq.**
                                Fletcher Law, PLLC
                                234 Fifth Avenue, 2nd Floor
                                New York, NY 10001


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                              Proceedings

1          THE COURT:  This is Civil Cause for a Pre-

2   Motion conference in the matter of the City of New York

3   et al. v. Henriquez et al., docket number 22-cv-3190.

4   Magistrate Judge Peggy Kuo presiding.

5          Will the parties please state their appearances

6   beginning with the plaintiff.

7          MR. SINGLETON:  Gerald Singleton for the City

8   of New York, Office of the Corporation Counsel.

9          MR. FLETCHER:  Good morning, your Honor.

10  Jordan Fletcher for defendant, counterclaim plaintiff

11  Juan Henriquez.  Nice to see you again.

12         THE COURT:  All right.  Good morning, everyone.

13  Mr. Singleton, you are not here.

14         MR. SINGLETON:  Your Honor, I apologize.  I was

15  not -- I missed it.  I just got back from vacation on a

16  redeye on Wednesday morning.  I've been buried in work

17  for the last two days.  My colleague just came in and

18  said he got a call and we were supposed to be in court.

19  He said he got the date wrong.  I apologize.  I don't

20  know, I thought I was on top of it.  We had it down on

21  the calendar for next week.

22         THE COURT:  All right.  Mr. Singleton, you have

23  two co-counsel.  Why are they not here if you're not

24  available?

25         MR. SINGLETON:  Same reason.  We had it on the

3

Proceedings

1  calendar on the docket for next week.  I don't know how

2  that happened, but it did.  And when one is in the

3  office, the other is not.

4          THE COURT:  What date did you have it on for?

5          MR. SINGLETON:  Which is what?  Next Friday.

6  The 18th I believe, next Friday.

7          THE COURT:  There is nothing scheduled for next

8  Friday.

9          MR. SINGLETON:  I understand that, your Honor.

10  I'm saying I guess I would characterize it as law office

11  failure.  I apologize.

12          THE COURT:  All right.  Well, Mr. Fletcher is

13  here and I am prepared to go forward.  This is a

14  motion --

15          MR. SINGLETON:  Your Honor --

16          THE COURT:  -- to hold the city in contempt for

17  certain actions that it is alleged to have taken.  That's

18  pretty serious.

19          MR. SINGLETON:  I understand that, your Honor.

20  And I wrote a letter and I grieved it and I would

21  appreciate -- I don't know what to say.  I mean I don't

22  have a suit on.  I live in Queens.  I cannot get there in

23  a -- I don't want to hold the Court up.  I can do it

24  telephonically, but I can't be there in the next half

25  hour.  I can --

4

Proceedings

1          THE COURT:  All right.  Well, I'm not going to

2     require you to be here because you can't be here quickly

3     enough for this to make sense, but are you prepared to

4     explain what the city has or has not done that is the

5     subject of the proposed contempt motion?

6          MR. SINGLETON:  Your Honor, we responded by

7     letter motion.  We stated that the only thing that we

8     haven't -- there are some vestigial references.  We've

9     taken down the flyer.  As I understand it, they were

10    taking down the flyers that could be regarded as -- that

11    weren't of an informational nature.  These are just

12    historical documents.  They're nothing promoting the

13    current conference.  There is nothing visible to a

14    consumer that would lead to confusion.  There is no

15    possibility of consumer confusion based on the things

16    that they're complaining about.

17          We have a domain name that had MSOC in it.  We

18    are not using that.  We're redirecting traffic from that

19    site to a new website so a consumer would not see that.

20    If they had a link to that because they are FDNY -- most

21    of the people who attend the FDNY conference are FDNY

22    paramedics and first responders and NYPD.  They're city

23    employees.  And if they have a bookmark in their -- as I

24    understand it, there's a bookmark in their computer and

25    they had the old site, it will automatically redirect to

5

Proceedings

1  the new site.  But there's nothing on the new site that

2  uses the trademarks.  I believe we are in compliance with

3  the preliminary injunction order and this is still under

4  litigation.  We don't want to give up the domain name

5  because it falls into a pool and then someone else will

6  grab it up.  It's already been reversed once on appeal

7  and we're taking an appeal now.

8          THE COURT:  All right.  So I do see that the

9  fdnymsoc.com is a current website and it redirects

10 without any commentary to the fdnypro.org/srfm website

11 which is advertising its own conference.  I appreciate

12 that that conference is not called MSOC and it's not used

13 on the conference.  But because somebody has the old

14 domain name and has gone there and there's nothing on the

15 FDNY website that disassociates itself from MSOC, I'm not

16 sure why FDNY hasn't taken it upon itself to explain its

17 lack of relationship with MSOC.  Is that something that's

18 been considered?

19         MR. SINGLETON:  Well, as I say, I mean if it

20 would help I mean we can put a disclaimer on the site

21 that --

22         THE COURT:  Yes.

23         MR. SINGLETON:  -- we're not affiliated with

24 the defendant's site.

25         THE COURT:  Okay.  I think that would help.

6

Proceedings

1        So then the other issue I had is there was

2   something, and I think you made reference to it, there

3   was a footnote in Mr. Fletcher's letter that said that --

4   footnote 2, counsel stated the foundation might take down

5   some, but not all, of the public web pages containing the

6   MSOC marks.  Do you know if that has happened?

7        MR. SINGLETON:  As I understand, they were

8   going to take down the flyers.  I didn't get a response

9   for that proposal.  And at the time the letter motion was

10  filed I responded.  I have not confirmed that the flyers

11  were taken down.  As I understand it, as I said, those

12  were flyers that promoted prior conferences.  There's no

13  reason to leave them up and they were going to take those

14  down.  And I'll confirm that.

15       THE COURT:  Okay.

16       MR. SINGLETON:  If the Court thinks that those

17  should not be there, I will make sure they are removed

18  today.

19       THE COURT:  Right.  Okay.  So that if it hasn't

20  happened, that will happen.  The agreement is that the

21  flyers will be taken down.

22       MR. SINGLETON:  I'll take the flyers down.

23       THE COURT:  Okay.  Very good.  And so Mr.

24  Fletcher, I looked on the websites that were discussed

25  because I didn't have anything attached to this request

7

Proceedings

1  and I appreciate it's a pre-motion conference request and

2  not the briefing itself.  But I didn't want to see --

3  because I need to determine whether the motion can go

4  forward.  And if there isn't enough to support a finding

5  of contempt, then there's no point going forward.

6          I did see, as Mr. Singleton mentioned, that the

7  fdnymsoc.com website, the old URL, redirects the

8  fdnypro.org for the new conference.  I've indicated that

9  that looks confusing and so Mr. Singleton says that he

10  will make sure the FDNY has some indication either on the

11  old website or on the new one that says something to the

12  effect -- because it's advertising a new conference, that

13  this conference --

14          MR. SINGLETON:  Well, your Honor, there is no

15  old -- your Honor, I'm sorry to interrupt.

16          THE COURT:  Okay.

17          MR. SINGLETON:  There is no old website.  It is

18  just a URL.  It is just an address.  And so if you -- we

19  have hundreds of domain names.  And it redirects traffic

20  to the new website.

21          THE COURT:  Okay.  All right.

22          MR. SINGLETON:  And so I would ask that -- so

23  there's nothing to be posted on the old -- there is no

24  old website.

25          THE COURT:  Okay.  All right.

8

Proceedings

1           MR. SINGLETON:  And I would ask, so that we

2    don't, we're not back before you in another few days,

3    that Mr. Fletcher -- you know, I'll put up the

4    disclaimer, reasonable.  I mean we may have a dispute

5    over whether it's too much.  But if it's just to say

6    that, you know, the FDNY has no relationship with, and

7    I'll put his client's web, you know, I'll put his URL

8    address, his website name.

9           THE COURT:  Okay.

10          MR. FLETCHER:  Your Honor --

11          THE COURT:  So I'll give Mr. Fletcher a moment

12   to talk about that proposal.

13          MR. FLETCHER:  Yeah.  Your Honor, if I could

14   back up and look at this from a higher view.  First off,

15   let me say I did not include a whole bunch of exhibits to

16   my pre-motion letter because I felt we would be talking

17   about it and I would be briefing it and it requires

18   affidavits --

19          THE COURT:  Well, I mean I think that the point

20   there that's a little bit tricky is that the websites are

21   not always static.  And so if you saw something that you

22   thought was not in compliance and you didn't -- maybe you

23   do have a screenshot and --

24          MR. FLETCHER:  I have lots of screenshots, your

25   Honor.

9

Proceedings

1          THE COURT:  Okay.  And so if there's some

2    indication of conduct, then it would be easier for the

3    Court to be able to see it because if I go on now and

4    it's already been fixed, then I don't see what you're

5    talking about.  So okay, I hear you that you have

6    screenshots.

7          MR. FLETCHER:  So your Honor, if I could back

8    up?  What we're talking about here is actually a full

9    suite of SEO search engine optimization technologies.

10          THE COURT:  Right.  Okay.  Don't use terms like

11    that that are not self-evident.  So start again.

12          MR. FLETCHER:  Okay.  So search engine

13    optimization is -- it's called SEO which is essentially

14    different things that website owners and web developers

15    can do to influence search results.  So the whole purpose

16    of all of this is that when someone types in a keyword

17    into a Google search bar or another search bar, SEO tells

18    the search results what to do.  And what SEO does is --

19          THE COURT:  So SEO is an algorithm?

20          MR. FLETCHER:  SEO is, sorry, it's a method.

21    I'm not an expert.

22          MR. SINGLETON:  It's an acronym for search

23    engine optimization.

24          THE COURT:  Yes, I heard that but I don't

25    know --

10

Proceedings

1          MR. SINGLETON:  I'm not tech savvy and I don't

2    know much more than that.

3          THE COURT:  Then don't interject, Mr.

4    Singleton.  Mr. Fletcher is trying to explain it and I

5    have some questions.  So the question is is it something,

6    for example, that a company like Google has, or is it

7    something that the owner of the website has, or is it

8    something else?

9          MR. FLETCHER:  Let me do my best to explain it

10   because I don't know whether it's letter A, B, or C, and

11   it may be all of the above.

12          It is something that the owner of a website, or

13   someone who runs a website, can do, and there are

14   various -- either they can do it themselves, they can get

15   third-party vendors to do it for them, and there are

16   third-party tools --

17          THE COURT:  Okay.

18          MR. FLETCHER:  -- that they plug in.

19          THE COURT:  Okay.  So what I hear you

20   explaining is something that I am familiar with which is

21   that there are tricks of the trade so to speak that

22   people can do to make sure that their website is at the

23   top of the heap whenever a search engine is being used by

24   an end-user.  And so therefore, you are saying that it is

25   really something that is used by the owner of the

11

Proceedings

1  website, right?

2          MR. FLETCHER:  Yes, exactly.  It is --

3          THE COURT:  And so you could, for example, use

4  words on your website that a very popular search terms

5  and so it will pop up and be at the top of the heap.

6  Okay.

7          MR. FLETCHER:  You can do that but you can also

8  do a host of things that are not necessarily publicly

9  visible but that are basically embedded into the

10 architecture of the website.

11         THE COURT:  Okay.  Great.  So tell me what you

12 think is embedded here that isn't -- because I looked on

13 the FDNY website and I didn't even actually see the old

14 flyers or advertisements.  I did see other websites like

15 local firehouses advertising prior years and they talk

16 about MSOC but they're not FDNY controlled.

17         MR. FLETCHER:  Right.  So --

18         THE COURT:  So what is it that FDNY is doing on

19 its website that is driving MSOC traffic to them?

20         MR. SINGLETON:  Understood.  There's about four

21 or five things that they're doing.

22         THE COURT:  Okay.

23         MR. FLETCHER:  And some of them are publicly

24 visible and some are not.  So as of -- in mid-March I

25 found nine publicly viewable webpages.  Earlier this week

12

Proceedings

1    I found six.  And I did that just by going into --

2    there's a search bar on the foundation's website.

3              THE COURT:  I'm going to do that right now.  So

4    I did this before I came in because I was curious what

5    you were talking about.

6              MR. FLETCHER:  It's a little hard to find the

7    search bar.  It's kind of buried.

8              THE COURT:  Well, I will find it.  So tell

9    me -- you're looking at fdnypro?

10             MR. FLETCHER:  Yeah, it's on fdnypro but you

11   have to like -- you can't get to it from the homepage,

12   but if you click on some of the links --

13             THE COURT:  All right.  So let me click on the

14   links.  I'm on the homepage now.  Where do I go?

15             MR. FLETCHER:  Can I pull up the homepage on my

16   computer too?

17             THE COURT:  Yes, please.  Because what I see at

18   fdnypro.org are -- it appears like there are several

19   several podcasts.  I was impressed by the vast volume of

20   podcasts.  But I also see magazines and books and events

21   and insider as links or click -- I don't know what those

22   are called, the bars where you click on it.  Or tabs.

23   Sorry.  They're tabs.  And then there's an SRFM

24   symposium.

25             MR. FLETCHER:  Yes.  So where is this?

13

Proceedings

1          THE COURT:  So tell me where I should click.

2          MR. FLETCHER:  Okay.  Finding the search bar.

3     Every time I go --

4          THE COURT:  Or what I can search for that will

5     get me there directly.  In other words, Mr. Fletcher --

6          MR. FLETCHER:  Yes.

7          THE COURT:  -- an SEO is not necessarily a use

8     of a trademark.

9          MR. FLETCHER:  No, SEO is a method.

10          THE COURT:  Okay.  And so I need to --

11          MR. FLETCHER:  And there are things that you

12     can do with the method.

13          THE COURT:  Right.  So I want to see where the

14     trademark is used because the injunction was against use.

15          MR. FLETCHER:  Understood.  I apologize.

16                    (Pause in proceedings)

17          MR. FLETCHER:  FDNY.  FDNY Foundation.

18          THE COURT:  Okay.  So FDNY not pro.  FDNY

19     Foundation?

20          MR. FLETCHER:  Yeah.

21          THE COURT:  Dot org or com?

22          MR. FLETCHER:  Dot org.  Okay.  So if you go

23     to fdnyfoundation.org --

24          THE COURT:  I see it.

25          MR. FLETCHER:  -- and you see at the top

14

Proceedings

1   there's a little magnifying glass next to donate now?

2            THE COURT:  Yes.

3            MR. FLETCHER:  Okay.  If you click on the

4    magnifying glass and type in MSOC, you'll see there are

5    still two public results for MSOC and articles on their

6    website.

7            THE COURT:  Right, but those are historical

8    website, historical documents from 2014 and 2015.

9            MR. FLETCHER:  They are, but this is why it's

10   important because basically how SEO works is there are

11   bots that crawl the internet.  There's like little

12   computer bots, they're software programs, that crawl

13   webpages and find search terms and find words that are

14   imbedded in websites.

15           THE COURT:  All right.  But th is --

16           MR. FLETCHER:  And they use that to create an

17   association and influence search.

18           THE COURT:  Okay.  I understand.  But when I

19   typed in Medical Special Operations Conference  -- well

20   actually, when I put in MSOC I did get men's soccer from

21   many, many pages.  But I'm going to put in Medical

22   Special Operations Conference, right?

23           MR. FLETCHER:  You mean into Google?

24           THE COURT:  Into Google.

25           MR. FLETCHER:  Yeah.  This is good.

15

Proceedings

1          THE COURT:  So if what you're saying is correct

2     and of concern --

3          MR. FLETCHER:  If you look to the fifth result

4     on Google.

5          THE COURT:  Okay.  Then I see Medical Special

6     Operations Conference, number one, and that is yours.

7          MR. FLETCHER:  Right.

8          THE COURT:  That is correct, right?  November

9     2025.

10          MR. FLETCHER:  Mm hm.

11          THE COURT:  The second one, Special Operations

12     Medical Association --

13          MR. FLETCHER:  Someone else.

14          THE COURT:  -- SOMA, and that's not you or

15     anybody.

16          MR. FLETCHER:  Mm hm.

17          THE COURT:  Then the next one is also SOMA.

18     Then there's the National USNR and Medical Special

19     Operations.  That is a collaboration with your

20     organization.  And then you get to FDNY Pro.

21          MR. FLETCHER:  Right.  So the fifth result on

22     Google right now is the foundation's current event.

23          THE COURT:  Okay.  And that's the symposium.

24     Nowhere on there does it say MSOC.

25          MR. FLETCHER:  No, but the point is -- so there

16

Proceedings

1    are the publicly viewable webpages on the foundation's

2    website.  There's also social media posts that were

3    publicly viewable in March.

4              THE COURT:  Yes.

5              MR. FLETCHER:  The old URLs, the way those work

6    is again, they said pings to the bots and the bots create

7    an association.

8              THE COURT:  Right.  So the issue again goes

9    back to use so --

10             MR. FLETCHER:  The issue is they are using it

11   even in a nonpublic way to influence searches.

12             THE COURT:  I know that it's nonpublic but tell

13   me how they are using it, right?  Because if somebody

14   types in my name, you know, and cats, right?

15             MR. FLETCHER:  Right.

16             THE COURT:  I have no -- I am not creating a

17   website that has cats and I'm trying to drive, you know,

18   anything to me.  But if somebody wrote about somehow that

19   I have cats or there's some link between me and cats,

20   that can show up.  And then if that shows up, there may

21   be a link to the courthouse biography of me, right?  So I

22   didn't do anything.  It just showed up there and --

23             MR. FLETCHER:  But there are things that you

24   can do to make that happen.

25             THE COURT:  But that's what I'm asking you

17

Proceedings

1  about.  What is the use?  Tell me how it's being used.

2          MR. FLETCHER:  The uses, one, the legacy

3  pages --

4          THE COURT:  Okay.

5          MR. FLETCHER:  -- that contain MSOC.  Two, the

6  hidden URLs --

7          THE COURT:  Okay.

8          MR. FLETCHER:  -- that still redirect traffic.

9  So one of the problems with the hidden URLs is there is

10  obviously collaboration between these parties for years,

11  right?

12          THE COURT:  Yes.

13          MR. FLETCHER:  During that time there were all

14  sorts of marketing flyers and emails that went out.  So

15  of someone that attended a 2019 conference searches their

16  email and clicks on an old FDNY MSOC link, they're going

17  to be directed straight to the foundation's current

18  conference.

19          THE COURT:  Right.

20          MR. FLETCHER:  So that's going to divert

21  traffic from people looking for the MSOC event to the --

22          THE COURT:  All right.  But I think that can be

23  solved by having some disclaimer on the FDNY website

24  because here's the problem.  You said there's been

25  collaboration for many years.  It's like having a wedding

18

Proceedings

1   announcement from the New York Times posted on the web.

2   It's there forever.  Right?

3           MR. FLETCHER:  But the thing is --

4           THE COURT:  And even after a divorce and even

5   after you don't want to have anything to do with that

6   individual, the news article is there.  And so you're

7   going to get -- if you type in the names of the two

8   previously married people, that will show up and it will

9   show that they were married.  And it may also direct to,

10  you know, the husband's website and the wife might not be

11  happy about.

12          So if it's a historical linkage, it's just

13  there.  And so my question is about use and --

14          MR. FLETCHER:  But they are still using it and

15  it can be taken down.

16          So the last thing I'd like to explain is about

17  meta tags.  Okay?  And this is a big thing.  So meta tags

18  are essentially keywords that are embedded into the

19  architecture of the foundation sites.  And basically what

20  that means is they are using third-party tools and they

21  feed specific keywords to the third-party tools.

22          THE COURT:  They who?

23          MR. FLETCHER:  They, whoever owns the website.

24  So in this case whoever is running the foundation's

25  website.

19

Proceedings

1          THE COURT:  Is feeding keywords?

2          MR. FLETCHER:  Is telling a specific tool that

3   it should distribute a variety of keywords.

4          THE COURT:  Is it just by virtue of those words

5   being on the website or is it --

6          MR. FLETCHER:  No, they are affirmatively

7   placing them.  They're asking this tool to embed these

8   keywords.

9          THE COURT:  How do you ask the tool to do this?

10          MR. FLETCHER:  That's sort of beyond my level.

11          THE COURT:  Well, but this is important because

12   it's again its use.  The fact that it shows up doesn't

13   make it use.  The fact that there's a --

14          MR. FLETCHER:  Well, it's not showing up by

15   accident.

16          THE COURT:  Well, but it's --

17          MR. FLETCHER:  It's showing up because they

18   intend for it to show up.

19          THE COURT:  Okay.  So that's what I'm trying to

20   say.  So --

21          MR. FLETCHER:  They are intentionally asking

22   the tool --

23          THE COURT:  Mr. Fletcher?

24          MR. FLETCHER:  Yes, your Honor.

25          THE COURT:  Tell me how you are showing that

20

Proceedings

1  they are intentionally doing that.

2          MR. FLETCHER:  Because if you look at the

3  underlying code which --

4          THE COURT:  You have seen the underlying code?

5          MR. FLETCHER:  My client, who originally

6  created this website, originally created the FDNY MSOC

7  website --

8          THE COURT:  Okay.

9          MR. FLETCHER:  -- and has a web development

10  business on the --

11          THE COURT:  So it's in there --

12          MR. FLETCHER:  It's in there.

13          THE COURT:  -- because your client put it

14  there.

15          MR. FLETCHER:  No, no, the FDNY currently is

16  putting it there.

17          THE COURT:  They run it but your client knows

18  it's there because your client put it there.

19          MR. FLETCHER:  No, my client knows it's there

20  because he knows how to see the code underlying the

21  website.

22          THE COURT:  Okay.  But he put the code there.

23          MR. FLETCHER:  Not --

24          THE COURT:  Originally.

25          MR. FLETCHER:  In 2013 --

21

Proceedings

1          THE COURT:  Yes, I know.

2          MR. FLETCHER:  -- I don't know what he did.

3          THE COURT:  But what I'm saying is your client

4    made the code.  The code is still --

5          MR. FLETCHER:  My client built the website.

6          THE COURT:  Yes.

7          MR. FLETCHER:  I don't know what he did.

8          THE COURT:  But you're telling me that he can

9    read the code.

10         MR. FLETCHER:  He can read the -- he is able to

11   see what keywords --

12         THE COURT:  Yes, and the keywords are there

13   because he put in there when he built --

14         MR. FLETCHER:  That is not my --

15         THE COURT:  No?

16         MR. FLETCHER:  That is not my understanding.

17         THE COURT:  Okay.  Well then so you're saying

18   that sometime after your client built the website, he

19   didn't put the code there but when you build a website

20   there's code there and you are aware of it, right?

21         MR. FLETCHER:  He knows how to look at

22   websites --

23         THE COURT:  Yes.

24         MR. FLETCHER:  -- and see what keywords are

25   embedded in the metadata.

22

Proceedings

1          THE COURT:  But I'm wondering who put it there.

2          MR. FLETCHER:  Well, it was not my client.  It

3     was --

4          THE COURT:  It was not your client.

5          MR. FLETCHER:  It was an agent of the FDNY,

6     whoever's running the --

7          THE COURT:  At the time that there was a

8     collaboration.

9          MR. FLETCHER:  I don't know when that occurred.

10          THE COURT:  Okay.  Well, so this is the issue.

11     Right?  It's one thing if your client at the time, let's

12     just use the marriage analogy, at the time they were

13     married, they bought a house together.  Right?  And they

14     have certain -- they ran a website together and they had

15     collaboration.  And that's still there even after the

16     divorce.  That's one scenario.

17          The other scenario was it wasn't there when

18     they were married and it was added after the divorce.

19          MR. FLETCHER:  I don't know when it was added,

20     your Honor.  But before the divorce, they were allowed to

21     use the name.  And as of February they're not.  They've

22     been ordered to stop.

23          THE COURT:  Okay.  So then what you need to do

24     is have a discussion about the use because this is a very

25     sophisticated use that people may not be aware that

Transcriptions Plus II, Inc.

23

Proceedings

1  they're actually using and maybe they don't want to use

2  it but it's just there.  So it makes --

3          MR. FLETCHER:  But I raised this with the city

4  and they refused.

5          THE COURT:  Okay.  Okay.

6          MR. FLETCHER:  Their argument is that it's not

7  legal.

8          THE COURT:  Yes.  Okay.

9          MR. FLETCHER:  And there's a lot of case law

10  that says that it is.

11          THE COURT:  I understand.  So Mr. Singleton, do

12  you understand what's going on?

13          MR. SINGLETON:  I'm trying to.  I'm not that

14  savvy.

15          THE COURT:  Okay.

16          MR. SINGLETON:  As I understood from the *1-800*

17  case that's cited in our letter on page 2, the bottom of

18  page 2, where the Second Circuit said the existence of

19  any such meta data, quote, in an unpublished directory of

20  terms that trigger delivery of contextually relevant

21  advertising is not a use in commerce.

22          THE COURT:  Okay.

23          MR. SINGLETON:  And I asked the webmaster for

24  the FDNY site are we -- you know, as I understand it and

25  from what I'm hearing from this conversation about SEO, I

24

Proceedings

1   think people can do things to their own websites to

2   increase search engine optimization.  But Google does a

3   lot of things.  And I quizzed him.  I asked our webmaster

4   are we doing anything to put search terms in the MSOC,

5   and he said no.

6            THE COURT:  Okay.

7            MR. SINGLETON:  You know, it's like, as I put

8   in my letter, if you do a Google targeted search for FDNY

9   MSOC, you're going to get the -- you're going to pull up

10  vestigial references to these historical documents in

11  line with your analogy to an old wedding.  But you're not

12  going to get it in a direct result looking for MSOC or

13  Medical Special Operations Conference.  There we're

14  coming up as a third, fourth, fifth result because like

15  SOMA, which comes up second, it's just another conference

16  that --

17           THE COURT:  All right.  So --

18           MR. SINGLETON:  -- somehow Google, it triggers

19  Google to throw it up there.

20           THE COURT:  Okay.  So let me ask you this, Mr.

21  Singleton.  Does the FDNY want people to come to its

22  website for its conference when they're actually looking

23  for the MSOC conference?

24           MR. SINGLETON:  No.  I mean we're not

25  talking --

25

Proceedings

1          THE COURT:  So then --

2          MR. SINGLETON:  As I understand, we're not

3    using terms that are targeting people that want his

4    website to come to ours.

5          THE COURT:  So then --

6          MR. SINGLETON:  If you put in FDNY, maybe, and

7    MSOC, then you will somehow come up with these -- I don't

8    even know if you put up -- I don't know.

9          THE COURT:  Okay.  So Mr. Singleton --

10         MR. SINGLETON:  I'm not sure I did -- if you

11   put in M -- if you search --

12         THE COURT:  Mr. Singleton?

13         MR. SINGLETON:  Yes?  I'm sorry.

14         THE COURT:  Calm down.  I suggest, since it's

15   clear that you don't want people to be misdirected that

16   you have a conversation with Mr. Fletcher and work this

17   out.  You may not be aware that something is happening

18   behind the scenes.  It may not technically be something

19   that the Second Circuit recognizes at the moment as being

20   a use but it is something that appears to have happened.

21   It doesn't seem expensive because when we did that

22   search, Mr. Fletcher, you got the two hits and it's not

23   expensive and it doesn't push FDNY to the top of the pile

24   in terms of the search.  So it may be that it's happening

25   and people aren't aware that that's happening or don't

26

Proceedings

1  know what the effect is of its happening.  But I do think

2  that there's at least at a cursory look that there

3  arguably could be some usage happening but I don't know

4  in the context of contempt whether it's a willful use

5  because it sounds like people don't quite understand what

6  is happening.

7          So I would suggest instead of pursuing the

8  contempt motion that you have a conversation with the

9  city and Mr. Singleton and his tech people who actually

10  understand what's going on to work this out including

11  adding a disclaimer, including putting in -- I mean it's

12  hard to break those linkages if it exists in a historical

13  article.  It's just there.  You know?  The internet is

14  forever.  Right?  So if there is some code that is

15  redirecting and that is not something that the city wants

16  to do, then please work it out so that you can fix it.

17  And also, there's been an offer to put a disclaimer which

18  would make it even more explicit so if somebody does go

19  there for some reason, or gets redirected there, that the

20  reader understands what's going on and there's no

21  confusion because that's the point of the trademark laws

22  is there not be confusion.  Okay?

23          MR. FLETCHER:  Your Honor, I'm happy to try to

24  work this out with the city.

25          THE COURT:  Yes.

27

Proceedings

1          MR. FLETCHER:  Can I say first if you put FDNY

2    MSOC into Google --

3          THE COURT:  Yes.

4          MR. FLETCHER:  -- the first three results are

5    their current conference.

6          THE COURT:  Yes, I understand, because you --

7          MR. FLETCHER:  But that is because of things

8    that they're actively doing today.  And if they

9    stopped --

10          THE COURT:  Yes.

11          MR.  FLETCHER:  -- those linkages, I understand

12    from my client, would break almost immediately.

13          THE COURT:  Okay.  So then you just need to

14    have a discussion about what is happening because it

15    sounds like Mr. Singleton might not be the best person to

16    understand what is happening because he can only see what

17    he can see.  And I'm surmising, Mr. Singleton, that

18    you're not familiar with the code underlying the website.

19    And so please have that discussion with technical people

20    so they understand.  So if it's an inadvertent use, I

21    don't think that that is really a basis for contempt.

22          And so if you can work it out -- the fact that

23    you put in, that you've tried those things, to have the

24    conversation and the city has been unwilling to engage is

25    problematic.  And so I'm now directing Mr. Singleton to

28

Proceedings

1   make sure that the right people on his side are having a

2   conversation with the right people on your side so that

3   you can work this out without the need to move forward

4   with the contempt motion.  Okay?

5           MR. FLETCHER:  Your Honor, if I could say one

6   other thing?  The Second Circuit case law is overwhelming

7   in our favor.

8           THE COURT:  I'm not going there --

9           MR. FLETCHER:  Okay.

10          THE COURT:  -- because I've said there is

11   enough to talk about use.  But what I'm focusing on is --

12          MR. FLETCHER:  Resolving it.

13          THE COURT:  -- whether it's willful or not.

14   Right?  Because for content, if people don't understand

15   it and it's just happening, I don't think a court, in

16   general, the court is not going to find content if it's

17   not willful.  And the representation you made which was

18   that the city was unwilling to talk, like I said, is

19   concerning.  So I'm now directing the city to have the

20   conversations to figure this out so that there is not a

21   lot of -- so there's no confusion through something as

22   clear as a disclaimer, as clear as making sure the code

23   doesn't redirect in a way that it's not supposed to

24   happen.  And then if you still run into problems, you can

25   bring the issue to the Court.  But based on what I'm

29

Proceedings

1   hearing, it is something happening behind the scenes and

2   so you just need to, or Mr. Singleton needs to make sure

3   that the right people on the city side are talking to

4   your folks, Mr. Fletcher, so that you understand it.

5           MR. FLETCHER:  Thank you, your Honor.  If Mr.

6   Singleton is representing that they do not intend to take

7   steps to intentionally divert traffic to their website,

8   then that's I think a basis for conversation.

9           THE COURT:  Yes.  And that --

10          MR. FLETCHER:  But the conversation to date has

11  been a wall.

12          THE COURT:  I appreciate that.  I understand.

13  And I know that this area is somewhat complicated and I

14  know that people with a tech background are better suited

15  to understand these things.  And so that's why I'm urging

16  that somebody with a tech background and understanding of

17  this have the conversation.  Okay?

18          So I'm going to deny granting leave for the

19  contempt motion without prejudice because I'm directing

20  the parties to talk through what these issues are.  And

21  then you can certainly -- and if you want me to get

22  involved as a mediator to get things going or to work

23  things out, I'm happy to do that so that you can get into

24  a good -- both parties are in a comfortable position as

25  the case progresses because this is just the preliminary

30

Proceedings

1    injunction phase.  But I understand what Judge Matsumoto

2    has said.  Her words are clear.  But execution and

3    application could be a little complicated because of the

4    technology.  Okay?

5            So I appreciate, Mr. Fletcher, that you've

6    brought this to the Court's attention.  I've done my best

7    to look.  I think I understand what the issue is now.  I

8    direct the parties, especially the city -- I direct the

9    parties to confer and work this out and I specifically

10   direct the city to make sure that somebody with technical

11   knowledge is suited, is involved so that you can figure

12   out what the solution is to prevent any confusion pending

13   the outcome of the lawsuit.

14           All right.  Mr. Singleton, anything else for

15   you?

16           MR. SINGLETON:  No.  I would just like to get a

17   copy, a transcript of today's conference expedited so

18   that I can give it to the webmaster so that he -- I don't

19   want anything to get lost in communication, obviously.

20           THE COURT:  Sure.

21           MR. SINGLETON:  And I've had conversations with

22   the webmaster.

23           THE COURT:  And you are free --

24           MR. SINGLETON:  He's a smart guy.  But you

25   know, the scientific people talk a different language it

31

Proceedings

1    seems to me sometimes and I don't want any

2    miscommunication here given the seriousness of the

3    issues.

4            THE COURT:  That is a valid and good concern.

5    You are free to order the transcript and it will be at

6    the city's cost.

7            MR. SINGLETON:  I appreciate that.  Could I ask

8    that the court reporter call me?

9            THE COURT:  There is no court reporter.

10           MR. SINGLETON:  Oh, I'm sorry.  Oh you mean I

11   have to -- this has to be transcribed.  Okay.  Okay.

12   This is a recording.  Okay.  I understand.

13           THE COURT:  All right.  So I will give you 30

14   days to get all this worked out so that --

15           MR. SINGLETON:  Thank you, your Honor.

16           THE COURT:  -- it's not lingering.  But after

17   30 days, if things have not been worked out, Mr.

18   Fletcher, like I said, you're granted leave to renew your

19   motion with more specific information.  If you're going

20   to attach screenshots, I think at that point you can

21   attach them without -- because it's still referred to me,

22   I'll grant you leave to attach screenshots and I can see

23   what you're talking about.

24           MR. FLETCHER:  Okay, your Honor.  I also -- if

25   you'd like to see all the documentation up front, I also

32

Proceedings

1   included an affidavit from my client so he can --

2          THE COURT:  I don't need it now because you're

3   not moving forward with the motion for contempt, but

4   afterwards.

5          MR. FLETCHER:  If we go there, because he's

6   sort of the best person to explain some of this.

7          THE COURT:  Yes, of course.  Of course.  And

8   then please share with the city any screenshots you have

9   to date that can explain what is causing you concern.

10         MR. SINGLETON:  Well, your Honor, if I might

11  say given your offer to mediate this issue, it may be --

12  I mean apparently his client, Juan Henriquez, is a code

13  writer and savvy on this stuff.  And I've got a

14  webmaster.  And maybe it might be wise, if we have

15  further issues, to have a mediation at which they're both

16  present to enlighten us about what they're saying if

17  there's still a dispute.

18         THE COURT:  Well, they should in the first

19  instance talk to each other.

20         MR. SINGLETON:  I agree.

21         THE COURT:  And then the lawyers have an

22  obligation to understand what's going on.  And then if

23  you still can't work it out, you can come to me.

24         MR. SINGLETON:  Very good.

25         THE COURT:  All right.  Mr. Fletcher, anything

33

Proceedings

1  else?

2          MR. FLETCHER:  Nothing else, your Honor.

3          THE COURT:  All right.  Thank you, everybody.

4  Thank you, Mr. Singleton.

5          MR. SINGLETON:  Thank you.

6                  (Matter concluded)

7                      -oOo-

34

## C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **13th** day of **April**, 2025.

_Mary Greco_

Transcriptions Plus II, Inc.